UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
J. Christopher Shore, Esq. (admitted *pro hac vice*)
(cshore@whitecase.com)
Harrison Denman, Esq. (admitted *pro hac vice*)
(harrison.denman@whitecase.com)
Andrew Zatz, Esq. (admitted *pro hac vice*)
(azatz@whitecase.com)
Samuel P. Hershey, Esq. (admitted *pro hac vice*)
(sam.hershey@whitecase.com)
Ashley Chase, Esq. (admitted *pro hac vice*)
(ashley.chase@whitecase.com)
Brett Bakemeyer, Esq. (admitted *pro hac vice*)
(brett.bakemeyer@whitecase.com)

**WHITE & CASE LLP**
555 S. Flower St., Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Aaron Colodny, Esq. (admitted *pro hac vice*)
(aaron.colodny@whitecase.com)

  -and-

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962
Telephone: (973) 538-4006
Warren J. Martin Jr., Esq. (wjmartin@pbnlaw.com)
John S. Mairo, Esq. (jsmairo@pbnlaw.com)
Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)

*Co-Counsel to the Official Committee of Unsecured
Creditors*

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al*., | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR (I) LEAVE, STANDING, AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY

---

[1] The last four digits of Debtor Invitae Corporation's ("**Invitae**," and with its subsidiary debtors, the "**Debtors**") tax identification number are 1898.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/invitae.  The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................ 1

JURISDICTION AND VENUE .................................................................................................... 5

RELIEF REQUESTED .................................................................................................................. 5

ALLEGATIONS OF THE PROPOSED COMPLAINT ................................................................ 6

    A.    Invitae Incurs Billions in Debt to Fund Unprofitable Acquisitions ................................... 6

    B.    The Company's Unsustainable Financial Trajectory ....................................................... 8

    C.    The Company's Advisors Recommend the Company Raise New Capital ......................... 9

    D.    Deerfield Was Aware the Company Was Insolvent and Likely Headed for a Bankruptcy ............ 10

    E.    The Company Crowns Deerfield. ..................................................................................... 13

    F.    The Company Executes the Uptier Transaction ............................................................... 15

    G.    The Market Acknowledged that the March Exchange Doomed the Company ................. 17

    H.    The Company Approves an Additional Exchange for Deerfield ...................................... 19

    I.    Deerfield Pushes the Company into Chapter 11 .............................................................. 19

    J.    The Company Pays Millions in Bonuses to Executives ................................................... 21

    K.    The Company's Investigation. ......................................................................................... 22

    L.    The Sale of the Debtors' Assets to LabCorp ................................................................... 22

    M.    The Committee's Investigation ....................................................................................... 23

    N.    Unencumbered Assets ...................................................................................................... 24

        1.    Unencumbered Bank Accounts ................................................................................. 24

        2.    Unencumbered Commercial Tort Claims. ................................................................ 26

LEGAL STANDARD ................................................................................................................. 27

ARGUMENT .............................................................................................................................. 29

    A.    The Proposed Claims Are Colorable ............................................................................. 29

        1.    The March Exchange Was a Fraudulent Transfer and Should Be Unwound ............ 29

        2.    The March Exchange Is an Avoidable Constructive Fraudulent Transfer ................ 31

        3.    The March Exchange Is an Avoidable Actual Fraudulent Transfer ........................... 39

        4. The Subsidiary Guarantees Issued In Connection With the March Exchange Should Be Avoided 43

        5. The August Exchange Should Be Avoided and the Value of the Stock Should Be Returned to the Debtors ............................................................................................................................................ 44

        6. The Consent Fees Should Be Avoided As Constructive Fraudulent Transfers ............................. 45

        7. Invitae's Directors and Officers Breached Their Fiduciary Duties ................................................ 46

        8. Deerfield Aided and Abetted the Fiduciary Defendants' Breaches of the Fiduciary Duties ......... 52

        9. The Unencumbered Assets Are Not Subject to Any Security Interests and Any Purported Liens on the Non-Perfected Assets Should Be Avoided ...................................................................................... 53

i

A.   Unencumbered Commercial Tort Claim......................................................................53

B.   Unencumbered Bank Accounts................................................................................55

10.   The Bonus Payments Should Be Avoided As Preferential and Fraudulent Transfers. ...................56

A.   The Bonus Payments Should Be Avoided As a Preferential Transfer .......................................56

B.   The Bonus Payments Should Be Avoided As Constructive Fraudulent Transfers .....................59

B.   Prosecution of the Proposed Claims Would Benefit the Estate ..........................................60

C.   The Debtors' Unwillingness to Pursue the Proposed Claims is Unjustified..................................61

D.   The Committee Should Be Granted Exclusive Authority to Settle the Proposed Claims...............65

NOTICE............................................................................................................65

NO PRIOR REQUEST ..............................................................................................66

WAIVER OF MEMORANDUM OF LAW ..........................................................................66

RESERVATION OF RIGHTS ......................................................................................66

CONCLUSION......................................................................................................66

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364
(Bankr. S.D.N.Y. 2005) ...................................................................................................28

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76 (Bankr. D. Del. 2010).........32

*ArcherDx, LLC v. Qiagen Sciences, LLC*, No. 1:18-cv-01019 (Fed. Cir. App. Mar. 27, 2024)
...........................................................................................................................................54

*Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525
(Bankr. D. Del. 2012) ................................................................................................32, 37

*Balasiano v. Borell (In re Furniture Factory Ultimate Holding, L.P.)*, 2023 Bankr. LEXIS 2164
(Bankr. D. Del. Aug. 31, 2023)......................................................................................51

*Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. Ct. 2010) ....................................................47

*Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R.
548 (Bankr. D. Del. 2008) ........................................................................................46, 51

*Burtch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711 (3d Cir. 2017)................................39

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) .........................................................47

*EPLG I, LLC v. Citibank, N.A.* (*In re Qimonda Richmond, LLC*), 467 B.R. 318 (Bankr. D. Del.
2012) .........................................................................................................................31, 32

*Feltman v. Wells Fargo Bank, N.A.* (*In re TS Emp., Inc.*), 597 B.R. 494 (Bankr. S.D.N.Y. 2019)
...................................................................................................................................34, 46

*Forman v. Gittleman (In re OpenPeak, Inc.)*, Nos. 16-28464 (SLM), 17-01755 (SLM), 2020
Bankr. LEXIS 3463 (Bankr. D.N.J. Dec. 10, 2020) ...........................................................30

*Frederick Hsu Living Trust v. ODN Holding Corporation*, No. 17-129, 2017 Del. Ch. LEXIS 67
(Del. Ch. Apr. 14, 2017) ...................................................................................................46

*Fry v. Trump*, 681 F. Supp. 252 (D.N.J. 1988).............................................................................47

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) .......................................................30

*In re Enron Corp.*, No. 01-16034-AJG, 2005 WL 6237551 (Bankr. S.D. Tex. Dec. 9, 2005)
...................................................................................................................................58, 59

*In re G-I Holdings, Inc.*, 313 B.R. 612 (Bankr. D.N.J. 2004) ...........................................27, 28, 61

*In re Jevic Holding Corp.*, Nos. 08-11006 (BLS), 08-51903, 2011 Bankr. LEXIS 3553 (Bankr. D. Del. Sept. 15, 2011) ...............................................................................................38

*In re Main St. Bus. Funding, LLC*, 642 B.R. 141 (Bankr. D. Del. 2022) .....................................54

*In re Marin Motor Oil, Inc.*, 689 F.2d 445 (3d Cir. 1982)............................................................27

*In re Millennium Lab Holdings II, LLC*, No. 15-12284 (LSS), 2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) .......................................................................................................46

*In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784 (Del. Ch. 2022)........................................50

*In re Nathan & Miriam Barnert Mem'l Hosp. Ass'n*, 2009 WL 3230789 (Bankr. D.N.J. Oct. 5, 2009) ...............................................................................................................56

*In re Pack Liquidating, LLC, 2024* WL 409830 (Bankr. D. Del. Feb. 2, 2024)............................59

*In re Roman Cath. Diocese of Harrisonburg*, 640 B.R. 59 (Bankr. M.D. Pa. 2022) ...................28

*In re Rural Metro Corp.*, 88 A.3d 54 (Del. Ch. 2014)...................................................................52

*In re Teligent, Inc.*, 380 B.R. 324 (Bankr. S.D.N.Y. 2008) ..........................................................58

*In re TOUSA, Inc.*, 422 B.R. 783 (Bankr. S.D. Fla. 2009), *aff'd* 680 F.3d 1298 (11th Cir. 2012) .......................................................................................................................44

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd* 906 A.2d 27 (Del. 2006) ...............................................................................................................47

*Kartzman v. Latoc, Inc.* (*In re Mall at the Galaxy*), 2022 Bankr. LEXIS 1180 (Bankr. D.N.J. Apr. 29, 2022) ...........................................................................................................31

*Kartzman v. Schwartz* (*In re Schwartz*), Nos. 10-21505 (DHS), 12-01344 (DHS), 2014 Bankr. LEXIS 3120 (Bankr. D.N.J. 2014) ..................................................................40

*Kirchner v. J.P. Morgan Chase Bank, N.A.* (*In re Millenium Lab Holdings II, LLC*), Nos. 15-12284 (LSS), 17-5140 (LSS), 2019 Bankr. LEXIS 636 (Bankr. D. Del. Feb. 28, 2019) .......................................................................................................................40, 41

*Maxus Liquidating Tr. v. YPF S.A.* (*In re Maxus Energy Corp.*), 641 B.R. 467 (Bankr. D. Del. 2022) ...............................................................................................................41, 42

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.* (*In re R.M.L.*), 92 F.3d 139 (3d Cir. 1996).................................................................................31, 32, 35, 36

*Miller v. Greystone Bus. Credit II, L.L.C.* (*In re USA Detergents, Inc.*), 418 B.R. 533 (Bankr. D. Del. 2009) .......................................................................................................46, 52

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992)............................................37

*MSGI Liquidation Tr. v. Modell* (*In re Modell's Sporting Goods, Inc.*), Nos. 20-14179 (VFP), 22-1076 (VFP), 2023 Bankr. LEXIS 1031 (Bankr. D.N.J. Apr. 14, 2023) ......................30, 40

*MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426 (D.N.J. 2012).........................................40

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) ........47

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003)............................................................................ passim

*Official Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.)*, 357 B.R. 32 (Bankr. S.D.N.Y. 2006) .......................................................................................................57

*Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.*), 304 B.R. 214 (Bankr. W.D. Pa. 2004) ......................................................................................62, 64

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.*) 299 B.R. 732 (Bankr. D. Del. 2003) .................................................................................................34, 40

*Palmer v. Reali*, 211 F. Supp. 3d 655 (D. Del. 2016) ....................................................................51

*Perkins v. Bamburger (In re Carton*), Nos. 20-19781 (VFP), 22-1272 (VFP), 2023 Bankr. LEXIS 2793 (Bankr. D.N.J. Nov 20, 2023)..............................................................................35

*Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38 (D. Del. 2021).........................................54

*Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014)...............................47, 50

*Resnik v. Woertz*, 774 F. Supp. 2d 614 (D. Del. 2011) ..................................................................46

*Ryan v. Gifford*, No. 2213-CC, 2007 WL 4259557 (Del. Ch. Nov. 30, 2007) .............................66

*SB Liquidation Trust v. Preferred Bank (In re Syntax-Brillian Corp.*), Nos. 08-11407 (BLS), 10-51389 (BLS), 2016 Bankr. LEXIS 988 (Bankr. D. Del. Feb. 8, 2016) ...................................41

*Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.*), 680 F.3d 1298 (11th Cir. 2012) .........................................................................................................34

*Sklar v. Susquehanna Bank (In re Global Prot. USA, Inc.*), 546 B.R. 586 (Bankr. D.N.J. 2016) .......................................................................................................................................................37

*Stanziale v. Brown-Minneapolis Tank ULC, LLC (In re BMT-NW Acquisition, LLC*), 582 B.R. 846 (Bankr. D. Del. 2018) ........................................................................................................32

*Stanziale v. Nachtomi (In re Tower Air, Inc.*), 416 F.3d 229 (3d Cir. 2005)................................50

*Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon*), 300 B.R. 57 (Bankr. N.D. Okla. 2003), *aff'd*, 299 B.R. 626 (10th Cir. 2003) ..............................................................................34

*United States v. Rocky Mt. Holdings, Inc.,* No. 0-3381, 2009 U.S. Dist. LEXIS 52203 (E.D. Pa. Mar. 3, 2009) ........................................................................................................................36

*Zazzali v. Mott* (*In re DBSI, Inc.*), 445 B.R. 344 (Bankr. D. Del 2011) .......................................41

## STATUTES AND RULES

11 U.S.C. § 101(31) ...........................................................................................................57

11 U.S.C. § 101(32)(A) ......................................................................................................36

11 U.S.C. § 544 ......................................................................................................... passim

11 U.S.C. § 547 ......................................................................................................56, 57, 58

11 U.S.C. § 548 ......................................................................................................... passim

11 U.S.C. § 1109(b) ...........................................................................................................27

28 U.S.C. § 157(b) ...............................................................................................................5

Cal. Civ. Code § 3439.04 ..............................................................................................30, 31

Del. Code Ann. Title 6, §§ 1304, 1305 .................................................................................31

N.J. Stat. Ann. § 25:2-25, 26, 27 ....................................................................................30, 31

N.Y. Debt. & Cred. Law § 273 .......................................................................................30, 31

N.Y. U.C.C. § 9-102(a)(13)(A) ..........................................................................................53

N.Y. U.C.C. § 9-104(a) .......................................................................................................55

N.Y. U.C.C. § 9-108(e)(1) ............................................................................................53, 54

N.Y. U.C.C. § 9-203(b) .......................................................................................................55

N.Y. U.C.C. § 9-308(a) .......................................................................................................55

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of Invitae Corp. ("**Invitae**") and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**," and together with Invitae's non-Debtor affiliates, the "**Company**"), by and through its undersigned counsel, hereby moves this Court for entry of an order granting the Committee (i) leave, standing, and authority to commence and prosecute certain claims and causes of action (the "**Proposed Claims**") against various named defendants (the "**Defendants**") on behalf of the Debtors' estates (the "**Estates**"), as set forth in more detail in the draft adversary complaint attached hereto as **Exhibit A** and incorporated for all purposes herein (the "**Proposed Complaint**"); and (ii) exclusive authority to settle such claims on behalf of the Estates (the "**Motion**").  In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Committee seeks standing to bring a series of estate claims and causes of action arising under state and federal law to remedy conduct by which the proposed Defendants gave one group of unsecured creditors all of the equity value of the Debtors' estates and attempted to leave more than $1 billion of similarly situated unsecured creditors with nothing. As set forth in the attached Proposed Complaint, the proposed Defendants' prepetition actions have resulted in the destruction of hundreds of millions of dollars of value to the Debtors' estates. And, unless this Court grants the Committee standing to pursue the valuable claims and causes of action resulting from its conduct, the Debtors would similarly release those assets for *zero* consideration.

2.      The Debtors have a tortured history of vaporizing capital, and the Committee has significant, unresolved concerns with respect to an entire series of acquisitions and dispositions transactions conducted by the Debtors' officers and directors in which they took more than

1

$1.4 billion of cash and squandered it.  This motion, however, only concerns the Debtors' end game, namely the 2023 Uptier Transaction which has previously been brought to this Court's attention.

3.    The complained of conduct began in the fall of 2021, ███████████████████



███████████████████.  By that time Invitae was not an early-stage startup business that required significant investment to cover near term losses with a good faith belief that borrowed capital would be repaid later.  Rather, in 2021, the Debtors' officers and directors ███████

███████████████████████████████████

4.    Specifically, in October 2022, the Debtors had approximately $585 million of cash and cash equivalents, $135 million owed to one secured lender, and over $1.4 billion of fully-funded unsecured debt.  Had the Debtors simply accelerated their inevitable chapter 11 filing at that time, the Debtors' estate would have likely had more than $700 million of unencumbered value to distribute to its unsecured creditors after they paid off their secured lender in full.  That is, before the Uptier Transaction, the Debtors had approximately three-quarters of a billion dollars in equity in their assets (but still far less than the $1.4 billion in unsecured debt).

5.    At the same time, however, the directors and officer Defendants knew that the Debtors would ███████████████████████████

███████████████████████████████

███████    The director and officer Defendants also advised and aware that the Debtors'

███████████████████████████████  So what to do?  Stop the clock, pay all creditors with existing liquidity or enter into a transaction that both

reduced their total debt and raised additional capital.  As set forth in the alleged Complaint, the Board did neither.

6.      In March 2023, under the guise of a "liability management exercise" purportedly designed to extend their "runway," the Debtors pledged the entirety of the unencumbered value of their assets to one favored group of unsecured lenders led by Deerfield Partners LP. (collectively with Deerfield Mgmt, LP and Deerfield Management Company, LP, "**Deerfield**").  In other words, rather than protect all creditors, the Board decided to coronate one particular group of lenders and provide them with a first look at all of the Debtors' assets in an inevitable bankruptcy.  In return, the Debtors received next to nothing.  As catalogued in the Complaint, through the Uptier Transaction, at a time when they were plainly insolvent, the Debtors provided approximately $100 million more value to the coronated unsecured creditors than they received in return ***and*** lost approximately $140 million of precious liquidity used to pay off the existing Term Loan early.

7.      The Board's decision to move forward with Deerfield and its selected group of other unsecured creditors at the expense of the Debtors' estate was not arbitrary or unknowing.  As alleged in the Complaint, prior to entering into the transaction, the Board was fully aware that the Uptier Transaction ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████.  To carry the analogy forward, if the Debtors needed another 10,000 feet of runway to lift the Invitae jet off of the ground, they spent all of their unencumbered value and liquidity to build 100 feet of runway and a crash pad.  So, without any qualified financial advisor or attorney advising them that the transaction would put the Debtors on a path towards payment of their existing creditors, the Board determined to plow ahead.

3

8.      The Debtors' situation and thought process was not lost on Deerfield, which fully understood and appreciated that the Debtors ████████████████████████████. Deerfield was also aware that the Uptier Transaction provided ████████████████. For Deerfield, the transaction was all about preparing for an inevitable chapter 11 filing.

9.      That filing then was no surprise to anyone when it eventually came to pass. Having pledged all of their tangible assets and restricting their ability to dispose of material assets without Deerfield's consent, less than a year after completing the Uptier Transaction, the Debtors were left with no choice but to file these Cases. Even then, the director and officer Defendants have continued their strategy of picking winners and losers within their creditor body, and have now proposed a plan of liquidation that would provide all of the value of their estates to their favored, newly and purportedly secured creditors and release any claims of their estate that could benefit the more than $1 billion of creditors actually harmed by their conduct. In effect, the $700 million of equity the Debtors had in their assets within a year of this filing was used for no legitimate purpose. It did not keep the Debtors out of bankruptcy. Did not reduce their leverage. Did not benefit their liquidity. Rather, it merely had the effect of ensuring that one group of unsecured creditors would support the Debtors' agenda.

10.     To add insult to injury, with complete knowledge that the Debtors would likely be unable to pay their unsecured creditors a dime, the Board determined to award the Company's executives more than $12 million of bonuses on the eve of the bankruptcy filing. In fact, according to the Debtors' current estimated waterfall, if the status quo is maintained, those exorbitant bonuses may be the difference between unsecured creditors receiving any recovery in these Chapter 11 Cases.

11.     As set forth below, the conduct of the Debtors, their Board, their officers, Deerfield, and the Agent (solely in its capacity as collateral agent) gives rise to significant estate claims and causes of action under state and federal law.  The Debtors have unjustifiably refused to bring any of these claims and instead have proposed to release all of them for no consideration.  Based on its investigation to date, the Committee believes that there is likely sufficient cash and other assets in this estate to pay the Debtors' purported senior secured claims in full if the liens supporting such claims are not avoided.  As such, there is simply no reason for those lenders to receive any form of release from the estate.  Likewise, because the Court has already approved the sale of the entire business to a third party for all cash consideration, there is no legitimate reason to release the Debtors' directors and officers from any of the estate's claims or causes of action.  In light of the foregoing, the Committee should be granted standing to prosecute and full authority to settle such claims and causes of action for the benefit of the Debtors' estates and *all* of their creditors.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory predicates for relief requested herein are sections 1103 and 1109 of chapter 11 of section 11 of the United States Code (the "**Bankruptcy Code**").

## RELIEF REQUESTED

15.     By this Motion, the Committee requests that the Court grant it leave, standing, and authority to (a) prosecute the Proposed Claims, and (b) if appropriate, propose and effectuate

settlements for all or a portion of the Proposed Claims on an exclusive basis, subject to further order of this Court.

## ALLEGATIONS OF THE PROPOSED COMPLAINT[2]

### A.      Invitae Incurs Billions in Debt to Fund Unprofitable Acquisitions

16.      Invitae was founded by Sean George and Randal Scott in January 2010 with aspirations to become a leader in the genetic testing services industry.  Between 2019 and 2021, the Company spent more than $3.3 billion in cash, equity and assumed liabilities or other forms of consideration acquiring thirteen different pre-commercial and unprofitable companies and technologies.[3]

| Date | Acquired Entity | Cash | Equity | Assumed Liabilities / Other | Total Consideration Paid | Total Consideration Received through Disposition |
|------|-----------------|------|--------|------------------------------|---------------------------|--------------------------------------------------|
| June 2019 | Singular Bio | $3,400,000 | $53,900,000 | $- | $57,300,000 | NA |
| July 2019 | Jungla Inc. | $14,100,000 | $44,900,000 | $- | $59,000,000 | NA |
| November 2019 | Clear Genetics, Inc. | $24,841,000 | $25,221,000 | $- | $50,062,000 | NA |
| March 2020 | Diploid | $32,323,000 | $42,453,000 | $7,538,000 | $82,314,000 | NA |
| April 2020 | Genelex | $- | $13,200,000 | $- | $13,200,000 | NA |
| April 2020 | YouScript Inc. | $24,500,000 | $28,200,000 | $- | $52,700,000 | NA |
| October 2020 | ArcherDX | $335,300,000 | $1,060,600,000 | $935,600,000 | $2,331,500,000 | $48,100,000[4] |
| December 2020 | IntelliGene Health Informatics, LLC | $- | $2,700,000 | $- | $2,700,000 | NA |

---

[2] The Proposed Complaint contains a more detailed recitation of the facts uncovered as part of the Committee's investigation to date.  The Proposed Complaint also include charts of (1) the Debtors' acquisitions, (2) the Retention Bonuses, and (3) the unencumbered bank accounts and balances as Appendixes.  The Committee reserves its right to amend the Complaint and supplement this Motion as its investigation continues.

[3] First Day Decl. ¶ 4.

[4] Invitae Corp., Annual Report (Form 10-K) at 88 (Feb. 28, 2023)

| Date | Acquired Entity | Cash | Equity | Assumed Liabilities / Other | Total Consideration Paid | Total Consideration Received through Disposition |
|---|---|---|---|---|---|---|
| February 2021 | Reference Genomics, Inc. d/b/a One Codex | $16,504,000 | $58,774,000 | $8,113,000 | $83,391,000 | "immaterial amount"[5] |
| April 2021 | Genosity, Inc. | $119,959,000 | $67,308,000 | $8,774,000 | $196,041,000 | NA |
| July 2021 | MedNeon LLC | $12,900,000 | $16,300,000 | $4,900,000 | $34,100,000 | NA |
| September 2021 | Ciitizen Corporation | $87,361,000 | $186,778,000 | $34,161,000 | $308,300,000 | $843,742 |
| December 2021 | Stratify Genomics, Inc. | $8,000,000 | $16,800,000 | $4,200,000 | $29,000,000 | NA |
| | **Total** | **$679,188,000** | **$1,617,134,000** | **$1,003,286,000** | **$3,299,608,000** | **$48,943,742** |
| Sale to LabCorp | | | | | | $239,000,000 |
| **Total** | | | | | ***$3,299,608,000*** | ***$287,943,742*** |

17.    The Company never turned a profit, and, according to the board materials and internal reports, each year measured its success in terms of revenue and the amount of cash it "burned."

18.    To fund the spending spree, Invitae received almost $1.5 billion of financing between September 2019 and April 2021: (1) $350 million of convertible unsecured notes that mature on September 1, 2024 (the "**2024 Unsecured Notes**");[6] (2) a first lien term loan (the "**Term Loan**") that the Company drew $135 million under and was scheduled to mature on June 1, 2024; and (3) $1.15 billion in convertible unsecured notes that mature on April 1, 2028 (the "**2028 Unsecured Notes**").[7] Following the issuance of the 2028 Unsecured Notes, the Company had the following capital structure:

---

[5] Invitae Corp., Annual Report (Form 10-K) at 88 (Feb. 28, 2023)

[6] See Invitae Corp., Current Report (Form 8-K) at 1.01 (Sept. 11, 2019); First Day Decl. ¶ 52.

[7] See Invitae Corp., Quarterly Report (Form 10-Q), at 20 (Aug. 2, 2021).

| Debt | Maturity Date | Principal Amount | Interest Rate |
|---|---|---|---|
| Term Loan | June 1, 2024 | $135 million | 8.75% + the greater of (i) WSJ Prime Rate and (ii) 2.00% |
| 2024 Unsecured Notes | September 1, 2024 | $350 million | 2.00% |
| 2028 Unsecured Notes | April 1, 2028 | $1,150 million | 1.50% |

19.     When completed, the Company, by its own admission was "overflowing" with a "portfolio of increasingly unprofitable business lines."  *See* First Day Declaration ¶ 61.

**B.     The Company's Unsustainable Financial Trajectory**

20.     According to an October 2021 presentation to Invitae's board of directors (the "**Board**"), six months after issuing the 2028 Unsecured Notes, the Company was already aware that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Yafei "Roxi" Wen, Invitae's then-Chief Financial Officer, presented that Company's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Proposed Compl. ¶ 53.  In 2021, Invitae reported a net loss of $379 million.  It had $923 million in cash that had been raised from the 2028 Unsecured Notes.[8]

21.     In a June 2022 presentation to the Board, Invitae projected that ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Proposed Compl. ¶ 57.  The next month management proposed a plan to divest certain businesses and reduce the Company's operating expenses which it estimated would save more than ▇▇▇▇▇ each year.  Even under those aggressive assumptions, the Company again estimated it would need ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *Id.* ¶ 60.  That



---

[8] Invitae Corp., Annual Report (Form 10-K) at 75-76 (Mar. 1, 2022).

presentation recognized that ████████████████████. Analysts warned that the Company's "[i]nability to renegotiate loans' terms could result in bankruptcy." *Id.* ¶ 62.

**C.      The Company's Advisors Recommend the Company Raise New Capital**

22.      Before these discussions and after the Company's first quarter financials were published in 2022, Deerfield proposed ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (the "**First Deerfield Uptier Proposal**"). At that time,

████████████████████████████████████████████████.

Ultimately, the Company and Deerfield did not move forward with a transaction at that time.

23.      In August 2022, it was clear that the Company needed to raise additional capital. Perella Weinberg Partners ("**PWP**"), the Company's financial advisor and investment banker, projected ████████████████████████████████████████

████████████████████████. Proposed Compl. ¶ 63.

24.      A year after the Company knew about its liquidity issues, the Company started planning a "liability management transaction." In early October 2022, Goldman Sachs ("**Goldman**"), another Company advisor, ████████████████████████████████

████████████████████████████████████████████████. *Id.* ¶ 66.

Goldman warned Ms. Wen in an email that ████████████████████████████████

████████████████████████████████████████████████████

██. Goldman noted that ████████████████████████████████████

████████. Goldman expressed its belief that the Company ████████████████████

████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 66.

25.     The Company's management and advisors presented the following restructuring alternatives to the Board in mid-October 2022:



26.     The Company projected that ████████████████████████ ████████████████████. The projections show that the Company ████████ ████████████████████████████████████████. The presentation showed ████████████████████████████. The Board expressed ██ ████████████████.

**D.      Deerfield Was Aware the Company Was Insolvent and Likely Headed for a Bankruptcy**

27.     By September 2022, Deerfield was discussing internally how it was ████ ████████████. It made clear in internal messages that ████████████████████ ████████████████████████████████████████████████

███████████. Between the third quarter of 2022 and the fourth quarter of 2022, Deerfield increased its holdings of 2024 Unsecured Notes from approximately $207 million to $242 million, to obtain a super majority of the outstanding 2024 Unsecured Notes.

28.     On October 31, 2022, Terence Fox-Karnal, a Partner at Deerfield and day-to-day lead on the transaction, and Deerfield managing partner James Flynn, discussed Deerfield's unsecured position. Proposed Compl. ¶ 70. Mr. Fox-Karnal proposed ████████████████ ██████████████████████████: *Id.*

████████████████████████████████████████████

████████████████████████████████

██████████████████████████

████████████████████

29.     Mr. Flynn questioned whether the Company could execute such a transaction that ████████████████████. Mr. Fox-Karnal ████████████████. *Id.* ¶ 71.

30.     Nearly a year after the Company identified its dire financial condition in 2021, the Company finally began to engage in potential restructuring discussions. However, ████████ ███████████████████████████████████████████. *Id.* ¶ 72. At that time, Baker Brothers Investments ("**Baker Brothers**") and SB Northstar LP ("**SB Northstar**") (both significant holders of the 2028 Unsecured Notes) were ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████. *Id.*

31.     During negotiations, the Company threatened ████████████████ ███████████████████████ ██████████████████████████. *Id.* ¶ 74.

Both Baker Brothers and SB Northstar informed the Company that such a transaction would ███

████████████████████████████████████████████████████████████

██████████. *Id.*  They also advised the Company ████████████████████████████

████. *Id.*

32.     Deerfield had its own concerns about the Company.   One of its principals

acknowledged that Invitae ████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

¶ 72.  Another expressed doubts that a cash infusion of ████████████████████████

████████████████████████████████████████████████████ *Id.*

¶ 73.  Deerfield refused to invest more money.   It is unclear what efforts, if any, the Company took

to identify additional financing opportunities outside of its capital structure at this time.

33.     On December 31, 2022, the Company had $557 million of cash and cash

equivalents, $366 million less than the year before.

34.     In January 2023, Deerfield proposed trading 90% of its unsecured debt for secured

convertible debt and receiving the remaining 10% in equity.  On January 14, 2023, Ms. Wen was

presented with a cash flow model that ████████████████████████████████████

████████████████████████████████████████████████. *Id.* ¶¶ 78-79.

████████████████████████████████████████ the Company projected

that ████████████████████████████████████████████████████████

████.

35.     The Company held a Board meeting on January 26, 2023 and management

presented a revised cash forecast that decreased the Company's projections of available cash in

the fourth quarter by ███████████ compared with the projections presented to the Board in

December 2022. *Id.* ¶ 81. The revised cash flow forecast now showed that, ███████████
███████████████████████████████████████████████████████████
███████████████████████████.[9] *Id.*



36.    In other words, prior to the close of the March Exchange, the Board was aware that
the transaction ███████████████████████████████████████████
███████████████████████████████████.

### E.    The Company Crowns Deerfield.

37.    Even though the Company knew the proposed uptier transaction neither extended
its runway nor de-levered its balance sheet to allow the potential for additional financing, the
Company gave up and determined to plow ahead with Deerfield. Proposed Compl. ¶ 162.
Definitive documentation of Deerfield's proposal was well underway by mid-January. In addition
to more than doubling the Company's secured debt, Deerfield insisted on terms that significantly
limited the Company's ability to raise additional capital including "anti-dilution" rights, the terms
of *pari passu* and junior debt, and consent rights over asset sales. In an apparent acknowledgment
of the Company likely trajectory, Deerfield also sought to restrict the rights of other creditors in a

---

[9] The Company's board materials indicate that █████████████████████████████████
███████████████████████████████████. Proposed Compl. ¶ 81 n.14.

future bankruptcy.  During negotiations, its counsel made clear that it ███████████████ ██████████████████████████████ *Id.* ¶ 84.

38.     Deerfield also acknowledged internally how punitive the proposed transaction would be for the Company's other creditors, with Mr. Flynn noting that the ██████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ *Id.* ¶ 86.  At the same time, Deerfield recognized that ███████████████████ ██████████████████████████████.  Both the Company and Deerfield were focused on the Company's ████████████████████████████████████████████ ████████████████████.

39.     Deerfield and the Company also colluded to ██████████████████████ ██████████████████████.  *Id.* ¶ 91.  In a seemingly last-minute decision, Deerfield agreed to provide ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████.  *Id.*  That plan was kept secret.  *Id.*

40.     Just days before the transaction closed, ██████████████████████████ ███████████████████████████████████████████████████ █  ████████████████████████████████████████████████  The Company refused ██████████████████████████████████████████████ ████████████████████████████████████████.  In email messages, Mr. Knight  was  resolute  that  ██████████████████████████████████████████ ████████████████████████████.

41.   

Proposed Compl. ¶ 93.

## F.      The Company Executes the Uptier Transaction

42.     As part of the Uptier Transaction, the Company prepaid the Term Loan in two transactions: (a) a $50 million principal payment plus a $3 million prepayment fee and (b) $85 million payment plus a $5.1 million prepayment fee (collectively, the "**Term Loan Repayment**"). The Company then (1) exchanged $305.7 million of principal amount of the 2024 Unsecured Notes for $275.3 million principal amount of the Series A 2028 Convertible Senior Secured Notes (the "**Series A Notes**"), (2) issued $30 million of Series B Convertible Senior Secured Notes (the "**Series B Notes**" and together with the Series A Notes, the "**2028 Senior Secured Notes**") for cash, and (3) issued 14,219,859 shares (with a fair market value of $22.9 million) to the converting 2024 Unsecured Noteholders (together, the "**March Exchange**" and together with the "**Term Loan Repayment**," the "**Uptier Transaction**"). The 2028 Senior Secured Notes are guaranteed by substantially all of the Company's subsidiaries and purportedly

15

secured by a first-priority lien on substantially all of the assets of the Company and the guarantors, subject to certain exceptions in the loan documents.[10]

43.    The full Board and a separate pricing committee of the Board (the "**Pricing Committee**") approved the terms of the March Exchange, which was executed and closed on March 7, 2023.[11]    The Uptier Transaction reduced the Company's cash by $135.6 million— exacerbating its liquidity issues.

44.    The Uptier Transaction gave Deerfield and a select group of unsecured lenders (together, the "**Participating 2024 Unsecured Noteholders**") approximately $100 million more in value than was provided to the Company.[12]    The Uptier Transaction also gave the Participating 2024 Unsecured Noteholders a security interest in substantially all of the Company's assets that would result in their payment prior to previously similar situated creditors in the Company's inevitable chapter 11 filing.    The 2028 Senior Secured Notes also had significant benefits when compare to the exchanged 2024 Unsecured Notes, including (1) guarantees from substantially all of Invitae's subsidiaries, (2) a higher interest rate paid at more regular intervals, (3) a $27.5 million make-whole premium designed to be paid upon the inevitable Invitae chapter 11 filing, and (4) significant approval rights and covenants on the Company's operations and material transactions, including asset sales and its restructuring.    Proposed Compl. ¶¶ 171-72.

45.    Both the Company and Deerfield knew that the Uptier Transaction would entitle the hand-selected 2024 Unsecured Participating Noteholders to payment in full, whereas the other

---

[10] *See* Exchange Agreement, Recitals.

[11] *See* Press Release, Invitae Announces Convertible Notes and Share Exchange and New Convertible Notes Issuance (Feb. 28, 2023); *see also* Invitae Corp., Annual Report (Form 8-K), at 1.01 (Mar. 7, 2023).

[12] Baker Brothers was one of the 2024 Unsecured Noteholders who participated in the March Exchange.

unsecured noteholders would get whatever was left over when Invitae filed for bankruptcy.  *Id.* ¶ 212.

46.     The Company was insolvent and inadequately capitalized at the time of the Uptier Transaction.  Shortly after the March Exchange, the Company reported in its public filings that its liabilities exceeded the book value of its assets.[13]  As the Company would later admit, the book value of the Company's assets, however, significantly overstated the market value of such assets. As one example, later that year, new-CFO Anna Schrank noted that the Company's ██████████

████████████████████████████████████████████████████████████████████

████████████████    When the Company eventually adjusted the value of its intangible assets in September 2023, *its liabilities exceeded its assets by approximately $1.1 billion*.  Thus, it is plausible that the value that the Company had been disclosing to the market all along was inflated, causing the opportunity for those close to the Company to trade out of their equity positions at inflated values.

### G.     The Market Acknowledged that the March Exchange Doomed the Company

47.     On February 28, 2023, the Company announced the March Exchange "led by Deerfield Management."[14]  Following the announcement, Invitae's stock price collapsed, falling more than 25% to $1.61 per share—an all-time low.[15]  Deerfield was not surprised and in internal messages noted that ████████████████████████████████████████████████████

███████████████████████████.

---

[13] Invitae Corp., Quarterly Report (Form 10-Q) at 1 (May 9, 2023).

[14] *See* Press Release, Invitae Announces Convertible Notes and Share Exchange and New Convertible Notes Issuance (Feb. 28, 2023).

[15] *Invitae Shares Hit New All-Time Low on Downbeat 2023 Revenue Guidance, Debt Refinance*, MarketScreener (Mar. 1, 2023), available at https://www.marketscreener.com/quote/stock/INVITAE-CORPORATION-23400709/news/Invitae-Shares-Hit-New-All-Time-Low-on-Downbeat-2023-Revenue-Guidance-Debt-Refinance-43128771/.

48.     While it is unclear what efforts the Company took to raise additional capital after the Uptier Transaction, it is clear, and not surprising, that any such efforts were not successful.  On April 27, 2023—less than two months after the March Exchange—management presented the Board another revised cash flow forecast, which again showed the Company ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████.  The Company did not account for the ████████████████████████████████████████████████████████████████████ ███████████████████████████████.  Drafts of that Board presentation prepared in early April noted that the Company ████████████████████████████████████████████████████ ████████

███████████████████████████████████████████████████████████████████████

49.     The Company determined to sell its Women's Health and Ciitizen business to try to dramatically reduce its operating expenses, but now needed Deerfield's consent.  The Company and Deerfield began to prepare for bankruptcy.

50.     Shortly thereafter Ms. Wen resigned as CFO.

18

### H.      The Company Approves an Additional Exchange for Deerfield

51.      On August 22, 2023, the Company entered into a second exchange agreement with Deerfield (the "**August Exchange**") whereby it exchanged Deerfield's remaining $17.2 million of 2024 Unsecured Notes[16] for $100,000 of Series A Notes and approximately 15.8 million shares of Invitae common stock (with a market value of approximately $16 million).[17]  The parties agreed that the accrued and unpaid interest on Deerfield's exchanged 2024 Unsecured Notes in the amount of $164,460.67 would remain due and payable on September 1, 2023.[18]  Upon information and belief, Deerfield sold that equity soon thereafter.

52.      Invitae's third quarter financials published on November 8, 2023, disclosed that "[a]s a result of losses, projected cash needs, and current liquidity level, substantial doubt exists about the Company's ability to continue as a going concern."[19]

### I.      Deerfield Pushes the Company into Chapter 11

53.      By the end of the summer of 2023, the Company heard pitches for restructuring advisors.  PWP pitched.  The Company hired Moelis & Company ("**Moelis**") and FTI Consulting ("**FTI**") instead at considerably added expense.  Very shortly after, Deerfield hired PWP to advise them on the restructuring transaction with Invitae.  PWP intimately knew the Company's strategy, privileged, and other confidential information.  Notwithstanding its adversity to Deerfield, the Company agreed that PWP could switch sides and ███████████████████████████████

---

[16] *See* Invitae Corp., Current Report (Form 8-K) at 1.01 (Aug. 22, 2023); Exchange Agreement.

[17] *See* First Supplemental Indenture; Invitae Corp., Current Report (Form 8-K), Exhibit 10.2 (Aug. 22, 2023).,

[18] *See* Exchange Agreement Art. 1.

[19] Invitae Corp., Quarterly Report (Form 10-Q) at 6 (Nov. 8, 2023).  The Company also noted that the debt markets were difficult and its ability to raise additional financing was uncertain.  *Id.* at 14.

███████. ████████████████████████████████████████

████████████████████████████████████████

54.    In September 2023, the Company retained Kirkland & Ellis LLP ("**K&E**") as restructuring counsel. Proposed Compl. ¶ 126. On September 23, 2023, the Company also formed a special committee of its board of directors (the "**Special Committee**") to work on and make recommendations to the Board regarding restructuring or financing activities ████████████ ████████████████████ *Id.* ¶¶ 127-28.

55.    Deerfield leveraged its consent to the sale of Women's Health and Ciitizen for a marketing process and chapter 11 filing funded with the Company's remaining cash, now the purported cash collateral of the Participating 2024 Unsecured Noteholders. Without another option, the Company acquiesced and agreed to case milestones and a $150 million minimum liquidity covenant that it knew would quickly be breached. Deerfield received a $2,100,000 consent fee and its advisors were paid over $3,000,000 as a result.[20]

56.    Shortly thereafter, Ciitizen was divested for a minority equity interest in the purchaser and no additional consideration.[21] The Company had purchased Ciitizen for $325 million approximately two years earlier.

57.    The Company also received restructuring proposals from the 2028 Unsecured Noteholders at that time. As negotiations progressed on the transaction support agreement

---

[20] *See* Second Supplemental Indenture Art. II(d); Second Supplemental Indenture Art. III(iv); Art. II(a); *The Debtors', the Official Committee of Unsecured Creditors', and the United States Trustee's Joint Stipulation of Undisputed Facts related to the Debtors' Application to Retain Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors-in-Possession* [Docket No. 454] (the "**Stipulated Facts**") ¶ 35; *Schedule of Assets and Liabilities for Invitae Corporation* [Docket No. 202] at 334, 339, 347, 350, 361 (Mar. 18, 2024).

[21] *See* Press Release, Invitae Corp., Invitae Divests Ciitizen Health Data Platform and Implements Further Cost Cuts (Dec. 13, 2023).

("**TSA**"), however, Deerfield made clear it would not consent to anything other than a sale with it receiving nearly all of the proceeds. That is what the Company did.

J.      **The Company Pays Millions in Bonuses to Executives**

58.    Following the March Exchange the Company paid more than $20 million in various forms of compensation to executives, some of which was far in excess of amounts it had previously approved. Specifically, between March 2023 and the end of the year, the Company paid ████ ███████████████████████████, gave "Stock Based" compensation and other long term retention bonuses over $5 million. The following amounts were received by Defendants: Mr. Knight received a total of $728,641.10, Ms. Wen received a total of $282,336.74, Mr. Nussbaum received a total of $158,206.52, Mr. Brida received a total of $ 302,083.98, and Mr. Werner received $82,473.30. On October 27, 2023, Mr. Knight received another $3,500,000 retention bonus.

59.    Then on the eve of bankruptcy, January 17, 2024, the Company paid executives and employees more than $16.5 million in bonuses, including (1) *another* $2,974,687 to Mr. Knight, (2) $2,002,750 to Ms. Schrank, (3) $1,834,351 to Mr. Brida, (4) $1,726,850 to Robert Guigley (Chief Commercial Officer), and (5) $1,594,740 to Dave Sholehvar (Chief Operating Officer).[22] The Company's board materials note these bonuses were ████████████ ███████████████████████████████████████████████████ ████████████. When it found out that the Company paid millions more in retention bonuses than what was budgeted in the 13 week cash flow, Deerfield wrote that it was ████████████ ████████████████████████████████████████████.

---

[22] *See Schedule of Assets and Liabilities for Invitae Corporation*, [Docket No. 202] at 354, 358-61 (Mar. 18, 2024). From the beginning of 2021 (the year in which the Company issued the 2028 Unsecured Notes) to the Petition Date, the Company's C-level executives were paid more than $70 million in total compensation.

21

### K.    The Company's Investigation.

60.    The Company authorized its Special Committee, composed of proposed Defendants Mssrs. Osborne, Gorjanc, and Aguiar (each of whom directed and approved the Uptier Transaction) was designated to investigate the March Exchange, including claims against themselves.  The Special Committee also hired Jill Frizzley as an advisor.  K&E conducted the investigation.  As discussed more fully in the Committee's objection to the retention of K&E as Debtors' counsel, K&E also "concurrently" represented Deerfield in unrelated matters.  Its concurrent representation of Deerfield was not disclosed to the Board or the Ms. Frizzley until after the investigation had concluded and the Board determined to release itself and Deerfield, presumably based on K&E's advice.

61.    The Special Committee's investigation included .[23]  That investigation included ████████████████████████████.

62.    K&E's investigation was completed in less than two months.  It presented its findings to Jill Frizzley on December 19, 2023.  K&E then presented its findings to the full Board on January 3, 2024.  At all times, the entire Special Committee (three out of four of whom were targets of the investigation) controlled the ability to settle claims.

### L.    The Sale of the Debtors' Assets to LabCorp

63.    On the February 13, 2024 (the "**Petition Date**"), the Company filed a motion to approve sale procedures to sell all of its assets and filed with its first day declaration a Plan[24] term

---

[23] *Debtors' Responses and Objections to Rule 2004 Document Requests and Interrogatories*, Interrog. No. 10.

[24] *See Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 471] (the "**Plan**").

sheet providing that after payment of certain priority claims, all sale proceeds would be used to pay the 2028 Purported Secured Noteholders in full.  The term sheet also proposed to release the Debtors, the director and officer defendants (the "**Fiduciary Defendants**"), Deerfield, the Agent, and the claims related to the 2028 Senior Secured Notes.  On May 7, 2023, this Court entered an order authorizing the sale of substantially all the Debtors' remaining assets to LabCorp Genetics for $239 million.  On May 9, 2023, the Debtors filed a proposed plan of reorganization and disclosure statement.  After payment of the proceeds from the sale and distribution of the retained assets, the proposed Plan provides for the payment in full of administrative, priority, convenience, unsecured claims at Invitae's subsidiaries and the 2028 Senior Secured Notes.  Based upon the value obtained in the LabCorp sale, the Committee believes that if the value of the claims and liens of the 2028 Purported Secured Noteholders remain valid—they are not—the 2028 Purported Secured Noteholderss are oversecured.  Upon information and belief, there was no material change in the value of the assets from the Petition Date, meaning the expectation was that the 2028 Purported Secured Noteholderss would always be paid in full.  The Debtors conceded this at a recent hearing, referring to unsecured creditors as the "fulcrum security."  May 7, 2024 Hr'g Tr. 48:19–21 [Docket No. 469].  However, in the disclosure statement, the Debtors estimate that the remaining unsecured creditors will receive nothing.  [Docket. No. 472] at 15.  The Plan proposes to release the Debtors' claims against the proposed Defendants for no monetary consideration.[25]

### M.    The Committee's Investigation

64.    Following the entry of the Final Cash Collateral Order,[26] the Committee and its professionals commenced an investigation of the Debtors' business and the circumstances leading

---

[25] *See Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 471] at 38-39 (May 9, 2024).

[26] *The Final Order Pursuant to Sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure: (I) Authorizing Debtors to Use Cash Collateral;*

to the filing of these Chapter 11 Cases.  The Committee has reviewed thousands of documents produced by the Debtors and Deerfield.

65.     The Debtors motion to approve its proposed disclosure statement and solicitation procedures is scheduled to be heard on June 11, 2024.  The Committee files this Motion now so that it may be heard on regular notice at the hearing to approve the Debtors' Disclosure Statement.[27]

66.     However, the Committee's investigation is still ongoing.  The Committee has scheduled interviews with Ms. Frizzley, Mr. Knight, Mr. Scott, and Mr. Fox-Karnal.  Although the Debtors and Deerfield have completed their initial productions, the Committee is in the process of reviewing privilege logs and seeking de-designations of several thousands of documents that have been withheld or redacted.  The Committee reserves all rights to supplement this Motion or the Proposed Complaint prior to the hearing on this Motion.

### N.     Unencumbered Assets.

#### 1.     Unencumbered Bank Accounts.

67.     As of the Petition Date, the Company had 26 bank accounts (collectively, the "**Bank Accounts**"), of which, 16 are owned and controlled by the Debtors and 10 are owned and controlled by non-Debtor foreign affiliates.[28]  The Debtors granted liens on the Bank Accounts (other than the Excluded Accounts)[29] in favor of U.S. Bank Trust Company, National Association,

---

*(II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 188].

[27] *The Disclosure Statement relating to the Joint Plan of Invitae Corporation and tis Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 472] (the "**Disclosure Statement**").

[28] *See Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintaining Existing Business Forms, and (D) Perform Intercompany Transactions* [Docket No. 10] (the "**Cash Management Motion**").

[29] "**Excluded Accounts**" means any (i) a zero balance account that sweeps on a daily basis into a deposit account subject to a Control Agreement, (ii) bank or deposit account used exclusively for payroll, the withheld employee portion of payroll taxes or other employee wage and benefit payments, (iii) merchant accounts in the nature of accounts

as Trustee and Collateral Agent under the 2028 Senior Secured Notes Indenture[30] (in such capacities, the **Agent**") as part of its Collateral under and as defined in the supplement to the indenture to the 2028 Senior Secured Notes (the "**2028 Senior Secured Notes Indenture**").

68.    While the 2028 Senior Secured Notes Indenture identifies deposit accounts as part of the Collateral (as defined in the 2028 Senior Secured Notes Indenture), the Agent was not granted any security interests in 14 of the Bank Accounts (collectively the "**Unencumbered Bank Accounts**") because such accounts are Excluded Assets and are neither subject to deposit account control agreements ("**DACAs**") or subject to control by the Agent sufficient to perfect such interest under applicable law.  A list of the Unencumbered Bank Accounts and the balance of such accounts as of the Petition Date is attached as Appendix C to the Proposed Complaint.  As of the Petition Date, the cash in the Unencumbered Bank Accounts totaled $3,067,938.69.

69.    Additionally, the Debtors also have three (3) letter of credit accounts, which are "Excluded Accounts" (collectively, the "**Unencumbered Letter of Credit Accounts**," and together with the Unencumbered Bank Accounts, the "**Unencumbered Accounts**"):

| Grantor | Financial Institution | Account No. | Face Amount of Underlying Letter of Credit |
|---|---|---|---|
| Invitae Corporation | HSBC Bank USA, National Association | 7147 | $69,000 |

---

with payment service providers such as Square, PayPal and Stripe, entered into in the ordinary course of business, (iv) any bank or deposit account exclusively used for purposes of cash deposits or pledges constituting Liens permitted pursuant to Sections 4.27(j), (n) or (p), (v) any deposit account used exclusively for receipt of any Third Party Payor Program accounts receivable or other accounts receivable under which any Third Party Payor is the account debtor are directly paid, *provided* that the funds in such account are transferred within two (2) Business Days to an account of a Note Party that is subject to a Control Agreement and (vi) any other Deposit Account or Securities Account (x) located in the United States, so long as with respect to this clause (vi)(x) the average trailing five (5) day closing balance of the aggregate amounts on deposit in all such accounts does not exceed $4,000,000 and (y) located outside of the United States, so long as, with respect to this clause (vi)(y) the average trailing five (5) day closing balance of the aggregate amounts on deposit in all such accounts does not exceed $6,000,000.  2028 Senior Secured Notes Indenture § 1.01.

[30] The "**2028 Senior Secured Notes Indenture**" means the supplement to the indenture to the 2028 Senior Secured Notes negotiated by the Company and Deerfield that would approve the Company's sale of its Women's Health and Ciitizen businesses.

| Grantor | Financial Institution | Account No. | Face Amount of Underlying Letter of Credit |
|---|---|---|---|
| Invitae Corporation | HSBC Bank USA, National Association | 3583 | $312,500 |
| Invitae Corporation | HSBC Bank USA, National Association | 3591 | $118,000 |
| | | TOTAL: | $499,500 |

### 2. Unencumbered Commercial Tort Claims.

70.     The Debtors granted liens on commercial tort claims in favor of the Agent as part of the Collateral under the 2028 Senior Secured Notes Indenture.  To constitute collateral under the 2028 Senior Secured Notes Indenture, a "Commercial Tort Claim" must be specifically identified on the relevant schedule to the Security Agreement (or supplement thereto in accordance with Section 5.9 of the Security Agreement).

71.     Certain of the Debtors' commercial tort claims against Natera that were sold to LabCorp (and are further described in the Proposed Complaint) (collectively, the "**Unencumbered Commercial Tort Claims**") are not listed on any schedule to the Security Agreement or a UCC-1 financing statement.  Those include:

| Litigation | Description |
|---|---|
| *Invitae Corp. v. Natera, Inc.*, C.A. No. 21-669-GBW (D. Del. filed May 7, 2021) | Invitae asserts patent infringement of U.S. Patent No. 10,604,799, which relates to DNA sequencing technology, against Natera. The matter is scheduled for trial beginning in September 2025. |
| *Invitae Corp. v. Natera, Inc.*, C.A. No. 21-1635-GWB (D. Del. filed Nov. 21, 2021) | Invitae asserts patent infringement of U.S. Patent Nos. 11,149,308 and 11,155,863, which relates to DNA sequencing technology, against Natera. The matter is scheduled for trial beginning in September 2025. |

## **LEGAL STANDARD**

72.     The Bankruptcy Code authorizes formation of an official committee of unsecured creditors which "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).  The right to be heard "includes the right to sue when a trustee or debtor in possession will not."  *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 446 n.11 (3d Cir. 1982) (quoting *In re Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982)).  The Third Circuit has recognized that "Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate."  *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery* ("**Cybergenics**"), 330 F.3d 548, 567 (3d Cir. 2003); *see also In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004) ("'[N]early all courts considering the issue [of appointing a creditor's committee to act on behalf of the debtor] have permitted creditor's committees to bring actions in the name of the debtor-in-possession if the committee is able to establish' that a debtor is neglecting its fiduciary duty.") (quoting *Cybergenics*, 330 F.3d at 553)), *aff'd in part, vacated in part on other grounds by* No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006).

73.     To be granted derivative standing, the Committee must establish that (i) the claim is "colorable;" (ii) prosecution of the claim would be beneficial to the estate; and (iii) the debtor-in-possession has unjustifiably failed to bring the claim.  *In re G-I Holdings, Inc.*, 313 B.R. at 628 ("A committee may have derivative standing to initiate an avoidance action on behalf of the debtor where . . . a colorable claim that would benefit the estate if successful exists[.]") (citing cases).

74.     Colorability only requires a showing that the claim meets the applicable pleading standards.  *Id.* at 631 ("[T]he first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.") (citations omitted).  In finding a claim colorable, the Court must accept as true all factual allegations in the complaint.  *Id.* at 630-31.

27

"[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim" the "colorability" prong of derivative standing is met. *Id.* (quoting *Jordan v. N.J. Dep't of Corr.*, 881 F. Supp. 947, 950 (D.N.J. 1995) (emphasis added)). Thus, if the Committee's claims "set out sufficient factual matter to show that [they are] facially plausible," they are colorable. *In re Roman Cath. Diocese of Harrisonburg*, 640 B.R. 59, 68 (Bankr. M.D. Pa. 2022).

75. The Court should grant the Committee standing if the asserted claims are likely to benefit the estate—in other words, if "the proposed litigation will not be a hopeless fling." *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005).

76. Finally, the Committee must demonstrate that the "debtor in possession unjustifiably failed to bring suit." *Official Comm. ex rel. Cybergenics*, 330 F.3d at 566 (citing *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985)). Courts have found such unjustifiable failure where "the debtor-in-possession . . . acts under the influence of conflicts of interest." *Id.* at 573 (internal citation omitted). For example, where a debtor's managers "avoid bringing a claim that would amount to reputational self-immolation" or where a debtor is "unwilling to pursue claims against . . . businesses . . . with whom it has an ongoing relationship that it fears damaging," "[t]he possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions." *Id.* A formal demand on the Debtors is not required and "refusal to pursue an avoidance action can be implied." *In re G-I Holdings, Inc.*, 313 B.R. at 630 (citing *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004)).

# ARGUMENT

**A.      The Proposed Claims Are Colorable**

### 1.      The March Exchange Was a Fraudulent Transfer and Should Be Unwound

77.      The March Exchange should be unwound as a fraudulent transfer under both section 544 and section 548 of the Bankruptcy Code.

78.      Section 548 of the Bankruptcy Code provides that a transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the petition date is avoidable as fraudulent if the debtor voluntarily or involuntarily:

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)
>
> > (i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (ii)
> >
> > > (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> > >
> > > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> > >
> > > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> > >
> > > (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548.

79.     Section 544(b) of the Bankruptcy Code grants the trustee the rights and powers of any unsecured creditor to avoid obligations pursuant to applicable state fraudulent conveyance law.  Here, the potentially applicable state fraudulent conveyance laws impose similar or identical requirements as Section 548 of the Bankruptcy Code.  11 U.S.C. § 544(b); *compare* 11 U.S.C. § 548 *with* N.J. Stat. Ann. § 25:2-25, 26, 27 (West) *and* Cal. Civ. Code § 3439.04 (West) *and* N.Y. Debt. & Cred. Law § 273 (McKinney); *see also MSGI Liquidation Tr. v. Modell* (*In re Modell's Sporting Goods, Inc.*), Nos. 20-14179 (VFP), 22-1076 (VFP), 2023 Bankr. LEXIS 1031, at *81 (Bankr. D.N.J. Apr. 14, 2023) ("In short, federal bankruptcy law and New York and New Jersey fraudulent transfer law all have similar standards.").[31]

80.     The March Exchange was a transfer of the Debtors' interests in property and obligations incurred by the Debtors within two years of the Petition Date.  Proposed Compl. ¶ 171.  Specifically, as part of the March Exchange, Invitae gave the Agent, for the benefit of the Participating 2024 Unsecured Noteholders, (1) $305.3 million in Series A 2028 Senior Secured Notes secured by a lien on substantially all of Invitae and its subsidiaries' assets (subject to the exceptions identified above) and 14,219,859 shares of Invitae's common stock (with a market price of $22.9 million).  *Id.*  The Debtors also incurred significant obligations in connection with the March Exchange, including, but not limited to, (1) $8.1 million in prepayment premiums resulting from the Term Loan Repayment, which was a condition precedent and (2) $19.1 million in debt issuance costs (primarily advisor fees).  *Id.* ¶ 172.  In return, the Debtors (1) extinguished

---

[31] With respect to state law fraudulent transfer claims, courts have held that it may be unnecessary to engage in a conflict of law analysis where the statutes are not in conflict. *See, e.g.*, *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (holding, in a non-bankruptcy context that "[i]f two jurisdictions' laws are the same, then there is *no conflict* at all, and a choice of law analysis is unnecessary").  Instead, "where there is no real conflict between the choice of law, the Court may utilize the law of the forum state." *Forman v. Gittleman (In re OpenPeak, Inc.)*, Nos. 16-28464 (SLM), 17-01755 (SLM), 2020 Bankr. LEXIS 3463, at *84-85 (Bankr. D.N.J. Dec. 10, 2020).

2024 Unsecured Notes with a fair market value that was significantly less than the face amount of the debt and (2) received $30 million in cash.  *Id.*

### 2. The March Exchange Is an Avoidable Constructive Fraudulent Transfer

81.    A transfer of an interest of the debtor in property, or any obligation incurred by the debtor, is avoidable as a constructive fraudulent transfer if: (i) the transfer made or obligation incurred was for less than reasonably equivalent value; and (ii) the debtor (a) was insolvent on the date of the transaction or was rendered insolvent thereby, (b) had unreasonably small capital, or (c) intended to incur, or reasonably should have known it would incur, debts that it could not pay as they matured.  *See* 11 U.S.C. § 548(a)(1)(B).

82.    The fraudulent conveyance laws of the relevant states—New York (the governing law of the 2028 Senior Secured Notes Indenture), New Jersey (Invitae's place of business), California (Invitae's place of business and chief executive office), and Delaware (Invitae's state of incorporation)—are similar to Section 548 of the Bankruptcy Code.  *See* N.Y. Debt. & Cred. Law § 273-74 (McKinney); N.J. Stat. Ann. § 25:2-25, 27 (West); Cal. Civ. Code § 3439.04-05 (West); Del. Code Ann. tit. 6, §§ 1304, 1305 (West).

### a.  The Debtors Did Not Receive Reasonably Equivalent Value for the March Exchange

83.    "Reasonably equivalent value" is not defined in the Bankruptcy Code.   In determining whether a debtor received reasonably equivalent value, the Third Circuit applies a "totality of the circumstances" test "including consideration of factors such as market value, good faith, and whether the transaction was at arms['] length."  *EPLG I, LLC v. Citibank, N.A.* (*In re Qimonda Richmond, LLC*), 467 B.R. 318, 327 (Bankr. D. Del. 2012); *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.* (*In re R.M.L.*), 92 F.3d 139, 151, 153 (3d Cir. 1996); *Kartzman v. Latoc, Inc.* (*In re Mall at the Galaxy*), 2022 Bankr. LEXIS 1180, at *36 (Bankr. D.N.J.

Apr. 29, 2022) (same).  "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred."  *In re R.M.L.*, 92 F.3d at 151.  The question of whether the value received was reasonably equivalent to the value given is a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine whether the debtor got roughly the value it gave. *Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 568 (Bankr. D. Del. 2012).

84.    Because reasonably equivalent value compels a factual analysis of all relevant circumstances, the issue may not be determined on a motion to dismiss or at the standing motion phase of an action.  *In re Qimoda Richmond, LLC*, 467 B.R. 318 at 327 ("[T]he issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss."); *see Stanziale v. Brown-Minneapolis Tank ULC, LLC* (*In re BMT-NW Acquisition, LLC*), 582 B.R. 846, 858 (Bankr. D. Del. 2018) ("Determining reasonable equivalence 'requires case-by-case adjudication,' which depends on 'all the facts of each case, an important element of which is market value.'" (quoting *Barrett v. Commonwealth Fed. Sav. and Loan Ass'n*, 939 F.2d 20, 23 (3d Cir. 1991)).

85.    The Proposed Complaint asserts that the Debtors provided the Agent, on behalf of the Participating 2024 Unsecured Noteholders, with approximately $100 million more in value than was received by the Debtors, including, among other things: (1) a $305.3 million secured note with all asset security interest and value that exceeded the fair market value of the exchanged 2024 Unsecured Notes,[32] (2) increased interest payments through the original maturity of the 2024

---

[32] When a company is insolvent at the time of the subject transaction, the debt is not worth its face or principal value because the company cannot otherwise pay its creditors in full in bankruptcy and the market would therefore apply a discount.  Courts in the Third Circuit take the market value of debt into account when determining whether a debtor received reasonably equivalent value.  *See e.g., Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 93

Unsecured Notes, (3) a make whole claim, that unless avoided or disallowed would provide the Agent with an $27.5 million increased claim in these Chapter 11 Cases; (4) approximately $22.9 million in Invitae common stock, (5) an $8.1 million obligation to pay a prepayment fee in connection with the 2024 Term Loan Repayment which was a condition precedent to the March Exchange, (6) the obligation to pay $19.1 million in costs in connection with the issuance of the 2028 Senior Secured Notes (primarily consisting of professional fees), (7) equity option value through a dramatically improved conversion feature in the 2028 Senior Secured Notes when compared to the 2024 Unsecured Notes, and (8) significant control over the Company, its ability to raise additional financing, and its ability to operate and restructure its business. Proposed Compl. ¶ 172.

86.    Throughout these Chapter 11 Cases, the Debtors and Deerfield have suggested the Debtors received two forms of value in return for the March Exchange: (1) extended maturity date when compared with the 2024 Unsecured Notes and (2) $30 million of "new-money financing."[33] The Proposed Complaint alleges that none of the foregoing provided value to the Debtors, let alone reasonably equivalent value for the issuance of a $305.3 million security interest in substantially all of the Debtors' assets. *Id.*[34]

87.    First, even accounting for the March Exchange, the Debtors projected that ▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 81.  Accordingly, the March Exchange did not buy the Debtors any more runway.  The relevant Officer and Director

---

(Bankr. D. Del. 2010) (denying the motion to dismiss constructive fraudulent transfer complaint finding that it was possible that the notes were worthless at the time of the transfer when the debtor gave $15 million of cash, preferred stock, and common stock in exchange for face value of $15 million of notes based on the debtors' insolvency at the time)

[33] *Statement in Response to Committee's Objection to the Debtors' Retention of Kirkland & Ellis*, [Docket No. 336] at 2 n.5 (Apr. 18, 2024).

[34] As an initial matter, the determination of whether any of the forgoing constitute reasonably equivalent value is a question of fact and thus it is improper to decide the issues at the standing phase of the proceeding.

Defendants were ███████████████████████████████. *Id.* ¶ 81.  Courts have found that the transfer of value in exchange for opportunity to avoid a potential default or bankruptcy does not constitute value when, like here, it only delayed the inevitable.  *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors* (*In re TOUSA, Inc.*), 680 F.3d 1298, 1311-13 (11th Cir. 2012); *Feltman v. Wells Fargo Bank, N.A.* (*In re TS Emp., Inc.*), 597 B.R. 494, 528 (Bankr. S.D.N.Y. 2019) ("The opportunity to avoid a default or bankruptcy may not necessarily constitute "reasonably equivalent value.'"); *cf. Official Comm. of Unsecured Creditors v. Credit Suisse First Boston* (*In re Exide Techs.*) 299 B.R. 732, 747-48 (Bankr. D. Del. 2003) (assertion of reasonable equivalent value of an "agree[ment] to forbear from exercising remedies," requires "a showing of what the value of the forbearance was"); *Stillwater Nat'l Bank & Trust Co. v. Kirtley* (*In re Solomon*), 300 B.R. 57, 67 (Bankr. N.D. Okla. 2003) (finding that a forbearance was not reasonably equivalent value for granting additional security), *aff'd,* 299 B.R. 626 (10th Cir. 2003).  Here, that is the case.  In fact, the March Exchange, made it more difficult for the Debtors to avoid their inevitable insolvency, by restricting the Debtors' ability to raise additional capital in the future or sell their assets.

88.    Second, when the costs of the transaction are considered, the $30 million in proceeds from the sale of the Series B Notes was almost entirely consumed by the transaction costs and completely consumed in the days and months after the transaction.

89.    On the other hand, the Debtors gave Deerfield more than $100 million more value than it received from the March Exchange. *Id.* ¶ 172.  The all-asset security interest that was purportedly provided to Deerfield and the other Participating 2024 Unsecured Noteholders will also entitle those creditors to receive up to an estimated $242 million more value under the

Debtors' proposed plan than such lenders would have received if such lenders shared pro rata with other unsecured creditors.

90.     Under the totality of circumstances test, courts also will examine whether the transaction was made at arm's length and in good faith when determining whether a debtor received reasonably equivalent value.  *See In re R.M.L., Inc.*, 92 F.3d at 149, 153.  A significant factor when determining whether a transferee acted in good faith is whether it knew or should have known of the financial condition of the debtor and the voidability of a transfer.  *Perkins v. Bamburger* (*In re Carton*), Nos. 20-19781 (VFP), 22-1272 (VFP), 2023 Bankr. LEXIS 2793, at *32 (Bankr. D.N.J. Nov 20, 2023) ("To determine whether a transferee took in good faith, the court takes an objective approach to determine what the transferee knew or should have known 'such that a transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer.'" (citing *In re Hill*, 342 B.R. 183, 203 (Bankr. D.N.J. 2006)).

91.     Here, the Proposed Complaint alleges that all parties, including the Debtors, Deerfield, and both of their advisors, were aware the Debtors were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ prior to the March Exchange and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇.  *See* Proposed Compl. ¶ 73.  In fact, both SB Northstar and Baker Brothers directly raised that the March Exchange was ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *Id.* ¶ 74.  All parties knew that the transaction would only ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇.  *Id.*  And, all parties knew that upon the inevitable chapter 11 filing, the consequence of the March Exchange would be to provide Deerfield and the other Participating 2024 Unsecured Noteholders with significant control over the Debtors' restructuring, bankruptcy

cases, and allow such lenders to capture 100% of the value of the Debtors' at the expense of the Debtors' other creditors.

92.     All of the foregoing was known or should have been known at the time of the March Exchange and has actually come to pass.  As is discussed in further detail in Section I.E, below, although the March Exchange was negotiated at arm's length, the Proposed Complaint alleges facts that demonstrate that it was not conducted in good faith.

### b.  The Debtors Were Insolvent at the Time of the March Exchange

93.     Section 548(a) of the Bankruptcy Code provides three relevant tests for insolvency—the balance sheet test, the capital adequacy test, and the cash flow test—only one of which must be met to establish a constructive fraudulent transfer claim. 11 U.S.C. § 548(a)(1)(B)(ii).  Solvency is a question of fact that is not proper for decision at the standing or motion to dismiss phase.  *See United States v. Rocky Mt. Holdings, Inc.,* No. 0-3381, 2009 U.S. Dist. LEXIS 52203, at *22 n.6 (E.D. Pa. Mar. 3, 2009).  Here, the Proposed Complaint illustrates that the Debtors were insolvent under each of the three applicable tests such that standing for the Committee to bring these claims is proper.

94.     <u>Balance Sheet Insolvency</u>.  Under the balance sheet test for insolvency, a debtor is "insolvent" when the "sum of such entity's debts is greater than all of such entity's property, at a fair valuation," exclusive of exempt property and any property transferred in actual fraudulent transfers.  *See* 11 U.S.C. § 101(32)(A); *In re R.M.L.*, 92 F.3d at 156.  Courts will consider adjustments to the debtor's financial statements if appropriate to determine "fair valuation."  *See R.M.L.*, 92 F.3d at 156.  Solvency is measured at the time the debtor transferred value, not at some later or earlier time.  *See id.*

95.     The Proposed Complaint proffers facts that demonstrate the Debtors were insolvent under the balance sheet test at the time of the March Exchange.  Proposed Compl. ¶¶ 51, 102.  By

March 31, 2023, after the Term Loan Repayment and the March Exchange, the Company reported it was insolvent with total liabilities of $1.7 billion and total assets with a book value of $1.69 billion. *Id.* ¶ 102.

96.    The Proposed Complaint asserts that the reported book value of the Debtors' assets, however, significantly exceeded their fair market value.  Courts will consider adjustments for purposes of finding balance sheet insolvency.  *See Sklar v. Susquehanna Bank* (*In re Global Prot. USA, Inc.*), 546 B.R. 586, 611 (Bankr. D.N.J. 2016); *see also* Proposed Compl. ¶ 102.  As an example, after the transaction closed, new-CFO Anna Schrank acknowledged the book value of the Company's assets significantly exceeded their fair market value.  *See supra* Section F.  At the end of September 2023, when the Company finally remarked its intellectual property to reflect a value closer to its market value, ***its liabilities exceeded its assets by approximately $1.1 billion***.[35] *Id.* ¶ 102.

97.    <u>Capital Adequacy Test</u>. A debtor was not adequately capitalized if the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital.    11 U.S.C. § 548(a)(1)(B)(ii)(II).  An entity has unreasonably small capital if it lacks the ability to generate sufficient profits to sustain operations.  *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  Courts have held that a plaintiff meets the requisite pleading standard to establish unreasonably small capital when a complaint asserts a transaction left the debtor with no access to raise money in capital markets or if it becomes "reasonably foreseeable" that the debtor would soon become insolvent.  *See, e.g.*, *In re Autobacs Strauss, Inc.*, 473 B.R. at 553 (holding that

---

[35] Invitae Corp., Quarterly Report (Form 10-Q) at 1 (Aug. 8, 2023); Invitae Corp., Quarterly Report (Form 10-Q) at 1 (Nov. 8, 2023).

plaintiffs sufficiently alleged that the debtor was left with unreasonably small capital where pled facts implied that the debtor had no access to raise money in the capital markets); *In re Jevic Holding Corp.*, Nos. 08-11006 (BLS), 08-51903, 2011 Bankr. LEXIS 3553, at *32 (Bankr. D. Del. Sept. 15, 2011) (holding that the creditors' committee sufficiently alleged that the debtor was left with unreasonably small capital following consummation of the challenged transaction where it was reasonably foreseeable that the debtor soon thereafter would become insolvent).

98.    As alleged in the Proposed Complaint, as early as July 2022, management identified that the Company would require ████████████████████████████████████████ ███████████████████████████████████████████████████████. Proposed Compl. ¶ 60. The Debtors' advisors at the time similarly advised ███████████████ ██████████████████████████████. *Id.* ¶¶ 66-67. Deerfield was also aware that the ██████████████████████████████████ ████████. *Id.* ¶¶ 69-71, 86-87. Indeed, prior to executing the transaction, both the Debtors and Deerfield had ███████████████████████████████████████ ████████████. *Id.* ¶¶ 79, 87.

99.    Prior to executing the March Exchange, the Debtors solicited the mostly likely source of additional capital—their existing lenders. *Id.* ¶ 72. The Company's advisors warned management ████████████████████████████████████████ ████████████. *Id.* ¶ 66. And, their CFO's analysis demonstrated that ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████. *Id.* ¶ 79.



100.     The March Exchange only worsened the Company's liquidity position, depleting the Company's cash by $135.6 million.  *Id.* ¶ 97. The terms of the 2028 Senior Secured Notes Indenture also imposed significant limitations on the Company ability to raise additional capital. *Id.* ¶ 172.

101.     It is no surprise that the Debtors were ultimately unable to raise additional capital and filed for chapter 11 protection.  Indeed, an eventual chapter 11 filing was contemplated by Deerfield and the Debtors at the time of the March Exchange.  *Id.* ¶ 99.

102.     <u>Cash Flow Test</u>.  A debtor fails the cash flow solvency test if, at the time a transfer is made, the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  This "forward looking" test requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred.  *Burtch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711, 715 (3d Cir. 2017) (citation omitted).  A court may, however, consider the facts and circumstances surrounding the transaction to determine whether the debtor was "able to pay, intended to pay, and . . . was paying its debts as they came due." *Id.* (citation omitted).

103.     The Debtors knew they ███████████████████████████████████ ███████████████████. *Id.* ¶¶ 107-11.  The Board projected that ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████. *Id.* ¶ 81, 107-11.  The Debtors' internal cash flow projections only got worse following the March Exchange.

### 3.  The March Exchange Is an Avoidable Actual Fraudulent Transfer

104.     Section 548(a)(1)(A) of the Bankruptcy Code provides that a transfer of an interest of the debtor in property that was made or incurred with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."  11 U.S.C. § 548(a)(1)(A).  Similarly,

under section 544(b) of the Bankruptcy Code, a bankruptcy trustee may avoid a transfer of property

or obligation that is voidable under state fraudulent transfer law.  11 U.S.C. § 544(b).  State

fraudulent transfer laws have similar elements for avoidance of actual fraudulent transfers.  *In re*

*Modell's Sporting Goods, Inc.,* 2023 Bankr. LEXIS 1031, at *81 ("In short, federal bankruptcy

law and New York and New Jersey fraudulent transfer law all have similar standards.").

105.     To establish standing to bring an actual fraudulent transfer claim, a plaintiff must

allege that there was either an intent to hinder, to delay, **_or_** defraud the Debtors' creditors.  *Kirchner*

*v. J.P. Morgan Chase Bank, N.A. (In re Millenium Lab Holdings II, LLC)*, Nos. 15-12284 (LSS),

17-5140 (LSS), 2019 Bankr. LEXIS 636, at *8 n.15 (Bankr. D. Del. Feb. 28, 2019).  The question

of whether the debtor executed a transaction with wrongful intent is a question of fact.  *In re Exide*

*Techs., Inc.*, 299 B.R. at 749.  Fraudulent intent must be assessed at the time of the transfer.

*Kartzman v. Schwartz* (*In re Schwartz*), Nos. 10-21505 (DHS) , 12-01344 (DHS), 2014 Bankr.

LEXIS 3120, at *15 (Bankr. D.N.J. 2014).

106.     Understanding that it is unlikely that a defendant will admit its fraudulent intent,

courts have identified several "badges of fraud" to assist in the determination of "actual intent."

*In re Millennium Lab Holdings II, LLC*, 2019 Bankr. LEXIS 636, at *9.[36]  For example, "badges

of fraud" may include: (1) the relationship between the debtor and the transferee; (2) consideration

for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's

estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the

---

[36] Badges of fraud include: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control
of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the
transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of
substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value
of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the
amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made
or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial debt was incurred;
and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of
the debtor.  *See MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426, 435 (D.N.J. 2012) (internal citations omitted).

property transferred; and (6) secrecy or concealment of the transaction. *Zazzali v. Mott* (*In re DBSI, Inc.*), 445 B.R. 344, 348 (Bankr. D. Del 2011); *SB Liquidation Trust v. Preferred Bank (In re Syntax-Brillian Corp.)*, Nos. 08-11407 (BLS), 10-51389 (BLS), 2016 Bankr. LEXIS 988, at *12 (Bankr. D. Del. Feb. 8, 2016). Actual fraudulent transfer does not employ a mechanical test and thus it is not necessary to allege that each badge of fraud exists. *In re Millennium Lab Holdings II, LLC*, 2019 Bankr. LEXIS 636, at *9. If the natural consequence of a debtor's action is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance. *Id.* Furthermore, a transferee's intent to hinder, delay or defraud the debtors' creditors may be imputed on the debtor where the transferee is in a position to control the transaction. *See Maxus Liquidating Tr. v. YPF S.A.* (*In re Maxus Energy Corp.*), 641 B.R. 467, 513 (Bankr. D. Del. 2022).



107.    Beginning in the summer of 2022, Deerfield's primary goal was to ██████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████. *Id.* ¶¶ 69,76. Deerfield's internal discussions demonstrate that it knew the Debtors were likely ████████████████ *Id.* ¶ 73. Deerfield was also aware that the Debtors needed more than ████████████████████████████ ████████████████. *Id.* And, that ████████████████████████████████ ████████████████████ *Id.*

108.    The Debtors also knew that without additional capital, a transaction that simply ████████████████████████████████████████████████████████████████████████ ████████████████████████ *Id.* ¶¶ 66, 73. The Debtors were also informed on multiple occasions by their advisors and the 2028 Unsecured Noteholders that simply ████████ ████████████████████████████████████████████████████████████. *Id.* ¶¶ 7, 66, 73.

109.    Notwithstanding that understanding, the Debtors proceeded to negotiate the transaction with Deerfield.  During those negotiations, it was apparent (or should have been apparent) that the Deerfield transaction would worsen the Company's insolvent position.  *Id.* ¶¶ 76-85.  Indeed, during the negotiations, it was apparent that the parties who were most likely to contribute additional capital (the Debtors' existing investors) would not. *Id.* ¶ 74.  The transaction did not reduce the Debtors' leverage.  *Id.* ¶ 98.  And, the terms that were required by Deerfield significantly restricted the Debtors ability to raise any additional capital.  *Id.* ¶ 172.

110.    Materials presented to the Board immediately prior to the transaction demonstrated that ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████.  *Id.* ¶ 81.  Those materials showed that the Debtors were aware that ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████.  *Id.*

111.    Deerfield was well aware of the reality of the Debtors' financial condition and internal communications demonstrate ████████████████████████████████ ████████████████████████████████████████████████████████████.  *Id.* ¶¶ 86-87.

112.    The Debtors and Deerfield intentions are highlighted by email correspondence that indicates ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████.  The end result, unless the March Exchange is avoided, Participating 2024 Unsecured Noteholders are estimated to receive a par recovery, while those holders who were not

Case 24-11362-MBK   Doc 536   Filed 05/22/24   Entered 05/22/24 22:25:17   Desc Main
Document     Page 51 of 75

chosen by the Debtors and Deerfield are estimated to receive nothing.  The Debtors' fraudulent

intent is also demonstrated by the ███████████████  ████████████████████████

██████████████████████████████████████████████████████.

113.     The facts alleged in the Proposed Complaint clearly demonstrate the Debtors' and

Deerfield's intent to provide all of the value of the Debtors' estate to Deerfield and the other

Participating 2024 Unsecured Noteholders.  The natural result of the March Exchange, was to

hinder, delay and defraud the Debtors other unsecured creditors.

114.     The Debtors' intent is also supported by numerous badges of fraud including:

   a.   A lack of reasonably equivalent value for the transfer. *See supra* Section I.A.1.a.

   b.   The Debtors were insolvent and inadequately capitalized as a result of the
        transaction. *See supra* Section 1.A.1.b.

   c.   The Debtors transferred a security interest in substantially all of their assets that
        entitled Deerfield and the Participating 2024 Unsecured Noteholders to
        substantially all of the value of the Debtors' estates.  Proposed Compl. ¶ 96.

   d.   The Debtors and Deerfield colluded in secret regarding the ██████████████████
        ██████████████████████████████████████. *Id.*
        ¶ 91.

   e.   The March Exchange allowed Deerfield significant control over the Debtors' major
        transactions, including its restructuring.  *Id.* ¶ 172.

### 4. The Subsidiary Guarantees Issued In Connection With the March Exchange Should Be Avoided

115.     To the extent the March Exchange is not avoided in its entirety, the guarantees and

security interests issued by the Debtors' subsidiaries should be avoided as constructive fraudulent

transfers.  As part of the Uptier Transaction, certain subsidiaries of Invitae, including, ArcherDX,

LLC; ArcherDX Clinical Services, Inc.; Genetic Solutions, LLC; Genosity, LLC; Ommdom Inc.

(together, the **"Debtor Subsidiaries"**), Ciitizen, LLC; and YouScript, LLC,[37] guaranteed

---

[37] Ciitizen, LLC and YouScript, LLC are not Debtor entities, the remaining entities are Debtors.

obligations of Invitae on the 2028 Senior Secured Notes and granted a security interest in substantially all of their assets to secure their guarantee obligations.[38]  *Id.* ¶ 198.  The Debtor Subsidiaries were not obligors or guarantors with respect to the 2024 Unsecured Notes or the 2028 Unsecured Notes.  *Id.* ¶ 100.  After the Term Loan Repayment, each of the Debtor Subsidiaries assets and equity was unencumbered.  *Id.* ¶¶ 97, 100.  Upon information and belief, the Debtor Subsidiaries received no value in connection with the March Exchange but pledged substantially all of their assets and equity to secure the $305.3 principal amount of the 2028 Senior Secured Notes.  *Id.* ¶¶ 96, 201.  The Debtor Subsidiaries did not receive reasonably equivalent value in connection with the issuance of that security interest.

116.    The Debtor Subsidiaries were rendered insolvent and, for the reasons stated in Section I.A.1.b, above, were inadequately capitalized as a result of the March Exchange. Accordingly, the issuance of the security interest with respect to the Subsidiary Guarantors should be avoided as a constructive fraudulent transfer.  *See, e.g.*, *In re TOUSA, Inc.*, 422 B.R. 783, 866 (Bankr. S.D. Fla. 2009) (invalidating upstream guarantees and related liens as constructive fraudulent conveyances for lack of reasonably equivalent value), *aff'd* 680 F.3d 1298 (11th Cir. 2012).

### 5.  The August Exchange Should Be Avoided and the Value of the Stock Should Be Returned to the Debtors

117.    By early August 2023, the Debtors had hired advisors to evaluate and prepare for an eventual chapter 11 filing.  Proposed Compl. ¶ 117.  Deerfield was also focused on forcing the Company ████████████████████████████████████████████████████████████████
████████████████████████████████████████.  *Id.* ¶¶ 125-150.  Deerfield was aware that

---

[38] Invitae Corp. Current Report (Form 8-K) (Mar. 8, 2023), at 3; *id.*, Ex. 4.1, at Signature Page.

in that eventual chapter 11 case, its remaining 2024 Unsecured Notes would likely receive at most pennies on the dollar. *Id.* ¶ 81.

118.   On August 22, 2023, the Debtors and Deerfield agreed to exchange its $17.2 million of remaining 2024 Unsecured Notes for $100,000 of Series A Notes and approximately 15.8 million shares of Invitae common stock (with a market value of approximately $16.3 million). *Id.* ¶ 121.   The Proposed Complaint alleges, upon information and belief, that Deerfield sold those shares shortly thereafter.   Deerfield received more than $16.3 million of liquid securities for 2024 Unsecured Notes that it knew were soon to be worthless and were largely illiquid.

119.   The Debtors were insolvent and inadequately capitalized at the time of the August Exchange. *Id*. ¶ 124.   On August 8, 2023, Invitae published its second quarter financials which disclosed that "[a]s a result of losses, projected cash needs, and current liquidity level, substantial doubt exists about the Company's ability to continue as a going concern." *Id*.   Invitae's third quarter financials also recorded that its liabilities exceeded its assets by approximately $1.1 billion. *Id*.   Invitae only had $158 million of cash and cash equivalents, rendering it inadequately capitalized as well. *Id*.   As such, the Committee should be granted standing to pursue these colorable claims.

### 6.  The Consent Fees Should Be Avoided As Constructive Fraudulent Transfers

120.   In connection with the execution of the Second Supplemental Indenture, Deerfield required the Company to pay it a $2.1 million consent fee and $3 million of its professional fees. The Company did not receive any value for those payments, as the Second Supplemental Indenture (1) removed all flexibility for the Company to restructure, (2) mandated sales and chapter 11 process milestone, and (3) accelerated Deerfield's realization of 100% of the value of the

liquidation of the Debtors' assets. The only potential value the Company received was to sell two businesses, one at a loss of over $300 million through a dubious sales process. Additionally, for the reasons set forth above, the Debtors were insolvent and inadequately capitalized at the time of they executed the Second Supplemental Indenture and made the Consent Fees. The Consent Fees should be avoided. *See In re Millennium Lab Holdings II, LLC*, No. 15-12284 (LSS), 2019 WL 1005657, at *1 (Bankr. D. Del. Feb. 28, 2019) (denying motion to dismiss actual and constructive fraudulent transfer claims to avoid a $35.3 million fee paid to banks as part of term loan transaction); *see In re TS Emp., Inc.*, 597 B.R. 494, 530 (Bankr. S.D.N.Y. 2019) (finding the debtors did not receive reasonably equivalent value for fees incurred in connection to amendments to a financing facility).

### 7. Invitae's Directors and Officers Breached Their Fiduciary Duties

121.    Directors and officers of a Delaware corporation owe companies two duties: the duty of care and the duty of loyalty. "The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances'; and (2) 'consider all material information reasonably available.'" *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd* 906 A.2d 27 (Del. 2006)).[39] "The duty of due care obligates corporate directors and officers to 'act on an informed basis.'" *Resnik v. Woertz*, 774 F. Supp. 2d 614, 632 (D. Del. 2011) (citations omitted).

---

[39] A single transaction is not necessary to assert a breach of fiduciary duty claim, rather a pattern of conduct can be used to demonstrate breach. *See Frederick Hsu Living Trust v. ODN Holding Corporation*, No. 17-129, 2017 Del. Ch. LEXIS 67, at *41 (Del. Ch. Apr. 14, 2017) (holding that a five-year long scheme of "abandoning the Company's growth strategy which was benefitting its common stockholders in favor of selling off whole business lines and hoarding cash in order to provide the maximum amount [defendant] could extract non-ratably from the Company by exercising its redemption right" breached a fiduciary duty).

122.    The duty of loyalty generally obligates a fiduciary to act in "good faith" and to refrain from conflicts and from putting its interests ahead of those of the corporation. *See Miller v. Greystone Bus. Credit II, L.L.C.*, (*In re USA Detergents, Inc.*), 418 B.R. 533, 545 (Bankr. D. Del. 2009) ("The duty of loyalty 'mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.'") (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009)).  The duty of loyalty is violated where a director or officer "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties" or appears on both sides of a transaction, expects to derive personal financial benefit from the transaction in the sense of self-dealing, or is beholden to an interested party.  *See Walt Disney Co. Derivative Litig.*, 907 A.2d at 751, 755; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) (subsequent history omitted).

123.    Under Delaware law,[40] "[a] claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. Ct. 2010).  Normally, breach of fiduciary duty claims must be brought derivatively on behalf of shareholders, but "[a]fter a corporation becomes insolvent, creditors gain standing to assert claims derivatively for breach of fiduciary duty." *Quadrant Structured Prods. Co., Ltd.*, 115 A.3d at 546; *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-2 (Del. 2007) (holding that "the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties" because a "corporation's insolvency 'makes the

---

[40] A breach of fiduciary duty claim against Invitae's directors and officers is governed by Delaware law, as the law of the state in which Invitae is incorporated.  *See Fry v. Trump*, 681 F. Supp. 252, 255-56 (D.N.J. 1988) ("Claims involving the 'internal affairs' of corporations, such as breach of fiduciary duty and the like, are subject to the laws of the state of incorporation.").

creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value'"").  As described above and in the Proposed Complaint, the Company was insolvent at all relevant times.  *See supra* Section I.A.1.B.

124.    <u>Breach of Duty of Care</u>.  As early as the fall of 2021, the Fiduciary Defendants knew the Company had ██████████████.  Proposed Compl. ¶ 3.  A year later, in October 2022, analyses prepared by the Company's financial advisors and management showed that ███ ████████████████████████████████████████████████████████████ ██████████████.  *Id.* ¶ 66.  The Company's advisors also warned the Fiduciary Defendants that ████████████████████████████████████████████████ ████████████████████████████.  *Id.*

125.    Fully aware of those identified issues, the Fiduciary Defendants determined to proceed with the March Exchange, which did not deleverage the Company or provide needed additional capital.  Various parties—including SB Northstar and Baker Brothers—████████████ ██████████████████████████████████████.  *Id.* ¶ 74.  But, denying the insolvent state of the Company, the Fiduciary Defendants pursued the Deerfield transaction that provided all of their value to one creditor constituency, Deerfield and the other Participating 2024 Unsecured Noteholders, at the expense of over $1 billion in similar situated creditors.  The Fiduciary Defendants knew that would be the result.  The Company's consideration of other transactions – such as the one ████████████████████████████████████████████████ – was shallow and largely ignored because the Fiduciary Defendants ██████████████ ████████████████████████████.  All the while, the Fiduciary Defendants held significant amounts of Invitae common stock.  *Id.* ¶ 102.

126.    The Fiduciary Defendants were aware that if the Company executed the March

Exchange it would ███████████████████████████████████████ *Id.* ¶ 174.  Board

materials indicate that the Fiduciary Defendants knew that ████████████████████████

████████████████████████████████████████████████████████. *Id.* ¶ 82.

The Fiduciary Defendants, however, made no efforts to understand whether ████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████. *Id.*

127.    The Debtors' CFO, Ms. Wen, had previously been advised that ███████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████. *Id.* ¶ 66.  However, upon information and belief, the

Board received no materials or advice as to the viability of a subsequent capital raise.  Nor did the

Fiduciary Defendants request their advisors conduct any market check to determine the viability

of any such financing.  Moreover, that the Company's existing lenders, who were familiar with

the business and had the most to lose, █████████████████████████████████████████

should have been a sign that raising additional capital without reducing leverage was doomed.

128.    Based on discovery received to date, it is unclear what efforts the Fiduciary

Defendants took to raise additional capital after the March Exchange closed.  Ultimately, the

Debtors were unable to raise additional financing, in part due to the terms and conditions of the

2028 Senior Secured Notes Indenture which were negotiated and agreed to by the Fiduciary

Defendants, including the dilution that would occur if the 2028 Senior Secured Notes were

converted to equity, the strong anti-dilution provisions contained therein, the amount of secured

debt issued thereunder, and the restrictions on issuing *pari passu* or junior secured debt.

129.    These actions constitute breaches of care because the Fiduciary Defendants approved the Uptier Transaction, without regard to Invitae's solvency, without meaningfully considering potential competing proposals or the viability of a subsequent capital raise, without exercising the care that an ordinarily careful and prudent person would exercise in similar circumstances, and without understanding the Company's ability to raise additional capital. The Fiduciary Defendants' actions were negligent, grossly negligent, in bad faith, and with reckless indifference to the interests of unsecured creditors. Additionally, the Fiduciary Defendants did not consider (or perhaps simply ignored) relevant and reasonably available material information, such as the ███████████████████████████████████████████████████████████ ████████████████████████████

130.    Although the business judgment rule presumes that a director acted on an informed basis and in good faith, *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014), such presumption can be overcome by demonstrating that the directors and officer "d[id] not act in good faith, act[ed] in a manner that cannot be attributed to a rational business purpose or reach[ed] their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Stanziale v. Nachtomi* (*In re Tower Air, Inc.*), 416 F.3d 229, 240 (3d Cir. 2005) (citation omitted). Upon such a showing, a fiduciary's conduct must be measured against a standard of "entire fairness," which is the "most onerous standard of review" and shifts the burden of proof to the defendants "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its stockholders." *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 815 (Del. Ch. 2022) ("It is rare that the court will dismiss a fiduciary duty claim on a Rule 12(b)(6) motion when entire fairness is the governing standard of review.") (citing *Tornetta v. Musk*, 250 A.3d 793, 812 (Del. Ch. 2019)).

50

131.    Here, the Fiduciary Defendants' actions and lack of action with respect to the March Exchange , including picking winners and losers among their capital structure, were not in good faith and the Fiduciary Defendants did not act on an informed basis or as a reasonably prudent person would have done in their position.   The Fiduciary Defendants' approval of the March Exchange without regard to Invitae's solvency, without meaningfully considering the viability of a █████████████████, and without exercising the care that an ordinarily careful and prudent person would exercise in similar circumstances constitutes a breach of the duty of care.   *See In re Bridgeport Holdings, Inc.*, 388 B.R. at 569-70 (finding breach of duty of care where D&Os "decided to proceed with the CDW sale without knowing what price other prospective purchasers, such as Office Depot, would have been willing to pay" and instead "simply approved the CDW deal that arose out of Wilson's long-time acquaintance with the CEO of CDW").   The Fiduciary Defendants' actions were negligent, grossly negligent, in bad faith, and/or with reckless indifference to the interests of unsecured creditors.   Additionally, the Fiduciary Defendants did not properly consider—or worse, blatantly ignored—relevant and reasonably available material information, such as the ████████████████████████████████████ ██████████████████████████████.   The March Exchange does not meet the entire fairness standard or the more deferential business judgment rule.   Accordingly, these claims are colorable.

132.    <u>Breach of the Duty of Loyalty</u>.   The Proposed Complaint also alleges that the Fiduciary Defendants breached their fiduciary duty of loyalty to Invitae and its unsecured creditors, by acting in bad faith, failing to act in the best interests of Invitae as a whole, and failing to subordinate their personal interests to the interests of Invitae.   *See e.g.*, *Balasiano v. Borell (In re Furniture Factory Ultimate Holding, L.P.)*, 2023 Bankr. LEXIS 2164, at *29-30 (Bankr. D.

Del. Aug. 31, 2023); Proposed Compl. ¶ 217.  The Officer Defendants have been paid more than

$15.2 million in bonuses since the Fiduciary Defendants knew the Company since March 2023

after the March Exchange closed.  *See e.g.*, *Palmer v. Reali*, 211 F. Supp. 3d 655, 667-68 (D. Del.

2016).  In particular, Mr. Knight, Mr. Brida, and Ms. Wen were paid special "retention" bonuses

in June 2023 and January 2024 (with respect to Mssrs. Knight and Brida).  The initial retention

bonuses paid in June 2023 were approved simultaneously with the closing of the March Exchange.

Moreover, management's determination to increase the retention bonuses granted on the eve of

bankruptcy was "materially misleading" according to Deerfield, further evidencing the Fiduciary

Defendants' failure to subordinate their personal interests and bad faith actions.

133.    The Officer Defendants' actions to favor certain creditors and keep the Debtors'

afloat to preserve their equity interests and receive bonuses breaches their fiduciary duty.  These

actions support a colorable claim for breach of fiduciary duty.

### 8.    Deerfield Aided and Abetted the Fiduciary Defendants' Breaches of the Fiduciary Duties

134.    To state a claim for aiding and abetting a breach of fiduciary duty under Delaware

law, in addition to the elements discussed in Section I.E, *supra*, the Committee must also allege

(i) knowing participation in the breach by the non-fiduciary defendants, and (ii) damages

proximately caused by the breach.  *See In re Rural Metro Corp.*, 88 A.3d 54, 80 (Del. Ch. 2014)

(citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)); *In re USA Detergents, Inc.*, 418

B.R. at 546.  The element of knowing participation is satisfied when the aider and abettor "act[s]

with the knowledge that the conduct advocated or assisted constitutes such a breach."  *In re Rural*

*Metro Corp.*, 88 A.3d at 97 (quoting *Malpiede*, 780 A.2d at 1097), or "when a third party, for

improper motives of its own, misleads the directors into breaching their duty of care."  *Id.* at 99.

135.    Deerfield knowingly participated in and substantially aided and abetted the Fiduciary Defendants in their above-alleged breaches of fiduciary duties.  Deerfield, with the motive of ensuring it would be positioned senior to the 2028 Unsecured Notes, used its preexisting relationship with the Debtors and its consent rights to encourage the Company's management to enter into a transaction that would not benefit the Company to ensure it was first in line as the Company snowballed toward chapter 11.  Proposed Compl. ¶ 223.

136.    Deerfield also colluded with the Debtors to hand pick ████████████████

████████████████████████████████████████████████████████████████

██████████████████.  *Id.*  By colluding to select winners and losers, Deerfield and the Company caused the non-participating 2024 Unsecured Noteholders and the Debtors other unsecured creditors significant damages.

**9.    The Unencumbered Assets Are Not Subject to Any Security Interests and Any Purported Liens on the Non-Perfected Assets Should Be Avoided**

137.    Under section 544 of the Bankruptcy Code, a trustee or debtor in possession may avoid any security interest that is not properly perfected as of the petition date, causing the secured party to lose its security interest and become a general unsecured creditor, preserving the value of the avoided security interest for the benefit of the estate.  11 U.S.C. § 544(a)(1).  The Agent did not have a security interest in the Unencumbered Assets was not properly perfected prior to the Petition Date.  The Proposed Complaint seeks to avoid any unperfected security interests on the Unencumbered Assets under section 544 of the Bankruptcy Code.

**A. Unencumbered Commercial Tort Claim**

138.    The N.Y. U.C.C. defines a "Commercial Tort Claim" as "a claim arising in tort with respect to which: the claimant is an organization; or the claimant is an individual and the claim arose in the course of the claimant's business or profession; and does not include damages

arising out of personal injury to or the death of an individual." N.Y. U.C.C. § 9-102(a)(13)(A). Under the N.Y. U.C.C., a commercial tort claim must be specifically identified in a security agreement for it to be subject to a valid lien. *See* N.Y. U.C.C. §9-108(e)(1).

139.     Therefore, to constitute collateral under the Secured Notes Indenture, a Commercial Tort Claim must be specifically identified on the relevant schedule to the Security Agreement. *Id.* § 9-108(e)(1); *see also, e.g.*, *Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38, 43 (D. Del. 2021) (interpreting an identical Uniform Commercial Code provision under Delaware law and holding that a provision that "all commercial tort claims (including D&O Claims)" constitute collateral was insufficient for purposes of section 9-108 of the Delaware Uniform Commercial Code to convey a security interest in those claims because "interests in commercial tort claims must . . . be specifically identified" rather than be described only by type of collateral); *In re Main St. Bus. Funding, LLC*, 642 B.R. 141, 153-54 (Bankr. D. Del. 2022) (holding that a "general collateral description" was insufficiently specific to create a security interest in commercial tort claims under an identical Pennsylvania statute). Here, the security interest granted by the Security Agreement encompasses:

a)     [a]ll accounts, chattel paper, deposit accounts, documents (as defined in the UCC), equipment, general intangibles, instruments, inventory, investment property, letter-of-credit rights, Pledged Collateral, and any supporting obligations relating to any of the foregoing;

b)     the commercial tort claims described on Schedule 1 and on any supplement thereto received by Agent pursuant to Section 5.9;

c)     all books and records pertaining to the other property described in this Section 3.1;

d)     all Intellectual Property owned by such Grantor at any time, including as of the date hereof, the Intellectual Property set forth on Schedule 5(a), together with all products, proceeds, substitutions, and accessions of or to any of such Intellectual Property; and

e)      to the extent not otherwise included, all proceeds of the foregoing. [41]

140.    Only one such claim was identified on Schedule 1 to the Secured Notes Indenture

Security Agreement: *ArcherDx, LLC v. Qiagen Sciences, LLC*, No. 1:18-cv-01019 (Fed. Cir. App.

Mar. 27, 2024).

141.    The Unencumbered Commercial Torts Claims are unencumbered because such

claim was never listed on a schedule to the 2028 Senior Secured Notes Indenture nor was any

UCC-1 that identified the Unencumbered Commercial Tort Claim filed.[42] Without such a

supplemental schedule or a contemporaneous formal writing delivered pursuant to or in

accordance with the Security Agreement, the Unencumbered Commercial Tort Claims and

proceeds thereof cannot qualify for inclusion in the grant set out in the Security Agreement and

were, therefore, unencumbered as of the Petition Date.

## B. Unencumbered Bank Accounts

142.    A security interest is perfected under Article 9 of the Uniform Commercial Code if

it has "attached" or, in short, becomes enforceable.  N.Y. U.C.C. Law § 9-308(a).  A security

interest becomes enforceable when (1) value has been given; (2) the debtor has rights in the

collateral (or the power to transfer rights in the collateral to the bank); and (3) in the case of deposit

account collateral, and the secured party has control.  N.Y. U.C.C. Law § 9-203(b).  Pursuant to

the N.Y. U.C.C.:

> [a] secured party has control of a deposit account if: (1) the secured party is the
> bank with which the deposit account is maintained; (2) the debtor, secured party,
> and bank have agreed in an authenticated record that the bank will comply with
> instructions originated by the secured party directing disposition of the funds in
> the deposit account without further consent by the debtor; (3) the secured party

---

[41] Secured Notes Indenture Security Agreement Art. III, § 3.1.

[42] Contemporaneously with this Standing Motion and Complaint, the Committee filed a claims objection to certain claims filed by the Agent which also seeks to reduce the Agent's claim to the extent the claim alleges a secured interest in the Natera Litigation.

becomes the bank's customer with respect to the deposit account; (4) the name
on the deposit account is the name of the secured party or indicates that the
secured party has a security interest in the deposit account; or (5) another person
has control of the deposit account on behalf of the secured party or, having
previously acquired control of the deposit account, acknowledges that it has
control on behalf of the secured party.

N.Y. U.C.C. Law § 9-104(a)

143.    The Agent was not granted a security interest in the Unencumbered Accounts
because they are Excluded Accounts.  But even if the Unencumbered Assets are not Excluded
Accounts, the Agent did not properly perfect its security interest in the Unencumbered Bank
Accounts.  The Unencumbered Bank Accounts are not subject DACAs or subject to control by the
Agent.  Indeed, here the accounts are held at HSBC Bank USA, National Association, JP Morgan
Chase & Co., and Silicon Valley Bank and are in the name of the Debtors.  Therefore, the Agent
does not have control and a perfected security interest under applicable law.  Accordingly,
$3,067,938.69 of cash held in the Unencumbered Bank Accounts and cash held in the
Unencumbered Letter of Credit Accounts are not subject to properly perfected pre-petition security
interests under New York law.

144.    Because the Agent does not have a perfected security interest in the Unencumbered
Commercial Tort Claims and the cash in the Unencumbered Bank Accounts, any purported lien of
the Agent may be avoided for the benefit of the Debtors' estate under section 544 of the
Bankruptcy Code.

### 10. The Bonus Payments Should Be Avoided As Preferential and Fraudulent Transfers.

#### A. The Bonus Payments Should Be Avoided As a Preferential Transfer

145.    Section 547 of the Bankruptcy Code provides that certain transfers of an interest in
the Debtors' property can be avoided as preferential transfers.  To avoid a transfer under section
547(b) of the Bankruptcy Code, a plaintiff must show that the transfer: (i) was made to or for the

56

benefit of a creditor; (ii) was for or on account of an antecedent debt; (iii) was made while the debtors were insolvent; (iv) was made on or within 90 days of the petition date or one year if the creditor was an insider; and (v) enables such creditor to receive more than it would have if the case where a chapter 7 liquidation. *See* 11 U.S.C. § 547(b), (g); *In re Nathan & Miriam Barnert Mem'l Hosp. Ass'n*, 2009 WL 3230789 at *1 (Bankr. D.N.J. Oct. 5, 2009).

146.    The Debtors' schedules identify bonus and stock payments totaling: (a) $7,203,328.16 total to Mr. Knight; (b) 2,136,434.98 to Mr. Brida; (c) $2,002,750 to Ms. Schrank, (d) $1,726,850 to Mr. Guigley, (e) $1,594,740 to Mr. Sholehvar, and (f) $82,473.30 of to Mr. Werner within one year of the Petition Date that the Committee seeks to claw back. Each of those payments were identified as the Debtors as having benefited an insider. *See Schedule of Assets and Liabilities and Statement of Financial Affairs for Invitae Corporation*, [Docket No. 202] at 354, 358-61 (Mar. 18, 2024).

147.    As alleged in the Proposed Complaint, the Debtors transferred over $15.2 million in retention bonuses to their executives (the "**Bonus Payments**"), including Messrs. Knight, Brida, Guigley, Sholehvar, Werner and Ms. Schrank (the "**Bonus Payment Defendants**") between March 2023 and January 2024. *See* Proposed Compl. ¶ 240.

148.    Bonus payments made to management are avoidable as preferences. *see Official Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 48 (Bankr. S.D.N.Y. 2006) (finding bonus payment to be a transfer made "'for or on account of an antecedent debt owed by the debtor before the transfer was made' within the meaning of section 547(b)" and thus subject to avoidance as a preferential transfer). The Proposed Complaint proffers that the Bonus Payments were made while the Debtors were insolvent because, and as further discussed above, at the time the Bonus Payments were made, the Debtors' debts and liabilities

exceeded the reasonable fair value of their assets, and the Debtors did not have the ability to meet their maturing obligations or to satisfy their existing or probable liabilities as they came due in the ordinary course of their business. *See supra* ¶¶ 58-59; Proposed Compl. ¶ 242.

149.     Directors, officers, or persons in control of the Debtors are "insiders" under section 101(31) of the Bankruptcy Code. As alleged in the Proposed Complaint, the Bonus Payment Defendants are insiders, and each of the Bonus Payments was made within one year of the Petition Date, as required for preference claims against insiders. *See id.* ¶ 245. Finally, the Proposed Complaint illustrates that, as a result of the Bonus Payments, each of the Bonus Payment Defendants received more than they would be entitled to receive (i) under a hypothetical Chapter 7 case; (ii) if the transfers had not been made; and (iii) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code. *See* Proposed Compl. ¶ 246.

150.     Because the Bonus Payments occurred during the preference period, were made on account of antecedent debt, were made while the Debtors were insolvent, and enabled the Bonus Payment Defendants (all of whom were insiders) to receive far more than they would have in a chapter 7 liquidation, they are avoidable preferences. *See generally* 11 U.S.C. § 547(b); *In re Teligent, Inc.*, 380 B.R. 324, 338-39 (Bankr. S.D.N.Y. 2008). The majority of the Bonus Payments were made in late January, when the Debtors knew they would soon be filing for chapter 11, upon information and belief, contemplated in conjunction with approval of filing the Debtors' chapter 11 petitions. Court have found similar bonus payments are avoidable preferences. *See In re Enron Corp.*, No. 01-16034-AJG, 2005 WL 6237551, at *21 (Bankr. S.D. Tex. Dec. 9, 2005) (finding bonus payments to be avoidable preferences where they were "made in direct anticipation of an imminent bankruptcy filing").

**B. The Bonus Payments Should Be Avoided As Constructive Fraudulent Transfers**

151.    To the extent the Bonus Payments are not avoided as preferential transfers, the Proposed Complaint sufficiently asserts, in the alternative, a cause of action for avoidance of the Bonus Payments as constructive fraudulent transfers.

152.    The Bonus Payments constituted a transfer of the Debtors' interests in property and an obligation incurred by the Debtors within the appropriate lookback period set forth in the Bankruptcy Code and relevant fraudulent transfer statutes as enacted in the states of New York, New Jersey, California, and Delaware.  *See* Proposed Compl. ¶ 251.  The Proposed Complaint sufficiently alleges that the Debtors did not receive reasonably equivalent value in exchange for the Bonus Payments, which were ***prepaid*** for 2024 such that, at the time the transfers were made on January 17, 2024, the Debtors had not yet received any value in exchange for the Bonus Payments.  *See id* ¶ 146.  The Proposed Complaint further alleges that the Debtors were insolvent, or became insolvent, and/or had unreasonably small capital in relation to their business at the time of or as a result of the Bonus Payments.  *See id* ¶ 253.  The Proposed Complaint further alleges that the Debtors made the Bonus Payments to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.  *See id* ¶¶ 242-43.  Accordingly, the Proposed Complaint alleges colorable claims for avoidance of the Bonus Payments as constructive fraudulent transfers under (i) section 548 of the Bankruptcy Code or (ii) section 544(b) of the Bankruptcy Code and the substantially similar fraudulent conveyance provision under applicable state law.  *See In re Enron Corp.*, 2005 WL 6237551, at *21 (finding retention bonus payments avoidable as constructive fraudulent transfers).

**B.      Prosecution of the Proposed Claims Would Benefit the Estate**

153.    Prosecution of the Proposed Claims would clearly benefit the Debtors' Estates.  In determining if an action would be beneficial, courts engage in a limited cost-benefit analysis.  *In re Pack Liquidating, LLC, 2024* WL 409830, at *21 (Bankr. D. Del. Feb. 2, 2024) ("While not an explicit requirement under *Cybergenics* for obtaining derivative standing, many other courts consider whether the committee's claim would benefit the bankruptcy estate based on a cost-benefit analysis.") (citing cases).  Courts conduct this analysis by "consider[ing] the probability of success and the potential costs of litigation[.]"  *Id.*

154.    Without prosecution of the Proposed Claims, the Defendants are getting a free release.  Because the Debtors have indicated that the 2028 Purported Secured Noteholders are oversecured, there is no impairment and therefore no consideration being exchanged for the release of claims related to the 2028 Senior Secured Notes.  Similarly, because the Company is winding down, there is no value the Fiduciary Defendants can give to the Company in exchange for their releases.

155.    Here, the Proposed Claims are not only viable, but they have significant potential value and could materially improve the recoveries of unsecured creditors, outweighing any delay or cost associated with litigating them.  Indeed, the Proposed Claims could result in avoiding the Uptier Transaction entirely and avoiding the liens that encumber the Debtors' property, dramatically shifting the recoveries and materially increasing the recoveries for the unsecured creditors.  Finally, the Committee understands that the Debtors have approximately $60 million of director and officer liability coverage.  This coverage provides a third-party source of significant recoverable value to the Debtors' Estates for the benefit of unsecured creditors.  Additionally, the Committee has the opportunity to claw back more than $15 million in bonus payments made to

the Bonus Payment Defendants.  And the value of the Unencumbered Assets is anywhere from $4 million in cash to tens of millions in proceeds from the Unencumbered Commercial Tort Claims.

156.     The Debtors have proposed to distribute the proceeds of the sale of their assets and their remaining assets through a liquidating plan.[43]  This litigation will not impact the sale or otherwise hold the Debtors' operations hostage.  It will result in the equitable distribution of the Debtors' estate.  At this time it is difficult to forecast any further financial costs to the estate related to the prosecution of the Proposed Claims.  More specifically, the Committee cannot forecast which claims will be prosecuted to judgment and whether litigation financing or fee arrangements are available.  In any event, it is not anticipated that the Proposed Claims will be litigated prior to the confirmation of a chapter 11 plan for the Debtors and these questions may be addressed in the context of Plan feasibility when the Committee will have better insight into the amount of cash in excess of the 2028 Purported Secured Noteholders' claims (if any) and the scope and financing of the post-effective date litigation.

157.     Accordingly, the benefits to be gained from pursuing the Proposed Claims are substantial and significantly outweigh any concerns about delay or expense.  There is no justification for declining to prosecute the Proposed Claims at this juncture.

### C.     The Debtors' Unwillingness to Pursue the Proposed Claims is Unjustified

158.     Where, as here, proposed claims are colorable, a presiding court then determines whether the "debtor in possession unjustifiably failed to bring suit." *Cybergenics*, 330 F.3d at 566.

159.     The Debtor committed not to bring suit against the 2028 Senior Secured Notes in the context of obtaining the Final Cash Collateral Order.  This was done with the perception that consent was necessary and that a fight over adequate protection could be avoided.  After all, the

---

[43] *See Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 471] (May 9, 2024)

2028 Secured Lenders are oversecured and therefore any form of release was unnecessary, much less one they did not provide any consideration for.  Moreover, the Debtors' TSA term sheet and proposed Plan provide for expansive releases to the Fiduciary Defendants without any explanation of the consideration being given or justification to the estate – and none will be given until the confirmation hearing.  *See* Disclosure Statement, Art. IV.I.  Given the way these claims have been handled, no deference should be given to release these claims for no consideration.

160.    While a formal demand upon the Debtors was not required, it was made in the context of negotiating automatic standing in the Final Cash Collateral Order – which the Debtors and Deerfield vehemently refused.  *In re G-I Holdings, Inc.*, 313 B.R. at 630 (citing *In re Nat'l Forge Co.*), 304 B.R. at 222 (unjustifiable failure to bring an action can be implied in a debtor in possessions' "refusal to pursue an avoidance action.").  In any event, demanding the Debtors to prosecute the Proposed Claims is futile because the power to prosecute the claims is with the Special Committee made up by the Fiduciary Defendants.

161.    The Third Circuit aptly recognized that before bankruptcy, a debtor's management and its most powerful creditors typically try to "work out" the debtors' financial distress and management therefore may take "extraordinary concessions" such as "committing to lavish retention bonuses" or "doing virtually anything to avoid filing for bankruptcy" which often reduces assets available to creditors.  *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003).  It is in those situations where "if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it."  *Id.*  "For example, a debtor may be unwilling to pursue claims against individuals or business . . . with whom it has an ongoing relationship that it

fears damaging." *Id.*  As a result, "[t]he possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions." *Id.*

162.    Here, the Debtors are acting "under the influence of conflicts of interest" with respect to their pursuit of claims against two separate sets of the proposed Defendants.  *First,* the Debtors appointed the Special Committee to conduct the investigation and determine whether causes of action against the Potential Defendants existed.  However, the process was flawed.  The Special Committee included three members of the Pricing Committee (which was created to approve the March Exchange) that were the subjects of the investigation.   The Special Committee—not its later appointed "Independent Director"—was granted the authority to address "conflicts matters" and therefore the power to make decisions about the investigation.  The Special Committee met regularly to discuss the upcoming chapter 11 filing and Board members were invited and encouraged to attend all Special Committee meetings.  Proposed Compl. ¶ 142.  On at least one occasion, including on the same date that Mr. Knight encouraged broader participation, the topic of ███████████████████████████████████ was discussed.  *Id.*

163.    Based on conversations with the Debtors, the Committee has significant concerns with respect to the breadth and intensity of the investigation that led to the Debtors' decision to release all of the claims against the Defendants outlined in the Complaint.  Among other things, it is unclear whether the investigators reviewed more than public filings, Board minutes and Board materials.  They only interviewed three witnesses.  And, the actual decision maker, Jill Frizzley, reviewed almost none of the primary source materials and relied on summaries of the interviews of the three witnesses.  Further, the Debtors are releasing potential claims that have never been the subject of any investigation, such as the bonus payments.  Finally, to make matters worse, the Debtors have claimed that all of the advice that was received in connection with the decision to

release the claims is subject to privilege, even though it was shared with the Defendants, so the Court has no record basis on which to determine the substantive legal precepts upon which the decision to release was based.

164.    Additionally, K&E advised the Special Committee on the investigation, advised the other subject of the investigation – Deerfield – on unrelated matters, and the main Board on everything else – three competing interests.  Finally, it appears that the full Board, not the Special Committee or its Independent Director, ultimately decided whether the transactions and claims at issue in the investigation were ultimately to be released upon the chapter 11 filing.   The investigation was tainted.  The Special Committee, investigating itself, and the Board, signing off on the ultimate decision, presumably wanted to avoid "reputational self-immolation" – the exact thing the Third Circuit warned against.

165.    *Second*, by providing Deerfield with a consent right on the Debtors' ability to sell any assets or consider a restructuring with any other creditor constituency, it was inevitably released.  *Id.* ¶¶ 9, 133.  The Special Committee and the Board were clearly "unwilling to pursue claims against [Deerfield]… with whom it has an ongoing relationship it fears damaging" because Deerfield was the gatekeeper to any financial resolution for the Debtors.  *See Cybergenics*, 330 F.3d at 573.  Indeed, by entering this chapter 11 bankruptcy with the TSA in place with Deerfield, which provided for a plan term sheet that provides for almost no recovery for unsecured creditors and full releases of all claims against the proposed Defendants, this chapter 11 case is being run for the primary benefit of the proposed Defendants.  The proposed plan reinforces this as it provides broad releases for Management and Deerfield, and provides for no recoveries – and no vote – for the Unsecured Noteholders.

64

**D.      The Committee Should Be Granted Exclusive Authority to Settle the Proposed Claims**

166.    The Debtors' refusal to bring the Proposed Claims also renders the Debtors incapable of effectively managing or settling any resulting litigation.  It is indisputable that any decision to settle any of the Proposed Claims will have a disproportionate economic impact on the Debtors' unsecured creditors, whose interests the Committee represents in this case.  The Debtors have chosen not to pursue the claims, the Committee should be granted full authority, including the authority to transfer such claims to a liquidating or litigation trust, to do so.  *See, e.g., In re Nat'l Forge Co.*, 304 B.R. at 217 (granting creditors' committee the authority to assert, pursue, and/or settle claims filed on behalf of the estate).

## NOTICE[44]

167.    In accordance with the *Notice, Case Management and Administrative Procedures Order* entered in these Chapter 11 Cases [Docket No. 62], notice of this Motion will be provided to: (a) the Debtors; (b) counsel to the Debtors, Attn: Kirkland & Ellis LLP, and Cole Schotz P.C.; (c) the office of the United States Trustee for the District of New Jersey; (d) counsel to the Required Holders; (e) the indenture trustee to the 2028 Convertible Notes and the 2024 Convertible Notes, and counsel thereto; (f) agent to the 2028 Senior Secured Notes, and counsel thereto; (g) the U.S. Securities and Exchange Commission; (h) the United States Attorney's Office for the District of New Jersey; (i) the attorneys general in the states where the Debtors conduct their business operations; (j) the Internal Revenue Service; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.

---

[44] All capitalized terms in this section not otherwise defined herein are to be given the definitions ascribed to them in the *Notice, Case Management and Administrative Procedures Order* [Docket No. 62].

## NO PRIOR REQUEST

168.    No prior request for the relief sought in this Motion has been made by the Committee.

## WAIVER OF MEMORANDUM OF LAW

169.    The Committee respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal bases upon which the Committee relies are set forth in the Motion and therefore, a separate memorandum of law would be unnecessary.

## RESERVATION OF RIGHTS

170.    The Committee reserves all rights with respect to the Motion and these Chapter 11 Cases, including the right to amend and/or supplement this Motion, the right to participate in additional briefing, and the right to be heard at any hearing or trial related to the Motion.  Nothing contained herein shall constitute a waiver of any of the rights or remedies of the Committee, each of which is expressly reserved.[45]

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Committee respectfully requests that this Court enter the proposed form of order filed contemporaneously herewith: (a) granting the Committee standing to pursue the Proposed Claims; (b) granting the Committee exclusive settlement authority with respect to the Proposed Claims; and (c) granting the Committee such other and further relief, at law or in equity, as this Court may deem just and proper.

---

[45] The Debtors have refused to produce approximately 100 families of documents concerning the Special Committee's investigation even though the Special Committee analyzed causes of action against Invitae's officers and directors and then disclosed its findings to those same officers and directors.  In fact, the Debtors' productions do not include any legal analyses that the Board considered to justify waiving these claims.  The Committee's position is that "[t]he presentation of the [Special Committee's] report constitutes a waiver of privilege because the client, the Special Committee, disclosed its communications concerning the investigation and final report to third parties-the individual director defendants and [their counsel]-whose interests are not common with the client." *Ryan v. Gifford*, No. 2213-CC, 2007 WL 4259557 (Del. Ch. Nov. 30, 2007).

Dated: May 21, 2024

By: */s/ John S. Mairo*
John S. Mairo, Esq.
Warren J. Martin Jr., Esq.
Christopher P. Mazza, Esq.
**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962
(973) 538-4006
(973) 538-5146 Facsimile
Email: wjmartin@pbnlaw.com
        jsmairo@pbnlaw.com
        cpmazza@pbnlaw.com

-and-

J. Christopher Shore, Esq. (admitted *pro hac vice*)
Harrison Denman, Esq. (admitted *pro hac vice*)
Andrew Zatz, Esq. (admitted *pro hac vice*)
Samuel P. Hershey, Esq. (admitted *pro hac vice*)
Ashley Chase, Esq. (admitted *pro hac vice*)
Brett Bakemeyer, Esq. (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: cshore@whitecase.com
        harrison.denman@whitecase.com
        azatz@whitecase.com
        sam.hershey@whitecase.com
        ashley.chase@whitecase.com
        brett.bakemeyer@whitecase.com

Aaron Colodny, Esq. (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 S. Flower St., Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Email: aaron.colodny@whitecase.com

*Co-Counsel to the Official Committee of*
*Unsecured Creditors*

67