**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
nicole.greenblatt@kirkland.com
francis.petrie@kirkland.com
jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
spencer.winters@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING DISCLOSURE STATEMENT**
**RELATING TO THE AMENDED JOINT PLAN OF INVITAE CORPORATION AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]   The last four digits of Debtor Invitae Corporation's tax identification number are 1898.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae.  The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

**PLEASE TAKE NOTICE** that on May 9, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 470] (the "Disclosure Statement Motion") seeking approval of the *Disclosure Statement Relating to the Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 472] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Disclosure Statement Relating to the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that a comparison between the Amended Disclosure Statement and the Disclosure Statement is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that a hearing to seek approval of the Disclosure Statement pursuant to the Disclosure Statement Motion will be held on **June 11, 2024, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Michael B. Kaplan, Chief United States Bankruptcy Judge.  The hearing will be held virtually only.  Instructions to attend the hearing virtually and **listen only** will be posted on the website of Kurtzman Carson Consultants LLC ("KCC") at https://www.kccllc.net/invitae prior to the hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Disclosure Statement Motion, the Disclosure Statement, the Amended Disclosure Statement, and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting KCC's website at https://www.kccllc.net/invitae.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: June 11, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            dharris@coleschotz.com


*Co-Counsel to the Debtors and
Debtors in Possession*


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:   joshua.sussberg@kirkland.com
         nicole.greenblatt@kirkland.com
         francis.petrie@kirkland.com
         jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:   spencer.winters@kirkland.com


*Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**Amended Disclosure Statement**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
nicole.greenblatt@kirkland.com
francis.petrie@kirkland.com
jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
spencer.winters@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO**
**THE AMENDED JOINT PLAN OF INVITAE CORPORATION AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]   The last four digits of Debtor Invitae Corporation's tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

**THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JUNE 11, 2024, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.**

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF INVITAE CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE

**ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE WIND DOWN CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE X, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.**

**<u>SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS</u>**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY STATE AUTHORITY.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE DEBTORS' BUSINESS AND FINANCIAL STRATEGIES, BUDGETS, AND PROJECTIONS;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE REGULATORY LICENSES HELD BY THE DEBTORS OR THE WIND-DOWN DEBTORS;

- THE EVOLVING REGULATORY LANDSCAPE AND POTENTIAL ADOPTION AND IMPACT OF NEW GOVERNMENTAL REGULATIONS;

- TAXATION APPLICABLE TO THE DEBTORS AND ANY CHANGES THERETO;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, AND PERFORMANCE OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY BOTH SHORT AND LONG-TERM LIQUIDITY NEEDS;

- THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- BANK VOLATILITY;

- THE INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;

- **COUNTERPARTY CREDIT RISK;**

- **RISKS IN CONNECTION WITH ACQUISITIONS;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.   THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS OR FINANCIAL LOSSES IN EXCESS OF FDIC INSURED COVERED AMOUNTS CAUSED BY THE FAILURE OF CRITICAL BANKING RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF AN ALTERNATIVE PLAN WOULD PROVIDE MORE VALUE TO STAKEHOLDERS THAN THE PLAN;**

- **THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THESE CHAPTER 11 CASES;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EXPENSES RELATED TO THE WIND-DOWN;**

- **LIMITED ACCESS TO CAPITAL RESOURCES;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS;**

- **CHANGES IN LABOR RELATIONS;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS;**

- **ADVERSE TAX CHANGES;**

- **POSSIBLE RESTRICTIONS ON THE ABILITY TO OPERATE; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................................**10**

II.     PRELIMINARY STATEMENT ...................................................................................**10**

    A.      Background. .......................................................................................................10
    B.      The TSA. ............................................................................................................12
    C.      The Sale Process. ..............................................................................................13
    D.      Statement of the Official Committee of Unsecured Creditors. .........................15

III.    OVERVIEW OF THE PLAN .......................................................................................**18**

    A.      The Plan. ............................................................................................................18
    B.      Holders of Claims May Be Released by the Debtors.........................................24

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
       PLAN ..............................................................................................................................**24**

    A.      What is chapter 11?...........................................................................................24
    B.      Why are the Debtors sending me this Disclosure Statement?............................24
    C.      Am I entitled to vote on the Plan?.....................................................................24
    D.      What is the Sale Transaction?............................................................................25
    E.      What will I receive from the Debtors if the Plan is consummated?....................28
    F.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, a
         Professional Fee Claim, or a Priority Tax Claim? .............................................34
    G.      What does it mean if I have a Convenience Class Claim?..................................36
    H.      What happens to my recovery if the Plan is not confirmed or does not go effective?.....................37
    I.      If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the
         Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
         "Consummation"? ..............................................................................................37
    J.      What are the sources of consideration and other consideration used to make distributions
         under the Plan? ...................................................................................................37
    K.      Are there anticipated Cash proceeds of the Sale Transaction that will be available for
         distribution to unsecured creditors? ..................................................................37
    L.      Is there potential litigation related to the Plan?.................................................37
    M.      Will there be releases, exculpation, and injunction granted to parties in interest as part of
         the Plan?.............................................................................................................37
    N.      What are the consequences of opting out of the releases provided by the Plan?...........................41
    O.      What are the consequences of not opting out of the releases provided by the Plan?......................42
    P.      Does the Plan preserve Causes of Action?.........................................................42
    Q.      Are any regulatory approvals required to consummate the Plan?......................43
    R.      What is the deadline to vote on the Plan? ..........................................................43
    S.      What are the overall projected recoveries under the Plan? ................................43
    T.      How do I vote for or against the Plan? ...............................................................43
    U.      Why is the Bankruptcy Court holding a Confirmation Hearing? .......................43
    V.      When is the Confirmation Hearing set to occur?................................................44
    W.      What is the purpose of the Confirmation Hearing? ............................................44
    X.      What is the effect of the Plan on the Debtors' ongoing business?......................44
    Y.      Will any party have significant influence over the corporate governance and operations of
         the Wind-Down Debtors? ..................................................................................44
    Z.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?............................45
    AA.     Who do I contact if I have additional questions with respect to this Disclosure Statement
         or the Plan?........................................................................................................45
    BB.     Who supports the Plan?......................................................................................45
    CC.     Do the Debtors recommend voting in favor of the Plan?...................................45

**V.      SOLICITATION AND VOTING PROCEDURES** ...................................................**45**

    A.    Classes Permitted to Vote on the Plan. ...............................................45

    B.    Votes Required for Acceptance by a Class. ..........................................46

    C.    Certain Factors to Be Considered Prior to Voting. ..............................46

    D.    Classes Not Entitled to Vote on the Plan. ...........................................47

    E.    Solicitation and Voting Procedures.....................................................47

    F.    Voting Procedures. ..............................................................................48

    G.    Voting and Tabulation Procedures.......................................................49

**VI.     CONFIRMATION OF THE PLAN**.......................................................................**53**

    A.    Requirements of Section 1129(a) of the Bankruptcy Code. ................53

    B.    Best Interests of Creditors—Liquidation Analysis. ...........................54

    C.    Feasibility. ...........................................................................................54

    D.    Acceptance by Impaired Classes. ........................................................55

    E.    Confirmation without Acceptance by All Impaired Classes................55

**VII.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** .....................**56**

    A.    Company History. ...............................................................................56

    B.    The Debtors' Operations. ....................................................................57

    C.    Invitae's Capital Structure and Ownership. ........................................60

**VIII.   EVENTS LEADING TO THESE CHAPTER 11 CASES** ...........................................**62**

    A.    Operating Expenses Resulting from Expansion....................................62

    B.    Macroeconomic Headwinds. ...............................................................63

    C.    Management Turnover. ........................................................................63

    D.    Operational and Liquidity Initiatives. .................................................64

    E.    Additional Initiatives...........................................................................64

    F.    Transaction Negotiations and the TSA. ..............................................65

**IX.     EVENTS OF THE CHAPTER 11 CASES** ............................................................**66**

    A.    First and Second Day Relief and Other Case Matters. ........................66

    B.    Use of Cash Collateral. .......................................................................68

    C.    Appointment of Unsecured Creditors' Committee. .............................68

    D.    Schedules and Statements. ...................................................................68

    E.    Bar Date Motion...................................................................................69

    F.    Lease Rejection Motion. ......................................................................69

    G.    Litigation. .............................................................................................69

    H.    The Post-Petition Sale Process. ...........................................................69

    I.    The Independent Investigation. ............................................................69

    J.    The Committee's Standing Motion. .....................................................70

**X.      RISK FACTORS** ..........................................................................................**71**

    A.    Risks Related to the Wind-Down.........................................................71

    B.    Risks Related to Recoveries under the Plan.........................................75

    C.    Risks Related to the Debtors' Businesses. ...........................................76

    D.    Miscellaneous Risk Factors and Disclaimers......................................77

**XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN** ......................................................................................................**78**

    A.    Introduction. .........................................................................................78

    B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.................................79

    C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
Claims Entitled to Vote.......................................................................80

    D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
Allowed Claims....................................................................................81

E.  Information Reporting and Back-Up Withholding. ........................................................................83

**XII.  RECOMMENDATION OF THE DEBTORS ........................................................................................85**

**EXHIBITS**

EXHIBIT A      Chapter 11 Plan

EXHIBIT B      TSA

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Supplement to the Liquidation Analysis

## I.    INTRODUCTION

Invitae Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Invitae" or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[1] The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE TRANSACTION SUPPORT AGREEMENT, INCLUDING HOLDERS OF OVER 78 PERCENT OF THE 2028 SENIOR SECURED NOTES CLAIMS, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.    Background.

Invitae is a leading medical genetics company that is in the business of delivering genetic testing services, digital health solutions, and health data services that support a lifetime of patient care and improved outcomes. Invitae offers genetic testing across multiple clinical areas, including hereditary cancer, precision oncology, and rare diseases. Invitae applies proprietary design, process automation, robotics, and bioinformatics software solutions to expand the use and impact of genetic information and achieve efficiencies in sample processing and complex variant interpretation, allowing medical interpretation at scale. With the help of Invitae's genetic information, healthcare providers can assist patients in better understanding their susceptibility to a variety of diseases, which may lead to making more informed, sometimes life-saving, decisions about their health and medical care.

Invitae was founded in January 2010, and the Company's proprietary design, process automation, robotics, and bioinformatics software solutions established itself in the genetic research and testing space. Invitae's quick growth was accompanied by a series of acquisitions designed to strategically bolster and expand the Company's reach into new and novel segments within the healthcare industry and genetic testing field.

Between 2019 and 2021, the Company made thirteen (13) acquisitions, many of which unlocked value for Invitae and helped expand the Company's offerings. These acquisitions were carefully selected to either fill gaps in the Company's product portfolio or expand its reach into promising new markets that offered substantial profitability potential. To fund, in part some of these acquisitions, as well as the Company's expanded operations and growth, in 2021 Invitae raised approximately $1.5 billion in newly funded securities, mainly in the forms of convertible senior unsecured notes and common equity. However, these acquisitions required large sums of capital and substantial operating expenses that the Company funded, in large part, by adding significant debt to its balance sheet. These acquisitions also increased operating expenses and cash burn significantly, as many of the newly acquired businesses were pre-commercial and, as such, unprofitable.

While the Company was facing internal challenges as it navigated its newly expanded footprint, its financial position was exacerbated by external market conditions. Widespread inflation in 2021 drove up the cost of raw materials, labor, manufacturing, and operational infrastructure, all while consumer discretionary spending was at a low. In response, the capital markets tightened, and the Federal Reserve raised interest rates. This confluence of

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I.B of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

economic factors imposed constraints on Invitae's ability to raise new capital at a crucial moment for the newly expanded company. Accordingly, the Company was left with limited options to address its funded debt obligations. Invitae was also facing an upcoming maturity on certain of its convertible senior unsecured notes coming due in 2024.

Beginning in 2022, Invitae took steps to address these pressures by implementing several operational initiatives designed to realign its business to focus on profitable growth. In July 2022, the Company appointed a new CEO and chairman of the board of directors of Invitae Corporation and implemented a cost savings program that included exiting certain non-core products, shrinking its geographical footprint, and implementing a reduction in force of approximately 1,000 employees, the combination of which saved the Company an estimated $326 million annually. Invitae also reduced costs through increasing automation, equipment productivity, and other operational streamlining.

While these initiatives provided the Company with incremental liquidity, the boost did not fully make up for the continued costs associated with the business. Accordingly, in March 2023, after a thorough and deliberate negotiation process with its major debtholders across its capital structure, the Company reached an agreement with a number of holders of the Company's 2024 Convertible Notes, to (i) exchange $305.7 million in aggregate principal amount of their 2024 Convertible Notes for $275.3 million aggregate principal amount of new secured Series A Notes due in 2028 and 14,219,859 shares of Common Stock, and (ii) issue $30 million of new secured Series B notes due in 2028. In August 2023, certain of these holders also exchanged additional 2024 Convertible Notes into common stock, eliminating $17.2 million in aggregate principal in funded debt obligations from the Company's balance sheet. This series of transactions provided the Debtors with significant operational runway by deleveraging the balance sheet through equitization, extending maturities by four (4) years on some of its debt obligations that were coming due imminently, as well as by providing an additional $30 million in liquidity at a crucial time based on the Company's liquidity position.

Despite these significant and sustained efforts and the benefits provided to the Company through the 2023 transactions, and even without the threat of the imminent 2024 maturity wall on certain of their other unsecured notes, the Company continued to face leverage challenges and a sustained decline in its stock price that further limited its ability to raise capital. Meanwhile, its business lines continued to require significant cash expenditures. By late September 2023, the Company retained restructuring advisors, including Kirkland & Ellis LLP ("K&E") as restructuring counsel, FTI Consulting, Inc. ("FTI") as financial and restructuring consultant, and Moelis & Company LLC ("Moelis") as financial advisor and investment banker, and began working closely with the special committee of Invitae's board of directors (the "Special Committee") to evaluate strategic alternatives.

In the following months, Invitae, with the assistance of K&E, FTI, and Moelis, began evaluating strategic alternatives to decrease its operational cash burn and preserve liquidity. In conjunction with these efforts, on December 7, 2023, Jill Frizzley, a disinterested director with restructuring expertise, was appointed to the board of directors of Invitae Corporation (the "Board") and to the Special Committee to assist with evaluating strategic alternatives and investigating Invitae's prior transactions for viable claims and causes of action.[3] In parallel, in December 2023 Invitae and Moelis commenced an external marketing process to generate and evaluate potential third-party interest, and to interface with holders throughout its capital structure on a potential restructuring transaction. Prior to the Petition Date, Moelis contacted twenty-five (25) strategic parties—nineteen (19) parties conducted introductory diligence calls with Moelis and thirteen (13) executed nondisclosure agreements.

Additionally, the Company engaged with certain holders of the 2028 Senior Secured Notes to address the immediate cash burn and longer-term balance sheet issues. Namely, as a liquidity-enhancing measure, the Company sought to wind down or divest additional non-core and cash-intensive business lines, including its reproductive health business segment ("Women's Health"), patient network business ("Ciitizen") and personalized medication management platform ("YouScript"), some of which dispositions may have otherwise been prohibited under the 2028 Senior Secured Notes Indenture. In exchange for the requisite consent to amend the 2028 Senior Secured Notes Indenture and permit certain wind-downs and divestitures, Invitae and the Consenting Stakeholders agreed on certain provisions that were designed to drive towards a longer-term solution, which included milestones for a comprehensive marketing of the Company and its assets, compliance with a minimum liquidity covenant, and a timeframe to enter

---

[3] *See Form 8-K*, Invitae Corp. (Dec. 7, 2023), https://ir.invitae.com/financials/sec-filings/2023/default.aspx. Discussed in greater detail in Article IX.I below.

into a mutually agreed upon transaction support agreement for a broader restructuring. After several months, pursuant to hard-fought and good faith negotiations that included extensive diligence and meetings with the Consenting Stakeholders and an ad hoc group of certain Holders of the 2028 Convertible Notes (the "Unsecured Ad Hoc Group") on February 13, 2024, the Debtors and approximately 78 percent of the Holders of the 2028 Senior Secured Notes Claims entered into a transaction support agreement (the "TSA"). The TSA contemplated, among other things, the support of the Consenting Stakeholders for the commencement of the Debtors' Chapter 11 Cases, the continuance of the Debtors' prepetition marketing process in chapter 11, and the allocation of sale proceeds pursuant to the Plan.

On February 13, 2024 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") with the support of the Consenting Stakeholders pursuant to the TSA, and consensus regarding the Debtors' use of Cash Collateral during the Chapter 11 Cases.

**B.      The TSA.**

In accordance with the milestone under the second supplement to the 2028 Senior Secured Notes Indenture dated as of December 8, 2023 (the "Second Supplemental Indenture"), the Company, advised by the Board, and the Consenting Stakeholders continued negotiations and ultimately entered into the TSA on February 13, 2024. The negotiations leading to execution of the TSA were arms-length and in good faith and resulted in the value-maximizing transaction contemplated by the TSA and the Plan, which allocates Distributable Value of the Debtors' estates (including proceeds of the Labcorp sale) in accordance with the Bankruptcy Code's priority scheme while also ensuring near-term distributions. The decision to enter into the TSA and commence these Chapter 11 Cases was the culmination of months of strategic review, including regular meetings of the Debtors' Special Committee, the Board, management, and advisors. Ultimately, the transactions contemplated by the TSA, and entering chapter 11 with the support of the Consenting Stakeholders, provided the best path forward for the Debtors to continue business as usual and continue its sale process from a position of strength in order to maximize Distributable Value to stakeholders.

The TSA contemplated support from the Consenting Stakeholders for the sale of substantially all of the Debtors' assets and/or equity, along with the Plan that will allocate sale proceeds and provide for an orderly wind down of the Debtors' business. Pursuant to the TSA, the Consenting Stakeholders agreed to vote in favor of the Plan, support the Debtors in their sale process, and allocate sale proceeds under the Plan to Holders of Allowed Subsidiary Unsecured Claims, Holders of Allowed General Unsecured Claims in an amount less than $250,000, and administrative costs of the Debtors' Estates before receiving their recovery. The Consenting Stakeholders' support under the TSA also enables the Debtors to use their Cash Collateral on a consensual basis, allowing the Debtors to administer these Chapter 11 Cases while maintaining operations in the ordinary course of business with sufficient cash on hand. The TSA also included certain milestones to expedite these Chapter 11 Cases, including:

- **One (1) day following the Petition Date**: the Debtors shall have file (i) a motion seeking approval of the Cash Collateral Orders; (ii) a motion seeking approval of the Bidding Procedures; and (iii) a motion to establish a claims bar date (the "Bar Date");

- **Three (3) days following the Petition Date**: the Bankruptcy Court shall have entered the Interim Cash Collateral Order;

- **Seven (7) days following the Petition Date**: the Bankruptcy Court shall have entered the Bidding Procedures Order;

- **Thirty (30) days following the Petition Date**: the Bankruptcy Court shall have entered a: (i) Final Cash Collateral Order; and (ii) an order establishing the Bar Date;

- **Sixty-two (62) days following the Petition Date**: the Bar Date shall have occurred;

- **Sixty-six (66) days following the Petition Date**: the Auction (if any) shall have commenced;

- **Fifteen (15) days following Auction**: the Bankruptcy Court shall have entered an order approving the proposed sale;

- **Twenty-five (25) days following the entry of an order approving the proposed sale**: subject to Bankruptcy Court availability, a hearing to approve the Disclosure Statement on a conditional basis shall have occurred;

- **Forty-one (41) days following the approval of the Disclosure Statement on a conditional basis**: subject to Bankruptcy Court availability, a joint hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan shall have occurred; and

- **159 days following the Petition Date**: the closing of the Sale Transaction and the Effective Date shall have occurred, subject to regulatory approvals.

The Plan ultimately contemplates the agreement memorialized by the TSA and the resulting sale process that maximized Distributable Value for stakeholders and provides payment in full to multiple classes of unsecured Claims. An estimated 395 holders of general unsecured claims that have Claims in Class 4 and Class 5 (constituting 93.4 percent of total general unsecured creditors of the Debtors) will have their claims satisfied in full, on claims totaling an estimated $16 million, before Class 3 is entitled to a recovery.

The Debtors conducted an independent investigation (as further described herein) into any potential Claims and Causes of Action that could implicate, among other things, the priority of distributions under the Plan and believe the terms set forth herein are fair, reasonable and consistent with those priorities, and incorporate hard fought concessions from the Consenting Stakeholders to facilitate the sale process and distribution scheme contemplated hereby. As such, the Debtors believe the Plan embodies a reasonable and appropriate settlement of potential Claims and Causes of Action.

**C.      The Sale Process.**

Beginning on December 14, 2023, pursuant to the Second Supplemental Indenture, Moelis began a fulsome third-party marketing process to solicit transaction proposals for substantially all of the Debtors' assets. The Debtors prepared a confidential information memorandum with extensive information on their assets and populated a virtual data room containing significant diligence. In consultation with their advisors, the Debtors then reached out to a group of twenty-five (25) strategic and financial investors. The Debtors selected this group based upon the parties' potential capacity to consummate a large-scale transaction and industry knowledge and experience. The Debtors and their advisors expended extensive efforts in negotiating with potential purchasers. The prepetition marketing period yielded nineteen (19) introductory calls and the execution of thirteen (13) nondisclosure agreements.

As the marketing process progressed, Moelis and the Debtors' other advisors kept members of the Debtors' secured and unsecured noteholder constituencies apprised of important developments and took input from these groups on the marketing process, when deemed appropriate. However, based on the proposals and initial indications of interest received by Moelis and the Debtors, it became apparent that the marketing process, which spanned a total of fifty-eight (58) days, was unlikely to yield a third-party partner that could facilitate an out-of-court sale transaction. Thus, the Debtors determined that pivoting to an in-court sale transaction, as contemplated by the TSA, was the best option available to the Debtors in their efforts to reach the highest or otherwise best transaction possible under the circumstances.

On the Petition Date, and in furtherance of the sale process, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 19] (the "Bidding Procedures Motion"). The Bidding Procedures Motion sought authority to establish certain formal bidding procedures for a potential sale of any or all of the Debtors' assets. On February 16, 2024, the Court entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of*

*Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 57] (the "Bidding Procedures Order").  In conjunction with the TSA, the Bidding Procedures Order and the *Notice of Additional Sale Process Deadline* [Docket No. 119] established certain milestones to move expeditiously through the sale process, including:

| Action | Description | Deadline |
|---|---|---|
| Interim Proposal Deadline | The deadline by which non-binding proposals from Acceptable Bidders must be actually received by the Bid Notice Parties | March 6, 2024, at 5:00 p.m., prevailing Eastern Time |
| Stalking Horse Deadline | The deadline by which the Debtors may choose a Stalking Horse Bidder and enter into a Stalking Horse APA. | March 29, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Stalking Horse Notice Deadline (if applicable) | The deadline by which the Debtors must file a Stalking Horse Notice. | Within two (2) business days after entry into a Stalking Horse APA. |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | April 10, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Auction (if any) | The date and time of the Auction, which will be held at the offices of Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022. | April 17, 2024, at 10:00 a.m. prevailing Eastern Time, if any. |
| Notice of Successful Bidder | Within two (2) business days upon the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | Within two (2) business days upon the conclusion of the Auction (if any). |
| Sale Objection and Adequate Assurance of Future Performance Objection Deadline | The deadline by which objections to the Successful Bidder and Sale Transactions, if any, or to dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Executory Contract or Unexpired Lease, must be made. | April 28, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Sale Hearing | The hearing, if any, before the Court to consider approval of the Successful Bid or Successful Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale Transaction(s). | May 6, 2024, or as soon thereafter as the Debtors may be heard. |

The marketing process was an extensive, far reaching, and months-long process in which the Debtors and their advisors sought strategic and financial investors to effectuate a value maximizing transaction.  The Debtors explored the possibility of designating a Stalking Horse Bidder based on indications of interest received by the Interim Proposal Deadline, but ultimately did not designate a Stalking Horse Bidder.  Instead, the Debtors determined that the best path forward was to allow parties to continue to develop their diligence and submit fulsome bids in advance of the Bid Deadline.  As the Debtors approached the April 10th Bid Deadline, they engaged with over seventy (70) potential buyers for the Debtors' assets and received six (6) indications of interest by the March 6 Interim Proposal Deadline.

14

During the marketing process, the Debtors consulted with the key stakeholders, including the Consenting Stakeholders and the Committee, about important occurrences of the marketing process—including the identity of bidders, key terms of the bids; and the time frame for receiving possible Stalking Horse Bids and Qualified Bids. However, given that the Consenting Stakeholders submitted a bid, the Debtors (in accordance with the Bidding Procedures) did not include the Consenting Stakeholders in the evaluation of any bids, nor did they share information with them about competing bids. Overall, the marketing process was comprehensive and transparent and conducted in accordance with the court-approved Bidding Procedures Order.

On April 17, 2024, in accordance with the Bidding Procedures Order, the Debtors held an auction to sell substantially all of their assets (the "Auction"). To evaluate the bids in hand and provide Qualified Bidders with the opportunity to consider increasing their bids, the Debtors adjourned the Auction until April 24, 2024. The Auction was competitive and involved hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors determined that Labcorp Genetics Inc.'s ("Labcorp," or the "Purchaser") bid represented the highest and otherwise best bid for a value-maximizing transaction of the Debtors' business. Accordingly, the Debtors designated Labcorp as the Purchaser pursuant to the *Notice of Successful Bidder with Respect to the Auction Held on April 17 and 24, 2024* [Docket No. 362] filed on April 24, 2024. The Purchaser's bid includes, among other things, a base purchase price of $239 million in cash, plus additional non-cash consideration including the preservation of a vast majority of employees' jobs and payment of certain cure costs, subject to certain terms and conditions.

On April 25, 2024, the Debtors sought Court approval to execute an asset purchase agreement with the Purchaser to consummate the Sale Transaction pursuant to the *Notice of (I) Filing of the Asset Purchase Agreement and Proposed Sale Order with Respect to the LabCorp Sale Transaction, (II) Modified Cure Objection Deadline, and (III) Rescheduled Sale Hearing* [Docket No. 364]. After a hearing on May 7, 2024, to consider the Sale Transaction the Court entered the *Order (I) Approving the Sale of Acquired Assets Free and Clear of All Liens, Claims, and Encumbrances and (II) Authorizing the Debtors to Enter into and Perform their Obligations Under the Labcorp Asset Purchase Agreement* [Docket No. 463] (the "Sale Order") authorizing the Sale Transaction. The Debtors, however, continue to evaluate their options, and if the Debtors determine that an alternative transaction providing for the sale of all, or substantially all, of the Debtors' assets (an "Alternative Transaction") would provide more value to stakeholders than the Plan, the Debtors will pursue the Alternative Transaction, and will provide Holders of Claims and Interests with additional information and revised documents, as applicable.

D.    **Statement of the Official Committee of Unsecured Creditors.**

**BELOW IS A STATEMENT FROM THE COMMITTEE REGARDING ITS POSITION ON THE PLAN. THE DEBTORS DISAGREE ENTIRELY WITH THE MERITS OF THE COMMITTEE'S STATEMENT AND ITS POSITION ON THE PLAN, AND THE DEBTORS RESERVE ALL RIGHTS WITH RESPECT TO THE COMMITTEE'S ASSERTIONS BELOW.**

**STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

On March 1, 2024, the Office of the United States Trustee, a division of the United States Department of Justice, appointed the Official Committee of Unsecured Creditors (the "**Committee**") to serve as the statutory fiduciary representative of general unsecured creditors in the chapter 11 cases of Invitae Corporation and its affiliated debtors and debtors in possession (collectively, the "**Debtors**").

**The Committee's Position**

**The Committee has reviewed the Debtors' proposed plan [Docket No. 471] (the "Plan") and disclosure statement [Docket No. 472] and it DOES NOT SUPPORT confirmation of the Plan.**

On May 30, 2024, the Bankruptcy Court ordered the Debtors, the Committee, Deerfield Partners L.P. (together with its affiliates, "**Deerfield**"), and the trustee and collateral agent for the 2028 Senior Secured Notes (the "**Agent**") to mediation to attempt to resolve the issues raised by the proposed Plan. To the extent the mediation

is successful, the parties may need to solicit the votes of unsecured creditors or otherwise obtain their support. The Committee will work to ensure that unsecured creditors are notified if that occurs.

### The Uptier Transaction

Between 2019 and 2021, the Debtors borrowed more than $1.5 billion to fund their purchase of unprofitable genetic testing businesses and operations. As early as the summer of 2021, the Debtors' officers and directors knew that, notwithstanding recently receiving more than $1.1 billion in low interest loans, they would soon run out of money unless they raised additional capital. In 2023, the situation became desperate.

In March 2023, the Debtors' officers and directors entered into a "liability management" transaction with Deerfield, whereby the Debtors exchanged the outstanding unsecured debt owed to Deerfield and other of the Debtors' preferred lenders for new secured debt (the "**Uptier Transaction**"), which did not provide the Debtors with any material capital or other value. At that time, the Debtors' officers and directors and Deerfield knew that the Debtors were insolvent and inadequately capitalized. Each of those parties also knew that the Uptier Transaction would not change the Debtors' inevitable insolvency or provide them with any more time to turn around their business. The Debtors' officers and directors proceeded with the transaction notwithstanding that understanding. The result of the Uptier Transaction was to seal the Debtors' fate and provide favored creditors with the purported right to receive the first of at least $332.5 million of value in the inevitable bankruptcy of the Debtors. To add insult to injury, the Debtors' board of directors then paid the Debtors' officers over $15 million of bonuses, including $12 million on the eve of bankruptcy. As described in further detail below, as a direct result of the Uptier Transaction and the lavish bonuses paid to executives, the Debtors' estimate their purportedly secured lenders will be paid in full while their more than $1.2 billion of unsecured creditors will receive a *de minimis* (if any) recovery.

### The Debtors' Plan

The Plan's sole purpose is to distribute the cash proceeds from the sale of the Debtors' business. The vast majority of those proceeds would go to Deerfield and other holders of the 2028 Senior Secured Notes, whose claims would be allowed under the Plan in the full amount asserted by the Agent and the Secured Noteholders. Further, the Debtors propose to provide unconditional releases to (i) Deerfield and the other holders of the 2028 Senior Secured Notes and (ii) the officers and directors who approved the Uptier Transaction and approved and received exorbitant bonuses from the Debtors.

The Debtors intend to release these parties despite the Committee having identified, and sought standing to pursue, valuable causes of action related to the Uptier Transaction. Specifically, after conducting its investigation and reviewing tens of thousands of relevant documents, the Committee believes that significant claims exist against certain current and former Invitae officers and directors, Deerfield and the other Secured Noteholders, and the Agent including for constructive and actual fraudulent transfer, breaches of fiduciary duties, and claims for aiding and abetting the same. These claims are described in detail in the Committee's motion for standing, which was filed at Docket No. 536.

These claims are based on, among other things, the Debtors' and Deerfield's knowledge that the Uptier Transaction was not even a band-aid to cover the Debtors' cash burn. Rather, it was intended to improperly vault Deerfield and its cherry-picked friends ahead of similarly-situated unsecured creditors so that the Debtors and Deerfield could walk hand-in-hand as the Debtors snowballed toward these inevitable Chapter 11 Cases. If successful, the claims alleged in the Standing Motion and the proposed complaint attached thereto would result in the avoidance of the liens securing the 2028 Senior Secured Notes, which would improve recoveries for general unsecured creditors of Invitae by hundreds of millions of dollars.

The Debtors' attempts to eliminate these causes of action and validate the liens securing the 2028 Senior Secured Notes are especially troubling because, with the Debtors working to close the committed sale of their business, the Debtors have no legitimate reason to steer value to one stakeholder or another. The Debtors' "tilting of the scales" in these Chapter 11 Cases is similar to the Debtors' actions in connection with the Uptier Transaction, as described above and in the Standing Motion, in that they benefit Deerfield and the other Secured Noteholders to

detriment of unsecured creditors.  Just as concerning is that the Plan proposes to release the directors and officers who were paid more than $12 million of bonuses on the eve of the bankruptcy filing at a time when they had full knowledge that (i) the Debtors would likely be unable to pay their unsecured creditors and (ii) no executive would likely remain with the Debtors after the sale of their business.

The Debtors also understate the amount of cash that will be available for distribution under the Plan.  The Committee's analysis of the Debtors' cash position shows that even if it were to lose on its litigation (which it does not believe it will), there are still sufficient proceeds to pay the Debtors' purported secured creditors in full and provide a recovery to unsecured creditors.  Yet the Plan assumes otherwise, soliciting only the votes of the holders of the 2028 Senior Secured Notes and not those of general unsecured creditors or any other stakeholder.

In addition to being unfair to general unsecured creditors, the Committee does not support the Plan at this time because it does not satisfy the necessary requirements of the Bankruptcy Code to be approved.  The Plan cannot be confirmed because, among other things, (i) the Plan will not have an impaired accepting class as required by section 1129(a)(10) of the Bankruptcy Code and (ii) the Plan includes improper releases and so-called "settlements" of valuable causes of action for no consideration.  Further, based on the Debtors' liquidation analysis, the Plan cannot be confirmed if one holder of the 2028 Senior Secured Notes votes to reject.  Finally, as the Debtors admit, if the Committee succeeds in prosecuting causes of action against the Secured Noteholders, the Plan is not confirmable.

<u>Conclusion</u>

Instead of pursuing their fatally flawed Plan and spending tens of millions of dollars that otherwise would go to unsecured creditors defending their directors and officers from personal liability for their failure, the Debtors should work with the Committee to modify the Plan to (i) preserve causes of action against Deerfield and the other Secured Noteholders, the Agent, and the Debtors' officers and directors and (ii) provide a mechanism to unwind the Uptier Transaction if the causes of action asserted by the Committee are successful.

*Unless and until the Debtors engage on those modifications, the Committee does <u>not</u> support the Debtors' proposed Plan and encourages all stakeholders to oppose the Plan, not vote in favor of the Plan and to opt out of all Plan releases*.

---

**THE DEBTORS DISAGREE WITH THE COMMITTEE'S STATEMENT AND ITS POSITION ON THE PLAN PROVIDED ABOVE, AND BELIEVE THE COMMITTEE'S ALLEGED CLAIMS ARE MERITLESS AND ARE NOT A SOURCE OF VALUE FOR THE ESTATE.**

**AS ILLUSTRATED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE PLAN IS THE PATH THAT PROVIDES FOR THE FASTEST AND MOST CERTAIN PATH FOR RECOVERY TO CREDITORS, INCLUDING A FULL RECOVERY FOR MANY UNSECURED CREDITORS.**

**FAILURE TO CONFIRM THE PLAN WOULD RESULT IN DELAYS AND INCREASED ADMINISTRATIVE EXPENSES AND WOULD ULTIMATELY REDUCE AVAILABLE DISTRIBUTIONS.**

**THE DEBTORS FURTHER DISPUTE THAT THERE IS ANY VIABLE ALTERNATIVE PLAN THAT WOULD SUPPORT LITIGATION OF THE COMMITTEE'S ASSERTED CLAIMS AND CAUSES OF ACTION WITHOUT SIGNIFICANTLY DEPLETING**

**DISTRIBUTABLE VALUE AND POTENTIALLY ELIMINATING ALL RECOVERIES TO UNSECURED CREDITORS.**

**THE DEBTORS THEREFORE ENCOURAGE ALL HOLDERS OF UNSECURED CLAIMS, ESPECIALLY THOSE IN CLASSES 4 AND 5, TO VOTE TO ACCEPT THE PLAN.**

### III.    OVERVIEW OF THE PLAN

#### A.    The Plan.

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains property under the plan.

The Plan is the best path forward for the Debtors and their estates.  The Plan contemplates the consummation of the Sale Transaction pursuant to the Sale Order.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will substitute the obligations set forth in the Plan for pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

A summary of the treatment is as follows, with a more detailed description provided in Article IV.E of this Disclosure Statement.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 4 | Convenience Class Claims | Unimpaired | Permitted to Vote (Presumed to Accept) |
| Class 5 | Subsidiary Unsecured Claims | Unimpaired | Permitted to Vote (Presumed to Accept) |
| Class 6 | Parent Unsecured Claims | Impaired | Permitted to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interest | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Contingent Subsidiary Unsecured Claims | Impaired | Permitted to Vote (Deemed to Reject) |

**1.    *Overview - Satisfaction of Claims and Interests.***

Each of the Debtors is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.  The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11.  Recoveries for certain Classes of Claims could be as high as 100 percent.  Please refer

to the Article IV.E of this Disclosure Statement for more detail on the projected recoveries for your specific Claim(s). Generally, the Plan contemplates the following treatment of Claims and Interests:

- Holders of Secured Tax Claims and Other Priority Claims will be rendered Unimpaired.

- Holders of Class 4 Convenience Class Claims, either by amount or by election, will receive payment in full in Cash.

- Holders of Class 5 Subsidiary Unsecured Claims Allowed as of the Effective Date that are not Convenience Class Claims, either by amount or election, shall be paid in full in Cash.

- Holders of Class 3 2028 Senior Secured Notes Claims will receive their *pro rata* share of Distributable Value following payment in full of Classes 1, 2, 4, and 5 Claims.  In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash.

- Holders of Class 6 Parent Unsecured Claims and Holders of Class 11 Contingent Subsidiary Unsecured Claims that are not Convenience Class Claims (by election) shall receive on the Effective Date its *pro rata* share of any residual Distributable Value following payment in full of Classes 1, 2, 4, 5, and 3 Claims, or such other treatment as agreed by such Holder (subject to the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders).  As discussed in Article IV.K of this Disclosure Statement, the Debtors anticipate that after satisfying all costs related to the Wind Down and providing distributions to all Holders of Claims with greater priority, Holders of Class 6 Parent Unsecured Claims and Holders of Class 11 Contingent Subsidiary Unsecured Claims are unlikely to receive a recovery under the Plan.

- Class 7 Intercompany Claims shall be reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Claims, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders.

- Class 8 Intercompany Interests shall be reinstated set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Intercompany Interest, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders.

- Any Claims arising under section 510(b) of the Bankruptcy Code shall be discharged without any distribution.

- Equity Interests in Invitae Corporation will be cancelled and will not be entitled to a distribution.

     **2.**     ***The Debtors' Disclaimer with Respect to the Solicitation and Tabulation of Votes Cast by Holders of Claims in Classes 4, 5, 6, and 11.***

The Debtors believe that Classes 4 and 5 are Unimpaired and are therefore presumed to accept the Plan.  The Debtors also have determined that Classes 6 and 11 may or may not receive a recovery under the Plan and are therefore deemed to reject.

In response and to resolve the Committee's objection to the Disclosure Statement, the Debtors shall provide Ballots to Holders of Claims in Classes 4, 5, 6, and 11 and permit such Holders to submit votes on the Plan. The Claims and Noticing Agent will tabulate the Ballots cast by Holders of Claims in Class 4, Class 5, Class 6, and Class 11.

3.          *Settlement, Compromise, and Release of Claims.*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distribution, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims, Intercompany Claims resolved or compromised after the Effective Date by the Debtors, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities, of Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests related to service performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim or Interest has accepted the Plan.

4.          *Assumption and Rejection of Executory Contracts.*

Each Executory Contract or Unexpired Lease the Debtors have not previously assumed, assumed and assigned, or rejected will automatically be deemed rejected by the applicable Wind Down Debtors in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code.  However, such Executory Contract or Unexpired Lease is not automatically deemed rejected if it (a) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) has been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (c) is the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; (d) is a contract, release, or other agreement or document entered into in connection with the Plan; (e) is the Asset Purchase Agreement; or (f) is to be assumed by the Debtors and assigned to the Purchaser in connection with the Sale Transaction and pursuant to the Asset Purchase Agreement.

5.          *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (ii) the effective date of such rejection, or (iii) the Effective Date.  The notice of the Plan Supplement shall be deemed appropriate notice of rejection when served on applicable parties.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Plan Administrator, or their property without the need for any objection by the Debtors, the Wind-Down Debtors, or the Plan Administrator, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of

the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**6.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

The Debtors, or the Wind-Down Debtors, or the Purchaser, will pay any Cures, on the Effective Date or as soon as reasonably practicable thereafter.  The proposed amount and timing of payment of each such Cure can be found in the Plan Supplement, unless otherwise agreed in writing (email being sufficient) between the Debtors, the Wind-Down Debtors, or the Purchaser, and the counterparty to the applicable Executory Contract or Unexpired Lease.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection (an "Executory Contract Objection") filed by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment, including pursuant to the Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee by the applicable Assumption or Rejection Objection Deadline or any other deadline that may be set by the Bankruptcy Court.  Any Executory Contract Objection (x) timely Filed prior to the Confirmation Hearing will be heard by the Bankruptcy Court at the Confirmation Hearing unless otherwise agreed to by the Debtors and the objecting party or (y) timely Filed after the Confirmation Hearing shall be heard as soon as reasonably practicable on a date requested by the Debtors or the Wind-Down Debtors, as the case may be.  Any Executory Contract Objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Wind-Down Debtor, as applicable, without the need for any objection by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors, or the Wind-Down Debtors, or the Purchaser, as applicable, of the Cure amount; *provided,* however, nothing in the Plan shall prevent the Wind-Down Debtors from paying any Cure amount despite the failure of the relevant counterparty to File an Executory Contract Objection.  The Debtors or the Wind-Down Debtors, as applicable, may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and/or assignment.

If there is any dispute regarding any Cure, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure will occur as soon as reasonably practicable after entry of a Final Order (which could be the Confirmation Order) resolving such dispute, approving such assumption (and, if applicable, assumption and assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

If an Executory Contract Objection relates solely to a Cure, the Debtors or the Wind-Down Debtors, may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease before resolving the Cure objection—but the Debtors or the Wind-Down Debtors must reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Wind-Down Debtor).

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure shall result in the full release and satisfaction of any Cures, Claims, or defaults arising under any assumed Executory Contract or Unexpired Lease at any time before such assumption's effective date.  **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed (or assumed and assigned) in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed**

**disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

       7.      *Insurance Policies.*

The Plan treats all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, as Executory Contracts. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Wind-Down Debtors.

Nothing in the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Wind-Down Debtors) or the Plan Administrator, as applicable, or draw on any collateral or security therefor.

       8.      *Indemnification Obligations.*

All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, will (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place before to the Effective Date—irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Wind-Down Debtors and/or the Plan Administrator. Any Claim or other right to indemnification, reimbursement, or contribution by the Debtors' directors, officers, or managers pursuant to charter, by-laws, contract, or otherwise against the Debtors or the Estates, shall be satisfied solely from the proceeds of any applicable D&O Liability Insurance Policies, or similar policy providing coverage to the Debtors' directors, officers, and managers, which policies shall survive the Effective Date, and which Claims or rights shall not be satisfied from any other assets of the Wind-Down Debtors or any proceeds thereof.

       9.      *Preservation of Causes of Action.*

Except as otherwise stated in the Plan or the Sale Order, in accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtors and the Plan Administrator (following transfer of such Causes of Action to the Plan Administrator), shall retain and may enforce all rights to commence and pursue any and all Causes of Action (including any actions specifically enumerated in the Schedule of Retained Causes of Action) regardless of whether they arose before or arise after the Petition Date. Moreover, the rights of the Wind-Down Debtors or the Plan Administrator to commence, prosecute, or settle such Causes of Action will be preserved, despite the occurrence of the Effective Date, except for Causes of Action: (i) acquired by the Purchaser in accordance with the Purchase Agreement, as applicable, or (ii) released or exculpated in the Plan (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors or the Plan Administrator can pursue such Causes of Action in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, will not pursue any and all**

**available Causes of Action against it.  The Debtors, the Wind-Down Debtors, and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as may be assigned or transferred to the Purchaser in accordance with the Asset Purchase Agreement or as otherwise expressly provided in the Plan.**  Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Wind-Down Debtors, or the Plan Administrator expressly reserve all Causes of Action, for later adjudication.  Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors, the Wind-Down Debtors, or the Plan Administrator reserve and will retain such Causes of Action despite the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity will vest in the corresponding Wind-Down Debtor except as otherwise expressly provided in the Plan.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtor, or the Plan Administrator in consultation with the Required Consenting Stakeholders, will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

10.    *Cancellation of Existing Agreements and Interests*.

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan or to the extent otherwise provided in the Plan, including in Article V.A of the Plan, all notes, agreements, instruments, certificates, and other documents evidencing Claims or Interests, including the 2028 Senior Secured Notes Indenture, the 2024 Convertible Notes Indenture, the 2028 Convertible Notes Indenture, and all other credit agreements and indentures, shall automatically be deemed discharged, cancelled, and of no further force and effect, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto, including any Liens and/or Claims in connection therewith, shall be deemed satisfied in full, cancelled, discharged, released, and of no force or effect, and the Trustees shall be released from all duties and obligations thereunder; *provided, however*, that provisions of the 2028 Senior Secured Notes Indenture, the 2024 Convertible Notes Indenture, and the 2028 Convertible Notes Indenture that survive the termination of the respective Indenture pursuant to its terms, including indemnification and charging lien rights of the Trustees, shall continue in full force and effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding such cancellation, discharge and release, the 2028 Senior Secured Notes Indenture, the 2024 Convertible Notes Indenture, and the 2028 Convertible Notes Indenture and any notes, instruments, or other documents issued or evidencing Claims thereunder shall continue in effect to the extent necessary (i) to allow the Holders of 2024 Convertible Note Claims, 2028 Convertible Note Claims, and 2028 Senior Secured Note Claims to receive and accept distributions; (ii) to allow the Trustees to receive and make post-Effective Date distributions, as applicable, or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims; (iii) to preserve any rights of the Trustees to payment of fees, expenses, and indemnification obligations as against any distributions to the Holders of notes, including any rights to priority of payment and/or to exercise charging liens and enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; (iv) to allow each Trustee to enforce any obligations owed to such Trustee under the Plan; and (v) to allow the Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court.

Upon completion of the final distributions in accordance with Article VI of the Plan, (i) the 2028 Senior Secured Notes, the 2024 Convertible Notes, and the 2028 Convertible Notes shall thereafter be deemed null, void, and worthless, and (ii) at the request of the applicable Trustee under the applicable Indenture, DTC shall take down the

relevant position relating to the 2028 Senior Secured Notes, the 2024 Convertible Notes, and the 2028 Convertible Notes without any requirement of indemnification or security on the part of the Debtors, the Trustees, or any third party designated by the foregoing parties.

Except for the foregoing, subsequent to the performance by the Trustees of their obligations pursuant to the Plan or as may be necessary to effectuate the terms of the Plan, the Trustees shall be relieved and discharged from all further duties and responsibilities related to the Plan and the respective Indenture.

**B.      Holders of Claims May Be Released by the Debtors.**

In order to effectuate an expedient process and limit future legal costs, the Plan also contemplates that Holders of Claims and Interests may be released by the Debtors.  Specifically (i) Holders of Claims who vote to accept the Plan and do not affirmatively opt out of the third party releases provided by the Plan, (ii) Holders of Claims who are presumed to accept the Plan and do not affirmatively opt out of the third party releases provided by the Plan, (iii) Holders of Claims who abstain from voting on the Plan and do not affirmatively opt out of the third party releases provided by the Plan, (iv) Holders of Claims who vote to reject the Plan and do not affirmatively opt out of the third party releases provided by the Plan; and (v) Holders of Claims and Interests who are deemed to reject the Plan and do not affirmatively opt out of the third party releases provided by the Plan shall be deemed "Releasing Parties" and will receive a release from the Debtors.  The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to stakeholders.

**IV.      QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN**

**A.      What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to

section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 4 | Convenience Class Claims | Unimpaired | Permitted to Vote (Presumed to Accept) |
| Class 5 | Subsidiary Unsecured Claims | Unimpaired | Permitted to Vote (Presumed to Accept) |
| Class 6 | Parent Unsecured Claims | Impaired | Permitted to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interest | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Contingent Subsidiary Unsecured Claims | Impaired | Permitted to Vote (Deemed to Reject) |

### D.    What is the Sale Transaction?

#### 1.    *Overview.*

The Sale Transaction is the sale for certain of the Debtors' assets, as explained in that certain agreement between the Debtors and the Purchaser.[4] The Sale Transaction provides for a purchase price of $239 million in cash, plus additional non-cash consideration, such as the payment of certain cure costs and the assumptions of liabilities arising out of ownership of the Acquired Assets, subject to certain terms and conditions.

#### 2.    *Sources of Consideration for Plan Distributions.*

The Debtors shall fund distributions under the Plan with: (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Wind-Down Debtors. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

#### 3.    *Delivery of Distribution on Account of Allowed Note Claims.*

Notwithstanding any provision of the Plan to the contrary, distributions of Cash on account of Allowed 2028 Senior Secured Notes Claims, Allowed 2024 Convertible Note Claims, or Allowed 2028 Convertible Note Claims shall be made to the respective Trustee for further distribution to Holders of such Claims in accordance with the terms of the 2028 Senior Secured Notes Indenture, the 2024 Convertible Note Indenture, or the 2028 Convertible Note Indenture, as applicable. Such distributions shall be subject in all respects to the rights of the Trustees to assert their

---

[4]    The asset purchase agreement between the Debtors and the Purchaser is attached as Exhibit A to the Sale Order in the *Notice of (I) Filing of the Asset Purchase Agreement and Proposed Sale Order with Respect to the LabCorp Sale Transaction, (II) Modified Cure Objection Deadline, and (III) Rescheduled Sale Hearing* [Docket No. 364].

respective charging liens against such distributions as set forth in the respective Indenture, to the extent that the fees and expenses of the Trustees have not otherwise been paid in full.

The Trustees shall have no duties or responsibility relating to any form of distribution to Holders of Claims that are not DTC-eligible and the Debtors, the Wind-Down Debtors and/or the Disbursing Agent, as applicable, shall use reasonably commercial efforts to seek the cooperation of DTC so that any distribution on account of Allowed 2028 Senior Secured Notes Claims, Allowed 2024 Convertible Note Claims, or Allowed 2028 Convertible Note Claims that are held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC (whether by means of book-entry exchange or otherwise) of the Effective Date or as soon as practicable thereafter. In no event shall the Trustees (in any capacity) be responsible for any manual, paper, or similar physical, and/or individualized method of distribution or other method of distribution that is not customary for the Trustees under the circumstances. If the Trustees are unable to make, or the Trustees consent to the Disbursing Agent making such distributions, the Disbursing Agent, with the cooperation of the Trustees, shall make such distributions to the extent practicable.

The Trustees shall not incur any liability whatsoever on account of any distributions under the Plan, except for fraud, gross negligence, or willful misconduct. The Debtors or the Wind-Down Debtors, as applicable, shall reimburse the 2028 Senior Secured Notes Collateral Agent and 2028 Senior Secured Notes Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred on or after the Effective Date solely in connection with the implementation of the Plan, including making distributions pursuant to, and in accordance with, the Plan, without the need for further approval or order of the Bankruptcy Court.

**4.**     *Wind-Down Debtors.*

On and after the Effective Date, the Wind-Down Debtors will continue in existence for purposes of, among other things, (i) winding down the Debtors' business and affairs as quickly as reasonably possible (as authorized by the Bankruptcy Court); (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided in the Plan; (iv) establishing and funding the Distribution Reserve Accounts; (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (vi) filing appropriate tax returns; (vii) complying with any continuing obligations under the Asset Purchase Agreement; and (viii) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan or transferred pursuant to the Asset Purchase Agreement on or prior to the Effective Date will vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator, in consultation with the Required Consenting Stakeholders, and the net proceeds thereof shall constitute Distributable Value.

**5.**     *Plan Administrator.*

On the Effective Date, the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and their authority, power, and incumbency in such roles shall be deemed to have terminated, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers. The Plan Administrator will act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her

responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer. The Debtors, after the Confirmation Date, and the Wind-Down Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator will include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Wind-Down Debtors, including: (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (viii) except as otherwise provided for in the Plan, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.D of the Plan; (ix) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (x) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (xi) discharging the sellers' and the Wind-Down Debtors' post-Effective Date obligations under the Asset Purchase Agreement; and (xii) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind Down Reserve.

**6.    *Wind Down.***

As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Plan and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of one or more of the Debtors or the Wind-Down Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Wind-Down Debtors as set forth in the Plan, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Equity Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

**E.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. Any Claims referenced as being *pari passu* will receive equal treatment between the classes of Claims.

The projected recoveries set forth in the table below are estimates only and are based on certain assumptions, including that some sources of consideration will be realized ***after*** the Effective Date. Specifically:

- On the Effective Date, accounts receivable will not be available for distribution. The Debtors anticipate accounts receivable to be collected over a nine-month period[5] after the Effective Date. There is no certainty that amounts realized will be consistent with the Debtors' estimates, none of which are guaranteed.

- Collection of the contingent earnout from the sale of Women's Health is subject to dispute and reconciliation and is not likely available for immediate distribution as of the Effective Date.

The estimates provided in the table below do not account for any delay in closing. If any delay in the closing of the Sale Transaction or the Plan Effective Date, Distributable Value would further be depleted, and administrative costs would increase. The Debtors estimate that these costs (inclusive of operating costs and professionals' fees) would range from $8 million to $10 million per month.

In no circumstance will Holders of Class 3 2028 Senior Secured Notes Claims receive an amount in full satisfaction of their Claims on the Effective Date. As explained above, significant value will not be available (if at all) until well after the Effective Date. Because Class 3 agreed to subordinate their Claims to Classes 4 and 5, any lower realization on contingent value and any increase in operating costs or administrative fees would be borne by Class 3.

For Projected Plan Recoveries, the Debtors are assuming a total distributable value of approximately $404.1[6] million. This includes contingent assets that will be recovered over a nine-month period following the Effective Date contemplated by the Wind-Down Budget to be included in the Plan Supplement.

Classes 4 and 5 will receive payment on the Effective Date. Class 3 will receive approximately 80% of its recovery of the Effective Date, and any additional distributions will be delivered at a later date.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[7]**

---

[5]    In the three (3) to four (4) months following the Effective Date, the Debtors anticipate realizing approximately 65 percent of accounts receivable, with an approximately five (5) month tail period for collection of the remaining amounts. The Debtors modeled their accounts receivable realization and timeline based on historic trends of payors.

[6]    Reflects a midpoint of the projected range of distributable value, which is estimated to be $398.7-$409.5 million.

[7]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' ability to collect accounts receivable and timing on contingent assets.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[8] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, on the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option with the consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned or delayed): (i) payment in full in cash in an amount equal to its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, or (iii) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | n/a | 100% | n/a |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall be paid in full in cash on the Effective Date, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code reasonably acceptable to the Required Consenting Stakeholders. | n/a | 100% | 0.0% |

---

[8]    In the aggregate, there are approximately four (4) 2028 Senior Secured Notes Claims, 340 Convenience Class Claims, fifty (50) Subsidiary Unsecured Claims, and thirty (30) Parent Unsecured Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[8] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 3 | 2028 Senior Secured Notes Claims | Except to the extent that a Holder of an Allowed 2028 Senior Secured Notes Claim agrees to a less favorable treatment, each holder of an Allowed 2028 Senior Secured Notes Claim (which shall include interest (including post-petition interest at the contract, non-default rate)[9], fees and all other amounts due and owing under the 2028 Senior Secured Notes Indenture) shall receive on the Effective Date (or such other applicable date) its Pro Rata share of Distributable Value (including Residual Cash) following payment in full of Claims in Classes 1, 2, 4, and 5.  In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash. | $335.6mm[10] | 91.0%-94.8%[11] | 100%[12] |

---

[9]    The 2028 Senior Secured Notes Claims are entitled to post-petition interest at the contract default rate.

[10]    Class 3's Allowed Claim includes the Make-Whole Amount (as defined below) and payment of accrued and unpaid prepetition interest and postpetition interest at the contract, non-default rate.

[11]    Class 3's high-end Plan recovery includes several assumptions surrounding the recovery of delayed and contingent proceeds, and the high-end Plan recovery in the original Disclosure Statement did not consider Class 3's approximately $27.5 million Make-Whole Amount (the "Make-Whole Amount"), or post-petition interest, which would need to be paid in full before any recovery could flow to junior classes.  Class 3's recovery amount provided for here includes recoveries coming from accounts receivable, many of which will not be available until approximately nine (9) months after the Effective Date.  Recoveries are also dependent on the contingent earnout related to the sale of Women's Health, which is currently subject to dispute and reconciliation.  For the avoidance of doubt, there is no scenario in which Class 3 2028 Senior Secured Notes Claims will receive a 100 percent recovery on the Effective Date.

[12]    The initial hypothetical chapter 7 recovery provided in the Disclosure Statement did not account for the Make-Whole Amount. Similar to the Plan recovery figures, the initial Liquidation Analysis, a form of which is attached hereto as **Exhibit C**, contains several assumptions relating to the distribution of contingent and delayed proceeds that would only become available after the Effective Date.  For a detailed discussion on these assumptions, please see Article VI.B herein.  We have included a supplemental Liquidation Analysis, attached hereto as **Exhibit D**, that includes the Make-Whole Amount as well as an updated understanding of Plan recoveries.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[8] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 4 | Convenience Class Claims | Except to the extent that a Holder of an Allowed Convenience Class Claim agrees to a less favorable treatment, each Holder of an Allowed General Unsecured Claims in an amount less than $250,000 and each Holder who elects to reduce their Allowed General Unsecured Claim to $250,000 shall receive on the Effective Date or as soon as reasonably practicable thereafter: payment in full in Cash, *provided*, that to the extent that a Holder of a Convenience Class Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Convenience Class Claim, such Holder shall only be entitled to a distribution on one Convenience Class Claim against the Debtors in full and final satisfaction of all such Claims. | $9.2mm[13] | 100% | 0.0% |
| 5 | Subsidiary Unsecured Claims | Except to the extent that a Holder of an Allowed Subsidiary Unsecured Claim agrees to a less favorable treatment, each Holder of a Subsidiary Unsecured Claim that is Allowed as of the Effective Date shall receive on the Effective Date or as soon as reasonably practicable thereafter: payment in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code; *provided*, that to the extent that a Holder of a Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Subsidiary Unsecured Claim, such Holder shall only be entitled to a distribution on one Subsidiary Unsecured Claim against the Debtors in full and final satisfaction of all such Claims; *provided further*, that to the extent that a Holder of a | $7.1mm | 100% | 0.0% |

---

[13]    Includes an assumed sixteen (16) Holders of Class 6 Claims electing to receive the Convenience Class treatment.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[8] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims that constitute a Parent Unsecured Claim, such Holder shall only be entitled to a distribution on account of its Subsidiary Unsecured Claim after reduction on account of any distribution on account of its Parent Unsecured Claim. | | | |
| 6 | Parent Unsecured Claims | Except to the extent that a Holder of an Allowed Parent Unsecured Claim agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of a Parent Unsecured Claim shall receive its Pro Rata share of any Distributable Value following payment in full of Classes 1, 2, 3, 4, and 5 Claims, or such other treatment as agreed by such Holder (subject to the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders). | $1,183.7mm[14] | 0% | 0% |
| 7 | Intercompany Claims | On the Effective Date, Intercompany Claims shall be (i) reinstated or (ii) set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Intercompany Claim, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders. | n/a | n/a | n/a |
| 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be (i) reinstated or (ii) set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), | n/a | n/a | n/a |

[14] In connection with the Sale Transaction, the Purchaser intends to assume substantially all of Invitae's workforce. The Debtors anticipate that this will not affect the amount of Class 6 Parent Unsecured Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[8] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | without any distribution on account of such Intercompany Interest, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders. | | | |
| 9 | Section 510(b) Claims | On the Effective Date, any Claims arising under section 510(b) of the Bankruptcy Code shall be discharged without any distribution. | n/a | n/a | n/a |
| 10 | Equity Interests | On the Effective Date, all Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Each holder of an Equity Interest shall receive no recovery or distribution on account of such Equity Interest. | n/a | n/a | n/a |
| 11 | Contingent Subsidiary Unsecured Claims | Except to the extent that a Holder of a Contingent Subsidiary Unsecured Claim agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Contingent Subsidiary Unsecured Claim shall receive its Pro Rata share of any Distributable Value allocable to the applicable Debtor subsidiary following payment in full of Classes 1, 2, 3, 4, and 5 Claims, or such other treatment as agreed to by such Holder subject to consent (not to be unreasonably withheld, conditioned, or delayed) of the Required Consenting Stakeholders; *provided*, that to the extent that a Holder of a Contingent Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Contingent Subsidiary Unsecured Claim, such Holder shall only be entitled to a distribution on one Contingent Subsidiary Unsecured Claim against the Debtors in full and final satisfaction of all such Claims; *provided further*, that to the extent that a Holder of a Contingent Subsidiary Unsecured Claim against a Debtor holds any joint and several liability | C/U/D | 0% | 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[8] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | claims, guaranty claims, or other similar claims that constitute a Parent Unsecured Claim, such Holder shall only be entitled to a distribution on account of its Contingent Subsidiary Unsecured Claim after reduction on account of any distribution on account of its Parent Unsecured Claim. | | | |

F.      **What will I receive from the Debtors if I hold an Allowed Administrative Claim, a Professional Fee Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      *Administrative Claims.[15]*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, in consultation with the Required Consenting Stakeholders, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable, with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Required Consenting Stakeholders; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Wind-Down Debtors, or the Plan Administrator, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy

---

[15]    Administrative Claims do not include any amounts owed with respect to 503(b)(9) Claims (as defined in the Final Critical Vendors Order) pursuant to the Final Critical Vendors Order, as the Debtors believe that all 503(b)(9) Claims have been paid in full.

Court and served on the Debtors and the requesting party by the Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

        **2.**       *Professional Fee Claims.*

        **(a)**       **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Wind-Down Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account. The Wind-Down Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

        **(b)**       **Professional Fee Escrow Account.**

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute Cash consideration to be distributed in accordance with the Wind-Down Budget or otherwise under the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

        **(c)**       **Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

        **3.**       *Post-Confirmation Fees and Expenses.*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, or Wind-Down Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Wind-Down Debtors, and/or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

        **4.**       *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and reasonably acceptable to the Required Consenting Stakeholders.

5.      ***Payment of Restructuring Expenses.***

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the TSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court or any other review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Wind-Down Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.  In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash.

6.      ***Statutory Fees.***

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors, (or funded by the Wind-Down Debtors and disbursed by the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until such Wind-Down Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

G.      **What does it mean if I have a Convenience Class Claim?**

If you have a Convenience Class Claim, that means (a) the total amount of your Allowed General Unsecured Claim is less than or equal to $250,000 and is not (i) a 2024 Convertible Notes Claim, (ii) a 2028 Convertible Notes Claim, or (iii) a Contingent Subsidiary Unsecured Claim; and (b) you elected on your Opt Out Form to treat your Allowed General Unsecured Claim as a Convenience Class Claim, including, if applicable, reducing your Allowed General Unsecured Claim to $250,000.  You will receive the treatment provided to Holders of Class 4 Convenience Class Claims.  Holders of Convenience Class Claims are entitled to a one-time Cash payment of their Allowed Convenience Class Claims (the "Convenience Class Claim Recovery").

If you have a Class 6 Parent Unsecured Claim or a Class 11 Contingent Subsidiary Unsecured Claim, you may irrevocably elect on your Opt Out Form to have your Class 6 Parent Unsecured Claim or Class 11 Contingent Subsidiary Unsecured Claim (as applicable) reduced to $250,000 and treated as a Class 4 Convenience Class Claim (the "Convenience Claim Election").  To be clear, if you make the Convenience Claim Election, your claim will be reduced to $250,000 (as applicable), considered a Convenience Class Claim, and you *may not* revoke your Convenience Claim Election.[16]

The Convenience Class Claim Recovery is a one-time Cash payment.  Holders of Allowed Convenience Class Claims and Holders making the Convenience Claim Election will not be entitled to additional distributions.

---

[16]    The Debtors anticipate that Class 4 (Convenience Class Claims) will recover, in a low-end and high-end scenario, approximately $8.8 million in the aggregate under the Plan.  This estimation is based upon the assumption that 35 percent Holders of Claims in Class 6 (Parent Unsecured Claims) and none of Holders of Claims in Class 11 (Contingent Subsidiary Unsecured Claims) will make the Convenience Claim Election.

**H.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein.  It is possible that any alternative plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article VI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit C**.

**I.     If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the Distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial Distributions to Holders of Allowed Claims will be made as soon as reasonably practicable after the Plan becomes effective—the "Effective Date", as specified in the Plan.  Although this will happen on the Effective Date for Class 4 and Class 5, full distributions available to Class 3, Class 6, and Class 11 will be delayed and contingent, and will take several months to be fully realized.  *See* Article IX of the Plan for a description of the conditions precedent to the occurrence of the Effective Date or "Consummation" of the Plan.

**J.     What are the sources of consideration and other consideration used to make distributions under the Plan?**

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Sale Transaction; (ii) the Debtors' Cash on hand; and (iii) the proceeds of any Causes of Action retained by the Wind-Down Debtors.

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**K.     Are there anticipated Cash proceeds of the Sale Transaction that will be available for distribution to unsecured creditors?**

The Debtors anticipate that after completing the Wind-Down and providing distributions to Holders of Claims in Classes 1 and 2, the Wind-Down Debtors will have sufficient proceeds to pay the Class 4 (Convenience Class Claims) and Class 5 (Subsidiary Unsecured Claims) in full.  The Debtors also anticipate that no or nearly no Distributable Value will be available for Holders of Class 6 (Parent Unsecured Claims), Class 9 (Section 510(b) Claims), Class 10 (Equity Interests), and Class 11 (Contingent Subsidiary Unsecured Claims).

**L.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.

**M.     Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan, enumerated herein and in the Plan, propose to provide releases to the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

As discussed in greater detail in Article IX.I of this Disclosure Statement, in October 2023 the Board authorized the Special Committee to investigate possible claims and causes of action that may be held by the Company (the "Investigation").  On October 23, 2023, the Company executed an agreement with Jill Frizzley to serve as an independent advisor with the option to serve as an independent director of the Company upon execution of a

subsequent mutual agreement.  Subsequently on December 7, 2023, the board of directors of Invitae Corporation appointed Jill Frizzley as an independent and disinterested director and a member of the Special Committee.  From October 2023 to the Petition Date, Ms. Frizzley, with K&E's assistance, oversaw and directed the Special Committee's Investigation of certain transactions within a two-year lookback period to determine whether the Company held any viable claims or causes of action arising from several of the Company's material divestitures and transactions, and to assess whether the Debtors should pursue, settle, release, or retain such claims.

Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the Estates.  The releases, exculpation, and injunction are an integral component of the Plan, which provides significant distributions of value to administrative, priority, secured, and unsecured creditors.

The Debtor Release is a release of the Debtors' claims against third parties.  By contrast, the Third-Party Release is a release of direct claims a Holder of a Claim or Interest has against third parties unless a Holder of such Claim or Interest affirmatively elects to opt out of the Third-Party Release.

The Debtors believe that the settlement, releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

"*Released Party*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor; (c) the Consenting Stakeholders; (d) the 2028 Senior Secured Notes Trustee; (e) the 2028 Senior Secured Notes Collateral Agent; (f) the Plan Administrator; (g) each Company Party; (h) the Purchaser; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j); *provided, however*, that each Entity that (x) elects to opt out of the releases described in Article VIII.D of the Plan or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation shall not be a Released Party.

"*Releasing Party*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor; (c) the Consenting Stakeholders; (d) the Trustees; (e) the Plan Administrator; (f) each Company Party; (g) the Purchaser; (h) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (i) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (j) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all holders of Interests; (m) each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) each Related Party of each Entity in clauses (a) through this clause (n); *provided, however*, that each Entity that (x) elects to opt out of the releases contained in Article VIII.D of the Plan or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation shall not be a Releasing Party; *provided, further, however*, that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party.

"*Exculpated Parties*" means, collectively:  (a) the Debtors; (b) the Wind-Down Debtors, (c) the Plan Administrator; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons, directors, members of any committees of any Entity's board of directors or managers, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT (I) VOTE TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED BY THE PLAN, (II) ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED BY THE PLAN; (III) ABSTAIN FROM VOTING ON THE**

PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED IN THE PLAN; (IV) VOTE TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED BY THE PLAN; OR (V) ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RLEASE PROVIDED BY THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS AND THE WIND-DOWN DEBTORS.

      1.    *Releases by the Debtors.*

    Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the TSA, the Disclosure Statement, the Plan, the Sale Transaction, the Asset Purchase Agreement, the Definitive Documents, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the TSA, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

      2.    *Releases by Holders of Claims and Interests.*

    Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, is deemed to

have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Wind-Down Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the TSA, the Disclosure Statement, the Plan, the Sale Transaction, the Asset Purchase Agreement, the Definitive Documents, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the TSA, the Disclosure Statement, the Sale Transaction, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in Article VIII.D of the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) a sound exercise of the Debtors' business judgment; (viii) given and made after due notice and opportunity for hearing; and (ix) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in Article VIII.D of the Plan and does not exercise such opt out is a Releasing Party and may not assert any Claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity (i) that opted out of the releases contained in Article VIII.D of the Plan or (ii) was deemed to reject the Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Plan, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.

      3.     *Exculpation.*

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission arising on or after the Petition Date and through the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the Definitive Documents, or any transaction, contract, instrument, release or other

agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

4.      *Injunction.*

Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, compromised, settled or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Related Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, compromised, or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

5.      *Statement of the SEC and Reservation of Rights.*

The Staff of the Securities and Exchange Commission (the "SEC Staff") asserts that the Third-Party Release is nonconsensual as to the Holders of the 2028 Senior Secured Notes Claims, Equity Interests, and subordinated Section 510(b) Claims. The SEC Staff has reserved all rights to object to the Third-Party Release and its other potential issues with the Plan at the Confirmation Hearing. The Debtors disagree with the SEC Staff's position and recommend that Holders of Claims vote to accept the Plan.

**N.      What are the consequences of opting out of the releases provided by the Plan?**

As described above, each Holder of a Claim that votes to accept the Plan, votes to reject the Plan, abstains from voting on the Plan, is presumed to accept the Plan, or is deemed to reject the Plan may opt out of providing the releases under the Plan. Making an opt out election will preserve any direct Causes of Action that the Holder may have against the Released Parties and those Causes of Action the Estates hold against a Holder.

Upon the Effective Date, the Plan Administrator will be vested with authority to commence, litigate, and settle any and all Causes of Action. Accordingly, because the proposed releases are bilateral in nature, opting out of the releases may result in a voting party being sued in their personal capacity by the Plan Administrator on account of any Causes of Action the Debtors may hold against the voting party, that are not otherwise released by the Plan.

**O.      What are the consequences of not opting out of the releases provided by the Plan?**

Each Holder of a Claim entitled to opt out of the releases that elects not to exercise such opt out, will become a Released Party under the Plan. Accordingly, any direct Causes of Action that such Holder may have against the Released Parties will be unconditionally released upon the Effective Date, and correspondingly, each such Holder will receive a release from the Debtors for any Causes of Action the Debtors may hold against them.

This means that no Released Party may be sued in their personal capacity by the Plan Administrator on account of any Causes of Action the Debtors may hold against such party.

**P.      Does the Plan preserve Causes of Action?**

The Plan preserves Causes of Action. The Wind-Down Debtors and the Plan Administrator will retain and may enforce all rights to commence and pursue any and all Causes of Action regardless of whether they arose before or arise after the Petition Date.

Moreover, the rights of the Wind-Down Debtors or the Plan Administrator to commence, prosecute, or settle such Causes of Action will be preserved, despite the occurrence of the Effective Date, except for Causes of Action: (i) acquired by the Purchaser in accordance with the Purchase Agreement, as applicable, or (ii) released or exculpated in the Plan (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors or the Plan Administrator can pursue such Causes of Action in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Wind-Down Debtors, and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as may be assigned or transferred to the Purchaser in accordance with the Purchase Agreement or as otherwise expressly provided in the Plan.** Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Wind-Down Debtors, or the Plan Administrator expressly reserve all Causes of Action, for later adjudication. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors, the Wind-Down Debtors, or the Plan Administrator reserve and will retain such Causes of Action despite the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity will vest in the corresponding Wind-Down Debtor except as otherwise expressly provided in the Plan. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in

no instance will any Cause of Action preserved pursuant to the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**Q.     Are any regulatory approvals required to consummate the Plan?**

The Debtors anticipate that regulatory filings and subsequent approvals may be required to consummate the Plan, prior to and after any change of ownership or control resulting from a sale or their ownership interests to continue their operations.  Federal and other national authorities and state and local regulators may require certain filings for the Debtors' businesses to continue operations and receive reimbursement from healthcare programs upon sale. Specifically, in the event of the Sale Transaction, there are certain state regulations that require regulator review periods prior to implementing the Sale Transaction.  It is a condition precedent to the Effective Date that any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan be obtained.

On May 15, 2024, as a regulatory prerequisite to close the Sale Transaction under California State Law, the Debtors submitted a Material Change Transaction Notice to California's Office of Healthcare Affordability ("OHCA"), and a request to expedite OHCA's review of the Sale Transaction by June 20, 2024.  On May 25, 2024, Labcorp submitted its Material Change Transaction Notice to OHCA.  Additionally, on May 25, 2024, OHCA responded to the Debtors that there were no further questions or additional information needed.  On June 6, 2024, OHCA noted both the Debtors' and Labcorp's submissions have been accepted and are in review, and that OHCA would attempt to complete their review with a June 28, 2024, deadline.

Moreover, on May 15, 2024, the Debtors reported the Sale Transaction to the Federal Trade Commission pursuant to the Hart-Scott-Rodino Act (the "HSR").  The waiting period required by the HSR expired on May 31, 2024.

**R.     What is the deadline to vote on the Plan?**

The deadline is July 15, 2024, at 4:00 p.m. (prevailing Eastern Time).

**S.     What are the overall projected recoveries under the Plan?**

The projected recoveries are provided in Article IV.E of this Disclosure Statement.

**T.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are permitted to vote on the Plan.  To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and submitted, in accordance with each Ballot's applicable instructions, via (i) e-mail at InvitaeBallots@kccllc.com, (ii) the E-Ballot Portal, or (iii) first class mail, overnight courier, and hand delivery to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245, so that they are **actually received** by Kurtzman Carson Consultants LLC ("KCC" or the "Claims and Noticing Agent"), pursuant to the instructions on the applicable Ballot, no later than **July 15, 2024 at 4:00 p.m. (prevailing Eastern Time)**.  *See* Article V of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**U.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

### V.    When is the Confirmation Hearing set to occur?

The hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **July 22, 2024, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Chief Judge Michael B. Kaplan, United States Bankruptcy Court for the District of New Jersey, at the Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom No. 8, Trenton, New Jersey 08608. The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by **July 15, 2024, at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) to provide notification to those persons who may not receive notice by electronic mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

### W.    What is the purpose of the Confirmation Hearing?

The purpose of the Confirmation Hearing is to seek Confirmation of the Plan. The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

### X.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are distributing assets and winding down under Chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on or as soon as reasonably practicable after the Effective Date. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

On or after the Effective Date, the Plan Administrator will commence the Wind Down of the Wind-Down Debtors in accordance with the terms of the Plan and subject at all times to such amendments and deviations as may be required.

### Y.    Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors?

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers. The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer. The Debtors, after the Confirmation Date, and the Wind-Down Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder

solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Z.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VIII of this Disclosure Statement, as well as in the *Declaration of Ana Schrank, Chief Financial Officer of Invitae Corporation, in Support of Chapter 11 Filing, First-Day Motions, and Access to Cash Collateral* [Docket No. 21] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise.

**AA.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Noticing Agent:

**By electronic mail at:** InvitaeInfo@kccllc.com

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims and Noticing Agent at www.kccllc.net/invitae (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

**BB.     Who supports the Plan?**

The Plan is supported by the Debtors and Holders of over 78 percent of 2028 Senior Secured Notes.

**CC.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Sale Transaction contemplated by the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.

**V.      SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**A.      Classes Permitted to Vote on the Plan.**

The following Classes are entitled or permitted (as applicable) to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim or Interest | Status |
|---|---|---|
| Class 3 | 2028 Senior Secured Notes Claims | Impaired |
| Class 4 | Convenience Class Claims | Unimpaired |
| Class 5 | Subsidiary Unsecured Claims | Unimpaired |
| Class 6 | Parent Unsecured Claims | Impaired |
| Class 11 | Contingent Subsidiary Unsecured Claims | Impaired |

**DISCLAIMER**: The Debtors believe that Classes 4 and 5 are unimpaired and are therefore presumed to accept the Plan. The Debtors also have determined that Classes 6 and 11 may or may not receive a recovery under the Plan and are therefore deemed to reject. In response and to resolve the Committee's objection to the Disclosure Statement, the Debtors shall provide Ballots to Holders of Claims in Classes 4, 5, 6, and 11 and permit such Holders to submit votes on the Plan. The Claims and Noticing Agent will tabulate the Ballots cast by Holders of Claims in Class 4, Class 5, Class 6, and Class 11.

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package. If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims and Noticing Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

## B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number and two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

If the Debtors determine that a Voting Class is either presumed to accept or deemed to reject the Plan, any votes cast by such a Class will not count towards confirmation of the Plan.

## C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article X of this Disclosure Statement.

### D.      Classes Not Entitled to Vote on the Plan.

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled nor permitted to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| Class 1 | Other Secured Claims | Unimpaired |
| Class 2 | Other Priority Claims | Unimpaired |
| Class 7 | Intercompany Claims | Unimpaired / Impaired |
| Class 8 | Intercompany Interest | Unimpaired / Impaired |
| Class 9 | Section 510(b) Claims | Impaired |
| Class 10 | Equity Interests | Impaired |

### E.      Solicitation and Voting Procedures.

#### 1.      *Claims and Noticing Agent.*

The Debtors have retained KCC to act, among other things, as Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.      *Solicitation Package.*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

      a.      the Solicitation and Voting Procedures;

      b.      the applicable form of Ballot, together with detailed voting instructions, and instructions on how to submit the Ballot;

      c.      the cover letter, which urges Holders of Claims in the Voting Classes to vote to accept the Plan (the "Cover Letter");

      d.      the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

      e.      this Disclosure Statement (and exhibits thereto, including the Plan);

      f.      the Disclosure Statement Order (without exhibits, except for the Solicitation and Voting Procedures);

      g.      a pre-addressed, postage pre-paid reply envelope;[17] and

      i.      any additional documents that the Bankruptcy Court has ordered to be made available.

#### 3.      *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors shall serve, or cause to be served, copies of the Solicitation Package to Holders of Claims in the Voting Classes.  In addition, these Solicitation and Voting Procedures, the Disclosure Statement, the Plan, the

---

[17]    The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive a Ballot directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

Disclosure Statement Order, and all pleadings filed with the Bankruptcy Court shall be made available on the Debtors' case website https://kccllc.net/Invitae; *provided* that any party that would prefer paper format may contact the Claims and Noticing Agent by: (a) calling (866) 967-0263 (domestic) or +1(310) 751-2663 (international) and asking for a member of the solicitation team; (b) submitting an inquiry to http://www.kccllc.net/invitae/inquiry; (c) writing to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245; or (d) e-mailing invitaeinfo@kccllc.com and referencing "Invitae" in the subject line.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date. In addition, the Debtors shall distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Classes **within three (3) business days following entry of the Disclosure Statement Order** who are entitled to vote. To the extent that such distribution is not made by the Solicitation Mailing Deadline, the Debtors shall distribute the Solicitation Packages immediately thereafter; *provided*, that the Debtors shall distribute the Confirmation Hearing Notice no later than three (3) business days following the Solicitation Mailing Deadline. The Debtors will not distribute Solicitation Packages or other solicitation materials to (i) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, (ii) any party to whom notice of the Motion was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; or (iii) the Holders in Class 7 (Intercompany Claims) or Class 8 (Intercompany Interests).

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

F.    **Voting Procedures.**

The Bankruptcy Court has approved **[June 6,] 2024,** as the record date for purposes of determining which Holders of Claims in Classes 3, 4, 5, 6, and 11 are entitled or permitted to vote on the Plan (the "Voting Record Date")

The Bankruptcy Court has approved **[July 15], 2024, at 4:00 p.m. (prevailing Eastern Time)** as the voting deadline for the Plan (the "Voting Deadline"). The Debtors may extend the Voting Deadline, in their discretion, without further order of the Bankruptcy Court (with notice to the Committee). To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and submitted, in accordance with each Ballot's applicable instructions, via (i) e-mail at InvitaeBallots@kccllc.com, (ii) the E-Ballot Portal, or (iii) first class mail, overnight courier, and hand delivery to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245, so that they are **actually received** by KCC, pursuant to the instructions on the applicable Ballot, no later than the Voting Deadline. Each Beneficial Holder Ballot shall be returned to the applicable Nominee so that such Nominee may properly complete and deliver to the Claims and Noticing Agent, a Master Ballot that reflects the vote of such Beneficial Holder so that it is received no later than the Voting Deadline. Ballots delivered by any means other than those listed as acceptable forms of delivery will not be counted.

The Debtors intend to file the Plan Supplement on or before the later of (i) **July 8, 2024** or (ii) the date that is no later than seven (7) days prior to the Voting Deadline. The notice of the Plan Supplement is attached to the Disclosure Statement Order as Exhibit 6.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS PERMITTED BY APPLICABLE LAW OR COURT ORDER.

ANY BALLOT THAT IS PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED TO THE DEBTORS THAT FAILS TO INDICATE ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND

RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR AS PERMITTED BY APPLICABLE LAW OR COURT ORDER.

## G. Voting and Tabulation Procedures.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a. except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted and actually received by the Claims and Noticing Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan or for any other purpose described in this Disclosure Statement;

b. the Claims and Noticing Agent will date-stamp all Ballots when received;

c. the Claims and Noticing Agent shall retain copies of Ballots and all solicitation-related correspondence for two (2) years following the closing of the Chapter 11 Cases, whereupon the Claims and Noticing Agent is authorized to destroy and/or otherwise dispose of: (a) all copies of Ballots; (b) printed solicitation materials including unused copies of the Solicitation Package; and (c) all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Bankruptcy Court in writing within such two year period;

d. the Debtors will file the Voting Report on or before **July 18, 2024**. The Voting Report shall, among other things, delineate every Ballot that was excluded from the voting results (each an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or other necessary information, or damaged. The Voting Report shall indicate the Debtors' decision with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

e. an executed Ballot is required to be submitted by the Entity (except with respect to Master Ballots submitted by the Nominees) submitting such Ballot. Delivery of a Ballot to the Claims and Noticing Agent by facsimile or any means other than expressly provided in the applicable Ballot will not be valid;

f. except as otherwise provided, a Ballot will be deemed delivered only when the Claims and Noticing Agent actually receives the executed Ballot;

g. no Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

h.     if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly submitted, valid Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

i.     Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

j.     a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

k.     the Debtors, subject to a contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

l.     neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

m.     unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with submissions of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted; *provided* that a valid opt out election on an otherwise defective or irregular Ballot submitted prior to the Voting Deadline shall be honored as a valid opt out election;

n.     in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

o.     subject to any order of the Bankruptcy Court, the Debtors reserve the right to reject any and all ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

p.     if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Bankruptcy Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution;

q.     if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

r.     the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be

entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

s.      after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Bankruptcy Court;

t.      the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes;

u.      in the event a Ballot is returned marked to accept a Convenience Claim Election, such Ballot will be deemed to accept the Plan; and

v.      to assist in the solicitation process, the Claims and Noticing Agent may, but is not required to, contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies; *provided* that the Claims and Noticing Agent is not obligated to do so and neither the Debtors nor the Claims and Noticing Agent will suffer any liability for failure to notify parties of such deficiencies

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to Beneficial Holders of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims who hold and will vote their position through a Nominee:[18]

a.      the Claims and Noticing Agent shall distribute or cause to be distributed through the applicable Nominees (i) Solicitation Packages for each Beneficial Holder of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims as of the Voting Record Date represented by a Nominee, which will contain, among other things, a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a Master Ballot for the Nominee;

b.      any Nominee that is a Holder of record with respect to Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims shall vote on behalf of, or facilitate voting by, Beneficial Holders of such Claims, as applicable, either by (i)(A) immediately, and in any event within five (5) Business Days after its receipt of the Solicitation Packages, distributing the Solicitation Packages, including the Beneficial Holder Ballots, it receives from the Claims and Noticing Agent to all such Beneficial Holders,[19] (B) providing such Beneficial Holders with a return address to send the completed Beneficial Holder Ballots, (C) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot, and (D) transmitting the Master Ballot to the Claims and Noticing Agent so that it is received no later than the Voting Deadline;

---

[18]   Beneficial Holders hold their positions in the Debtors' publicly-traded debt securities in the Debtors' Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims in "street name" through a Nominee, which is a bank, broker or other intermediary, or their agent.

[19]   Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee. Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices. If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.

c.  the applicable indenture trustee will not be entitled to vote on behalf of a Beneficial Holder; rather, each Beneficial Holder must vote his or her own Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims according to instructions received from its Nominee;

d.  any Ballot returned to a Nominee by a Beneficial Holder, whether in a Beneficial Holder Ballot or otherwise according to the Nominee's instructions, shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Claims and Noticing Agent a Master Ballot that reflects the vote of such Beneficial Holders so that it is received no later than the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Claims and Noticing Agent. Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of two (2) years following the closing of these Chapter 11 Cases;

e.  if a Beneficial Holder holds Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

f.  votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in the Voting Classes as of the Voting Record Date, as evidenced by the applicable securities position report(s) obtained from the DTC. Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date. Votes cast on account of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims will be tabulated in the same manner with respect to each applicable Debtor;

g.  Master Ballots may be submitted via (i) e-mail at InvitaeBallots@kccllc.com (preferred method of delivery) or (ii) first class mail, overnight courier, and hand delivery to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245;

h.  if conflicting votes or "over votes" are submitted by a Nominee pursuant to a Master Ballot, the Claims and Noticing Agent will use reasonable efforts to reconcile discrepancies with the Nominees. If over votes on a Master Ballot are not reconciled before the preparation of the voting report tabulating votes on the Plan, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over vote, but only to the extent of the Nominee's position in Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims;

i.  to assist in the solicitation process, the Claims and Noticing Agent may, but is not required to, contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies; provided that the Claims and Noticing Agent is not obligated to do so and neither the Debtors nor the Claims and Noticing Agent will suffer any liability for failure to notify parties of such deficiencies;

j.  for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Class 3 2028 Senior Secured Notes Claims or Class 6 Parent Unsecured Claims, although any principal amounts may be adjusted by the Claims and Noticing Agent to reflect the amount of the Claim actually voted, including prepetition interest;

k. a single Nominee may complete and deliver to the Claims and Noticing Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the latest received valid Master Ballot received before the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior received Master Ballot. Likewise, if a Beneficial Holder submits more than one Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly;

l. Nominees, or their agents, may forward Solicitation Packages (or a summary thereof) to their Beneficial Holder clients by e-mail or other customary means of communication, including an online electronic link to solicitation materials, in addition to (or in lieu of) mailing a Solicitation Package and/or Beneficial Holder Ballot;

m. Nominees, or their agents, may collect votes from their Beneficial Holder clients by e-mail or other customary means of communication, in addition to (or in lieu of) collecting a Beneficial Holder Ballot; and

n. no fees or commissions or other remuneration will be payable to any Nominee, broker, dealer, or other person for soliciting Beneficial Holder Ballots with respect to the Plan.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,**

---

**PLEASE EMAIL THE CLAIMS AND NOTICING AGENT AT INVITAEINFO@KCCLLC.COM OR CALL THE CLAIMS AND NOTICING AGENT AT (866) 967-0263 (U.S. OR CANADA), +1 (310) 751-2663 (INTERNATIONAL)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## VI. CONFIRMATION OF THE PLAN

### A. Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for confirmation are the following: (i) the Plan is accepted by all Impaired Classes or, if the Plan is rejected by an Impaired Class, at least one Impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 2028 Senior Secured Notes Claims, Holders of Class 6 Parent Unsecured Claims, Holders of Class 9 Section 510(b) Claims, Holders of Class 10 Equity Interests, and Class 11 Contingent Subsidiary Unsecured Claims).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of Chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of Section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.**      **Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit C**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan, including Holders of unsecured Claims, would be the same or greater than under a hypothetical chapter 7 liquidation.  As set forth in greater detail in the Liquidation Analysis and this Disclosure Statement, all creditors would likely receive significantly reduced recoveries in a hypothetical liquidation.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors as distributions under the Plan will provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation as of the Effective Date.

**C.**      **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s)unless the plan contemplates such liquidation or restructuring.

The Plan contemplates and effectuates a sale of substantially all of the Debtors' assets and subsequent Wind Down of the Debtors' remaining Estates.  Accordingly, the Debtors believe that all Plan obligations will be

satisfied without the need for further reorganization of the Debtors and the Plan satisfies the feasibility requirement of section 11129(a)(11) of the Bankruptcy Code.

### D.      Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (iii) provides that, on the Consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their Ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance.

Class 3's projected recovery is highly contingent on certain distributable value being realized after the Effective Date.  Thus, Class 3 is an Impaired class.

### E.      Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one (1) impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

#### 1.      *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain

circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

#### (a) **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

#### (b) **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## VII. THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A. Company History.

Invitae was founded by Randal W. Scott and Sean E. George on January 13, 2010, as a subsidiary of Genomic Health, Inc., a company focused on genetic research in cancer detection. Invitae was created to bring mainstream medical-grade genetic testing to the public and to provide healthcare providers with patients' genetic makeup to inform important healthcare decisions. Invitae was incorporated in the State of Delaware under the name Locus Development, Inc. and changed its name to Invitae Corporation in 2012. That same year, Invitae separated from Genomic Health, Inc. and became an independent entity.

Today, Invitae offers genetic tests across several clinical areas, including hereditary cancer, precision oncology, and rare diseases. Invitae makes available critical and potentially life-saving genetic data that guides patients in making informed medical decisions and evaluating their health and wellness throughout their lifetime. Since its inception, Invitae has provided genetic tests to more than 4.4 million patients, and over 135,000 healthcare providers have ordered Invitae tests. This evolution of the business has successfully resulted in Invitae's ability to interpret almost 2 million disease-associated genes.



**B.    The Debtors' Operations.**

**1.    *Invitae's Business Segments.***

Invitae's operations focus on popularizing the use of genetics in the healthcare space by lowering costs, removing barriers to adoption, and expanding insights and solutions through both comprehensive genetic testing and efficient data and network services.  The Company has four (4) main business segments within this genetic testing and data services framework:  (a) genetic testing focused on hereditary cancers; (b) genetic testing for rare diseases; (c) personalized cancer monitoring; and (d) data products.

**(a)    *Hereditary Cancer.***

Invitae offers genetic tests for genes associated with hereditary cancers such as breast cancer, ovarian cancer, colon cancer, and pancreatic cancer.  Within these subdivisions, there are dozens of genetic testing options that test for a variety of cancers by analyzing certain genetic markers and genes.  Invitae's "HerCan" business has a strong presence in almost all National Cancer Institute-Designated cancer centers in the United States.

**(b)    *Pediatric & Rare Diseases.***

Under the rare diseases business line, Invitae offers tests for exome, cardiology, immunology, neurology, metabolic disorders, and pediatric genetics and newborn screening.  This business segment includes the most common genetic tests recommended by the American Academy for Pediatrics for children showing symptoms of intellectual disorders.  Invitae's pediatric testing allows for the detection of intellectual disorders earlier in life, leading to earlier treatment that mitigates symptoms and increases cognitive functions into adulthood.

Generally, this business segment allows providers to choose from dozens of testing options, which target and identify a wide array of genes.  For example, a healthcare provider can order a cerebral palsy spectrum disorders panel for a pediatric client that analyzes 424 genes to determine the underlying cause of cerebral palsy.  Detecting rare disease at an early diagnosis allows for more effective treatments and improved outcomes, especially for young patients.  Those early diagnoses can also deliver substantial cost savings to patients and the healthcare system via informed treatment plans.  Invitae also has a state-of-the-art variant interpretation program that allows Invitae to perform repeat analysis at no additional cost to patients.  Invitae's "Rare" testing services are now deeply embedded in the top U.S. children's hospitals, and Invitae has been a trusted partner for many clinicians and healthcare providers for over ten (10) years.

(c)      *Personalized Cancer Monitoring.*

Invitae offers somatic[20] cancer testing through the Company's personalized cancer monitoring platform, which detects minimal residual or recurrent disease ("MRD") and monitors treatment response.  Invitae has developed a unique MRD product that has demonstrated greater sensitivity and specificity to detect MRD for cancer patients who are receiving treatment to reduce the chance of cancer coming back, as well as patient monitoring for disease recurrence.  Invitae also has the potential to extend personalized cancer monitoring through comprehensive genomic profiling of baseline tissue, which enables therapy selection and clinical trial enrollment for patients with cancerous tumors.

(d)      *Data Products.*

The data and patient network services business segment aggregates and de-identifies patient data to enable medical professionals, biopharmaceutical companies, and patients access to genetic information to advance genetic research and create better health outcomes in compliance with applicable healthcare laws, including HIPAA.

Invitae generates revenue from its access to data products and services through certain arrangements with some of its large customers, including industry groups, health systems, and biopharmaceutical companies.  These contracts offer customers various testing and data information services for the duration of the contract or subscription term.  Invitae has entered into collaboration agreements to provide its customers with diagnostic testing and related data aggregation reporting services.  Invitae has also entered into data sharing agreements with customers to provide certain de-identified data for research purposes.

2.      *Invitae's Testing Services.*

The core of Invitae's business focuses on making comprehensive, high-quality medical genetic data more accessible and instrumental to the healthcare ecosystem, including, among others, patients, healthcare providers, biopharma partners, and patient advocacy groups in order to expand genetic insights and health solutions.  Invitae generates revenue primarily from its testing services and receives payment generally through government entities and private insurance companies, and healthcare institutions, and direct payments from individuals.

To receive testing, a patient's healthcare provider orders the relevant tests.  The healthcare provider will then provide their patient with a collection kit designed to collect genetic samples (including saliva and blood), which is mailed back to Invitae's laboratory for processing.  After Invitae receives the collection kit, Invitae accessions and prepares the specimens for testing, and then runs them through a sequencer, which records various genetic data collected from the specimen for medical interpretation.

A key component to genetic research data is Invitae's variant interpretation systems.  Invitae's method of variant interpretation includes the process of evaluating and classifying genomic sequence variations, also known as mutations or variants.  This allows the clinician to evaluate and, if appropriate, discuss the evidence with their patients.  These variations can occur naturally or from exposure to environmental factors such as pollutants or radiation.  Some variants may have no impact on health, while others can lead to the development of serious conditions such as cancer or inherited genetic disorders.  Some variants may result in unknown significance, but over time, can be reclassified as more data is collected to bridge the relationship between a genetic variant and a genetic condition.  Broad genomic testing has helped to dramatically improve the diagnostic process over time through variant interpretation and Invitae's access to such data is a key driver of its business.

Once finalized, the results can be accessed through the Invitae online portal or from the healthcare provider who submitted the order.  Invitae also provides access to board-certified genetic counselors who offer peer-to-peer support as well as detailed insights regarding variants, genes, and conditions.

---

[20]    Somatic cancer variants are the most common cause of cancer, occurring from damage to genes in an individual cell during a person's life.

3.  *Laboratories.*

Invitae's laboratories are state-of-the-art facilities that process patients' genetic samples as they arrive.  As of the Petition Date, Invitae processed a majority of its genetic tests, including those related to the HerCan and Rare business lines, at its laboratory in San Francisco.  Invitae conducts research, and its personalized cancer monitoring testing, from its "Metropark" facility located in Iselin, New Jersey.

4.  *Intellectual Property.*

Since its founding, Invitae has developed a differentiated portfolio of valuable intellectual property.  Invitae relies on a combination of intellectual property rights, including trade secrets, copyrights, trademarks, customary contractual protections and, to a lesser extent, patents, to protect core technology.  As of the Petition Date, Invitae has issued current U.S. patents, pending U.S. patent applications and corresponding non-U.S. patents and patent applications directed to various aspects of laboratory, analytic and business practices.

In the ordinary course of business, Invitae uses proprietary procedures for (i) the laboratory processing of patient samples and (ii) the analysis of the resulting data to generate clinical reports.  In particular, Invitae has automated aspects of processes for curating information about known genetic variants, identifying genetic variants in a patient's sequence information, associating those genetic variants with known information about their potential effects on disease, and presenting that information for review by personnel responsible for its interpretation and for the delivery of test reports to clinicians and patients.

5.  *Regulatory Environment.*

The genetic testing industry is heavily regulated.  Federal and state regulators impose restrictions on "clinical reference laboratories" that receive specimens for the purpose of running specialized tests.  Accordingly, because the Company receives and tests genetic specimens, they qualify as clinical reference laboratories and are thus subject to both federal and state regulations.

(a)  **CLIA.**

Under the Clinical Laboratory Improvement Amendments of 1988, ("CLIA"), all facilities that perform applicable tests on "materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings" are required to meet certain federal requirements.  If a facility performs tests for these purposes, it is considered a laboratory under CLIA and generally must apply and obtain a certificate from the CLIA program that corresponds to the complexity of tests performed.  The Company's laboratories in California and New Jersey are required to hold federal certificates of accreditation in order to conduct their business.

Under CLIA, Invitae is required to hold certificates applicable to the type of laboratory examinations it performs and to comply with standards covering personnel, facilities administration, inspections, quality control, quality assurance, and proficiency testing.  Invitae has current certifications under CLIA to perform testing at laboratory locations in California and New Jersey.  To renew CLIA certifications, Invitae is subject to survey and inspection generally every two (2) years to assess compliance with program standards.  Moreover, CLIA inspectors may randomly inspect clinical reference laboratories.  If clinical reference laboratories are out of compliance with CLIA requirements, Invitae may be subject to sanctions such as suspension, limitation, or revocation of CLIA certificates, as well as directed plans of correction, state on-site monitoring, significant civil money penalties, civil injunctive suits, or criminal penalties.  Furthermore, Invitae must maintain CLIA compliance and certifications to be eligible to bill for diagnostic services provided to Medicare and Medicaid beneficiaries.

(b)  **State Licensure Requirements.**

In addition, Invitae's laboratories are required to hold home state laboratory licenses in California and New Jersey, as well as out-of-state laboratory licenses in other states from which Invitae accepts patient samples, including California, New Jersey, Maryland, New York, Pennsylvania, and Rhode Island.  California and New Jersey laws establish standards for day-to-day operations of laboratories in those states that may differ from CLIA requirements.  Such laws mandate proficiency testing, which involves testing of specimens that have been specifically prepared for

the laboratories.  If clinical reference laboratories like Invitae's are out of compliance with applicable standards, the appropriate state agency may suspend, restrict, or revoke licenses to operate clinical reference laboratories.  In addition, such a state agency may assess substantial civil money penalties or impose specific corrective action plans for out-of-compliance laboratories.

(c)      <b>Federal Oversight of Tests.</b>

In the ordinary course of business, Invitae provides many of its tests as laboratory-developed tests ("<u>LDTs</u>"). The Centers for Medicare & Medicaid Services, along with certain state agencies, regulate the performance of LDTs as authorized by CLIA and state law, respectively.  Historically, the U.S. Food and Drug Administration ("<u>FDA</u>") has exercised enforcement discretion with respect to most LDTs and has not required laboratories that furnish LDTs to comply with the agency's requirements for medical devices (*e.g.*, establishment registration, device listing, quality system regulations, premarket clearance or premarket approval, and post-market controls).  In April 2024, however, the FDA announced a final rule to phase out this policy of general enforcement discretion and regulate LDTs, including those manufactured by laboratories that are certified under CLIA, as medical devices.  After a four-year phase-out period, the FDA expects LDTs to meet the same applicable requirements as traditional manufacturers of diagnostic products, except under certain narrow circumstances.  Specifically, (1) after the first year of effectiveness of the proposed rule, the FDA will end its general enforcement discretion approach to MDR requirements, correction and removal reporting requirements, and most quality system ("<u>QS</u>") requirements; (2) within two years of effectiveness, the final rule will end the enforcement discretion approach with regard to registration and listing requirements, listing requirements, and compliance with investigational use requirements; (3) after three years, the FDA will cease its general enforcement discretion approach with respect to all QS requirements and will expect compliance with the "device" Current Good Manufacturing Practice Regulations 21 U.S.C. 360j(f) and part 820 (21 CFR part 820); and (4) after four years (but not before April 1, 2028), the FDA will end its general enforcement discretion approach with respect to the premarket review procedures for moderate- and low-risk diagnostic products.

(d)      <b>HIPAA.</b>

Under the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("<u>HIPAA</u>"), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 ("<u>HITECH</u>"), the U.S. Department of Health and Human Services has issued regulations that establish uniform standards governing the conduct of certain electronic healthcare transactions and requirements for protecting the privacy and security of protected health information ("<u>PHI</u>"), used or disclosed by covered entities, including most health care providers and their respective business associates, as well as the business associates' subcontractors. Invitae is generally a covered entity under HIPAA and required to comply with the provisions of HIPAA and HITECH and the regulations implemented thereunder that set forth standards for the privacy of PHI; security standards for the protection of electronic PHI; breach notification requirements; and standards for electronic transactions.

Penalties for failure to comply with a requirement of HIPAA or HITECH vary significantly, and, depending on the knowledge and culpability of the HIPAA-regulated entity, may include civil monetary penalties for each provision of HIPAA that is violated.  Compliance with HIPAA and HITECH requires significant resources, and Invitae may be restricted in its ability to perform certain activities that involve the collection, use, or disclosure of PHI as a result of limitations in the HIPAA privacy regulations.  As of the Petition Date, Invitae was not aware of any material non-compliance with its HIPAA obligations.

C.      <b>Invitae's Capital Structure and Ownership.</b>

1.      *The Debtors' Organizational Structure.*

Invitae's current organizational structure is reflected below:



**2.**    ***The Debtors' Prepetition Capital Structure.***

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $1.482 billion in debt obligations, consisting of (a) 2028 Senior Secured Notes and (b) Convertible Senior Unsecured Notes.  Invitae also had 291.1 million shares of Common Stock, par value $0.0001 per share, outstanding as of the Petition Date.

Invitae has issued several categories of notes, each as more fully described below:

| Facility | Maturity | Approximate Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| ***Secured*** | | |
| **2028 Senior Secured Notes** | **March 15, 2028** | **$305.4 million** |
| ***Unsecured*** | | |
| **2024 Convertible Notes** | **September 1, 2024** | **$27.1 million** |
| **2028 Convertible Notes** | **April 1, 2028** | **$1,150 million** |
| **Total Debt Obligations** | | **$1,482.5 million** |

(a)    Secured Notes.

***2028 Senior Secured Notes***.  In March 2023, Invitae entered into that certain Indenture, dated as of March 7, 2023, by and among: (a) Invitae Corporation, as issuer; (b) certain of its subsidiaries pursuant to the 2028 Senior Secured Notes Indenture, as Guarantors; and (c) U.S. Bank Trust Company, National Association (in its capacity as trustee, the "2028 Senior Secured Notes Trustee" and, in its capacity as collateral agent, the "2028 Senior Secured Notes Collateral Agent") (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "2028 Senior Secured Notes Indenture").  The 2028 Senior Secured Notes Indenture provided for the issuance of $275.3 million initial aggregate principal amount of the 4.5% Series A Convertible Senior Secured Notes due 2028 (the "Series A Notes") and an initial aggregate principal amount of $30 million of the 4.5% Series B Convertible Senior Secured due 2028 (the "Series B Notes" and, together with the Series A Notes, the "2028 Senior Secured Notes") by Invitae.  In August 2023, pursuant to an amendment to the Senior Secured Indenture, the Company issued additional Series A Notes in an aggregate principal amount of $100,000.

The 2028 Senior Secured Notes are senior secured obligations of Invitae and certain of its subsidiaries and will mature on March 15, 2028, unless earlier converted, redeemed, or repurchased. Holders of the 2028 Senior Secured Notes may elect to convert all or any portion of their 2028 Senior Secured Notes into fully paid and nonassessable shares of Common Stock (subject to certain limitations as set forth in the Senior Secured Indenture). The 2028 Senior Secured Notes bear cash interest at a rate of 4.50% per year, payable quarterly in arrears on March 15, June 15, September 15, and December 15 of each year, beginning on June 15, 2023. The 2028 Senior Secured Notes are guaranteed by material subsidiaries and secured by (i) a security interest in substantially all the assets of Invitae and its domestic material subsidiaries, and (ii) a pledge of the equity interests of Invitae's direct and indirect subsidiaries, subject to certain customary exceptions. As of the Petition Date, the 2028 Senior Secured Notes had an aggregate outstanding principal amount of $305.4 million.

(b)    <strong>Unsecured Notes.</strong>

<u><strong><em>2024 Convertible Notes</em></strong></u>. In September of 2019, Invitae entered into that certain Indenture, dated as of September 10, 2019, by and among (a) Invitae, as issuer, and (b) U.S. Bank National Association, as predecessor trustee to Wilmington Savings Fund Society Bank (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "<u>2024 Convertible Notes Indenture</u>"). The 2024 Unsecured Notes Indenture provided for Invitae's issuance of $350 million aggregate principal amount of the 2.00% convertible senior unsecured notes coming due in 2024 (the "<u>2024 Convertible Notes</u>").

The 2024 Convertible Notes are senior unsecured obligations of Invitae Corp. and will mature on September 1, 2024, unless earlier converted, redeemed, or repurchased. The 2024 Convertible Notes bear cash interest at a rate of 2.00% per year, payable semi-annually in arrears on March 1 and September 1 of each year, beginning on March 1, 2020. Upon conversion, the 2024 Convertible Notes will be convertible into cash, shares of Common Stock, or a combination of cash and shares of Common Stock, at Invitae's election. As of the Petition Date, the 2024 Convertible Notes had an aggregate outstanding principal amount of $27.1 million.

<u><strong><em>2028 Convertible Notes</em></strong></u>. In April of 2021, Invitae entered into that certain Indenture, dated as of April 8, 2021, by and among (a) Invitae, as issuer and (b) U.S. Bank National Association, as predecessor trustee to Wilmington Savings Fund Society Bank (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "<u>2028 Convertible Notes Indenture</u>"). The 2028 Unsecured Notes Indenture provided for the issuance of $1.15 billion aggregate principal amount of 1.50% Convertible Notes due 2028 (the "<u>2028 Convertible Notes</u>").

The 2028 Convertible Notes are senior unsecured obligations of Invitae Corporation and will mature on April 1, 2028, unless earlier converted, redeemed, or repurchased. The 2028 Convertible Notes bear cash interest at a rate of 1.50% per year, payable semi-annually in arrears on April 1 and October 1 of each year, beginning on October 1, 2021. Upon conversion, the 2028 Convertible Notes will be convertible into cash, shares of Common Stock, or a combination of cash and shares of Common Stock, at Invitae's election. As of the Petition Date, the 2028 Convertible Notes had an outstanding principal balance of $1.15 billion.

(c)    <strong>Invitae's Equity Interests.</strong>

As of the Petition Date, Invitae had approximately 291.1 million shares of Common Stock (par value $0.0001 per share) outstanding. On February 6, 2024, the New York Stock Exchange (the "<u>NYSE</u>") notified Invitae and publicly announced that the NYSE would immediately suspend trading of the Common Stock and commence proceedings to delist the Common Stock pursuant to Section 802.01D of the NYSE Listed Company Manual. Invitae has historically traded on the NYSE under the ticker "NVTA." On February 6, 2024, the NYSE announced that the Company's Common Stock will be delisted from the NYSE. The Company's Common Stock has since traded on the "over the counter" market.

## VIII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Operating Expenses Resulting from Expansion.

Between 2019 and 2021, seeking to diversify and grow its business, Invitae sought to capitalize on several promising market opportunities and made thirteen (13) acquisitions over the course of three (3) years. These

62

acquisitions were carefully selected to either fill gaps in the Company's product portfolio or expand its reach into promising new markets that offered substantial profitability potential. To fund in part some of these acquisitions, as well as the Company's expanded operations and growth, in 2021 Invitae raised approximately $1.5 billion in newly funded securities, mainly in the forms of convertible senior unsecured notes and common equity.

Some of these acquisitions included, among others:

> ***ArcherDX, LLC*** ("ArcherDX"): Acquired in 2020 in a transaction valued at roughly $1.4 billion, ArcherDX is a leading genomic analysis company. The acquisition added tumor profiling and liquid biopsy technologies for predicting and monitoring therapeutic response to Invitae's service offerings.
>
> ***Genosity, Inc.*** ("Genosity"): Acquired in 2021 for $196 million, Genosity is a biotechnology company that provides software and laboratory services for clinical and research applications of genomics. The acquisition of Genosity provided critical support for the speed, efficiency, and flexibility needed for mainstream global adoption of Invitae's PCM business.
>
> ***Ciitizen, LLC***: Acquired in 2021 for $325 million, Ciitizen is a healthcare AI-startup. The purchase of Ciitizen enhanced Invitae's platform by providing patients an easy-to-use, centralized hub for their genomic and clinical information.

While presenting expanded growth opportunities for the reach of Invitae's business, the addition of multiple new business lines also burdened Invitae with significant operating expenses. Such high operating leverage made Invitae increasingly vulnerable to economic and business cycle swings during a time when the genetic testing industry as a whole was experiencing increased competition. Accordingly, of the above-mentioned acquisitions, certain assets of ArcherDX were subsequently divested in 2022 in order to limit Invitae's capital expenditures, and, by the end of 2023, Ciitizen was also divested in order to limit Invitae's cash obligations associated with this non-core business line.

### B.  Macroeconomic Headwinds.

Adverse macroeconomic developments, including inflation, slowing growth, and rising interest rates, have adversely affected Invitae's business and financial condition. These developments resulted in disruptions and volatility in global financial markets and increased rates of default, as well as negatively affecting business and consumer spending. These adverse economic conditions have also increased the costs of operating for Invitae's business, including vendor, supplier, and workforce expenses, and have had a substantial impact on access to capital as well as increasing cost of capital.

Generally, under difficult economic conditions, consumers seek to reduce discretionary spending, meaning that many patients would choose to forgo tests like those offered in Invitae's product portfolio. Decreased demand for elective genetic tests has negatively affected and will likely continue to negatively affect Invitae's overall financial performance.

Furthermore, as a public company, Invitae must comply with various regulatory and reporting requirements. Invitae incurs recurring expenses in accounting, internal auditing (including internal controls and procedures), financial planning and analysis, and investor relations, in addition to heavy operating expenditures from its overflowing portfolio of increasingly unprofitable business lines.

### C.  Management Turnover.

In addition, during this highly volatile time frame, Invitae faced staffing challenges. Over the past two (2) years, Invitae experienced turnover in four (4) chief financial officers and various other c-suite executives, including the former CEO. Despite the Company's best efforts, this high management turnover further delayed Invitae's responses to the challenges the Company faced and prevented Invitae from more swiftly implementing a cohesive strategy for the go-forward enterprise.

### D.    Operational and Liquidity Initiatives.

On July 18, 2022, Invitae initiated a strategic realignment of operations and began implementing cost reduction programs aimed at shifting operational and commercial efforts to the higher-margin, higher-growth testing opportunities among the hereditary cancer, precision oncology, and rare diseases business lines. To that end, the strategic realignment included divesting certain other business and product lines, such as pre-implantation, prenatal diagnosis, pregnancy loss and infertility products, and certain assets of the ArcherDX business line, in order to reduce excessive cash burn. In addition, Invitae streamlined the Company's international footprint. As part of this initiative, Invitae exited operations in nearly one hundred (100) countries.

The strategic realignment included lab and office space consolidation, elimination of business activities and services, decrease in other operating expenses, a reduction in workforce of approximately 1,000 positions, and a reduced international footprint. The strategic realignment reduced operational costs and implemented crucial cost saving measures as the estimated cash savings from the realignment is approximately $326 million annually.

To address an upcoming 2024 debt maturity cliff, in March 2023, after discussion and negotiations with certain holders of the 2024 Convertible Notes, Invitae entered into purchase and exchange agreements with multiple holders of the outstanding 2024 Convertible Notes through the execution of the Senior Secured Indenture. Under the terms of the agreements by and between Invitae, the Guarantors signatory thereto, and the holders, Invitae (a) exchanged $305.7 million aggregate principal amount of 2024 Convertible Notes for $275.3 million aggregate principal amount of new secured Series A Notes due in 2028 and 14,219,859 shares of Invitae's common stock ($30.6 million) and (b) issued and sold new secured Series B Notes, providing a new money infusion of $30 million.

The Company also entered into that certain supplemental Indenture, dated as of August 22, 2023, by and between Invitae, the Guarantors signatory thereto, and certain holders of the outstanding 2024 Convertible Notes (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "First Supplemental Indenture"). Pursuant to the First Supplemental Indenture, Invitae exchanged $17.2 million aggregate principal amount of 2024 Convertible Notes for $0.1 million aggregate principal amount of Series A Notes and 15 million shares of common stock. Through that transaction, the Company eliminated $17.1 million in aggregate principal of Notes from its balance sheet that would otherwise have matured in 2024.

The March 2023 and August 2023 transactions provided Invitae with significant operational runway by extending maturities by four (4) years on some of its debt obligations that were coming due imminently, as well as by providing an additional $30 million in liquidity at a crucial time based on the Company's liquidity position.

### E.    Additional Initiatives.

Leading up to the Petition Date, in conjunction with its advisors, Invitae implemented several governance and operational initiatives to right-size its balance sheet, reduce operating expenses from unprofitable and burdensome business lines, and address its debt obligations.

### (a)    Governance.

Given the state of operations and the looming potential of a restructuring, the Board of Invitae determined that it was advisable and in the best interests of the Company and its stockholders to establish the Special Committee, and to delegate to the Special Committee certain rights, authorities, and powers in connection with evaluating potential actions. On September 23, 2023, the Board formed the Special Committee consisting of William Osborne, Randy Scott, Eric Aguiar, and Christine Gorjanc as its initial members.[21] Upon their appointment, the Company, the Special Committee, and Invitae's advisors immediately began evaluating potential restructuring alternatives.

On October 23, 2023, Invitae executed an agreement with Jill Frizzley to serve as an independent advisor and later elected to expand the size of the Board to nine (9) directors and appoint Ms. Frizzley as an independent

---

[21]    Jill Frizzley was appointed to the Special Committee on December 7, 2023. On January 1, 2024, Randy Scott stepped down from his position as member of the Special Committee, though he remains a full member of the Board.

director on the Board and a member of the Special Committee.  Ms. Frizzley is an experienced board member and industry professional who currently serves as a director for Proterra Inc. and iMedia Brands, and has previously served as a director on numerous public and private boards of directors, some of which included distressed situations, including Virgin Orbit Holdings, Inc., Surgalign Holdings, Inc., Avaya Holdings Corporation, and Hudson Technologies, Inc.  In her capacity as independent director, Ms. Frizzley directed and oversaw the Special Committee's Investigation on possible claims and causes of action that may be held by the Company directed at reviewing the factual and legal bases for potential claims arising from such Company transactions within a two-year lookback period, including, but not limited to, several of the Company's material divestitures and transactions, March 2023 debt transaction, and the August 22, 2023 notes exchange transaction.

(b)      **Retention of Advisors and Contingency Planning.**

Given Invitae's need to address its balance sheet and find a solution to its liquidity issues, Invitae retained strategic advisors to assist with the financing process, sale process, and the eventual chapter 11 contingency preparation.  On September 1, 2023, Invitae retained Moelis to assist with certain investment banking services in connection with any potential financing and restructuring.  On October 23, 2023, Invitae expanded Moelis's scope of services to include certain investment banking services in connection with a potential sale of Invitae.  On September 22, 2023, Invitae retained K&E as restructuring counsel to assist with these restructuring efforts.  On September 26, 2023, Invitae expanded the scope of services of FTI to support its finance and accounting functions in the development of long-range financial projections and related scenario analyses.  FTI also supported operational decision making, due diligence for a sales process, and contingency planning for a possible restructuring and other various strategic alternatives.

(c)      **The Second and Third Supplemental Indentures and Subsequent Wind Down of Business Lines.**

Even after reducing operating costs, certain of Invitae's business lines remained burdensome and unprofitable.  As such, in the third quarter of 2023 Invitae began exploring its ability to further wind down and divest unprofitable, non-core, and expensive business lines, including Ciitizen, Women's Health, and YouScript.  Given the Company's liquidity position, Invitae conducted a months-long process to strategically maximize value for these business lines, which included discussions with multiple potential third-party buyers to assess all available options.  On November 15, 2023, Invitae and Aranscia, LLC ("Aranscia"), a global provider of diagnostics software, services, and testing solutions, closed on an agreement pursuant to which Aranscia acquired select assets of the YouScript personalized medication management platform from Invitae in a $4 million, all-cash transaction.  On December 13, 2023, Invitae finalized an agreement with Transformation Capital, an active investor and financial partner entirely dedicated to healthcare technology and novel healthcare services, to divest the assets of Ciitizen.

On January 17, 2024, Invitae reached an agreement with Natera, Inc. regarding the divestiture of Women's Health, determining that this was the best deal available after outreach to multiple third parties and taking into account the current financial position of the Company.  This transaction included, among other things, the sale of certain assets of Women's Health including the Women's Health customer list for $10 million in cash, providing the Company with an infusion of new capital, and certain litigation credits and potential cash milestone payments.  The winding down of Women's Health, along with the other applicable business lines, provided Invitae with incremental liquidity, operational flexibility, and annualized cash savings of approximately $140 million.

To finalize the Women's Health transaction, Invitae entered into the Second Supplemental Indenture granting the consent to wind down the applicable business lines.  In exchange for the requisite consents, Invitae and the Consenting Stakeholders agreed on certain milestones, including some related to the prepetition marketing process and a milestone for reaching a mutually agreed-upon transaction pursuant to a TSA.  Invitae entered into that third supplemental indenture, dated as of January 12, 2024, by and among Invitae and Wilmington Savings Fund Society Bank, as trustee and collateral agent (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Third Supplemental Indenture") pursuant to which certain milestones were extended.

F.      **Transaction Negotiations and the TSA.**

In light of the Company's mounting liquidity challenges, the Company, with the assistance of their advisors, continued to engage with the Consenting Stakeholders pursuant to the Second Supplemental Indenture, to develop a

comprehensive restructuring solution.  The Company also engaged with the Unsecured Ad Hoc Group up until the days leading up to the Petition Date in an effort to obtain a proposal, either on a standalone basis or in conjunction with the Consenting Stakeholders, for a recapitalization or other transaction that would be value-maximizing.  The Company provided voluminous diligence to both the Consenting Stakeholders and the Unsecured Ad Hoc Group and engaged for several weeks on transaction structure.  Although these efforts resulted in a transaction proposal from the Unsecured Ad Hoc Group on December 5, 2024, this proposal was ultimately unactionable, and the Company proceeded to continue to discuss its path forward with both the Consenting Stakeholders and the Unsecured Ad Hoc Group.

Accordingly, in accordance with the milestone under the Third Supplemental Indenture, the Company and the Consenting Stakeholders continued negotiations and ultimately entered into the TSA on February 13, 2024, contemplating a sale and orderly wind down of the Debtors' business through these Chapter 11 Cases.

## IX.    EVENTS OF THE CHAPTER 11 CASES

### A.    First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on February 15, 2024, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions, and at a hearing on March 15, 2024, the Bankruptcy Court granted certain of the First Day Motions on a final basis as follows:[22]

(i)     **Case Management Motion.**  *Debtors' Motion to Establish Certain Notice, Case Management, and Administrative Procedures* [Docket No. 16].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Case Management Motion [Docket No. 62];

(ii)    **Cash Management Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions* [Docket No. 10].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Cash Management Motion on an interim basis [Docket No. 49], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Cash Management Motion on a final basis [Docket No. 190];

(iii)   **Creditor Matrix Motion.**  *Debtors' Motion for Entry of an Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable Information and (II) Waiving the Requirement to File a List of Equity Security Holders and Provide Notice Directly to Equity Security Holders* [Docket No 17].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Creditor Matrix Motion on an interim basis [Docket No. 50].  The hearing on the Order approving the Creditor Matrix Motion on a final basis is scheduled for June 18, 2024;

(iv)    **Critical Vendors Motion.**  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) 503(b)(9) Claimants, (C) Lien Claimants, and (D) Foreign Vendors and (II) Confirming Administrative Expense Priority of Outstanding Orders* [Docket No. 7].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 51],

---

[22]    The First Day Motions, the First Day Declaration, and all orders for relief granted in these Chapter 11 Cases can be viewed free of charge at www.kccllc.net/invitae.

and on March 18, 2024, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 191] (the "Final Critical Vendors Order");

(v)     **Customer Programs Motion.** *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain and Administer Their Customer Programs and (II) Honor Certain Prepetition Obligations Related Thereto* [Docket No. 8]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Customer Programs Motion on an interim basis [Docket No. 51], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Customer Programs Motion on a final basis [Docket No. 193];

(vi)    **Insurance Motion.** *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (II) Renew, Supplement, Modify, or Repurchase Insurance and Surety Coverage* [Docket No. 9]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Insurance Motion on an interim basis [Docket No. 53], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 194];

(vii)   **Joint Administration Motion.** *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 3]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Joint Administration Motion [Docket No. 54];

(viii)  **NOL Motion.** *Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock* [Docket No. 12]. On February 16, 2024, the Bankruptcy Court entered an Order approving the NOL Motion on an interim basis [Docket No. 55]. On March 18, 2024, the Bankruptcy Court entered an Order approving the NOL Motion on a final basis [Docket No. 196];

(ix)    **KCC 156(c) Retention Application.** *Debtors' Application for Entry of an Order Authorizing the Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date* [Docket No. 5]. On February 16, 2024, the Bankruptcy Court entered an Order approving the KCC 156(c) Retention Application [Docket No. 49];

(x)     **Record Date Motion.** *Debtors' Motion for Entry of an Order Establishing a Record Date for Potential Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates* [Docket No. 13]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Record Date Motion [Docket No. 56];

(xi)    **Schedules/SOFAs Extension Motion.** *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 15]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Schedules/SOFAs Extension Motion [Docket No. 58];

(xii)   **Taxes Motion.** *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Taxes and Fees* [Docket No. 11]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Taxes Motion on an interim basis [Docket No. 59], and on March 15, 2024, the Bankruptcy Court entered an Order approving the Taxes Motion on a final basis [Docket No. 199];

(xiii)  **Utilities Motion.** *Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests* [Docket No. 14]. On February 16, 2024, the Bankruptcy Court entered an Order approving the Utilities Motion on an interim basis [Docket No. 560], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Utilities Motion on a final basis [Docket No. 200]; and

(xiv)   **Wages Motion.** *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses*

*and (II) Continue Employee Benefits Programs* [Docket No. 6].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Wages Motion on an interim basis [Docket No. 43], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Wages Motion on a final basis, overruling an informal objection from the U.S. Trustee [Docket No. 201].

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including K&E and Cole Schotz as co-counsel to the Debtors, Moelis as investment banker to the Debtors, FTI as financial advisor to the Debtors, KCC as claims, noticing, and solicitation agent to the Debtors, and Deloitte as tax advisors to the Debtors, among others.

### B.    Use of Cash Collateral.

As of the Petition Date, the Debtors had approximately $142 million of cash on hand.  Cash Collateral provides critical liquidity to meet immediate operational needs and smoothly transition into chapter 11.  The Debtors, with the assistance of their relevant advisors, analyzed their projected cash needs and prepared a 13-week cash flow forecast (the "Budget") for the use of Cash Collateral during the Chapter 11 Cases.  Considerations underlying the Budget relate to forecasts of amounts needed to administer these Chapter 11 Cases, satisfy employee and trade payable obligations, and maximize the value of their estates.  The Debtors engaged in good-faith negotiations with the Consenting Stakeholders over the terms of the Interim Cash Collateral Orders and Final Cash Collateral Orders.

In light of those negotiations, on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure: (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 18] (the "Cash Collateral Motion").  On February 16, 2024, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on an interim basis [Docket No. 47].  On March 18, 2024, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on a final basis [Docket No. 188], overruling an objection from the Committee.

### C.    Appointment of Unsecured Creditors' Committee.

On March 1, 2024, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 131] appointing the Committee.  The three-member Committee has retained White & Case LLP as its legal counsel, Ducera Partners LLC as its investment banker, and Province LLC as its financial advisor. The Committee includes the following entities:

•    Wilmington Savings Fund Society, Federal Savings Bank;

•    Chimtech Holding Ltd.; and

•    Workday, Inc.

### D.    Schedules and Statements.

On February 16, 2024, the Bankruptcy Court entered the *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 58] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional twenty (20) days for a total of thirty-four (34) days after the Petition Date.

The Debtors filed their Schedules and Statements at Docket Nos. 202, 203, 204, 205, 206, and 207, and filed amended Schedules and Statements at Docket Nos. 311, 312, 313, 314, 315, and 316.  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at www.kccllc.net/invitae.

### E.    Bar Date Motion.

On February 14, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claims, and (IV) Approving Notice Thereof* [Docket No. 24] (the "Bar Date Motion").  On March 18, 2024, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 189] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was April 15, 2024, at 4:00 p.m. prevailing Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is August 11, 2024, at 4:00 p.m. prevailing Eastern Time.  The Bar Date Notice was served on March 20, 2024 [Docket No. 219] and was published in *The New York Times* (national edition) on March 21, 2024 [Docket No. 235].

### F.    Lease Rejection Motion.

On February 14, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing (I) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (II) Abandonment of Any Personal Property, Each Effective as of the Rejection Date* [Docket No. 23] (the "Lease Rejection Motion").  On March 18, 2024, the Bankruptcy Court entered an order granting the relief set forth in the Lease Rejection Motion [Docket No. 195] (the "Lease Rejection Order").  Pursuant to the Lease Rejection Order, the Debtors rejected leases and subleases at their locations in Cambridge, MA; Golden, CO; Louisville, CO; Palo Alto, CA; Irvine, CA; Seattle, WA; Boulder, CO; and San Francisco, CA.  Additionally, on April 2, 2024, the Bankruptcy court entered the *Supplemental Order Authorizing (I) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (II) Abandonment of Any Personal Property, Each Effective as of the Rejection Date* [Docket No. 265] (the "Supplemental Lease Rejection Order").  Pursuant to the Supplemental Lease Rejection Order, the Debtors rejected their lease and sublease in New York, New York.

### G.    Litigation.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, consumer protection, regulatory, and disputes with other companies.  Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

### H.    The Post-Petition Sale Process.

The details of the Debtors' post-petition sale process are described in Article II.C of this Disclosure Statement.

### I.    The Independent Investigation.

On October 18, 2023, the Board authorized the Special Committee to commence an investigation relating to the Company's restructuring efforts and any potential claims and causes of action arising therefrom, specifically any potential Company claims or causes of action arising under the Company's prior transactions.  To ensure appropriate

governance, the Company and the K&E sought to engage a restructuring professional that was independent to the transactions being investigated.

On October 23, 2023, the Company executed an engagement agreement with Jill Frizzley to serve as an independent advisor with the option to serve as an independent director of the Company upon execution of a subsequent mutual agreement. Subsequently on December 7, 2023, the board of directors of Invitae Corporation appointed Jill Frizzley as an independent and disinterested director and a member of the Special Committee. From October 2023 to the Petition Date, as an independent advisor and director, Ms. Frizzley, with K&E's assistance, oversaw and directed the Special Committee's Investigation of certain transactions within a two-year lookback period to determine whether the Company held any viable claims or causes of action. The Investigation consisted of document review, multiple interviews with the Company CEO and an advisor to certain of the transactions, and several update conferences between Kirkland, Ms. Frizzley, the Special Committee, and the Board.

The Investigation was designed to accomplish, and ultimately accomplished, four (4) goals, including:

- reviewing the factual and legal bases for potential claims within the two-year lookback period;

- assessing the strengths and weaknesses of each claim to determine the proper treatment of claims in a chapter 11 plan;

- evaluating any proposed release, settlement, retention, or prosecution of claims or causes of action; and

- making determinations and presenting conclusions to the Board in connection with the release of claims or causes of action.

The Investigation primarily encompassed four (4) transactions:

- The March 2023 Uptier Transaction: This transaction was a Purchase and Exchange Agreement with certain holders of the 2024 Convertible Notes. In March 2023, the Company exchanged $305.7 million aggregate principal amount of 2024 Notes for $275.3 million aggregate principal amount of new secured Series A Notes due in 2028 and 14 million shares ($30.6 million) of common stock.

- The August 2023 Exchange: In August 2023, the Company exchanged $17.2 million aggregate principal amount of 2024 Convertible Notes for $0.1 million aggregate principal amount of Series A Notes and 15 million shares of common stock.

- One Codex Acquisition: In February 2021, the Company acquired its OneCodex business line for $17.3 million cash and 1.4 million shares of common stock. The Company subsequently divested OneCodex in September 2022.

- ArcherDX Acquisition: In October 2020, the Debtors acquired ArxherDX and subsequently divested RUOKit Assets in December 2022.

Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the estates. The releases, exculpation, and injunction are an integral component of the Plan, which provides significant distributions of value to administrative, priority, secured, and unsecured creditors.

### J.    The Committee's Standing Motion.

On May 22, 2024, the Committee filed *The Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 536] (the "Standing Motion"). The Standing Motion seeks, among other things, to grant the Committee authority to commence and prosecute certain of claims and causes of action on behalf of the Debtors' Estates. The Committee requested the Court to hear the Standing Motion on June

11, 2024, in conjunction with the hearing approving the Disclosure Statement.  In response, the Debtors' filed the *Debtors' Motion for Entry of an Order Scheduling the Hearing on the Committee's Standing Motion with the Hearing on Plan Confirmation, Together with Interim Dates and Deadlines* [Docket No. 548] (the "Scheduling Motion") proposing a briefing schedule to ultimately litigate the merits of the Standing Motion in conjunction with the Confirmation Hearing.  On May 30, 2024, the Committee objected to the Scheduling Motion by filing *The Official Committee of Unsecured Creditors' Objection to the Debtors' Motion for Entry of an Order Scheduling the Hearing on the Committee's Standing Motion with the Hearing on Plan Confirmation, Together with Interim Dates and Deadlines, Deerfield's Joinder, and U.S. Bank's Joinder Thereto* [Docket No. 563] (the "Scheduling Objection").  On the same day, the Court heard argument on the Scheduling Motion and the Scheduling Objection and ordered the Debtors and the Committee to mediate to resolve their issues.  Mediation will commence on June 20, 2024.

The Debtors disagree entirely with the merits of the Committee's Standing Motion.  A hearing on the Standing Motion is currently scheduled for July 9, 2024, at 10:00 a.m. (prevailing Eastern time).

## X.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Wind-Down.

After the sale proceeds are allocated pursuant to the Plan, the Debtors are conducting an orderly wind-down, subject to the Wind-Down Budget.  Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

> **1.    *The Debtors Will Consider All Available Restructuring Alternatives if the Plan Is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.***

The Debtors will consider all restructuring alternatives available, which may include the filing of an alternative chapter 11 plan or any other transaction that would maximize the value of the Debtors' Estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' assets.

Further, distributions would not be advisable or possible without the retention of key employees pursuant to the Plan.  If such employees are not retained, the Plan and the Distribution process contemplated thereunder would not be feasible.

### 2.    *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a)    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b)    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent and, if required.  If such conditions precedent are not met or not waived, the Effective Date will not take place.

### (c)    Failure to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### (d)    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to restructure and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property with a lesser value than currently provided in the Plan or no Distribution whatsoever under the Plan.

(e)       **Nonconsensual Confirmation.**

In the event that any impaired class does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one (1) impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

(f)       **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

(g)       **Filing of a Competing Plan.**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan through June 12, 2024. Because the Debtors have filed the Plan contemporaneously with this Disclosure Statement, the Debtors have avoided the risks associated with competing plans being filed by third parties and now have the exclusive right to solicit votes on the Plan through August 11, 2024. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan because creditors and others may propose a competing plan.

(h)       **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would generally result in smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(i)       **One or More of the Chapter 11 Cases May be Dismissed.**

If the Bankruptcy Court finds that a debtor has incurred substantial or continuing loss or diminution to its estate and lacks a reasonable likelihood of rehabilitation or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of these

Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor, which may ultimately result in significantly lower recoveries for creditors than those provided for in the Plan.

**(j)      The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(k)      Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(l)      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and/or recharacterized as equity contributions.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**(m)      Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

**(n)      Risk of Termination of the TSA.**

The TSA contains certain provisions that give the parties the ability to terminate the TSA upon the occurrence of certain events.  Termination of the TSA could result in protracted chapter 11 cases, which could significantly and detrimentally affect the Debtors' relationships with regulators, vendors, suppliers, employees, and customers.

**(o)      The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  Any Holder of a Claim or Interest where such Claim or Interest is subject to an objection cannot rely on the estimates in this Disclosure Statement.  As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(p)      **The Debtors May Not Consummate the Sale Transaction.**

The Plan contemplates the implementation of the Sale Transaction pursuant to the Sale Order.  However, in the event the conditions to close the Sale Transaction are not satisfied, or the Sale Transaction is not otherwise consummated by the Outside Date, the Debtors may have to liquidate under Chapter 11 of the Bankruptcy Code and conduct the wind down and dissolution of the Debtors' estates.

(q)      **The Committee's Standing Motion May be Granted.**

The Plan assumes that the 2028 Senior Secured Noteholders' liens are valid (based on all of the Debtors' efforts to confirm that to date) and that the Committee will not prevail on its Standing Motion.  Accordingly, the Debtors are moving forward with a Plan that allocates value in accordance with this priority scheme.  In the event that the Committee prevails on its motion and the liens are invalid, the entirety of the Debtors' capital structure would be reconstituted, and the core of the Plan would need to be amended and revisited.  With such a fundamental change, it would be nearly impossible for the Debtors to maintain their current solicitation and confirmation timeline, and any Holder of a Claim or Interests may not receive its expected share of the estimated distributions described in this Disclosure Statement.

3.      *Even if the Wind-Down Transactions Are Implemented, the Debtors Will Continue to Face Risks.*

Even if the Wind-Down Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, and changes in the Debtors' industry.  As a result of these risks and others, there is no guarantee that the Wind-Down Transactions will achieve the Debtors' stated goals.

4.      *Governmental Approvals May Not Be Granted.*

Consummation of the Wind-Down Transactions may depend on obtaining approvals of certain Governmental Units.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Wind-Down Transactions and Confirmation of the Plan.

B.      **Risks Related to Recoveries under the Plan**

1.      *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  The resulting proceeds of the Sale Transaction may be materially lower than projections.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.      *The Tax Implications of the Debtors' Bankruptcy Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Article XI of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

3.      *The Orderly Wind Down May Take Longer and Cost More Than Estimated, Which May Decrease Recoveries.*

The Wind Down presents risks for all stakeholders.  The Wind Down is estimated to take approximately 9 months to complete.  However, this is merely an estimate and it is possible that it could take longer.  In the event the Wind Down takes longer to be completed, the associated costs, such as professional fees, will also be higher than estimated.  Accordingly, estimated recoveries pursuant to the Wind Down could also be lower than estimated.

4.      *The Debtors' Substantial Ongoing Liquidity Needs May Impact Recoveries.*

The Debtors have nonetheless had to maintain significant business operations to comply with the demands of these Chapter 11 Cases. Accordingly, depending on how long the Chapter 11 Cases go, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of these Chapter 11 Cases. The Debtors cannot guarantee that Cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of these Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

C.      **Risks Related to the Debtors' Businesses.**[23]

1.      *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Plan and Effectuate Distributions.*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel, including scientists, in the medical genetics and testing industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Plan and provide distributions to the creditors.

2.      *The Wind Down May Be Adversely Affected by Potential Litigation.*

In the ordinary course of business, the Wind-Down Debtors may become parties to litigation. In general, litigation can be expensive, and time consuming to bring or defend against. Such litigation could result in settlements or damages that would adversely affect the Wind-Down Debtors' financial condition.

3.      *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition.*

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Debtors and may have an adverse effect on the Wind-Down Debtors' financial condition.

---

[23]    For the avoidance of doubt, as used in this section, the term Debtors shall refer to both the Debtors prior to the Effective Date and the Wind-Down Debtors after the Effective Date.

D.      **Miscellaneous Risk Factors and Disclaimers.**

1.      ***The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.***

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.      ***No Legal or Tax Advice Is Provided By This Disclosure Statement.***

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

3.      ***No Admissions Made.***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4.      ***Failure to Identify Litigation Claims or Projected Objections.***

No reliance should be placed on the fact that a particular litigation claim, or projected objection to a particular Claim, is or is not identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5.      ***Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.      ***Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.***

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.      ***No Representations Outside This Disclosure Statement Are Authorized.***

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY**

**CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF NEW JERSEY.**

**XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.     Introduction.**

The following discussion is an overview of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders of Claims that are entitled to vote to accept or reject the Plan. This overview is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

Substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is or will be binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors, Wind-Down Debtors, or Holders of Claims take.

**ALL HOLDERS OF CLAIMS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS.**

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders of Claims that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, banks, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, real estate investment trusts and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). Furthermore, this overview assumes that a Holder holds only Claims in a single Class and, except as set forth below, holds such Claims only as "capital assets" (within the meaning of section 1221 of the IRC). This overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This overview does not discuss special considerations that may apply to Holders that are both Holders of Claims and Holders of Interests, nor any differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims entitled to vote to accept or reject the Plan described below also may vary depending on the nature of any Wind-Down Transactions that the

Debtors and/or Wind-Down Debtors engage in.  This overview does not address the U.S. federal income tax consequences to Holders of Claims or Interests that are (a) Unimpaired or otherwise entitled to payment in full under the Plan, (b) deemed to reject the Plan, (c) not entitled to vote to accept or reject the Plan, or (d) are permitted to vote but are either presumed to accept or deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC, a "U.S. Person") has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. Person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the pass-through entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING OVERVIEW OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The Plan is being structured as a Wind Down of the Debtors' operations and a series of distributions by the Debtors (and Wind-Down Debtors, as applicable) to Holders in respect of their Claims.

In connection with the Plan, the Debtors (or Wind-Down Debtors, as applicable) may, with the consent of the Required Consenting Stakeholders, among other things, distribute sale proceeds to Holders of certain Claims.  As a result of any sale of assets (including as a result of the Sale Transaction), the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors as determined for U.S. federal income tax purposes (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.  Income will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.  The Debtors and the Wind-Down Debtors do not currently anticipate that a material cash tax liability is likely to arise in connection with the Sale Transaction.

Thus, the U.S. federal income tax consequences of the Plan to the Debtors will in large part be a function of (a) the Debtors' tax basis in their assets that the Debtors transfer, (b) the quantum of liabilities assumed by the purchasers(s) of such assets, (c) the difference between the value of what the Holders receive in exchange for their Claims and the amount of their Claims, and (d) the Debtors' ability to demonstrate the existence of tax losses, including losses that may be generated as a result of the implementation of the Wind-Down Transactions and historically incurred losses.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets.  Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Plan, potentially in a way that has a materially adverse impact on the Debtors.  The Debtors, together with their advisors, continue to study this issue.

Because the Plan is being structured as a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, are not discussed further.

The Debtors continue to analyze whether there will be any material administrative income tax liabilities that must be satisfied under the Plan.

**C.**      **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

         **1.**      *U.S. Federal Income Tax Consequences for Holders of Allowed Class 3 2028 Senior Secured Notes Claims.*

Pursuant to the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Class 3 2028 Senior Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Class 3 2028 Senior Secured Notes Claim, each Holder thereof shall receive its *pro rata* share of Distributable Value (generally as cash) following payment in full of Classes 1, 2, 4, and 5 Claims. In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash.

Each such U.S. Holder will be treated as exchanging such Allowed Class 3 2028 Senior Secured Notes Claim in a taxable exchange under section 1001 of the IRC for such Distributable Value. Accordingly, subject to the rules regarding accrued but untaxed interest, each U.S. Holder of such an Allowed Class 3 2028 Senior Secured Notes Claim should recognize gain or loss equal to the difference between (i) the amount of any Distributable Value received in exchange for such Claim, and (ii) such Holder's adjusted basis, if any, in such Claim.

         **2.**      *Accrued Interest.*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Class 3 2028 Senior Secured Notes Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder of a surrendered Allowed Class 3 2028 Senior Secured Notes Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

If the Distributable Value received by a U.S. Holder of an Allowed Class 3 2028 Senior Secured Notes Claim is not sufficient to fully satisfy all principal and interest on an Allowed Class 3 2028 Senior Secured Notes Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 3 2028 Senior Secured Notes Claim will be allocated first to the principal amount of such Allowed Class 3 2028 Senior Secured Notes Claim, with any excess allocated to unpaid interest that accrued on such Allowed Class 3 2028 Senior Secured Notes Claim, if any. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Class 3 2028 Senior Secured Notes Claim should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

         **3.**      *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Class 3 2028 Senior Secured Notes

Claim may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Class 3 2028 Senior Secured Notes Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than at original issuance and if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of debt constituting its Allowed Class 3 2028 Senior Secured Notes Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 4.    *Net Investment Income Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 5.    *Limitations on Losses.*

Where gain or loss is recognized by a U.S. Holder upon the exchange of its Allowed Class 3 2028 Senior Secured Notes Claim, the character of such gain or loss as long-term or short-term capital gain (or loss) or as ordinary income (or loss) will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Allowed Class 3 2028 Senior Secured Notes Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Allowed Class 3 2028 Senior Secured Notes Claim was acquired at a market discount, whether and to what extent the U.S. Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Allowed Class 3 2028 Senior Secured Notes Claim for more than one year at the time of the exchange. Each U.S. Holder of an Allowed Class 3 2028 Senior Secured Notes Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Class 3 2028 Senior Secured Notes Claim.

U.S. Holders of an Allowed Class 3 2028 Senior Secured Notes Claim who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### D.    **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the Consummation of the Plan and the Wind-Down Transactions to such Non-U.S. Holder.

1.      *Gain Recognition.*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Allowed Class 3 2028 Senior Secured Notes Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Wind-Down Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Net Investment Income Tax would generally not apply). In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      *Accrued Interest.*

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Allowed Class 3 2028 Senior Secured Notes Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)      the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of Invitae's stock entitled to vote;

(b)      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Invitae (each, within the meaning of the IRC);

(c)      the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a "branch profits tax" with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments). As

described above in more detail under the heading "*Accrued Interest*," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

3. *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

E.       **Information Reporting and Back-Up Withholding.**

The Debtors, the Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH**

**HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

* * * * *

## XII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger Distribution to Holders of Allowed Claims than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims vote to accept the Plan.

Invitae Corporation on behalf of itself
and each of the other Debtors

By:    /s/ Ana Schrank

Name:    Ana Schrank
Title:    Chief Financial Officer

Prepared By:

Dated: June 11, 2024

_____
/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:        msirota@coleschotz.com
                   wusatine@coleschotz.com
                   fyudkin@coleschotz.com
                   dharris@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900
Email:        joshua.sussberg@kirkland.com
                   nicole.greenblatt@kirkland.com
                   francis.petrie@kirkland.com
                   jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
spencer.winters@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**Exhibit A**

**Chapter 11 Plan**

[Filed separately]

**<u>Exhibit B</u>**

**TSA**

[Filed Separately]

## Exhibit C

**Liquidation Analysis**

[Filed Separately]

**<u>Exhibit D</u>**

**Supplement to the Liquidation Analysis**

**Liquidation Analysis[1]**

## I.    Introduction

Section 1129(a)(7) of the Bankruptcy Code (also known as the "Best Interests Test")  requires that each holder of an impaired Claim or Equity Interest either (a) accept the Plan, or (b) receive or retain under the Plan property of a value, as of the Plan's Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date (the "Liquidation Analysis").  In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7.  The gross amount of Cash available includes the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the commencement of its hypothetical chapter 7 case.  Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the use of chapter 7 for purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code

This Liquidation Analysis was prepared by the Debtors with assistance from their financial advisors and represents the Debtors' best estimate of the cash proceeds, net of liquidation related costs, which would be available for distribution to the Holders of Claims and Interests if the Debtors were to be liquidated via a chapter 7 liquidation. A general summary of the assumptions used in preparing this Liquidation Analysis follows.

**THE INFORMATION SET FORTH IN THIS LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME UP TO THE CONFIRMATION HEARING.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN WAS NOT EXAMINED BY ANY INDEPENENT ACCOUNTANTS AND NO INDEPENDENT APPRAISALS WERE CONDUCTED IN PREPARING THE LIQUIDAITON ANALYSIS. THE PRESENTATION OF CLAIMS REPRESENT ESTIMATES WHICH ARE PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.**

## II.    Overview and General Assumptions

Hypothetical chapter 7 recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below.  The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of August 2, 2024 (the "Conversion Date") and the net costs to execute the administration of the wind-down of the Estates.  The Conversion Date occurs immediately following closing of the approved sale to Labcorp Genetics Inc. ("Labcorp").  Terms of the sale are consistent with those set forth in the Asset Purchase Agreement.  The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a court appointed chapter 7 trustee.  The Liquidation Analysis reflects the wind-down and liquidation of the

---

[1]    Capitalized terms used but not otherwise defined in this Liquidation Analysis shall have the meanings ascribed to them in the *Disclosure Statement Relating to the Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") or the *Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), as applicable.

Debtors' remaining assets not included in the sale, and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date (the "Wind-Down").

Estimate of Costs.  The Debtors' estimated liquidation costs under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those that might be payable to attorneys and other professionals that a trustee may engage.  Further, costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals.

Distribution of Net Proceeds under Absolute Priority Rule.  The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full.

After consideration of the effects that a chapter 7 liquidation could have on the ultimate proceeds available for distribution to creditors, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professionals advisors to such trustee, and (ii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor with a recovery that is not less than such creditor would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Assumptions.  Underlying this Liquidation Analysis are numerous estimates and assumptions that are subject to significant operational, economic, and competitive uncertainties.  Many of these uncertainties are beyond the control of the Debtors or a chapter 7 trustee.  Additionally, various liquidation decisions upon which certain assumptions are based are subject to change.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds which would be realized were the Debtors to undergo an actual liquidation.  The actual amounts of claims against the estate could vary significantly from the Debtors' estimate, depending on the claims asserted during the pendency of the chapter 7 case.  This Liquidation Analysis does not include liabilities that may arise as a result of litigation, certain new tax assessments, or other potential claims.

Summary Notes to Liquidation Analysis

1. **Statement of Limitations.**  The Debtors do not maintain financials on a legal entity-by-entity basis. Therefore, this Liquidation Analysis is presented on a consolidated basis.  The Liquidation Analysis does provide estimates for subsidiary claims arising from contract cures, 502(b)(6) damages and other litigation asserted by counterparties at the ArcherDX, LLC subsidiary.  While subsidiaries do possess patents and intellectual property, no value is ascribed to these assets in a liquidation.

2. **Dependence on Assumptions.**  Underlying this Liquidation Analysis are numerous estimates and assumptions that are subject to significant operational and economic uncertainties.  Many of these uncertainties are beyond the control of the Debtors.  Further, this Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation of the Debtors in a manner described herein.

3. **Chapter 7 Liquidation Process.**  Illustratively, the Wind-Down assumes a chapter 7 trustee is appointed in lieu of a Plan Administrator.  During the Wind-Down, it is assumed the chapter 7 trustee will oversee nearly identical activities to that of the Plan Administrator.  This includes auditing and validating contingent earnouts due to the Estate, validating accounts receivable collected on the Estate's behalf, and pursuing other causes of action.  The Wind-Down also assumes retention of select staff and

external advisors to assist with these activities and with any final administrative requirements. The Debtors believe appointment of a Plan Administrator will ultimately maximize value for the Estates given the Wind-Down requires oversight of a number of activities which are operational in nature. Appointment of a Chapter 7 trustee without institutional knowledge of the operations of the Debtors could increase the time required to effectuate the Wind-Down or risk the contemplated recoveries.

4. **Claims Estimates.** In preparing the Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based on the filed Schedules. Additional Claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

5. **Distribution of Net Proceeds.** Any available net proceeds would be allocated to the applicable Holders of Claims and Interests of each Debtor in strict priority in accordance with section 726 of the Bankruptcy Code. For the purposes of the Best Interests Test, the Claims will be satisfied in the following order:

    I.   Secured Claims
         a.  $305mm 2028 Senior Secured Notes due March 2028
         b.  Other Secured Claims
   II.   Administrative Claims
         a.  Administrative Professional Fees
         b.  Employee Related Administrative Claims
         c.  Other Administrative Claims
  III.   Priority Claims
         a.  Priority Employee Claims
         b.  Priority Tax Claims
  IV.   Unsecured Claims
         a.  Parent Unsecured Claims
             i.  $350mm 2024 Convertible Notes due September 2024 ($27.4mm outstanding)
           ii.  $1,150mm 2028 Convertible Notes due April 2028
          iii.  Trade Claims
          iv.  502(b)(6) Claims
           v.  Payor and Other Litigation Claims (Parent)
         b.  Subsidiary Unsecured Claims
             i.  Trade Claims
           ii.  502(b)(6) Claims
         c.  Contingent Subsidiary Unsecured Claims
             i.  Other Contingent, Unliquidated, or Disputed Litigation Claims

Based on the estimated recoveries set forth in the following Liquidation Analysis, it is management's (and their advisors') opinion that the current Plan satisfies the Best Interests Test. Under the Plan, each Class of creditors will receive equal or greater value than they would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### III.    Liquidation Analysis Results

| Results of Best Interest Test by Plan Class | | | | | |
|---|---|---|---|---|---|
| **Class Name** | **Class** | **Plan Recovery** | **Chapter 7 Recovery** | | **Pass / Fail** |
| | | | **Low** | **High** | |
| 2028 Senior Secured Notes Claims | Class 3 | *91.0% – 94.8%* | *100.0%* | *100.0%* | *n/a²* |
| Other Secured Claims | Class 1 | *100.0%* | *n/a* | *n/a* | **Pass** |
| Administrative Claims | Unclassified | *100.0%* | *50.3%* | *76.4%* | **Pass** |
| Other Priority Claims | Class 2 | *100.0%* | *–* | *–* | **Pass** |
| Priority Tax Claims | Unclassified | *100.0%* | *–* | *–* | **Pass** |
| Convenience Class Claims | Class 4 | *100.0%* | *–* | *–* | **Pass** |
| Subsidiary Unsecured Claims | Class 5 | *100.0%* | *–* | *–* | **Pass** |
| Parent Unsecured Claims | Class 6 | *–* | *–* | *–* | **Pass** |
| Contingent Subsidiary Unsecured Claims | Class 11 | *–* | *–* | *–* | **Pass** |
| Intercompany Claims | Class 7 | *n/a* | *n/a* | *n/a* | *n/a* |
| Intercompany Interests | Class 8 | *n/a* | *n/a* | *n/a* | *n/a* |
| Section 510(b) Claims | Class 9 | *n/a* | *n/a* | *n/a* | *n/a* |
| Equity Interests | Class 10 | *n/a* | *n/a* | *n/a* | *n/a* |

---

[2] Per the Transaction Support Agreement, Holders of Allowed Class 3 claims have consented to receive less than they would under a liquidation scenario and to receive distributions only after payment in full of Allowed Claims in Classes 1, 2, 4, and 5.

## Net Proceeds Available for Distribution
*($ thousands)*

| | Book Value | Low (%) | High (%) | Low ($) | High ($) |
|---|---|---|---|---|---|
| **DISTRIBUTABLE VALUE** | | | | | |
| **Sale Value** | **$239,000** | *100.0%* | *100.0%* | **$239,000** | **$239,000** |
| Cash and Cash Equivalents | 96,319 | *100.0%* | *100.0%* | 96,319 | 96,319 |
| Contingent Accounts Receivable | 66,263 | *85.0%* | *90.0%* | 56,323 | 59,636 |
| Contingent Earnout from Sale of Women's Health | 15,000 | *25.0%* | *75.0%* | 3,750 | 11,250 |
| **Total Other Estate Value** | **$177,581** | *88.1%* | *94.2%* | **$156,392** | **$167,205** |
| **Total Distributable Value, Gross** | **$416,581** | | | **$395,392** | **$406,205** |
| Less: Estate Wind-Down Costs | | | | (12,821) | (12,821) |
| Less: Chapter 7 Trustee Fees | | | | (11,862) | (12,186) |
| Less: Chapter 7 Professionals and Sale Transaction Fee | | | | (12,408) | (11,124) |
| Less: 327(a) Professionals Carve Out | | | | (2,500) | (2,500) |
| **Total Distributable Value, Net** | | | | **$355,802** | **$367,574** |

## Claims Waterfall
*($ thousands)*

| | Book Value | Low (%) | High (%) | Low ($) | High ($) |
|---|---|---|---|---|---|
| **I. SECURED CLAIMS** | | | | | |
| $305mm Convertible Notes due Mar-2028 | 335,663 | *100.0%* | *100.0%* | 335,663 | 335,663 |
| Other Secured Claims | – | – | – | – | – |
| Total Secured Claims | $335,663 | *100.0%* | *100.0%* | $335,663 | $335,663 |
| Add: 327(a) Professionals Carve Out | | | | 2,500 | 2,500 |
| **Value Available for Distribution to Administrative Claims** | | | | **$22,639** | **$34,411** |
| **II. ADMINISTRATIVE CLAIMS** | | | | | |
| Administrative Professional Fees | 22,033 | *53.3%* | *77.8%* | 11,745 | 17,149 |
| Employee-Related | 7,028 | *47.3%* | *75.0%* | 3,326 | 5,271 |
| Other Administrative Claims | 15,989 | *47.3%* | *75.0%* | 7,568 | 11,991 |
| Total Administrative Claims | $45,051 | *50.3%* | *76.4%* | $22,639 | $34,411 |
| **Value Available for Distribution to Priority Claims** | | | | **–** | **–** |
| **III. PRIORITY CLAIMS** | | | | | |
| Priority Employee Claims | 1,307 | – | – | – | – |
| Priority Tax Claims | 3,603 | – | – | – | – |
| Total Priority Claims | $4,909 | – | – | – | – |
| **Value Available for Distribution to Unsecured Claims** | | | | **–** | **–** |
| **IV. UNSECURED CLAIMS** | | | | | |
| $350mm Convertible Notes due Sep-2024 | 27,303 | – | – | – | – |
| $1,150mm Convertible Notes due Apr-2028 | 1,156,373 | – | – | – | – |
| Trade Claims - Parent | 12,304 | – | – | – | – |
| 502(b)(6) Claims - Parent | 34,612 | – | – | – | – |
| Payor and Other Litigation Claims - Parent | C/U/D | – | – | – | – |
| Trade Claims - Subsidiary | 2,313 | – | – | – | – |
| 502(b)(6) Claims - Subsidiary | 4,114 | – | – | – | – |
| Contingent Litigation Claims - Subsidiary | C/U/D | – | – | – | – |
| Total Unsecured Claims | $1,237,019 | – | – | – | – |

| Value Available for Distribution to Equity Interests | – | – |
| --- | --- | --- |

Summary Notes to Net Proceeds Available for Distribution

1. **Sale Value.** The terms of the sale are consistent with those set forth in the Asset Purchase Agreement.

2. **Cash and Cash Equivalents.** The estimated bank Cash as of the Conversion Date is per the Cash Collateral Budget delivered May 22nd, 2024. Includes restricted cash, namely a letter of credit, assumed to be reposted upon consummation of the sale transaction. Does not include impact of delay in sale closing, which would further deplete cash and increase administrative costs.

3. **Contingent Accounts Receivable.** The Asset Purchase Agreement stipulates a reverse TSA construct for the collection and remittance of accounts receivable. Illustratively, recoveries range between 85% – 90%. The Debtors would note collection of accounts receivable is contingent and to be completed over a nine-month period post-Conversion Date. As such, value from contingent accounts receivable is not available for distribution on the Conversion Date.

4. **Contingent Earnout from Sale of Women's Health.** The Debtors are entitled to a contingent, volume-based retention earnout from the prepetition sale of their Women's Health business. The Debtors would note collection of the earnout is contingent and subject to reconciliation. As such, value from the contingent earnout is likely not available for distribution on the Conversion Date.

5. **Estate Wind-Down Costs.** Estate wind-down costs assumes 12-month support for accounts receivable collection, as well as general estate wind-down costs. The Debtors assume an additional 3-months of wind-down costs are incurred relative to the Wind-Down Budget on account of the chapter 7 trustee's lack of institutional knowledge of the Debtors' affairs.

6. **Chapter 7 Trustee Fees.** Based on section 326 of Bankruptcy Code, chapter 7 trustee fees are calculated at 3.0% of all gross liquidation proceeds in excess of $1 million. For convenience, the same rate was calculated on amounts under $1 million.

7. **Chapter 7 Professionals and Sale Transaction Fee.** Chapter 7 professionals and sale transaction fee includes professionals supporting the chapter 7 trustee during the estate wind-down and a 2% sale transaction fee from the Distributable Value, gross payable to Moelis & Company.

8. **Carve Out 327(a) Professionals Claims.** The carve out includes a $2.5 million post-carve out trigger notice cap pursuant the Cash Collateral Order, carved-out of Distributable Value with recovery applied to Administrative Professional Fees.

Summary Notes to Claims Waterfall

1. **$305mm 2028 Senior Secured Notes Due Mar-2028.** Secured obligations under the 2028 Senior Secured Notes Indenture; secured component of claim includes the Make Whole Amount pursuant to Section 2.13 of the 2028 Senior Secured Notes Indenture, accrued and unpaid interest, as well as adequate assurance. Other amounts that could be due and payable under the 2028 Senior Secured Notes Indenture are excluded.

2. **Administrative Professional Fees.** Administrative Professional Fees include: (i) section 327(a) professional fees for advisors to the Debtors including Kirkland & Ellis LLP, Cole Schotz P.C., FTI Consulting, Inc., Kurtzman Carson Consultants, LLC, and Deloitte Tax LLP, and such amounts are

accrued but unpaid as of Conversion Date per the Cash Forecast; (ii) section 327(a) professional fees for advisors to the Committee including White & Case LLP and Province, LLC, and such amounts are accrued but unpaid as of the Conversion Date per the Cash Forecast; (iii) U.S. Trustee fees which are accrued but unpaid amounts as of the Conversion Date; (iv) Moelis & Company transaction fees which are transaction/restructuring fees payable to Moelis & Company net of the 2% sale transaction fee and monthly fee crediting; and (v) Perella Weinberg Partners and Ducera Partners LLC transaction fees which are transaction/restructuring fees payable to Perella Weinberg Partners and Ducera Partners net of monthly fee crediting.

3. **Employee-Related.**  Employee-related represents two weeks of payroll and employee benefits accrual as well as accrued and unpaid commissions as of the Conversion Date.

4. **Other Administrative Claims.**  Other Administrative Claims include: (i) postpetition payables which are accrued but unpaid amounts as of the Conversion Date per the Cash Forecast; (ii) customer refunds which are estimated accrued and unpaid refunds as of the Conversion Date; and (iii) administrative taxes which are accrued but unpaid use, property and other non-income tax estimates as of the Conversion Date.

5. **Priority Employee Claims.**  Priority employee claims include postpetition retention payables accrued but unpaid as of the Conversion Date per the Cash Forecast.

6. **Priority Tax Claims.**  Priority Tax Claims include accrued but unpaid sales and use taxes and payroll exposure estimates as of the Conversion Date.

7. **Unsecured Claims.**  Unsecured Claims include: (i) $350 million 2024 Convertible Notes due September 2024 which are unsecured obligations under the 2024 Convertible Notes Indenture including accrued interest;  (ii) $1,150 million 2028 Convertible Notes due April 2028 which are unsecured obligations under the 2028 Convertible Notes Indenture including accrued interest;  (iii) trade claims representing claimants asserting the full amount of their claims; (iv) section 502(b)(6) claims representing landlords asserting section 502(b)(6) rejection damages; and (v) payor and other litigation claims both against Invitae and its Debtor subsidiaries, which are a placeholder for contingent, unliquidated, and/or disputed claims.

## Exhibit B

**Comparison**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
nicole.greenblatt@kirkland.com
francis.petrie@kirkland.com
jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
spencer.winters@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*~~Proposed~~ Co-Counsel to the Debtors and
Debtors in Possession*

*Co-Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO**
**THE AMENDED JOINT PLAN OF INVITAE CORPORATION AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The last four digits of Debtor Invitae Corporation's tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

**THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JUNE 11, 2024, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.**

2

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF INVITAE CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE

ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE WIND DOWN CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE X, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE DEBTORS' BUSINESS AND FINANCIAL STRATEGIES, BUDGETS, AND PROJECTIONS;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE REGULATORY LICENSES HELD BY THE DEBTORS OR THE WIND-DOWN DEBTORS;

- THE EVOLVING REGULATORY LANDSCAPE AND POTENTIAL ADOPTION AND IMPACT OF NEW GOVERNMENTAL REGULATIONS;

- TAXATION APPLICABLE TO THE DEBTORS AND ANY CHANGES THERETO;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, AND PERFORMANCE OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY BOTH SHORT AND LONG-TERM LIQUIDITY NEEDS;

- THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- BANK VOLATILITY;

3

- **THE INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;**

- **COUNTERPARTY CREDIT RISK;**

- **RISKS IN CONNECTION WITH ACQUISITIONS;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.   THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS OR FINANCIAL LOSSES IN EXCESS OF FDIC INSURED COVERED AMOUNTS CAUSED BY THE FAILURE OF CRITICAL BANKING RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF AN ALTERNATIVE PLAN WOULD PROVIDE MORE VALUE TO STAKEHOLDERS THAN THE PLAN;**

- **THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THESE CHAPTER 11 CASES;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EXPENSES RELATED TO THE WIND-DOWN;**

4

- **LIMITED ACCESS TO CAPITAL RESOURCES;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS;**

- **CHANGES IN LABOR RELATIONS;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS;**

- **ADVERSE TAX CHANGES;**

- **POSSIBLE RESTRICTIONS ON THE ABILITY TO OPERATE; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................... 9~~10~~

II.     PRELIMINARY STATEMENT .................................................................................. 9~~10~~

        A.      Background. ..................................................................................................... 9~~10~~
        B.      The TSA. ........................................................................................................... 1~~12~~
        C.      The Sale Process. ............................................................................................. 1~~23~~
        D.      Statement of the Official Committee of Unsecured Creditors. .................... 15

III.    OVERVIEW OF THE PLAN ...................................................................................... 14~~8~~

        A.      The Plan. ........................................................................................................... 14~~8~~
        B.      Holders of Claims May Be Released by the Debtors. .................................. ~~19~~24

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN ........................................................................................................................... ~~19~~24

        A.      What is chapter 11? ......................................................................................... ~~19~~24
        B.      Why are the Debtors sending me this Disclosure Statement? ....................... 20~~4~~
        C.      Am I entitled to vote on the Plan? ................................................................. 20~~4~~
        D.      What is the Sale Transaction? ........................................................................ 20~~5~~
        E.      What will I receive from the Debtors if the Plan is consummated? .............. 22~~8~~
        F.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, a
                Professional Fee Claim, or a Priority Tax Claim? ......................................... 27~~34~~
        G.      What does it mean if I have a Convenience Class Claim? ............................. 29~~36~~
        H.      What happens to my recovery if the Plan is not confirmed or does not go effective? ... 29~~37~~
        I.      If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation"? ............................................................................................ 29~~37~~
        J.      What are the sources of consideration and other consideration used to make distributions
                under the Plan? ................................................................................................ 30~~7~~
        K.      Are there anticipated Cash proceeds of the Sale Transaction that will be available for
                distribution to unsecured creditors? .............................................................. 30~~7~~
        L.      Is there potential litigation related to the Plan? ............................................ 30~~7~~
        M.      Will there be releases, exculpation, and injunction granted to parties in interest as part of
                the Plan? .......................................................................................................... 30~~7~~
        N.      What are the consequences of opting out of the releases provided by the Plan? ... 34~~1~~
        O.      What are the consequences of not opting out of the releases provided by the Plan? ... 34~~2~~
        P.      Does the Plan preserve Causes of Action? ..................................................... 34~~2~~
        Q.      Are any regulatory approvals required to consummate the Plan? .................. 43~~5~~
        R.      What is the deadline to vote on the Plan? ...................................................... 43~~5~~
        S.      What are the overall projected recoveries under the Plan? ............................ 43~~5~~
        T.      How do I vote for or against the Plan? ........................................................... 43~~5~~
        U.      Why is the Bankruptcy Court holding a Confirmation Hearing? .................. 43~~6~~
        V.      When is the Confirmation Hearing set to occur? ........................................... 36~~44~~
        W.      What is the purpose of the Confirmation Hearing? ....................................... 36~~44~~
        X.      What is the effect of the Plan on the Debtors' ongoing business? ................ 36~~44~~
        Y.      Will any party have significant influence over the corporate governance and operations of
                the Wind-Down Debtors? ................................................................................ 36~~44~~
        Z.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ... 37~~45~~
        AA.     Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? ...................................................................................................... 37~~45~~
        BB.     Who supports the Plan? ................................................................................... 37~~45~~
        CC.     Do the Debtors recommend voting in favor of the Plan? ............................... 37~~45~~

V.      SOLICITATION AND VOTING PROCEDURES ................................................ 3745

        A.      Classes ~~Entitled~~Permitted to Vote on the Plan. ........................................ 3845
        B.      Votes Required for Acceptance by a Class. ...................................................... 3846
        C.      Certain Factors to Be Considered Prior to Voting. ......................................... 3846
        D.      Classes Not Entitled to Vote on the Plan. ....................................................... 3847
        E.      Solicitation and Voting Procedures. ................................................................ 3947
        F.      Voting Procedures. ......................................................................................... 408
        G.      Voting and Tabulation Procedures. ................................................................. 419

VI.     CONFIRMATION OF THE PLAN ..................................................................... 453

        A.      Requirements of Section 1129(a) of the Bankruptcy Code. ............................ 453
        B.      Best Interests of Creditors—Liquidation Analysis. ....................................... 546
        C.      Feasibility. ...................................................................................................... 546
        D.      Acceptance by Impaired Classes. ................................................................... 4655
        E.      Confirmation without Acceptance by All Impaired Classes. ........................... 4755

VII.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ........ 4856

        A.      Company History. ............................................................................................ 4856
        B.      The Debtors' Operations. ................................................................................ 4957
        C.      Invitae's Capital Structure and Ownership. .................................................... 5260

VIII.   EVENTS LEADING TO THESE CHAPTER 11 CASES .................................... 5462

        A.      Operating Expenses Resulting from Expansion. .............................................. 5462
        B.      Macroeconomic Headwinds. ............................................................................ 5563
        C.      Management Turnover. .................................................................................... 5563
        D.      Operational and Liquidity Initiatives. ............................................................. 5564
        E.      Additional Initiatives. ..................................................................................... 564
        F.      Transaction Negotiations and the TSA. ........................................................... 657

IX.     EVENTS OF THE CHAPTER 11 CASES ......................................................... 5766

        A.      First and Second Day Relief and Other Case Matters. ..................................... 5766
        B.      Use of Cash Collateral. ................................................................................... 5968
        C.      Appointment of Unsecured Creditors' Committee. ......................................... 608
        D.      Schedules and Statements. .............................................................................. 608
        E.      Bar Date Motion. ............................................................................................ 609
        F.      Lease Rejection Motion. .................................................................................. 609
        G.      Litigation. ....................................................................................................... 649
        H.      The Post-Petition Sale Process. ....................................................................... 649
        I.      The Independent Investigation. ........................................................................ 649
        J.      The Committee's Standing Motion. ................................................................. 70

X.      RISK FACTORS .............................................................................................. 6271

        A.      Risks Related to the Wind-Down. ................................................................... 6271
        B.      Risks Related to Recoveries under the Plan. ................................................... 6675
        C.      Risks Related to the Debtors' Businesses. ....................................................... 767
        D.      Miscellaneous Risk Factors and Disclaimers. ................................................. 6877

XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN ............................................................................................................... 6978

        A.      Introduction. ................................................................................................... 6978
        B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ... 709
        C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
                Claims Entitled to Vote. .................................................................................. 7180

7

D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
        Allowed Claims. ............................................................................... ~~73~~81

E.      Information Reporting and Back-Up Withholding. ............................................ ~~74~~83

**XII.      RECOMMENDATION OF THE DEBTORS** ............................................ ~~76~~**85**

8

**EXHIBITS**

EXHIBIT A      Chapter 11 Plan

EXHIBIT B      TSA

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Supplement to the Liquidation Analysis

## I.    INTRODUCTION

Invitae Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Invitae" or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[1] The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE TRANSACTION SUPPORT AGREEMENT, INCLUDING HOLDERS OF OVER 78% PERCENT OF THE 2028 SENIOR SECURED NOTES CLAIMS, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.    Background.

Invitae is a leading medical genetics company that is in the business of delivering genetic testing services, digital health solutions, and health data services that support a lifetime of patient care and improved outcomes. Invitae offers genetic testing across multiple clinical areas, including hereditary cancer, precision oncology, and rare diseases. Invitae applies proprietary design, process automation, robotics, and bioinformatics software solutions to expand the use and impact of genetic information and achieve efficiencies in sample processing and complex variant interpretation, allowing medical interpretation at scale. With the help of Invitae's genetic information, healthcare providers can assist patients in better understanding their susceptibility to a variety of diseases, which may lead to making more informed, sometimes life-saving, decisions about their health and medical care.

Invitae was founded in January 2010, and the Company's proprietary design, process automation, robotics, and bioinformatics software solutions established itself in the genetic research and testing space. Invitae's quick growth was accompanied by a series of acquisitions designed to strategically bolster and expand the Company's reach into new and novel segments within the healthcare industry and genetic testing field.

Between 2019 and 2021, the Company made thirteen (13) acquisitions, many of which unlocked value for Invitae and helped expand the Company's offerings. These acquisitions were carefully selected to either fill gaps in the Company's product portfolio or expand its reach into promising new markets that offered substantial profitability potential. To fund, in part some of these acquisitions, as well as the Company's expanded operations and growth, in 2021 Invitae raised approximately $1.5 billion in newly funded securities, mainly in the forms of convertible senior unsecured notes and common equity. However, these acquisitions required large sums of capital and substantial operating expenses that the Company funded, in large part, by adding significant debt to its balance sheet. These acquisitions also increased operating expenses and cash burn significantly, as many of the newly acquired businesses were pre-commercial and, as such, unprofitable.

While the Company was facing internal challenges as it navigated its newly expanded footprint, its financial position was exacerbated by external market conditions. Widespread inflation in 2021 drove up the cost of raw materials, labor, manufacturing, and operational infrastructure, all while consumer discretionary spending was at a low. In response, the capital markets tightened, and the Federal Reserve raised interest rates. This confluence of

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I.B of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

economic factors imposed constraints on Invitae's ability to raise new capital at a crucial moment for the newly expanded company.  Accordingly, the Company was left with limited options to address its funded debt obligations.  Invitae was also facing an upcoming maturity on certain of its convertible senior unsecured notes coming due in 2024.

Beginning in 2022, Invitae took steps to address these pressures by implementing several operational initiatives designed to realign its business to focus on profitable growth.  In July 2022, the Company appointed a new CEO and chairman of the board of directors of Invitae Corporation and implemented a cost savings program that included exiting certain non-core products, shrinking its geographical footprint, and implementing a reduction in force of approximately 1,000 employees, the combination of which saved the Company an estimated $326 million annually.  Invitae also reduced costs through increasing automation, equipment productivity, and other operational streamlining.

While these initiatives provided the Company with incremental liquidity, the boost did not fully make up for the continued costs associated with the business.  Accordingly, in March 2023, after a thorough and deliberate negotiation process with its major debtholders across its capital structure, the Company reached an agreement with a number of holders of the Company's 2024 Convertible Notes, to (i) exchange $305.7 million in aggregate principal amount of their 2024 Convertible Notes for $275.3 million aggregate principal amount of new secured Series A Notes due in 2028 and 14,219,859 shares of Common Stock, and (ii) issue $30 million of new secured Series B notes due in 2028.  In August 2023, certain of these holders also exchanged additional 2024 Convertible Notes into common stock, eliminating $17.2 million in aggregate principal in funded debt obligations from the Company's balance sheet.  This series of transactions provided the Debtors with significant operational runway by deleveraging the balance sheet through equitization, extending maturities by four (4) years on some of its debt obligations that were coming due imminently, as well as by providing an additional $30 million in liquidity at a crucial time based on the Company's liquidity position.

Despite these significant and sustained efforts and the benefits provided to the Company through the 2023 transactions, and even without the threat of the imminent 2024 maturity wall on certain of their other unsecured notes, the Company continued to face leverage challenges and a sustained decline in its stock price that further limited its ability to raise capital.  Meanwhile, its business lines continued to require significant cash expenditures.  By late September 2023, the Company retained restructuring advisors, including Kirkland & Ellis LLP ("K&E") as restructuring counsel, FTI Consulting, Inc. ("FTI") as financial and restructuring consultant, and Moelis & Company LLC ("Moelis") as financial advisor and investment banker, and began working closely with the special committee of Invitae's board of directors (the "Special Committee") to evaluate strategic alternatives.

In the following months, Invitae, with the assistance of K&E, FTI, and Moelis, began evaluating strategic alternatives to decrease its operational cash burn and preserve liquidity.  In conjunction with these efforts, on December 7, 2023, Jill Frizzley, a disinterested director with restructuring expertise, was appointed to the board of directors of Invitae Corporation (the "Board") and to the Special Committee to assist with evaluating strategic alternatives and investigating Invitae's prior transactions for viable claims and causes of action.[2]  In parallel, in December 2023 Invitae and Moelis commenced an external marketing process to generate and evaluate potential third-party interest, and to interface with holders throughout its capital structure on a potential restructuring transaction.  Prior to the Petition Date, Moelis contacted twenty-five (25) strategic parties—nineteen (19) parties conducted introductory diligence calls with Moelis and thirteen (13) executed nondisclosure agreements.

Additionally, the Company engaged with certain holders of the 2028 Senior Secured Notes to address the immediate cash burn and longer-term balance sheet issues.  Namely, as a liquidity-enhancing measure, the Company sought to wind down or divest additional non-core and cash-intensive business lines, including its reproductive health business segment ("Women's Health"), patient network business ("Ciitizen") and personalized medication management platform ("YouScript"), some of which dispositions may have otherwise been prohibited under the 2028 Senior Secured Notes Indenture.  In exchange for the requisite consent to amend the 2028 Senior Secured

---

[2]     See Form 8-K, Invitae Corp. (Dec. 7, 2023), https://ir.invitae.com/financials/sec-filings/2023/default.aspx.  Discussed in greater detail in Article IX.I below.

Notes Indenture and permit certain wind-downs and divestitures, Invitae and the Consenting Stakeholders agreed on certain provisions that were designed to drive towards a longer-term solution, which included milestones for a comprehensive marketing of the Company and its assets, compliance with a minimum liquidity covenant, and a timeframe to enter into a mutually agreed upon transaction support agreement for a broader restructuring.  After several months, pursuant to hard-fought and good faith negotiations that included extensive diligence and meetings with the Consenting Stakeholders and an ad hoc group of certain Holders of the 2028 Convertible Notes (the "Unsecured Ad Hoc Group") on February 13, 2024, the Debtors and approximately 78 percent of the Holders of the 2028 Senior Secured Notes Claims entered into a transaction support agreement (the "TSA").  The TSA contemplated, among other things, the support of the Consenting Stakeholders for the commencement of the Debtors' Chapter 11 Cases, the continuation of the Debtors' prepetition marketing process in chapter 11, and the allocation of sale proceeds pursuant to the ~~eventual p~~Plan.

On February 13, 2024 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") with the support of the Consenting Stakeholders pursuant to the TSA, and consensus regarding the Debtors' use of Cash Collateral during the Chapter 11 Cases.

**B.    The TSA.**

In accordance with the milestone under the second supplement to the 2028 Senior Secured Notes Indenture dated as of December 8, 2023 (the "Second Supplemental Indenture"), the Company, advised by the Board, and the Consenting Stakeholders continued negotiations and ultimately entered into the TSA on February 13, 2024.  The negotiations leading to execution of the TSA were arms-length and in good faith and resulted in the value-maximizing transaction contemplated by the TSA and the Plan, which allocates Distributable Value of the Debtors' estates (including proceeds of the Labcorp sale) in accordance with the Bankruptcy Code's priority scheme while also ensuring near-term distributions.  The decision to enter into the TSA and commence these Chapter 11 Cases was the culmination of months of strategic review, including regular meetings of the Debtors' Special Committee, the Board, management, and advisors.  Ultimately, the transactions contemplated by the TSA, and entering chapter 11 with the support of the Consenting Stakeholders, provided the best path forward for the Debtors to continue business as usual and ~~to~~ continue its sale process from a position of strength in order to maximize Distributable Value to stakeholders.

The TSA contemplated support from the Consenting Stakeholders for the sale of substantially all of the Debtors' assets and/or equity, along with the Plan that will allocate sale proceeds and provide for an orderly wind down of the Debtors' business.  Pursuant to the TSA, the Consenting Stakeholders agreed to vote in favor of the Plan, support the Debtors in their sale process, and allocate sale proceeds under the Plan to Holders of Allowed Subsidiary Unsecured Claims, Holders of Allowed General Unsecured Claims in an amount less than $250,000, and administrative costs of the Debtors' Estates before receiving their recovery.  The Consenting Stakeholders' support under the TSA also enables the Debtors to use their Cash Collateral on a consensual basis, allowing the Debtors to administer these Chapter 11 Cases while maintaining operations in the ordinary course of business with sufficient cash on hand.  The TSA also included certain milestones to expedite these Chapter 11 Cases, including:

- **One (1) day following the Petition Date**: the Debtors shall have file (i) a motion seeking approval of the Cash Collateral Orders; (ii) a motion seeking approval of the Bidding Procedures; and (iii) a motion to establish a claims bar date (the "Bar Date");

- **Three (3) days following the Petition Date**: the Bankruptcy Court shall have entered the Interim Cash Collateral Order;

- **Seven (7) days following the Petition Date**: the Bankruptcy Court shall have entered the Bidding Procedures Order;

- **Thirty (30) days following the Petition Date**: the Bankruptcy Court shall have entered a: (i) Final Cash Collateral Order; and (ii) an order establishing the Bar Date;

- **Sixty-two (62) days following the Petition Date**: the Bar Date shall have occurred;

- **Sixty-six (66) days following the Petition Date**: the Auction (if any) shall have commenced;

- **Fifteen (15) days following Auction**: the Bankruptcy Court shall have entered an order approving the proposed sale;

- **Twenty-five (25) days following the entry of an order approving the proposed sale**: subject to Bankruptcy Court availability, a hearing to approve the Disclosure Statement on a conditional basis shall have occurred;

- **Forty-one (41) days following the approval of the Disclosure Statement on a conditional basis**: subject to Bankruptcy Court availability, a joint hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan shall have occurred; and

- **159 days following the Petition Date**: the closing of the Sale Transaction and the Effective Date shall have occurred, subject to regulatory approvals.

The Plan ultimately contemplates the agreement memorialized by the TSA and the resulting sale process that maximized Distributable Value for stakeholders and ~~ensured~~provides payment in full to multiple classes of unsecured Claims.  An estimated 395 holders of general unsecured claims that have Claims in Class 4 and Class 5 (constituting 93.4 percent of total general unsecured creditors of the Debtors) will have their claims satisfied in full, on claims totaling an estimated $16 million, before Class 3 is entitled to a recovery.

The Debtors conducted an independent investigation (as further described herein) into any potential Claims and Causes of Action that could implicate, among other things, the priority of distributions under the Plan and believe the terms set forth herein are fair, reasonable and consistent with those priorities, and incorporate hard fought concessions from the Consenting Stakeholders to facilitate the sale process and distribution scheme contemplated hereby.  As such, the Debtors believe the Plan embodies a reasonable and appropriate settlement of potential Claims and Causes of Action.

**C.  The Sale Process.**

Beginning on December 14, 2023, pursuant to the Second Supplemental Indenture, Moelis began a fulsome third-party marketing process to solicit transaction proposals for substantially all of the Debtors' assets.  The Debtors prepared a confidential information memorandum with extensive information on their assets and populated a virtual data room containing significant diligence.  In consultation with their advisors, the Debtors then reached out to a group of twenty-five (25) strategic and financial investors.  The Debtors selected this group based upon the parties' potential capacity to consummate a large-scale transaction and industry knowledge and experience.  The Debtors and their advisors expended extensive efforts in negotiating with potential purchasers.  The prepetition marketing period yielded nineteen (19) introductory calls and the execution of thirteen (13) nondisclosure agreements.

As the marketing process progressed, Moelis and the Debtors' other advisors kept members of the Debtors' secured and unsecured noteholder constituencies apprised of important developments and took input from these groups on the marketing process, when deemed appropriate.  However, based on the proposals and initial indications of interest received by Moelis and the Debtors, it became apparent that the marketing process, which spanned a total of fifty-eight (58) days, was unlikely to yield a third-party partner that could facilitate an out-of-court ~~S~~sale ~~T~~transaction.  Thus, the Debtors determined that pivoting to an in-court ~~S~~sale ~~T~~transaction, as contemplated by the TSA, was the best option available to the Debtors in their efforts to reach the highest or otherwise best transaction possible under the circumstances.

On the Petition Date, and in furtherance of the sale process, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 19] (the "**Bidding**

Procedures Motion"). The Bidding Procedures Motion sought authority to establish certain formal bidding procedures for a potential sale of any or all of the Debtors' assets. On February 16, 2024, the Court entered the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 57] (the "Bidding Procedures Order"). In conjunction with the TSA, the Bidding Procedures Order and the *Notice of Additional Sale Process Deadline* [Docket No. 119] established certain milestones to move expeditiously through the sale process, including:

| Action | Description | Deadline |
|---|---|---|
| Interim Proposal Deadline | The deadline by which non-binding proposals from Acceptable Bidders must be actually received by the Bid Notice Parties | March 6, 2024, at 5:00 p.nm., prevailing Eastern Time |
| Stalking Horse Deadline | The deadline by which the Debtors may choose a Stalking Horse Bidder and enter into a Stalking Horse APA. | March 29, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Stalking Horse Notice Deadline (if applicable) | The deadline by which the Debtors must file a Stalking Horse Notice. | Within two (2) business days after entry into a Stalking Horse APA. |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | April 10, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Auction (if any) | The date and time of the Auction, which will be held at the offices of Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022. | April 17, 2024, at 10:00 a.m. prevailing Eastern Time, if any. |
| Notice of Successful Bidder | Within two (2) business days upon the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | Within two (2) business days upon the conclusion of the Auction (if any). |
| Sale Objection and Adequate Assurance of Future Performance Objection Deadline | The deadline by which objections to the Successful Bidder and Sale Transactions, if any, or to dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Executory Contract or Unexpired Lease, must be made. | April 28, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Sale Hearing | The hearing, if any, before the Court to consider approval of the Successful Bid or Successful Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale Transaction(s). | May 6, 2024, or as soon thereafter as the Debtors may be heard. |

The marketing process was an extensive, far reaching, and months-long process in which the Debtors and their advisors sought strategic and financial investors to effectuate a value maximizing transaction. The Debtors explored the possibility of designating a Stalking Horse Bidder based on indications of interest received by the Interim Proposal Deadline, but ultimately did not designate a Stalking Horse Bidder. Instead, the Debtors

determined that the best path forward was to allow parties to continue to develop their diligence and submit fulsome bids in advance of the Bid Deadline.  As the Debtors approached the April ~~10~~10th Bid Deadline, they engaged with over seventy (70) potential buyers for the Debtors' assets and received six (6) indications of interest by the March 6 Interim Proposal Deadline.

During the marketing process, the Debtors consulted with the key stakeholders, including the Consenting Stakeholders and the Committee, about important occurrences of the marketing process—including the identity of bidders, key terms of the bids; and the time frame for receiving possible Stalking Horse Bids and Qualified Bids. However, given that the Consenting Stakeholders submitted a bid, the Debtors (in accordance with the Bidding Procedures) did not include the Consenting Stakeholders in the evaluation of any bids, nor did they share information with them about competing bids.  Overall, the marketing process was comprehensive and transparent and conducted in accordance with the court-approved Bidding Procedures Order.

On April 17, 2024, in accordance with the Bidding Procedures Order, the Debtors held an auction to sell substantially all of their assets (the "Auction").  To evaluate the bids in hand and provide Qualified Bidders with the opportunity to consider increasing their bids, the Debtors adjourned the Auction until April 24, 2024.  The Auction was competitive and involved hard-fought, arms-length negotiations with each participating bidder.  At the conclusion of the Auction, the Debtors determined that Labcorp Genetics Inc.'s ("Labcorp," or the "Purchaser") bid represented the highest and otherwise best bid for a value-maximizing transaction of the Debtors' business. Accordingly, the Debtors designated Labcorp as the Purchaser pursuant to the *Notice of Successful Bidder with Respect to the Auction Held on April 17 and 24, 2024* [Docket No. 362] filed on April 24, 2024.  The Purchaser's bid includes, among other things, a base purchase price of $239 million in cash, plus additional non-cash consideration including the preservation of a vast majority of employees' jobs and payment of certain cure costs, subject to certain terms and conditions.

On April 25, 2024, the Debtors sought Court approval to execute an asset purchase agreement with the Purchaser to consummate the Sale Transaction pursuant to the *Notice of (I) Filing of the Asset Purchase Agreement and Proposed Sale Order with Respect to the LabCorp Sale Transaction, (II) Modified Cure Objection Deadline, and (III) Rescheduled Sale Hearing* [Docket No. 364].  After a hearing on May 7, 2024, to consider the Sale Transaction the Court entered the *Order (I) Approving the Sale of Acquired Assets Free and Clear of All Liens, Claims, and Encumbrances and (II) Authorizing the Debtors to Enter into and Perform their Obligations Under the Labcorp Asset Purchase Agreement* [Docket No. 463] (the "Sale Order") authorizing the Sale Transaction.  The Debtors, however, continue to evaluate their options, and if the Debtors determine that an alternative transaction providing for the sale of all, or substantially all, of the Debtors' assets (an "Alternative Transaction") would provide more value to stakeholders than the Plan, the Debtors will pursue the Alternative Transaction, and will provide Holders of Claims and Interests with additional information and revised documents, as applicable.

**D.    Statement of the Official Committee of Unsecured Creditors.**

**BELOW IS A STATEMENT FROM THE COMMITTEE REGARDING ITS POSITION ON THE PLAN.  THE DEBTORS DISAGREE ENTIRELY WITH THE MERITS OF THE COMMITTEE'S STATEMENT AND ITS POSITION ON THE PLAN, AND THE DEBTORS RESERVE ALL RIGHTS WITH RESPECT TO THE COMMITTEE'S ASSERTIONS BELOW.**

**STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

On March 1, 2024, the Office of the United States Trustee, a division of the United States Department of Justice, appointed the Official Committee of Unsecured Creditors (the "**Committee**") to serve as the statutory fiduciary representative of general unsecured creditors in the chapter 11 cases of Invitae Corporation and its affiliated debtors and debtors in possession (collectively, the "**Debtors**").

**The Committee's Position**

**The Committee has reviewed the Debtors' proposed plan [Docket No. 471] (the "Plan") and**

disclosure statement [Docket No. 472] and it DOES NOT SUPPORT confirmation of the Plan.

On May 30, 2024, the Bankruptcy Court ordered the Debtors, the Committee, Deerfield Partners L.P. (together with its affiliates, "**Deerfield**"), and the trustee and collateral agent for the 2028 Senior Secured Notes (the "**Agent**") to mediation to attempt to resolve the issues raised by the proposed Plan. To the extent the mediation is successful, the parties may need to solicit the votes of unsecured creditors or otherwise obtain their support. The Committee will work to ensure that unsecured creditors are notified if that occurs.

### The Uptier Transaction

Between 2019 and 2021, the Debtors borrowed more than $1.5 billion to fund their purchase of unprofitable genetic testing businesses and operations. As early as the summer of 2021, the Debtors' officers and directors knew that, notwithstanding recently receiving more than $1.1 billion in low interest loans, they would soon run out of money unless they raised additional capital. In 2023, the situation became desperate.

In March 2023, the Debtors' officers and directors entered into a "liability management" transaction with Deerfield, whereby the Debtors exchanged the outstanding unsecured debt owed to Deerfield and other of the Debtors' preferred lenders for new secured debt (the "**Uptier Transaction**"), which did not provide the Debtors with any material capital or other value. At that time, the Debtors' officers and directors and Deerfield knew that the Debtors were insolvent and inadequately capitalized. Each of those parties also knew that the Uptier Transaction would not change the Debtors' inevitable insolvency or provide them with any more time to turn around their business. The Debtors' officers and directors proceeded with the transaction notwithstanding that understanding. The result of the Uptier Transaction was to seal the Debtors' fate and provide favored creditors with the purported right to receive the first of at least $332.5 million of value in the inevitable bankruptcy of the Debtors. To add insult to injury, the Debtors' board of directors then paid the Debtors' officers over $15 million of bonuses, including $12 million on the eve of bankruptcy. As described in further detail below, as a direct result of the Uptier Transaction and the lavish bonuses paid to executives, the Debtors' estimate their purportedly secured lenders will be paid in full while their more than $1.2 billion of unsecured creditors will receive a *de minimis* (if any) recovery.

### The Debtors' Plan

The Plan's sole purpose is to distribute the cash proceeds from the sale of the Debtors' business. The vast majority of those proceeds would go to Deerfield and other holders of the 2028 Senior Secured Notes, whose claims would be allowed under the Plan in the full amount asserted by the Agent and the Secured Noteholders. Further, the Debtors propose to provide unconditional releases to (i) Deerfield and the other holders of the 2028 Senior Secured Notes and (ii) the officers and directors who approved the Uptier Transaction and approved and received exorbitant bonuses from the Debtors.

The Debtors intend to release these parties despite the Committee having identified, and sought standing to pursue, valuable causes of action related to the Uptier Transaction. Specifically, after conducting its investigation and reviewing tens of thousands of relevant documents, the Committee believes that significant claims exist against certain current and former Invitae officers and directors, Deerfield and the other Secured Noteholders, and the Agent including for constructive and actual fraudulent transfer, breaches of fiduciary duties, and claims for aiding and abetting the same. These claims are described in detail in the Committee's motion for standing, which was filed at Docket No. 536.

These claims are based on, among other things, the Debtors' and Deerfield's knowledge that the Uptier Transaction was not even a band-aid to cover the Debtors' cash burn. Rather, it was intended to improperly vault Deerfield and its cherry-picked friends ahead of similarly-situated unsecured creditors so that the Debtors and Deerfield could walk hand-in-hand as the Debtors snowballed toward these inevitable Chapter 11 Cases. If successful, the claims alleged in the Standing Motion and the proposed complaint attached thereto would result in the avoidance of the liens securing the 2028 Senior Secured Notes, which would improve recoveries for general unsecured creditors of Invitae by hundreds of millions of dollars.

16

The Debtors' attempts to eliminate these causes of action and validate the liens securing the 2028 Senior Secured Notes are especially troubling because, with the Debtors working to close the committed sale of their business, the Debtors have no legitimate reason to steer value to one stakeholder or another.  The Debtors' "tilting of the scales" in these Chapter 11 Cases is similar to the Debtors' actions in connection with the Uptier Transaction, as described above and in the Standing Motion, in that they benefit Deerfield and the other Secured Noteholders to detriment of unsecured creditors.  Just as concerning is that the Plan proposes to release the directors and officers who were paid more than $12 million of bonuses on the eve of the bankruptcy filing at a time when they had full knowledge that (i) the Debtors would likely be unable to pay their unsecured creditors and (ii) no executive would likely remain with the Debtors after the sale of their business.

The Debtors also understate the amount of cash that will be available for distribution under the Plan.  The Committee's analysis of the Debtors' cash position shows that even if it were to lose on its litigation (which it does not believe it will), there are still sufficient proceeds to pay the Debtors' purported secured creditors in full and provide a recovery to unsecured creditors.  Yet the Plan assumes otherwise, soliciting only the votes of the holders of the 2028 Senior Secured Notes and not those of general unsecured creditors or any other stakeholder.

In addition to being unfair to general unsecured creditors, the Committee does not support the Plan at this time because it does not satisfy the necessary requirements of the Bankruptcy Code to be approved.  The Plan cannot be confirmed because, among other things, (i) the Plan will not have an impaired accepting class as required by section 1129(a)(10) of the Bankruptcy Code and (ii) the Plan includes improper releases and so-called "settlements" of valuable causes of action for no consideration.  Further, based on the Debtors' liquidation analysis, the Plan cannot be confirmed if one holder of the 2028 Senior Secured Notes votes to reject.  Finally, as the Debtors admit, if the Committee succeeds in prosecuting causes of action against the Secured Noteholders, the Plan is not confirmable.

**Conclusion**

Instead of pursuing their fatally flawed Plan and spending tens of millions of dollars that otherwise would go to unsecured creditors defending their directors and officers from personal liability for their failure, the Debtors should work with the Committee to modify the Plan to (i) preserve causes of action against Deerfield and the other Secured Noteholders, the Agent, and the Debtors' officers and directors and (ii) provide a mechanism to unwind the Uptier Transaction if the causes of action asserted by the Committee are successful.

***Unless and until the Debtors engage on those modifications, the Committee does not support the Debtors' proposed Plan and encourages all stakeholders to oppose the Plan, not vote in favor of the Plan and to opt out of all Plan releases.***

**THE DEBTORS DISAGREE WITH THE COMMITTEE'S STATEMENT AND ITS POSITION ON THE PLAN PROVIDED ABOVE, AND BELIEVE THE COMMITTEE'S ALLEGED CLAIMS ARE MERITLESS AND ARE NOT A SOURCE OF VALUE FOR THE ESTATE.**

**AS ILLUSTRATED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE PLAN IS THE PATH THAT PROVIDES FOR THE FASTEST AND MOST CERTAIN PATH FOR RECOVERY TO CREDITORS, INCLUDING A FULL RECOVERY FOR MANY UNSECURED CREDITORS.**

17

**FAILURE TO CONFIRM THE PLAN WOULD RESULT IN DELAYS AND INCREASED ADMINISTRATIVE EXPENSES AND WOULD ULTIMATELY REDUCE AVAILABLE DISTRIBUTIONS.**

**THE DEBTORS FURTHER DISPUTE THAT THERE IS ANY VIABLE ALTERNATIVE PLAN THAT WOULD SUPPORT LITIGATION OF THE COMMITTEE'S ASSERTED CLAIMS AND CAUSES OF ACTION WITHOUT SIGNIFICANTLY DEPLETING DISTRIBUTABLE VALUE AND POTENTIALLY ELIMINATING ALL RECOVERIES TO UNSECURED CREDITORS.**

**THE DEBTORS THEREFORE ENCOURAGE ALL HOLDERS OF UNSECURED CLAIMS, ESPECIALLY THOSE IN CLASSES 4 AND 5, TO VOTE TO ACCEPT THE PLAN.**

**III.    OVERVIEW OF THE PLAN**

   **A.    The Plan.**

   A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains property under the plan.

   The Plan is the best path forward for the Debtors and their estates.  The Plan contemplates the consummation of the Sale Transaction pursuant to the Sale Order.

   Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will substitute the obligations set forth in the Plan for pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

   A summary of the treatment is as follows, with a more detailed description provided in Article IV.E of this Disclosure Statement.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 4 | Convenience Class Claims | Unimpaired | ~~Not Entitled~~Permitted to Vote (Presumed to Accept) |
| Class 5 | Subsidiary Unsecured Claims | Unimpaired | ~~Not Entitled~~Permitted to Vote (Presumed to Accept) |
| Class 6 | Parent Unsecured Claims | Impaired | ~~Not Entitled~~Permitted to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interest | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 11 | Contingent Subsidiary Unsecured Claims | Impaired | ~~Not Entitled~~Permitted to Vote (Deemed to Reject) |

**1.** *Overview - Satisfaction of Claims and Interests.*

Each of the Debtors is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code. The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11.  Recoveries for certain Classes of Claims could be as high as 100~~%~~ percent.  Please refer to the Article IV.E of this Disclosure Statement for more detail on the projected recoveries for your specific Claim(s).  Generally, the Plan contemplates the following treatment of Claims and Interests:

- Holders of Secured Tax Claims and Other Priority Claims will be rendered Unimpaired.

- Holders of Class 4 Convenience Class Claims, either by amount or by election, will receive payment in full in Cash.

- Holders of Class 5 Subsidiary Unsecured Claims Allowed as of the Effective Date that are not Convenience Class Claims, either by amount or election, shall be paid in full in Cash.

- Holders of Class 3 2028 Senior Secured Notes Claims will receive their *pro rata* share of Distributable Value following payment in full of Classes 1, 2, 4, and 5 Claims.  In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash.

- Holders of Class 6 Parent Unsecured Claims and Holders of Class 11 Contingent Subsidiary Unsecured Claims that are not Convenience Class Claims (by election) shall receive on the Effective Date its *pro rata* share of any residual Distributable Value following payment in full of Classes 1, 2, 4, 5, and 3 Claims, or such other treatment as agreed by such Holder (subject to the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders).  As discussed in Article IV.K of this Disclosure Statement, the Debtors anticipate that after satisfying all costs related to the Wind Down and providing distributions to all Holders of Claims with greater priority, Holders of Class 6 Parent Unsecured Claims and Holders of Class 11 Contingent Subsidiary Unsecured Claims are unlikely to receive a ~~0%~~ recovery under the Plan.

- Class 7 Intercompany Claims shall be reinstated, set off, settled, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Claims, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders.

- Class 8 Intercompany Interests shall be reinstated set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Intercompany Interest, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders.

- Any Claims arising under section 510(b) of the Bankruptcy Code shall be discharged without any distribution.

- Equity Interests in Invitae Corporation will be cancelled and will not be entitled to a distribution.

**2.**    *The Debtors' Disclaimer with Respect to the Solicitation and Tabulation of Votes Cast by Holders of Claims in Classes 4, 5, 6, and 11.*

The Debtors believe that Classes 4 and 5 are Unimpaired and are therefore presumed to accept the Plan. The Debtors also have determined that Classes 6 and 11 may or may not receive a recovery under the Plan and are therefore deemed to reject.

In response and to resolve the Committee's objection to the Disclosure Statement, the Debtors shall provide Ballots to Holders of Claims in Classes 4, 5, 6, and 11 and permit such Holders to submit votes on the Plan. The Claims and Noticing Agent will tabulate the Ballots cast by Holders of Claims in Class 4, Class 5, Class 6, and Class 11.

**3.**    ~~2.~~ *Settlement, Compromise, and Release of Claims.*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distribution, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims, Intercompany Claims resolved or compromised after the Effective Date by the Debtors, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities, of Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests related to service performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim or Interest has accepted the Plan.

**4.**    ~~3.~~ *Assumption and Rejection of Executory Contracts.*

Each Executory Contract or Unexpired Lease the Debtors have not previously assumed, assumed and assigned, or rejected will automatically be deemed rejected by the applicable Wind Down Debtors in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code.  However, such Executory Contract or Unexpired Lease is not automatically deemed rejected if it (a) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) has been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (c) is the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; (d) is a contract, release, or other agreement or document entered into in connection with the Plan; (e) is the Asset Purchase Agreement; or (f) is to be assumed by the Debtors and assigned to the Purchaser in connection with the Sale Transaction and pursuant to the Asset Purchase Agreement.

**5.**    ~~4.~~ *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (ii) the effective date of such rejection, or (iii) the Effective Date.  The notice of the Plan Supplement shall be deemed appropriate notice of rejection when served on applicable parties.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Plan Administrator, or their property without the need for any objection by the Debtors, the Wind-Down Debtors, or the Plan Administrator, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in ~~Article VIII.F~~Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in ~~Article III.B~~Article III.B of the Plan and may be objected to in accordance with the provisions of ~~Article VII~~Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

<u>6.</u> ~~5.~~ *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors, or the Wind-Down Debtors, or the Purchaser, will pay any Cures, on the Effective Date or as soon as reasonably practicable thereafter.  The proposed amount and timing of payment of each such Cure can be found in the Plan Supplement, unless otherwise agreed in writing (email being sufficient) between the Debtors, the Wind-Down Debtors, or the Purchaser, and the counterparty to the applicable Executory Contract or Unexpired Lease.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection (an "Executory Contract Objection") filed by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment, including pursuant to the Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee by the applicable Assumption or Rejection Objection Deadline or any other deadline that may be set by the Bankruptcy Court.  Any Executory Contract Objection (x) timely Filed prior to the Confirmation Hearing will be heard by the Bankruptcy Court at the Confirmation Hearing unless otherwise agreed to by the Debtors and the objecting party or (y) timely Filed after the Confirmation Hearing shall be heard as soon as reasonably practicable on a date requested by the Debtors or the Wind-Down Debtors, as the case may be.  Any Executory Contract Objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Wind-Down Debtor, as applicable, without the need for any objection by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors, or the Wind-Down Debtors, or the Purchaser, as applicable, of the Cure amount; *provided,* however, nothing in the Plan shall prevent the Wind-Down Debtors from paying any Cure amount despite the failure of the relevant counterparty to File an Executory Contract Objection.  The Debtors or the Wind-Down Debtors, as applicable, may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and/or assignment.

If there is any dispute regarding any Cure, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure will occur as soon as reasonably practicable after entry of a Final Order (which could be the Confirmation Order) resolving such dispute, approving such assumption (and, if applicable, assumption and assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

If an Executory Contract Objection relates solely to a Cure, the Debtors or the Wind-Down Debtors, may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease before resolving the Cure objection—but the Debtors or the Wind-Down Debtors must reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Wind-Down Debtor).

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure shall result in the full release and satisfaction of any Cures, Claims, or defaults arising under any assumed Executory Contract or Unexpired Lease at any time before such assumption's effective date. **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed (or assumed and assigned) in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 7. ~~6.~~ *Insurance Policies.*

The Plan treats all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, as Executory Contracts. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Wind-Down Debtors.

Nothing in the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Wind-Down Debtors) or the Plan Administrator, as applicable, or draw on any collateral or security therefor.

### 8. ~~7.~~ *Indemnification Obligations.*

22

All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, will (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place before to the Effective Date—irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Wind-Down Debtors and/or the Plan Administrator. Any Claim or other right to indemnification, reimbursement, or contribution by the Debtors' directors, officers, or managers pursuant to charter, by-laws, contract, or otherwise against the Debtors or the Estates, shall be satisfied solely from the proceeds of any applicable D&O Liability Insurance Policies, or similar policy providing coverage to the Debtors' directors, officers, and managers, which policies shall survive the Effective Date, and which Claims or rights shall not be satisfied from any other assets of the Wind-Down Debtors or any proceeds thereof.

**9.** ~~8.~~ *Preservation of Causes of Action.*

Except as otherwise stated in the Plan or the Sale Order, in accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtors and the Plan Administrator (following transfer of such Causes of Action to the Plan Administrator), shall retain and may enforce all rights to commence and pursue any and all Causes of Action (including any actions specifically enumerated in the Schedule of Retained Causes of Action) regardless of whether they arose before or arise after the Petition Date. Moreover, the rights of the Wind-Down Debtors or the Plan Administrator to commence, prosecute, or settle such Causes of Action will be preserved, despite the occurrence of the Effective Date, except for Causes of Action: (i) acquired by the Purchaser in accordance with the Purchase Agreement, as applicable, or (ii) released or exculpated in the Plan (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors or the Plan Administrator can pursue such Causes of Action in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Wind-Down Debtors, and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as may be assigned or transferred to the Purchaser in accordance with the Asset Purchase Agreement or as otherwise expressly provided in the Plan.** Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Wind-Down Debtors, or the Plan Administrator expressly reserve all Causes of Action, for later adjudication. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors, the Wind-Down Debtors, or the Plan Administrator reserve and will retain such Causes of Action despite the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity will vest in the corresponding Wind-Down Debtor except as otherwise expressly provided in the Plan. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtor, or the Plan Administrator, in consultation with the Required Consenting Stakeholders, will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**10.** *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan or to the extent otherwise provided in the Plan, including in Article V.A of the Plan, all notes, agreements, instruments, certificates, and other documents evidencing Claims or Interests, including the 2028 Senior Secured Notes Indenture, the 2024 Convertible Notes Indenture, the 2028 Convertible Notes Indenture, and all other credit agreements and indentures, shall automatically be deemed discharged, cancelled, and of no further force and effect, and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto, including any Liens and/or Claims in connection therewith, shall be deemed satisfied in full, cancelled, discharged, released, and of no force or effect, and the Trustees shall be released from all duties and obligations thereunder; *provided, however*, that provisions of the 2028 Senior Secured Notes Indenture, the 2024 Convertible Notes Indenture, and the 2028 Convertible Notes Indenture that survive the termination of the respective Indenture pursuant to its terms, including indemnification and charging lien rights of the Trustees, shall continue in full force and effect. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding such cancellation, discharge and release, the 2028 Senior Secured Notes Indenture, the 2024 Convertible Notes Indenture, and the 2028 Convertible Notes Indenture and any notes, instruments, or other documents issued or evidencing Claims thereunder shall continue in effect to the extent necessary (i) to allow the Holders of 2024 Convertible Note Claims, 2028 Convertible Note Claims, and 2028 Senior Secured Note Claims to receive and accept distributions; (ii) to allow the Trustees to receive and make post-Effective Date distributions, as applicable, or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims; (iii) to preserve any rights of the Trustees to payment of fees, expenses, and indemnification obligations as against any distributions to the Holders of notes, including any rights to priority of payment and/or to exercise charging liens and enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; (iv) to allow each Trustee to enforce any obligations owed to such Trustee under the Plan; and (v) to allow the Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court.

Upon completion of the final distributions in accordance with Article VI of the Plan, (i) the 2028 Senior Secured Notes, the 2024 Convertible Notes, and the 2028 Convertible Notes shall thereafter be deemed null, void, and worthless, and (ii) at the request of the applicable Trustee under the applicable Indenture, DTC shall take down the relevant position relating to the 2028 Senior Secured Notes, the 2024 Convertible Notes, and the 2028 Convertible Notes without any requirement of indemnification or security on the part of the Debtors, the Trustees, or any third party designated by the foregoing parties.

Except for the foregoing, subsequent to the performance by the Trustees of their obligations pursuant to the Plan or as may be necessary to effectuate the terms of the Plan, the Trustees shall be relieved and discharged from all further duties and responsibilities related to the Plan and the respective Indenture.

**B.      Holders of Claims May Be Released by the Debtors.**

In order to effectuate an expedient process and limit future legal costs, the Plan also contemplates that Holders of Claims and Interests may be released by the Debtors.  Specifically (i) Holders of Claims who vote to accept the Plan and do not affirmatively opt out of the third party releases provided by the Plan, (ii) Holders of Claims who are presumed to accept the Plan and do not affirmatively opt out of the third party releases provided by the Plan, (iii) Holders of Claims who abstain from voting on the Plan and do not affirmatively opt out of the third party releases provided by the Plan, (iv) Holders of Claims who vote to reject the Plan and do not affirmatively opt out of the third party releases provided by the Plan; and (v) Holders of Claims and Interests who are deemed to reject the Plan and do not affirmatively opt out of the third party releases provided by the Plan shall be deemed "Releasing Parties" and will receive a release from the Debtors.  The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to stakeholders.

**IV.      QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN**

**A.      What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| | | | |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | 2028 Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 4 | Convenience Class Claims | Unimpaired | ~~Not Entitled~~Permitted to Vote (Presumed |

| | | | to Accept) |
|---|---|---|---|
| Class 5 | Subsidiary Unsecured Claims | Unimpaired | ~~Not Entitled~~Permitted to Vote (Presumed to Accept) |
| Class 6 | Parent Unsecured Claims | Impaired | ~~Note Entitled~~Permitted to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interest | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Contingent Subsidiary Unsecured Claims | Impaired | ~~Not Entitled~~Permitted to Vote (Deemed to Reject) |

**D.    What is the Sale Transaction?**

**1.    _Overview._**

The Sale Transaction is the sale for certain of the Debtors' assets, as explained in that certain agreement between the Debtors and the Purchaser.[3]  The Sale Transaction provides for a purchase price of $239 million in cash, plus additional non-cash consideration, such as the payment of certain cure costs and the assumptions of liabilities arising out of ownership of the Acquired Assets, subject to certain terms and conditions.

**2.    _Sources of Consideration for Plan Distributions._**

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Wind-Down Debtors. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**3.    _Delivery of Distribution on Account of Allowed Note Claims._**

Notwithstanding any provision of the Plan to the contrary, distributions of Cash on account of Allowed 2028 Senior Secured Notes Claims, Allowed 2024 Convertible Note Claims, or Allowed 2028 Convertible Note Claims shall be made to the respective Trustee for further distribution to Holders of such Claims in accordance with the terms of the 2028 Senior Secured Notes Indenture, the 2024 Convertible Note Indenture, or the 2028 Convertible Note Indenture, as applicable.  Such distributions shall be subject in all respects to the rights of the Trustees to assert their respective charging liens against such distributions as set forth in the respective Indenture, to the extent that the fees and expenses of the Trustees have not otherwise been paid in full.

The Trustees shall have no duties or responsibility relating to any form of distribution to Holders of Claims that are not DTC-eligible and the Debtors, the Wind-Down Debtors and/or the Disbursing Agent, as applicable, shall use reasonably commercial efforts to seek the cooperation of DTC so that any distribution on

---

[3]    The asset purchase agreement between the Debtors and the Purchaser is attached as __Exhibit A__ to the Sale Order in the _Notice of (I) Filing of the Asset Purchase Agreement and Proposed Sale Order with Respect to the LabCorp Sale Transaction, (II) Modified Cure Objection Deadline, and (III) Rescheduled Sale Hearing_ [Docket No. 364].

account of Allowed 2028 Senior Secured Notes Claims, Allowed 2024 Convertible Note Claims, or Allowed 2028 Convertible Note Claims that are held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC (whether by means of book-entry exchange or otherwise) of the Effective Date or as soon as practicable thereafter.  In no event shall the Trustees (in any capacity) be responsible for any manual, paper, or similar physical, and/or individualized method of distribution or other method of distribution that is not customary for the Trustees under the circumstances.  If the Trustees are unable to make, or the Trustees consent to the Disbursing Agent making such distributions, the Disbursing Agent, with the cooperation of the Trustees, shall make such distributions to the extent practicable.

The Trustees shall not incur any liability whatsoever on account of any distributions under the Plan, except for fraud, gross negligence, or willful misconduct.  The Debtors or the Wind-Down Debtors, as applicable, shall reimburse the 2028 Senior Secured Notes Collateral Agent and 2028 Senior Secured Notes Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred on or after the Effective Date solely in connection with the implementation of the Plan, including making distributions pursuant to, and in accordance with, the Plan, without the need for further approval or order of the Bankruptcy Court.

## **4.** ~~3.~~ *Wind-Down Debtors.*

On and after the Effective Date, the Wind-Down Debtors will continue in existence for purposes of, among other things, (i) winding down the Debtors' business and affairs as quickly as reasonably possible (as authorized by the Bankruptcy Court); (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided in the Plan; (iv) establishing and funding the Distribution Reserve Accounts; (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (vi) filing appropriate tax returns; (vii) complying with any continuing obligations under the Asset Purchase Agreement; and (viii) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan or transferred pursuant to the Asset Purchase Agreement on or prior to the Effective Date will vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator, in consultation with the Required Consenting Stakeholders, and the net proceeds thereof shall constitute Distributable Value.

## **5.** ~~4.~~ *Plan Administrator.*

On the Effective Date, the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and their authority, power, and incumbency in such roles shall be deemed to have terminated, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.  The Plan Administrator will act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions ~~hereof~~of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer.  The Debtors, after the Confirmation Date, and the Wind-Down Debtors or Plan Administrator, after the Effective Date, shall be permitted

27

to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator will include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Wind-Down Debtors, including:  (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (viii) except as otherwise provided for in the Plan, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.D of the Plan; (ix) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (x) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (xi) discharging the sellers' and the Wind-Down Debtors' post-Effective Date obligations under the Asset Purchase Agreement; and (xii) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind Down Reserve.

### 6. ~~5.~~ *Wind Down.*

As soon as practicable after the Effective Date, the Plan Administrator shall:  (i) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Plan and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of one or more of the Debtors or the Wind-Down Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Wind-Down Debtors as set forth in the Plan, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Equity Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

E.      **What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Any Claims referenced as being *pari passu* will receive equal treatment between the classes of Claims.

The projected recoveries set forth in the table below are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis attached hereto as **Exhibit C**.  Accordingly, recoveries actually received by Holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below., including that some sources of consideration will be realized ***after*** the Effective Date.  Specifically:

- On the Effective Date, accounts receivable will not be available for distribution.  The Debtors anticipate accounts receivable to be collected over a nine-month period[4] after the Effective Date.  There is no certainty that amounts realized will be consistent with the Debtors' estimates, none of which are guaranteed.

- Collection of the contingent earnout from the sale of Women's Health is subject to dispute and reconciliation and is not likely available for immediate distribution as of the Effective Date.

The estimates provided in the table below do not account for any delay in closing.  If any delay in the closing of the Sale Transaction or the Plan Effective Date, Distributable Value would further be depleted, and administrative costs would increase.  The Debtors estimate that these costs (inclusive of operating costs and professionals' fees) would range from $8 million to $10 million per month.

In no circumstance will Holders of Class 3 2028 Senior Secured Notes Claims receive an amount in full satisfaction of their Claims on the Effective Date.  As explained above, significant value will not be available (if at all) until well after the Effective Date.  Because Class 3 agreed to subordinate their Claims to Classes 4 and 5, any lower realization on contingent value and any increase in operating costs or administrative fees would be borne by Class 3.

For Projected Plan Recoveries, the Debtors are assuming a total distributable value of approximately $404.1[5] million.  This includes contingent assets that will be recovered over a nine-month period following the Effective Date contemplated by the Wind-Down Budget to be included in the Plan Supplement.

Classes 4 and 5 will receive payment on the Effective Date.  Class 3 will receive approximately 80% of its recovery of the Effective Date, and any additional distributions will be delivered at a later date.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[46]**

---

[4]   In the three (3) to four (4) months following the Effective Date, the Debtors anticipate realizing approximately 65 percent of accounts receivable, with an approximately five (5) month tail period for collection of the remaining amounts.  The Debtors modeled their accounts receivable realization and timeline based on historic trends of payors.

[5]   Reflects a midpoint of the projected range of distributable value, which is estimated to be $398.7-$409.5 million.

[46]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions ability to collect accounts receivable and timing on contingent assets.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[57] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, on the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option with the consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned or delayed): (i) payment in full in cash in an amount equal to its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, or (iii) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | n/a | 100% | ~~100%~~n/a |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall be paid in full in cash on the Effective Date, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code reasonably acceptable to the Required Consenting Stakeholders. | n/a | 100% | ~~1~~0.0% |
| 3 | 2028 Senior Secured Notes Claims | Except to the extent that a Holder of an Allowed 2028 Senior Secured Notes Claim agrees to a less favorable treatment, each holder of an Allowed 2028 Senior Secured Notes Claims (which shall include interest (including post-petition interest at the contract default rate) and fees and | $~~[305.4]mm~~335.6 mm[9] | ~~[●]~~91.0%-94.8%[10] | ~~[●]~~100%[11] |

___
57   In the aggregate, approximately 4,028 senior fifty (50) Subsidiary Secured Notes Claims (which shall include Unsecured Claims.

Except to the extent that a Holder of an Allowed 2028 Senior Secured Notes Claims, [3340] Convenience Class Claims,

___
8   The 2028 Senior Secured Notes shall accrue post-petition interest at the contract default rate.

9   Class 3's Allowed Claim includes the Make-Whole Amount (as defined below) and payment of accrued and unpaid prepetition interest and postpetition interest at the contract, non-default rate.

10  Class 3's high-end Plan recovery includes several assumptions surrounding the recovery of delayed and contingent proceeds, and the high-end Plan recovery in the original Disclosure Statement did not consider Class 3's approximately $27.5 million Make-Whole Amount (the "Make-Whole Amount"), or post-petition interest, which would need to be paid in full before any recovery could flow to junior classes.  Class 3's recovery amount provided for here includes recoveries coming from accounts receivable, many of which will not be available until approximately nine (9) months after the Effective Date.  Recoveries are also dependent on the contingent earnout related to the sale of Women's Health, which is currently subject to dispute and reconciliation.  For the avoidance of doubt, there is no scenario in which Class 3 2028 Senior Secured Notes Claims will receive a 100 percent recovery on the Effective Date.

11  The initial hypothetical chapter 7 recovery provided in the Disclosure Statement did not account for the Make-Whole Amount.  Similar to the Plan recovery figures, the initial Liquidation Analysis, a form of which is attached hereto

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[57] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
|  |  | all other amounts due and owing under the 2028 Senior Secured Notes Indenture) shall receive on the Effective Date (or such other applicable date) its Pro Rata share of Distributable Value (including Residual Cash) following payment in full of Claims in Classes 1, 2, 4, and 5. In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash. |  |  |  |
| 4 | Convenience Class Claims | Except to the extent that a Holder of an Allowed Convenience Class Claim agrees to a less favorable treatment, each Holder of an Allowed General Unsecured Claims in an amount less than $250,000 and each Holder who elects to reduce their Allowed General Unsecured Claim to $250,000 shall receive on the Effective Date or as soon as reasonably practicable thereafter: payment in full in Cash, *provided*, that to the extent that a Holder of a Convenience Class Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Convenience Class Claim, such Holder shall only be entitled to a distribution on one Convenience Class Claim against the Debtors in full and final satisfaction of all such Claims. | $[6.9mm]9.2mm[12] | 100% | 0.0% |

as **Exhibit C**, contains several assumptions relating to the distribution of contingent and delayed proceeds that would only become available after the Effective Date. For a detailed discussion on these assumptions, please see Article VI.B herein. We have included a supplemental Liquidation Analysis, attached hereto as **Exhibit D**, that includes the Make-Whole Amount as well as an updated understanding of Plan recoveries.

[12] Includes an assumed sixteen (16) Holders of Class 6 Claims electing to receive the Convenience Class treatment.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[57] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 5 | Subsidiary Unsecured Claims[6] | Except to the extent that a Holder of an Allowed Subsidiary Unsecured Claim agrees to a less favorable treatment, each Holder of a Subsidiary Unsecured Claim that is Allowed as of the Effective Date shall receive on the Effective Date or as soon as reasonably practicable thereafter: payment in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code; *provided*, that to the extent that a Holder of a Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Subsidiary Unsecured Claim, such Holder shall only be entitled to a distribution on one Subsidiary Unsecured Claim against the Debtors in full and final satisfaction of all such Claims; *provided further*, that to the extent that a Holder of a Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims that constitute a Parent Unsecured Claim, such Holder shall only be entitled to a distribution on account of its Subsidiary Unsecured Claim after reduction on account of any distribution on account of its Parent Unsecured Claim. | $[6.4mm] 7.1mm | 100% | 0.0% |
| 6 | Parent Unsecured | Except to the extent that a Holder of an Allowed Parent Unsecured Claim agrees | $[1,183.7mm][7][13] | 0% | 0% |

<hr>

[6] The Debtors believe that approximately [ten (10)] Class 5 Subsidiary Unsecured Claims totaling approximately $[6.4] million are structurally senior to Class 6 Parent Unsecured Claims.

[7][13] In connection with the Sale Transaction, the Purchaser intends to assume substantially all of Invitae's workforce. The Debtors anticipate that this will not affect the amount of Class 6 Parent Unsecured Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[57] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | Claims | to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of a Parent Unsecured Claim shall receive its Pro Rata share of any Distributable Value following payment in full of Classes 1, 2, 3, 4, and 5 Claims, or such other treatment as agreed by such Holder (subject to the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders). | | | |
| 7 | Intercompany Claims | On the Effective Date, Intercompany Claims shall be (i) reinstated or (ii) set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Intercompany ~~Interest~~Claim, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders. | n/a | n/a | n/a |
| 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be (i) reinstated or (ii) set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Debtors (with the consent (not to be unreasonably withheld, delayed or conditioned) of the Required Consenting Stakeholders), without any distribution on account of such Intercompany Interest, or such other treatment as reasonably determined by the Debtors and the Required Consenting Stakeholders. | n/a | n/a | n/a |
| 9 | Section 510(b) Claims | On the Effective Date, any Claims arising under section 510(b) of the Bankruptcy Code shall be discharged without any distribution. | n/a | n/a | n/a |
| 10 | Equity Interests | On the Effective Date, all Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Each holder of an Equity | n/a | n/a | n/a |

33

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[57] (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | Interest shall receive no recovery or distribution on account of such Equity Interest. | | | |
| 11 | Contingent Subsidiary Unsecured Claims | Except to the extent that a Holder of a Contingent Subsidiary Unsecured Claim agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Contingent Subsidiary Unsecured Claim shall receive its Pro Rata share of any Distributable Value allocable to the applicable Debtor subsidiary following payment in full of Classes 1, 2, 3, 4, and 5 Claims, or such other treatment as agreed to by such Holder subject to consent (not to be unreasonably withheld, conditioned, or delayed) of the Required Consenting Stakeholders; *provided*, that to the extent that a Holder of a Contingent Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Contingent Subsidiary Unsecured Claim, such Holder shall only be entitled to a distribution on one Contingent Subsidiary Unsecured Claim against the Debtors in full and final satisfaction of all such Claims; *provided further*, that to the extent that a Holder of a Contingent Subsidiary Unsecured Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims that constitute a Parent Unsecured Claim, such Holder shall only be entitled to a distribution on account of its Contingent Subsidiary Unsecured Claim after reduction on account of any distribution on account of its Parent Unsecured Claim. | $[•]C/U/D | 0% | [•]0% |

F.    **What will I receive from the Debtors if I hold an Allowed Administrative Claim, a Professional Fee Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    *Administrative Claims.*[814]

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, in consultation with the Required Consenting Stakeholders, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable, with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Required Consenting Stakeholders; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Wind-Down Debtors, or the Plan Administrator, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**  Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party by the Claims Objection Deadline.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

2.    *Professional Fee Claims.*

(a)    **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Wind-Down Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.  The Wind-Down Debtors shall establish the Professional Fee Escrow Account in

---

[814]    Administrative Claims do not include any amounts owed with respect to 503(b)(9) Claims (as defined in the Final Critical Vendors Order) pursuant to the Final Critical Vendors Order, as the Debtors believe that all 503(b)(9) Claims have been paid in full.

trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

**(b)      Professional Fee Escrow Account.**

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute Cash consideration to be distributed in accordance with the Wind-Down Budget or otherwise under the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)      Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

**3.      *Post-Confirmation Fees and Expenses.***

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, or Wind-Down Debtors, as applicable.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Wind-Down Debtors, and/or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**4.      *Priority Tax Claims.***

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and reasonably acceptable to the Required Consenting Stakeholders.

**5.      *Payment of Restructuring Expenses.***

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the TSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court or any other review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Wind-Down Debtors (as applicable) shall

36

continue to pay, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.  In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash.

### 6.    *Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors, (or funded by the Wind-Down Debtors and disbursed by the Disbursing Agent on behalf of each of the Wind-Down Debtors) for each quarter (including any fraction thereof) until such Wind-Down Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

### G.    What does it mean if I have a Convenience Class Claim?

If you have a Convenience Class Claim, that means (a) the total amount of your Allowed General Unsecured Claim is less than or equal to $250,000 (the "Convenience Class Claim Threshold") and is not (i) a 2024 Convertible Notes Claim, (ii) a 2028 Convertible Notes Claim, or (iii) a Contingent Subsidiary Unsecured Claim; and (b) you elected on your Opt Out Form to treat your Allowed General Unsecured Claim as a Convenience Class Claim, including, if applicable, reducing your Allowed General Unsecured Claim to $250,000.  You will receive the treatment provided to Holders of Class 4 Convenience Class Claims.  Holders of Convenience Class Claims are entitled to a one-time Cash payment of their Allowed Convenience Class Claims (the "Convenience Class Claim Recovery").

If you have a Class 6 Parent Unsecured Claim or a Class 11 Contingent Subsidiary Unsecured Claim, you may irrevocably elect on your Opt Out Form to have your Class 6 Parent Unsecured Claim or Class 11 Contingent Subsidiary Unsecured Claim (as applicable) reduced to $250,000 and treated as a Class 4 Convenience Class Claim (the "Convenience Class Claim Election").  To be clear, if you make the Convenience Class Claim Election, your claim will be reduced to $250,000 (as applicable), considered a Convenience Class Claim, and you *may not* revoke your Convenience Class Claim Election.[915]

The Convenience Class Claim Recovery is a one-time Cash payment.  Holders of Allowed Convenience Class Claims and Holders making the Convenience Class Claim Election will not be entitled to additional distributions.

### H.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein.  It is possible that any alternative plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article VI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit C**.

---

[915]    The Debtors anticipate that Class 4 (Convenience Class Claims) will recover, in a low-end and high-end scenario, approximately [$$8.68 million]  in the aggregate under the Plan.  Alternatively, in a high-end scenario, the Debtors anticipate that Class 4 will recover approximately [$9.6 million.]  This estimation is based upon the assumption that [99%]35 percent Holders of Claims in Class 6 (Parent Unsecured Claims) and [●]%none of Holders of Claims in Class 11 (Contingent Subsidiary Unsecured Claims) will make the Convenience Class Claim Election.

**I.** **If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the Distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial Distributions to Holders of Allowed Claims will be made as soon as reasonably practicable after the Plan becomes effective—the "Effective Date," as specified in the Plan. Although this will happen on the Effective Date for Class 4 and Class 5, full distributions available to Class 3, Class 6, and Class 11 will be delayed and contingent, and will take several months to be fully realized. *See* Article IX of the Plan for a description of the conditions precedent to the occurrence of the Effective Date or "Consummation" of the Plan.

**J.** **What are the sources of consideration and other consideration used to make distributions under the Plan?**

The Debtors shall fund distributions under the Plan with: (i) the proceeds from the Sale Transaction; (ii) the Debtors' Cash on hand; and (iii) the proceeds of any Causes of Action retained by the Wind-Down Debtors.

Each distribution and issuance referred to in ~~Article VI~~Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**K.** **Are there anticipated Cash proceeds of the Sale Transaction that will be available for distribution to unsecured creditors?**

The Debtors anticipate that after completing the Wind-Down and providing distributions to Holders of Claims in Classes 1 and 2, the Wind-Down Debtors will have sufficient proceeds to pay the Class 4 (Convenience Class Claims) and Class 5 (Subsidiary Unsecured Claims) in full. The Debtors also anticipate that no or nearly no Distributable Value will be available for Holders of Class 6 (Parent Unsecured Claims), Class 9 (Section 510(b) Claims), Class 10 (Equity Interests), and Class 11 (Contingent Subsidiary Unsecured Claims).

**L.** **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.

**M.** **Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan, enumerated herein and in the Plan, propose to provide releases to the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

As discussed in greater detail in Article IX.I of this Disclosure Statement, in October 2023 the Board authorized the Special Committee to investigate possible claims and causes of action that may be held by the Company (the "Investigation"). On October 23, 2023, the Company executed an agreement with Jill Frizzley to serve as an independent advisor with the option to serve as an independent director of the Company upon execution of a subsequent mutual agreement. Subsequently on December 7, 2023, the board of directors of Invitae Corporation appointed Jill Frizzley as an independent and disinterested director and a member of the Special Committee. From October 2023 to the Petition Date, Ms. Frizzley, with K&E's assistance, oversaw and directed the Special Committee's Investigation of certain transactions within a two-year lookback period to determine whether

the Company held any viable claims or causes of action arising from several of the Company's material divestitures and transactions, and to assess whether the Debtors should pursue, settle, release, or retain such claims.

Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the Estates. The releases, exculpation, and injunction are an integral component of the Plan, which provides significant distributions of value to administrative, priority, secured, and unsecured creditors.

The Debtor Release is a release of the Debtors' claims against third parties. By contrast, the Third-Party Release is a release of direct claims a Holder of a Claim or Interest has against third parties unless a Holder of such Claim or Interest affirmatively elects to opt out of the Third-Party Release.

The Debtors believe that the settlement, releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

"*Released Party*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor; (c) the Consenting Stakeholders; (d) the 2028 Senior Secured Notes Trustee; (e) the 2028 Senior Secured Notes Collateral Agent; (f) the Plan Administrator; (g) each Company Party; (h) the Purchaser; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j); *provided, however*, that each Entity that (x) elects to opt out of the releases described in ~~Article VIII.D~~Article VIII.D of the Plan or (y) timely objects to the releases contained in ~~Article VIII.D~~Article VIII.D of the Plan and such objection is not resolved before Confirmation shall not be a Released Party.

"*Releasing Party*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor; (c) the Consenting Stakeholders; (d) the Trustees; (e) the Plan Administrator; (f) each Company Party; (g) the Purchaser; (h) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (i) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (j) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all holders of Interests; (m) each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) each Related Party of each Entity in clauses (a) through this clause (n); *provided, however*, that each Entity that (x) elects to opt out of the releases contained in ~~Article VIII.D~~Article VIII.D of the Plan or (y) timely objects to the releases contained in ~~Article VIII.D~~Article VIII.D of the Plan and such objection is not resolved before Confirmation shall not be a Releasing Party; *provided, further, however,* that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party.

"*Exculpated Partie*s" means, collectively:  (a) the Debtors; (b) the Wind-Down Debtors, (c) the Plan Administrator; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons, directors, members of any committees of any Entity's board of directors or managers, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT (I) VOTE TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED BY THE PLAN, (II) ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED BY THE PLAN; (III) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RELEASES PROVIDED IN THE PLAN; (IV) VOTE TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE**

**THIRD PARTY RELEASES PROVIDED BY THE PLAN; OR (V) ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE THIRD PARTY RLEASE PROVIDED BY THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS AND THE WIND-DOWN DEBTORS.**

1.    *Releases by the Debtors.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the TSA, the Disclosure Statement, the Plan, the Sale Transaction, the Asset Purchase Agreement, the Definitive Documents, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the TSA, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

2.    *Releases by Holders of Claims and Interests.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each

40

Debtor, Wind-Down Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the TSA, the Disclosure Statement, the Plan, the Sale Transaction, the Asset Purchase Agreement, the Definitive Documents, or any transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the TSA, the Disclosure Statement, the Sale Transaction, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in Article VIII.D of the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) a sound exercise of the Debtors' business judgment; (viii) given and made after due notice and opportunity for hearing; and (ix) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in ~~Article VIII.D~~Article VIII.D of the Plan and does not exercise such opt out is a Releasing Party and may not assert any Claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity (i) that opted out of the releases contained in ~~Article VIII.D~~Article VIII.D of the Plan or (ii) was deemed to reject the Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in ~~Article VIII.C~~Article VIII.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in ~~Article VIII.C~~Article VIII.C of the Plan, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.

3.      *Exculpation.*

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission arising on or after the Petition Date and through the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the Definitive Documents, or any transaction, contract, instrument, release or

41

other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Definitive Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

4.    *Injunction.*

Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, ~~discharged,~~compromised, settled or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Related Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, compromised, or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in ~~Article VIII.F~~Article VIII.F of the Plan.

**5.**    *Statement of the SEC and Reservation of Rights.*

The Staff of the Securities and Exchange Commission (the "SEC Staff") asserts that the Third-Party Release is nonconsensual as to the Holders of the 2028 Senior Secured Notes Claims, Equity Interests, and subordinated Section 510(b) Claims.  The SEC Staff has reserved all rights to object to the Third-Party Release and its other potential issues with the Plan at the Confirmation Hearing.  The Debtors disagree with the SEC Staff's position and recommend that Holders of Claims vote to accept the Plan.

N.    **What are the consequences of opting out of the releases provided by the Plan?**

As described above, each Holder of a Claim that votes to accept the Plan, votes to reject the Plan, abstains from voting on the Plan, is presumed to accept the Plan, or is deemed to reject the Plan may opt out of providing the releases under the Plan.  Making an opt out election will preserve any direct Causes of Action that the Holder may have against the Released Parties and those Causes of Action the Estates hold against a Holder.

Upon the Effective Date, the Plan Administrator will be vested with authority to commence, litigate, and settle any and all Causes of Action. Accordingly, because the proposed releases are bilateral in nature, opting out of the releases may result in a voting party being sued in their personal capacity by the Plan Administrator on account of any Causes of Action the Debtors may hold against the voting party, that are not otherwise released by the Plan.

**O.** **What are the consequences of not opting out of the releases provided by the Plan?**

Each Holder of a Claim entitled to opt out of the releases that elects not to exercise such opt out, will become a Released Party under the Plan. Accordingly, any direct Causes of Action that such Holder may have against the Released Parties will be unconditionally released upon the Effective Date, and correspondingly, each such Holder will receive a release from the Debtors for any Causes of Action the Debtors may hold against them.

This means that no Released Party may be sued in their personal capacity by the Plan Administrator on account of any Causes of Action the Debtors may hold against such party.

**P.** **Does the Plan preserve Causes of Action?**

The Plan preserves Causes of Action. The Wind-Down Debtors and the Plan Administrator will retain and may enforce all rights to commence and pursue any and all Causes of Action regardless of whether they arose before or arise after the Petition Date.

Moreover, the rights of the Wind-Down Debtors or the Plan Administrator to commence, prosecute, or settle such Causes of Action will be preserved, despite the occurrence of the Effective Date, except for Causes of Action: (i) acquired by the Purchaser in accordance with the Purchase Agreement, as applicable, or (ii) released or exculpated in the Plan (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors or the Plan Administrator can pursue such Causes of Action in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Wind-Down Debtors, and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as may be assigned or transferred to the Purchaser in accordance with the Purchase Agreement or as otherwise expressly provided in the Plan.** Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Wind-Down Debtors, or the Plan Administrator expressly reserve all Causes of Action, for later adjudication. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

43

The Debtors, the Wind-Down Debtors, or the Plan Administrator reserve and will retain such Causes of Action despite the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity will vest in the corresponding Wind-Down Debtor except as otherwise expressly provided in the Plan. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator, through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, or the Plan Administrator will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party.

**Q.    Are any regulatory approvals required to consummate the Plan?**

The Debtors anticipate that regulatory filings and subsequent approvals may be required to consummate the Plan, prior to and after any change of ownership or control resulting from a sale or their ownership interests to continue their operations. Federal and other national authorities and state and local regulators may require certain filings for the Debtors' businesses to continue operations and receive reimbursement from healthcare programs upon sale. Specifically, in the event of the Sale Transaction, there are certain state regulations that require regulator review periods prior to implementing the Sale Transaction. It is a condition precedent to the Effective Date that any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan be obtained.

On May15, 2024, as a regulatory prerequisite to close the Sale Transaction under California State Law, the Debtors submitted a Material Change Transaction Notice to California's Office of Healthcare Affordability ("OHCA"), and a request to expedite OHCA's review of the Sale Transaction by June 20, 2024. On May 25, 2024, Labcorp submitted its Material Change Transaction Notice to OHCA. Additionally, on May 25, 2024, OHCA responded to the Debtors that there were no further questions or additional information needed. On June 6, 2024, OHCA noted both the Debtors' and Labcorp's submissions have been accepted and are in review, and that OHCA would attempt to complete their review with a June 28, 2024, deadline.

Moreover, on May 15, 2024, the Debtors reported the Sale Transaction to the Federal Trade Commission pursuant to the Hart-Scott-Rodino Act (the "HSR"). The waiting period required by the HSR expired on May 31, 2024.

**R.    What is the deadline to vote on the Plan?**

The deadline is July 15, 2024, at 4:00 p.m. (prevailing Eastern Time).

**S.    What are the overall projected recoveries under the Plan?**

The projected recoveries are provided in Article IV.E of this Disclosure Statement.

**T.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are ~~entitled~~permitted to vote on the Plan. To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and submitted ~~may be submitted~~, in accordance with each Ballot's applicable instructions, via (i) e-mail at ~~InvitaeBallots@kccllc.com pursuant to the instructions set forth on the applicable~~ InvitaeBallots@kccllc.com, (ii) the E-Ballot Portal, or (iii) first class mail, overnight courier, and hand delivery to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245, so that they are **actually received** by Kurtzman Carson Consultants LLC ("KCC" or the "Claims and Noticing Agent"), pursuant to the instructions on the applicable Ballot, no later than

**July 15, 2024 at 4:00 p.m. (prevailing Eastern Time)**.  *See* Article V of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**U. Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**V. When is the Confirmation Hearing set to occur?**

The ~~Debtors will request that~~hearing at which the Bankruptcy Court ~~schedule the~~will consider Confirmation ~~Hearing for [July 22], 2024~~of the Plan will commence on **July 22, 2024, at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Chief Judge Michael B. Kaplan, United States Bankruptcy Court for the District of New Jersey, at the Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom No. 8, Trenton, New Jersey 08608.** The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by **July 15, 2024, at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) to provide notification to those persons who may not receive notice by electronic mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**W. What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to seek Confirmation of the Plan. The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**X. What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are distributing assets and winding down under Chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on or as soon as reasonably practicable after the Effective Date. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

On or after the Effective Date, the Plan Administrator will commence the Wind Down of the Wind-Down Debtors in accordance with the terms of the Plan and subject at all times to such amendments and deviations as may be required.

**Y. Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors?**

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors,

45

and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers. The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions ~~hereof~~of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer. The Debtors, after the Confirmation Date, and the Wind-Down Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

### Z.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?

As described in Article VIII of this Disclosure Statement, as well as in the *Declaration of Ana Schrank, Chief Financial Officer of Invitae Corporation, in Support of Chapter 11 Filing, First-Day Motions, and Access to Cash Collateral* [Docket No. 21] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise.

### AA.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Noticing Agent:

**By electronic mail at:** InvitaeInfo@kccllc.com

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims and Noticing Agent at www.kccllc.net/invitae (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

### BB.    Who supports the Plan?

The Plan is supported by the Debtors and Holders of over 78~~%~~ percent of 2028 Senior Secured Notes.

### CC.    Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Sale Transaction contemplated by the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.

## V.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.      Classes ~~Entitled~~Permitted to Vote on the Plan.

The following Class~~es~~ ~~is~~are entitled or permitted (as applicable) to vote to accept or reject the Plan (the "Voting Classes"):

| | | |
|---|---|---|
| Class 3 | 2028 Senior Secured Notes Claims | Impaired |
| Class 4 | Convenience Class Claims | Unimpaired |
| Class 5 | Subsidiary Unsecured Claims | Unimpaired |
| Class 6 | Parent Unsecured Claims | Impaired |
| Class 11 | Contingent Subsidiary Unsecured Claims | Impaired |

**DISCLAIMER**: The Debtors believe that Classes 4 and 5 are unimpaired and are therefore presumed to accept the Plan.  The Debtors also have determined that Classes 6 and 11 may or may not receive a recovery under the Plan and are therefore deemed to reject.  In response and to resolve the Committee's objection to the Disclosure Statement, the Debtors shall provide Ballots to Holders of Claims in Classes 4, 5, 6, and 11 and permit such Holders to submit votes on the Plan.  The Claims and Noticing Agent will tabulate the Ballots cast by Holders of Claims in Class 4, Class 5, Class 6, and Class 11.

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package.  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims and Noticing Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

B.      Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number and two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

If the Debtors determine that a Voting Class is either presumed to accept or deemed to reject the Plan, any votes cast by such a Class will not count towards confirmation of the Plan.

C.      Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article X of this Disclosure Statement.

**D.      Classes Not Entitled to Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled nor permitted to vote to accept or reject the Plan:

| | | |
|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired |
| Class 2 | Other Priority Claims | Unimpaired |
| ~~Class 4~~ | ~~Convenience Class Claims~~ | ~~Unimpaired~~ |
| ~~Class 5~~ | ~~Subsidiary Unsecured Claims~~ | ~~Unimpaired~~ |
| ~~Class 6~~ | ~~Parent Unsecured Claims~~ | ~~Impaired~~ |
| Class 7 | Intercompany Claims | Unimpaired / Impaired |
| Class 8 | Intercompany Interest | Unimpaired / Impaired |
| Class 9 | Section 510(b) Claims | Impaired |
| Class 10 | Equity Interests | Impaired |
| ~~Class 11~~ | ~~Contingent Subsidiary Unsecured Claims~~ | ~~Impaired~~ |

**E.      Solicitation and Voting Procedures.**

**1.      *Claims and Noticing Agent.***

The Debtors have retained ~~Kurtzman Carson Consultants LLC~~KCC to act, among other things, as Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.      *Solicitation Package.***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

a.      the Solicitation and Voting Procedures;

b.      the applicable form of Ballot, together with detailed voting instructions, and instructions on how to submit the Ballot;

48

c.       the cover letter, which urges Holders of Claims in the Voting Classes to vote to accept the Plan (the "Cover Letter");

d.       the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

e.       this Disclosure Statement (and exhibits thereto, including the Plan);

f.       the Disclosure Statement Order (without exhibits, except for the Solicitation and Voting Procedures);

g.       a pre-addressed, postage pre-paid reply envelope;[1016] and

i.       any additional documents that the Bankruptcy Court has ordered to be made available.

**3.       *Distribution of the Solicitation Package and Plan Supplement.***

The Debtors shall serve, or cause to be served, copies of the Solicitation Package to Holders of Claims in the Voting Classes.  In addition, these Solicitation and Voting Procedures, the Disclosure Statement, the Plan, the Disclosure Statement Order, and all pleadings filed with the Bankruptcy Court shall be made available on the Debtors' case website https://kccllc.net/Invitae; *provided* that any party that would prefer paper format may contact the Claims and Noticing Agent by:  (a) calling (866) 967-0263 (domestic) or +1(310) 751-2663 (international) and asking for a member of the solicitation team; (b) submitting an inquiry to http://www.kccllc.net/invitae/inquiry; (c) writing to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245; or (d) e-mailing invitaeinfo@kccllc.com and referencing "Invitae" in the subject line.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.  In addition, the Debtors shall distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Classes **within three (3) business days following entry of the Disclosure Statement Order** who are entitled to vote~~, as described in Section D.1. below~~.  To the extent that such distribution is not made by the Solicitation Mailing Deadline, the Debtors shall distribute the Solicitation Packages immediately thereafter; *provided*, that the Debtors shall distribute the Confirmation Hearing Notice no later than ~~two~~three (~~2~~3) business days following the Solicitation Mailing Deadline.  The Debtors will not distribute Solicitation Packages or other solicitation materials to (i) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, (ii) any party to whom notice of the Motion was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; or (iii) the Holders in Class 7 (Intercompany Claims) or Class 8 (Intercompany Interests).

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

**F.       Voting Procedures.**

The Bankruptcy Court has approved **[June 6,] 2024,** as the record date for purposes of determining which Holders of Claims in Classes 3 ~~(the "Voting Class")~~, 4, 5, 6, and 11 are entitled or permitted to vote on the Plan (the "Voting Record Date")~~.~~

---

[1016]  The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive a Ballot directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

The Bankruptcy Court has approved **[July 15], 2024, at 4:00 p.m. (prevailing Eastern Time)** as the voting deadline for the Plan (the "Voting Deadline").  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Bankruptcy Court (with notice to the Committee).  To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and submitted, in accordance with each Ballot's applicable instructions, via (i) e-mail ~~to KCC at InvitaeBallots@kcclle.com or (ii~~at InvitaeBallots@kccllc.com, (ii) the E-Ballot Portal, or (iii) first class mail, overnight courier, and hand delivery to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245, so that they are **actually** **received** by KCC, pursuant to the instructions on the applicable Ballot, no later than the Voting Deadline.  Each Beneficial Holder Ballot shall be returned to the applicable Nominee so that such Nominee may properly complete and deliver to the Claims and Noticing Agent, a Master Ballot that reflects the vote of such Beneficial Holder so that it is received no later than the Voting Deadline.  Ballots delivered by any means other than those listed as acceptable forms of delivery will not be counted.

The Debtors intend to file the Plan Supplement on or before the later of (i) July 8, 2024 or (ii) the date that is no later than seven (7) days prior to the Voting Deadline.  The notice of the Plan Supplement is attached to the Disclosure Statement Order as Exhibit 6.

~~If a Holder of a Claim in the Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims and Noticing Agent.~~

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS PERMITTED BY APPLICABLE LAW OR COURT ORDER.

ANY BALLOT THAT IS PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED TO THE DEBTORS THAT FAILS TO INDICATE ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR AS PERMITTED BY APPLICABLE LAW OR COURT ORDER.

### G.    Voting and Tabulation Procedures.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a.    except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted and actually received by the Claims and Noticing Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in

connection with confirmation of the Plan or for any other purpose described in this Disclosure Statement;

b.  the Claims and Noticing Agent will date-stamp all Ballots when received;

c.  the Claims and Noticing Agent shall retain copies of Ballots and all solicitation-related correspondence for two (2) years following the closing of the Chapter 11 Cases, whereupon the Claims and Noticing Agent is authorized to destroy and/or otherwise dispose of:  (a) all copies of Ballots; (b) printed solicitation materials including unused copies of the Solicitation Package; and (c) all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Bankruptcy Court in writing within such two year period;

d.  the Debtors will file the Voting Report on or before **July 18, 2024**.  The Voting Report shall, among other things, delineate every Ballot that was excluded from the voting results (each an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or other necessary information, or damaged.  The Voting Report shall indicate the Debtors' decision with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

e.  an executed Ballot is required to be submitted by the Entity (except with respect to Master Ballots submitted by the Nominees) submitting such Ballot.  Delivery of a Ballot to the Claims and Noticing Agent by facsimile or any means other than expressly provided in the applicable Ballot will not be valid;

f.  except as otherwise provided, a Ballot will be deemed delivered only when the Claims and Noticing Agent actually receives the executed Ballot;

g.  no Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

h.  if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly submitted, valid Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

i.  Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

j.  a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

k.  the Debtors, subject to a contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

l.    neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

m.    unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with submissions of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted; *provided* that a valid opt out election on an otherwise defective or irregular Ballot submitted prior to the Voting Deadline shall be honored as a valid opt out election;

n.    in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

o.    subject to any order of the Bankruptcy Court, the Debtors reserve the right to reject any and all ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

p.    if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Bankruptcy Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution;

q.    if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

r.    the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

s.    after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Bankruptcy Court;

t.    the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes; ~~and~~

u.    in the event a Ballot is returned marked to accept a Convenience Claim Election, such Ballot will be deemed to accept the Plan; and

~~u~~v.    to assist in the solicitation process, the Claims and Noticing Agent may, but is not required to, contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies; *provided* that the Claims and Noticing

Agent is not obligated to do so and neither the Debtors nor the Claims and Noticing Agent will suffer any liability for failure to notify parties of such deficiencies

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to Beneficial Holders of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims who hold and will vote their position through a Nominee:[17]

a.   the Claims and Noticing Agent shall distribute or cause to be distributed through the applicable Nominees (i) Solicitation Packages for each Beneficial Holder of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims as of the Voting Record Date represented by a Nominee, which will contain, among other things, a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a Master Ballot for the Nominee;

b.   any Nominee that is a Holder of record with respect to Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims shall vote on behalf of, or facilitate voting by, Beneficial Holders of such Claims, as applicable, either by (i)(A) immediately, and in any event within five (5) Business Days after its receipt of the Solicitation Packages, distributing the Solicitation Packages, including the Beneficial Holder Ballots, it receives from the Claims and Noticing Agent to all such Beneficial Holders,[18] (B) providing such Beneficial Holders with a return address to send the completed Beneficial Holder Ballots, (C) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot, and (D) transmitting the Master Ballot to the Claims and Noticing Agent so that it is received no later than the Voting Deadline;

c.   the applicable indenture trustee will not be entitled to vote on behalf of a Beneficial Holder; rather, each Beneficial Holder must vote his or her own Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims according to instructions received from its Nominee;

d.   any Ballot returned to a Nominee by a Beneficial Holder, whether in a Beneficial Holder Ballot or otherwise according to the Nominee's instructions, shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Claims and Noticing Agent a Master Ballot that reflects the vote of such Beneficial Holders so that it is received no later than the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Claims and Noticing Agent. Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of two (2) years following the closing of these Chapter 11 Cases;

e.   if a Beneficial Holder holds Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block

---

[17]   Beneficial Holders hold their positions in the Debtors' publicly-traded debt securities in the Debtors' Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims in "street name" through a Nominee, which is a bank, broker or other intermediary, or their agent.

[18]   Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee. Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices. If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.

53

of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

f. votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in the Voting Classes as of the Voting Record Date, as evidenced by the applicable securities position report(s) obtained from the DTC. Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date. Votes cast on account of Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims will be tabulated in the same manner with respect to each applicable Debtor;

g. Master Ballots may be submitted via (i) e-mail at InvitaeBallots@kccllc.com (preferred method of delivery) or (ii) first class mail, overnight courier, and hand delivery to Invitae Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245;

h. if conflicting votes or "over votes" are submitted by a Nominee pursuant to a Master Ballot, the Claims and Noticing Agent will use reasonable efforts to reconcile discrepancies with the Nominees.  If over votes on a Master Ballot are not reconciled before the preparation of the voting report tabulating votes on the Plan, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over vote, but only to the extent of the Nominee's position in Class 3 2028 Senior Secured Notes Claims and Class 6 Parent Unsecured Claims;

i. to assist in the solicitation process, the Claims and Noticing Agent may, but is not required to, contact parties that submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies; provided that the Claims and Noticing Agent is not obligated to do so and neither the Debtors nor the Claims and Noticing Agent will suffer any liability for failure to notify parties of such deficiencies;

j. for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Class 3 2028 Senior Secured Notes Claims or Class 6 Parent Unsecured Claims, although any principal amounts may be adjusted by the Claims and Noticing Agent to reflect the amount of the Claim actually voted, including prepetition interest;

k. a single Nominee may complete and deliver to the Claims and Noticing Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest received valid Master Ballot received before the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior received Master Ballot.  Likewise, if a Beneficial Holder submits more than one Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly;

l. Nominees, or their agents, may forward Solicitation Packages (or a summary thereof) to their Beneficial Holder clients by e-mail or other customary means of communication, including an online electronic link to solicitation materials, in addition to (or in lieu of) mailing a Solicitation Package and/or Beneficial Holder Ballot;

m.      Nominees, or their agents, may collect votes from their Beneficial Holder clients by e-mail or other customary means of communication, in addition to (or in lieu of) collecting a Beneficial Holder Ballot; and

n.      no fees or commissions or other remuneration will be payable to any Nominee, broker, dealer, or other person for soliciting Beneficial Holder Ballots with respect to the Plan.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,**

---

**PLEASE EMAIL THE CLAIMS AND NOTICING AGENT AT INVITAEINFO@KCCLLC.COM OR CALL THE CLAIMS AND NOTICING AGENT AT (866) 967-0263 (U.S. OR CANADA), +1 (310) 751-2663 (INTERNATIONAL)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## VI.     CONFIRMATION OF THE PLAN

### A.      Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for confirmation are the following: (i) the Plan is accepted by all Impaired Classes or, if the Plan is rejected by an Impaired Class, at least one Impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 2028 Senior Secured Notes Claims, Holders of Class 6 Parent Unsecured Claims, Holders of Class 9 Section 510(b) Claims, Holders of Class 10 Equity Interests, and Class 11 Contingent Subsidiary Unsecured Claims).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of Chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of Section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full

or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

    **B.**    **Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit C**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan, including Holders of unsecured Claims, would be the same or greater than under a hypothetical chapter 7 liquidation.  As set forth in greater detail in ~~Article VI.B of~~the Liquidation Analysis and this Disclosure Statement, ~~Holders of 2028 Senior Secured Note Claims and Holders of Parent Unsecured Claims~~all creditors would likely receive significantly reduced recoveries in a hypothetical liquidation.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors as distributions under the Plan will provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation as of the Effective Date.

    **C.**    **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s)unless the plan contemplates such liquidation or restructuring.

The Plan contemplates and effectuates a sale of substantially all of the Debtors' assets and subsequent Wind Down of the Debtors' remaining Estates.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors and the Plan satisfies the feasibility requirement of section 11129(a)(11) of the Bankruptcy Code.

    **D.**    **Acceptance by Impaired Classes.**

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or ~~1~~(iii) provides that, on the Consummation date, the holder of such claim or equity interest receives cash equal to

the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their Ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance.

Class 3's projected recovery is highly contingent on certain distributable value being realized after the Effective Date.  Thus, Class 3 is an Impaired class.

**E.    Confirmation without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one (1) impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

**1.    *No Unfair Discrimination.***

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**2.    *Fair and Equitable Test.***

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan

until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### (a)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (b)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## VII.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    Company History.

Invitae was founded by Randal W. Scott and Sean E. George on January 13, 2010, as a subsidiary of Genomic Health, Inc., a company focused on genetic research in cancer detection.  Invitae was created to bring mainstream medical-grade genetic testing to the public and to provide healthcare providers with patients' genetic makeup to inform important healthcare decisions.  Invitae was incorporated in the State of Delaware under the name Locus Development, Inc. and changed its name to Invitae Corporation in 2012.  That same year, Invitae separated from Genomic Health, Inc. and became an independent entity.

Today, Invitae offers genetic tests across several clinical areas, including hereditary cancer, precision oncology, and rare diseases.  Invitae makes available critical and potentially life-saving genetic data that guides patients in making informed medical decisions and evaluating their health and wellness throughout their lifetime.  Since its inception, Invitae has provided genetic tests to more than 4.4 million patients, and over 135,000 healthcare providers have ordered Invitae tests.  This evolution of the business has successfully resulted in Invitae's ability to interpret almost 2 million disease-associated genes.



B.      **The Debtors' Operations.**

1.      *Invitae's Business Segments.*

Invitae's operations focus on popularizing the use of genetics in the healthcare space by lowering costs, removing barriers to adoption, and expanding insights and solutions through both comprehensive genetic testing and efficient data and network services. The Company has four (4) main business segments within this genetic testing and data services framework:  (a) genetic testing focused on hereditary cancers; (b) genetic testing for rare diseases; (c) personalized cancer monitoring; and (d) data products.

(a)      *Hereditary Cancer.*

Invitae offers genetic tests for genes associated with hereditary cancers such as breast cancer, ovarian cancer, colon cancer, and pancreatic cancer. Within these subdivisions, there are dozens of genetic testing options that test for a variety of cancers by analyzing certain genetic markers and genes. Invitae's "HerCan" business has a strong presence in almost all National Cancer Institute-Designated cancer centers in the United States.

(b)      *Pediatric & Rare Diseases.*

Under the rare diseases business line, Invitae offers tests for exome, cardiology, immunology, neurology, metabolic disorders, and pediatric genetics and newborn screening. This business segment includes the most common genetic tests recommended by the American Academy for Pediatrics for children showing symptoms of intellectual disorders. Invitae's pediatric testing allows for the detection of intellectual disorders earlier in life, leading to earlier treatment that mitigates symptoms and increases cognitive functions into adulthood.

Generally, this business segment allows providers to choose from dozens of testing options, which target and identify a wide array of genes. For example, a healthcare provider can order a cerebral palsy spectrum disorders panel for a pediatric client that analyzes 424 genes to determine the underlying cause of cerebral palsy. Detecting rare disease at an early diagnosis allows for more effective treatments and improved outcomes, especially for young patients. Those early diagnoses can also deliver substantial cost savings to patients and the healthcare system via informed treatment plans. Invitae also has a state-of-the-art variant interpretation program that allows Invitae to perform repeat analysis at no additional cost to patients. Invitae's "Rare" testing services are now deeply embedded in the top U.S. children's hospitals, and Invitae has been a trusted partner for many clinicians and healthcare providers for over ten (10) years.

(c)      *Personalized Cancer Monitoring.*

Invitae offers somatic[13][19] cancer testing through the Company's personalized cancer monitoring platform, which detects minimal residual or recurrent disease ("MRD") and monitors treatment response. Invitae has developed a unique MRD product that has demonstrated greater sensitivity and specificity to detect MRD for cancer patients who are receiving treatment to reduce the chance of cancer coming back, as well as patient monitoring for disease recurrence. Invitae also has the potential to extend personalized cancer monitoring through comprehensive genomic profiling of baseline tissue, which enables therapy selection and clinical trial enrollment for patients with cancerous tumors.

(d)      *Data Products.*

The data and patient network services business segment aggregates and de-identifies patient data to enable medical professionals, biopharmaceutical companies, and patients access to genetic information to advance genetic research and create better health outcomes in compliance with applicable healthcare laws, including HIPAA.

Invitae generates revenue from its access to data products and services through certain arrangements with some of its large customers, including industry groups, health systems, and biopharmaceutical companies. These

---

[13][19]    Somatic cancer variants are the most common cause of cancer, occurring from damage to genes in an individual cell during a person's life.

contracts offer customers various testing and data information services for the duration of the contract or subscription term.  Invitae has entered into collaboration agreements to provide its customers with diagnostic testing and related data aggregation reporting services.  Invitae has also entered into data sharing agreements with customers to provide certain de-identified data for research purposes.

### 2.   *Invitae's Testing Services.*

The core of Invitae's business focuses on making comprehensive, high-quality medical genetic data more accessible and instrumental to the healthcare ecosystem, including, among others, patients, healthcare providers, biopharma partners, and patient advocacy groups in order to expand genetic insights and health solutions.  Invitae generates revenue primarily from its testing services and receives payment generally through government entities and private insurance companies, and healthcare institutions, and direct payments from individuals.

To receive testing, a patient's healthcare provider orders the relevant tests.  The healthcare provider will then provide their patient with a collection kit designed to collect genetic samples (including saliva and blood), which is mailed back to Invitae's laboratory for processing.  After Invitae receives the collection kit, Invitae accessions and prepares the specimens for testing, and then runs them through a sequencer, which records various genetic data collected from the specimen for medical interpretation.

A key component to genetic research data is Invitae's variant interpretation systems.  Invitae's method of variant interpretation includes the process of evaluating and classifying genomic sequence variations, also known as mutations or variants.  This allows the clinician to evaluate and, if appropriate, discuss the evidence with their patients.  These variations can occur naturally or from exposure to environmental factors such as pollutants or radiation.  Some variants may have no impact on health, while others can lead to the development of serious conditions such as cancer or inherited genetic disorders.  Some variants may result in unknown significance, but over time, can be reclassified as more data is collected to bridge the relationship between a genetic variant and a genetic condition.  Broad genomic testing has helped to dramatically improve the diagnostic process over time through variant interpretation and Invitae's access to such data is a key driver of its business.

Once finalized, the results can be accessed through the Invitae online portal or from the healthcare provider who submitted the order.  Invitae also provides access to board-certified genetic counselors who offer peer-to-peer support as well as detailed insights regarding variants, genes, and conditions.

### 3.   *Laboratories.*

Invitae's laboratories are state-of-the-art facilities that process patients' genetic samples as they arrive.  As of the Petition Date, Invitae processed a majority of its genetic tests, including those related to the HerCan and Rare business lines, at its laboratory in San Francisco.  Invitae conducts research, and its personalized cancer monitoring testing, from its "Metropark" facility located in Iselin, New Jersey.

### 4.   *Intellectual Property.*

Since its founding, Invitae has developed a differentiated portfolio of valuable intellectual property.  Invitae relies on a combination of intellectual property rights, including trade secrets, copyrights, trademarks, customary contractual protections and, to a lesser extent, patents, to protect core technology.  As of the Petition Date, Invitae has issued current U.S. patents, pending U.S. patent applications and corresponding non-U.S. patents and patent applications directed to various aspects of laboratory, analytic and business practices.

In the ordinary course of business, Invitae uses proprietary procedures for (i) the laboratory processing of patient samples and (ii) the analysis of the resulting data to generate clinical reports.  In particular, Invitae has automated aspects of processes for curating information about known genetic variants, identifying genetic variants in a patient's sequence information, associating those genetic variants with known information about their potential effects on disease, and presenting that information for review by personnel responsible for its interpretation and for the delivery of test reports to clinicians and patients.

5.    *Regulatory Environment.*

The genetic testing industry is heavily regulated.  Federal and state regulators impose restrictions on "clinical reference laboratories" that receive specimens for the purpose of running specialized tests.  Accordingly, because the Company receives and tests genetic specimens, they qualify as clinical reference laboratories and are thus subject to both federal and state regulations.

(a)    CLIA.

Under the Clinical Laboratory Improvement Amendments of 1988, ("CLIA"), all facilities that perform applicable tests on "materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings" are required to meet certain federal requirements.  If a facility performs tests for these purposes, it is considered a laboratory under CLIA and generally must apply and obtain a certificate from the CLIA program that corresponds to the complexity of tests performed.  The Company's laboratories in California and New Jersey are required to hold federal certificates of accreditation in order to conduct their business.

Under CLIA, Invitae is required to hold certificates applicable to the type of laboratory examinations it performs and to comply with standards covering personnel, facilities administration, inspections, quality control, quality assurance, and proficiency testing.  Invitae has current certifications under CLIA to perform testing at laboratory locations in California and New Jersey.  To renew CLIA certifications, Invitae is subject to survey and inspection generally every two (2) years to assess compliance with program standards.  Moreover, CLIA inspectors may randomly inspect clinical reference laboratories.  If clinical reference laboratories are out of compliance with CLIA requirements, Invitae may be subject to sanctions such as suspension, limitation, or revocation of CLIA certificates, as well as directed plans of correction, state on-site monitoring, significant civil money penalties, civil injunctive suits, or criminal penalties.  Furthermore, Invitae must maintain CLIA compliance and certifications to be eligible to bill for diagnostic services provided to Medicare and Medicaid beneficiaries.

(b)    State Licensure Requirements.

In addition, Invitae's laboratories are required to hold home state laboratory licenses in California and New Jersey, as well as out-of-state laboratory licenses in other states from which Invitae accepts patient samples, including California, New Jersey, Maryland, New York, Pennsylvania, and Rhode Island.  California and New Jersey laws establish standards for day-to-day operations of laboratories in those states that may differ from CLIA requirements.  Such laws mandate proficiency testing, which involves testing of specimens that have been specifically prepared for the laboratories.  If clinical reference laboratories like Invitae's are out of compliance with applicable standards, the appropriate state agency may suspend, restrict, or revoke licenses to operate clinical reference laboratories.  In addition, such a state agency may assess substantial civil money penalties or impose specific corrective action plans for out-of-compliance laboratories.

(c)    Federal Oversight of Tests.

In the ordinary course of business, Invitae provides many of its tests as laboratory-developed tests ("LDTs").  The Centers for Medicare & Medicaid Services, along with certain state agencies, regulate the performance of LDTs as authorized by CLIA and state law, respectively.  Historically, the U.S. Food and Drug Administration ("FDA") has exercised enforcement discretion with respect to most LDTs and has not required laboratories that furnish LDTs to comply with the agency's requirements for medical devices (*e.g.*, establishment registration, device listing, quality system regulations, premarket clearance or premarket approval, and post-market controls).  In April 2024, however, the FDA announced a final rule to phase out this policy of general enforcement discretion and regulate LDTs, including those manufactured by laboratories that are certified under CLIA, as medical devices.  After a four-year phase-out period, the FDA expects LDTs to meet the same applicable requirements as traditional manufacturers of diagnostic products, except under certain narrow circumstances.  Specifically, (1) after the first year of effectiveness of the proposed rule, the FDA will end its general enforcement discretion approach to MDR requirements, correction and removal reporting requirements, and most quality system ("QS") requirements; (2) within two years of effectiveness, the final rule will end the enforcement discretion approach with regard to registration and listing requirements, listing requirements, and compliance with investigational use requirements; (3) after three years, the FDA will cease its general enforcement discretion

approach with respect to all QS requirements and will expect compliance with the "device" Current Good Manufacturing Practice Regulations 21 U.S.C. 360j(f) and part 820 (21 CFR part 820); and (4) after four years (but not before April 1, 2028), the FDA will end its general enforcement discretion approach with respect to the premarket review procedures for moderate- and low-risk diagnostic products.

(d)    **HIPAA.**

Under the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"), the U.S. Department of Health and Human Services has issued regulations that establish uniform standards governing the conduct of certain electronic healthcare transactions and requirements for protecting the privacy and security of protected health information ("PHI"), used or disclosed by covered entities, including most health care providers and their respective business associates, as well as the business associates' subcontractors.  Invitae is generally a covered entity under HIPAA and required to comply with the provisions of HIPAA and HITECH and the regulations implemented thereunder that set forth standards for the privacy of PHI; security standards for the protection of electronic PHI; breach notification requirements; and standards for electronic transactions.

Penalties for failure to comply with a requirement of HIPAA or HITECH vary significantly, and, depending on the knowledge and culpability of the HIPAA-regulated entity, may include civil monetary penalties for each provision of HIPAA that is violated.  Compliance with HIPAA and HITECH requires significant resources, and Invitae may be restricted in its ability to perform certain activities that involve the collection, use, or disclosure of PHI as a result of limitations in the HIPAA privacy regulations.  As of the Petition Date, Invitae was not aware of any material non-compliance with its HIPAA obligations.

C.    **Invitae's Capital Structure and Ownership.**

1.    *The Debtors' Organizational Structure.*

Invitae's current organizational structure is reflected below:



2.    *The Debtors' Prepetition Capital Structure.*

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $1.482 billion in debt obligations, consisting of (a) 2028 Senior Secured Notes and (b) Convertible Senior Unsecured Notes.  Invitae also had 291.1 million shares of Common Stock, par value $0.0001 per share, outstanding as of the Petition Date.

| *Facility* | *Approximate Outstanding* |
| --- | --- |

| | Maturity | Principal Amount as of the Petition Date |
|---|---|---|
| ***Secured*** | | |
| **2028 Senior Secured Notes** | **March 15, 2028** | **$305.4 million** |
| | | |
| ***Unsecured*** | | |
| **2024 Convertible Notes** | **September 1, 2024** | **$27.1 million** |
| **2028 Convertible Notes** | **April 1, 2028** | **$1,150 million** |
| | | |
| **Total Debt Obligations** | | **$1,482.5 million** |

Invitae has issued several categories of notes, each as more fully described below:

(a)    **Secured Notes.**

***2028 Senior Secured Notes***.  In March 2023, Invitae entered into that certain Indenture, dated as of March 7, 2023, by and among: (a) Invitae Corporation, as issuer; (b) certain of its subsidiaries pursuant to the 2028 Senior Secured Notes Indenture, as Guarantors; and (c) U.S. Bank Trust Company, National Association (in its capacity as trustee, the "2028 Senior Secured Notes Trustee" and, in its capacity as collateral agent, the "2028 Senior Secured Notes Collateral Agent") (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "2028 Senior Secured Notes Indenture").  The 2028 Senior Secured Notes Indenture provided for the issuance of $275.3 million initial aggregate principal amount of the 4.5% Series A Convertible Senior Secured Notes due 2028 (the "Series A Notes") and an initial aggregate principal amount of $30 million of the 4.5% Series B Convertible Senior Secured Notes due 2028 (the "Series B Notes" and, together with the Series A Notes, the "2028 Senior Secured Notes") by Invitae.  In August 2023, pursuant to an amendment to the Senior Secured Indenture, the Company issued additional Series A Notes in an aggregate principal amount of $100,000.

The 2028 Senior Secured Notes are senior secured obligations of Invitae and certain of its subsidiaries and will mature on March 15, 2028, unless earlier converted, redeemed, or repurchased.  Holders of the 2028 Senior Secured Notes may elect to convert all or any portion of their 2028 Senior Secured Notes into fully paid and nonassessable shares of Common Stock (subject to certain limitations as set forth in the Senior Secured Indenture). The 2028 Senior Secured Notes bear cash interest at a rate of 4.50% per year, payable quarterly in arrears on March 15, June 15, September 15, and December 15 of each year, beginning on June 15, 2023.  The 2028 Senior Secured Notes are guaranteed by material subsidiaries and secured by (i) a security interest in substantially all the assets of Invitae and its domestic material subsidiaries, and (ii) a pledge of the equity interests of Invitae's direct and indirect subsidiaries, subject to certain customary exceptions.  As of the Petition Date, the 2028 Senior Secured Notes had an aggregate outstanding principal amount of $305.4 million.

(b)    **Unsecured Notes.**

***2024 Convertible Notes***.  In September of 2019, Invitae entered into that certain Indenture, dated as of September 10, 2019, by and among (a) Invitae, as issuer, and (b) U.S. ~~National~~ Bank National Association, as predecessor trustee to Wilmington Savings Fund Society Bank (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "2024 Convertible Notes Indenture").  The 2024 Unsecured Notes Indenture provided for Invitae's issuance of $350 million aggregate principal amount of the 2.00% convertible senior unsecured notes coming due in 2024 (the "2024 Convertible Notes").

The 2024 Convertible Notes are senior unsecured obligations of Invitae Corp. and will mature on September 1, 2024, unless earlier converted, redeemed, or repurchased.  The 2024 Convertible Notes bear cash interest at a rate of 2.00% per year, payable semi-annually in arrears on March 1 and September 1 of each year, beginning on March 1, 2020.  Upon conversion, the 2024 Convertible Notes will be convertible into cash, shares of Common Stock, or a combination of cash and shares of Common Stock, at Invitae's election.  As of the Petition Date, the 2024 Convertible Notes had an aggregate outstanding principal amount of $27.1 million.

***2028 Convertible Notes***.  In April of 2021, Invitae entered into that certain Indenture, dated as of April 8, 2021, by and among (a) Invitae, as issuer and (b) U.S. ~~National~~ Bank National Association, as predecessor trustee to Wilmington Savings Fund Society Bank (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "2028 Convertible Notes Indenture").  The 2028 Unsecured Notes Indenture provided for the issuance of $1.15 billion aggregate principal amount of 1.50% Convertible Notes due 2028 (the "2028 Convertible Notes").

The 2028 Convertible Notes are senior unsecured obligations of Invitae ~~Corp.~~ Corporation and will mature on April 1, 2028, unless earlier converted, redeemed, or repurchased.  The 2028 Convertible Notes bear cash interest at a rate of 1.50% per year, payable semi-annually in arrears on April 1 and October 1 of each year, beginning on October 1, 2021.  Upon conversion, the 2028 Convertible Notes will be convertible into cash, shares of Common Stock, or a combination of cash and shares of Common Stock, at Invitae's election.  As of the Petition Date, the 2028 Convertible Notes had an outstanding principal balance of $1.15 billion.

(c)    **Invitae's Equity Interests.**

As of the Petition Date, Invitae had approximately 291.1 million shares of Common Stock (par value $0.0001 per share) outstanding.  On February 6, 2024, the New York Stock Exchange (the "NYSE") notified Invitae and publicly announced that the NYSE would immediately suspend trading of the Common Stock and commence proceedings to delist the Common Stock pursuant to Section 802.01D of the NYSE Listed Company Manual.  Invitae has historically traded on the NYSE under the ticker "NVTA."  On February 6, 2024, the NYSE announced that the Company's Common Stock will be delisted from the NYSE.  The Company's Common Stock has since traded on the "over the counter" market.

## VIII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Operating Expenses Resulting from Expansion.

Between 2019 and 2021, seeking to diversify and grow its business, Invitae sought to capitalize on several promising market opportunities and made thirteen (13) acquisitions over the course of three (3) years.  These acquisitions were carefully selected to either fill gaps in the Company's product portfolio or expand its reach into promising new markets that offered substantial profitability potential.  To fund in part some of these acquisitions, as well as the Company's expanded operations and growth, in 2021 Invitae raised approximately $1.5 billion in newly funded securities, mainly in the forms of convertible senior unsecured notes and common equity.

Some of these acquisitions included, among others:

***ArcherDX, LLC*** ("ArcherDX"): Acquired in 2020 in a transaction valued at roughly $1.4 billion, ArcherDX is a leading genomic analysis company.  The acquisition added tumor profiling and liquid biopsy technologies for predicting and monitoring therapeutic response to Invitae's service offerings.

***Genosity, Inc.*** ("Genosity"): Acquired in 2021 for $196 million, Genosity is a biotechnology company that provides software and laboratory services for clinical and research applications of genomics.  The acquisition of Genosity provided critical support for the speed, efficiency, and flexibility needed for mainstream global adoption of Invitae's PCM business.

***Ciitizen, LLC***: Acquired in 2021 for $325 million, Ciitizen is a healthcare AI-startup.  The purchase of Ciitizen enhanced Invitae's platform by providing patients an easy-to-use, centralized hub for their genomic and clinical information.

While presenting expanded growth opportunities for the reach of Invitae's business, the addition of multiple new business lines also burdened Invitae with significant operating expenses.  Such high operating leverage made Invitae increasingly vulnerable to economic and business cycle swings during a time when the genetic testing industry as a whole was experiencing increased competition.  Accordingly, of the above-mentioned acquisitions, certain assets of ArcherDX were subsequently divested in 2022 in order to limit Invitae's capital expenditures, and,

64

by the end of 2023, Ciitizen was also divested in order to limit Invitae's cash obligations associated with this non-core business line.

### B.      Macroeconomic Headwinds.

Adverse macroeconomic developments, including inflation, slowing growth, and rising interest rates, have adversely affected Invitae's business and financial condition.  These developments resulted in disruptions and volatility in global financial markets and increased rates of default, as well as negatively affecting business and consumer spending.  These adverse economic conditions have also increased the costs of operating for Invitae's business, including vendor, supplier, and workforce expenses, and have had a substantial impact on access to capital as well as increasing cost of capital.

Generally, under difficult economic conditions, consumers seek to reduce discretionary spending, meaning that many patients would choose to forgo tests like those offered in Invitae's product portfolio.  Decreased demand for elective genetic tests has negatively affected and will likely continue to negatively affect Invitae's overall financial performance.

Furthermore, as a public company, Invitae must comply with various regulatory and reporting requirements.  Invitae incurs recurring expenses in accounting, internal auditing (including internal controls and procedures), financial planning and analysis, and investor relations, in addition to heavy operating expenditures from its overflowing portfolio of increasingly unprofitable business lines.

### C.      Management Turnover.

In addition, during this highly volatile time frame, Invitae faced staffing challenges.  Over the past two (2) years, Invitae experienced turnover in four (4) chief financial officers and various other c-suite executives, including the former CEO.  Despite the Company's best efforts, this high management turnover further delayed Invitae's responses to the challenges the Company faced and prevented Invitae from more swiftly implementing a cohesive strategy for the go-forward enterprise.

### D.      Operational and Liquidity Initiatives.

On July 18, 2022, Invitae initiated a strategic realignment of operations and began implementing cost reduction programs aimed at shifting operational and commercial efforts to the higher-margin, higher-growth testing opportunities among the hereditary cancer, precision oncology, and rare diseases business lines.  To that end, the strategic realignment included divesting certain other business and product lines, such as pre-implantation, prenatal diagnosis, pregnancy loss and infertility products, and certain assets of the ArcherDX business line, in order to reduce excessive cash burn.  In addition, Invitae streamlined the Company's international footprint.  As part of this initiative, Invitae exited operations in nearly one hundred (100) countries.

The strategic realignment included lab and office space consolidation, elimination of business activities and services, decrease in other operating expenses, a reduction in workforce of approximately ~~one thousand~~ (1,000) positions, and a reduced international footprint.  The strategic realignment reduced operational costs and implemented crucial cost saving measures as the estimated cash savings from the realignment is approximately $326 million annually.

To address an upcoming 2024 debt maturity cliff, in March 2023, after discussion and negotiations with certain holders of the 2024 Convertible Notes, Invitae entered into purchase and exchange agreements with multiple holders of the outstanding 2024 Convertible Notes through the execution of the Senior Secured Indenture.  Under the terms of the agreements by and between Invitae, the Guarantors signatory thereto, and the holders, Invitae (a) exchanged $305.7 million aggregate principal amount of 2024 Convertible Notes for $275.3 million aggregate principal amount of new secured Series A Notes due in 2028 and 14,219,859 shares of Invitae's common stock ($30.6 million) and (b) issued and sold new secured Series B Notes, providing a new money infusion of $30.~~0~~ million.

The Company also entered into that certain supplemental Indenture, dated as of August 22, 2023, by and between Invitae, the Guarantors signatory thereto, and certain holders of the outstanding 2024 Convertible Notes

(and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "First Supplemental Indenture"). Pursuant to the First Supplemental Indenture, Invitae exchanged $17.2 million aggregate principal amount of 2024 Convertible Notes for $0.1 million aggregate principal amount of Series A Notes and 15 million shares of common stock. Through that transaction, the Company eliminated $17.1 million in aggregate principal of Notes from its balance sheet that would otherwise have matured in 2024.

The March 2023 and August 2023 transactions provided Invitae with significant operational runway by extending maturities by four (4) years on some of its debt obligations that were coming due imminently, as well as by providing an additional $30 million in liquidity at a crucial time based on the Company's liquidity position.

### E.      Additional Initiatives.

Leading up to the Petition Date, in conjunction with its advisors, Invitae implemented several governance and operational initiatives to right-size its balance sheet, reduce operating expenses from unprofitable and burdensome business lines, and address its debt obligations.

#### (a)      Governance.

Given the state of operations and the looming potential of a restructuring, the Board of Invitae determined that it was advisable and in the best interests of the Company and its stockholders to establish the Special Committee, and to delegate to the Special Committee certain rights, authorities, and powers in connection with evaluating potential actions. On September 23, 2023, the Board formed the Special Committee consisting of William Osborne, Randy Scott, Eric Aguiar, and Christine Gorjanc as its initial members.[20] Upon their appointment, the Company, the Special Committee, and Invitae's advisors immediately began evaluating potential restructuring alternatives.

On October 23, 2023, Invitae executed an agreement with Jill Frizzley to serve as an independent advisor and later elected to expand the size of the Board to nine (9) directors and appoint Ms. Frizzley as an independent director on the Board and a member of the Special Committee. Ms. Frizzley is an experienced board member and industry professional who currently serves as a director for Proterra Inc. and iMedia Brands, and has previously served as a director on numerous public and private boards of directors, some of which included distressed situations, including Virgin Orbit Holdings, Inc., Surgalign Holdings, Inc., Avaya Holdings Corporation, and Hudson Technologies, Inc. In her capacity as independent director, Ms. Frizzley directed and oversaw the Special Committee's Investigation on possible claims and causes of action that may be held by the Company directed at reviewing the factual and legal bases for potential claims arising from such Company transactions within a two-year lookback period, including, but not limited to, several of the Company's material divestitures and transactions, March 2023 debt transaction, and the August 2023 notes exchange transaction.

#### (b)      Retention of Advisors and Contingency Planning.

Given Invitae's need to address its balance sheet and find a solution to its liquidity issues, Invitae retained strategic advisors to assist with the financing process, sale process, and the eventual chapter 11 contingency preparation. On September 1, 2023, Invitae retained Moelis to assist with certain investment banking services in connection with any potential financing and restructuring. On October 23, 2023, Invitae expanded Moelis's scope of services to include certain investment banking services in connection with a potential sale of Invitae. On September 22, 2023, Invitae retained K&E as restructuring counsel to assist with these restructuring efforts. On September 26, 2023, Invitae expanded the scope of services of FTI to support its finance and accounting functions in the development of long-range financial projections and related scenario analyses. FTI also supported operational decision making, due diligence for a sales process, and contingency planning for a possible restructuring and other various strategic alternatives.

---

[20] Jill Frizzley was appointed to the Special Committee on December 7, 2023. On January 1, 2024, Randy Scott stepped down from his position as member of the Special Committee, though he remains a full member of the Board.

(c)     **The Second and Third Supplemental Indentures and Subsequent Wind Down of Business Lines.**

Even after reducing operating costs, certain of Invitae's business lines remained burdensome and unprofitable.  As such, in the third quarter of 2023 Invitae began exploring its ability to further wind down and divest unprofitable, non-core, and expensive business lines, including Ciitizen, Women's Health, and YouScript.  Given the Company's liquidity position, Invitae conducted a months-long process to strategically maximize value for these business lines, which included discussions with multiple potential third-party buyers to assess all available options.  On November 15, 2023, Invitae and Aranscia, LLC ("Aranscia"), a global provider of diagnostics software, services, and testing solutions, closed on an agreement pursuant to which Aranscia acquired select assets of the YouScript personalized medication management platform from Invitae in a $4 million, all-cash transaction.  On December 13, 2023, Invitae finalized an agreement with Transformation Capital, an active investor and financial partner entirely dedicated to healthcare technology and novel healthcare services, to divest the assets of Ciitizen.

On January 17, 2024, Invitae reached an agreement with Natera, Inc. regarding the divestiture of Women's Health, determining that this was the best deal available after outreach to multiple third parties and taking into account the current financial position of the Company.  This transaction included, among other things, the sale of certain assets of Women's Health including the Women's Health customer list for $10 million in cash, providing the Company with an infusion of new capital, and certain litigation credits and potential cash milestone payments.  The winding down of Women's Health, along with the other applicable business lines, provided Invitae with incremental liquidity, operational flexibility, and annualized cash savings of approximately $140 million.

To finalize the Women's Health transaction, Invitae entered into the Second Supplemental Indenture granting the consent to wind down the applicable business lines.  In exchange for the requisite consents, Invitae and the Consenting Stakeholders agreed on certain milestones, including some related to the prepetition marketing process and a milestone for reaching a mutually agreed-upon transaction pursuant to a TSA.  Invitae entered into that third supplemental indenture, dated as of January 12, 2024, by and among Invitae and ~~U.S. National~~Wilmington Savings Fund Society Bank ~~Association~~, as trustee and collateral agent (and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Third Supplemental Indenture") pursuant to which certain milestones were extended.

F.     **Transaction Negotiations and the TSA.**

In light of the Company's mounting liquidity challenges, the Company, with the assistance of their advisors, continued to engage with the Consenting Stakeholders pursuant to the Second Supplemental Indenture, to develop a comprehensive restructuring solution.  The Company also engaged with the Unsecured Ad Hoc Group up until the days leading up to the Petition Date in an effort to obtain a proposal, either on a standalone basis or in conjunction with the Consenting Stakeholders, for a recapitalization or other transaction that would be value-maximizing.  The Company provided voluminous diligence to both the Consenting Stakeholders and the Unsecured Ad Hoc Group and engaged for several weeks on transaction structure.  Although these efforts resulted in a transaction proposal from the Unsecured Ad Hoc Group on December 5, 2024, this proposal was ultimately unactionable, and the Company proceeded to continue to discuss its path forward with both the Consenting Stakeholders and the Unsecured Ad Hoc Group.

Accordingly, in accordance with the milestone under the Third Supplemental Indenture, the Company and the Consenting Stakeholders continued negotiations and ultimately entered into the TSA on February 13, 2024, contemplating a sale and orderly wind down of the Debtors' business through these Chapter 11 Cases.

## IX.      EVENTS OF THE CHAPTER 11 CASES

### A.      First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "Ffirst Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on February 15, 2024, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions, and at a hearing on March 15, 2024, the Bankruptcy Court granted certain of the First Day Motions on a final basis as follows:[+521]

(i)      **Case Management Motion.**  *Debtors' Motion to Establish Certain Notice, Case Management, and Administrative Procedures* [Docket No. 16].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Case Management Motion [Docket No. 62];

(ii)      **Cash Management Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions* [Docket No. 10].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Cash Management Motion on an interim basis [Docket No. 49], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Cash Management Motion on a final basis [Docket No. 190];

(iii)      **Creditor Matrix Motion.**  *Debtors' Motion for Entry of an Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable Information and (II) Waiving the Requirement to File a List of Equity Security Holders and Provide Notice Directly to Equity Security Holders* [Docket No 17].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Creditor Matrix Motion on an interim basis [Docket No. 50].  The hearing on the Order approving the Creditor Matrix Motion on a final basis is scheduled for ~~May 20~~June 18, 2024;

(iv)      **Critical Vendors Motion.**  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) 503(b)(9) Claimants, (C) Lien Claimants, and (D) Foreign Vendors and (II) Confirming Administrative Expense Priority of Outstanding Orders* [Docket No. 7].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 51], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 191] (the "Final Critical Vendors Order");

(v)      **Customer Programs Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain and Administer Their Customer Programs and (II) Honor Certain Prepetition Obligations Related Thereto* [Docket No. 8].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Customer Programs Motion on an interim basis [Docket No. 51], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Customer Programs Motion on a final basis [Docket No. 193];

(vi)      **Insurance Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (II) Renew, Supplement, Modify, or Repurchase Insurance and Surety Coverage* [Docket No. 9].  On February 16, 2024, the Bankruptcy Court entered an Order

---

[+521] The First Day Motions, the First Day Declaration, and all orders for relief granted in these Chapter 11 Cases can be viewed free of charge at www.kccllc.net/invitae.

approving the Insurance Motion on an interim basis [Docket No. 53], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 194];

(vii)    **Joint Administration Motion.**  *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 3].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Joint Administration Motion [Docket No. 54];

(viii)    **NOL Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock* [Docket No. 12].  On February 16, 2024, the Bankruptcy Court entered an Order approving the NOL Motion on an interim basis [Docket No. 55].  On March 18, 2024, the Bankruptcy Court entered an Order approving the NOL Motion on a final basis [Docket No. 196];

(ix)    **KCC 156(c) Retention Application.**  *Debtors' Application for Entry of an Order Authorizing the Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date* [Docket No. 5].  On February 16, 2024, the Bankruptcy Court entered an Order approving the KCC 156(c) Retention Application [Docket No. 49];

(x)    **Record Date Motion.**  *Debtors' Motion for Entry of an Order Establishing a Record Date for Potential Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates* [Docket No. 13].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Record Date Motion [Docket No. 56];

(xi)    **Schedules/SOFAs Extension Motion.**  *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 15].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Schedules/SOFAs Extension Motion [Docket No. 58];

(xii)    **Taxes Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Taxes and Fees* [Docket No. 11].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Taxes Motion on an interim basis [Docket No. 59], and on [March 15, 2024], the Bankruptcy Court entered an Order approving the Taxes Motion on a final basis [Docket No. 199];

(xiii)    **Utilities Motion.**  *Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests* [Docket No. 14].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Utilities Motion on an interim basis [Docket No. 560], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Utilities Motion on a final basis [Docket No. 200]; and

(xiv)    **Wages Motion.**  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs* [Docket No. 6].  On February 16, 2024, the Bankruptcy Court entered an Order approving the Wages Motion on an interim basis [Docket No. 43], and on March 18, 2024, the Bankruptcy Court entered an Order approving the Wages Motion on a final basis, overruling an informal objection from the U.S. Trustee [Docket No. 201].

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including ~~Kirkland~~K&E and Cole Schotz as co-counsel to the Debtors, Moelis as investment banker to the Debtors, FTI as financial advisor to the Debtors, KCC as claims, noticing, and solicitation agent to the Debtors, and Deloitte as tax advisors to the Debtors, among others.

## B.  Use of Cash Collateral.

As of the Petition Date, the Debtors had approximately $142 million of cash on hand.  Cash Collateral provides critical liquidity to meet immediate operational needs and smoothly transition into chapter 11.  The Debtors, with the assistance of their relevant advisors, analyzed their projected cash needs and prepared a 13-week cash flow forecast (the "Budget") for the use of Cash Collateral during the Chapter 11 Cases.  Considerations underlying the Budget relate to forecasts of amounts needed to administer these Chapter 11 Cases, satisfy employee and trade payable obligations, and maximize the value of their estates.  The Debtors engaged in good-faith negotiations with the Consenting Stakeholders over the terms of the Interim Cash Collateral Orders and Final Cash Collateral Orders.

In light of those negotiations, on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure: (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 18] (the "Cash Collateral Motion"). On February 16, 2024, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on an interim basis [Docket No. 47].  On March 18, 2024, the Bankruptcy Court entered an Order approving the Cash Collateral Motion on a final basis [Docket No. 188], overruling an objection from the Committee.

## C.  Appointment of Unsecured Creditors' Committee.

On March 1, 2024, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 131] appointing the Committee.  The three-member Committee has retained White & Case LLP as its legal counsel, Ducera Partners LLC as its investment banker, and Province LLC as its financial advisor. The Committee includes the following entities:

- Wilmington Savings Fund Society, Federal Savings Bank;

- Chimtech Holding Ltd.; and

- Workday, Inc.

## D.  Schedules and Statements.

On February 16, 2024, the Bankruptcy Court entered the *Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 58] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional twenty (20) days for a total of thirty-four (34) days after the Petition Date.

The Debtors filed their Schedules and Statements at Docket Nos. 202, 203, 204, 205, 206, and 207, and filed amended Schedules and Statements at Docket Nos. 311, 312, 313, 314, 315, and 316.  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at www.kccllc.net/invitae.

## E.  Bar Date Motion.

On February 14, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claims, and (IV) Approving Notice Thereof* [Docket No. 24] (the "Bar Date

70

Motion"). On March 18, 2024, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 189] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was April 15, 2024, at 4:00 p.m. prevailing Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is August 11, 2024, at 4:00 p.m. prevailing Eastern Time. The Bar Date Notice was served on March 20, 2024 [Docket No. 219] and was published in *The New York Times* (national edition) on March 21, 21, 2024 [Docket No. 235].

### F.    Lease Rejection Motion.

On February 14, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing (I) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (II) Abandonment of Any Personal Property, Each Effective as of the Rejection Date* [Docket No. 23] (the "Lease Rejection Motion"). On March 18, 2024, the Bankruptcy Court entered an order granting the relief set forth in the Lease Rejection Motion [Docket No. 195] (the "Lease Rejection Order"). Pursuant to the Lease Rejection Order, the Debtors rejected leases and subleases at their locations in Cambridge, MA; Golden, CO; Louisville, CO; Palo Alto, CA; Irvine, CA; Seattle, WA; Boulder, CO; and San Francisco, CA. Additionally, on April 2, 2024, the Bankruptcy court entered the *Supplemental Order Authorizing (I) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (II) Abandonment of Any Personal Property, Each Effective as of the Rejection Date* [Docket No. 265] (the "Supplemental Lease Rejection Order"). Pursuant to the Supplemental Lease Rejection Order, the Debtors rejected their lease and sublease in New York, New York.

### G.    Litigation.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, consumer protection, regulatory, and disputes with other companies. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

**H.      The Post-Petition Sale Process.**

The details of the Debtors' post-petition sale process are described in Article II.C of this Disclosure Statement.

**I.      The Independent Investigation.**

On October 18, 2023, the Board authorized the Special Committee to commence an investigation relating to the Company's restructuring efforts and any potential claims and causes of action arising therefrom, specifically any potential Company claims or causes of action arising under the Company's prior transactions.   To ensure appropriate governance, the Company and the K&E sought to engage a restructuring professional that was independent to the transactions being investigated.

On October 23, 2023, the Company executed an engagement agreement with Jill Frizzley to serve as an independent advisor with the option to serve as an independent director of the Company upon execution of a subsequent mutual agreement.   Subsequently on December 7, 2023, the board of directors of Invitae Corporation appointed Jill Frizzley as an independent and disinterested director and a member of the Special Committee.   From October 2023 to the Petition Date, as an independent advisor and director, Ms. Frizzley, with K&E's assistance, oversaw and directed the Special Committee's Investigation of certain transactions within a two-year lookback period to determine whether the Company held any viable claims or causes of action.   The Investigation consisted of document review, multiple interviews with the Company CEO and an advisor to certain of the transactions, and several update conferences between Kirkland, Ms. Frizzley, the Special Committee, and the Board.

The Investigation was designed to accomplish, and ultimately accomplished, four (4) goals, including:

- reviewing the factual and legal bases for potential claims within the two-year lookback period;

- assessing the strengths and weaknesses of each claim to determine the proper treatment of claims in a chapter 11 plan;

- evaluating any proposed release, settlement, retention, or prosecution of claims or causes of action; and

- making determinations and presenting conclusions to the Board in connection with the release of claims or causes of action.

The Investigation primarily encompassed four (4) transactions:

- The March 2023 Uptier Transaction: This transaction was a Purchase and Exchange Agreement with certain holders of the 2024 Convertible Notes. In March 2023, the Company exchanged $305.7 million aggregate principal amount of 2024 Notes for $275.3 million aggregate principal amount of new secured Series A Notes due in 2028 and 14 million shares ($30.6 million) of common stock.

- The August 2023 Exchange: In August 2023, the Company exchanged $17.2 million aggregate principal amount of 2024 Convertible Notes for $0.1 million aggregate principal amount of Series A Notes and 15 million shares of common stock.

- One Codex Acquisition: In February 2021, the Company acquired its OneCodex business line for $17.3 million cash and 1.4 million shares of common stock. The Company subsequently divested OneCodex in September 2022.

- ArcherDX Acquisition: In October 2020, the Debtors acquired ArxherDX and subsequently divested RUOKit Assets in December 2022.

Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the estates. The releases, exculpation, and injunction are an integral component of the Plan, which provides significant distributions of value to administrative, priority, secured, and unsecured creditors.

**J.**      **The Committee's Standing Motion.**

On May 22, 2024, the Committee filed *The Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 536] (the "Standing Motion"). The Standing Motion seeks, among other things, to grant the Committee authority to commence and prosecute certain of claims and causes of action on behalf of the Debtors' Estates. The Committee requested the Court to hear the Standing Motion on June 11, 2024, in conjunction with the hearing approving the Disclosure Statement. In response, the Debtors' filed the *Debtors' Motion for Entry of an Order Scheduling the Hearing on the Committee's Standing Motion with the Hearing on Plan Confirmation, Together with Interim Dates and Deadlines* [Docket No. 548] (the "Scheduling Motion") proposing a briefing schedule to ultimately litigate the merits of the Standing Motion in conjunction with the Confirmation Hearing. On May 30, 2024, the Committee objected to the Scheduling Motion by filing *The Official Committee of Unsecured Creditors' Objection to the Debtors' Motion for Entry of an Order Scheduling the Hearing on the Committee's Standing Motion with the Hearing on Plan Confirmation, Together with Interim Dates and Deadlines, Deerfield's Joinder, and U.S. Bank's Joinder Thereto* [Docket No. 563] (the "Scheduling Objection"). On the same day, the Court heard argument on the Scheduling Motion and the Scheduling Objection and ordered the Debtors and the Committee to mediate to resolve their issues. Mediation will commence on June 20, 2024.

The Debtors disagree entirely with the merits of the Committee's Standing Motion. A hearing on the Standing Motion is currently scheduled for July 9, 2024, at 10:00 a.m. (prevailing Eastern time).

## X.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE**

**DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.      **Risks Related to the Wind-Down.**

After the sale proceeds are allocated pursuant to the Plan, the Debtors are conducting an orderly wind-down, subject to the Wind-Down Budget. Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

1.      ***The Debtors Will Consider All Available Restructuring Alternatives if the Plan Is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.***

The Debtors will consider all restructuring alternatives available, which may include the filing of an alternative chapter 11 plan or any other transaction that would maximize the value of the Debtors' Estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' assets.

Further, distributions would not be advisable or possible without the retention of key employees pursuant to the Plan. If such employees are not retained, the Plan and the Distribution process contemplated thereunder would not be feasible.

2.      ***Certain Bankruptcy Law Considerations.***

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(a)      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

    **(b)**      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent and, if required.  If such conditions precedent are not met or not waived, the Effective Date will not take place.

    **(c)**      **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

    **(d)**      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to restructure and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a Distribution of property with a lesser value than currently provided in the Plan or no Distribution whatsoever under the Plan.

    **(e)**      **Nonconsensual Confirmation.**

In the event that any impaired class does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one (1) impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

**(f)**      **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

**(g)**      **Filing of a Competing Plan.**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan through June 12, 2024. Because the Debtors have filed the Plan contemporaneously with this Disclosure Statement, the Debtors have avoided the risks associated with competing plans being filed by third parties and now have the exclusive right to solicit votes on the Plan through August 11, 2024. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan because creditors and others may propose a competing plan.

**(h)**      **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would generally result in smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**(i)**      **One or More of the Chapter 11 Cases May be Dismissed.**

If the Bankruptcy Court finds that a debtor has incurred substantial or continuing loss or diminution to its estate and lacks a reasonable likelihood of rehabilitation or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of these Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor, which may ultimately result in significantly lower recoveries for creditors than those provided for in the Plan.

**(j)**      **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(k)**      **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

(l)   **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and/or recharacterized as equity contributions.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(m)   **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

(n)   **Risk of Termination of the TSA.**

The TSA contains certain provisions that give the parties the ability to terminate the TSA upon the occurrence of certain events.  Termination of the TSA could result in protracted chapter 11 cases, which could significantly and detrimentally affect the Debtors' relationships with regulators, vendors, suppliers, employees, and customers.

(o)   **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  Any Holder of a Claim or Interest where such Claim or Interest is subject to an objection cannot rely on the estimates in this Disclosure Statement.  As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(p)      **The Debtors May Not Consummate the Sale Transaction.**

The Plan contemplates the implementation of the Sale Transaction pursuant to the Sale Order.  However, in the event the conditions to close the Sale Transaction are not satisfied, or the Sale Transaction is not otherwise consummated by the Outside Date, the Debtors may have to liquidate under Chapter 11 of the Bankruptcy Code and conduct the wind down and dissolution of the Debtors' estates.

(q)      **The Committee's Standing Motion May be Granted.**

The Plan assumes that the 2028 Senior Secured Noteholders' liens are valid (based on all of the Debtors' efforts to confirm that to date) and that the Committee will not prevail on its Standing Motion.  Accordingly, the Debtors are moving forward with a Plan that allocates value in accordance with this priority scheme.  In the event that the Committee prevails on its motion and the liens are invalid, the entirety of the Debtors' capital structure would be reconstituted, and the core of the Plan would need to be amended and revisited.  With such a fundamental change, it would be nearly impossible for the Debtors to maintain their current solicitation and confirmation timeline, and any Holder of a Claim or Interests may not receive its expected share of the estimated distributions described in this Disclosure Statement.

3.      *Even if the Wind-Down Transactions Are Implemented, the Debtors Will Continue to Face Risks.*

Even if the Wind-Down Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, and changes in the Debtors' industry.  As a result of these risks and others, there is no guarantee that the Wind-Down Transactions will achieve the Debtors' stated goals.

4.      *Governmental Approvals May Not Be Granted.*

Consummation of the Wind-Down Transactions may depend on obtaining approvals of certain Governmental Units.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Wind-Down Transactions and Confirmation of the Plan.

B.      **Risks Related to Recoveries under the Plan**

1.      *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  The resulting proceeds of the Sale Transaction may be materially lower than projections.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.      *The Tax Implications of the Debtors' Bankruptcy Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Article XI of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

3.      *The Orderly Wind Down May Take Longer and Cost More Than Estimated, Which May Decrease Recoveries.*

The Wind Down presents risks for all stakeholders.  The Wind Down is estimated to take approximately 9 months to complete.  However, this is merely an estimate and it is possible that it could take longer.  In the event the Wind Down takes longer to be completed, the associated costs, such as professional fees, will also be higher than estimated.  Accordingly, estimated recoveries pursuant to the Wind Down could also be lower than estimated.

### 4. *The Debtors' Substantial Ongoing Liquidity Needs May Impact Recoveries.*

The Debtors have nonetheless had to maintain significant business operations to comply with the demands of these Chapter 11 Cases. Accordingly, depending on how long the Chapter 11 Cases go, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of these Chapter 11 Cases. The Debtors cannot guarantee that Cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of these Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### C. Risks Related to the Debtors' Businesses.[1622]

#### 1. *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Plan and Effectuate Distributions.*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel, including scientists, in the medical genetics and testing industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Plan and provide distributions to the creditors.

#### 2. *The Wind Down May Be Adversely Affected by Potential Litigation.*

In the ordinary course of business, the Wind-Down Debtors may become parties to litigation. In general, litigation can be expensive, and time consuming to bring or defend against. Such litigation could result in settlements or damages that would adversely affect the Wind-Down Debtors' financial condition.

#### 3. *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition.*

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Debtors and may have an adverse effect on the Wind-Down Debtors' financial condition.

---

[1622] For the avoidance of doubt, as used in this section, the term Debtors shall refer to both the Debtors prior to the Effective Date and the Wind-Down Debtors after the Effective Date.

D. **Miscellaneous Risk Factors and Disclaimers.**

1. ***The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.***

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. ***No Legal or Tax Advice Is Provided By This Disclosure Statement.***

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

3. ***No Admissions Made.***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4. ***Failure to Identify Litigation Claims or Projected Objections.***

No reliance should be placed on the fact that a particular litigation claim, or projected objection to a particular Claim, is or is not identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5. ***Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6. ***Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.***

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.      *No Representations Outside This Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.    ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.    VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF NEW JERSEY.**

**XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

   **A.    Introduction.**

   The following discussion is an overview of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders of Claims that are entitled to vote to accept or reject the Plan.  This overview is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

   Substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.  No portion of this discussion is or will be binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors, Wind-Down Debtors, or Holders of Claims take.

   **ALL HOLDERS OF CLAIMS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS.**

   This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders of Claims that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, banks, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, real estate investment ~~companies~~trusts and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  Furthermore, this overview assumes that a Holder holds only Claims in a single Class and, except as set forth below, holds such Claims only as "capital assets" (within the meaning of section 1221 of the IRC).  This overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This overview does not discuss special

considerations that may apply to persons who are both Holders of Claims and Holders of Interests, nor any differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims entitled to vote to accept or reject the Plan described below also may vary depending on the nature of any Wind-Down Transactions that the Debtors and/or Wind-Down Debtors engage in. This overview does not address the U.S. federal income tax consequences to Holders of Claims or Interests that are (a) Unimpaired or otherwise entitled to payment in full under the Plan, (b) deemed to reject the Plan, ~~or~~ (c) not entitled to vote to accept or reject the Plan, or (d) are permitted to vote but are either presumed to accept or deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC, a "U.S. Person") has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. Person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the pass-through entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING OVERVIEW OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The Plan is being structured as a Wind Down of the Debtors' operations and a series of distributions by the Debtors (and Wind-Down Debtors, as applicable) to Holders in respect of their Claims.

In connection with the Plan, the Debtors (or Wind-Down Debtors, as applicable) may, with the consent of the Required Consenting Stakeholders, among other things, distribute sale proceeds to Holders of certain Claims. As a result of any sale of assets (including as a result of the Sale Transaction), the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors as determined for U.S. federal income tax purposes (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Income will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation. The Debtors and the Wind-Down Debtors do not currently anticipate that a material cash tax liability is likely to arise in connection with the Sale Transaction.

Thus, the U.S. federal income tax consequences of the Plan to the Debtors will in large part be a function of (a) the Debtors' tax basis in their assets that the Debtors transfer, (b) the quantum of liabilities assumed by the purchasers(s) of such assets, (c) the difference between the value of what the Holders receive in exchange for their Claims and the amount of their Claims, and (d) the Debtors' ability to demonstrate the existence of tax losses,

including losses that may be generated as a result of the implementation of the Wind-Down Transactions and historically incurred losses.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Plan, potentially in a way that has a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Because the Plan is being structured as a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, are not discussed further.

The Debtors continue to analyze whether there will be any material administrative income tax liabilities that must be satisfied under the Plan.

C.     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

1.     *U.S. Federal Income Tax Consequences for Holders of Allowed Class 3 2028 Senior Secured Notes Claims.*

Pursuant to the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Class 3 2028 Senior Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Class 3 2028 Senior Secured Notes Claim, each Holder thereof shall receive its *pro rata* share of Distributable Value (generally as cash) following payment in full of Classes 1, 2, 4, and 5 Claims. In addition, to the extent not otherwise paid as Restructuring Expenses, the Debtors will pay to the 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent an amount equal to the outstanding documented 2028 Senior Secured Notes Trustee and 2028 Senior Secured Collateral Agent fees and expenses, including counsel fees and expenses, on the Effective Date in Cash.

Each such U.S. Holder will be treated as exchanging such Allowed Class 3 2028 Senior Secured Notes Claim in a taxable exchange under section 1001 of the IRC for such Distributable Value. Accordingly, subject to the rules regarding accrued but untaxed interest, each U.S. Holder of such an Allowed Class 3 2028 Senior Secured Notes Claim should recognize gain or loss equal to the difference between (i) the amount of any Distributable Value received in exchange for such Claim, and (ii) such Holder's adjusted basis, if any, in such Claim.

2.     *Accrued Interest.*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Class 3 2028 Senior Secured Notes Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder of a surrendered Allowed Class 3 2028 Senior Secured Notes Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

If the Distributable Value received by a U.S. Holder of an Allowed Class 3 2028 Senior Secured Notes Claim is not sufficient to fully satisfy all principal and interest on an Allowed Class 3 2028 Senior Secured Notes Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 3 2028 Senior Secured Notes Claim will be allocated first to the principal amount of such Allowed Class 3 2028 Senior Secured Notes Claim, with any excess allocated to unpaid interest that accrued on such Allowed Class 3 2028 Senior Secured Notes Claim, if any. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Class 3 2028 Senior Secured Notes Claim should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

3.     *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Class 3 2028 Senior Secured Notes Claim may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Class 3 2028 Senior Secured Notes Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than at original issuance and if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of debt constituting its Allowed Class 3 2028 Senior Secured Notes Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 4. *Net Investment Income Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 5. *Limitations on Losses.*

Where gain or loss is recognized by a U.S. Holder upon the exchange of its Allowed Class 3 2028 Senior Secured Notes Claim, the character of such gain or loss as long-term or short-term capital gain (or loss) or as ordinary income (or loss) will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Allowed Class 3 2028 Senior Secured Notes Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Allowed Class 3 2028 Senior Secured Notes Claim was acquired at a market discount, whether and to what extent the U.S. Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Allowed Class 3 2028 Senior Secured Notes Claim for more than one year at the time of the exchange. Each U.S. Holder of an Allowed Class 3 2028 Senior Secured Notes Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Class 3 2028 Senior Secured Notes Claim.

U.S. Holders of an Allowed Class 3 2028 Senior Secured Notes Claim who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### D. **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the Consummation of the Plan and the Wind-Down Transactions to such Non-U.S. Holder.

1.       *Gain Recognition.*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Allowed Class 3 2028 Senior Secured Notes Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Wind-Down Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Net Investment Income Tax would generally not apply). In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to ~~thirty (~~30~~)~~ percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.       *Accrued Interest.*

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Allowed Class 3 2028 Senior Secured Notes Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)      the Non-U.S. Holder actually or constructively owns ~~ten (~~10~~)~~ percent or more of the total combined voting power of all classes of Invitae's stock entitled to vote;

(b)      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Invitae (each, within the meaning of the IRC);

(c)      the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a "branch profits tax" with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of ~~thirty (~~30~~)~~ percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a ~~thirty (~~30~~)~~ percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a ~~thirty (~~30~~)~~ percent rate (or

such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments).  As described above in more detail under the heading "*Accrued Interest*," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### 3.      *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.  FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.  Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E.      **Information Reporting and Back-Up Withholding.**

The Debtors, the Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

\* \* \* \* \*

## XII. RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger Distribution to Holders of Allowed Claims than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims vote to accept the Plan.

Invitae Corporation on behalf of itself
and each of the other Debtors

By:   /s/ Ana Schrank
Name:   Ana Schrank
Title:   Chief Financial Officer

Prepared By:

Dated: ~~May 9~~June 11, 2024

                                        /s/ Michael D. Sirota
                                        **COLE SCHOTZ P.C.**
                                        Michael D. Sirota, Esq.
                                        Warren A. Usatine, Esq.
                                        Felice R. Yudkin, Esq.
                                        Daniel J. Harris, Esq.
                                        Court Plaza North, 25 Main Street
                                        Hackensack, New Jersey 07601
                                        Telephone:  (201) 489-3000
                                        Email:      msirota@coleschotz.com
                                                    wusatine@coleschotz.com
                                                    fyudkin@coleschotz.com
                                                    dharris@coleschotz.com


                                        **KIRKLAND & ELLIS LLP**
                                        **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                        Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
                                        Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
                                        Francis Petrie (admitted *pro hac vice*)
                                        Jeffrey Goldfine (admitted *pro hac vice*)
                                        601 Lexington Avenue
                                        New York, New York 10022
                                        Telephone:  (212) 446-4800
                                        Facsimile:   (212) 446-4900
                                        Email:      joshua.sussberg@kirkland.com
                                                    nicole.greenblatt@kirkland.com
                                                    francis.petrie@kirkland.com
                                                    jeffrey.goldfine@kirkland.com


                                        -and-


                                        **KIRKLAND & ELLIS LLP**
                                        **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                        Spencer A. Winters, P.C. (admitted *pro hac vice*)
                                        333 West Wolf Point Plaza
                                        Chicago, Illinois 60654
                                        Telephone: (312) 862-2000
                                        Facsimile: (312) 862-2200
                                        spencer.winters@kirkland.com


                                        ~~*Proposed*~~ *Co-Counsel to the Debtors and*
                                        *Debtors in Possession*

90

**<u>Exhibit A</u>**

**Chapter 11 Plan**

[Filed separately]

**<u>Exhibit B</u>**

**TSA**

[Filed Separately]

**Exhibit C**

**Liquidation Analysis**

[~~To come~~Filed Separately]

**Exhibit D**

**Supplement to the Liquidation Analysis**