**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
nicole.greenblatt@kirkland.com
francis.petrie@kirkland.com
jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
spencer.winters@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' OBJECTION TO THE
## OFFICIAL COMMITTEE OF UNSECURED
## CREDITORS' MOTION FOR (I) LEAVE, STANDING
## AND AUTHORITY TO COMMENCE AND PROSECUTE
## CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF
## DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY

---

[1]  The last four digits of Debtor Invitae Corporation's tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

Preliminary Statement ......................................................................................................... 1

Background ......................................................................................................................... 10

    A.    Company Background and Governance ....................................................... 10

    B.    The Debtors' Business Expansion and Debt Funding ............................... 13

    C.    The Market Environment During the Relevant Time Period....................... 14

    D.    The Debtors Pursue Operational Restructuring Measures and Explore
           Transactions With Experienced Advisors .................................................. 16

    E.    The Debtors Manage Their Liabilities to Address Looming Maturities............... 17

    F.    The Company Continues to Face Financial Headwinds and Divests
           Unprofitable Business Lines ...................................................................... 23

    G.    The Company Takes Action to Retain Key Executives Needed to Oversee
           the Company's Restructuring and Sale of Its Business ............................. 25

    H.    The Special Committee Investigation Into Potential Claims............................... 28

    I.    Bankruptcy Negotiations and Filing Chapter 11 ....................................... 28

    J.    The Company's Proactive Efforts Lead to the Value-Maximizing Sale to
           Labcorp .................................................................................................... 30

Argument ........................................................................................................................... 31

I.    The Legal Standard ................................................................................................ 31

II.    The Committee's Proposed Complaint Fails to Allege Colorable Claims ...................... 33

    A.    The Committee's Constructive Fraudulent Transfer Claims for the March
           Exchange Are Not Colorable ..................................................................... 34

           1.    The Debtors Received Reasonably Equivalent Value from the
                 March Exchange ............................................................................. 34

           2.    The Debtors Were Not Insolvent at the Time of the Transaction............ 44

           3.    The Section 546(e) Safe Harbor Bars the Committee's
                 Constructive Fraudulent Transfer Claims ..................................... 49

    B.    The Committee's Actual Fraudulent Transfer Claims Are Not Colorable ........... 51

    C.    The Proposed Subsidiary Guarantees Claims Are Meritless ............................... 56

    D.    The Committee's August Transaction Claims Are Not Colorable ...................... 57

    E.    The Committee's Consent Fee Claims Are Not Colorable.................................. 58

    F.    The Committee's Fiduciary Claims Are Not Colorable ...................................... 61

1.   The Fiduciary Defendants' Conduct Was Protected by the Company's Exculpation Provision and Their Reliance on Experienced Advisors ................................................................. 61

2.   There Was No Violation of the Duty of Care ........................................... 64

3.   There Was No Violation of the Duty of Loyalty ...................................... 71

4.   The Committee's Aiding and Abetting Claim Is Not Colorable .............. 72

G.   The Committee's Retention Payment Claims Are Not Colorable ....................... 74

1.   The Board Did Not Breach Any Fiduciary Duties By Approving the Retention Payments.......................................................................... 74

2.   The Retention Payments Were Not Preferential Transfers...................... 77

3.   The Retention Payments Were Not Fraudulent Transfers ....................... 79

H.   The Committee's Disallowance and Setoff Claims Are Not Colorable .............. 81

I.   The Committee's Alleged Unencumbered Assets Claims Are Neither Colorable Nor Appropriate for a Standing Motion ............................................... 82

III.   The Debtors Have Not "Unjustifiably Refused" to Pursue the Proposed Claims ........... 83

A.   The Legal Standard for Justifiable Refusal........................................................... 84

B.   The Debtors Investigated the Proposed Claims, Concluded that the Costs of Litigating Them Outweighed the Purported Benefits of Litigating, and Pursued the Claims Through the Settlements Proposed in the Plan ................... 85

C.   Giving the Committee License to Pursue the Proposed Claims Will Impose Significant Costs on the Estates With No Benefit ................................. 89

1.   The Substantial Benefits Secured by the Debtors Through the Settlement and Plan Would be Destroyed by the Committee's Proposed Litigation.................................................................................. 90

2.   Pursuing the Proposed Claims Would Result in Massive Costs to the Debtors' Estates for Which There Is No Identifiable Source of Funding .................................................................................................. 93

3.   Pursuit of the Proposed Claims Will Not Benefit the Debtors' Estates as a Whole .......................................................................... 98

IV.   The Committee's Request for Sole Authority to Propose Settlement of the Proposed Claims Has No Basis in the Governing Law ................................................. 100

Conclusion .......................................................................................................................... 102

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                  <u>Page(s)</u>

*Adamson v. Bernier (In re Bernier)*,
    282 B.R. 773 (Bankr. D. Del. 2002) ...............................................................................52, 56

*In re Adelphia Commc'ns Corp.*,
    371 B.R. 660 (S.D.N.Y. 2007)..............................................................................................101

*Affiliated Physicians and Emps. Master Tr. v. Dept. of Treasury, IRS (In re*
    *Affiliated Physicians & Emps. Master Tr.)*,
    No. 21-14286 (MBK),
    2022 WL 16953555 (Bankr. D.N.J. Nov. 15, 2022)...............................................................36

*In re AgFeed USA, LLC*,
    558 B.R. 116 (Bankr. D. Del. 2016) ......................................................................................75

*ALA, Inc. v. CCAIR, Inc.*,
    29 F.3d 855 (3d Cir. 1994)....................................................................................................33

*Allonhill, LLC v. Stewart Lender Servs., Inc.* (*In re Allonhill, LLC*),
    No. 14-10663 (KG),
    2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019),
    *aff'd in relevant part*, 2020 WL 1542376 (D. Del. Mar. 31, 2020),
    *reconsideration denied*, 2020 WL 6822985 (D. Del. Nov. 20, 2020) ....................................60

*In re Am.'s Hobby Ctr., Inc.*,
    223 B.R. 275 (Bankr. S.D.N.Y. 1998)...................................................................................94

*Amborn v. Lester (In re Lester)*,
    616 B.R. 549 (Bankr. D. Or. 2020).......................................................................................42

*In re Amcad Holdings*,
    579 B.R. 33 ...........................................................................................................4, 34, 35, 36

*Anand v. Nat'l Republic Bank of Chi.*,
    239 B.R. 511 (N.D. Ill. 1999) ....................................................................................36, 37, 59

*In re Anand*,
    210 B.R. 456 (Bankr. N.D. Ill. 1997) ....................................................................................38

*Ankrah v. HSBC Bank USA, N.A. (In re Ankrah)*,
    602 B.R. 286 (Bankr. D.N.J. 2019) .......................................................................................35

*In re AppliedTheory Corp.*,
    493 F.3d 82 (2d Cir. 2007).....................................................................................................99

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Asmussen v. Quaker City Corp.*,
    156 A. 180 (Del. Ch. 1931)....................................................................................................66

*Bd. of Trustees of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*,
    296 F.3d 164 (3d Cir. 2002)................................................................................................72

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................33

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
    891 A.2d 150 (Del. Ch. 2005)......................................................................................65, 67

*Binks v. DSL.net, Inc.*,
    No. CIV.A. 2323-VCN,
    2010 WL 1713629 (Del. Ch. Apr. 29, 2010).....................................................................73

*In re Boston Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y., 2020)..............................................................................51

*Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*,
    561 F.3d 377 (5th Cir. 2009) ...........................................................................................101

*In re Broadstripe, LLC.*,
    444 B.R. 51 (Bankr. D. Del. 2010)....................................................................................82

*Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*,
    296 B.R. 327 (Bankr. D. Del. 2003) ..................................................................................52

*Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co.*,
    No. 9250-VCG,
    2017 WL 3172722 (Del. Ch. July 24, 2017)......................................................................73

*In re Caesars Ent. Operating Co., Inc.*,
    561 B.R. 457 (Bankr. N.D. Ill. 2016) ..........................................................................89, 90

*In re Capmark Fin. Grp. Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) .............................................................................36, 52

*In re Catholic Bishop of N. Alaska*,
    No. F08-00110-DMD,
    2009 WL 8412174 (Bankr. D. Alaska Sept. 11, 2009)......................................................95

*In re Catholic Diocese of Wilmington, Inc.*,
    437 B.R. 488 (Bankr. D. Del. 2010) ..................................................................................92

*Cede & Co. v. Technicolor, Inc.*,
    634 A.2d 345 (Del. 1993) ..................................................................................................71

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Centaur*
   2010 WL 4624910 ....................................................................................................101

*In re Chalk Line Mfg., Inc.*,
   184 B.R. 828 (Bankr. N.D. Ala. 1995) ....................................................................95

*Chen v. Howard-Anderson*,
   87 A.3d 648 (Del. Ch. 2014)....................................................................................65

*In re Cherrydale Farms, Inc.*,
   No. 99-597 (PJW),
   2001 WL 1820323 (Bankr. D. Del. Feb. 20, 2001) ................................................78

*In re Churchill Nut Co.*,
   251 B.R. 143 (Bankr. N.D. Cal. 2000) ....................................................................79

*In re Cognizant Tech. Sols. Corp. Derivative Litig.*,
   101 F.4th 250 (3d Cir. 2024) ...................................................................................75

*In re Columbia Pipeline Gp., Inc.*,
   No. CV 2018-0484-JTL,
   2021 WL 772562 (Del. Ch. Mar. 1, 2021)...............................................................73

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*,
   385 F. Supp. 2d 449 (D. Del. 2004).........................................................................62

*In re Copperfield Invests., LLC*,
   421 B.R. 604 (Bankr. E.D.N.Y. 2010).....................................................................84

*Cox. v. Ridgestone Bank (In re Cent. Ill. Energy Co-op.)*,
   No. 09-81409,
   2012 WL 5076288 (Bankr. C.D. Ill. Oct. 18, 2012) ...............................................36

*In re CTE 1 LLC*,
   No. 19-30256 (VFP),
   2023 WL 5257940 (Bankr. D.N.J. Aug. 11, 2023)..................................................52

*Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*,
   No. 01 CIV.6209 (DC),
   2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ........................................................37

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003)........................................................10, 31, 84, 98

*Daly v. Fusco (In re All-Type Printing, Inc.)*,
   274 B.R. 316 (Bankr. D. Conn. 2002) .....................................................................36

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Diocese of Camden, New Jersey*,
No. 20-21257 (JNP),
2022 WL 884242 (Bankr. D.N.J. Mar. 24, 2022) ..................................................33, 84, 85, 95

*In re Dollar Thrifty S'holder Litig.*,
14 A.3d 573 (Del. Ch. 2010)..................................................................................65

*Drivetrain, LLC v. X. Com., Inc.*,
No. AP 22-50448,
2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) ..................................................77

*In re DSI Renal Holdings*, LLC,
574 B.R. 446 (Bankr. D. Del. 2017) ......................................................................75

*EiserAmper LLP v. Morgan (In re SRC Liquidation LLC)*,
581 B.R. 78 (D. Del. 2017)................................................................................34, 81

*Elway Co. v. Miller (In re Elrod Holdings Corp.)*,
421 B.R. 700 (Bankr. D. Del. 2010) ..................................................................36, 55

*Espinoza v. Zuckerberg*,
124 A.3d 47 (Del. Ch. 2015)..................................................................................76

*In re F-Squared Inv. Mgmt., LLC*
2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) ................................................48

*In re F-Squared Inv. Mgmt. LLC*,
600 B.R. 294 (Bankr. D. Del. 2019) ......................................................................80

*In re Fedders N. Am., Inc.*,
405 B.R. 527 (Bankr. D. Del. 2009) ..................................................................34, 55

*Fidelity Bank, Nat'l Ass'n v. M.M Grp., Inc.*,
77 F.3d 880 (6th Cir. 1996) ..................................................................................92

*Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*,
251 A.3d 212 (Del. Ch. 2021)................................................................................73

*In re Fitness Holdings Int'l, Inc.*,
714 F.3d 1141 (9th Cir. 2013) ..........................................................................4, 36

*Friedman v. Wellspring Cap. Mgmt., LLC (In re SportCo Holdings, Inc.)*,
No. 19-11299 (JKS),
2021 WL 4823513 (Bankr. D. Del. Oct. 14, 2021) ................................................54

**TABLE OF AUTHORITIES (CONT'D)**

*Fritze LLC v. Keyspan Home Energy Servs., LLC ( In re Fritze LLC)*,
   No. 07-02113 (DHS),
   2009 WL 3245499 (Bankr. D.N.J. Oct. 6, 2009) ..................................................36

*In re Fulghum Constr. Corp.*,
   872 F.2d 739 (6th Cir. 1989) .............................................................................78

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*,
   313 B.R. 612 (Bankr. D.N.J. 2004) .......................................................32, 33, 49, 85

*Gagliardi v. TriFoods Int'l, Inc.*,
   683 A.2d 1049 (Del. Ch. 1996) ..........................................................................65

*Gellert v. Coltec Ind., Inc. (In re Crucible Materials Corp.)*,
   No. 09-11582 MFW,
   2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012) ................................................36

*In re Gibson Grp., Inc.*,
   66 F.3d 1436 (6th Cir. 1995) .............................................................................89

*Glob. Crossing Est. Representative v. Winnick*,
   No. 04-CIV-2558 (GEL),
   2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) .........................................................43

*Global Outreach, S.A. v. Ya Global Invs., L.P. (In re Global Outreach, S.A.)*,
   No. 09-15985 (DHS),
   2014 WL 4948184 (Bankr. D.N.J. Oct. 2, 2014) ...................................................61

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*,
   No. 20-10766 (BLS),
   2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ................................................49

*Gonzales v. Liberman (In re Brutsche)*,
   No. 11-13326-J7,
   2013 WL 501666 (Bankr. D.N.M. Feb. 11, 2013) .................................................36

*Goodman v. Southern Crane & Hydraulics, LLC (In re Gulf Fleet Holdings, Inc.)*,
   No. 12-05048,
   2013 WL 1755490 (Bankr. W.D. La. April 23, 2013) .............................................36

*In re Green Field Energy Servs., Inc.*,
   594 B.R. 239 (Bankr. D. Del. 2018) .....................................................................64

*In re Grossinger's Assocs.*,
   184 B.R. 429 (Bankr. S.D.N.Y. 1995) .................................................................94

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*,
   530 U.S. 1 (2000) ...................................................................................................102

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ........................................................................................5

*In re Hechinger Inv. Co. of Del., Inc.*,
   327 B.R. 537 (Bankr. D. Del. 2004) .........................................................................77

*Holliday v. Credit Suisse Securities (USA) LLC*,
   2021 WL 4150523 (S.D.N.Y., 2021) .......................................................................51

*IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy,
Inc. v. Winborne*,
   301 A.3d 596 (Del. Ch. 2023) ..................................................................................69

*Image Masters, Inc. v. Chase Home Fin.*,
   489 B.R. 375 (E.D. Pa. 2013) ...................................................................................36

*In re Jevic Holding Corp.*,
   2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ................................................74

*In re Kaplan*,
   162 B.R. 684 (Bankr. E.D. Pa. 1993) .......................................................................79

*Kaplan v. First Options of Chicago, Inc.*,
   189 B.R. 882 (E.D. Pa. 1995) ...................................................................................79

*In re Key3Media Grp., Inc.*,
   336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, No. 03-10323 (MFW), 2006 WL
   2842462 (D. Del. Oct. 2, 2006) .........................................................................42, 60

*Kittay v. Peter D. Leibowits Company, Inc., et al. (In re Duke & Benedict, Inc.)*,
   265 B.R. 524 (Bankr. S.D.N.Y. 2001) .....................................................................42

*Lawrence v. Bonadio, Insero & Co. (In re Interco Sys., Inc.)*,
   202 B.R. 188 (Bankr. W.D.N.Y. 1996) ....................................................................42

*Lee v. Pincus*,
   No. CV 8458-CB,
   2014 WL 6066108 (Del. Ch. Nov. 14, 2014) ..........................................................73

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
Holdings Inc.)*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) .....................................................................50

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Lenois v. Lawal*,
  No. 11963-VCMR,
  2017 WL 5289611 (Del. Ch. Nov. 7, 2017) ...........................................................64

*In re Liquid Holdings Grp., Inc.*,
  No. 16-10202 (KG),
  2018 WL 2759301 (Bankr. D. Del. June 6, 2018) ...................................................76

*In re Louisiana Pellets, Inc.*,
  838 Fed. App'x 45 (5th Cir. 2020) .......................................................................4

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l., Inc.)*,
  181 F.3d 505 (3d Cir. 1999)...................................................................................49

*In re Lyondell Chem. Co.*,
  567 B.R. 55 (Bankr. S.D.N.Y. 2017) .....................................................................46

*In re Mack Indus., Ltd.*,
  No. 17-B-09308,
  2020 WL 6708874 (Bankr. N.D. Ill. Nov. 16, 2020)..............................................52

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) .....................................................................62, 73, 74

*In re Manley Toys Ltd.*,
  No. 16-15374 (JNP),
  2020 WL 1580244 (Bankr. D.N.J. Mar. 31, 2020).........................................86, 95

*McElrath v. Kalanick*,
  No. 2017-0888-SG,
  2019 WL 1430210 (Del. Ch. Apr. 1, 2019) ...........................................................70

*In re McGuirk*,
  414 B.R. 878 (Bankr. N.D. Ga. 2009) ...................................................................99

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
  945 F.2d 635 (3d Cir. 1991).............................................................................37, 57

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018)............................................................................................51

*In re Midway Games Inc.*,
  428 B.R. 303 (Bankr. D. Del. 2010) ..............................................................70, 81

*In re Milazzo*,
  450 B.R. 363 (Bankr. D. Conn. 2011) ...................................................................84

<u>**TABLE OF AUTHORITIES (CONT'D)**</u>

<u>**Page(s)**</u>

*Miller v. Black Diamond Cap. Management, L.L.C. (In re Bayou Steel BD
    Holdings, L.L.C.),*
    642 B.R. 371 (Bankr. D. Del. 2022) ...................................................................37, 43

*Moody v. Sec. Pac. Bus. Credit, Inc.,*
    971 F.2d 1056 (3d Cir. 1992)...........................................................................44

*In re Morris Communications NC,*
    914 F.2d 458 (4th Cir. 1990) ...........................................................................60

*In re Murray Metallurgical Coal Holdings, LLC,*
    614 B.R. 819 (Bankr. S.D. Ohio, 2020)..............................................87, 89, 98, 99

*Myers v. Martin (In re Martin),*
    91 F.3d 389 (3d Cir. 1996)...............................................................................86

*In re Nine West LBO Securities Litigation,*
    87 F.4th 130 (2d Cir. 2023) .............................................................................51

*In re NMI Sys., Inc.,*
    179 B.R. 357 (Bankr. D.D.C. 1995) .................................................................78

*O'Toole v. Karnani (In re Trinsum Grp., Inc.),*
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ..............................................................45

*Off. Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp. v. Off. Comm. of
    Unsecured Creditors of Adelphia Commc'ns Corp. (In re Adelphia Commc'ns
    Corp.),*
    544 F.3d 420 (2d Cir. 2008)............................................................................31

*Off. Comm. of Unsecured Creditors of Propex Inc. v. BNP Paribas (In re Propex,
    Inc.),*
    415 B.R. 321 (Bankr. E.D. Tenn. 2009) ...........................................................36

*Okla. Firefighters Pension & Ret. Sys. v. Corbat,*
    No. 12151-VCG,
    2017 WL 6452240 (Del. Ch. Dec. 18, 2017)....................................................68

*Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt
    PLC),*
    No. 20-12522 (JTD),
    2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) .............................................52

*In re OPP Liquidating Co., Inc.,*
    No. 19-10729 (MFW),
    2022 WL 774063 (Bankr. D. Del. Mar. 14, 2022)............................................80

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Oracle Corp. Derivative Litig.*,
   No. CV 2017-0337-SG,
   2020 WL 3410745 (Del. Ch. June 22, 2020) ......................................................72

*Palkon v. Maffei*,
   311 A.3d 255 (Del. Ch. 2024),
   *cert. denied*, 2024 WL 1211688 (Del. Ch. Mar. 21, 2024) ...............................65

*In re Parker Sch. Uniforms, LLC*,
   No. 18-10085 (CSS),
   2021 WL 4553016 (Bankr. D. Del. Oct. 5, 2021) ..............................................36

*Pembroke Dev. Corp. v. Commnwealth Savings & Loan Assoc. (In re Pembroke*
   *Dev. Corp.)*,
   124 B.R. 398 (Bankr. S.D. Fla. 1991) ...............................................................37

*In re Penn Cent. Transp. Co.*,
   596 F.2d 1102 (3d Cir. 1979) ............................................................................86

*Pergament v. Reisner (In re Reisner)*,
   357 B.R. 206 (Bankr. E.D.N.Y. 2006) ..............................................................42

*Perkins v. North Park Realty Management, LLC, et al. (In re Sakhe)*,
   No. 15-32238-RG,
   2021 WL 5999195 (Bankr. D.N.J. Dec. 17, 2021) ...........................................42

*Perkins, Chapter 7 Trustee v. Bamberger (In re Carton)*,
   No. 20-19781-VFP,
   2023 WL 8057870 (Bankr. D.N.J. Nov. 20, 2023) ...........................................36

*Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*,
   No. 12-13852 (ALG),
   2013 WL 3828509 (Bankr. S.D.N.Y. July 23, 2013) ........................................37

*Point Serv. Corp. v. Pritchard Mining Co., Inc.*,
   No. 2:09-0769,
   2010 WL 1410673 (S.D. W. Va. Mar. 31, 2010) ..............................................95

*Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*,
   863 A.2d 772 (Del. Ch. 2004) .................................................................62, 66, 72

*Protective Comm. For Indep. S'holders of TMT Trailer Ferry Inc. v. Anderson*,
   390 U.S. 414 (1968) ...........................................................................................86

*Quadrant Structured Prod. Co. v. Vertin*,
   102 A.3d 155 (Del. Ch. 2014) ...........................................................................71

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re R.M.L., Inc.*,
  92 F.3d 139 (3d Cir. 1996).........................................................................................80

*RBC Cap. Mkts., LLC v. Jervis*,
  129 A.3d 816 (Del. 2015) .........................................................................................73

*In re Redden*,
  No. 04-12335 (PJW),
  2013 WL 5436368 (Bankr. D. Del. Sept. 30, 2013) ...........................................85, 98

*Redmond* v. *SpiritBank (In re Brooke Corp.*),
  541 B.R. 492 (Bankr. D. Kan. November 20, 2015) ................................................59

*In re Residential Cap., LLC*
  491 B.R. 63 (Bankr. S.D.N.Y. 2013) ......................................................................64

*In re RNI Wind Down Corp.*,
  369 B.R. 174 (Bankr. D. Del. 2007) ........................................................................96

*In re Roman Catholic Diocese of Rockville Ctr, New York*,
  654 B.R. 212 (Bankr. S.D.N.Y. 2023) .................................................................33, 91

*Rossco Holdings, Inc. v. McConnell*,
  613 F. App'x 302 (5th Cir. 2015) ...........................................................................101

*In re Rural Metro Corp.*,
  88 A.3d 54 (Del. Ch. 2014).......................................................................................64

*In re S B Bldg. Assocs. Ltd. P'ship*,
  621 B.R. 330 (Bankr. D.N.J. 2020) ..........................................................................87

*In re Sabine Oil & Gas Corp.*,
  547 B.R. 503 (Bankr. S.D.N.Y.),
  *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ..............................................................84, 93, 99

*In re Samson Resources Corp.*,
  625 B.R. 291 (Bankr. D. Del. 2020) ....................................................................50, 51

*In re Samson Resources Corp.*,
  No. 15-11934,
  2023 WL 40033815 (Bankr. D. Del. June 14, 2023)...........................................48, 59

*Schmidt v. The Grand Ltd. (In re Black Elk Energy Offshore Operations, LLC)*,
  605 B.R. 138 (Bankr. S.D. Tex. 2019) .....................................................................36

*Scott v. Nat'l Century Fin. Enters. Inc. (In re Balt. Emergency Servs. II, Corp.)*,
  432 F.3d 557 (4th Cir. 2005) .................................................................................9, 32

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Se. Waffles, LLC,*
    702 F.3d 850 (6th Cir. 2012) ............................................................4, 36

*Sec. Inv. Protection Corp. v. Ida Fishman Revocable Trust (In re Bernard L.
    Madoff Inv. Sec. LLC),*
    773 F.3d 411 (2d Cir. 2014).................................................................50

*Matter of Seidman,*
    37 F.3d 911 (3d Cir. 1994)...................................................................71

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
    403 F.3d 43 (2d Cir. 2005)..............................................................66, 72

*In re SI Restructuring Inc.,*
    714 F.3d 860 (5th Cir. 2013) ...............................................................84

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.),*
    337 B.R. 791 (Bankr. S.D.N.Y. 2005)..................................................55

*Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),*
    423 F.3d 166 (2d Cir. 2005).................................................31, 95, 102

*Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.)*
    346 B.R. 798 (B.A.P. 8th Cir. 2006).................................................4, 36

*Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon),*
    300 B.R. 57 (Bankr. N.D. Okla. 2003) .................................................37

*Stone v. Ritter,*
    911 A.2d 362 (Del. 2006) ....................................................................69

*In re Sunbeam Corp.,*
    284 B.R. 355 (Bankr. S.D.N.Y. 2002).............................................85, 91

*Tavenner v. Wells Fargo Bank (In re Ferguson),*
    No. 11-32141-KRH,
    2014 WL 1044897 (Bankr. E.D. Va. Mar. 18, 2014) ...........................37

*In re Taylor, Bean & Whitaker Mortgage Corporation,*
    No. 09-7047,
    2017 WL 4736682 (Bankr. M.D.Fla. 2017) .........................................51

*Telefest, Inc. v. VU-TV, Inc.,*
    591 F. Supp. 1368 (D.N.J. 1984) ...............................................45, 56, 57

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Teleservices Grp., Inc.*,
   No. 03-17230 (MBK),
   2009 WL 838157 (Bankr. D.N.J. Jan. 15, 2009) ....................................71

*In re The Brown Sch.*,
   368 B.R. 394 (Bankr. D. Del. 2007) ......................................................76

*Tilden v. Cunningham*,
   No. 2017-0837-JRS,
   2018 WL 5307706 (Del. Ch. Oct. 26, 2018) .........................................64

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005)...................................................................65

*In re Trans World Airlines, Inc.*,
   180 B.R. 389 (Bankr. D. Del. 1994) ......................................................46

*Travellers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*),
   134 F.3d 188 (3d Cir. 1998).............................................................38, 58

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*,
   906 A.2d 168 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007)...........70

*In re Trib. Co. Fraudulent Conv. Litig.*,
   No. 12-cv-2652 (RJS),
   2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ..............................................56

*In re Tribune Company Fraudulent Conveyance Litigation*,
   946 F.3d 66 (2d Cir. 2019).....................................................................51

*Trustee v. Casale* (*In re Phillips Group, Inc.*),
   382 B.R. 876 (Bankr. W.D. Pa. 2008) ..................................................36

*In re Ultimate Acquisition Partners, LP*,
   No. 11-10245 MFW,
   2012 WL 1556098 (Bankr. D. Del. May 1, 2012) .................................82

*In re Ultimate Escapes Holdings LLC*,
   682 F. App'x 125 (3d Cir. 2017) ...........................................................64

*In re Union Meeting Partners*,
   160 B.R. 757 (Bankr. E.D. Pa. 1993) ...................................................79

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes* (*In re STN Enters.*),
   779 F.2d 901 (2d Cir. 1985)............................................................ *passim*

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Verestar, Inc.*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) .................................................................66, 72

*VFB LLC v. Campbell Soup Co.*,
482 F.3d 624 (3d Cir. 2007) ........................................................................................34

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ..........................................................................................88

*Walker v. Sonafi Pasteur (In re Aphton Corp.)*,
423 B.R. 76 (Bankr. D. Del. 2010) ..............................................................................36

*In re Walt Disney Co. Deriv. Litig.* (*Disney II*),
906 A.2d 27 (Del. 2006) ...............................................................................................65

*In re Ward*,
36 B.R. 794 (D.S.D. 1984)............................................................................................59

*In re Weyandt*,
544 F. App'x 107 (3d Cir. 2013) ..................................................................................83

*Winer Fam. Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007)..........................................................................................18

*In re Women First Healthcare, Inc.*,
345 B.R. 131 (Bankr. D. Del. 2006) .............................................................................82

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) .............................................................................86

**Statutes**

6 Del. C. § 141(e) ................................................................................................63, 64

8 Del. C. § 102(b)(7) .....................................................................................................62

11 U.S.C. § 101(22)(A).............................................................................................50, 51

11 U.S.C. § 101(49)(A)(i)-(ii).....................................................................................50

11 U.S.C. § 330(a)(1) ....................................................................................................93

11 U.S.C. § 544............................................................................................................35, 49

11 U.S.C. § 546(e) ................................................................................................5, 49, 58

11 U.S.C. § 547(b)(2) ...................................................................................................77

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 547(c)(2)................................................................................................78, 79

11 U.S.C. § 547(c)(4)....................................................................................................78

11 U.S.C. § 548..............................................................................................................37

11 U.S.C. § 548(a)(1)(B)(ii)(II)....................................................................................46

11 U.S.C. § 548(a)(1)(B)(ii)(III)...................................................................................48

11 U.S.C. § 548(d)(2)(A)...........................................................................................4, 35

11 U.S.C. § 561(a)(1).....................................................................................................50

11 U.S.C. § 741(7).....................................................................................................49, 50

11 U.S.C. § 1107(a)........................................................................................................31

Cal. Civ. Code § 3439.03...............................................................................................35

Del. Code Ann. tit. 6, § 1303(a)....................................................................................35

N.J. Stat. Ann. § 25:2-24(a)...........................................................................................35

N.Y. Debt. & Cred. Law § 272(a).................................................................................35

**Rules**

Fed. R. Bankr. P. 9019(a) ...........................................................................................102

**Other Authorities**

COLLIER on BANKRUPTCY § 548.09 (15th ed. 1984)..............................................60

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection (the "Objection") to *The Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* [Dkt. No. 536] (the "Standing Motion") filed by the official committee of unsecured creditors (the "Committee").[1]

## PRELIMINARY STATEMENT

1.      The Committee's Standing Motion is the culmination of a months-long campaign—beginning pre-petition—to invalidate the Debtors' straightforward capital structure (and related plan distribution scheme) by attacking a March 2023 debt exchange transaction (the "March Exchange"). The March Exchange was accomplished in accordance with the terms of governing credit documents and involved the exchange of approximately $305 million of existing unsecured debt (due in 2024) for $275 million in secured notes (due in 2028). As a result of the liens granted in connection with the March Exchange (nearly a year before the filing of these bankruptcy cases), those secured notes now have priority recourse to the Debtors' assets. Specifically, the Debtors' approximately $305 million in face amount of senior secured debt[2] has first priority on the Debtors' approximately $400 million of distributable value (inclusive of the sale proceeds and

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Standing Motion and the *Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 615] (the "Plan") and the *Disclosure Statement Relating to the Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 614] (the "Disclosure Statement"). References to exhibits refer to exhibits to the *Declaration of Jeffrey R. Goldfine in Support of the Debtors' Objection to the Committee's Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* filed contemporaneously herewith (the "Goldfine Declaration"). As used herein, all references to sections refer to sections of the Bankruptcy Code, unless otherwise specified.

[2]     This number is comprised of the approximate $275 million of notes that were issued in exchange for the $305 million of unsecured notes and $30 million of notes that were issued for new money; it does not include the make-whole or any claim for interest.

cash on hand), ahead of approximately $1.2 billion of other prepetition funded unsecured debt. Accordingly, from the moment it was formed, the Committee has attacked the March Exchange in a desperate attempt to find valuable estate claims and causes of action where none exist and to gain leverage against the Debtors' largest secured creditor, Deerfield. Unfortunately, the Committee's desire to create value through litigation claims does not make the claims viable and, under the facts and circumstances of these cases, the Committee's ongoing crusade against Deerfield and the Debtors has only served to (1) deplete the limited estate resources available for distribution, and (2) threaten confirmation of the Debtors' proposed Plan, which secures near term recoveries in full to 94% of the Debtors' unsecured creditors—a significant concession contemplated by the TSA governing these chapter 11 proceedings.

2.      Much like its previous (unsuccessful) requests for "automatic" standing in the cash collateral order and attacks on the retention of Debtors' counsel, the Committee's Standing Motion fails on the merits and should be denied. The Committee seeks to upend the Plan based on meritless claims and causes of action that the Debtors have *already* resolved. The Committee— as an estate fiduciary with duties to *all* unsecured creditors, is essentially asking the Court to leave the estates without a viable path to exit chapter 11 and to eviscerate recoveries for 94% of the unsecured creditors that the Committee is supposed to represent. Worse yet, there simply are no factual or legal grounds for the Committee's attack. To the contrary, without even concluding its own investigation, the Committee's Standing Motion spews a series of unsubstantiated, false, and misleading allegations and then asks the Court to find that Invitae's experienced public company Board of Directors was grossly negligent in approving the March Exchange solely for the purpose of "crown[ing]" Deerfield as a secured lender. This is baseless. The record reflects that the Board—aided by experienced and disinterested third-party advisors—engaged in extensive arm's-

length negotiations with Deerfield, an unaffiliated third-party, and took actions consistent with the motivations of a public company Board to address near term maturities and create runway to execute on its business plan. The Committee's story simply does not (and cannot) support colorable claims or a finding that the Debtors have unjustifiably refused to prosecute estate claims. In short, there is no basis to grant this Committee the extraordinary remedy of standing in these cases.

### A.  There Are No Colorable Claims

3. *First*, the Proposed Claims the Committee seeks to prosecute are not colorable. The Committee attempts to paint the March Exchange as an "aggressive" liability management transaction that was done simply to benefit Deerfield. But this is pure fiction. Deerfield was neither Invitae's equity sponsor nor controlling shareholder; instead, at the time of the March Exchange, Deerfield was a third-party creditor holding the majority of Invitae's most imminently maturing unsecured debt. Following a robust process that included negotiations with multiple constituencies of creditors (including those that the Committee currently represents), the Company ultimately effected the contractually permitted, plain-vanilla March Exchange. The transaction reduced Invitae's debt, provided for significant maturity extension, and resulted in the infusion of new capital. And notably, the March Exchange was not done in secret. Because Invitae is a public company, all material facts about the transaction were publicly disclosed at the time of the transaction. And no creditors, including any holders of the 2028 Unsecured Notes the Committing is acting for, brought—or even meaningfully threatened to bring—litigation prior to these chapter 11 cases, when they (and not these estates) would have had to foot the bill for that litigation.

4. The March Exchange bears no resemblance to the types of transactions frequently attacked as "creditor-on-creditor" violence. To the contrary, it was an expressly permitted, open

3

and transparent up-tier of a limited amount of existing debt, on terms and conditions approved by a separate pricing committee of the Debtors' Board, to provide the breathing room the Debtors needed to pursue ongoing operational restructuring plans.  The March Exchange is the sort of transaction that any well-advised Board in the Debtors' position dutifully exploring options permitted by their debt documents would have—and should have—undertaken in the same circumstances.  If this arm's-length debt-exchange can be challenged successfully based on the sort of conspiracy theories floated by the Committee, it is difficult to envision how *any* liability management transaction will survive scrutiny going forward.

5.      Unable to allege **any** contractual prohibition implicated by the March Exchange, the Committee asserts claims of fraudulent transfer—both constructive and intentional—and in doing so asks this Court to make extraordinary findings that contradict the clear, unremarkable facts of these cases.  The Committee cannot show that Invitae received anything less than reasonably equivalent value in connection with the March Exchange because Invitae received *more* than dollar-for-dollar value in connection with the exchange of $305 million of unsecured debt for $275 million of secured debt.  Dollar-for-dollar satisfaction of existing debt is the hornbook definition of reasonably equivalent value.[3]  Moreover, besides receiving *better than*

---

[3]     *See, e.g.*, 11 U.S.C. § 548(d)(2)(A) (satisfaction or securing of existing debt constitutes "value"); *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1145 (9th Cir. 2013) ("[P]ayment of a preexisting debt is value, and if the payment is dollar-for-dollar, full value is given."); *In re Se. Waffles, LLC*, 702 F.3d 850, 857 (6th Cir. 2012) ("Typically, a dollar-for-dollar reduction in debt constitutes—as a matter of law—reasonably equivalent value for purposes of the fraudulent-transfer statutes."); *Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.*) 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006) ("For purposes of fraudulent transfer analysis, value includes the satisfaction of an antecedent debt."); *In re Louisiana Pellets, Inc.*, 838 Fed. App'x 45, 50 (5th Cir. 2020) (per curiam) ("When a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt, however, the question is easy because the debtor by definition receives reasonably equivalent value—indeed, *exactly* equivalent value, assuming, of course that the debt itself was based upon value."); *In re Amcad Holdings*, 579 B.R. at 41 ("A transfer made by a Debtor to reimburse a party for a pre-existing obligation, without further explanation, does not show a lack of reasonably equivalent value.").  For the same reason, the Committee's attempt to avoid the August 2023 transaction also fails.  There, Invitae exchanged, dollar-for-dollar, $17.2 million of unsecured debt for less than $17.2 million of equity.  Again, that is reasonably equivalent value as a matter of law.

reasonably equivalent value in terms of the debt exchange, Invitae also received $30 million of new money and 4.5 years of runway through a maturity extension.  Invitae was also not insolvent or rendered insolvent as a result of the March Exchange, both because its assets exceeded its liabilities, and because it maintained cash and cash equivalent on hand in excess of $170 million (and more than $85 million of accounts receivable and another $217 million of marketable securities) as of March 31, 2023, more than enough to pay its debts when due and, as it turns out, to engage in an organized restructuring of its operations including through this chapter 11 process. And even if the Committee could adequately plead a constructive fraudulent transfer claim—and it cannot—it would be barred by the safe harbor under Section 546(e).

6.    The Committee also identifies no evidence—because there is none—of any intent to hinder, delay, or defraud creditors.  This defeats the actual fraudulent transfer claims. The lynchpin of the Committee's actual fraud claim is that Invitae preferred Deerfield over its other creditors.  Even if true (and it is not), such allegations fail to state a claim for actual fraud as a matter of law because granting a lien on existing debt in exchange for less debt—among other things—is not fraudulent even if a group of creditors is "preferred" over another.  *See, e.g.*, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995).  Indeed, whenever a company adds a limited amount of secured debt to its balance sheet under a permitted basket—or in Invitae's case, utilizing uncapped capacity under its existing indentures—there will *always* be a subset of creditors who benefits.  This does not give rise to an actual fraudulent conveyance claim. Moreover, here there is ample evidence that the Invitae Board engaged with many stakeholders over the course of more than four months to garner the best possible terms available.  And, there is absolutely no evidence of any Board member (or anyone else at Invitae) having ties to Deerfield or any other motive to "crown" Deerfield as a preferred creditor other than the simple fact that

Deerfield's notes matured *four years earlier* than the notes held by the majority of the unsecured creditors the Committee represents.

7.      The Committee's fiduciary duty claims with respect to the March Exchange likewise fail for several reasons:  (1) they are exculpated in Invitae's charter; (2) there is a robust record reflecting that the Board acted in good faith at all times; and (3) the Board was advised by multiple experienced advisors in exercising its business judgment.  The Committee's attempt to second guess the Board's business judgment does not create colorable claims.  In fact, the Committee's suggestion that rather than pursue the March Exchange, the Board should have simply shut down the company, fired all employees, and immediately liquidated to maximize cash recoveries to the unsecured noteholders, would be far more likely to give rise to fiduciary claims than the Board's effort to navigate a startup biotech company through a difficult market.  The Committee's hindsight and inflammatory rhetoric does not convert responsible governance into grounds for a fiduciary duty claim.

8.      Besides the March Exchange, the Committee also takes aim at certain transactions executed in the lead up to the chapter 11 filings.  First, the Committee seeks to avoid as a fraudulent conveyance a consent fee paid to Deerfield under the second supplemental indenture that permitted the divestiture of certain business lines.  This claim fails as a matter of law as Invitae received more in value from the consent than the $2.1 million consent fee, namely: Invitae received up to $65 million in consideration for the divestitures and also saved $140 million in annualized costs.  Second, the Committee contends that retention payments made to certain executives prior to the filing of the chapter 11 cases should be avoided as fraudulent transfers or preferences and that the Board breached its duty of loyalty in approving such retention bonuses.  These claims fail as well.  The retention payments were approved by disinterested members of the Board's Compensation

Committee, who did not stand to personally benefit from such payments in any way.  And the payments were a prudent exercise of the directors' business judgment, as they were intended to maximize value by ensuring continuity of leadership once it became clear that the Debtors would need to pursue a sale of substantially all their assets to an unknown third-party buyer through a chapter 11 process.  Responsible boards of directors often take steps to ensure retention and active engagement of key executives, and the results show Invitae's Board got it right:  the Debtors— and all of their stakeholders—received immense value from the retention payments as they enabled the $239 million sale to Labcorp, a transaction that would have been impossible without the efforts of the Debtors' key executives.

**B.  The Debtors Did Not Unjustifiably Refuse to Prosecute Claims**

9.      *Second*, the Committee cannot show that the Debtors unjustifiably refused (or in fact refused *at all*) to pursue the Proposed Claims.  To the contrary, the Debtors established a Special Committee, led by a newly appointed disinterested director who investigated the claims. And the Debtors did not simply toss the claims away, as the Committee asserts.  Rather, the Debtors engaged in hard-fought negotiations with Deerfield and extracted significant, value-maximizing concessions in connection with the TSA, which formed the basis for the Plan.  Among other things, the Debtors obtained:  (1) Deerfield's consent to use cash collateral to fund these cases; (2) agreement on the framework and milestones for the sale and auction process that resulted in a sale of substantially all of the Debtors' assets; (3) the ability of Deerfield to credit bid in connection with the auction, which drove up the sale price by approximately $60 million; (4) Deerfield's commitment to ensure that administrative claims would be paid in full (an estimated $70+ million) ahead of the recoveries of secured creditors and funding (of up to $15 million) would be available to responsibly wind down the Debtors' estates and facilitate the

Debtors' emergence from chapter 11; and (5) Deerfield's commitment to ensure the payment in full of certain unsecured creditors, including certain creditors holding claims against Invitae's subsidiaries and those holding claims less than $250,000 by amount or election.[4]  The Debtors were determined to extract maximum settlement value, resolve all potential estate claims and causes of action, and ensure a cost-effective and value-maximizing chapter 11 process as part of the overall negotiated terms of the TSA.  The Debtors achieved these goals despite having very limited leverage.  Among other things, the Debtors insisted throughout negotiations that Deerfield "pay the freight" of a chapter 11 process—and Deerfield made valuable concessions to do so—even before either party knew what ultimate distributable value would be.

10.     As part of their calculus and in the exercise of their business judgment, the Debtors also carefully considered the costs of litigating the Proposed Claims on behalf of the estate and determined the expense would be extraordinary.  The estimated multi-million-dollar price tag of pursuing the Proposed Clams has not changed, and yet the Committee fails to provide any indication of how it intends to pay for the litigation it seeks to pursue, especially given the finite pool of distributable assets resulting from the sale.  Moreover, beyond the monetary cost of litigating the Proposed Claims, holding up the distribution of funds pending lengthy litigation is extremely costly to all the Debtors' stakeholders, including the hundreds of unsecured creditors set to recover in full under the Plan.

11.     In short, the Committee should be not granted standing to litigate the meritless Proposed Claims where the Debtors have extracted tangible, near-term value that will benefit the overwhelming majority of stakeholders in these cases.  The Committee, on the other hand,

---

[4]     These payments to unsecured creditors in classes 4 and 5 of the Debtors' pending Plan are currently estimated to cover payments of approximately $17.2 million in value to nearly 400 (94%) in number of general unsecured claims asserted against the Debtors.

irresponsibly trumpets a fictional alternative plan that seeks to further deplete estate value on a long road to nowhere. The Committee's alternative plan is based on fundamentally flawed assumptions that vastly overstate the distributable value available to pay the Debtors' creditors, rendering it unconfirmable and making clear that the Debtors' plan is the best, and only, viable option for confirmation in these cases.

### C.   There is No Basis to Grant the Committee Settlement Authority

12.      *Third*, the Committee's request for "exclusive" authority to settle the Proposed Claims lacks any legal basis and should be rejected. The Bankruptcy Code gives settlement authority to the Debtors—while ensuring that creditors have a right to be heard before any such settlement is approved—for good reason. Here, the record reflects a robust process conducted by an actively engaged and well-advised Special Committee in assessing all estate claims and causes of action in conjunction with negotiating and prosecuting the sale of the Debtors' assets *and* a proposed Plan that maximizes and allocates distributable value to nearly all of the Debtors' stakeholders in a manner consistent with the Bankruptcy Code's priority scheme. The fact that a subset of the Committee's stakeholders does not like their position in the Debtors' capital structure is not grounds to disregard these efforts—or to substitute the Committee's judgment for that of the Debtors' eminently qualified Board of Directors. Of course, the Committee retains all of its rights to object to the proposed resolution embodied in the Debtors' Plan at the confirmation hearing scheduled for July 22, 2024. The Committee should not, however, be entitled to preemptively veto a proposed settlement and derail the Debtors' Plan before this Court considers confirming it.

*       *       *

13.      It is well established that the granting of standing is the "exception rather than the rule," *Scott v. Nat'l Century Fin. Enters. Inc. (In re Balt. Emergency Servs. II, Corp.)*, 432 F.3d 557, 560 (4th Cir. 2005), and should only occur when the Bankruptcy Code's "envisioned scheme

9

breaks down," *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003).   Here, the Debtors have dutifully upheld their obligations to maximize value despite difficult circumstances and stand poised and ready to distribute that value in accordance with the Bankruptcy Code's priority scheme.   There has been no "break[] down" and, accordingly, there is no justification for granting standing to the Committee in these cases.   To the contrary, giving the Committee license to pursue meritless claims would result in substantial and unjustifiable harm to these estates and the Debtors' ability to make distributions to all stakeholders.   Accordingly, for these reasons and as explained in more detail below, the Debtors respectfully request that the Court deny the Standing Motion.

## **BACKGROUND**

### A.      **Company Background and Governance**

14.      Invitae was founded by Randy W. Scott and Sean E. George in 2012, to bring mainstream medical-grade genetic testing to the public and to provide healthcare providers with patients' genetic makeup to inform important healthcare decisions.   *Declaration of Ana Schrank, Chief Financial Officer of Invitae Corporation, in Support of Chapter 11 Filing, First Day Motions, and Access to Cash Collateral* [Dkt. No. 21] ¶ 18.   Invitae was incorporated in the State of Delaware under the name Locus Development, Inc. and changed its name to Invitae Corporation in 2012.   *Id.*   That same year, Invitae (hereinafter the "Company") separated from Genomic Health, Inc. and became an independent entity.   *Id.*

15.      The Debtors offer genetic tests across several clinical areas, including hereditary cancer, precision oncology, and rare diseases.   [Dkt. No. 21 ¶ 19.]   The Debtors make available critical and potentially life-saving genetic data that guide patients in making informed medical decisions and evaluating their health and wellness throughout their lifetime.   *Id.*   For example, patients who have no family history of genetic disease or past record of health issues often do not

think to actively monitor or preemptively treat certain diseases, despite their actual underlying risk of developing a potentially fatal illness. *Id.* However, genetic testing offered by the Debtors can detect patients' predispositions for certain fatal illnesses, and can therefore monitor and treat them before any physical symptoms arise. *Id.* This ultimately can help save patients' lives without the need for more invasive and expensive medical treatments. *Id.*

16.    The Debtors' Board of Directors consists of nine individuals.[5] Eight out of those nine are independent within the meaning of the listing standards of the New York Stock Exchange, and seven of the nine are fully outside directors.[6] The Board's members are a carefully selected group of highly accomplished individuals who provide an extensive range of expertise related to finance, healthcare, business management, technology, and engineering[7]:

- ***Randy Scott, Ph.D., Chairperson of the Board.*** Dr. Scott is a co-founder of the Company and served as chairman of the Board and chief executive officer from 2012 to 2017 and executive chairman from 2017 to 2019. Dr. Scott serves as a director of multiple public and private life companies in the life sciences industry. Dr. Scott holds a B.S. in Chemistry from Emporia State University and a Ph.D. in Biochemistry from the University of Kansas.

- ***Eric Aguiar, M.D.*** Dr. Aguiar has been a member of the Board since September 2010. He is a partner at Aisling Capital, an investment firm specializing in products, technologies, and global health businesses. Dr. Aguiar serves and has served as a director of multiple public and private companies in the life sciences industry. He received an M.D. with honors from Harvard Medical School and a B.A. in Arts and Sciences from Cornell University. Dr. Aguiar is also a member of the Council on Foreign Relations, and is a Chartered Financial Analyst.

- ***Geoffrey S. Crouse.*** Mr. Crouse has served on the Board since March 2012. Mr. Crouse has served as CEO of Candela Corporation, a non-surgical aesthetic device company since July 2017, and prior to that served in executive roles (including CEO) for various companies in the biopharmaceutical and life sciences industry. Mr. Crouse holds a

---

[5]    Invitae Leadership, *Board of directors*, https://ir.invitae.com/governance/board-of-directors/default.aspx.

[6]    *See* Invitae Corp., April 19, 2023 Proxy Statement, at 6.

[7]    *See* Invitae Leadership, *Board of directors*, *supra* note 5.

B.A. in English and Japanese from Boston College and an MBA and MPH from the University of California, Berkeley.

- **_Jill Frizzley._** Ms. Frizzley currently serves as the president of Wildrose Partners LLC, an independent consulting company providing governance and related advisory services to corporations. Previously, Ms. Frizzley served as counsel at the law firm of Weil, Gotshal & Manges LLP. Ms. Frizzley serves and has served as a director on numerous public and private boards of directors, including Proterra Inc., iMedia Brands, Inc., Virgin Orbit Holdings, Inc., Surgalign Holdings, Inc., Avaya Holdings Corporation, Hudson Technologies, Inc. and Vivus, Inc. Ms. Frizzley holds a BSc degree from the University of Alberta and an LLB degree from the University of Toronto Faculty of Law.

- **_Christine M. Gorjanc._** Ms. Gorjanc has served on the Board since November 2015. She is an experienced financial executive with expertise gained through service as a CFO or senior financial executive for a number of multinational public companies, including Arlo Technologies, Inc. and Netgear, Inc., Aspect Communications Corporation, Tandem Computers, Inc., and Xidex Corporation. She also spent eight years in public accounting with a number of public accounting firms. Ms. Gorjanc has served as a director on the boards of Shapeways Holdings, Inc., Juniper Networks, Inc., and Zymergen Inc. Ms. Gorjanc holds a B.A. in accounting from the University of Texas at El Paso and an M.S. in taxation from Golden Gate University. In April 2022, Ms. Gorjanc achieved NACD Directorship Certified status (National Association of Corporate Directors).

- **_Ken Knight._** Mr. Knight is Invitae's president and CEO and was appointed to the board in 2022. Mr. Knight previously served as Invitae's COO from June 2020 to July 2022. Prior to joining Invitae, he served senior executive roles at Amazon.com, Inc., Caterpillar Inc. and General Motors Company. Since June 2021, Mr. Knight has served as a director and a member of the audit and finance committee of Simpson Manufacturing Co. Inc. Mr. Knight holds a B.S. in Electrical Engineering from the Georgia Institute of Technology and an M.B.A from the Massachusetts Institute of Technology.

- **_Kimber Lockhart._** Ms. Lockhart has been on Invitae's Board since 2020. She currently serves on the boards of a number of private and public companies. Previously, Ms. Lockhart served in various senior roles at One Medical. Ms. Lockhart holds a B.S. in Computer Science from Stanford University.

- **_Chitra Nayak._** Ms. Nayak serves as the environmental, social and governance (ESG) lead of the Board. She has served as a director on the boards of Infosys Limited, LifeWorks Inc., Intercom, and UrbanFootprint. Previously Ms. Nayak served as COO or in other senior roles at Comfy, Inc., Funding Circle Ltd., Salesforce, Inc., the California State Automobile Association, Charles Schwab Corporation, and Boston Consulting Group. Ms. Nayak holds a B.S. in Engineering from the Indian Institute of Technology, an M.S. in Environmental Engineering from Cornell University, and an MBA from Harvard Business School (with honors).

- ***William H. Osborne.***  Mr. Osborne has been a member of the Board since January 2023 and serves on the Audit Committee.  He has served in senior roles at Boeing, Navistar, Inc., and Federal Signal Corporation.  He has served on the boards of Quaker Chemical Corporation, and Armstrong World Industries, Inc.  Mr. Osborne holds a B.S. in Mechanical Engineering from Kettering University, an M.S. in Engineering from Wayne State University, and an MBA from University of Chicago.

17.     The Board maintains an active Audit Committee, Compensation Committee, and Nominating and Governance Committee.

**B.     The Debtors' Business Expansion and Debt Funding**

18.     In the years after it was founded, Invitae was focused on growing its business, including through acquisition.  Between 2019 and 2021, pursuing diversification and growth in their business, the Debtors sought to capitalize on several promising market opportunities, and made thirteen acquisitions over the course of three years; the Committee lists these acquisitions in its Proposed Complaint at Appendix A.

19.     The Debtors' strategy of diversification and growth through acquisition required substantial capital, which was largely funded through debt.

20.     First, in September 2019, Invitae issued $350 million of convertible unsecured notes set to mature on September 1, 2024 (the "2024 Unsecured Notes," held by "2024 Unsecured Noteholders").  Compl. ¶ 44.  One group of unsecured lenders led by Deerfield Partners LP ("Deerfield") has held the majority of the 2024 Unsecured Notes since at least August 2022.  *Id.*

21.     Second, in October 2020, Invitae obtained a $135 million first lien term loan (the "Term Loan") from affiliates of Perceptive Advisors.  Compl. ¶¶ 47, 50.  The Term Loan was set to mature on June 1, 2024, and included a prepayment premium of 4-6%, depending on when prepayment was made.  *Id.* ¶ 47.

22.     Third, in April 2021, Invitae issued $1.15 billion in unsecured notes that mature on April 1, 2028 (the "2028 Unsecured Notes," held by "2028 Unsecured Noteholders").  Compl.

13

¶ 49.   There were three primary investors in the 2028 Unsecured Notes: SB Northstar LP ("SB Northstar"), Baker Brothers Investments ("Baker Brothers"), and Chimera Investments.  *Id.*

### C.   The Market Environment During the Relevant Time Period

23.   At the time of its founding, Invitae was a growth-stage biotechnology company, with a mission to "bring comprehensive genetic information into mainstream medical practice to improve the quality of healthcare for billions of people."  Ex. 3 (2020 Invitae Form 10-K) at 3. Invitae's business model required significant capital and envisioned achieving profitability only after many years of growth.  *Id.*  Thus, while the Company's revenue continued to grow each year, Invitae was not yet generating a profit by the time of the events alleged in the Complaint.  *Id.* at 15; Compl. ¶¶ 43-51.  That Invitae expected to experience years of loss before scaling to the point of profitability was no secret: "[w]e expect to continue incurring significant losses, and we may not successfully execute our plan to achieve or sustain profitability."  Ex. 3 (2020 Invitae Corp. Form 10-K) at 15.  The same was true of Invitae's plan to grow through acquisitions, as well as the fact that those acquisitions presented significant execution and other risks.  *Id.*  ("We have acquired and may continue to acquire businesses or assets . . . that could harm our operating results . . . or cause us to incur debt or significant expense.").

24.   These risk and uncertainties were well known to the holders of the 2024 and 2028 Unsecured Notes that the Committee represents when they made their investments.  Indeed, by the time Invitae issued the 2028 Unsecured Notes in April 2021, it had completed or announced ten of the thirteen acquisitions identified by the Committee in its Complaint, for which the Committee alleges the Company paid $2,928,208,000 in consideration, or nearly 90% of the $3,299,608,000 in consideration that the Company paid for all the acquisitions listed in the Complaint.  *Compare* Compl. Appendix A (listing acquisitions, with ten through April 2021), *with id.* ¶ 49 (2028 Unsecured Notes issued April 8, 2021).

25.     As a growth-stage company, Invitae's high operating leverage made it increasingly vulnerable to economic and business cycle swings, particularly during a time when the genetic testing industry as a whole was experiencing increased competition.    [Dkt. No. 21 ¶ 58.] In addition, adverse macroeconomic developments, including inflation, slowing growth, and rising interest rates, resulted in disruptions and volatility in global financial markets, increased rates of default, and decreased business and consumer spending, all of which placed pressure on the Debtors' business and financial condition.    *Id.* ¶ 59.    Generally, under difficult economic conditions, consumers seek to reduce discretionary spending, meaning that many patients would choose to forgo tests like those offered in the Debtors' product portfolio; this decreased demand for elective genetic tests negatively affected the Debtors' overall financial performance.    *Id.* ¶ 60. At the same time, the adverse economic conditions in the marketplace also increased the costs of operating for the Debtors' business, including vendor, supplier, and workforce expenses, and had a substantial impact on the Debtors' access to capital as well as increasing its cost of capital.    *Id.* ¶ 59.

26.     The market impacts were not limited to the Debtors; biotechnology valuations began to decline industrywide in 2021 and have continued to slide since then.    In addition to the adverse economic conditions described above, the market experienced a general shift, to valuing profitability over growth, which impacted the stock price of emerging biotechnology companies

(including the Debtors) and their ability to access additional capital.  Analyst reports reflect this

shift in market priorities,[8] as do the stock prices of Invitae and its peers[9]:



### D.    The Debtors Pursue Operational Restructuring Measures and Explore Transactions With Experienced Advisors

27.    To address these adverse market conditions, Invitae's management proposed an

expense reduction and realignment plan in July 2022, known as "Project Genesis," which would

re-focus the Company's core to support growth.  Compl. ¶ 59.  Through Project Genesis, the

---

[8]    *See* Ex. 50 (Julia Qin, Jan. 6, 2023 J.P.Morgan Report, *Growth Life Science Tools & Diagnostics*, North America Equity Research) at 1-2 ("Growth Life Science Tools & Diagnostics experienced a rough 2022 with macro headwinds and idiosyncratic execution challenges pressuring both growth trends and valuation levels . . . . Genetic Analysis companies . . . saw an average of 1.6x sales multiple compression from pre-pandemic levels."); Ex. 49 (D. Leonard et al., Wells Fargo, Oct. 15, 2021 Industry Update) ("Rising interest rates and the growth to value rotation are especially unfriendly to emerging growth diagnostics stocks.").

[9]    Source:  Bloomberg Finance L.P.  The Bloomberg Genetic Analysis Valuation Peers index, maintained by Bloomberg Intelligence, is comprised of life science and genetic testing companies with similar missions and strategies to Invitae, and includes Guardant Health Inc., Exact Sciences Corp., Natera Inc., 23&Me Holding Co, and GeneDx Holdings Corp., among other life sciences companies.

Debtors implemented cost reduction programs aimed at shifting operational and commercial efforts to the higher-margin, higher-growth testing opportunities in the hereditary cancer, precision oncology, and rare diseases business lines. *Id.*; [Dkt. No. 21 ¶ 6]; Ex. 10 (July 16, 2022 Invitae Form 8-K). Among other things, the Company's realignment included (1) converging the company focus by shrinking international business and evaluating certain product exits; (2) improving gross margins to increase profitability; and (3) lowering operating expenses to address cash burn. *Id.* The strategic realignment included lab and office space consolidation, elimination of business activities and services, decrease in other operating expenses, reduction in workforce of approximately 1,000 FTEs, and reduced international footprint, which together were expected to result in approximately $326 million in annual cash savings. *Id.* By the end of 2022, these efforts were proving successful: ███████████████████████████████████████ ███████████████████████████████████████ Ex. 23 (February 2023 Board Monthly Business Review) at 27.

### E.    The Debtors Manage Their Liabilities to Address Looming Maturities

28.    The Project Genesis prioritization was intended, in part, to put the Company on the best footing possible as it began engaging in negotiations with its stakeholders to address the Company's potential liquidity issues.

29.    In the Spring of 2022, Invitae's Board hired experienced independent advisors to proactively address the Company's potential liquidity strain. Invitae engaged with J. Wood Capital ("J. Wood") and Perella Weinberg Partners ("Perella") for advice on potential restructuring opportunities with creditors that would extend the Company's nearest-term debt maturities, and in particular the 2024 Unsecured Notes, since that looming maturity date gave the Debtors the least amount of time to weather macroeconomic headwinds. Ex. 18 (June 3, 2022 Board Minutes) (referenced in Compl. ¶ 57).

30.     In late summer 2022, the Debtors engaged with Goldman Sachs to hold additional discussions with the Debtors' creditors regarding potential transactions involving either or both of the 2024 and/or 2028 Unsecured Notes.  Compl. ¶ 63.  The goal of these potential transactions was to address the maturities that were coming up in 2024:  the Company's $135 million Term Loan, due June 1, 2024, and the Company's $350 million Senior Unsecured Notes due September 1, 2024.  *Id.* ¶¶ 62, 63.  At the same time, the Company sought additional capital to increase its cash runway toward profitability while continuing to execute operational changes, although it had to weigh that interest carefully against potential shareholder dilution.

31.     Throughout January and February of 2023, the Debtors and their advisors continued to evaluate interest from creditors in a transaction involving their outstanding debts.  Ex. 21 (January 20, 2023 Finance Committee Meeting Minutes); Ex. 26 (February 10, 2023 Finance Committee Minutes).  They solicited feedback from investors and considered alternative transactions from a stockholder value perspective, informed by receptivity observed and feedback received from sources of, and potential participants in, potential alternative transactions.  *Id.*  Still, addressing the 2024 debt maturity overhang remained at the forefront of the Debtors' priority list.  Ex. 22 (January 26, 2023 Board Presentation) (referenced in Compl. ¶ 81).[10]

32.     Given the need for options to extend the Company's operational runway, at the end of 2022, the Debtors directed J. Wood to refocus its efforts with Deerfield, holder of the majority of the 2024 Secured Notes due September 1, 2024, and resume negotiations that had begun in the summer.  Ex. 22 (January 26, 2023 Board Presentation) (referenced in Compl. ¶ 81).  By early

---

[10]   These documents, as with all board materials relied on in the Committee's Complaint, are incorporated by reference and thus proper to consider even under a 12(b)(6) standard.  *See, e.g.*, *Winer Fam. Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007) (courts determining motion to dismiss consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") (citation omitted).

2023, Deerfield had provided the only proposal that would adequately address this issue without unnecessarily exorbitant shareholder dilution.  *Id.*

33.     To help evaluate a potential debt exchange transaction with the 2024 Unsecured Noteholders, the Board formed a pricing committee (the "Pricing Committee") comprised of Randy Scott, Christine Gorjanc, and Eric Aguiar, to which the Board delegated the authority to determine the number of notes and shares to be issued, the conversion price for the new notes, the exercise price of certain warrants, and the power to negotiate the terms and conditions of the Exchange.  Compl. ¶ 101.

34.     In February 2023, leading up to the approval of the March Exchange transaction, the Company Board and its Pricing and Finance Committees engaged in a robust governance process, holding eight meetings to consider transaction alternatives from unsecured noteholders and ultimately to finalize the March Exchange terms in a manner that was most beneficial to the Company's stakeholders.  Third-party advisors from J. Wood were present at multiple of those meetings to provide reports on and engage in detailed discussions regarding terms for the potential transaction.  *E.g.*, Ex. 26 (February 10, 2023 Finance Committee Minutes), Ex. 29 (February 25, 2023 Board Minutes (referenced in Compl. ¶ 98).

35.     Along with obtaining cost savings through Project Genesis, pushing out the 2024 maturities was a critical step in the Company's plan for obtaining additional liquidity, weathering the adverse market conditions and putting the Company on the path to profitability.  To that end, the Debtors expressly envisioned accessing liquidity via an at-the-market offering (the "ATM") once it had successfully extended most of its debt due in 2024.  Ex. 22 (January 26, 2023 Board Presentation) (referenced in Compl. ¶ 81).  For example, J. Wood and Perella expressly advised the Company's Board that utilizing the ATM to obtain liquidity was a "Must Do," and stated:

> *We believe announcement of the 2024 exchange will remove a significant overhang on the company and will open options for the company going forward (e.g., ATM program) while retaining flexibility to turn to the 2028s at the right time*.

Ex. 30 (February 25, 2023 Board Presentation) (referenced in Compl. ¶ 98).  Thus, pushing out the 2024 maturities and accessing capital via the ATM was crucial to shoring up the Company's finances while they continued executing operational changes during a challenging period.

36.     In contrast with its negotiations with Deerfield, Invitae's negotiations with holders of the 2028 Unsecured Notes did not progress in a way that would address *either* of the Company's most pressing issues—*i.e.*, its need to extend the looming 2024 maturities, or its desire to raise additional capital.  In particular, and as the Committee's Proposed Complaint acknowledges, the proposal made by the 2028 Unsecured Noteholders in late 2022 and early 2023 prioritized reducing the outstanding amount of 2028 notes (not set to mature for *five years*).  Understandably, this long-dated debt was not nearly as high on the Company's list of priorities as the need to deal with the more than $485 million in debt coming due by September 2024.  Compl. ¶ 60.  Indeed, the Company's advisors specifically indicated that access to capital would be difficult without addressing the 2024 debt overhang.  Ex. 30 (February 25, 2023 Board Presentation) (referenced in Compl. ¶ 98).[11]

37.     Despite these negatives, the Board devoted significant discussion to the proposed transaction involving the 2028 Unsecured Notes.  On February 24, 2023, the Finance Committee of the Board met to discuss the proposed transaction.  Ex. 28 (February 24, 2023 Finance Committee Minutes).  The Finance Committee noted that the proposed transaction failed to

---

[11]   Analysts did likewise.  *See* Ex. 51 (July 26, 2022 Cowen Equity Research, *Invitae Corp.*) ("[We] forecast a $200M equity raise in '24 at $2.50/share (to support ongoing burn/investment), enabling YE24 cash of $190M and YE25 of $104M.  A critical assumption over the next three years is NVTA successfully refinances its two 2024 maturities: the June 2024 $135M term loan secured by a first priority lien, and the September 2024 $350M convertible bond.").

provide terms that were better than the previously declined proposals from the 2028 Unsecured Noteholders; that extending the 2024 Notes maturity provided a "substantially greater benefit" than securing the 2028 Unsecured Notes; and that there was a "higher hurdle on stockholder approval for the Potential 2028 Notes Restructuring due to expected dilution in excess of authorized capital." *Id.* The Committee then requested that the Company meet with financial advisors for a detailed analysis and recommendation. *Id.*

38.     On February 25, 2023, J. Wood provided a detailed report and advised on the transaction proposed by 2028 Unsecured Noteholders. Ex. 29 (February 25, 2023 Board Minutes) (referenced in Compl. ¶ 98). Comparing the proposal to the transaction being negotiated with the holders of the 2024 Notes, J. Wood advised the Board regarding (i) the "various risks, particularly . . . substantially greater near-term dilution," posed by the 2028 Unsecured Noteholder proposal; (ii) the "substantially greater benefit of extending the term of the 2024 Notes . . . as opposed to the 2028 Notes"; (iii) the "expectation that addressing the 2024 Notes first [would] allow the [Company] to address its balance sheet challenges in an orderly manner with the prospect of building value and momentum"; and (iv) "the fact that the 2028 Notes represent[ed] relatively low cost funding . . . ." *Id.* Ultimately, "representatives of J. Wood . . . provided the Board with a recommendation to move forward with the Proposed 2024 Notes Restructuring (in lieu of a potential 2028 Notes Restructuring and also in lieu of potentially stalling the Proposed 2024 Notes Restructuring to pursue discussion with respect to a Potential 2028 Notes Restructuring)." *Id.*

39.     On February 28, 2023, after extensive discussions and negotiations, the Debtors entered into purchase and exchange agreements with multiple holders of the outstanding 2024 Unsecured Notes (the "March Exchange"). Through the March Exchange, the Debtors exchanged $305.7 million of 2024 Unsecured Notes for $275.3 million of the 4.5% Series A Convertible

Senior Secured Notes due March 2028 and 14.2 million shares of common stock, and issued and

sold to the participating 2024 Unsecured Noteholders $30 million of the 4.5% Series B Convertible

Senior Secured Notes due March 2028 (collectively with the Series A Convertible Senior Secured

Notes, the "Secured 2028 Notes," held by the "Secured 2028 Noteholders"), in exchange for cash.

Compl. ¶ 96.

40.    The March Exchange was open to virtually all of the 2024 Unsecured Noteholders,

with the vast majority of holders ultimately participating—including Baker Brothers, one of the

key holders of the 2028 Unsecured Notes now represented by the Committee.  Ex. 31 (February

28, 2023 Pricing Committee Discussion Presentation); Mot. ¶ 44 n.12.  Through the March

Exchange, the Debtors addressed approximately 96% of their 2024 debt obligations.[12]  Notably,

the March Exchange also provided for $245 million in additional first lien secured capacity, to

allow the Company to obtain additional capital in the debt markets if necessary.[13]

41.    After the March Exchange, the Debtors continued to negotiate with stakeholders to

address what little remained of the 2024 maturity overhang.  Approximately five months later, in

August 2023, Invitae further reduced its liabilities and extended its runway to achieve positive

cash flow.  Compl. ¶ 121.  On August 22, 2023, the Debtors entered into a Supplemental Indenture,

dated as of August 22, 2023, with Deerfield (the "First Supplemental Indenture"), pursuant to

which the Company eliminated $17.2 million in debt from its balance sheet that otherwise would

have matured in 2024, by exchanging $17.2 million aggregate principal amount of 2024 Unsecured

---

[12]    *Invitae Announces Convertible Notes and Share Exchange and New Convertible Notes Issuance,* Invitae
(Feb. 28, 2023),    available    at    https://ir.invitae.com/news-and-events/press-releases/press-release-
details/2023/Invitae-Announces-Convertible-Notes-and-Share-Exchange-and-New-Convertible-Notes-
Issuance/default.aspx (referenced in Compl. ¶ 95).

[13]    *See* Ex. 47 (March 8, 2023 Invitae Form 8-K, Exhibit 4.1 (Indenture)) §§ 2.01, 2.12.

Notes for $0.1 million aggregate principal amount of 2028 Secured Notes and 15.8 million shares of the Company's common stock (the "August Exchange").  *Id.*

**F.     The Company Continues to Face Financial Headwinds and Divests Unprofitable Business Lines**

42.     Notwithstanding its robust efforts to restructure its balance sheet, manage its liabilities, and pave the way to profitability, the Company continued to face financial headwinds. Invitae continued to face leverage challenges and a sustained decline in its stock price that further limited its ability to raise capital.  [Dkt. No. 21 ¶ 8.]  In the fall of 2023, the Debtors retained strategic advisors to help the Company evaluate restructuring options.  On September 1, 2023, Invitae retained Moelis & Company ("Moelis") to assist with certain investment banking services in connection with any potential financing and restructuring.  Compl. ¶ 117.  Invitae subsequently expanded Moelis' scope of services to include certain investment banking services in connection with a potential sale of Invitae.  [Dkt. No. 21 ¶ 71.]  On September 22, 2023, Invitae retained Kirkland & Ellis LLP ("K&E") as restructuring counsel to assist with these restructuring efforts. Compl. ¶ 126.  On September 26, 2023, Invitae expanded the scope of services of another one of its outside advisors, FTI Consulting, Inc. ("FTI") to support its finance and accounting functions in the development of long-range financial projections and related scenario analyses.  [Dkt. No. 21 ¶ 71.]  FTI also supported operational decision making, due diligence for a sales process, and contingency planning for a possible restructuring and other various strategic alternatives.  *Id.*

43.     On September 23, 2023, the Company's Board established a special committee (the "Special Committee"), and appointed William Osborne, Randy Scott, Eric Aguiar, and Christine Gorjanc as its initial members.  Compl. ¶ 127.  Upon its appointment, the Special Committee immediately began evaluating potential restructuring alternatives.  *Id.* ¶ 128.  On October 23, 2023, the Company executed an agreement with Jill Frizzley, an experienced board member with

experience in restructuring and the healthcare industry, to serve as an independent advisor; on December 7, 2023, Ms. Frizzley was appointed to the Board as an independent director and made a member of the Special Committee. *Id.* ¶¶ 129, 138.[14]  Ms. Frizzley has served as a director on numerous public and private boards of directors, some of which included distressed situations, including Virgin Orbit Holdings, Inc., Surgalign Holdings, Inc., Avaya Holdings Corporation, and Hudson Technologies, Inc.  [Dkt. No. 21 ¶ 70.]

44.     Even after reducing operating costs through Project Genesis, certain of Invitae's business lines remained unprofitable and burdensome to the Company, requiring significant operating cash flow without generating sufficient returns.  [Dkt. No. 21 ¶ 72.]  Accordingly, in the third quarter of 2023, Invitae began exploring whether to further wind down and divest unprofitable, non-core, and expensive business lines.  *Id.*  On November 15, 2023, following a months-long process to strategically maximize value for these business lines, which included discussions with multiple potential third-party buyers to assess all available options, Invitae closed on an agreement pursuant to which Aranscia, LLC, a global provider of diagnostics software, services, and testing solutions, acquired select assets from Invitae for $4 million in an all-cash transaction.  *Id.*  A month later, on December 13, 2023, Invitae finalized an agreement to sell the assets of Ciitizen, another subsidiary business, to Transformation Capital.  *Id.*  And on January 17, 2024, the Company reached an agreement to divest another business, Women's Health, to Natera, Inc. *Id.* ¶ 73.

45.     Because these assets constituted collateral for their 2028 Senior Secured Notes, the Senior Secured Noteholders' consent was required for their divestiture.  Compl. ¶ 111.  Deerfield

---

[14]    On January 1, 2024, Randy Scott stepped down from his position as a member of the Special Committee, though he remains a full member of the Board.  [Dkt. No. 21 ¶ 69 n.5.]

conducted significant diligence into the proposed divestitures, and initially proposed a $5 million

consent fee.  Ex. 38 (November 14, 2023 Deerfield Consent Proposal and Comparison) at 2.  After

months of negotiation and meetings, the Debtors obtained Deerfield's consent to the Women's

Health and Ciitizen divestitures, in exchange for a significantly smaller consent fee of $2.1 million,

as set forth in a Second Supplemental Indenture.  Compl. ¶ 139.

> **G.    The Company Takes Action to Retain Key Executives Needed to Oversee the Company's Restructuring and Sale of Its Business**

46.    For years before the petition date, the Company maintained a Stock Incentive Plan

("SIP") and Management Incentive Plan ("MIP").  The Committee now purports to challenge

"stock based comp" awarded to the Company's officers (Compl. ¶ 106 & App. B), but these were

largely ordinary-course restricted stock unit ("RSU") awards under the Company's 2015 SIP,

along with RSUs awarded at the time of individuals' hiring or promotion.  *See* Exs. 6, 7, 8, 9, 11,

13 (Invitae Form 8-Ks dated June 18, 2020, June 26, 2020, May 4, 2021, April 14, 2022,

August 25, 2022 and April 6, 2023).

47.    In April 2023, the Board approved cash retention bonuses for Ken Knight, Roxi

Wen, Rob Werner, Bob Nussbaum, Tom Brida, Desarie French, and Lee Bendekgey, to be paid in

50% increments at the end of June and December 2023, premised upon continued employment.

Compl. ¶ 106.  Although the Committee conspiratorially refers to these retention payments as

"special bonuses," and insinuates that they were given in connection with the March Exchange

(*id.*, App. B), the payments were in fact (i) retention bonuses designed to ensure executives'

"continued service" during 2023; (ii) approved by "all of the independent members of the Board,"

based on the recommendation of the Compensation Committee (and its third-party consultants at

Compensia), following discussions that began as early as February 2, 2023; and (iii) not related in

any way to the completion of the March Exchange.  *See* Ex. 25 (February 2, 2023 Compensation

Committee Minutes); Ex. 27 (February 22, 2023 Compensation Committee Minutes); Ex. 13

(April 6, 2023 Form 8-k).   During its discussions, the Compensation Committee expressly

considered the balance between (1) the need, in an uncertain environment, to carefully plan and

allocate resources toward compensation arrangements; and (2) challenges facing the Company

from a compensation perspective, including a low stock value along with a focus on cash burn—

in other words, the Compensation Committee evaluated the very real risk that the Company's key

executives would leave rather than go through a difficult restructuring only to face an uncertain

future, especially if their existing equity incentive awards were rendered worthless by the decline

in the Company's stock price.  Ex. 32 (March 9, 2023 Compensation Committee Minutes).

48.     As the restructuring of Invitae reached a critical juncture in the fall of 2023, the

Company took additional critical steps to ensure that its management's incentives were aligned

with the Company's operational and financial plans.  On October 18, 2023, the Board approved a

$100,000 retention arrangement for Tom Brida and cancelled Ken Knight's preexisting $1,000,000

incentive plan in favor of one for $3,500,000, subject to clawback if he ceased his employment

within two years.  Compl. ¶ 134; Ex. 37 (October 18, 2023 Unanimous Written Consent); Ex. 14

(October 19, 2023 Invitae Form 8-K).   These bonuses were the subject of over a month of

discussion by the Compensation Committee, which engaged consultants at Compensia to provide

advice and perform "benchmarking among a peer group" to ensure that the bonuses "would be

reasonable relative to arrangements implemented among companies of the size, complexity and

market capitalization of the [Company]."  Ex. 34 (September 15, 2023 Compensation Committee

Minutes); Ex. 35 (September 21, 2023 Compensation Committee Minutes).

49.     In January 2024, the Company made retention payments to key executives, with

the goal of ensuring that Invitae's executives stayed with the Company during its restructuring

process.  The Board approved these payments based on the recommendation of the Compensation Committee and the advice of compensation consultants at FTI, who (i) compared the proposed payments with "a peer set assembled by FTI, with FTI noting that the proposed retention plans have been designed to ensure effectiveness in the context of the Corporation's circumstances in motivating, incentivizing and retaining employees, and [] a retention bonus survey in the context of merger and acquisition transactions, with FTI noting that the proposed retention plans are required to compensate for variable compensation which could otherwise be addressed with equity incentives"; and (ii) expressed the "view that the plans are fair and reasonable in the context of the Corporation's circumstances and in-line with similar plans of other companies."   Ex. 41 (January 9, 2024 Compensation Committee Minutes); Ex. 42 January 11, 2024 Board Minutes); *see also* Ex. 39 (January 5, 2024 Compensation Committee Minutes); Ex. 40 (January 7, 2024 Board Minutes).

50.    As the Company made clear to Deerfield in response to the letter referenced in the Committee's Proposed Complaint (¶ 148), the Board approved a "competitive and cost-conscious program to retain key officers and personnel in their roles while the Company navigates this transition [through Chapter 11]," following "many weeks" of "intensive" deliberations, involving "multiple meetings of the full Board as well as multiple Compensation Committee meetings," in order to "address a real and present retention risk as the Company works to pursue a sale process, finalize negotiations around a Transaction Support Agreement, and prepare for an uncertain chapter 11 process with Deerfield's support"; the "increased workload associated with the pending sales process and preparing for a chapter 11 filing … necessitate officer stability, especially in circumstances where the likelihood of receiving equity-based compensation or future bonus

payments is speculative at best"; and "the proposed retention program was fair and reasonable in the context of the Company's circumstances."  Ex. 44 (January 26, 2024 letter to Deerfield).

**H.     The Special Committee Investigation Into Potential Claims**

51.     In her capacity as an independent director of Invitae, Ms. Frizzley directed and oversaw the Special Committee's investigation into possible claims and causes of action that could potentially benefit the Debtors (the "Special Committee Investigation").  [Dkt. No. 21 ¶ 70.]  In particular, Ms. Frizzley directed a review of the factual and legal bases for potential claims arising from Company transactions within a two-year lookback period, including, but not limited to, several of the Company's material divestitures and transactions, the March Exchange, and the August Exchange.  *Id.*

52.      Directed by Ms. Frizzley, K&E conducted a months-long investigation, which included targeted searches and reviews of thousands of documents, including board materials and presentations, public filings, agreements, and financial documents.  K&E also conducted multiple interviews with the Company's CEO and a lead financial advisor to the March and August Exchanges.

**I.     Bankruptcy Negotiations and Filing Chapter 11**

53.     The Second Supplemental Indenture, effective on December 8, 2023, provided for certain milestones, namely that the Company would make initial outreach to bidders for a sale transaction of any or all material assets of the Company no later than the following week, and that the Company would execute a TSA no later than January 12, 2024.  Compl. ¶ 139.  The Third Supplemental Indenture, entered into on January 12, 2024, provided for the extension of milestones for the Company's restructuring process as the Company continued efforts to structure its bidding process and evaluate transaction proposals.  [Dkt. No. 21 ¶ 74.]

54.     Consistent with its goal of restructuring its substantial debt obligations and in light of its mounting liquidity challenges, the Company and its Board, with the assistance of advisors, continued to engage with the Senior Secured Noteholders to develop a comprehensive restructuring solution.  [Dkt. No. 21 ¶ 75.]  And for several months and up until the days leading up to the Petition Date, the Company also engaged with certain holders of the 2028 Convertible Senior Unsecured Notes (the "Unsecured Ad Hoc Group") in an effort to obtain a proposal—either on a standalone basis or in conjunction with the Senior Secured Noteholders—for a recapitalization or other transaction that would be value-maximizing.  *Id.*  The Company provided voluminous diligence to both the Senior Secured Noteholders and the Unsecured Ad Hoc Group and engaged for several weeks on transaction structure.  *Id.*

55.     Ultimately, without a meaningful proposal from the Unsecured Ad Hoc Group that would keep Invitae out of bankruptcy, the Company and the Senior Secured Noteholders entered into the Transaction Support Agreement (the "TSA") on February 13, 2024.  [Dkt. No. 21 ¶ 77]; Compl. ¶ 151.  The negotiations leading to execution of the TSA were arm's-length and in good faith and resulted in a value-maximizing transaction, providing very significant value to unsecured creditors.  [Dkt. No. 21 ¶ 77.]  Pursuant to the TSA, the Senior Secured Noteholders agreed to vote in favor of the Debtors' chapter 11 plan and support the Debtors in their sale process for the Company's business.  *Id.* ¶ 78.

56.     The decision to enter into the TSA and commence these chapter 11 cases was the culmination of months of strategic review, including regular meetings of the Debtors' Special Committee, the Board, management, and advisors.  [Dkt. No. 21 ¶ 77.]  Ultimately, the Company and its Board concluded that the transactions contemplated by the TSA, and entering chapter 11 with the support and consent of the Senior Secured Noteholders, provided (and continues to

provide) the best path forward for the Debtors to maximize the value of the sale of their business and distributions to stakeholders. *Id*.

> **J.**    **The Company's Proactive Efforts Lead to the Value-Maximizing Sale to Labcorp**

57.    Beginning on December 14, 2023, the Company's advisors at Moelis began a fulsome third-party marketing process to solicit proposals for the sale of the Company's business. [Dkt. No. 21 ¶ 76.] Moelis developed a Confidential Information Presentation and began contacting various potential buyers for Invitae's business.    *Id*.    Moelis initially contacted 24 strategic parties.  *Id.*

58.    Critical to any sale process was demonstrating the value and potential profitability of the Company's business.  After launching Project Genesis, the Company was successful in executing its operational vision, with significantly increased revenue and gross margins, and lower headcount and monthly cash burn.  Without this dramatic change in response to unforeseeable market difficulties and turnover uncertainty, a successful sale would have been highly unlikely.

59.    Consistent with the TSA, the Debtors ran an extensive, far reaching, and months-long marketing process for their assets before and after the petition date.  *Disclosure Statement Relating to the Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 472] (the "Disclosure Statement") at 14.  In consultation with their advisors, the Debtors prepared a confidential information memorandum and populated a virtual data room; reached out to strategic and financial investors; and engaged in extensive negotiations with potential purchasers.  *Id.*  Due to their secured status, the Senior Secured Noteholders were permitted to, and did, submit a credit bid as part of the sale process.  *Id.*  The Committee was "not supportive" of Deerfield's credit bid ([Dkt. No. 437] (Moelis Declaration) ¶ 12), even though that bid ultimately helped spur a competitive auction, involving "hard-fought,

arm's-length negotiations with each participating bidder," and directly leading to an increase of $60 million in the sale price for the Debtors' assets ([Dkt. No. 472] (Disclosure Statement) at 14; Ex. 46 (April 17 & April 24, 2024 Auction Transcripts)).  Fortunately, the Committee's opposition to the Senior Secured Noteholders' credit bid and liens was unsuccessful.  Had the Committee succeeded in obstructing the Labcorp sale, it would have resulted in $60 million less in value to the Debtors' estates.

60.     Ultimately, Labcorp became the successful purchaser of the Debtors' business, for a base purchase price of $239 million in cash, plus additional non-cash consideration including the preservation of a vast majority of employees' jobs and payment of certain cure costs, subject to certain terms and conditions.  Compl. ¶ 154; *Notice of Successful Bidder with Respect to the Auction Held on April 17 and 24, 2024* [Dkt. No. 362] at 2-3.

<u>**ARGUMENT**</u>

I.     **The Legal Standard**

61.     The Committee's Complaint and Standing Motion aptly illustrate why bankruptcy courts rarely grant derivative standing except when the Bankruptcy Code's "envisioned scheme breaks down."  *Cybergenics*, 330 F.3d at 553.  And here there has been no such break down.

62.     The Debtors' course of action (*i.e.*, settling the claims pursuant to the Plan) provides significant and otherwise unattainable benefits to the Debtors.  By contrast, the Committee's proposed course of action (*i.e.*, miring the estates in protracted litigation) will be value-destructive for the estates and all stakeholders.  The Debtors, as fiduciaries to all of the estates' constituents, must consider and integrate the various, often competing, considerations of different stakeholders into a value-maximizing plan.[15]  Accordingly, parties other than the debtor, such as a committee,

---

[15]    *See* 11 U.S.C. § 1107(a) ("[A] debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter."); *Off. Comm. of Equity Sec. Holders*

whose only focus is unsecured creditors, are generally not well-situated to manage the estate's legal claims. *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 180 (2d Cir. 2005) ("As a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative."). Derivative standing, therefore, is the rare exception to the general rule that the trustee or debtor in possession maintains "the privilege of prosecuting" various actions on behalf of the estate. *See In re Balt. Emergency Servs. II*, 432 F.3d at 560.

63.    It is the movant's "burden in the first instance to demonstrate that it has satisfied the test for derivative standing." *See G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 629 (Bankr. D.N.J. 2004). Courts grant derivative standing only where the movant establishes that (a) colorable claims exist; and (b) the debtor has unjustifiably refused to bring those claims. *See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985) ("If the committee presents a colorable claim . . . [the] court's threshold inquiry will still not be at an end. In order to decide whether the debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action, the court must also examine . . . whether an action asserting such claim(s) is likely to benefit the reorganization estate.").

64.    The Committee's Standing Motion should be denied for several compelling and independent reasons. **First**, granting standing to the Committee would not benefit the Debtors' estates given the pervasive and significant legal and factual defects in the claims for which they

---

*of Adelphia Commc'ns Corp. v. Off. Comm. of Unsecured Creditors of Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420, 424 (2d Cir. 2008) (stating that the derivative standing doctrine and related precedent does not "undermine either the debtor's central role in handling the estate's legal affairs or the court's responsibility to monitor for abuses by the parties").

seek derivative standing (the "Proposed Claims").  **Second**, the Committee cannot show that the

Debtors have unjustifiably refused to pursue the Proposed Claims because the Debtors settled such

claims through the Plan rather than incur the cost and delay of litigating claims that are baseless

on their face.  **Third**, the Committee should not be granted exclusive authority to settle estate

claims, as to do so would usurp the authority conferred to the Debtors under the Bankruptcy Code

and would undermine the Debtors' ability to effectuate any restructuring transaction.

## II.     The Committee's Proposed Complaint Fails to Allege Colorable Claims

65.     To assess whether a claim is colorable, the court must determine if the movant "has

asserted 'claims for relief that on appropriate proof would support a recovery.'"  *In re G-I*

*Holdings, Inc.*, 313 B.R. at 631 (quoting *In re STN Enters.*, 779 F.2d at 913).  In many ways, "[t]his

inquiry is like that of a motion to dismiss for failure to state a claim."  *In re Diocese of Camden,*

*New Jersey*, No. 20-21257 (JNP), 2022 WL 884242, at *4 (Bankr. D.N.J. Mar. 24, 2022).

Accordingly, each of the movant's proposed claims must be "plausible on its face."

*See In re Roman Catholic Diocese of Rockville Ctr, New York*, 654 B.R. 212, 220 (Bankr.

S.D.N.Y. 2023) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he Court is

not bound to accept as true legal conclusions couched in [f]actual allegations, and 'threadbare

recitals of elements of a cause of action, supported by mere conclusory statements, will not

suffice."  *Diocese of Camden*, 2022 WL 88242, at *4 (citation omitted).  Unlike a motion to

dismiss, however, the Court should also "examine the facts for any dispositive affirmative defenses

and may deny a motion for standing when an affirmative defense appears on its face."  *Id.* (citation

omitted); *see also ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (same).

66.     Here, a review of each cause of action in the Committee's Proposed Complaint

plainly confirms that the claims are not colorable and, in many cases, are borderline frivolous.

A.    **The Committee's Constructive Fraudulent Transfer Claims for the March Exchange Are Not Colorable**

67.    In Count 1 of the Proposed Complaint, the Committee seeks standing to unwind the March Exchange, and the obligations that Invitae assumed therein, as a constructive fraudulent transfer.  Mot. ¶ 77.  This claim is not colorable because Invitae indisputably received reasonably equivalent value and was not insolvent at the time of the transaction.

1.    *The Debtors Received Reasonably Equivalent Value from the March Exchange*

68.    The Committee is required to allege facts supporting a plausible inference that Invitae did not receive reasonably equivalent value in the transaction.  *See, e.g.*, *Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 547 (Bankr. D. Del. 2009).  The allegations in the Proposed Complaint fall well short of doing so.

69.    In determining whether a debtor received reasonably equivalent value for an obligation or a transfer, "[t]he Third Circuit employs a 'common sense' approach and has held that 'a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave.'"  *EiserAmper LLP v. Morgan (In re SRC Liquidation LLC)*, 581 B.R. 78, 97 (D. Del. 2017) (quoting *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)).  A court should conduct this inquiry by using "a totality of the circumstances" approach that considers the good faith of the parties, the difference between the value given and received, and whether the transaction was at arm's-length.  *Solmonese v. Shyamsundar (In re Amcad Holdings), LLC*, 579 B.R. 33, 41 (Bankr. D. Del. 2017) (citation omitted).  As the Committee's counsel recently argued in seeking to dismiss fraudulent conveyance claims relating to a different liability management transaction, "'[r]easonably equivalent value ... is not wholly synonymous with market value and it depends upon an analysis of all the facts and circumstances... includ[ing] both direct and indirect benefits to the transferor.'"  Ex. 53 at p.24 (citation omitted).  Although in some instances the

determination of whether a debtor received reasonably equivalent value creates an issue of fact, it frequently can be (and is) resolved at the pleading stage. *See, e.g.*, *In re Amcad Holdings*, 579 B.R. at 41-42 (dismissing claim at pleading stage, finding reasonably equivalent value established on the face of the complaint); *Ankrah v. HSBC Bank USA, N.A. (In re Ankrah)*, 602 B.R. 286, 291 (Bankr. D.N.J. 2019) (plaintiff's claims, even in light most favorable to plaintiff, failed to allege lack of reasonably equivalent value).[16]

70.    The Bankruptcy Code expressly provides that "value" for the purposes of a fraudulent transfer includes the "satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(d)(2)(A).[17]  Accordingly, it is blackletter law that where, as here, a

---

[16]    The Committee asserts that both reasonably equivalent value and solvency—the two primary elements of a constructive fraudulent transfer claim—are questions of fact that "may not be determined on a motion to dismiss or at the standing motion phase of an action."  Mot. ¶ 84 (as to reasonably equivalent value); *id.* ¶ 93 (issue of solvency "not proper for decision at the standing or motion to dismiss phase").  Not only is this contrary to the caselaw, but it is contrary to common sense.  If the Committee were correct, no constructive fraud claim could *ever* be dismissed at the pleading stage, and colorability would be established as a matter of law for any such claim any time a committee sought standing.  This is obviously nonsensical and plainly false.  Indeed, the Committee's counsel *just* filed a motion to dismiss fraudulent and constructive fraudulent conveyance claims in litigation brought related to a liability management transaction, arguing that the complaint failed to adequately allege both insolvency and lack of reasonably equivalent value.  *See* Ex. 53.

[17]    The same is true under the fraudulent conveyance laws of New York, New Jersey, California and Delaware, which the Committee cites as potentially applying under 11 U.S.C. § 544, but which the Committee also admits are "similar to Section 548 of the Bankruptcy Code."  Mot. ¶ 82; *see also* N.Y. Debt. & Cred. Law § 272(a); N.J. Stat. Ann. § 25:2-24(a); Cal. Civ. Code § 3439.03; Del. Code Ann. tit. 6, § 1303(a).

transaction satisfies or secures a preexisting obligation, a debtor receives reasonably equivalent

value on a dollar-for-dollar basis for every dollar of the obligation satisfied[18] or secured.[19]

---

[18]    *See, e.g.*, *In re Fitness Holdings Int'l*, 714 F.3d at 1145-46 ("[P]ayment of a preexisting debt is value, and if the
payment is dollar-for-dollar, full value is given."); *In re Se. Waffles*, 702 F.3d at 857 ("Typically, a dollar-for-
dollar reduction in debt constitutes—as a matter of law—reasonably equivalent value for purposes of the
fraudulent-transfer statutes."); *In re Rosen Auto Leasing*, 346 B.R. at 805 ("For purposes of fraudulent transfer
analysis, value includes the satisfaction of an antecedent debt."); *Perkins, Chapter 7 Trustee v. Bamberger
(In re Carton)*, No. 20-19781-VFP, 2023 WL 8057870, at \*10 (Bankr. D.N.J. Nov. 20, 2023) ("Because the
money received by the Defendant were payments on antecedent debts those payments presumptively constitute
reasonably equivalent value."); *Affiliated Physicians and Emps. Master Tr. v. Dept. of Treasury, IRS
(In re Affiliated Physicians & Emps. Master Tr.)*, No. 21-14286 (MBK), 2022 WL 16953555, at \*7 (Bankr. D.N.J.
Nov. 15, 2022) ("It is well-settled that a 'transfer made in satisfaction of an antecedent debt or for an obligation
for which the Plaintiff was liable presumptively constitutes reasonably equivalent value.'") (quoting *In re Parker
Sch. Uniforms, LLC*, No. 18-10085 (CSS), 2021 WL 4553016, at \*7 (Bankr. D. Del. Oct. 5, 2021)); *Schmidt v.
The Grand Ltd. (In re Black Elk Energy Offshore Operations, LLC)*, 605 B.R. 138, 150-53 (Bankr. S.D.
Tex. 2019) ("Given the parties agreement that [the debtor] received a dollar-for-dollar reduction in debt on
account of the transfer, [the movant] has satisfied its burden of demonstrating that the payments in question were
not fraudulent transfers under the Bankruptcy Code."); *In re Amcad Holdings*, 579 B.R. at 41-42 ("A transfer
made by a Debtor to reimburse a party for a pre-existing obligation, without further explanation, does not show a
lack of reasonably equivalent value."); *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 390 (E.D. Pa.
2013) (holding that debtor received reasonably equivalent value where "each transaction at issue resulted in a
dollar-for-dollar reduction in [debtor's] liability"); *Gonzales v. Liberman (In re Brutsche)*, No. 11-13326-J7, 2013
WL 501666, at \*6 (Bankr. D.N.M. Feb. 11, 2013) ("a dollar-for-dollar reduction in debt is not merely reasonably
equivalent value, but is actually 'perfectly equivalent value'") (citing cases); *Goodman v. Southern Crane &
Hydraulics, LLC (In re Gulf Fleet Holdings, Inc.)*, No. 12-05048, 2013 WL 1755490, at \*2 (Bankr. W.D. La.
April 23, 2013) (explaining that "[b]y definition, the satisfaction of an antecedent debt constitutes 'reasonably
equivalent value' . . .courts have uniformly held that such payments are not avoidable as constructively fraudulent
transfers.") (citing cases); *Gellert v. Coltec Ind., Inc. (In re Crucible Materials Corp.)*, No. 09-11582 MFW, 2012
WL 5360945, at \*8 (Bankr. D. Del. Oct. 31, 2012) ("When the transfer to a creditor is in dollar-for-dollar
satisfaction of an antecedent debt, there can be no claim for constructive fraudulent transfer."); *Cox. v. Ridgestone
Bank (In re Cent. Ill. Energy Co-op.)*, No. 09-81409, 2012 WL 5076288, at \*5 n. 2 (Bankr. C.D. Ill. Oct. 18,
2012) ("It is black letter law that a debtor's transfer of funds in satisfaction of a debt owed by the debtor is not
constructively fraudulent."); *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 714 (Bankr. D. Del.
2010) (fact that transfer reduced an obligation was "dispositive" of reasonably equivalent value inquiry,
explaining that "[r]eduction of a preexisting obligation is value"); *Walker v. Sonafi Pasteur (In re Aphton Corp.)*,
423 B.R. 76, 89 n.50 (Bankr. D. Del. 2010) (noting that "[c]ourts have held that when a transfer is made to pay
an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (citing cases); *Off. Comm. of
Unsecured Creditors of Propex Inc. v. BNP Paribas (In re Propex, Inc.)*, 415 B.R. 321, 324 (Bankr. E.D. Tenn.
2009) ("Propex received 'reasonably equivalent value' for the $20 million payment as a matter of law because
the payment reduced the principal balance of the indebtedness dollar-for-dollar"); *Daly v. Fusco (In re All-Type
Printing, Inc.)*, 274 B.R. 316, 324 (Bankr. D. Conn. 2002) (finding that dollar-for-dollar satisfaction of debt
"provided 'reasonably'—indeed, perfectly—equivalent value in exchange for such payment.").

[19]    *See, e.g.*, *Fritze LLC v. Keyspan Home Energy Servs., LLC ( In re Fritze LLC)*, No. 07-02113 (DHS), 2009 WL
3245499, at \*7 (Bankr. D.N.J. Oct. 6, 2009) (recognizing that "[c]ourts have held that securing an antecedent debt
can constitute reasonably equivalent value") (quoting *Trustee v. Casale (In re Phillips Group, Inc.)*, 382 B.R.
876, 887 (Bankr. W.D. Pa. 2008)); *Anand v. Nat'l Republic Bank of Chi.*, 239 B.R. 511, 517 (N.D. Ill. 1999)
("collateralization of an antecedent debt confers value on the debtor, since the bankruptcy statute's definition of
'value' includes 'securing of a present or antecedent debt of the debtor.'"); *In re Capmark Fin. Grp.*, 438 B.R. at
518 ("[W]here payment on account of an antecedent debt can be made without running afoul of the fraudulent
transfer laws, a debtor may take the lesser step of granting an interest in collateral to secure an antecedent debt.")
(collecting cases); *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01 CIV.6209 (DC), 2002

36

71.     Through the March Exchange, the Debtors satisfied $305 million of unsecured debt, in exchange for $275 million of secured debt and less than $30 million of equity. Accordingly, the Debtors received reasonably equivalent value through the March Exchange ***as a matter of law***.  And that does not even account for the substantial *additional* value that the Debtors received from the transaction, over and above the retirement and collateralization of existing debt. Among other things, Invitae received a four-and-a-half-year extension of the then-looming maturity date of the remaining 2024 Unsecured Notes,[20] incremental liquidity through the infusion of $30 million of cash,[21] and a $30 million reduction of debt in exchange for equity that was worth less than $30 million at the time.[22]

72.     In the Standing Motion, the Committee challenges each of the elements of value that the Debtors received, but their challenges fail as a matter of law.

---

WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (finding that debtor "received 'value' when its antecedent debt was extended and collateralized"; affirming dismissal of fraudulent transfer claim for failure to plead lack of reasonably equivalent value); *Tavenner v. Wells Fargo Bank (In re Ferguson)*, No. 11-32141-KRH, 2014 WL 1044897, at *4 (Bankr. E.D. Va. Mar. 18, 2014) ("Courts have held consistently that an antecedent indebtedness constitutes value for the granting of a security interest.") (collecting cases).

[20]   *See Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*, No. 12-13852 (ALG), 2013 WL 3828509, at *5 (Bankr. S.D.N.Y. July 23, 2013) ("[C]ourts find fair consideration where, in exchange for the grant of collateral, a debtor obtains maturity date extensions.") (collecting cases); *Anand*, 239 B.R. at 519 (considering extension of maturity date as "value" received by the debtor); *Pembroke Dev. Corp. v. Commnwealth Savings & Loan Assoc. (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 401 (Bankr. S.D. Fla. 1991) ("The creditor also gave additional consideration for the execution of the [agreement] by . . . extending the maturity date on the original loan between the debtor and the creditor. Therefore, the Court finds that the debtor has received reasonably equivalent value . . . . the [transfer] may not be avoided as a fraudulent conveyance under 11 U.S.C. § 548."). The 4.5-year maturity extension that the Debtors obtained is a far cry from the cases the Committee cites for the proposition that transfers made in exchange for forbearance do not constitute value.  E.g., *Stillwater Nat'l Bank & Trust Co. v. Kirtley* (*In re Solomon*), 300 B.R. 57, 67 (Bankr. N.D. Okla. 2003) (cited by the Committee; involved 30-day forbearance).  In any event, the March Exchange did not involve a "forbearance," but instead the retirement of existing debt in exchange for the issuance of (less) new debt with a different maturity.

[21]   *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991); *Miller v. Black Diamond Cap. Management, L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*, 642 B.R. 371, 397 (Bankr. D. Del. 2022).

[22]   *See supra* note 18.

73.   First, the Committee asserts that, because the debt retired through the March Exchange was trading at below its face value, the retirement of that debt did not constitute reasonably equivalent value for the secured debt that the Debtors provided in exchange.  Mot. ¶ 85 n.32.  Of course, this argument ignores the fact that the terms of the new debt issued by the Debtors included a four-year extension of the original debt's maturity date, and also ignores the substantial other value received by the Debtors from the March Exchange, as detailed above.   But the Committee's argument is also deficient as a matter of law.  As the Committee's own restructuring and financial advisory firm recently testified, reasonably equivalent value is evaluated from the perspective of the debtor.  *See* Ex. 52 (*Witness Testimony Concludes on Day 30 of Incora/Wesco Trial*, Reorg Research, June 7, 2024) (noting that Province managing director testified that "reasonably equivalent value analysis should focus on the debtor's perspective"); [Dkt. No. 431] (order authorizing Committee to retain Province).  *See also In re Anand*, 210 B.R. 456, 459 (Bankr. N.D. Ill. 1997) (debtor receives reasonably equivalent value from securitizing antecedent debt, since "from the perspective of the debtor, the value of the interest in the collateral transferred to the creditor can never be more than the amount of the debt").  From the Debtors' perspective, its debt was worth face value.   Indeed, courts have held exactly that in various contexts. *See Travellers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 134 F.3d 188 (3d Cir. 1998) (valuing public debt at its face value rather than at market discount caused by anticipation of debtor's demise).   And the Committee recognizes this as well, as demonstrated by the fact that it ascribes 100 cents of value to all of the Debtors' outstanding debt in evaluating the Debtors' solvency at the time of the March Exchange.  Compl ¶ 46.  The Committee cannot have it both ways:  the same debt cannot be deemed to be worth par for purposes of solvency but below par for purposes of reasonably equivalent value.

74.     Second, the Committee discounts the other substantial benefits the Debtors received, over and above the satisfaction and security of antecedent debt, but its own allegations show that those benefits were critical to the Company's plan to restructure its entire capital stack and prepare the Company for a return to profitability and growth.

75.     For example, the Committee complains that, even with the maturity extension, the Company was still forecast to run out of cash by the original maturity date.  Mot. ¶ 87.  As an initial matter, this is false.  A contemporaneous presentation to the Board by the Committee's financial advisors shows that the Company was expected to have sufficient liquidity to address the stub amount of 2024 Unsecured Notes that were not expected to participate in the March Exchange:[23]



76.     In any event, that the March Exchange did not, *standing alone*, completely solve *all* of Invitae's cash flow problems does not mean that Invitae did not receive value from the four-year maturity extension it obtained, much less that the transaction was a fraudulent transfer.

---

[23]    Ex. 30 (February 25, 2023 Board Presentation) (referenced in Compl. ¶ 98).  And this expectation was before the Company was able to equitize an additional $17 million of Deerfield's 2024 Unsecured Notes in August 2023, thereby further reducing the amount of debt due in 2024.

Instead, as the meeting minutes referenced in the Committee's complaint (*e.g.*, Compl. ¶ 62) make clear, the Company and its external advisors expressly recognized that addressing its impending 2024 debt overhang was a critical first step to raising additional cash to prepare a path to restoring profitability—and without that step, *i.e.*, without the March Exchange, the Company had no chance of doing so. Ex. 30 (February 25, 2023 Board Presentation) (noting that the Company's advisors "believe[d] announcement of the 2024 exchange will remove a significant overhang on the company and will open options for the company going forward (*e.g.*, ATM program) while retaining flexibility to turn to the 2028s at the right time.") (referenced in Compl. ¶ 98). Moreover, the March Exchange provided Invitae with $245 million in additional first lien secured capacity, meaning it had multiple options for accessing the capital markets after the transaction.

77.     The Committee also tries to cast aside the additional $30 million in cash that Invitae received through the March Exchange by saying the cash was "almost entirely consumed" by transaction costs from the deal. Mot. ¶ 88. But elsewhere, the Committee (improperly) highlights the payment of those same "costs" as a purported "benefit" to the 2024 Noteholders (*id.* ¶ 80 (counting as a benefit Debtors' payment of "$19.1 million in debt issuance costs (primarily advisor fees)"); Compl. ¶ 172 (same))—which means that the Committee is double-counting those dollars, to *both* decrease the value received by Invitae *and* increase the value received by the 2024 Noteholders.

78.     And in evaluating the value Invitae received from the transaction, the Committee inexplicably ignores the fact that Invitae was able to reduce its outstanding debt by over $30 million by claiming that the $22.9 million in structurally junior stock that the 2024 Noteholders received was value that the Debtors simply gave away, without any regard to the

forgiveness of over $30 million debt that the Debtors received in exchange.  Mot. ¶ 85; Compl. ¶ 172.

79.     Finally, likely recognizing that the Debtors received reasonably equivalent value from the March Exchange as a matter of law when they retired more debt than they incurred through the transaction, the Committee attempts to manufacture a claim that Invitae *overpaid* to retire the 2024 Unsecured Notes.  The Committee states in conclusory fashion without any supporting calculations that, through the March Exchange, "the Debtors provided approximately $100 million more value to the coronated unsecured creditors than they received in return."  Mot. ¶ 6.  But this argument not only ignores the substantial value that Invitae received as a result of the transaction as a matter of law (as discussed above), it vastly overstates the "value" that the 2024 Noteholders received in connection with the March Exchange, since many of the purported items of "value" that the Committee claims "the Debtors provided … the Participating 2024 Unsecured Noteholders" were not items of value, and/or were not provided to the noteholders at all.

80.     For example, the Committee includes in its "$100 million" figure the $8.1 million prepayment fee that Invitae paid in connection with the repayment of the Term Loan.  Mot. ¶ 85; Compl. ¶ 172.  But that fee (i) was paid to the Term Loan lenders, not the 2024 Noteholders; (ii) was contractually required in order to repay the Term Loan; and (iii) benefitted Invitae and *all* of its stakeholders, since the repayment of the Term Loan removed the most pressing maturity on the Company's balance sheet.

81.     The Committee also cites the fact that the Debtors agreed to pay $19.1 million in costs associated with the issuance of the 2028 Senior Secured Notes.  *Id.*  But those costs were only incurred because the parties elected to proceed with the transaction—to say that the 2024 Noteholders "benefitted" from a transaction because they were reimbursed for costs they only

incurred because of that same transaction is circular and illogical.  Moreover, the Committee impermissibly attempts to ascribe zero value to the professional services rendered in connection with the transaction.  Mot. ¶ 85; Compl. ¶ 172.  But sophisticated professional advisors do not work for free, and the services that professionals provided in facilitating the March Exchange plainly constitute "value."  *See Lawrence v. Bonadio, Insero & Co. (In re Interco Sys., Inc.)*, 202 B.R. 188, 194 (Bankr. W.D.N.Y. 1996) ("[W]hen in the exercise of reasonable, good faith business judgment, there is a perceived financial benefit to the corporation which justifies the fees or expenses paid . . . unless the Trustee meets his or her burden to prove that there was in fact no benefit, or a substantially and reasonably quantifiable disproportionate financial benefit, the payment of professional fees or expenses to the professionals or others who perform the services or provided the goods at the request of the corporation and charged a reasonable rate is not avoidable as a fraudulent conveyance.").

82.    The Committee also claims that the Debtors provided additional value to the 2028 Secured Noteholders in the form of the make-whole right in the 2028 Senior Secured Notes.  Mot. ¶ 85; Compl. ¶ 172.  However, it is well established that reasonably equivalent value is evaluated at the time of the transaction at issue.[24]  At the time of the March Exchange, the make-whole was merely a contingent future right.  This contingent future right would only be triggered in certain potential circumstances that had not occurred, and had no value from the Debtors' perspective—

---

[24]    *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 94 (Bankr. D. Del. 2005), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006) ("[T]he determination of reasonably equivalent value must be made at the time of the transaction"); *Perkins v. North Park Realty Management, LLC, et al. (In re Sakhe)*, No. 15-32238-RG, 2021 WL 5999195, at *51 (Bankr. D.N.J. Dec. 17, 2021) ("Value and reasonably equivalent value are measured at the time of the transaction.") (citation omitted); *Kittay v. Peter D. Leibowits Company, Inc., et al., (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 532 (Bankr. S.D.N.Y. 2001) ("[T]he focus of the reasonably equivalent value analysis is the value of the property at the time of the transaction."); *Pergament v. Reisner (In re Reisner)*, 357 B.R. 206, 211 (Bankr. E.D.N.Y. 2006) ("The time at which 'reasonably equivalent value' is determined is the time of the transaction.") (citation omitted); *Amborn v. Lester (In re Lester)*, 616 B.R. 549, 565 (Bankr. D. Or. 2020) (same).

and certainly not sufficient value to outweigh the substantial value that the Debtors received from the transaction.

83.    Finally, the fact that the Committee includes the 14.2 million shares of common stock issued as part of the March Exchange as "value" given to the 2024 Unsecured Noteholders demonstrates a fundamental contradiction in its Complaint:  on the one hand, the Committee claims that Invitae was hopelessly insolvent, while on the other hand it claims that Invitae's equity was a valuable asset provided to the 2024 Unsecured Noteholders for which Invitae did not receive reasonably equivalent value in exchange.  Courts regularly reject such contradictory allegations, and this Court should do so here as well—either the Committee should be taken at its word that Invitae had a positive equity value and was therefore solvent, or it should be taken at its word that Invitae was hopelessly insolvent and the stock that the Company issued in exchange for satisfying $30 million in debt had no value.  In either event, the Committee's constructive fraudulent transfer claim fails as a matter of law.  *See Glob. Crossing Est. Representative v. Winnick*, No. 04-CIV-2558 (GEL), 2006 WL 2212776, at *9 (S.D.N.Y. Aug. 3, 2006) ("Absent some explanation (and plaintiff provides none), the Estate Representative may not argue out of one side of its mouth that [the debtor] was in dire financial straits, completely insolvent, and destined for failure when this stock was transferred, and out of the other side argue that its stock had tremendous value that the creditors of [the debtor] should be permitted to now recover. For that reason, Count I must be dismissed to the extent that it attempts to avoid transfers of stock and opportunities to sell stock to defendants.").

84.    The fact that the Debtors received reasonably equivalent value from the March Exchange obviates the need to inquire into the Debtors' or the 2024 Unsecured Noteholders' good faith.  *Cf.* Mot. ¶ 90; *see In re Bayou Steel BD Holdings*, 642 B.R. at 393-94 (holding that, where

the allegations of the complaint establish that the debtor received reasonably equivalent value, alleging a "lack of good faith or failure to transact at arm['s]-length cannot affect this math" and prevent dismissal.).   But any such inquiry would only further weaken the colorability of the Committee's proposed claims, since (i) the Proposed Complaint acknowledges that the March Exchange was the product of months of arm's-length negotiations among Invitae and Deerfield, both sophisticated businesses, with their own legal and financial advisors (Compl. ¶¶ 62-65, 72, 80, 86; *see also* Mot. ¶ 92 (acknowledging that "the March Exchange was negotiated at arm's length")); and (ii) the meeting minutes relied upon by the Proposed Complaint demonstrate that the parties to the March Exchange considered and intended the transaction to be a necessary step to returning the company to profitability (Compl. ¶¶ 62-65).

### 2.   *The Debtors Were Not Insolvent at the Time of the Transaction*

85.    Even if Invitae did not receive reasonably equivalent value through the March Exchange—and it did—the Committee's proposed constructive fraud claims still would not be colorable because the Committee fails to plausibly allege that the Company was insolvent at the time of the transaction.   Indeed, although the Committee asserts that Invitae was insolvent under all three of the solvency tests that courts apply to constructive fraud claims, the facts as alleged in the Committee's Proposed Complaint establish that Invitae was solvent regardless of which test is applied.

86.    Balance Sheet Test.   Under the balance sheet test, courts evaluate whether liabilities exceed assets, using the fair value of those assets, as determined on a going concern basis. *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992).

87.    Here, the Committee does not (because it cannot) allege that Invitae's financial statements reflected an excess of liabilities over assets at the time of the March Exchange.   To the contrary, Invitae's most recent financial statements prior to the March Exchange show a positive

equity value (Ex. 4 (Invitae Corp. Form 10-K) at 73, 75); the Company received an unqualified

going concern opinion from its third-party auditors contemporaneously with the March Exchange

(*id.* at 71); and the Company was able to issue a solvency certificate at the time of the March

Exchange (Ex. 43 (March 7, 2023 Solvency Certificate).   In response, the Committee cites

financial statements from well *after* the transaction was completed, and speculates without

evidence or adequate factual allegations that (i) Invitae's financial condition must have

deteriorated (and it entered balance sheet insolvency) by the time of the transaction, and/or (ii) the

value of Invitae's intangible assets were artificially inflated.   Compl. ¶ 102.   There are three

problems with the Committee's approach.

88.      First, as the Committee acknowledges, "solvency is measured at the time the debtor

transferred value, not at some later or earlier time." Mot. ¶ 94 (citation omitted).   Accordingly,

the Committee's post-hoc allegations, relating to the company's financial condition *after* the

transaction took place, do not satisfy its burden of showing that a constructive fraud claim would

be colorable.  *See Telefest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1376 (D.N.J. 1984) ("[I]t is

incumbent on one who seeks to set aside a transfer to disclose that, at the time of the transfer, the

transferor was insolvent or was thereby rendered insolvent.  It will not suffice to disclose that at

some subsequent time the transferor was or became insolvent."); *O'Toole v. Karnani

(In re Trinsum Grp., Inc.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011) ("insolvency of the

transferor . . . cannot be presumed from subsequent insolvency at a later point in time.").

89.      Second, the Debtors' financial statements show book value, not fair value, which

is the standard through which solvency is measured.  Indeed, "with limited exceptions, e.g., cash

and cash equivalents, balance sheet asset numbers do not in fact reflect the fair value of the assets,"

and there may be "assets of substantial value which are not even listed on the asset side of [a

company's] balance sheet." *In re Trans World Airlines, Inc.*, 180 B.R. 389, 405 (Bankr. D. Del. 1994).  Simply pointing to the fact that liabilities exceeded assets on the Debtors' balance sheet is no substitute for allegations that actually analyze insolvency under the appropriate test—indeed, under the "book value" test used by the Committee, many (highly profitable) companies would be adjudged insolvent.

90.     Third, the Committee's allegations of insolvency are further contradicted by its own allegations, and the contemporaneous decisions of other investors.  As noted above, the Committee recognizes that Invitae had a positive equity value, and was solvent, when it alleges that the stock the 2024 Unsecured Noteholders received as part of the March Exchange constituted "value" that the Company purportedly gave away.   Compl. ¶ 172.   That recognition was shared by the Company's other investors—including both the equity investors whose trading supported a positive market capitalization in the hundreds of millions of dollars, as well as the Company's creditors, who in March and August 2023 (i) chose to exchange their structurally senior notes for the Company's equity; (ii) agreed to take convertible notes with lower coupons than would be available for non-convertible debt, precisely for the right to convert into equity; and (iii) negotiated heavily over the conversion rate.  *Supra*, ¶¶ 28-41.  *See In re Lyondell Chem. Co.*, 567 B.R. 55, 112 (Bankr. S.D.N.Y. 2017) (courts defer to the "contemporary, informed opinion" of "private investors who, with their finances and time at stake, and with access to substantial professional expertise decide to invest in a business viewed as potentially profitable").

91.     Capital Adequacy Test.  The capital adequacy test examines whether the transaction at issue left the debtor with unreasonably small capital for the operation of its business.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  The Committee cannot come close to showing insolvency under this test. First, the March Exchange provided much-needed capital for Invitae—indeed, excluding Invitae's

repayment of the Term Loan (for which even the Committee does not dispute Invitae received reasonably equivalent value), Invitae netted more cash from the March Exchange (in the form of $30 million in new money) than it expended (in the form of the Term Loan prepayment fee and reimbursement of the 2024 Unsecured Noteholders' expenses).  Thus, Invitae's advisors at Perella Weinberg Partners confirmed that the "recently completed 2024 convertible exchange [with Deerfield] has extended the Company's runway" and that, despite cash burn being "unsustainable," management had "developed illustrative proposals for an operating scenario that may allow the Company to self-fund through breakeven."  Ex. 33 (July 2023 Discussion Materials) at 2 (cited in Compl. ¶ 116).  Second, Invitae had substantial cash reserves before and after the March Exchange; indeed, as of the end of March, Invitae had well over $400 million in cash, cash equivalents, marketable securities and accounts receivable.  Ex. 5 (May 9, 2023 Invitae Form 10-Q) at 1 (cited in Compl. ¶ 102).  Third, the March Exchange was expressly effectuated with the intent of extending Invitae's maturity window so that it could focus on *raising* additional capital.  For example, on October 13, 2022, Invitae discussed with its advisors that a key objective for Invitae included "[r]aising additional capital to fund the core business" and how one of the options to achieve this objective would be to negotiate the 2024 maturity with Deerfield.  Ex. 20 (October 13, 2022 Discussion Materials for Project Icon) (cited in Compl. ¶ 67).  As the board materials referenced in the Proposed Complaint make clear, the March Exchange was designed to "address [the Company's] balance sheet challenges in an orderly manner with the prospect of building value and momentum" while also "support[ing] the Corporation's intermediate-term cash runway."  Ex. 29 (February 25, 2023 Board Minutes) (referenced in Compl. ¶ 98).  The Company's advisors believed that addressing the impending 2024 maturities would lift the overhang on the Company's stock and allow the Company to access liquidity through the public markets via the

Company's ATM program that the Board had previously approved.  Ex. 30 (February 25, 2023 Board Presentation) (referenced in Compl. ¶ 98).   On top of that, the Company also had $245 million in remaining first lien secured capacity, and could raise additional capital through the debt markets, if necessary.

92.    <u>Cash Flow Test.</u>  The cash flow test considers whether the debtor intended or expected to incur debts beyond its ability to pay.  11 U.S.C. § 548(a)(1)(B)(ii)(III).   Subjective intent or belief is inferred from circumstantial evidence that the company could "not have reasonably believed that it would be able to pay its debts as they matured."  *See In re Samson Res. Corp.*, 2023 WL 4003815, at *37 (Bankr. D. Del. June 14, 2023).   However, a *limited* ability to pay debts is ***not*** an *inability* to pay debts as they come due.  *See In re F-Squared Inv. Mgmt.*, LLC, 2019 WL 4261168, at *19 (Bankr. D. Del. Sept. 6, 2019).   The March Exchange lowered the aggregate principal amount of debt and extended the maturity date, and Invitae expected to be able to meet its debt obligations as they became due.   Indeed, the facts surrounding the transaction, including documents referenced in the Proposed Complaint, demonstrate that Invitae expressly entered into the March Exchange in order to increase its ability to pay its obligations as they came due, not worsen its financial condition.  *See, e.g.*, Ex. 33 (July 2023 Discussion Materials) ("The recently completed 2024 convertible exchange has extended the Company's operating runway.") (referenced in Compl. ¶ 116).   Importantly, as shown above, at the time the March Exchange was approved, the Board's experienced financial advisors advised that the Company would have sufficient liquidity to address the remaining amount of the 2024 Unsecured Notes that were not expected participate in the transaction.  Ex. 30 (February 25, 2023 Board Presentation) (referenced in Compl. ¶ 98).

### 3. The Section 546(e) Safe Harbor Bars the Committee's Constructive Fraudulent Transfer Claims

93.     In determining whether a claim is colorable, the court should examine "the facts as alleged by the plaintiff for any dispositive affirmative defenses." *In re G-I Holdings*, 313 B.R. at 631. Here, the facts alleged in the Proposed Complaint reveal at least one such defense: the section 546(e) safe harbor.

94.     Section 546(e) provides, in relevant part, that:

> [N]otwithstanding sections 544 . . . 548(a)(1)(b) . . . of this title, the trustee may not avoid a . . . settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency . . . in connection with a securities contract, as defined in section 741(7) . . . that is made before the commencement of this case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

95.     There are two elements to the Section 546(e) safe harbor: (1) there must be a qualifying transfer, *i.e.*, a "settlement payment" *or* a transfer "in connection with a securities contract"; and (2) the challenged transfer must be "made by or to (or for the benefit of) a [qualifying participant]," such as a financial institution or financial participant. *See Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*, No. 20-10766 (BLS), 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023).

96.     With respect to the first element (a qualifying transfer), courts have construed "settlement payment" broadly to encompasses any transfer that is made to "complete a securities transaction." *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l., Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999) (same). A transfer "in connection with a securities contract" is also defined "with extraordinary breadth," and "expansively includes contracts for the purchase or sale of securities, as well as any agreements that are similar or related to contracts for the purchase or sale of

securities." *Sec. Inv. Protection Corp. v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 417-18 (2d Cir. 2014).  And courts have construed the "in connection with" requirement "broadly to mean 'related to.'"  *See Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012).

97.     Here, the March Exchange involved qualifying transfers.  Invitae's exchange of the 2024 Unsecured Notes, for example, was both a "settlement payment"—it completed a securities transaction (the exchange of the 2024 Unsecured Notes for the 2028 Secured Notes)—and a transaction in connection with a securities contract (including, among other contracts, the March 7, 2023 Indenture exchanging the 2024 Unsecured Notes).  And the liens that Invitae granted to secure the 2024 Unsecured Notes were also transfers "in connection with a securities contract"— namely, the Exchange Agreement (*see* Mot. ¶ 42 n.10), which constitutes a "contract for the purchase [or] . . . sale of a security" because, pursuant to the agreement, Invitae agreed to sell, and the Participating 2024 Unsecured Noteholders agreed to buy, securities (the 2028 Secured Notes and common stock), in exchange for the Participating 2024 Unsecured Noteholders' tendering of its 2024 Unsecured Notes.  Ex. 47 (Exchange Agreement).  At the very least, this agreement was "similar to" a contract for the purchase or sale of a security.  11 U.S.C. § 741(7)(A)(vii).  Because the security interests were related to (and therefore "in connection with") the Exchange Agreement, the qualifying transfer requirement is satisfied.

98.     With respect to the second element (a qualifying participant), the 2024 Unsecured Noteholders plainly qualified as financial participants[25]; the agent for the 2024 Notes and the 2028

---

[25]   *See* 11 U.S.C. § 101(22A)(A) (defining "financial participant" as entity that has certain amount of outstanding securities contracts at time of transaction at issue); 11 U.S.C. § 561(a)(1) (listing "securities contracts" as defined in section 741(7) as a qualifying agreement or transaction); 11 U.S.C. § 741(7) (a "securities contract" is defined in part as "a contract for the purchase, sale, or loan of a security"); 11 U.S.C. § 101(49)(A)(i)-(ii) (a "security" includes notes and stock).  "In short, a financial participant is [A] an entity, [C] who has one or more required agreements [E] in the required amounts, [D] with the debtor or any other entity (other than an affiliate)." *In re Samson Resources Corp.*, 625 B.R. 291, 299 (Bankr. D. Del. 2020).  The 2024 Unsecured Noteholders

Secured Notes was U.S. Bank Trust Company, National Association, which is both a financial institution[26] and a financial participant[27]; and Invitae qualifies as both a financial participant[28] and, as U.S. Bank's customer, a financial institution as well.[29]

99.     Accordingly, because the March Exchange—as well as the August Exchange and the Consent Fee—involved a "settlement payment" and/or a transfer "in connection with a securities contract," by or to a financial institution or financial participant, it may not be avoided as a constructive fraudulent transfer under the Bankruptcy Code.

### B.   The Committee's Actual Fraudulent Transfer Claims Are Not Colorable

100.    In Count 2 of the Proposed Complaint, the Committee seeks to unwind the March Exchange as an actual fraudulent transfer.  "A plaintiff seeking to recover a transfer as 'actually'

---

plainly satisfy this standard through their holdings in the 2024 Unsecured Notes, even putting aside their other investments.

[26]  *See* 11 U.S.C. § 101(22)(A) (defining "financial institution"); *Holliday v. Credit Suisse Securities (USA) LLC*, 2021 WL 4150523, *6 (S.D.N.Y., 2021) ("U.S. Bank is a financial institution for purposes of Section 546(e)'s safe harbor.").

[27]  For the avoidance of doubt, U.S. Bank was not acting as a "mere conduit," particularly since both of the other participants in the March Exchange were financial institutions and/or financial participants. *Cf. Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892, 897 (2018) ("mere conduit" doctrine); *see In re Tribune Company Fraudulent Conveyance Litigation*, 946 F.3d 66, 77-81 (2d Cir. 2019) (finding transfers at issue were covered under safe harbor in part because debtor itself met statutory definition of "financial institution" because it was customer of a trust company and bank that was acting as debtor's agent in "connection with a securities contract").

[28]  Courts—including those in cases in which the Committee's counsel represented the plaintiffs—have concluded that debtors can qualify as financial participants for purposes of the Bankruptcy Code. *Samson*, 625 B.R. at 301 ("A natural reading of this [definition of financial participants] supports a broad interpretation that allows debtors to be included in the definition."); *In re Taylor, Bean & Whitaker Mortgage Corporation*, No. 09-7047, 2017 WL 4736682, *6 (Bankr. M.D.Fla. 2017) (same).  At the time of filing the petition, Invitae had a securities contract (the Exchange Agreement) with another entity (the 2028 Secured Noteholders) for the purchase or sale of a security, which had a gross mark-to-market position of over the $100,000,000 statutory threshold.

[29]  *In re Nine West LBO Securities Litigation*, 87 F.4th 130, 145 (2d Cir. 2023) ("[T]he Bankruptcy Code defines a 'financial institution' to include a 'customer' of a bank or other such entity 'when' the bank or other such entity 'is acting as agent' for the customer 'in connection with a securities contract.'"); *In re Boston Generating LLC*, 617 B.R. 442, 487 (Bankr. S.D.N.Y., 2020) (customer qualified as "financial institution" when it caused U.S. Bank to make transfer in connection with tender offer).

fraudulent, as opposed to 'constructively' fraudulent, must demonstrate that the transfer was made with actual intent to hinder, delay, or defraud the debtors' creditors." *Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, No. 20-12522 (JTD), 2024 WL 206682, at *23 (Bankr. D. Del. Jan. 18, 2024).  These claims must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b).  *See In re CTE 1 LLC*, No. 19-30256 (VFP), 2023 WL 5257940, at *12 (Bankr. D.N.J. Aug. 11, 2023).  While the Rule 9(b) standard may be "somewhat relaxed" for a bankruptcy trustee or someone standing in the trustee's shoes, "the trustee must still comply with the 'who, what, when, where and how test' of particularity." *In re Mack Indus., Ltd.*, No. 17-B-09308, 2020 WL 6708874, at *7 (Bankr. N.D. Ill. Nov. 16, 2020).  The Committee's proposed actual fraudulent transfer claims come nowhere close to meeting this standard.

101.    At bottom, the Committee's claims relating to the March Exchange are that Invitae provided value to one "favored group of unsecured lenders"—the 2024 Unsecured Noteholders— at the expense of another—the 2028 Unsecured Noteholders.  (Mot. ¶ 6; Compl. ¶ 156).  But it is blackletter law that "[a] debtor may prefer one creditor over another without running afoul of the fraudulent conveyance laws." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010).[30]  Because that is all the Committee purports to allege, its actual fraud claims are not colorable.

102.    But even if the Committee's *legal* theory of actual fraud were cognizable (and again it is not), the Committee's Proposed Complaint does not allege sufficient *facts* to state such a claim

---

[30]    *See also Brown v. GE Capital Corp. (In re Foxmeyer Corp.)*, 296 B.R. 327, 337 (Bankr. D. Del. 2003) ("[A]s abundant caselaw makes clear, a debtor can favor, indeed prefer, any one or several of its unsecured creditors with a transfer of assets to the detriment of such debtor's remaining unsecured creditor body, even in the face of such debtor's insolvency, and such transfer, as a matter of law, cannot, without more, then be avoided as a fraudulent conveyance on the ground that such debtor possessed actual intent to hinder, delay, or defraud its creditors.") (collecting cases); *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("[A] debtor's intent to prefer one bona fide creditor over another is not equivalent to intent to hinder, delay or defraud creditors.").

in any event.  The fundamental problem the Committee finds itself confronting in this case is that Deerfield is not now, and never was, an insider of the Debtors.  Deerfield was neither the Debtors' equity sponsor nor a controlling shareholder, and the Committee does not and cannot allege that Deerfield had any interest or relationship with the Debtors other than as the majority holder of Invitae's 2024 Senior Unsecured Notes—*i.e.*, the notes that, as of early 2023, posed the most pressing maturity of the Debtors' unsecured obligations.  This fact renders the Committee's actual fraudulent transfer claim particularly deficient, because it forces the Committee to advance the bizarre (and baseless) theory that the Debtors entered into the March Exchange with one group of completely unaffiliated creditors (to whom they "gratuitously" provided "$100 million in value") for no other reason than to harm another group of completely unaffiliated creditors, and to place that latter group in a worse position in a potential bankruptcy, with no actual benefit of any kind received by the Debtors.  This theory is illogical and implausible on its face, and, notwithstanding the tens of thousands of documents it received in discovery, the Committee does not and cannot support it with any actual factual allegation.  Given the high pleading burden the Committee faces here, the failure to plead any facts suggesting an intent on the part of the Debtors to defraud their creditors is fatal to an actual fraud claim.

103.    That is particularly true since the Committee's own allegations provide a far more plausible—and  non-actionable—motivation  for  Invitae's  decision  to  enter  into  the March Exchange:  simply put, Invitae did a deal with the 2024 Unsecured Noteholders, and not the 2028 Unsecured Noteholders, because the 2024 Unsecured Notes were set to mature first.  As the  Committee  admits  (Compl. ¶ 66),  and  as  Invitae's  board  materials  and  public  statements confirm, the March Exchange allowed the Debtors to deal with their upcoming 2024 maturity wall, which  the  Company's  board,  management  and  advisors  believed  would  "remove  a  significant

overhang on the company" and "open options for the company going forward" to raise additional capital. Ex. 30 (February 25, 2023 Board Presentation) (referenced in Compl. ¶ 98); Ex. 12 (February 28, 2023 Press Release) (referenced in Compl. ¶ 95). As the Company's management put it, restructuring the 2024 Unsecured Notes posed a "substantially greater benefit . . . given their relative immediacy [] as opposed to the 2028 Notes (as to which the Corporation continues to benefit from a significant period of time to address)." Ex. 29 (February 25, 2023 Board Minutes) (referenced in Compl. ¶ 98). And as the Company's external advisors at J. Wood and Perella put it, "addressing the 2024 Notes first will allow the Corporation to address its balance sheet challenges in an orderly matter with the prospect of building value and momentum (which would afford the Corporation greater strength in negotiation a transaction for the Corporation with respect to the 2028 Notes … [which] represent relatively low cost funding)." *Id.*

104.   Faced with the fact that its own allegations provide a far more plausible (and entirely benign) explanation for the March Exchange than the one concocted for its Standing Motion, the Committee asserts that it has pled "badges of fraud" that support its actual fraud claim. But these conclusory allegations do not survive even the most cursory scrutiny. *See Friedman v. Wellspring Cap. Mgmt., LLC* (*In re SportCo Holdings, Inc.*), No. 19-11299 (JKS), 2021 WL 4823513, at *14 (Bankr. D. Del. Oct. 14, 2021) ("Conclusory statements that badges of fraud are present are insufficient; the plaintiff must allege facts demonstrating that badges of fraud exist.").

105.   For example, recognizing that there is no evidence whatsoever that the Debtors intended to do anything but address their looming debt maturities, the Committee focuses on *Deerfield's* intent, arguing that Deerfield, as the transferee, was "in a position to control the transaction." Mot. ¶¶ 106-11. However, the law is clear that absent extenuating circumstances, it "is the intent of the transferor and not the transferee that is relevant for purposes of pleading a

claim for intentional fraudulent conveyance under the Bankruptcy Code." *Elrod Holdings*, 421 B.R. at 709 (citing *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005)).  To impute a transferee's intent to the debtor, a plaintiff must allege (among other things) that the transferee was "in a position to dominate or control" the debtor.  *Id*. at 710.  But the Committee's bare allegations of control are nothing more than hollow and misplaced conclusions; nowhere does the Committee plausibly allege that Deerfield controlled Invitae's board or its ultimate authority to control Invitae's "disposition of [its] property."  *Id.* Moreover, to impute Deerfield's intent to Invitae, the Committee would need to allege not only "functional" control but also that Deerfield exercised "formal, legal" control over the company. *See id.* at 712 (declining to impute transferee's alleged intent to debtor where plaintiff failed to allege "formal, legal" control).  Given the indisputably arm's-length relationship between Deerfield and the Debtors, the Committee does not and cannot make such an allegation here.

106.   The Committee's other purported badges of fraud (Mot. ¶ 114) are equally inadequate:  (i) there was reasonably equivalent value for the March Exchange (*see supra* ¶¶ 68-84); (ii) the company was not insolvent at the time of the March Exchange (*see supra* ¶¶ 85-92), and insolvency is a decidedly weak badge of fraud, given that the same allegation could be made in nearly every bankruptcy, *In re Fedders N. Am.*, 405 B.R. at 545-46; (iii) the Debtors did not maintain any "control" in the assets transferred to the 2028 Secured Noteholders; (iv) the granting of a security interest, without more, is not a badge of fraud; (v) the March Exchange was not carried out in secret—it was publicly disclosed through press releases and securities filings, and in fact, Baker Brothers, one of the 2028 Unsecured Noteholders that the Committee represents, not only knew of the transaction, but "was one of the 2024 Unsecured Noteholders who participated in the

March Exchange" (Mot. ¶ 44 n.12); and (vi) exerting "control" through the granting of security interests and covenants cannot be a badge of fraud, since this exists in every secured debt issuance.

107.    Finally, "the court may also consider the implications of the *absence* of certain badges of fraud or badges of intent to hinder or delay in the circumstances surrounding the transfer and/or evidence of a legitimate purpose for the transfer." *In re Bernier*, 282 B.R. at 781-82 (emphasis added); *In re Trib. Co. Fraudulent Conv. Litig.*, No. 12-cv-2652 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) (the "flip side of these badges of fraud is that their absence . . . would constitute evidence that there was no intent to defraud") (quotations and citations omitted). "Indeed, the absence of several very significant badges of wrongful intent may *disprove* actual intent to hinder, delay or defraud." *Bernier*, 282 B.R. at 782. Here, the Committee itself identifies at least *nine* badges of fraud in its Motion that it admits it *cannot* plead here, further supporting the conclusion that the Committee's actual fraud claims are not colorable. (Mot. ¶ 106 n.36.)

## C.    The Proposed Subsidiary Guarantees Claims Are Meritless

108.    In Count 4 of the Proposed Complaint, the Committee asserts that the specific guarantees and securities that the Debtor Subsidiaries issued in connection with the March Exchange were fraudulent and should be avoided. Mot. ¶ 115. The Committee is wrong.

109.    The Committee incorrectly ignores the Debtors' corporate relationship, and focuses myopically on the subsidiary level, to argue that the Debtor Subsidiaries received "no value" as a result of the March Exchange. *Id.* at ¶ 115. But guaranties involving parents and their subsidiaries are not viewed in isolation for the purposes of considering whether a subsidiary received value. *See Telefest*, 591 F. Supp. at 1379 ("the notion that a benefit accrues to a subsidiary only when there is a direct flow of capital to that entity the result of its guarantee of a loan to its parent is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often

needed because of the unequal abilities of interrelated corporate entities to collateralize loans"). Instead, courts will consider whether the subsidiary received indirect or intangible benefits in upholding a conveyance. *See id.* at 1379-81 (finding that "indirect benefits" to a subsidiary constituted fair consideration and rejecting claim that subsidiary guaranty was a fraudulent conveyance); *Mellon Bank*, 945 F.2d at 646-48, 650 (finding reasonably equivalent value for a debtor corporation's guaranty of an affiliate's debt when the loan strengthened the corporate group as a whole, such that the guarantor corporation would benefit from "synergy" within the corporate group). With respect to the March Exchange, Invitae's subsidiaries received a substantial benefit because the March Exchange allowed the subsidiaries to benefit the "intangible benefits of maintaining Parent's financial strength." *Telefest*, 591 F. Supp at 1380 (citation omitted). As noted above, Invitae executed the March Exchange in order to maintain the Company's existence and improve cashflow, thereby strengthening the overall corporate portfolio. Its subsidiaries clearly benefitted from the March Exchange.

110.    Regardless, the Committee's proposed claims on behalf of the Debtor Subsidiaries have been mooted by the Plan, which pays all unsecured creditors of the Debtor Subsidiaries in full. *See* [Dkt. No. 615] at 18-19. In other words, Deerfield, notwithstanding its secured status, has agreed to subordinate itself to unsecured creditors at the Debtor Subsidiaries. Because there are no creditors at the Debtor Subsidiary level who could benefit from the voiding of liens on the Debtor Subsidiaries' assets, the Committee's Debtor Subsidiary claims would be subject to dismissal and a waste of estate resources in any event.

### D.    The Committee's August Transaction Claims Are Not Colorable

111.    In Count 3, the Committee challenges the August Transaction, in which the 2024 Noteholders agreed to forgive $17.2 million in Invitae's existing debt in exchange for 15,819,604 shares of the company's stock with a market value of $16 million and $100,000 of Series A 2028

Senior Secured Notes.  Compl. ¶ 121.  This claim fails for the same reasons as its challenge to the March Exchange—namely, the Debtors indisputably received reasonably equivalent value when they obtained the elimination of $17.2 million in debt in exchange for the issuance of stock, and any claim is further barred by the section 546(e) safe harbor.

112.    While the Committee argues that the Debtors did not receive reasonably equivalent value because "Deerfield received approximately $16 million in the form of Invitae equity compared with its 2024 Unsecured Notes, which the Debtors estimate will now receive pennies on the dollar" (Compl. ¶ 192), it is a well settled-rule that a debtor receives a dollar-for-dollar value from satisfying a valid, antecedent debt.  *See supra* ¶ 70.  And, as noted above, because reasonably equivalent value must be evaluated from the Debtors' perspective, the fact that the 2024 Notes ultimately did not receive payment in full, and/or traded for less than their face value, is irrelevant—from the Debtors' perspective as an ongoing concern, the 2024 Notes comprised a valid debt of the Company, and the elimination of those debts brought the Company value equivalent to the face amount of that debt.  *See Trans World Airlines, Inc.*, 134 F.3d at 197 (concluding that the proper valuation for publicly traded debt is the debt's face value).  And, as also noted above, the Committee's allegations that the Invitae stock Deerfield received was "valuable" is directly contrary to Deerfield's allegations that the Company was hopelessly insolvent by August 2023.  Compl. at 30 (claiming that Company was "doomed" after March Exchange).

### E.    The Committee's Consent Fee Claims Are Not Colorable

113.    In late 2023, the Debtors sought consent from the holders of the 2028 Secured Notes to divest two businesses, Women's Health and Ciitizen.  After a hard-fought, arm's-length negotiation between the Debtors and the 2028 Secured Noteholders, coordinated by experienced bankers at Moelis & Co., the 2028 Secured Noteholders agreed to consent to the disposition, in

exchange for the payment of a $2.1 million consent fee, along with their professional fees.  Mot. ¶ 120; Ex. 45 (UCC Financial Overview) at 3.

114.    In Count 14 of the Proposed Complaint, the Committee challenges the Consent Fees as a constructive fraudulent transfer.  But to colorably do so, it must show that the Debtors did not receive reasonably equivalent value, and the Committee cannot make such a showing.

115.    It is well established that contractual waivers constitute "value" received by a debtor.  *In re Ward*, 36 B.R. 794, 799 (D.S.D. 1984) (creditor's forbearance was reasonably equivalent value); *Anand*, 239 B.R. at 511 (same); *Redmond* v. *SpiritBank (In re Brooke Corp.*), 541 B.R. 492, 520 (Bankr. D. Kan. November 20, 2015) ("Forbearance of the enforcement of loans has been recognized as reasonably equivalent value for the granting of security interests in additional collateral and for the execution of a modification agreement that required the payment of an extension fee.").    Accordingly, the Debtors plainly received value from Deerfield's agreement to release its collateral.

116.    The value that the Debtors received from Deerfield's consent far exceeded the fee that the Debtors paid in exchange.  Indeed, because it was reached following extended negotiation between two sophisticated parties, the agreed-upon price is a clear indication of the fair market value as a matter of law.  *See In re Samson Resources Corp.*, No. 15-11934, 2023 WL 40033815, at *26 (Bankr. D. Del. June 14, 2023) ("When sophisticated parties make reasoned judgements about the value of the assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market, at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight"); *Allonhill, LLC v. Stewart Lender Servs., Inc.* (*In re Allonhill, LLC*), No. 14-10663 (KG), 2019 WL 1868610, at *40 (Bankr. D. Del. Apr. 25, 2019), *aff'd in relevant part*, 2020 WL 1542376, at *11

(D. Del. Mar. 31, 2020), *reconsideration denied*, 2020 WL 6822985 (D. Del. Nov. 20, 2020) (observing that the best evidence of fair market value is the actual price negotiated by a willing buyer and a willing seller after an extensive marketing process and negotiations).

117.    In response, the Committee's claim wrongly focuses on the price at which the two businesses were divested, as compared to the price Invitae paid to purchase the businesses. *See* Mot. ¶ 120 (alleging that "[t]he only potential value the Company received was to sell two businesses, one at a loss of over $300 million through a dubious sale process.").  But the prices Invitae paid for the businesses are wholly irrelevant to the analysis of reasonably equivalent value at the time they were sold years later.  The only relevant consideration before the Court is what reasonably equivalent value the Debtors received in exchange for paying the consent fee. *See Key3Media Group*, 336 B.R. at 94 ("[T]he determination of reasonably equivalent value must be made at the time of the transaction."); *In re Morris Communications NC*, 914 F.2d 458, 466 (4th Cir. 1990) ("The critical time is when the transfer was 'made.'") (quoting COLLIER on BANKRUPTCY § 548.09 (15th ed. 1984)).  Just because the businesses were sold at a loss does not mean that the sales were not beneficial to the Debtors—a fact that the Committee implicitly recognizes, since it has never sought, and does not seek, to unwind the sales themselves as fraudulent transfers.

118.    It is undisputed that Invitae sold Ciitizen for $4 million in cash and sold Women's Health for $10 million in cash at closing, a credit of up to $20 million for the settlement of outstanding litigation, and a cash earnout of up to $22.5 million—a total of up to $56.5 million in cash value.  Compl. ¶ 140; Ex. 17 (1/22/24 Invitae Corp. Form 8-K) at 2; Ex. 15 (12/14/23 Invitae Corp. Form 8-K) at 2; Ex. 45 (UCC Financial Overview) at 10.  Selling Women's Health and Ciitizen also relieved the Debtors of the obligation to pay significant expenses associated with

keeping these businesses running, resulting in the reduction of approximately 400 FTEs, and annualized cash savings of approximately $140 million, along with incremental liquidity and operational flexibility.  Ex. 17 (1/22/24 Invitae Corp. Form 8-K) at 3; Ex. 45 (UCC Financial Overview) at 9.  These benefits were in addition to the direct cash benefits that the Debtors received in the exchange for the sale of the businesses.  *See, e.g.*, *Global Outreach, S.A. v. Ya Global Invs., L.P. (In re Global Outreach, S.A.)*, No. 09-15985 (DHS), 2014 WL 4948184, at *10-11 (Bankr. D.N.J. Oct. 2, 2014) (in assessing whether a debtor received reasonably equivalent value, a court may take into account indirect benefits).

119.    Given the substantial value (in both cash and indirect benefits) that the Debtors received in excess of the Consent Fee, the Committee's challenge to the Consent Fee as a fraudulent transfer fails as a matter of law.

### F.    The Committee's Fiduciary Claims Are Not Colorable

120.    The Committee's breach of fiduciary duty claims in Count 5 are borderline frivolous.  The Committee first claims that the Board and certain officers (the "Fiduciary Defendants") breached the duty of care by approving the March Exchange.  The Committee then claims that the Board breached the duty of loyalty by "favoring certain creditors," and "keeping the Debtors' [*sic*] afloat to preserve their equity interests and receive bonuses."  Neither claim is remotely colorable.

### 1.    *The Fiduciary Defendants' Conduct Was Protected by the Company's Exculpation Provision and Their Reliance on Experienced Advisors*

121.    As an initial matter, the Committee's duty of care claim against the Fiduciary Defendants is barred by the exculpation provision in Invitae's charter, which provides:

> To the fullest extent permitted by the DGCL, as the same exists or as may hereafter be amended (including, but not limited to Section 102(b)(7) of the DGCL), a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

Ex. 48 (Charter) at Art. VIII, § A.

122.    Section 102(b)(7) of the Delaware General Corporate Law provides that a corporation's certificate of incorporation may include a provision "eliminating or limiting the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer," except for any breach of the duty of loyalty; lack of good faith, intentional misconduct or a knowing violation of law; or any transaction which the director or officer derived an improper personal benefit.  8 Del. C. § 102(b)(7). Consistent with the policy rationale of permitting directors to take business risks without fear of negligence lawsuits, courts regularly apply Section 102(b)(7) exculpatory provisions to bar claims for a violation of the duty of care.  *Malpiede v. Townson*, 780 A.2d 1075, 1090-96 (Del. 2001).

123.    The Committee's proposed claims are plainly subject to the exculpation provision in Invitae's charter.  *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 790-91 (Del. Ch. 2004) (holding that exculpation clauses apply to prevent creditors as well as shareholders from bringing duty of care claims); *Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004) (dismissing creditor's claims of a breach of the duty of care by director, including gross negligence, under exculpatory provision). Accordingly, unless the Committee can show the Fiduciary Defendants acted disloyally or in bad faith, or engaged in intentional misconduct or a knowing violation of the law, its proposed fiduciary claim is exculpated.  As set forth further below, the Committee cannot come close to meeting this burden—indeed, even if the Board's actions were not exculpated under the Company's charter, the Committee would not have stated a colorable duty of care claim.

124.    But even if the exculpation clause does not apply, the Director Defendants are still protected from liability because they reasonably relied on the advice of outside advisors.  As the

Committee acknowledges in its Proposed Complaint (Compl. ¶¶ 65, 115, 133, 143), the Company's directors appointed a Special Committee that received legal advice from Latham & Watkins LLP and financial advice from Goldman Sachs, Perella Weinberg Partners, and J. Wood Capital Advisors. Ex. 19 (October 13, 2022, Board Minutes). J. Wood and Perella ultimately advised on the March Exchange—repeatedly offering their strong recommendation that the transaction was in the best interests of the Company (Ex. 24 (February 25, 2023 Board Minutes) (referenced in Compl. ¶ 98))—and it was unanimously approved by the Board. Similarly, the Compensation Committee relied on the advice of FTI Consulting and Compensia in approving the Retention Payments. *See* Ex. 39 (January 5, 2024 Compensation Committee Minutes).

125. Because the Board and the Special Committee relied on experienced advisors, they are protected by Section 141(e) of the DGCL, which provides that a director "shall, in the performance of such member's duties, be fully protected in relying in good faith upon ... such information, ***opinions***, reports or ***statements*** presented to the corporation by any ... person as to matters the member reasonably believes are within such ... person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." 6 Del. C. § 141(e) (emphasis added). This provision protects directors "when they rely in good faith upon information presented to them from various sources, including any other persons as to matters the member reasonably believes are within such person's professional or expert competence and who has been selected with reasonable care by and on behalf of the corporation." *In re Residential Cap.*, LLC, 491 B.R. 63, 70 (Bankr. S.D.N.Y. 2013) (citations and quotations omitted). The Committee has not identified anything false or improper about the advice provided by these advisors, and even if they had, they have not alleged any facts to support the notion that the Board should not have relied on that advice. *See Tilden v. Cunningham*, No. 2017-0837-JRS,

2018 WL 5307706, at *17 (Del. Ch. Oct. 26, 2018) (dismissing bad faith claim where directors relied on outside financial advisor); *Lenois v. Lawal*, No. 11963-VCMR, 2017 WL 5289611, at *18 (Del. Ch. Nov. 7, 2017) (same).  Accordingly, the Director Defendants' reliance on their outside advisors alone necessarily defeats the Committee's proposed claims here.  *In re Rural Metro Corp.*, 88 A.3d 54, 86 n.13 (Del. Ch. 2014) ("[I]f the directors followed a process or reached a result falling outside the range of reasonableness, but did so in reliance on the advice of experts, they could be found to have breached their fiduciary duties under the applicable standard of review and yet be 'fully protected' against liability under Section 141(e) of the DGCL.").

### 2. *There Was No Violation of the Duty of Care*

126.    To be clear, even if the duty of care claim was not exculpated and the Board was not protected by 141(e) of the DGCL, the Proposed Complaint still fails to allege a colorable duty of care claim because the Committee does not plead allegations to overcome the business judgment rule.  Except in cases where there is a colorable allegation that the director or officer has a personal interest in a transaction at issue, "[t]he business judgment rule is the default standard of review" for a claim that a director or officer of a Delaware corporation breached their duty of care. *In re Ultimate Escapes Holdings LLC*, 682 F. App'x 125, 129 (3d Cir. 2017).  The business judgment review *presumes* that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company," *In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 295 (Bankr. D. Del. 2018) (citations omitted), and "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives," *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

127.    A plaintiff may overcome the presumption that directors and officers acted in good faith *only* by establishing that a decision was so egregious as to constitute corporate waste, such

that the only explanation for the decision was bad faith. *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (citing *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1053 (Del. Ch. 1996)). A plaintiff seeking to overcome the presumption bears the burden of showing that "no reasonable business person could possibly authorize the action in good faith." *Id.* Put differently, the plaintiff must show that the directors' business decision lacks "any rationally conceivable basis" or "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Palkon v. Maffei*, 311 A.3d 255, 268 & n.15 (Del. Ch. 2024), *cert. denied*, 2024 WL 1211688 (Del. Ch. Mar. 21, 2024); *see also Tower Air*, 416 F.3d at 238 ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). Alternatively, a plaintiff may attempt to establish a claim even where the business judgment rule applies, by proving that the directors or officers were grossly negligent. *See In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 64-65 (Del. 2006). "In the duty of care context gross negligence has been defined as 'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.'" *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005). This is an extremely high burden: "[a]s long as a board attempts to meet its duties, no matter how incompetently, the directors did not consciously disregard their obligations." *Chen v. Howard-Anderson*, 87 A.3d 648, 683 (Del. Ch. 2014).

128.    The Committee sprinkles the terms "bad faith" and "gross negligence" throughout both its Motion (¶¶ 129, 131, 132) and Proposed Complaint (¶¶ 210, 215-17) in an effort to avoid the business judgment rule. This conclusory effort fails. The actual *facts* the Committee alleges come nowhere close to meeting the Committee's burden of stating a claim that would overcome the business judgment rule. Specifically, the Committee alleges that the Fiduciary Defendants

breached their duty of care by approving the March and August Exchanges, purportedly because those transactions (i) favored certain creditors over others, and (ii) did not, by themselves, solve the company's liquidity problems. Compl. ¶¶ 210-216. Neither of these allegations are sufficient to sustain a fiduciary claim.

129.    First, the Committee's allegations that the Fiduciary Defendants acted in "bad faith" by preferring one group of creditors over another are legally and factually meritless. The law is clear that "the mere fact that directors of an insolvent firm favor certain creditors over others of similar priority does not constitute a breach of fiduciary duty, absent self-dealing." *Prod. Res. Grp.*, 863 A.2d at 791-92 (citing *Asmussen v. Quaker City Corp.*, 156 A. 180 (Del. Ch. 1931) (establishing the general rule that discrimination in priority between creditors of equal priority by insolvent companies is usually permitted)); *see also Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005) (as long as it is not preferring insiders, insolvent corporation may pay certain creditors and leave others unpaid); *In re Verestar, Inc.*, 343 B.R. 444, 477 (Bankr. S.D.N.Y. 2006) (same). Because the 2024 Noteholders were not "insiders" of Invitae—instead, they simply happened to be creditors with an earlier maturity (and therefore more leverage) than other creditors of the Debtors—there was absolutely nothing wrong with the Fiduciary Defendants' decision to "prefer" the 2024 Noteholders over the Debtors' 2028 Noteholders.

130.    Second, the Committee does not plausibly allege that, in approving the March and August Exchanges, the Fiduciary Defendants were not pursuing a business strategy that they genuinely believed was in the best interest of the Company. Far from acting with "bad faith" or "reckless indifference," *Benihana of Tokyo*, 891 A.2d at 192, the Fiduciary Defendants engaged in a thorough and deliberate negotiation process with Invitae's major debtholders across its capital

structure.  Indeed, the board minutes from the meetings that are referenced in the Committee's Proposed Complaint establish that the Fiduciary Defendants (i) carefully considered the benefits and costs of the March and August Exchanges, including alternatives to those transactions proposed by other creditor groups, and (ii) elected to pursue the March and August Exchanges because they believed those transactions were in Invitae's best interests, as they would address the looming 2024 maturity overhang, provide some liquidity, and pave the way for the Company's efforts to raise the additional capital needed to return the business to profitability.

131.    In February 2023, leading up to the approval of the March debt exchange transaction, the Company's Board and its Pricing and Finance Committees held eight meetings to consider transaction alternatives from unsecured noteholders and to finalize transaction terms for the March Exchange to ensure they maximized value for the Company's stakeholders.  Third-party advisors from J. Wood and Perella were present at multiple of those meetings to provide reports on, and engage in detailed discussions regarding, terms for the potential transaction.  *E.g.*, Ex. 26 (February 10, 2023 Finance Committee Minutes); Ex. 29 (February 25, 2023 Board Minutes) (referenced in Compl. ¶ 98).  For example:

- During a February 1, 2023 meeting, members of the Finance Committee met with management and J. Wood advisors and discussed the status of negotiations with the 2024 Unsecured Noteholders, as well as alternatives to the proposed transaction. Ex. 24 (February 1, 2023 Finance Committee Minutes).

- During a February 24, 2023 meeting, members of the Finance Committee engaged in a detailed discussion regarding the proposed restructuring of the 2024 Notes, as well as discussions with the 2028 Unsecured Noteholders.  Ex. 28 (February 24, 2023 Finance Committee Minutes).  Board members specifically discussed the lack of "any new financing" offered by the 2028 Unsecured Noteholders, the "relative immediacy" of the 2024 Notes' maturity date as compared to the 2028 Notes, and the "higher hurdle on stockholder approval" that would be required for the transaction proposed by the 2028 Unsecured Noteholders.  *Id.*

- During a February 25, 2023 meeting, the entire Board discussed the transactions. Compl. ¶ 98.  During the meeting, J. Wood provided a detailed report and expressly recommended proceeding with the March Exchange for a host of specific reasons:

The representatives of J. Woods Capital Advisors provided a detailed report regarding, and engaged in detailed discussion with the Board with respect to, a potential restructuring transaction involving the Corporation's convertible notes due in 2028 (the "*2028 Notes*") recently proposed by a holder of the 2028 Notes (the "*Potential 2028 Notes Restructuring*"), including as compared with a potential restructuring transaction involving the Corporation's convertible notes due in 2024 (the "*2024 Notes*") under negotiation with a lead holder of the 2024 Notes (the "*Proposed 2024 Notes Restructuring*"), including (i) that, while offering certain potential benefits, the Potential 2028 Notes Restructuring presented various risks, particularly in view of the substantially greater near-term dilution represented by the Potential 2028 Notes Restructuring (and required share authorization), (ii) the substantially greater benefit of extending the term of the 2024 Notes (given their relative immediacy) as opposed to the 2028 Notes (as to which the Corporation continues to benefit from a significant period of time to address), (iii) the expectation that addressing the 2024 Notes first will allow the Corporation to address its balance sheet challenges in an orderly manner with the prospect of building value and momentum (which would afford the Corporation greater strength in negotiating a transaction for the Corporation with respect to the 2028 Notes), and (iv) the fact that the 2028 Notes represent relatively low cost funding (thus not pushing the Corporation to accelerate the 2028 Notes as a restructuring priority). As part of its report, the representatives of J. Woods Capital Advisors provided the Board with a recommendation to move forward with the Proposed 2024 Notes Restructuring (in lieu of a Potential 2028 Notes Restructuring and also in lieu of potentially stalling the Proposed 2024 Notes Restructuring to pursue discussion with respect to a Potential 2028 Notes Restructuring).

132.    In other words, the Committee has failed to establish that the Fiduciary Defendants acted with the requisite scienter. *See Okla. Firefighters Pension & Ret. Sys. v. Corbat*, No. 12151-VCG, 2017 WL 6452240, at *1 (Del. Ch. Dec. 18, 2017) ("To imply director liability [for breach of the duty of care], the response of the directors must have been in bad faith. The inaction must suggest, not merely inattention, but actual scienter."). Instead, they merely seek to exploit hindsight to argue that the Fiduciary Defendants should have known the March and August Exchanges would not result in the hoped-for liquidity. This is not enough as a matter of law. *See Stone v. Ritter*, 911 A.2d 362, 373 (Del. 2006) (affirming motion to dismiss where "[w]ith the benefit of hindsight, the plaintiffs' complaint [sought] to equate a bad outcome with bad faith"). Delaware courts routinely refuse to infer bad faith merely because a decision turned out badly, as such approach "would impose liability by hindsight." *IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 621 (Del. Ch. 2023); *see also id.* ("What actually happens down the road is a different issue than whether the decision appears extreme when made.").

133.    That the Fiduciary Defendants did not act with bad faith is particularly apparent here given the "alternatives" that the Committee implies Invitae's Board should have pursued instead of the March and August Exchanges.  Notably, the Committee identifies no transaction that would have resulted in additional cash being invested into the Company; instead, the Committee claims that the Board should have pursued an alternative exchange transaction that would have included some of the 2028 Unsecured Noteholders as well as the 2024 Unsecured Noteholders (Compl. ¶¶ 90, 112), or that the Board simply should have put the Company into chapter 11 back in early 2023 (*id.* ¶ 117).  These arguments are dead ends.

134.    For starters, the Board expressly looked into the first alternative and concluded that it was not in the best interests of the Company.  As meeting materials and minutes reflect, the Company's advisors believed that the proposal from the 2028 Unsecured Noteholders was not actionable because it would have required a shareholder vote and such vote would have asked the shareholders to massively dilute themselves.  Ex. 28 (February 24, 2023 Finance Committee Minutes); Ex. 29 (February 25, 2023 Board Minutes) (cited in Compl. ¶ 98).  In addition, the proposal from the 2028 Unsecured Noteholders did not address the Company's nearest-term maturities.  Instead, the Company still would have had to execute a transaction with the 2024 Noteholders.  *Id.*  Invitae's decision to extend its debt maturity and increase cash easily meets the business judgment threshold.  The Company opted to give itself more time to pay down debts and make operational improvements, as opposed to allowing debt maturity deadlines to loom that hurt its share price and restricted its restructuring options.  In other words, the Committee has not and cannot come close to meeting its burden of establishing that the Board's considered selection of one transaction over another was made in "bad faith."  *McElrath v. Kalanick*, No. 2017-0888-SG, 2019 WL 1430210, at *10 (Del. Ch. Apr. 1, 2019) (clarifying that bad faith requires a conscious

69

disregard for fiduciary duties and noting "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties").

135.    As to the decision not to simply put Invitae in bankruptcy in 2023, even assuming that the Company was insolvent as of the March Exchange (it was not), it is well established that "[d]irectors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of creditors' interests," and "deepening insolvency" is not grounds for a fiduciary duty claim. *In re Midway Games Inc.*, 428 B.R. 303, 316 (Bankr. D. Del. 2010). For example, in rejecting a claim that directors breached their fiduciary duties to creditors by failing to consider a bankruptcy filing, instead incurring additional debt, Justice Strine, writing as Vice Chancellor in *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, concluded:

> It is no doubt regrettable that [the company] became insolvent. That insolvency no doubt injured their stockholders, creditors, customers, and employees. But the mere fact of a business failure does not mean that a plaintiff can state claims against the directors, officers, and advisors on the scene just by pointing out that their business strategy did not pan out. If simple failure gave rise to claims, the deterrent to healthy risk taking by businesses would undermine the wealth-creating potential of capitalist endeavors. For that reason, our law defines causes of action that may be pled against business fiduciaries and advisors with care, in order to balance society's interest in promoting good-faith risk-taking and in preventing fiduciary misconduct.

906 A.2d 168, 218 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007).[31] Those sentiments are directly applicable here.

---

[31]    As the Committee's own caselaw makes clear, "Delaware law does not require the Board to shut down [a] business and manage towards a near-term dissolution for the benefit of creditors," even when that business is insolvent. *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 185 (Del. Ch. 2014).

### 3.    There Was No Violation of the Duty of Loyalty

136.    The Committee's allegations that the Fiduciary Defendants breached their duty of loyalty are so threadbare and conclusory that it is difficult to even decipher how the Committee claims the Company's officers and directors were disloyal.  It appears the Committee seeks to state a duty of loyalty claim on the grounds that the Fiduciary Defendants "favor[ed] certain creditors," and "[kept] the Debtors' [*sic*] afloat to preserve their equity interests and receive bonuses."  Mot. ¶ 133; Compl. ¶ 217.  These allegations fall far short of the requisite pleading to sustain a breach of the duty of loyalty claim.

137.    "The threshold inquiry in assessing whether a director violated his duty of loyalty is whether the director has a conflicting interest in the transaction."  *Matter of Seidman*, 37 F.3d 911, 934 (3d Cir. 1994) (citation omitted).  Directors are considered to be interested if they appear on both sides of a transaction or receive a personal benefit from a transaction not received by the shareholders generally.  *See In re Teleservices Grp., Inc.*, No. 03-17230 (MBK), 2009 WL 838157, at *12 (Bankr. D.N.J. Jan. 15, 2009) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993)).  Here, the Committee's loyalty claim cannot even get past this threshold issue:  while the Proposed Complaint asserts that the Fiduciary Defendants "fail[ed] to subordinate their personal interests to the interests of Invitae" (Compl. ¶¶ 209, 217), the Committee never actually identifies what "personal interests" of the Fiduciary Defendants were implicated by any of the transactions at issue, or how they were implicated.

138.    Nor does the Committee identify how the Fiduciary Defendants stood to receive any *personal* benefit from the March and August Exchanges—*i.e.*, uptier debt exchanges with a third-party lender following arm's-length negotiations.   As noted above, the fact that the transactions "favor[ed] certain creditors" does not state a claim for breach of fiduciary duty. *See supra* ¶ 129; *Prod. Res. Grp.*, 863 A.2d at 791-92; *In re Sharp Int'l Corp.*, 403 F.3d at 54.

And as to the allegation that the Fiduciary Defendants are liable for "keeping the Debtors' [*sic*] afloat to preserve their equity interests and receive bonuses" (Mot. ¶ 133), the law is clear that "there is no basis, without more being alleged, to equate a charge of 'deepening insolvency' with a . . . breach of the duty of loyalty." *In re Verestar, Inc.*, 343 B.R. at 477.

### 4.  *The Committee's Aiding and Abetting Claim Is Not Colorable*

139.    In Count 6 of the Proposed Complaint, the Committee alleges that Deerfield aided and abetted the alleged breaches of fiduciary duties.  As with the fiduciary duty claims, this claim also is not colorable.

140.    "In order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." *Bd. of Trustees of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002); *see also In re Oracle Corp. Derivative Litig.*, No. CV 2017-0337-SG, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) ("To withstand a motion to dismiss, a plaintiff must plead facts making it reasonably conceivable that the defendant knowingly supported a breach of duty and that his resulting assistance to the primary actor constituted substantial assistance in causing the breach.").

141.    Even if a court were to find that the Committee has sufficiently pled allegations that the Fiduciary Defendants breached their fiduciary duties—and it has not—the Committee's Proposed Complaint fails to allege any facts making it reasonably conceivable that Deerfield "knowingly participated" in the breach.  "The element of knowing participation involves two concepts: knowledge and participation." *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. 2021).  It is a "stringent" standard and difficult to plead. *Binks v. DSL.net, Inc.*, No. CIV.A. 2323-VCN, 2010 WL 1713629, at *10 (Del.

Ch. Apr. 29, 2010).  To satisfy the knowledge prong, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *Presidio*, 251 A.3d at 275.  The test for knowledge turns on actual "proof of scienter" of the alleged abettor.  *Lee v. Pincus*, No. CV 8458-CB, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014). The scienter requirement "makes an aiding and abetting claim among the most difficult to prove," *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 865-66 (Del. 2015), and "protects the alleged aider and abettor by ensuring that the alleged aider and abettor still will not face potential liability absent pled facts that support an inference of scienter," *In re Columbia Pipeline Gp., Inc.*, No. CV 2018-0484-JTL, 2021 WL 772562, at *53 (Del. Ch. Mar. 1, 2021).  The participation prong "requires that the secondary actor have provided substantial assistance to the primary violator." *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co.*, No. 9250-VCG, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017).  To satisfy this prong, a plaintiff must plead that the third party "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Malpiede*, 780 A.2d at 1098.

142.    The Committee's allegations do not come close to meeting either component necessary to satisfy the "knowing participation" requirement.  The Committee does not even try to establish that Deerfield knew or had reason to believe that there was anything improper about the March and August Exchanges.  Rather, the Complaint makes a conclusory statement that Deerfield "used its preexisting relationship with the Debtors and its consent rights to encourage the Company's management to enter into [the March and August Exchanges]" and "colluded with the Debtors to hand pick a select group of 2024 Unsecured Noteholders the opportunity to participate in the March Exchange at the expense of other similarly situated creditors."  Compl. ¶ 223.  Unsurprisingly, courts have found such bare-bones, conclusory allegations flatly

insufficient to state a claim for aiding and abetting.  *See, e.g.*, *In re Jevic Holding Corp.*, 2011 WL

4345204, at *13 (Bankr. D. Del. Sept. 15, 2011) ("The Complaint merely states in general terms

that CIT knew the directors and officers of Jevic who breached their fiduciary duties, knew that

their conduct amounted to such breach, and directed, encouraged, and assisted such conduct.").

The Committee does not allege facts that would support an allegation that Deerfield "conspired"

with Invitae's Board, or "create[d] or exploit[ed] conflicts of interest" among the Company's

directors, which are the types of facts that the Committee would need to allege in order to state a

colorable claim for aiding and abetting.  *Malpiede*, 780 A.2d at 1097-98.  At most, the facts alleged

in the Proposed Complaint describe an arm's-length negotiation between Invitae and one of its

creditors—and it is well established that "arm's-length negotiations are inconsistent with

participation in a fiduciary breach."  *Id.* at 1098.

## G.    The Committee's Retention Payment Claims Are Not Colorable

143.    The Committee challenges the Company's issuances of retention payments to

certain of the Company's officers as a breach of fiduciary duty (Count 5), a preference (Count 10),

and/or a fraudulent transfer (Count 11).  Each of these claims fails as a matter of law.

### 1.  *The Board Did Not Breach Any Fiduciary Duties By Approving the Retention Payments*

144.    The Committee appears to challenge the Board's decision to award the Retention

Payments to certain officers and directors as a fiduciary violation, although it is unclear whether

they allege a breach of the duty of loyalty or care.  Compl. ¶ 214.  As the Proposed Complaint

acknowledges, the Retention Payments were approved by the Compensation Committee and the

full Board (and, as to Mr. Knight, the independent members of the Board), *not* the directors and

officers who received them.  Compl. ¶ 147; *see also* Ex. 42 (January 11, 2024 Board Minutes)

(referenced in Compl. ¶ 147).  As a result, any allegation that the Retention Payments constituted

a breach of the duty of loyalty must be rejected, *In re AgFeed USA, LLC*, 558 B.R. 116, 128 (Bankr. D. Del. 2016), and in order to challenge the Retention Payments as a fiduciary violation, the Committee must meet the standard for alleging "corporate waste."

145.   Delaware law recognizes that directors have broad discretion in the amount of compensation they award to a corporation's officers. *In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 F.4th 250, 265 (3d Cir. 2024).   It is only where compensation constitutes "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade," that courts in Delaware and the Third Circuit will entertain waste claims related to executive compensation.   *Id.*; *see also In re DSI Renal Holdings*, *LLC*, 574 B.R. 446, 476-77 (Bankr. D. Del. 2017) (complaint must allege that directors "authorized an exchange that was so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration") (internal citation omitted).   Even then, courts have refused to find such compensation constituted waste. *See In re Cognizant Tech.*, 101 F.4th at 265 (finding plaintiffs could not sustain a waste claim where plaintiffs did not plead facts demonstrating that the Director Defendants did nothing for their salaries during the relevant period).   If there is any substantial consideration received by the corporation, and if there is a good faith judgment that a transaction is worthwhile given the circumstances, there should be no finding of waste, "even if the fact finder would conclude ex post that the transaction was unreasonably risky." *In re The Brown Sch.*, 368 B.R. 394, 408 (Bankr. D. Del. 2007) (internal citation omitted); *In re Liquid Holdings Grp., Inc.*, No. 16-10202 (KG), 2018 WL 2759301, at *20 (Bankr. D. Del. June 6, 2018) (noting that the test for corporate waste is an "extreme" test and is "rarely satisfied") (quoting *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015)).

146.     Here, the Committee does not and cannot allege facts that would show that the Board's decision to award the Retention Payments was so unreasonable as to comprise "corporate waste." As noted above, Invitae's Compensation Committee developed the Retention Payments to ensure there would be no disruption to operations and to facilitate and maximize the value of the sale, to ensure retention and active engagement of its key executives, to help facilitate an uncertain chapter 11 process, and to go with the business once sold, and in doing so retained and worked closely with third-party compensation advisors to develop and refine a competitive and cost-conscious program to retain key officers and personnel in their roles while Invitae navigated this transition. *Supra*, ¶¶ 46-50. The deliberations with respect to the retention programs were intensive, taking place over many weeks and involving multiple meetings of the full Board and multiple Compensation Committee meetings. *Id.* This thorough, multi-week process ultimately concluded with Board approval only after (i) the Compensation Committee informed itself through experts, and received advice that these types of programs are common in distressed situations, and that the amounts awarded were in line with market amounts; and (ii) the Board determined, consistent with industry practice and the advice from the Company's advisors, that the retention program was reasonable and in the best interests of the Company. *Id.*

147.     It was reasonable for the Compensation Committee to conclude that the risk of losing key employees in the middle of a restructuring outweighed the cost. The Debtors—and all their stakeholders—received immense value from and consideration in exchange for the Retention Payments, as these payments helped enable the $239 million sale to Labcorp. And there was a very clear corporate purpose to these Retention Payments: without the efforts of the Debtors' key executives the company would have been impossible to sell. Accordingly, the Committee's

allegations that the decision to award the Retention Payments was a breach of fiduciary duty or a waste claim are not colorable as a matter of law.

### 2.  The Retention Payments Were Not Preferential Transfers

148.    As an initial matter, the Retention Payments issued to various officers in January 2024, and to Mr. Knight in late 2023, cannot be preferential transfers because they were not payments on account of an antecedent debt—the most basic requirement that any transaction must meet in order to constitute a potential preference.  11 U.S.C. § 547(b)(2); *see Drivetrain, LLC v. X. Com., Inc.*, No. AP 22-50448, 2023 WL 1804627, at *7 (Bankr. D. Del. Feb. 7, 2023) ("[I]t is well established that advance payments are prima facie not preferences because the transfer from the debtor to the creditor is not for or on account of an antecedent debt.") (quoting *In re Hechinger Inv. Co. of Del., Inc.*, 327 B.R. 537 (Bankr. D. Del. 2004)).  Each of these payments was made in advance of a future vesting date, in exchange for the officers' future service, and with an express "clawback" provision that would require the officers to return the advance payment if they quit the Company before the payments actually vested.  *See* Ex. 14 (October 19, 2023 Invitae Form 8-K) (attaching Retention Bonus Agreement); Ex. 16 (January 18, 2024 Invitae Form 8-K) (attaching Retention Bonus Agreement).

149.    But even if the Retention Payments were payments on account of an antecedent debt, they would not constitute preferential transfers, since each of the Retention Payments was intended to be, and was, a contemporaneous exchange for new value given to the Debtors—namely, the commitment to stay with the business for the following year, subject to a clawback right if the executives left the Company during that period (except in certain circumstances).  *See* 11 U.S.C. § 547(c)(4); *In re NMI Sys., Inc.*, 179 B.R. 357, 374 (Bankr. D.D.C. 1995) ("Pillard's services, at the compensation contracted for between the parties, constituted new value every time he performed new services. . .. The value of his services also included a bonus

component. Thus, in applying the new value exception of § 547(c)(4) any unpaid bonus compensation for new work performed must be taken into account.").

150.     The Retention Payments challenged by the Committee also were indisputably made by the Debtors in the ordinary course of business, according to ordinary business terms.  This is certainly true with respect to the "Stock Based Bonuses" awarded through the SIP, which were completely in line with the Company's past practices and industry standard; in many instances were approved *years* before the petition date; and in any event were awards of *equity*, which the Committee itself implies was worthless due to the Company's alleged insolvency.  And it is also true of the Retention Payments, which were in line with industry standard, and designed by compensation consultants.   As a result, they are not recoverable.   11 U.S.C.  § 547(c)(2); *In re Cherrydale Farms, Inc.*, No. 99-597 (PJW), 2001 WL 1820323, at *4 (Bankr. D. Del. Feb. 20, 2001) (finding bonus payment fell within the Section 547(c)(2) exception and noting that "[t]he relevant inquiry is whether [the debtor] has an established practice of making such payments, discretionary or otherwise"); *accord In re Fulghum Constr. Corp.,* 872 F.2d 739, 743 (6th Cir. 1989) ("Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties") (citation omitted).

151.     In any event, as a matter of law, preferences are *voidable* but not *void*.  *In re Union Meeting Partners*, 160 B.R. 757, 766 (Bankr. E.D. Pa. 1993) ("The fact that a creditor's action is voidable as a preference does not render that action void or otherwise invalid prior to a court's determination that the transfer is in fact avoided."); *In re Churchill Nut Co.*, 251 B.R. 143, 150 (Bankr. N.D. Cal. 2000) (same); *In re Kaplan*, 162 B.R. 684, 709, n.6 (Bankr. E.D. Pa. 1993) (same), *aff'd sub nom. Kaplan v. First Options of Chicago, Inc.*, 189 B.R. 882 (E.D. Pa. 1995).

152.     The officers who received the Retention Payments here worked tirelessly to prepare the Debtors' assets for sale and continue to work to consummate the sale. *See* Ex. 16 (January 18, 2024 Invitae Form 8-K) (attaching Retention Payment Agreement, which provides that executives would be required to repay bonus if they left the Company within one year). Indeed, many of the officers who received Retention Payments have stayed on with the business and will remain with the business when the sale to Labcorp is consummated, and the fact that they remained with the business notwithstanding the Debtors' financial uncertainty such that they could transition to whichever bidder successfully ultimately acquired the Debtors' assets—*i.e.*, the exact result intended through the Retention Payments—undoubtedly increased the price that the Debtors received through the sale. *See* [Dkt. No. 463] (APA) § 6.3(a) (Labcorp acquiring 95% of employees). Accordingly, given the recipients' reliance on the Retention Payments to provide valuable services to the Debtors, it would be patently unfair and inequitable to void those payments now.

### 3.   *The Retention Payments Were Not Fraudulent Transfers*

153.     The Committee's claim that the Retention Payments are fraudulent transfers fails because Invitae received reasonably equivalent value for the Retention Payments. As the Third Circuit has recognized, determining whether a debtor received reasonably equivalent value for an intangible service involves a two-step inquiry considering (1) whether the debtor received *any* value, and (2) whether, under a totality-of-the-circumstances standard, the value conferred on the debtor was reasonably equivalent to what the debtor gave up. *In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996).

154.     Here, the Committee cannot credibly argue that Invitae received *no* value from the Retention Payments. To the contrary, the Retention Payments incentivized certain officers to stay with the business and to complete the value-maximizing sale to Labcorp. The involvement of

these officers undoubtedly increased the price that the Debtors received through the sale.  As the Third Circuit has made clear, the standard for determining value is relatively low; the question is whether the debtor received *any* benefit, and the benefit need not be a "direct, tangible economic benefit."  *Id.* at 151; *In re F-Squared Inv. Mgmt. LLC*, 600 B.R. 294, 304 (Bankr. D. Del. 2019).  Even the "chance of receiving an economic benefit" is sufficient to constitute value.  *R.M.L.*, 92 F.3d 139 at 153.  In the bonus context, the fact that a bonus is discretionary is irrelevant.  *F-Squared*, 600 B.R. at 305 (rejecting as a matter of law that payment of a bonus pursuant to an entirely discretionary bonus plan that does not contain any pre-enunciated performance or incentivizing metrics can never be for "value").  Thus, the Debtors received a value for the Retention Payments.

155.    Additionally, the Debtors received reasonably equivalent value for the Retention Payments, and the payments would clearly pass the totality-of-the-circumstances test.  *See R.M.L.*, 92 F.3d at 148, 153 (courts determine reasonably equivalent value by considering (1) whether the transaction was at arm's-length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid); *In re OPP Liquidating Co., Inc.*, No. 19-10729 (MFW), 2022 WL 774063, at *13 (Bankr. D. Del. Mar. 14, 2022) (same).  As described above (*supra* ¶¶ 46-50), the Retention Payments ensured that key members of management remained at the Company to help effect the Labcorp sale and otherwise preserve the Debtors' value.

156.    Moreover, the Retention Payments were at arm's-length, comparable to other retention bonuses in the market, and approved by the Compensation Committee and the independent members of the Board based on the advice of well-reputed third-party advisors.  *Supra* ¶¶ 46-50.  The Committee does not meaningfully argue otherwise.  Indeed, it writes a one-sentence

conclusory assertion proffering that the Debtors did not receive reasonably equivalent value for the Retention Payments.  Compl. ¶ 252.  But the Committee does not allege any actual facts—as opposed to threadbare recitals of the fraudulent transfer elements—in support of its claims.  For instance, the Committee does not assert that the payments were above market.  Nor does it assert that the bonuses were not at arm's-length.

157.    Courts in the Third Circuit have consistently found that debtors have received reasonably equivalent value with respect to similar bonus payments.  *In re SRC Liquidation LLC*, 581 B.R. at 97-98 (affirming dismissal of fraudulent transfer counts where complaint failed to sufficiently allege that company received less than reasonably equivalent value for bonuses it paid), *aff'd*, 765 F. App'x 726 (3d Cir. 2019); *see also Midway Games*, 428 B.R. at 323 (concluding that plaintiff failed to state a claim for avoidance of fees paid to its directors as fraudulent transfers where it did not allege that the fees paid were excessive).  This is true even when the activities of officers and directors are ultimately unsuccessful in saving the company, as it "does not detract from the work undertaken by [officers and directors] for which they were compensated." *In re SRC Liquidation LLC*, 581 B.R. at 98.  Accordingly, the Retention Payments were not fraudulent transfers, and the Committee's proposed fraudulent conveyance claim is not colorable as a matter of law.

### H.    The Committee's Disallowance and Setoff Claims Are Not Colorable

158.    Because the Committee's substantive claims all fail as a matter of law, its claims for disallowance (Claim 12) and setoff (Claim 13) necessarily fail as well.  *See In re Broadstripe, LLC.*, 444 B.R. 51, 109 (Bankr. D. Del. 2010) ("To disallow a claim under section 502(d) requires a judicial determination that a claimant is liable."); *In re Ultimate Acquisition Partners, LP*, No. 11-10245 MFW, 2012 WL 1556098, at *3 (Bankr. D. Del. May 1, 2012) ("The Court finds that the Trustee's 502(d) claim should be dismissed.  A debtor or trustee 'wishing to avail itself of the

benefits of section 502(d) must first obtain a judicial determination on the preference complaint.'") (internal citation omitted); *In re Women First Healthcare, Inc.*, 345 B.R. 131, 134-35 (Bankr. D. Del. 2006) (in order to exercise right of setoff, debtor must first show that "the creditor owes [a debt] to the estate"); *see also* Compl. ¶ 264 (seeking setoff only "[t]o the extent that any damages are awarded to the Estates from Deerfield").

**I.    The Committee's Alleged Unencumbered Assets Claims Are Neither Colorable Nor Appropriate for a Standing Motion**

159.    In Claims 7-9 of their Proposed Complaint, the Committee seeks to avoid the Secured Noteholders' liens on certain bank accounts and commercial tort claims (the "Alleged Unencumbered Assets"). The Committee is not entitled to standing to pursue these claims.

160.    First, by its own admission, the Committee does not require standing to challenge the Secured Noteholders' liens—it can do so (and has done so) through its pending Claim Objection [Dkt. No. 528], which will be addressed at confirmation. The Committee states in its Claim Objection that it is a party in interest with a "well-established right to object to the allowance of claims, to seek the reduction of any secured portion of such claims to the extent of certain unencumbered assets, and to request the other relief set forth" in its objection. [Dkt. No. 528], Attachment 1 at ¶ 32. It is therefore unclear why the Committee *also* thinks it needs standing to pursue an ordinary-course perfection challenge through a separate, duplicative adversary proceeding, instead of through the Claim Objection that the Committee already filed—especially when doing so will only increase the administrative costs to be borne by the estates.

161.    Second, even if the Committee's Proposed Complaint were an appropriate vehicle to challenge the Secured Noteholders' prepetition liens on the Alleged Unencumbered Assets, its challenge is mooted by the Court's Final Cash Collateral Order [Dkt. No. 188], and is therefore not colorable or beneficial to the estates. Pursuant to the Cash Collateral Order, the Secured

Noteholders are deemed to have been granted fully perfected first-priority senior liens over "all of the Debtors' other now-owned and hereafter acquired real and personal property, assets and rights of any kind of nature, wherever located, whether encumbered or unencumbered," to the extent of any diminution in value of the Secured Noteholders' interests in their prepetition collateral.  [Dkt. No. 188] at ¶¶ 20-21.   Because the Secured Noteholders' prepetition collateral includes the Debtors' cash, and because that cash has been used to fund the administrative expenses of the estates, there can be no question that there has been a diminution in value.   Thus, even if the Committee were able to avoid the Secured Noteholders' prepetition liens on the Alleged Unencumbered Assets, the Secured Noteholders possess (or will be deemed to possess) fully perfected replacement adequate protection liens over the same assets, rendering the Committee's claims moot.

**III.     The Debtors Have Not "Unjustifiably Refused" to Pursue the Proposed Claims**

162.     As noted above, derivative standing extends the rights of the debtors-in-possession to self-interested stakeholders, and is therefore reserved only for narrow circumstances "when the Bankruptcy Code's envisioned scheme breaks down."   *In re Weyandt*, 544 F. App'x 107, 110 (3d Cir. 2013) (citing *Cybergenics*, 330 F.3d at 553).   It is for this reason that granting derivative standing requires that a creditors' committee not only prove that a colorable claim exists, but ***also*** establish that the Debtors have ***unjustifiably*** refused to bring such claim.   *In re SI Restructuring Inc.*, 714 F.3d 860, 863-64 (5th Cir. 2013).   Absent proof of unjustified behavior, the Court should deny derivative standing.   *See In re Diocese of Camden*, 2022 WL 884242, at *9, *12 (denying committee's motion for derivative standing despite there being potentially colorable claims "[b]ecause the Committee has not shown that Debtor is unjustified in refusing to pursue the claims asserted by the Committee"); *In re Milazzo*, 450 B.R. 363, 378 (Bankr. D. Conn. 2011) (where moving creditor "offered no evidence to support a finding that the estate would eventually benefit

in an additional monetary amount" and debtor provided testimony regarding "amount of the transfers at issue, the various defenses raised, the complexity of the factual issues to be tried, the anticipated expense and duration of the trial, and the competence and aggressiveness [of] defendant's counsel," derivative standing was not in best interest of estate); *In re Copperfield Invests., LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010) (emphasizing that "[t]he party seeking derivative standing bears the burden of establishing, by competent evidence, that the proposed claims are colorable and that the trustee unjustifiably refused to bring suit"). The Committee has failed to meet its burden because the Debtors have not unjustifiably refused to pursue any of the Proposed Claims. The Committee's Motion should be denied on this basis alone.

### A.    The Legal Standard for Justifiable Refusal

163.    In determining whether a Debtor's refusal is unjustified, "[t]he court should weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 516 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016); *see also In re Sunbeam Corp.*, 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002) ("Thus, a finding that allowing a committee to pursue a debtor's claim would be necessary and beneficial to the resolution of the bankruptcy proceeding is required in all instances."). The cost-benefit analysis required under the test for derivative standing should include an assessment of the probability of success, the amount of potential recovery, and the costs of litigation. *In re STN Enters.*, 779 F.2d at 905; *Diocese of Camden*, 2022 WL 884242, at *5.

164.    The Committee bears the burden to produce evidence to "assure [the Court] that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *In re G-I*

*Holdings*, 313 B.R. at 629 (quoting *In re STN Enters.*, 779 F.2d at 905-06).  This is not an easy standard for the Committee to meet and it fails to do so.

165.    A cost benefit analysis requires more than "blind confidence."  *In re Diocese of Camden*, 2022 WL 884242, at *10.  The party challenging the debtor's purported refusal to bring a claim—here, the Committee—must "allege sufficient facts" that address the "litigation risks" and likelihood of success for the specific claims.  *Id.*  Furthermore, the alleged benefit to the estate must be supported by analysis that demonstrates "why [the] amount is accurate or reliable."  *Id.* at *11.  Conclusory allegations of potential value, even if "substantial," "d[o] not adequately analyze the costs and risks of…litigation, and therefore, fail[] to provide a cost-benefit analysis that meets [the] burden of proof" to establish standing.  *Id.* at *9.  Moreover, when a request for derivative standing will not benefit the estate as a whole, courts have held that derivative standing is "necessarily improper."  *In re Redden,* No. 04-12335 (PJW), 2013 WL 5436368, at *3 (Bankr. D. Del. Sept. 30, 2013).

166.    As described in greater detail below, the Committee falls far short of demonstrating that the Debtors unjustifiably refused to pursue the Committee's meritless proposed claims.  *First*, the Debtors *are* pursuing the proposed claims, through settlements they obtained from the Senior Secured Noteholders and implemented through the Plan.  And by not litigating the proposed claims, the Debtors extracted significant concessions from the Debtors' secured creditors.  *Second*, allowing the Committee to pursue the proposed claims would impose significant costs on the estates without any benefit to the Debtors' stakeholders at large.

**B.      The Debtors Investigated the Proposed Claims, Concluded that the Costs of Litigating Them Outweighed the Purported Benefits of Litigating, and Pursued the Claims Through the Settlements Proposed in the Plan**

167.    A debtor's exercise of its fiduciary duties includes the pursuit of *both* litigation *and* settlement as a means of maximizing value.  The Third Circuit has emphasized that "compromises

are favored in bankruptcy" since they minimize litigation costs and provide for the efficient resolution of bankruptcy cases. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting *Protective Comm. For Indep. S'holders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Accordingly, pursuit of claims is not limited to litigation—settlement is a form of "pursuit" as well. *See In re Manley Toys Ltd.*, No. 16-15374 (JNP), 2020 WL 1580244, at *8 (Bankr. D.N.J. Mar. 31, 2020) ("Engaging in settlement discussions with opposing parties is evidence that the [Debtors] are in fact pursuing the Claims.").

168.   Here, the Debtors plainly "pursued" the claims identified by the Committee. Specifically, the Debtors negotiated a settlement with the Senior Secured Creditors that provides a multitude of benefits to the Debtors' estates, including valuable concessions the Debtors secured from Deerfield, including: (1) Deerfield's commitment to support the Plan, which maximizes estate value and will result in equitably distributed near-full recoveries to over 95% of the Debtors' creditors, and the payment in full of all administrative claims, (2) access to and use of the cash collateral, and (3) ensuring a competitive, market-based auction process for the Debtors' assets.

169.   ***First***, as the senior secured noteholder holding the vast majority of the Debtors' secured debt, Deerfield's support for the Plan is a significant benefit to the Debtors' estates. Litigation would have prevented this support. Instead, Deerfield's agreement to support the Plan paved a clear path to providing near-total recovery for the secured notes claims and full recovery

for the vast majority of unsecured claims, through the creation of a convenience class and subsidiary unsecured claim class with Deerfield's agreement to the non-impairment of those classes notwithstanding Deerfield's structural seniority.  [Dkt. No. 615.]  Deerfield also agreed to payment of all administrative claims in full, which is necessary to facilitate exit from chapter 11 and avoid liquidation, as well as to ensure funds would be available to responsibly wind down these estates and collect any remaining contingent assets for distribution to stakeholders.  *See In re Murray Metallurgical Coal Holdings, LLC*, 614 B.R. 819, 837 (Bankr. S.D. Ohio, 2020) ("There is a risk that the Committee's strategy could lead to a liquidation in which administrative and priority creditors are not paid in full as they would be under a Chapter 11 plan.").

170.    ***Second***, the Debtors secured Deerfield's consent to use cash collateral to fund these chapter 11 proceedings, which allowed the Debtors to continue operating as a going concern, the primary goal of chapter 11 proceedings.  *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 361 (Bankr. D.N.J. 2020).  The Final Cash Collateral Order was the culmination of negotiations with Deerfield, and ensured estate resources were maximized and not wasted or depleted as a result of matters unrelated to the chapter 11 proceedings.  [Dkt. No. 188.]  Because of Deerfield's willingness to commit cash collateral through confirmation, the Debtors were able to continue operations and avoid a liquidation, design a plan that pays the majority of creditors in full, and establish runway and flexibility from a friendly lender with beneficial terms.

171.    ***Third***, the Debtors benefited by ensuring a competitive, value-maximizing auction process for its core business.  The marketing process spanned multiple months, during which the Debtors engaged with over 70 parties, and they received six indications of interest.  [Dkt. No. 463.] Critically, as noted above, the Debtors were able to secure a credit bid from Deerfield that resulted in an increased sale price of approximately $60 million.  *Supra*, ¶ 59.  The Debtors' decision not

to pursue litigation challenging Deerfield's liens enabled this bid, and sharply contrasts with the Committee's own attempt to block Deerfield from participating, which (if successful) would have cost the estates $60 million—demonstrating the extent of the Committee's value-destroying behavior in these cases, which has culminated in the Standing Motion.

172.    Ultimately, the concessions the Debtors obtained from Deerfield provide benefits to the Debtors' estates that far outweigh the purported benefits of pursuing the Committee's claims. As a creature of equity, bankruptcy proceedings are designed to maximize estate value to benefit the creditors as a whole and to reorganize the Debtors' business to ensure that they emerge as a surviving going concern. *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 157-58 (D. Del. 2012) ("[T]he Bankruptcy Code's central objective [is] facilitating a debtor's reorganization . . . so that it can reassess its available assets and liabilities and proceed forward as a viable entity able to properly satisfy all of its creditors and outstanding obligations."). The Plan achieves this purpose, as it maximizes returns for as many creditors as possible, while ensuring that the Debtors reorganize and alleviate balance sheet pressures allowing them to continue operating. Given the limited pool of assets, not every creditor can expect recovery in every case. Designing and implementing a plan of reorganization requires concessions by all stakeholders. By not pursuing meritless claims to avoid transactions, the Debtors' estates and the vast majority of creditors received benefits from Deerfield's concessions that far outweigh any costs of litigating and avoiding any transactions.

173.    In other words, the Debtors *did* pursue the Committee's proposed claims, and "[t[he [D]ebtors' decision to forego pursuing the claims in favor of settling them through a plan is a reasonable exercise of the debtors' judgment." *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016) (finding that "debtors have supplied an adequate justification for

their decision not to pursue the claims," namely that debtors "favor resolving the claims through a comprehensive plan of reorganization that will provide distributions to creditors").

### C.   Giving the Committee License to Pursue the Proposed Claims Will Impose Significant Costs on the Estates With No Benefit

174.   As noted above, derivative standing should not be granted unless the Committee can show that such relief is in the best interests of the Debtors' estates, based on a cost-benefit analysis. *See In re Murray*, 614 B.R. at 833-34 ("[A] party seeking derivative standing to bring a claim on behalf of a bankruptcy estate must demonstrate that the claim 'would benefit the estate if successful . . . based on a cost-benefit analysis performed by the court.'") (quoting *In re Gibson Grp., Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995)).   The Court can—indeed must—look beyond the pleadings to assure itself that the Committee has established that standing is justified.   *See In re STN Enters.*, 779 F.2d at 905-06; *In re Copperfield Invests.*, 421 B.R. at 609 ("The party seeking derivative standing bears the burden of establishing, by competent evidence, that . . . the trustee unjustifiably refused to bring suit").   In its motion, the Committee gives short shrift to the costs and benefits of bringing the proposed claims, supporting denial of its motion outright. *See In re Caesars Ent.*, 561 B.R. at 469 ("Because the Committee has addressed neither potential recovery nor potential cost, the Committee has not shown that the recovery might justify the cost.").

175.   Here, the cost-benefit analysis weighs heavily against granting derivative standing. *First*, permitting the Committee to litigate would destroy the substantial benefits the Debtors obtained through their settlement and proposed plan.   *Second*, pursuing the Committee's claims will require an enormous outlay of funds to prosecute and defend the lawsuit, for which the Committee has not identified any source of funds that could be used to pursue the expensive, multi-year litigation necessary to collect on the claims.   *Third*, the Committee's proposed claims would

not actually benefit the Debtors' estates because most of the claims, even if successful, would merely reallocate value between creditors to the detriment of hundreds of creditors.

### 1. The Substantial Benefits Secured by the Debtors Through the Settlement and Plan Would be Destroyed by the Committee's Proposed Litigation

176.    Any analysis of the costs and benefits of litigating the Committee's proposed claims must begin with the significant benefits the Debtors obtained from the settlement they reached with Deerfield as set forth in the Plan.  Allowing the Committee to pursue its proposed claims will shatter the carefully forged consensus embodied in the Plan, which represents the result of hard-fought negotiations with multiple stakeholders over many months.  The transactions contemplated by the Plan provide for a near term exit from chapter 11 with immediate full payments to the vast majority of nearly all the Debtors' stakeholders and a wind down plan to further collect contingent assets that will fund recoveries.  As a result of the Debtors' settlement process with Deerfield and other stakeholders, the Debtors secured a viable and value maximizing exit from chapter 11 while settling *all* claims with the Secured Noteholders—the parties most senior in the Debtors' capital structure—in a manner that affords payment to *hundreds* of unsecured claimholders with unsecured noteholders.  Settling these debts is an integral part of the Plan and the Debtors' prospects of emerging from these chapter 11 proceedings as a going concern, yet the Standing Motion seeks to unwind these efforts, all but assuring the Debtors' liquidation and no meaningful recovery for the vast majority of creditors.

177.    Moreover, regardless of the likelihood of success of the Committee's proposed litigation, any such litigation will drain the estates' resources through unnecessary administrative fee burn, further risking the 100% recovery that nearly all creditors will currently receive under the Plan.  In the meantime, the recoveries of nearly all creditors will be delayed, likely for years, all on a bet that these (meritless) claims might succeed.  Indeed, because the Committee effectively

seeks standing to challenge the validity of the Debtors' entire current capital structure—among other relief, the Committee seeks to avoid, lien strip, recharacterize, subordinate, and/or equitably disallow substantially all of the Debtors' more than $300 million of secured debt—litigation of the Proposed Claims likely would prevent the Debtors from making any distributions on any terms until the Committee's proposed litigation is resolved.  *See In re Sunbeam*, 284 B.R. at 375 ("[T]he Committee seeks to pursue claims that will delay resolution of this reorganization proceeding by impeding approval of the pending plan of reorganization.  The Committee's pursuit of these claims is not in the best interest of the estate."); *accord In re Roman Cath. Diocese of Rockville Ctr.*, 654 B.R. at 223.

178.    In sum, the Committee cannot show that sufficient financial benefit or other equitable considerations from litigating the Proposed Claims—considerations that appear to benefit only the Committee but to the detriment of all other stakeholders—outweighs the tremendous harm that would befall the Debtors, their estates, and the many stakeholders in this chapter 11 case.  Permitting the Committee to pursue its claims would disrupt "the efficient and orderly administration of the [bankruptcy estate] for the benefit of creditors," one of the "primary purpose[s]" of bankruptcy proceedings.  *Fidelity Bank, Nat'l Ass'n v. M.M Grp., Inc.*, 77 F.3d 880, 882 (6th Cir. 1996).

179.    In response to this, the Committee will no doubt point to its own alternative plan— which the Committee claims will provide superior recoveries for all creditors, including payment of administrative claims and convenience claims, while allowing the Committee to pursue its Proposed Complaint against Deerfield and the Fiduciary Defendants.  This is a red-herring if not

a flagrant lie. The Committee's proposed plan is flawed, built on incorrect assumptions that overestimate distributable value by as much as $70 million, and unconfirmable.[32]

180.    The Committee's assumptions are unreasonable on their face. For example, the Committee's alternative plan assumes prompt consensual settlement without the need of months of litigation, which would save up to $9 million to $14 million. Yet it is the Committee that brings a motion for derivative standing to upend an already viable plan where hundreds of secured and unsecured creditors will recover in full. It is nonsensical for the Committee to initiate further litigation, imposing substantial costs on the Debtors' estate, while at the same time point to millions of dollars of potential savings under its fictional alternative plan. If the Committee was truly concerned about minimizing litigation costs and administrative expenses and fees, it would not be relentlessly pursuing challenges to use of cash collateral, retention issues, standing and the Plan, which have increased administrative burn in these cases by more than $18 million to date.

181.    And, even if the Committee could somehow account for the missing $70 million that its alternative plan assumes, the Committee's proposed litigation will ensure the destruction of value of the Debtors' estates. On the one hand, even if the Committee succeeds in its proposed litigation, much of the sale proceeds generated in these cases will be consumed in litigation costs, and hundreds of unsecured creditors that are otherwise set to recover in full under the Debtors'

---

[32]    The Debtors also anticipate that the Committee may reassert its previously articulated argument that the Debtors need not proceed under the TSA because the estate holds sufficient assets to pay all secured creditors in full, inclusive of the make-whole amount, as demonstrated in the Liquidation Analysis of the Plan. The Court should reject this argument for two reasons. ***First***, the Committee's failure to raise this argument in its motion renders the argument waived. *See In re Catholic Diocese of Wilmington, Inc.*, 437 B.R. 488, 492 n.19 (Bankr. D. Del. 2010) (collecting cases). ***Second***, even if the Court considered this anticipated argument, the Committee's contentions would be wrong. The Liquidation Analysis is not the proper measure to evaluate whether any class of creditors is impaired. Rather, the Liquidation Analysis simply supports the best interests test and shows that a proposed chapter 11 plan would provide for greater recoveries to each class of non-consenting creditors than if the cases converted into a chapter 7 liquidation, upon which the Debtors' estate would become administratively insolvent without residual value available for unsecured creditors. Therefore, the Court should reject any attempt by the Committee to reassert this argument.

Plan will have their recoveries significantly reduced.  And if the Committee loses its contemplated litigation (which is far more likely given the weakness of the Proposed Claims), those same 100 percent recoveries—along with the potential recoveries for parent unsecured creditors under the Debtors' proposed Plan—will evaporate entirely, and the Debtors' secured creditors will receive all remaining distributable value.  Thus, in even the best-case scenario, the Committee's alternative plan will simply drain the Debtors' estates of value, harming hundreds of secured and unsecured creditors for little more than a speculative prospect of partial recovery for just *three* unsecured creditors.

### 2.    *Pursuing the Proposed Claims Would Result in Massive Costs to the Debtors' Estates for Which There Is No Identifiable Source of Funding*

182.    In analyzing the cost of proposed litigation in the context of a standing motion, courts consider professional fees for both litigating and defending the claims, *see In re Sabine*, 547 B.R. at 574, remaining wary that litigation imposed by a creditor committee may become unjustifiably costly for the debtor, which cannot control costs incurred by the committees' professionals but must nonetheless pay for them, *see* 11 U.S.C. § 330(a)(1); *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 280 (Bankr. S.D.N.Y. 1998) ("It must be remembered that the fees of a creditors' committee['s] professionals are generally absorbed by the debtor in possession pursuant to the statutory scheme."); *In re Grossinger's Assocs.*, 184 B.R. 429, 436 (Bankr. S.D.N.Y. 1995) (chapter 7 case in which the court held that "[t]o permit the untimely commencement of a complex and difficult lender liability litigation of highly dubious merit, which would indefinitely delay the otherwise imminent final distribution and closing of this estate, would constitute an abuse of the Court's discretion").

183.    Here, the costs of litigation far outweigh any benefit to the estates.  Indeed, the Committee barely even ***mentions***—much less analyzes—any of the anticipated costs and sources

of funding for the claims it seeks to pursue, and ████████████████████████████

████████████████████████████████████ [33]    Instead, the Committee attempts to shirk

its burden of establishing that litigating the Proposed Complaint would benefit the estates, stating:

"At this time it is difficult to forecast any further financial costs to the estate related to the

prosecution of the Proposed Claims.  More specifically, the Committee cannot forecast which

claims will be prosecuted to judgment and whether litigation financing or fee arrangements are

available."  Mot. ¶ 156.  The Committee then suggests that "these questions"—*i.e.*, the costs of

pursuing the claims, and finding a way to pay for them—can be addressed at confirmation.  *Id.* [34]

But the Committee bears the burden of answering "these questions" *now*, since they go to the heart

of whether standing is appropriate, and the Committee cannot simply defer answering them until

confirmation—particularly since it was the Committee that insisted that the issue of standing be

litigated *before* confirmation in the first place.  [Dkt. No. 563.]  Standing alone, the Committee's

failure to analyze the costs of pursuing the Proposed Claims merits a denial of its Standing Motion.

*See, e.g.*, *In re Catholic Bishop of N. Alaska*, No. F08-00110-DMD, 2009 WL 8412174, at *6

(Bankr. D. Alaska Sept. 11, 2009) (holding that because "[t]he [Committee] has provided no

estimate as to the costs for recovery . . . [i]t is impossible for the court to make a cost-benefit

analysis under such circumstances").

184.    To be clear, the Committee has not identified or offered a source of funding for this

proposed litigation, whatever the costs may be.  The Final Cash Collateral Order forbids the use

of estate funds to prosecute any claim against prepetition secured creditors or the reimbursement

---

[33]    Ex. 54 (June 26, 2024 Deposition of David Dunn) at 77:8-78:17.

[34]    This is likely because the Committee's true goal is not to litigate the cases at all, but to use them as leverage to obtain better treatment under the Plan.

of fees to prosecute such claims.  [Dkt. No. 188, ¶ 20.]  Courts are highly reluctant to grant a creditor derivative standing to pursue estate claims where the movant cannot show how they plan to finance their proposed litigation.  *See, e.g.*, *In re Manley Toys Ltd.*, No. 16-15374 (JNP), 2020 WL 1580244, at *8 ("Lack of sufficient funding is a rational basis to decline to pursue claims or to pursue settlement of claims in lieu of litigation."); *Diocese of Camden*, 2022 WL 884242, at *12 ("The Committee did not explain how this issue could be resolved . . . if [the plan sponsors] do not fund a trust, how a trust with little or no liquid assets would be able to fund what would likely be protracted, expensive litigation.").  Indeed, "courts often view favorably the willingness of the party seeking derivative standing to absorb the costs of litigation, since such willingness not only demonstrates a belief in the merits of the claim, but also spares the bankruptcy estate from absorbing any further costs."  *In re Smart World Techs., LLC*, 423 F.3d at 180; *see also In re STN Enters.*, 779 F.2d at 906 (holding that derivative standing was appropriate where the creditor's committee agreed to bear fees and seek recompense out of any recovery); *In re Chalk Line Mfg., Inc.*, 184 B.R. 828, 833 (Bankr. N.D. Ala. 1995); *Point Serv. Corp. v. Pritchard Mining Co., Inc.*, No. 2:09-0769, 2010 WL 1410673, at *5 (S.D. W. Va. Mar. 31, 2010) (permitting derivative standing because the movant would "proceed at its own expense").  Unsurprisingly, the Committee has made no such representation here.

185.    The Proposed Complaint asserts fourteen claims for relief against twenty defendants (excluding the 100 "John Does" included in the caption).  The Committee seeks to sue sophisticated corporate defendants represented by well-regarded counsel, alongside directors and officers who will either draw upon insurance or, given the significant self-insured retention in the Company's D&O policy, upon the Company's indemnity obligations—which may be

characterized as administrative expenses and further drain value from the estates[35]—to retain

additional well-regarded counsel, all of whom will vigorously oppose the Committee's claims at

every stage of the litigation, and all of whom will likely seek reimbursement from the estates. The

Committee's counsel has already burned nearly $9 million investigating the Proposed Claims, and

their proposed litigation has not even reached the pleading stage. [Dkt. Nos. 512, 544, 693.] To

say that the Committee's proposed litigation will be expensive is an understatement.

186.    How does the Committee propose paying for all this? They do not say. In fact, the

Committee's witness on the issue at the hearing will acknowledge that



.[36] Instead, after the Debtors raised concerns about the cost of the litigation,

[37] Even the Committee's counsel at White & Case—which

has full access to the documents produced by the Debtors, drafted the Proposed Complaint, and

claims in its Motion that the Proposed Claims are colorable—

[38] Moreover, the Committee admits that

---

[35]    Where, as here, the Company's articles of incorporate and bylaws allow for officers and directors to "be indemnified and advanced expenses by the Corporation[] . . . to the fullest extent authorized by the DGCL," such claims for reimbursement may not be subject to disallowance under Section 502(e). *See In re RNI Wind Down Corp.*, 369 B.R. 174, 185-87, 190-91 (Bankr. D. Del. 2007).

[36]    Ex. 54 (June 26, 2024 Deposition of David Dunn) at 167:21-168:14, 169:10-17.

[37]    *Id.* at 82:12-25, 90:16-25, 91:13-92:2, 104:19-105:15, 106:4-18, 121:25-122:5, 134:8-22.

[38]    *Id.* at 110:5-15.



187.    Ultimately, there can be no doubt that, however their proposed litigation is funded, it will drain significant funds from the Debtors and harm the estates.  For example, if White & Case's fee structure is purely hourly, it will indisputably cost millions of dollars in administrative fees, whatever the result of the litigation.  And if the Committee utilizes a litigation funder or a contingency arrangement, a "successful" litigation will be even worse for the Debtors' creditors, who will see a sizeable portion of the estates' assets paid to a funder or law firm without any corresponding increase in the distributable value available for creditors, resulting in a net loss for the Debtors' estates that could reach into the nine figures depending on the contingency percentage and the amount of the lien avoided.  Whatever the fee structure, the Committee's proposed litigation will simply reduce the Debtors' estates and the creditors' recoveries, and the Committee's failure to identify any workable source of funds for this litigation weighs strongly against the grant of derivative standing.

188.    In sum, granting derivative standing would impose enormous costs on the Debtors, who will be forced to shoulder tens of millions of dollars in legal and other professional fees to pursue complex, highly fact-intensive claims, with an extremely low likelihood of success.  Such a financial burden directly threatens the potential recovery of hundreds of secured and unsecured

---

[39]    *Id.* at 95:1-7, 106:19-107:1, 116:9-20, 117:10-118:2.

creditors under the Debtors' liquidating plan where there are finite resources available for distribution. Therefore, the Committee's standing motion must be denied.

### 3. *Pursuit of the Proposed Claims Will Not Benefit the Debtors' Estates as a Whole*

189. Courts have held that derivative standing is "necessarily improper" where it would not benefit the estate as a whole. *In re Redden*, 2013 WL 5436368, at *3 ("Without an argument that granting standing would benefit the bankruptcy estate, derivative standing is necessarily improper."). Thus, the Third Circuit has held that derivative standing should be granted only where necessary to "maximiz[e] the value of the estate and allow[] creditors to recover their claims from that estate." *Cybergenics*, 330 F.3d at 568.

190. Here, the Committee has not shown—and cannot show—that the purported benefits of pursuing its proposed claims will outweigh the costs to the Debtors' estates.

191. *First*, the proposed claims are paradigmatic examples of claims that purportedly advance the interests of the Committee's constituency yet do nothing to benefit the Debtors' estates. Where the net effect of a claim, if successful, is only to redistribute a set number of assets, that claim is being asserted only for the parochial interests of a specific creditor class, not the estate as a whole. *In re Murray*, 614 B.R. at 834 ("[A] committee's failure to prove that the claim it seeks to bring would benefit the estate provides an additional basis for denying its request for derivative standing."); *In re McGuirk*, 414 B.R. 878, 880 (Bankr. N.D. Ga. 2009) ("Derivative standing is granted to benefit the estate as a whole, not merely to benefit the creditor bringing the claim."); *In re AppliedTheory Corp.*, 493 F.3d 82, 86 (2d Cir. 2007) ("Requiring bankruptcy court approval conditioned upon the litigation's effect on the estate helps prevent committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but result in a net loss to the entire estate.").

192.     The Committee cannot show that granting it derivative standing will benefit the estates; instead, the Committee treats the interests of *certain* unsecured creditors, which represent only a portion of the Debtors' total funded debt, as though they were the exclusive interests of the estates.  With few exceptions, the Committee's Proposed Claims merely seek to avoid secured claims and liens or reorder priorities without producing incremental value that benefits the Debtors' estates.  *See In re Sabine*, 547 B.R. at 570-71 (holding that in considering constructive fraudulent transfer claims, the Court must "consider the fact that any value 'realized' from avoided liens would not be incremental value brought into the estates but instead would be a reallocation of value"); *In re Murray*, 614 B.R. at 836-37 (holding that committee did not show its recharacterization claim would benefit estate).  In a best-case scenario for the Committee, success on these claims would simply redirect value away from the overwhelming majority of creditors who have agreed to settle under the Plan to just a handful of funded debt holders, who are the only creditors to stand to obtain any benefits at all.  This is precisely the kind of parochial interest that the doctrine of derivative standing was not meant to indulge.  *See In re Murray*, 614 B.R. at 836 (denying standing in part because unsecured creditors would not benefit "[e]ven if the Committee's recharacterization stratagem were successful").

193.     *Second*, the Debtors' estates will not benefit from the litigation that the Committee seeks standing to bring because that litigation will not be successful.  As set forth in detail above, the Committee's Proposed Claims are not colorable as a matter of law, based on the allegations in the Committee's own Proposed Complaint (and the documents referenced therein).  The Debtors' decision to settle, rather than litigate, the claims that the Committee now seeks standing to pursue.  The Debtors' decision was not "unjustifiable," and the Committee has not met its burden of showing otherwise.

\* \* \*

194.    Devoting just five pages of its 65-page Standing Motion to issues of benefit to the estate and unjustifiability, the Committee raises half-hearted arguments devoid of reason and substantiated facts.  *See* Mot. pp. 60-64.  As the Debtors will demonstrate at the confirmation hearing, they have not refused to pursue any colorable claims in this case.  Instead, the Debtors committed substantial time and resources to submit a viable plan that distributes proceeds from the sale of the Debtors' businesses and all other viable and collectible estate assets to fund these cases, and repay their senior secured noteholders and the vast majority of unsecured creditors pursuant to the waterfall set forth in the bankruptcy code, with any remaining value to flow to parent unsecured creditors.  Any perceived, marginal benefit from allowing the Committee to pursue its claims and disrupt the Plan would provide no benefit to the Debtors' estates and simply harm hundreds of creditors who stand to recover under the Plan.  Therefore, the Committee has failed to meet its burden of demonstrating that the benefits outweigh the costs of derivative standing, and the Standing Motion must be denied.

## IV.    The Committee's Request for Sole Authority to Propose Settlement of the Proposed Claims Has No Basis in the Governing Law

195.    Even if the Court were to grant the Committee standing to pursue any of the claims in its Proposed Complaint—and it should not—the Court should reject the Committee's extraordinary request for sole authority to settle any of the Debtors' claims, and instead recognize the Debtors' clear statutory authority to settle causes of action.

196.    The Debtors are vested with exclusive power to pursue and settle claims on behalf of their estates.  *See, e.g.*, *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 386-87 (5th Cir. 2009) ("A chapter 11 plan of reorganization or liquidation then settles the estate's causes of action or retains those causes of action for enforcement by the debtor, the trustee,

or a representative of the estate appointed for the purpose of enforcing the retained claims.");

*Rossco Holdings, Inc. v. McConnell*, 613 F. App'x 302, 306 (5th Cir. 2015) (per curiam) ("Before

confirmation of a [c]hapter 11 plan, the debtor-in-possession generally has the power to pursue

these causes of action on behalf of the estate as if it were a trustee.").  "A grant of derivative

standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue

to have the right, subject to Court approval, to settle the Claims."  *In re Centaur* 2010 WL

4624910, at *7; *In re Adelphia Commc'ns Corp.*, 371 B.R. 660, 670-71 (S.D.N.Y. 2007) ("[A]

debtor-in-possession may assert control over an adversary proceeding notwithstanding a

committee's derivative standing, where that standing was granted for reasons other than debtor

misconduct.").  The debtor's exclusive power to pursue and settle claims on behalf of their estates

exists even when a Court grants an unsecured creditors committee standing to pursue claims based

on a debtors' unjustifiable refusal to pursue those claims.  *See, e.g.*, *In re Centaur*, 2010 WL

4624910, at *7 (granting Committee's standing motion in part to authorize Committee to prosecute

certain claims, but denying standing motion to the extent it sought exclusive authority to settle the

claims).

197.    By requesting exclusive authority to settlement estate claims, the Committee seeks

to override important provisions of the Bankruptcy Code and the Bankruptcy Rules.  *First*,

Bankruptcy Rule 9019 permits only a debtor or trustee to propose a settlement or compromise.

Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion ***by the trustee*** and after

notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P.

9019(a) (emphasis added).  And the Supreme Court has held that authority granted by the

Bankruptcy Code solely to a trustee is limited, by its terms, to a trustee or a debtor in possession.

*See Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*, 530 U.S. 1, 6-7 (2000) (holding

that individual creditors cannot employ the power of "the trustee" to surcharge a secured creditor under section 506(c) of the Bankruptcy Code).  Accordingly, the trustee or debtor in possession has the express—and exclusive—right to settle claims in a chapter 11 case.  *Second*, granting the Committee authority to settle claims would also undermine many aspects of the Debtors' restructuring, including their exclusive right to propose and solicit votes for the Plan, which already addresses each of the claims put forward by the Committee.[40]  *See Smart World Techs.*, 423 F.3d at 175 (finding that "the debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only fiduciary").  This result is fundamentally inconsistent with the Bankruptcy Code, and the Committee identifies no reason for it—indeed, the Standing Motion does not identify any legal basis for its request for standing, and it should be denied.

## CONCLUSION

198.    The Standing Motion does not satisfy the standards for derivative standing by any measure.  Worse than that, granting the Standing Motion threatens grave harm to these chapter 11 estates.  The bankruptcy scheme has not broken down here.  To the contrary, it has fostered and facilitated a Plan that maximizes distributable value and recoveries for virtually all creditors.  Permitting a third party with duties to only a few stakeholders to blow this up in order to pursue meritless claims as a means of obtaining leverage against other creditors would fundamentally impair the Debtors' ability to manage these chapter 11 cases in a coordinated fashion.  It would undercut the Debtors' careful efforts to maximize value for all of the estates' constituencies, which is what the Debtors have been focused on from the outset of these cases.  In short, it would put the

---

[40]    The Court recently extended Debtors' Filing Exclusivity Period and Solicitation Exclusivity Period by 60 days to August 10, 2024 and October 11, 2024, respectively.  [Dkt. No. 623.]  The Committee consented to these extensions.  [Dkt. No. 626.]

entirety of these proceedings at risk.  Accordingly, and for the reasons described in detail herein,

the Debtors respectfully request that the Standing Motion be denied.[41]

<em>[Remainder of page intentionally left blank]</em>

---

[41]   The Debtors respectfully asks the Court to reserve judgment on standing until confirmation, as the Debtors will
bear the burden of introducing evidence at the confirmation hearing to prove up any properly perfected liens.  A
ruling on standing at this juncture will deprive the Debtors of their opportunity to make this claim of proof and
would be tantamount to ruling on the perfection of the liens.

Dated:  July 2, 2024

/s/ Michael D. Sirota
_____
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com
          dharris@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:    joshua.sussberg@kirkland.com
          nicole.greenblatt@kirkland.com
          francis.petrie@kirkland.com
          jeffrey.goldfine@kirkland.com
-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:    spencer.winters@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*