**SULLIVAN & CROMWELL LLP**

Justin J. DeCamp (admitted *pro hac vice*)
Ari B. Blaut (admitted *pro hac vice*)
Benjamin S. Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-1656
Facsimile:  (212) 558-3588
Email:   decampj@sullcrom.com
         blauta@sullcrom.com
         bellerb@sullcrom.com

*Counsel to Deerfield Partners, L.P.*

**WOLLMUTH MAHER & DEUTSCH LLP**

James N. Lawlor
500 Fifth Avenue
New York, NY 10110
Telephone:  (212) 382-3300
Facsimile:  (973) 741-2398
Email: jlawlor@wmd-law.com

*Counsel to Deerfield Partners, L.P.*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEERFIELD'S (I) OBJECTION TO THE COMMITTEE'S
STANDING MOTION AND (II) RESPONSE TO THE
COMMITTEE'S OBJECTIONS TO THE MAKE WHOLE AMOUNT**

---

[1] The last four digits of Debtor Invitae Corporation's tax identification number are 1898.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae.  The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL BACKGROUND.............................................................................................5

I. DEERFIELD AND THE COMPANY BEGIN DISCUSSING LIABILITY MANAGEMENT
TRANSACTIONS IN SPRING 2022 .........................................................................5

II. THE COMPANY EXPLORES A COMPREHENSIVE BALANCE SHEET RESTRUCTURING ..............7

III. NEGOTIATION OF AND ENTRY INTO THE MARCH EXCHANGE .................................9

IV. MARKET REACTION TO THE MARCH EXCHANGE AND SUBSEQUENT TRANSACTIONS .........12

V. DEERFIELD'S VIEW OF THE COMPANY'S PROSPECTS EVOLVES AS EVENTS UNFOLD..........13

STANDARD OF REVIEW ...............................................................................................14

        1.    Standing Motion..................................................................................14

        2.    Claim Objection ..................................................................................16

ARGUMENT .....................................................................................................................17

I. THE PROPOSED CAUSES OF ACTION ARE NOT COLORABLE.................................18

    A.    THE MARCH EXCHANGE, AUGUST EXCHANGE AND THE CONSENT FEE ARE
NOT CONSTRUCTIVE FRAUDULENT TRANSFERS. .................................................19

        1.    The March Exchange was not a Constructive Fraudulent Transfer..........19

            (a)    Invitae Received Reasonably Equivalent Value in the March
Exchange.............................................................................19

            (b)    Invitae Was Not Insolvent When the March Exchange Was
Executed.............................................................................24

        2.    The August Exchange Was Not a Constructive Fraudulent Transfer.......32

            (a)    Invitae Received Reasonably Equivalent Value in the August
Exchange.............................................................................33

            (b)    Invitae Was Not Insolvent at the Time of the August Exchange...34

        3.    The Payment of Consent Fee Was Not a Constructive Fraudulent
Transfer...............................................................................................36

        4.    Avoidance of Guarantees and Liens of the Debtor Subsidiaries
(Count IV)............................................................................................38

    B.    THE MARCH AND AUGUST EXCHANGES AND THE PAYMENT OF THE
CONSENT FEE ARE PROTECTED BY THE SAFE HARBOR UNDER
SECTION 546(E) OF THE BANKRUPTCY CODE. .....................................................40

1. The March and August Exchanges and the Consent Fee Were Transfers Made in Connection with a Securities Contract. ....................................41

 (a) The March Exchange Was a Qualifying Transaction Made in Connection with a Securities Contract...........................................42

 (b) The August Exchange Was a Qualifying Transaction Made in Connection with a Securities Contract...........................................42

 (c) The Consent Fee Is a Qualifying Transaction Made in Connection with a Securities Contract. .............................................43

2. Deerfield, Invitae and the 2028 Secured Convertible Notes Indenture Trustee and Collateral Agent Were Qualifying Participants. ....................45

 (a) Deerfield Was a Financial Participant at All Relevant Times. ......46

 (b) Invitae Qualified as a Customer of a Financial Institution in the March Exchange. ......................................................49

 (c) U.S. Bank Was Qualifying Financial Institution and Financial Participant. ...........................................................50

C. THE MARCH EXCHANGE WAS NOT AN ACTUAL FRAUDULENT TRANSFER. ............51

D. DEERFIELD DID NOT AID OR ABET INVITAE'S OFFICERS' AND DIRECTORS' ALLEGED BREACH OF FIDUCIARY DUTIES. ............................................56

E. THE PURPORTED UNENCUMBERED ASSETS ARE SUBJECT TO THE ADEQUATE PROTECTION LIENS AND THE PROCEEDS OF OTHERWISE UNENCUMBERED COMMERCIAL TORT CLAIMS ARE SUBJECT TO PREPETITION LIENS.......................59

II. THE DEBTORS JUSTIFIABLY DETERMINED TO SETTLE THE PROPOSED CAUSES OF ACTION. .....................................................................60

III. THE OBJECTION TO THE MAKE WHOLE AMOUNT SHOULD BE OVERRULED. .....................64

A. THE MAKE WHOLE AMOUNT IS NOT "UNMATURED INTEREST" UNDER THE BANKRUPTCY CODE.................................................................64

B. EVEN IF THE MAKE WHOLE AMOUNT CONSTITUTES INTEREST, THE HOLDERS OF THE 2028 SECURED CONVERTIBLE NOTES ARE ENTITLED TO THE MAKE WHOLE AMOUNT UNDER SECTION 506(B) OF THE BANKRUPTCY CODE. .....................................................................68

C. THE MAKE WHOLE AMOUNT IS NOT AN UNENFORCEABLE PENALTY UNDER § 502(B)(1) OF THE BANKRUPTCY CODE.................................................69

D. THE PREPETITION SECURED PARTIES ARE ENTITLED TO BOTH THE MAKE WHOLE AMOUNT AND POST-PETITION INTEREST. ...................................71

CONCLUSION.......................................................................72

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adamson* v. *Bernier (In re Bernier)*,
 282 B.R. 773 (Bankr. D. Del. 2002) ......................................................................52

*In re Agriprocessors, Inc.*,
 490 B.R. 374 (N.D. Iowa 2013) ...........................................................................34

*Anand* v. *Nat'l Republic Bank*,
 239 B.R. 511 (Bankr. N.D. Ill. 1999) ..............................................................21, 37

*In re AppliedTheory Corp.*,
 493 F.3d 82 (2d Cir. 2007)....................................................................................63

*In re Armstrong*,
 320 B.R. 97 (N.D. Tex. 2005)..........................................................................16, 17

*Ashcroft* v. *Iqbal*,
 556 U.S. 678 (2009)..............................................................................................52

*In re Balt. Emergency Servs. II, Corp.*,
 432 F.3d 557 (4th Cir. 2005) .........................................................................14, 15

*Barrett* v. *Continental Illinois Nat'l Bank & Trust Co.*,
 882 F.2d 1 (1st Cir. 1989)....................................................................................27

*Beard Research, Inc.* v. *Kates*,
 8 A.3d 573 (Del. Ch. Ct. 2010)............................................................................56

*In re Bernard L. Madoff Inv. Sec. LLC*,
 773 F.3d 411 (2d Cir. 2014)............................................................................41, 44

*Bocker* v. *Hartzell Engine Techs., LLC*,
 2023 WL 415792 (D. Del. Jan. 26, 2023)............................................................23

*In re Boston Generating LLC*,
 617 B.R. 442 (Bankr. S.D.N.Y. 2020)..................................................................50

*In re Brandywine Townhouses, Inc.*,
 518 B.R. 671 (Bankr. N.D. Ga. 2014) .................................................................71

*In re Broadstripe, LLC*,
 444 B.R. 51 (Bankr. D. Del. 2010) ......................................................................60

*In re Brown*,
221 B.R. 46 (Bankr. S.D. Ga. 1998) ....................................................................................17

*In re Burlington Coat Factory Secur. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..............................................................................................52

*Bryant* v. *Comm'r*,
2 T.C. 789 (1943).................................................................................................................67

*In re Capmark Fin. Grp.*,
438 B.R 471 (Bankr. D. Del. 2010) .....................................................................................21

*Cappellini* v. *Mellon Mortg. Co.*,
991 F.Supp. 31 (D. Mass. 1997) .........................................................................................66

*In re Champion Enters., Inc.*,
2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) ..............................................................20

*In re Cluff*,
313 B.R. 323 (Bankr. D. Utah 2004) ...................................................................................17

*Co. of Am.* v. *Comm'r*,
882 F.2d 832 (1989).............................................................................................................67

*Crescent/Mach I Partners, L.P.* v. *Turner*,
846 A.2d 963 (Del. Ch. 2000)..............................................................................................57

*In re Diocese of Camden, N.J.*,
2022 WL 884242 (Bankr. D.N.J. Mar. 24, 2022)..........................................................16, 60

*In re Direct Access Partners, LLC*,
602 B.R. 495 (Bankr. S.D.N.Y. 2019) .................................................................................27

*Dist. Bond Co.* v. *Comm'r*,
1 T.C. 837 (1943)................................................................................................................67

*In re EBC I, Inc.*,
380 B.R. 348 (Bankr. D. Del. 2008) .........................................................................30, 31, 36

*In re Elrod Holdings Corp.*,
421 B.R. 700 (Bankr. D. Del. 2010) ....................................................................................51

*In re Fairfield Sentry Limited*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)..........................................................50

*Feldman* v. *Kings Highway Sav. Bank*,
102 N.Y.S.2d 306 (N.Y. App. Div. 2d Dep't 1951), *aff'd*, 303 N.Y. 675
(N.Y. 1951) .........................................................................................................................66

*In re Fin. Ctr. Assocs. of E. Meadow, L.P.*,
    140 B.R. 829 (Bankr. E.D.N.Y. 1992)..................................................................71

*Friedberg* v. *Barefoot Architect Inc.*,
    723 F. App'x 100 (3d Cir. 2018) ........................................................................51

*In re Fritze LLC*,
    2009 WL 3245499 (Bankr. D.N.J. Oct. 6, 2009)..................................................21

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006)................................................................................34

*FTC* v. *Shire ViroPharmaInc.*,
    917 F.3d 147 (3d Cir. 2019)................................................................................48

*In re G-I Holdings, Inc.*,
    313 B.R. 612 (Bankr. D.N.J. 2004) .....................................................................15

*In re Gonzalez*,
    342 B.R. 165 (Bankr. S.D.N.Y. 2006)............................................................20, 22

*Great Plains Real Estate Dev., L.L.C.* v. *Union Cent. Life Ins. Co.*,
    2007 WL 6908824 (S.D. Iowa June 4, 2007), *aff'd*, 536 F.3d 939 (8th Cir.
    2008) ...................................................................................................................66

*Guarantee Co. of N. Am. USA* v. *SBN Enterprises, Inc.*,
    2011 WL 3205318 (D.N.J. July 27, 2011).............................................................54

*In re Hall*,
    304 F.3d 743 (7th Cir. 2002) ..............................................................................23

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D. Del. 2005), *aff'd sub nom. In re Hechinger Inv. Co. of
    Delaware, Inc.*, 278 F. App'x 125 (3d Cir. 2008) ................................................58

*Holliday* v. *Credit Suisse Securities (USA) LLC*,
    2021 WL 4150523 (S.D.N.Y., 2021).....................................................................45

*In re HomeBanc Mortg. Corp.*,
    945 F.3d 801 (3d Cir. 2019)................................................................................45

*In re Image Worldwide, Ltd.*,
    139 F.3d 574 (7th Cir. 1998) ..............................................................................39

*In re Interco Sys., Inc.*,
    202 B.R. 188 (Bankr. W.D.N.Y. 1996) ................................................................22

*JMD Holding Corp.* v. *Cong. Fin. Corp.*,
    4 N.Y.3d 373, 828 N.E.2d 604 (N.Y. 2005) ........................................................69

*Jurista* v. *Amerinox Processing, Inc.*,
    492 B.R. 707 (D.N.J. 2013) ................................................................................53

*Kelley* v. *Safe Harbor Managed Acct.*,
    31 F.4th 1058 (8th Cir. 2022) ............................................................................50

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991) ..............................................................................48

*In re L.A. Int'l Airport Hotel Assocs.*,
    196 B.R. 134 (B.A.P. 9th Cir.1996)) ..................................................................17

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ...........................................................41, 44

*In re Lyondell Chem. Co.*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) .....................24, 26

*In re M. Silverman Laces, Inc.*,
    2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ....................................................21

*In re Mallinckrodt PLC*,
    2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ...........................................41, 46

*Malpiede* v. *Townson*,
    780 A.2d 1075 (Del. 2001) ...........................................................................56, 57

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ...................................................................54

*McNellis* v. *Raymond*,
    287 F. Supp. 232 238-39 (N.D.N.Y. 1968)..........................................................39

*Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991)............................................................... *passim*

*Merit Mgm't Group, LP* v. *FTI Consulting, Inc.*,
    583 U.S. 366 (2018)......................................................................................42, 51

*In re Merritt*,
    711 F. App'x 83 (3d Cir. 2017) .....................................................................14, 15

*In re Millennium Lab Holdings II, LLC*,
    2019 Bankr. LEXIS 636 .....................................................................................52

*Moody* v. *Security Pacific Business Credit, Inc.*,
971 F.2d 1056 (3d Cir. 1992) ....................................................................... 27, 30, 35

*Morgan* v. *Cash*,
2010 WL 2803746 (Del. Ch. July 16, 2010) ........................................................... 58

*MSGI Liquidation Trust* v. *Modell*,
2023 WL 2961856 ................................................................................................. 56

*In re Nazu, Inc.*,
350 B.R. 304 (Bankr. S.D. Tex. 2006) .................................................................. 17

*In re Nine W. LBO Sec. Litig.*,
87 F.4th 130 (2d Cir. 2023) ................................................................................... 49

*In re Nine West LBO Securities Litigation*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020) ................................................................... 50

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp. v. Chinery*,
330 F.3d 548 (3d Cir. 2003) .................................................................................. 15

*Off. Comm. of Unsecured Creditors of Propex Inc.* v. *BNP Paribas (In re Propex
Inc.)*,
415 B.R. 321 (Bankr. E.D. Tenn. 2009) ............................................................... 20

*Off. Unsecured Creditors' Comm.* v. *Stern (In re SPM Mfg. Corp.)*,
984 F.2d 1305 (1st Cir. 1993) ................................................................................ 15

*Ogle* v. *Fidelity & Deposit Co. of Maryland*,
586 F.3d 143 (2d Cir. 2009) .................................................................................. 69

*In re Opus E. LLC*,
698 F. App'x 711 (3d Cir. 2017) ........................................................................... 30

*Oran* v. *Stafford*,
226 F.3d 275 (3d Cir. 2000) .................................................................................. 48

*Orr* v. *Kinderhill Corp.*,
991 F.2d 31 (2d Cir. 1993) .................................................................................... 39

*In re Our Alchemy, LLC*,
2019 WL 4447519 (Bankr. D. Del. Sept. 16, 2019) .............................................. 58

*Peltz* v. *Hatten*,
279 B.R. 710 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003) ..................... 26

*Pembroke Dev. Corp.* v. *Commonwealth Savs. & Loan Ass'n (In re Pembroke Dev. Corp.)*,
124 B.R. 398 (Bank. S.D. Fla. 1991) ..................................................................21, 37

*Perkins* v. *North Park Realty Mgmt, LLC, et al. (In re Sakhe)*,
2021 WL 5999195 (Bankr. D.N.J. Dec. 17, 2021) ..................................................23

*In re Plassein Int'l Corp.*,
590 F.3d 252 (3d Cir. 2009) .....................................................................................42

*In re Prime Realty, Inc.*,
380 B.R. 529 (B.A.P. 8th Cir. 2007) ........................................................................24

*In re PSN USA, Inc.*,
2011 WL 4031147 (Bankr. S.D. Fla. Sept. 9, 2011) ...............................................39

*In re Quebecor World (USA) Inc.*,
480 B.R. 468 (S.D.N.Y. 2012), *aff'd*, 719 F.3d 94 (2d Cir. 2013) ..........................44

*In re Quorum Health Corp.*,
2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)......................................41, 47, 48

*Raleigh* v. *Ill. Dep't of Revenue*,
530 U.S. 15 (2000)....................................................................................................17

*In re Rally Partners, LP*,
306 B.R. 165 (Bankr. E.D. Tex. 2003) .....................................................................16

*In re R.M.L., Inc.*,
92 F.3d 139 (3d Cir. 1996).............................................................................. *passim*

*Redmond* v. *SpiritBank (In re Brooke Corp.)*,
541 B.R. 492 (Bankr. D. Kan. Nov. 20, 2015) ........................................................37

*In re Reilly*,
245 B.R. 768 (B.A.P. 2d Cir. 2000)..........................................................................17

*In re Resorts Int'l, Inc.*,
181 F.3d 505 (3d Cir. 1999)......................................................................................42

*In re Rite Way Elec., Inc.*,
510 B.R. 471 (Bankr. E.D. Pa. 2014) .......................................................................24

*In re Rosen Auto Leasing, Inc.*,
346 B.R. 798 (8th Cir. BAP 2006)............................................................................34

*In re Rural Metro Corp.*,
88 A. 3d 54 (Del. Ch. March 7, 2014) ......................................................................57

*In re Sabine Oil & Gas Corp.*,
  547 B.R. 503 (Bankr. S.D.N.Y. 2016) ............................................................38, 62

*In re Sadler*,
  2015 WL 9474174 (N.D. Ohio Dec. 29, 2015) ........................................................64

*In re School Specialty, Inc.*,
  2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013) ..............................64, 69, 70, 71

*In re Se. Waffles, LLC*,
  460 B.R. 132 (B.A.P. 6th Cir. 2011), *aff'd*, 702 F.3d 850 (6th Cir. 2012) ............21

*Sec. Inv'r Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
  2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ..........................................................46

*Sec. Inv'r Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
  505 B.R. 135 (S.D.N.Y. 2013) ................................................................................46

*Shapiro* v. *UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ....................................................................................52

*Silverman* v. *Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005) ....................................................................51

*In re Smart World Techs., LLC*,
  423 F.3d 166 (2d Cir. 2005) ....................................................................................15

*In re South Side House, LLC*,
  451 B.R. 248 (Bankr. E.D.N.Y. 2011), *aff'd* 2012 WL 273119 (E.D.N.Y. Jan.
  30, 2012) ..................................................................................................................70

*Steele* v. *Kencast, Inc.*,
  2023 WL 8531834 (D.N.J. Feb. 28, 2023) ..............................................................56

*In re SunEdison, Inc.*,
  620 B.R. 505 (Bankr. S.D.N.Y. 2020) ....................................................................50

*Telefest, Inc.* v. *VU-TV, Inc.*,
  591 F. Supp. 1368 (D.N.J. 1984) ......................................................................39, 40

*In re Teleglobe Communications Corp.*,
  392 B.R. 561 (Bankr. D. Del. 2008) ........................................................................30

*In re Today's Destiny, Inc.*,
  No. 05-90080, 2008 WL 5479109 (Bankr. S.D. Tex. 2008) ............................16, 17

*In re Trans World Airlines, Inc.*,
   180 B.R. 389 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d
   Cir. 1998) ............................................................................................................25, 34

*Travelers Cas. & Sur. Co. of Am.* v. *Pac. Gas & Elec. Co.*,
   549 U.S. 443 (2007)....................................................................................................69

*In re Trib. Co. Fraudulent Conv. Litig.*,
   2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ..................................................................52

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   946 F.3d 66 (2d Cir. 2019)................................................................................ *passim*

*In re Trico Marine Servs., Inc.*,
   450 B.R. 474 (Bankr. D. Del. 2011) ..........................................................................65

*In re Ultimate Acquisition Partners, LP*,
   2012 WL 1556098 (Bankr. D. Del. May 1, 2012)......................................................60

*In re Ultra Petroleum Corp.*,
   51 F.4th 138 (5th Cir. 2022) ................................................................................68, 71

*In re Ultra Petroleum Corp.*,
   624 B.R. 178 ..............................................................................................................64

*United States* v. *Moody*,
   923 F.2d 341 (5th Cir. 1991) .....................................................................................53

*United States* v. *Tabor Ct. Realty Corp.*,
   803 F.2d 1288 (3d Cir. 1986)....................................................................................38

*In re Vanderveer Estates Holdings, Inc.*,
   283 B.R. 122 (Bankr. E.D.N.Y. 2002).......................................................................69

*VFB LLC* v. *Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007)................................................................................20, 26

*In re Ward*,
   36 B.R. 794 (D.S.D. 1984) ........................................................................................37

*Wells Fargo Bank, N.A.* v. *Hertz Corp.* (*In re Hertz Corp.*),
   2022 Bankr. LEXIS 3358 (Bankr. D. Del. Nov. 21, 2022) ...............................65, 68

*Wetzel* v. *Advocate Realty Inv., LLC*,
   275 F.3d 1308 (11th Cir.2001) ..................................................................................69

*In re Weyandt*,
   544 F. App'x 107 (3d Cir. 2013) ...............................................................................15

*In re Women First Healthcare, Inc.*,
  345 B.R. 131 (Bankr. D. Del. 2006) ...................................................................60

*Zazzali* v. *AFA Fin. Grp., LLC*,
  2012 WL 4903593(Bankr. D. Del. 2012) ...........................................................46

**Statutes**

11 U.S.C. § 101(22) ...............................................................................45, 46, 49

11 U.S.C. § 101(32) ...........................................................................................24

11 U.S.C. § 101(49) .....................................................................................41, 42

11 U.S.C. § 741(7) .......................................................................41, 42, 43, 44

11 U.S.C. § 502(b) ...............................................................................64, 65, 69

11 U.S.C. § 506(b) .....................................................................................68, 69

11 U.S.C. § 546(e) .................................................................................. *passim*

11 U.S.C. § 548(a) .................................................................................. *passim*

N.J. Stat. Ann. § 25:2-26(b) ..............................................................................54

**Other Authorities**

David Moadel, *Invitae Stock Soars 277% in a Day: Time to Buy?*, THE MOTLEY
  FOOL (Aug. 14, 2022 at 10:23 AM), available at
  https://www.fool.com/investing/2022/08/14/invitae-stock-soars-277-in-a-day-
  time-to-buy/.............................................................................................................7

Fed. R. Civ. P. 9(b) ...........................................................................................52

Fed. R. Bankr. P. 3001 ................................................................................16, 17

Fed. R. Evid. R. 201 ..........................................................................................47

Stephen McJohn, *Person or Property? On the Legal Nature of the Bankruptcy
  Estate*, 10 BANKR. DEV. J. 465 (1993) ..............................................................62

Deerfield Partners, L.P. (together with its applicable affiliated funds and entities, "Deerfield"), by its attorneys, hereby submits this (i) objection to *The Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estate and (II) Exclusive Settlement Authority* [Docket No. 536] (together with the proposed complaint attached thereto, the "Standing Motion")[2] and (ii) response to the Committee's objections to the Make Whole Amount[3] set forth in *The Official Committee of Unsecured Creditors' Objection to the 2028 Senior Secured Note Claims [Claims Nos. 360, 378, 379, 380, 381, 382]* [Docket No. 528] (the "Claim Objection").  In support hereof, Deerfield submits the *Declaration of Benjamin S. Beller in Support of Deerfield's (I) Objection to the Committee's Standing Motion and (II) Response to the Committee's Objections to the Make Whole Amount* filed contemporaneously herewith (the "Beller Declaration"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Standing Motion asks this Court to compel the Debtors to trade the payment ***in full*** of 94% of all unsecured creditors and all administrative and priority claims pursuant to the Plan for frivolous, wasteful litigation against the Debtors' current directors and officers, the Secured Notes Trustee and Collateral Agent and Deerfield.  While the Committee is duty-bound as a fiduciary for all unsecured creditors, from its formation, it has instead pursued a campaign to sabotage the Debtors' efforts to deliver that recovery to the vast majority of unsecured creditors

---

[2] Capitalized terms not defined herein have the meanings given to them in the Standing Motion or Proposed Complaint as applicable.

[3] Pursuant to the Court's oral rulings at the hearing on June 11, 2024, only the objections to the Make Whole Amount set forth in Sections B and C of the Claims Objection are set to be heard at the hearing on July 9, 2024 (the "Standing Motion Hearing").  *See* Jun. 11 Hr'g Tr. 37:14-38:13.  As a result, only those arguments are addressed herein. Deerfield reserves all rights with respect to all other objections and arguments set forth in the Claims Objection.

under the Plan as quickly as possible – recoveries that are being gifted by the Prepetition Secured Parties.  The Committee's strategy serves the interests not of the entirety of the Debtors' unsecured creditor body but of a few sophisticated holders of the Debtors' 2028 Convertible Notes who try to point fingers at others for their investment decisions.[4]

2.      Fundamentally, the Standing Motion puts forward a false narrative surrounding the Company's liability management efforts over the course of 2022, 2023 and 2024 that is unsupported (and patently belied) by the documentary and testimonial evidence that will be put into the record at the Standing Motion Hearing.  While the Committee's Standing Motion and Proposed Complaint contains ample rhetoric and cursory, unsupported allegations, it fails to state *any* colorable claims that would warrant granting the Committee standing in these chapter 11 cases.  And, to the extent such claims were colorable (which they are not), the Debtors were entirely justified in negotiating value for releasing those claims in the interest of maximizing value for creditors instead of putting themselves on a path to nowhere in these chapter 11 cases and incurring massive administrative costs along the way.

3.      The Committee's principal focus is on an exchange transaction between the Company and a group of holders of the 2024 Convertible Notes in March 2023 (the "March Exchange").  The March Exchange was the result of nearly 11 months of negotiations by the Company and its legal and financial advisors and a number of large holders of the Company's outstanding debt.  That process began in May 2022, and included the Company exploring comprehensive capital structure transactions and more narrowly focused transaction structures to address their debt maturities in 2024.  After determining that proposals for a comprehensive capital

---

[4] As the Court is aware, the Committee is comprised of three members, including the Indenture Trustee for the 2028 Convertible Notes and a holder of the 2028 Convertible Notes, and Committee counsel, White & Case LLP, served as legal counsel to a three-member ad hoc group of holders of the 2028 Convertible Notes prior to the Petition Date.

structure transaction from certain 2028 Convertible Noteholders were not in the Company's best

interests in late December 2022, the Company entered into the March Exchange, which provided

significant benefits to the Company, including:

(i)   the effective extension of $305 million of unsecured convertible notes maturing in 2024 to 2028;

(ii)  a 10% reduction in principal amount of the Company's outstanding debt;

(iii) the elimination of a qualified audit opinion in connection with the 2024 maturities;

(iv)  the addition of $30 million in new money liquidity; and

(v)   the capacity for the Company to incur up to $245 million in incremental *pari passu* first-lien secured debt to give the Company the ability to access the debt markets following the March Exchange to address its liquidity needs.

4.      Prior to entering into the March Exchange, the Company's directors and officers

carefully considered potential alternatives to the March Exchange (which they ultimately

determined were not in the best interests of the Company), the potential costs and risks associated

with the March Exchange, and the litany of benefits the March Exchange conferred on the

business.  And crucially, the terms of the March Exchange were the result of an arm's-length

negotiation by the Company to implement a transaction on the best terms available.

5.      Despite the considerate process run by the Company to identify the most beneficial

transaction (in the face of a need to address its 2024 debt maturities in the first half of 2023) and

the substantial value received by the Debtors through the March Exchange, the Committee argues

that because the March Exchange didn't address the Company's unsecured debt maturing five

years down the line, and didn't solve all of the Company's financial challenges, the March

Exchange is not only a constructive fraudulent transfer, but an actual fraudulent transfer and a

breach of fiduciary duties by the Debtors' directors and officers (aided and abetted by Deerfield).

3

While the March Exchange may not have solved all of the Company's balance sheet and financial challenges in one fell swoop, it solved the Company's most pressing and "mission critical" issues, while giving the business runway to stabilize cash burn and a number of means to raise additional capital.   There can be no question that such a transaction provided substantial benefits to the Company, was the result of a reasonable and calculated effort by the Company to obtain the most favorable terms, was in the best interests of the Company and its stakeholders and was a reasonable exercise of the Company's business judgment.   And, as described in greater detail below, the Committee's challenges to the other transactions included in the Standing Motion similarly fail. There is simply no basis for the Committee's allegations to the contrary.

6.      Separate from the Committee's pursuit of derivative standing, the Committee also objects to the Make Whole Amount under the 2028 Secured Convertible Notes Indenture.[5]   But that objection also fails.   Make whole provisions are routinely negotiated in debt documents to protect against potential losses from the early termination of an investment resulting from a prepayment of the debt or a breach of the debt documents, and courts have routinely held that make whole provisions constitute enforceable liquidated damages as opposed to unmatured interest.   The Make Whole Amount at issue here is calculated in a manner that is completely independent of future interest payments and reasonably approximated the losses that holders of the 2028 Secured Convertible Notes expected to incur as a result of the Debtors' breach of the 2028 Secured Convertible Notes Indenture.   Thus, the Committee's contention that the Make Whole Amount constitutes unmatured interest is both factually and legally unsound.

---

[5] The Committee strategically tries to connect the Claims Objection to the challenges in the Standing Motion, but those issues are wholly distinct and in fact orthogonal to the claims disputes.

7.       Having already misspent millions of dollars of estate resources on the fees of the advisors to the Committee, the Debtors and the Prepetition Secured Parties – dollars that could otherwise have further bolstered recoveries to the Debtors' stakeholders (including potentially unsecured creditors) – the Committee has elected to continue down the path of value-destructive litigation to try to bring meritless claims that the Debtors have already investigated and decided in their business judgment to be worthless and resource wasting.  This Court should put a stop to the further degradation of the value of the estates at the hands of a Committee that appears dead set on looting the full recovery by 94% of its constituency for the benefit of the small number of holders of the 2028 Convertible Notes.

8.       Accordingly, the Standing Motion should be denied and the objections to the Make Whole Amount should be overruled.

## FACTUAL BACKGROUND

I.    **DEERFIELD AND THE COMPANY BEGIN DISCUSSING LIABILITY MANAGEMENT TRANSACTIONS IN SPRING 2022.**

9.       Deerfield made its initial purchase of the Company's debt in the initial offering in 2019 of Invitae's convertible unsecured notes with a September 1, 2024 maturity (the "2024 Convertible Notes").  Ex. 1, June 26, 2024 Deposition of Terence Fox-Karnal at 25:3-7.  Deerfield purchased additional 2024 Convertible Notes in the secondary market and was the largest holder of the tranche by late 2020.[6]  At the time of these purchases, Deerfield viewed the 2024 Convertible Notes as an attractive investment due both to their potential for equity conversion and high likelihood to be repaid.  *See* Ex. 1, June 26, 2024 Deposition of Terence Fox-Karnal at 27:13-20; *id.* 29:5-17.

---

[6] Deerfield Mgmt. Co., L.P., Holdings Report, Form 13F-HR, Information Table (Nov. 11, 2020) (showing Deerfield held $163.4 million of 2024 Convertible Notes as of September 30, 2020).

10.     As of Spring 2022, the Company had three tranches of funded debt:  (1) $350 million of 2024 Convertible Notes;[7] (2) a $135 million first lien term loan (the "2024 Secured Term Loan") entered into on October 2, 2020, secured by a first priority lien on all of Invitae's and its subsidiaries' assets and guaranteed by substantially all of Invitae's subsidiaries, with a June 1, 2024 maturity;[8] and (3) $1.15 billion in convertible unsecured notes issued by Invitae on April 8, 2021, with an April 1, 2028 maturity (the "2028 Convertible Notes").[9]

11.     At that time, Deerfield and the Company began discussions around solving the Company's near-term debt maturities, with the parties ultimately agreeing on terms of a transaction in May 2022 (the "Proposed May 2022 Transaction") ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

12.     Ultimately, progress on the Proposed May 2022 Transaction stalled, and the transaction never came to fruition.  On July 18, 2022, the Company announced leadership changes and major cost-cutting measures projected to save $326 million annually and extend cash runway

---

[7] See Invitae Corp., Current Report (Form 8-K) at 1.01 (Sept. 11, 2019); Declaration of Ana Schrank, Chief Financial Officer of Invitae Corporation, in Support of Chapter 11 Filing, First Day Motions, and Access to Cash Collateral [Docket No. 21] ¶ 52 (the "First Day Declaration").

[8] See Invitae Corp., Current Report (Form 8-K) at 1.01 (Oct. 2, 2020).

[9] See Invitae Corp., Annual Report (Form 10-K) (Feb. 28, 2023).

through the end of 2024.[10]  Shortly before the announcement, the Company informed Deerfield that the Company no longer wished to proceed with the Proposed May 2022 Transaction, and instead intended to explore a comprehensive balance sheet restructuring to address most or all of its outstanding debt.  Ex. 8, July 17, 2022 internal Deerfield communications.

13.     After an earnings beat in early August 2022, Invitae's stock surged by 277%.[11] Deerfield remained a supportive partner of the Company and expressed an interest in taking part in a comprehensive deal that addressed both the short-term maturities and the Company's quantum of debt.  Ex. 10 (November 2022 email exchange between Deerfield and Invitae); Ex.11 (Invitae analysis of various proposals).

## II.    THE COMPANY EXPLORES A COMPREHENSIVE BALANCE SHEET RESTRUCTURING.

14.     Throughout the Fall of 2022, the Company and its advisors continued to evaluate their transaction options. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

15.     In November 2022, the Company began soliciting feedback from certain holders of the 2028 Convertible Notes, including Baker Brothers Investments ("Baker Brothers"), a holder

---

[10] Invitae Corp., Current Report (Form 8-K) at Ex. 99.1 (July 19, 2022) (announcing a "strategic business realignment to accelerate [Invitae's] path to positive cash flow").

[11] David Moadel, *Invitae Stock Soars 277% in a Day: Time to Buy?*, THE MOTLEY FOOL (Aug. 14, 2022 at 10:23 AM), available at https://www.fool.com/investing/2022/08/14/invitae-stock-soars-277-in-a-day-time-to-buy/.

of 2024 Convertible Notes and a substantial holder of 2028 Convertible Notes, on a comprehensive balance sheet restructuring. Ex. 14. Deerfield was not directly involved in those discussions. Despite ongoing engagement by the Company and its advisors with Baker Brothers, including the exchange of no less than five proposals over the course of three months, the engagement with Baker Brothers proved not to be productive. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Through the negotiations, the Company made clear its fundamental concerns with Baker Brothers' transaction proposals, but Baker Brothers largely ignored the Company's feedback. Ex. 19 and 21. Ultimately, the Company viewed Baker Brothers' various proposals for a comprehensive capital structure transaction as a "riskier option" than a narrower transaction to address the 2024 maturities ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

16.    Up to this point, Deerfield had been relatively in the dark regarding the status of the comprehensive restructuring efforts. On December 7, 2022, Invitae presented to Deerfield a proposal ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Deerfield was generally receptive to the proposal and the Company's efforts to pursue a comprehensive capital structure solution. Ex. 28.

17.     Nevertheless, on December 28, 2022, the Company notified Deerfield that it was pivoting away from a comprehensive restructuring to pursue a transaction that addressed only the 2024 Convertible Notes given the inside maturity and looming "going concern" issue. *See* Ex. 29. Deerfield did not have any understanding as to the reason for that pivot. Despite the Company's shifting focus, the Company continued its discussions with Baker Brothers on a potential comprehensive restructuring.

## III.     NEGOTIATION OF AND ENTRY INTO THE MARCH EXCHANGE.

18.     Once the Company determined to refocus its efforts on an alternative to a comprehensive restructuring, the Company and Deerfield began to negotiate a more targeted deal to address the Company's immediate maturities in 2024. At this point, the Company believed finding a resolution to the 2024 maturities was "mission critical," including to avoid the "going concern" qualification in their audited financial statements. Ex. 30. Negotiations in the following months involved significant concessions by Deerfield, including with respect to the amount of additional secured debt the Company could incur and the amount of new capital Deerfield would invest. After reaching terms with Deerfield in the middle of February, the Company began outreach to other holders of 2024 Convertible Notes (along with Deerfield, the "Participating Noteholders"). ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████ Baker

Brothers was a Participating Noteholder.

19.     The March Exchange was announced on February 28, 2023 and closed on March 7, 2023.  Immediately prior to the March Exchange, Invitae repaid the 2024 Secured Term Loan (the "Term Loan Repayment"), which carried a minimum variable interest rate of 10.75%.[12]  After accounting for prepayment penalties and given a 13.51% rate at prepayment, the Company estimated that early repayment resulted in net savings of $15.5 million.[13]  This estimate was likely low, as rising rates would have placed the rate at maturity at 17.25%.[14]

20.     Deerfield and Invitae believed that the March Exchange and term loan repayment would create significant equity value for the Company.  The March Exchange resulted in the repayment or extension of maturity of substantially all of the Company's short-term debt, extending its runway to allow for further implementation of its cost-cutting plan, and providing sufficient liquidity at least into 2025 without additional capital.[15]  Proposed Compl. ¶ 96.  The coinciding earnings release reported adjusted ongoing quarterly cash burn of $77.0 million, less

---

[12] See Invitae Corp., Current Report (Form 8-K) at Ex. 99.1 (Feb. 28, 2023); Invitae Corp., Current Report (Form 8-K) at Ex. 10.1 at *15; 24 (Feb. 7, 2023); (stating that the Term Loan would bear interest at the "Applicable Margin" (8.75%) plus the "Reference Rate" (the greater of the three-month LIBOR rate or 2.00%).

[13] See Invitae Corp., Current Report (Form 8-K) at Ex. 10.1-10.3 (Feb. 7, 2023); First Day Decl. ¶ 6-7.

[14] See Invitae Corp., Current Report (Form 8-K) at Ex. 10.1 at *15; 24 (Feb. 7, 2023) (stating that if the three-month LIBOR rate could no longer be determined, the Reference Rate would equal the *Wall Street Journal* Prime Rate unless the parties agreed to an alternative; Money Rates, THE WALL STREET JOURNAL, available at https://www.wsj.com/market-data/bonds/moneyrates (listing the Prime Rate as 8.5% effective on July 27, 2023).

[15] Press Release, Invitae Corp., *Invitae Announces Convertible Notes and Share Exchange and New Convertible Notes Issuance* (Feb. 28, 2023), (available at https://ir.invitae.com/news-and-events/press-releases/press-release-details/2023/Invitae-Announces-Convertible-Notes-and-Share-Exchange-and-New-Convertible-Notes-Issuance/default.aspx).

than half the $196 million burn in the same quarter the prior year.[16]  Among other things, Deerfield believed that addressing the Company's most pressing problem (*i.e.,* the 2024 maturities) would improve the Company's stock price, allowing it to negotiate refinancing terms with the holders of the 2028 Convertible Notes from a position of comparative strength and to access equity capital markets as needed.  Ex. 1, June 26, 2024 Deposition of Terence Fox-Karnal at 75:16-25; 108:20-109:14.

21.     In addition, the coupon on the new notes was lower than the prevailing SOFR-risk-free rate.[17]  The March Exchange also provided for $245 million in additional first lien secured capacity, to allow the Company to obtain additional capital in the debt markets.  Repayment of the 2024 Secured Term Loan, coupled with the partial exchange of 2024 Convertible Notes for stock, reduced the Company's total outstanding debt by $135.5 million and positioned it with nearly $450 million in cash on hand.  In exchange for the extended maturity, a discounted coupon rate, and added liquidity, the new notes were secured by a first priority lien on Invitae's and its subsidiaries' assets and guaranteed by all of Invitae's subsidiaries.

## IV.    MARKET REACTION TO THE MARCH EXCHANGE AND SUBSEQUENT TRANSACTIONS.

22.     Following the March Exchange, the market did not respond as favorably as the Company and Deerfield had expected.  Deerfield was disappointed by the market's initial reaction to the March Exchange but believed that Invitae's share price would improve as it continued to

---

[16] *Invitae Reports Fourth Quarter and Full Year 2022 Financial Results; Provides Company Updates*, Invitae (Feb. 28, 2023), available at https://ir.invitae.com/news-and-events/press-releases/press-release-details/2023/Invitae-Reports-Fourth-Quarter-and-Full-Year-2022-Financial-Results-Provides-Company-Updates/default.aspx.

[17] *See* Indenture, dated as of March 7, 2023, among Invitae Corporation, the Guarantors Party Hereto from Time to Time, and U.S. Bank Trust Company, National Association, as Trustee and Collateral Agent. 4.5% Series A Convertible Senior Secured Notes due 2028; 4.5% Series B Convertible Senior Secured Notes due 2028; Federal Reserve Bank of New York, Secured Overnight Financing Rate Data, available at https://www.newyorkfed.org/markets/reference-rates/sofr (showing an SOFR rate of 4.55% at the time of the March Exchange).

execute its cost-cutting plan and investors gained a better understanding of the additional runway

the March Exchange created.  Ex. 37 and 38.  ████████████████████████████████████

████████████████████████████████████  Ex. 39.  On March 22, 2023, Invitae

and Deerfield announced a joint venture to advance genetics-based drug development for rare

diseases.

23.    During the months following the exchange, Deerfield acquired nearly half ($17.2

million) of Invitae's remaining 2024 Convertible Notes on the open market.[18]   Deerfield

anticipated that Invitae would be willing to exchange the remaining 2024 Convertible Notes for

equity or long-term debt, allowing the Company to preserve liquidity rather than repay the notes

with cash.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  To further deleverage the Company, Deerfield

exchanged the debt (and the interest payments Invitae would otherwise pay) for $16.7 million in

stock and $100,000 in 2028 Secured Convertible Notes on August 22, 2023 (the "August

Exchange" and, together with the March Exchange, the "Exchange Transactions").[19]

## V.    DEERFIELD'S VIEW OF THE COMPANY'S PROSPECTS EVOLVES AS EVENTS UNFOLD.

24.    Although Deerfield believed investors would eventually respond to the retirement

of nearly all short-term debt and ongoing cost cuts, the stock price continued to decline over the

---

[18] *See* Ex. 1, June 26, 2024 Deposition of Terence Fox-Karnal at 234:15-235:2; Invitae Corp., Current Report
(Form 8-K) at 1.01 (Sept. 11, 2019 (reporting the issuance of $350 million of 2024 Convertible Notes; Invitae Corp.,
Current Report (Form 8-K) at 1.01 (Mar. 7, 2023) (reporting the exchange of $305.7 million 2024 Convertible Notes,
leaving $44.3 million outstanding).

[19] Invitae Corp., Current Report (Form 8-K) at 1.01 (Aug. 22, 2023).

second half of 2023.  The Company struggled to cut costs at the rate it had projected, and efforts

to sell off nonessential businesses were slower and less lucrative than expected.

25.     Deerfield's concerns were compounded by the departure of the Company's

longtime CFO, Roxi Wen, on June 30, 2023.[20] ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████    Deerfield met with the

Company and its new financial advisor, Moelis & Company, on September 13, 2023, but was

unconvinced that the further cuts and divestments presented to them could be executed quickly

enough to address the Company's liquidity issues.  Ex. 43 and 44.

26.     On October 20, 2023, once it became clear that Invitae would not be able to raise

new capital and would not be able to address its ongoing cash burn, Deerfield approached the

Company with a preliminary term sheet for a potential restructuring to maximize value to

stakeholders rather than have the Company deplete its remaining cash.  Ex. 45.  The Company did

not initially engage on the restructuring proposal and instead requested Deerfield's consent under

the indenture governing the 2028 Secured Notes (the "2028 Secured Convertible Notes

Indenture")[21] to the divestment of certain cash-burning business lines.  On December 8, 2023, the

parties entered into a supplemental indenture through which Deerfield granted those consents and

---

[20] *See* Invitae Corp., Current Report (Form 8-K) at 5.02 (May 25, 2023).

[21] Invitae Corp., Current Report (Form 8-K) Ex. 4.1, Indenture, dated as of March 7, 2023, between Invitae Corporation, the guarantor parties thereto and U.S. Bank Trust Company, National Association, as trustee and collateral agent (March 8, 2023).

the parties agreed on milestones for a sale process and a time frame to enter into a transaction support agreement for a broader restructuring (the "Second Supplemental Indenture").[22]    In exchange for Deerfield's consent, the Debtors paid a $2.1 million consent fee (the "Consent Fee").[23]

27.    Thereafter, as contemplated by the Second Supplemental Indenture, the Company and Deerfield negotiated the terms of a transaction support agreement (the "Transaction Support Agreement") to facilitate the implementation of a sale of the Company's assets and distribution of sale proceeds to the Company's stakeholders through an expeditious and efficient chapter 11 proceeding.[24]    Importantly, the Transaction Support Agreement provided the framework for the Plan, including the gifting of value to provide payment in full to all unsecured trade creditors at each of Invitae's subsidiaries (the "Subsidiary Unsecured Creditors"), as well any unsecured creditor with a claim in an amount less than $250,000 (the "Convenience Class Creditors"). Through the Transaction Support Agreement, Deerfield also consented to the Debtors' use of cash collateral, allowing operations to continue without incurring substantial debtor-in-possession financing fees.

## STANDARD OF REVIEW

### 1.    Standing Motion

28.    Granting derivative standing is an "uncommon" practice, *In re Merritt*, 711 F. App'x 83, 86 (3d Cir. 2017), and is considered "the exception rather than the rule," *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d 557, 562 (4th Cir. 2005).  Derivative standing is an equitable

---

[22]    See Invitae Corp., Current Report (Form 8-K) at 1.01 (Dec. 11, 2023).

[23]    *Id.*

[24]    See Invitae Corp., Current Report (Form 8-K) at 1.01 (Feb. 14, 2024).

remedy available to bankruptcy courts only when the "Bankruptcy Code's envisioned scheme breaks down." *In re Merritt*, 711 F. App'x at 86 (quoting *In re Weyandt*, 544 F. App'x 107, 110 (3d Cir. 2013)).

29.     Courts disfavor granting derivative standing to a creditors' committee – a fiduciary for only one class of creditors rather than for the debtor or the estate as a whole – because its "interests are necessarily different" from those of the estates and its relationship with the estate therefore "must necessarily be adversarial." *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d at 562 (internal quotations omitted); *accord Off. Unsecured Creditors' Comm.* v. *Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1316 (1st Cir. 1993); *see also In re Smart World Techs., LLC*, 423 F.3d 166, 175 n.12 (2d Cir. 2005) ("A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate."). In its role as gatekeeper, the bankruptcy court is tasked with "ensur[ing] that a would-be derivative suit would not simply advance the interests of a particular plaintiff at the expense of other parties to the bankruptcy proceeding." *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d at 562. Indeed, the hurdle of obtaining derivative standing from the court is "a critical check" against a creditor's committee taking actions for the primary benefit of a particular creditor's legal counsel. *See id.* (citing *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.* v. *Chinery*, 330 F.3d 548, 575 (3d Cir. 2003)).

30.     To establish derivative standing, a creditor must demonstrate that "1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and 4) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case." *In re G-I Holdings, Inc.*, 313 B.R. 612,

628 (Bankr. D.N.J. 2004) (citing *Canadian Pac. Forest Prods. Ltd.* v. *J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir.1995)); *see also In re Diocese of Camden, N.J.*, 2022 WL 884242, at \*4 (Bankr. D.N.J. Mar. 24, 2022).  The Committee, as the party seeking standing, bears the burden of proof as to each requirement.  *In re Diocese of Camden, N.J.*, 2022 WL 884242 at \*4.  While the "colorable" inquiry is "like that of a motion to dismiss [a complaint] for failure to state a claim," the court is "not bound to accept as true legal conclusions couched in factual allegations, and 'threadbare recitals of elements of a cause of action, supported by mere conclusory statements, will not suffice."  *Id.* (citation omitted).  Among other things, the court must also "examine the facts for any dispositive affirmative defenses and may deny a motion for standing when an affirmative defense appears on its face."  *Id*.

### 2.    Claim Objection

31.    Federal Rule of Bankruptcy Procedure 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."  If a proof of claim is filed in accordance with Rule 3001, "Rule 3001(f) is triggered, giving the creditor's claim prima facie validity."  *In re Armstrong*, 320 B.R. 97, 104 (N.D. Tex. 2005).

32.    "If a proof of claim has prima facie validity, the objecting party must produce sufficient evidence to overcome the proof of claim's prima facie validity."  *In re Today's Destiny, Inc.*, 2008 WL 5479109, at \*4 (Bankr. S.D. Tex. Nov. 26, 2008) (citing 11 U.S.C. § 502(a); *In re Armstrong*, 320 B.R. at 102–03).  "Conclusory statements are insufficient to rebut 3001(f)'s presumption."  *Id.* at \*4.  An objecting party must produce "evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."  *In re Armstrong*, 320 B.R. at 104 (quoting *In re Rally Partners, LP*, 306 B.R. 165, 168–69 (Bankr. E.D. Tex. 2003)); *In re Reilly*,

16

245 B.R. 768, 773 (B.A.P. 2d Cir. 2000) ("To overcome this prima facie evidence, the objecting party must come forth with evidence, which, if believed, would refute at least one of the allegations essential to the claim.") (citing *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992)); *In re Nazu, Inc.*, 350 B.R. 304, 323 (Bankr. S.D. Tex. 2006) ("Because the Debtor has produced no evidence to rebut [claimant's] Claim, [claimant] need not produce additional evidence to prove her Claim beyond a preponderance of the evidence."); *In re Brown*, 221 B.R. 46, 47–48 (Bankr. S.D. Ga. 1998). The "mere denial of the validity or the amount of a claim" is insufficient to overcome the presumption of validity, and "the objecting party must establish at least a prima facie case in support of the objection."). *In re Today's Destiny, Inc.*, 2008 WL 5479109 at *4.

33.     "If the objecting party puts forth sufficient evidence to rebut a proof of claim's prima facie validity, the claim is not per se denied." *Id.* at 4-5 (citing *In re Armstrong*, 320 B.R. at 104; *In re L.A. Int'l Airport Hotel Assocs.*, 196 B.R. 134, 139 (B.A.P. 9th Cir.1996)). Instead, the proof of claim is no longer presumed to be valid. *In re Cluff*, 313 B.R. 323, 331 (Bankr. D. Utah 2004) ("Bankruptcy Rule 3001 does not provide substantive grounds for disallowance; it merely determines which party will have the burden of proof moving forward on the objection"). The claimant may still establish the validity of its claim if it meets the burden of proof, as determined by applicable state law. *In re Armstrong*, 320 B.R. at 103 (citing *Raleigh* v. *Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

## ARGUMENT

34.     The Committee has failed to carry its burden in establishing either that the causes of action in its Proposed Complaint are colorable or that the Debtors unjustifiably refused to pursue the Committee's proposed causes of action. The Committee also has failed to establish that the Make Whole Amount should be disallowed on any basis. The below addresses each of these issues in turn.

## I.     THE PROPOSED CAUSES OF ACTION ARE NOT COLORABLE.

35.     The Committee's Standing Motion identifies no colorable claim or cause of action. *First*, none of the March Exchange, the August Exchange, or the Consent Fee constitutes a constructive fraudulent transfer because Invitae clearly received reasonably equivalent value in each such transaction.   In addition, Invitae was not insolvent at the time of either the March Exchange or the August Exchange.   Finally, each challenged transaction falls clearly within the safe harbor provision of section 546(e) of the Bankruptcy Code.

36.     *Second*, there is no colorable claim that the March Exchange was an actual fraudulent transfer.     As the record clearly demonstrates—and the Committee itself acknowledges—the March Exchange was conducted at arm's-length to address genuine issues with a looming maturity of the 2024 Convertible Notes.   *See* UCC Standing Mot. ¶ 92 ("[T]he March Exchange was negotiated at arm's length.").   The substantial value Invitae received in connection with the March Exchange also contradicts any actual fraudulent intent in connection with the transaction.

37.     *Third*, the Committee's claims against the Company's directors and officers (and related aiding-and-abetting claims against Deerfield) are not colorable given the careful consideration and analysis conducted by the directors and officers in engaging in the transactions at issue in the Committee's Proposed Complaint and the arm's-length, good faith negotiations that led to those transactions.   And even if there were a colorable claim against the directors and officers, the Committee has not articulated a colorable aiding-and-abetting claim against Deerfield, which engaged in the March Exchange as a good-faith third-party creditor.

A.    **The March Exchange, August Exchange and the Consent Fee Are Not Constructive Fraudulent Transfers.**

38.     In relevant part, section 548 of the Bankruptcy Code provides that a transfer may be deemed constructively fraudulent if the debtor did not receive reasonably equivalent value in exchange for the transfer or obligation *and* the debtor:  (1) was insolvent at the time of the transaction or became insolvent as a result of the transaction; (2) was engaged (or was about to be engaged) in a business or transaction for which any property remaining with the debtor was an unreasonably small capital; or (3) intended to incur or believed that it would incur debts that would be beyond its ability to repay as the debts matured.  11 U.S.C. § 548(a)(1)(B)(ii).

1.    **The March Exchange was not a Constructive Fraudulent Transfer.**

39.     The March Exchange was not a constructive fraudulent transfer under section 548 of the Bankruptcy Code because the Company received significant value through the exchange including from the extension of the maturity of $305.7 million of existing 2024 Convertible Notes by four years, reduction of principal by approximately $7.5 million and the extension or retirement of nearly all of the Company's short-term debt, significant reduction in the Company's total outstanding debt, $30 million of new working capital, the capacity for $245 million of additional secured debt, and defusing the risk of a looming "going concern" qualification that could have resulted in a free-fall bankruptcy.  The litany of benefits far outweighs the costs to the Company, which the Committee grossly overstates.  In addition, the Company was solvent at the time of each transaction pursuant to the Balance Sheet Test, the Capital Adequacy Test, and the Cash Flow Test.

(a)    **Invitae Received Reasonably Equivalent Value in the March Exchange.**

40.     A party receives reasonably equivalent value when it "gets 'roughly the value it gave.'"  *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (internal citation

19

omitted).   To make this determination, courts often look to the totality of the circumstances surrounding the transactions, considering "the good faith of the transferee," "the fair market value compared to the price paid," and "whether the transaction was at arm's-length."  *In re R.M.L., Inc.*, 92 F.3d 139, 145 (3d Cir. 1996) (citing *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991)).   The fair market value prong does not require a "penny for penny exchange," but if the debtor receives value that is "so low that it shocks the conscience," the transfer will be presumed to have been for less than reasonably equivalent value.  *In re Gonzalez*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006).

41.   Here, the March Exchange was the result of the Company's months-long marketing process to address its balance sheet and capital structure challenges, as well as numerous rounds of negotiations assisted by able advisors with multiple of its sophisticated creditors.   This hard-fought process culminated in the March Exchange, which consisted of (i) the exchange of $305.7 million of existing 2024 Convertible Notes for $275.3 million of new secured convertible notes maturing in 2028 (the "2028 Secured Convertible Notes") and $22.9 million of stock; and (ii) the issuance of $30 million of new 2028 Senior Secured Notes for $30 million in cash.

42.   As a threshold matter, the March Exchange was a trade of fair consideration, as it satisfied antecedent debt with a principal reduction of approximately $7.5 million.  *In re Champion Enter., Inc.*, 2010 WL 3522132, at *18 (Bankr. D. Del. Sept. 1, 2010) (defining "value" under N.Y. Debt. & Cred. § 272 to include satisfaction or securing of an antecedent debt); *see also In re Propex Inc.*, 415 B.R. 321, 324 (Bankr. E.D. Tenn. 2009) (concluding that the debtor received "reasonably equivalent value" because the payment reduced the principal balance of the debt dollar for dollar); *In re Se. Waffles, LLC*, 460 B.R. 132, 140 (B.A.P. 6th Cir. 2011), *aff'd*, 702 F.3d 850 (6th Cir. 2012) (same).   Courts have routinely blessed transactions that collateralize antecedent

debt in exchange for a maturity extension. *See, e.g.*, *In re M. Silverman Laces, Inc.*, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (finding that debtor "received 'value' when its antecedent debt was extended and collateralized" and affirming dismissal of fraudulent transfer claim for failure to plead lack of reasonably equivalent value); *see also In re Fritze LLC*, 2009 WL 3245499, at *7 (Bankr. D.N.J. Oct. 6, 2009) ("Courts have held that securing an antecedent debt can constitute reasonably equivalent value") (citation omitted); *In re Capmark Fin. Grp.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) ("[W]here payment on account of an antecedent debt can be made without running afoul of the fraudulent transfer laws, a debtor may take the lesser step of granting an interest in collateral to secure an antecedent debt.") (collecting cases).

43.    Moreover, the March Exchange and related Term Loan Repayment also extended or retired nearly all of the Company's short-term debt, significantly reduced the Company's total outstanding debt, provided $30 million of new working capital, allowed for $245 million of additional secured debt capacity, and defused the risk of a looming "going concern" qualification that could have resulted in a free-fall bankruptcy. Courts commonly consider these features as "value" for purposes of section 548 of the Bankruptcy Code. *See, e.g.*, *Anand* v. *Nat'l Republic Bank*, 239 B.R. 511, 518-19 (Bankr. N.D. Ill. 1999) (concluding that debtor received reasonably equivalent value when bank agreed to extend maturity date of notes in return for collateral to secure loans); *Pembroke Dev. Corp.* v. *Commonwealth Savs. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400-01 (Bank. S.D. Fla. 1991) (fair consideration included, among other things, deferring interest payments and extending the maturity date on the original loan). Invitae therefore received substantially more value than an amount "so low that it shocks the conscience" through the March Exchange, *In re Gonzalez*, 342 B.R. at 173, or neither Deerfield nor the other

Participating Noteholders acted in bad faith in connection with that transaction. *In re R.M.L., Inc.*, 92 F.3d at 153.

44.     Nevertheless, the Committee asserts that the Company gave up "more than $100 million more value to the participating holders of the 2024 Unsecured Notes [] than it received."  Proposed Compl. ¶ 99.  The Standing Motion makes no attempt to back-up its $100 million figure, but to reach this inflated calculation, the Committee relies on "value" that the Participating Noteholders purportedly received from the March Exchange that are legally and factually flawed.  *See id.* ¶¶ 99, 172.

- *$8.1 million in Term Loan prepayment fee*.  As the Committee acknowledges, Invitae made the "$8.1 million . . . prepayment fee in connection with the *[2024] Term Loan* [r]epayment." *Id.* ¶ 172.  No amount of these *2024 Term Loan* prepayment fees was paid to the Participating Noteholders who held the *2024 Unsecured Notes*.

- *$19.1 million of debt issuance cost*.  The Standing Motion fails to provide relevant detail with respect to the purported $19.1 million of debt issuance costs.  Those fees were paid for legal and consulting services in connection with the March Exchange and negotiations with respect to prior, unconsummated transactions.[25]  Those fees do not constitute consideration to the Participating Noteholders, and to the extent the Committee includes them as a cost to the Company relevant for a constructive fraudulent transfer claim, it does so without recognizing *any* value to the benefit the Company received from those services.  *See In re Interco Sys., Inc.*, 202 B.R. 188, 194 (Bankr. W.D.N.Y. 1996) ("[W]hen in the exercise of reasonable, good faith business judgment, there is a perceived financial benefit to the corporation which justifies the fees or expenses paid . . . unless the Trustee meets his or her burden to prove that there was in fact no benefit, or a substantially and reasonably quantifiable disproportionate financial benefit, the payment of professional fees or expenses to the professionals or others who perform the services or provided the goods at the request of the corporation and charged a reasonable rate is not avoidable as a fraudulent conveyance.").

- *$27.5 million Make Whole Amount*.  The $27.5 million Make Whole Amount was a *contingent* claim under the 2028 Secured Convertible Notes Indenture *at the time of the March Exchange*, and therefore had no value at the time of the March Exchange.  *See, e.g., Perkins* v. *North Park Realty Mgmt, LLC, et al. (In re Sakhe)*,

---

[25] Furthermore, as is shown by Invitae's internal accounting records (that the Committee had access to when it filed the Standing Motio ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████     *See* Ex. 48.

2021 WL 5999195, at *51 (Bankr. D.N.J. Dec. 17, 2021) ("Value and reasonably equivalent value are measured at the time of the transaction.") (citation omitted); *In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002) ("We are not saying that legal claims are not assets . . . , only that they are contingent assets whose value must be assessed in light of the probability that they will be realized.").

- *Unquantified "significant equity option value."* The Committee does not attempt to quantify the alleged "significant equity option value" stemming from the "improved conversion feature" in the 2028 Secured Notes. Proposed Compl. ¶ 172. In any event, the Committee's allegation that the 2028 Secured Notes had "significant equity option value" plainly contradicts its assertion that Invitae was insolvent at the time of the March Exchange, *compare id.* ¶ 172 *with* ¶¶ 93-103, and therefore should be disregarded by the Court as "internally inconsistent and contradictory. *See Bocker* v. *Hartzell Engine Techs., LLC*, 2023 WL 415792, at *4 (D. Del. Jan. 26, 2023) ("Where a plaintiff's own pleading is internally inconsistent and contradictory, the court is not obligated to reconcile or accept such contradictory allegations.") (collecting cases).

- *Unquantified "significant control over the Debtors."* Neither has the Committee offered any facts to quantify the value of the Participating Noteholders' alleged "control over the Debtors." More importantly, as the record clearly shows (to which the Committee had full access when it filed the Standing Motion), the Participating Noteholders did not exercise any control over Invitae, and Invitae engaged in extensive negotiations with 2028 Convertible Noteholders and third parties both before and after the March Exchange regarding potential refinancing and alternative transactions. *See, e.g.*, Ex. 49 (Invitae's work plan to engage with Baker Brothers and SoftBank prior to the March Exchange]; Ex. 50; 51 (Invitae's simultaneous negotiations with Deerfield, Baker Brothers, SoftBank, and ten other third-party potential investors).

45.    Therefore, the Committee's blanket assertion that the Participating Noteholders received approximately $100 million in value more than it provided through the March Exchange is both unexplained and implausible. To the contrary, the record is clear that Invitae obtained significant value from the Participating Noteholders in connection with the transaction, which addressed the debt maturing in 2024 in light of the looming "going concern" qualification in the absence of any alternative transaction yielding greater benefits to the Company (including proposals from Baker Brothers). Ex. 70.

46.    In short, Invitae received reasonably equivalent value from the March Exchange. The Committee misleadingly inflates the value that Invitae provided to the Participating

Noteholders and at the same time deflates the substantial benefits that Invitae received. The Court

should reject the Committee's intellectually dishonest gamesmanship.

> **(b)      Invitae Was Not Insolvent When the March Exchange Was Executed.**

47.      Even if the Court found that Invitae did not receive reasonably equivalent value in

one of the subject transactions, the Committee's constructive fraudulent transfer claims would still

fail because Invitae was not insolvent at the time of the transaction and did not become insolvent

as a result of the transaction. *See* 11 U.S.C. § 548(a)(1)(B)(ii). Insolvency is not presumed in

fraudulent transfer actions. *In re Rite Way Elec., Inc.*, 510 B.R. 471, 482 (Bankr. E.D. Pa. 2014).

Rather, the movant bears the burden of showing insolvency. *See In re Prime Realty, Inc.*, 380 B.R.

529, 534-5 (B.A.P. 8th Cir. 2007).

48.      In the present case, there are three potential tests for insolvency: the Balance Sheet

Test, the Capital Adequacy Test, and the Cash Flow Test. *In re Lyondell Chem. Co.*, 567 B.R. 55,

98 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018). None of these tests support that

Invitae was insolvent at the time of the March Exchange.

49.      **The Balance Sheet Test**. The Balance Sheet Test deems a debtor insolvent when

the sum of the debtor's liabilities exceeds the sum of its assets, both calculated at fair market value.

11 U.S.C. § 101(32)(A); *see also Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 648

(3d Cir. 1991). It is well established that "insolvency is to be measured at the time the debtor

transferred value or incurred an obligation." *Mellon Bank*, 945 F.2d at 648. Courts often recognize

that sophisticated investors' decision to invest in a business reflects an objective belief that the

business was viable at the time of investment. *See In re Lyondell Chem. Co.*, 567 B.R. 55, 112

(Bankr. S.D.N.Y. 2017) (collecting cases in which courts showed deference to the manifested,

contemporaneous belief by investors that a company's projections were reasonable and that a company was not undercapitalized).

50.    As a threshold matter, the Committee's application of the Balance Sheet Test impermissibly relies on the type of "hindsight" or "*post-hoc*" analysis that the Third Circuit has rejected.  *See In re R.M.L., Inc.*, 92 F.3d at 156.  The Committee notes that "[s]olvency is measured **at the time the debtor transferred value**," but then immediately hinges its analysis on balance sheets from weeks and months **after** the March Exchange.  UCC Standing Mot. ¶¶ 94, 95; Proposed Compl. ¶ 102 (citing balance sheet numbers from Invitae's May 9, 2023 Form 10-Q for the quarter ending on Mar. 31, 2023; Aug. 8, 2023 Form 10-Q for the quarter ending on Jun. 30, 2023; and Nov. 8, 2023 Form 10-Q for the quarter ending on Sept. 30, 2023).

51.    In addition, the Committee's claim that Invitae was insolvent simply because the book value of its liabilities exceeded that of its assets is also meritless.  *See* UCC Standing Mot. ¶ 95.  Courts in this Circuit have held that "with limited exceptions, e.g., cash and cash equivalents, balance sheet asset numbers do not in fact reflect the fair value of the assets," and there may be "assets of substantial value which are not even listed on the asset side of [a company's] balance sheet."  *In re Trans World Airlines, Inc.*, 180 B.R. 389, 405 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d Cir. 1998).  Indeed, the Committee's simple arithmetic approach to solvency analysis would deem dozens of S&P 500 companies insolvent.[26]

52.    For good reasons, courts do not rely on book values when analyzing solvency and instead defer to the "contemporary, informed opinion" of "private investors who, with their

---

[26] *See, e.g.*, McDonald's Corp., Quarterly Report (Form 10-Q) at 3 (May 8, 2024) (reporting total liabilities of $58.3 billion compared to total assets of $53.5 billion); Lowe's Co., Quarterly Report (Form 10-Q) at 5 (May 30, 2024) (showing total liabilities exceeding total assets by $14 billion); Domino's Pizza Inc., Quarterly Report (Form 10-Q) at e (April 29, 2024) (disclosing a liability-to-asset ratio of 329%).

finances and time at stake, and with access to substantial professional expertise decide to invest in a business viewed as potentially profitable." *In re Lyondell Chem. Co.*, 567 B.R. 55, 111 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) (collecting cases). Courts also look at the company's stock price, which, absent reason to mistrust the market's efficiency, is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007). As one court in this circuit has noted:

> When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.

*Peltz* v. *Hatten*, 279 B.R. 710, 738 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

53.     Here, sophisticated investors chose to invest additional capital into the business through the March Exchange to receive convertible securities, whose interest rate was below market and whose value derives in large part from the optionality to convert into equity. The Company's stock price at the time also shows that equity investors, including Baker Brothers,[27] believed that at the time the March Exchange was announced, the value of the Company's assets exceeded its liabilities by over $500 million.[28] Despite the Committee's claims of insolvency, the market value of the remaining 2024 Convertible Notes *improved* after the March Exchange, rising from $0.79 on the dollar the day before the exchange to $0.89 on the dollar on the day after the

---

[27] *See* Invitae Corp., Post-Effective Amendment to Form S-3 Registration Statement at 9 (Feb. 28, 2023) (reporting Baker Brothers' beneficial ownership of 3.4% of outstanding Invitae common stock).

[28] *See* Invitae Corp., Annual Report (Form 10-K) (Feb. 28, 2023) at 1 (listing 246,235,501 shares outstanding); FACTSET, Invitae Corp. (NVTA) Price History (attached as Ex. 69) (showing a February 28, 2023 closing price of $2.15, implying a market cap of $529.4 million).

exchange was completed and remaining comfortably above pre-exchange levels through the end
of 2023.[29]

54.    Accordingly, the Balance Sheet Test does not support that Invitae was insolvent at
the time of the March Exchange.

55.    **The Capital Adequacy Test**.   The second test for insolvency is the Capital
Adequacy Test, which looks to whether the transaction left the debtor with "unreasonably small
capital."  11 U.S.C. § 548(a)(1)(B)(ii)(II).  The Third Circuit has held that the relevant inquiry is
whether it was reasonably foreseeable to the debtor that the transaction would leave it with "an
inability to generate enough cash flow to sustain operations."  *Moody* v. *Security Pacific Business
Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  In making this determination, the court may look
to historical "cash flow, net sales, gross profit margins, and net profits and losses" as well as "the
transferor's debt to equity ratio, its historical capital cushion, and the need for working capital in
the transferor's industry."  *Id.* at 1073; *see also In re Direct Access Partners, LLC*, 602 B.R. 495,
536 (Bankr. S.D.N.Y. 2019).  Courts also consider the "nature of the enterprise itself and the extent
of the enterprise's need for capital during the period in question."  *Barrett* v. *Continental Illinois
Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989).

56.    At the time of the March Exchange, it was reasonably foreseeable to Invitae that
the transaction would allow it to generate enough cash flow to sustain operations.  *Moody*, 971
F.2d at 1070.  The March Exchange added cash to Invitae's balance sheet, retired or extended the
duration of 96% of the Company's short-term convertible debt, reduced its total outstanding debt
by $115 million, provided new debt at a coupon rate below the prevailing risk-free rate, allowed
for $245 million in additional first lien secured capacity, and positioned the Company with nearly

---

[29] *See* REFINITIV, Price History for CUSIP 46185LAB9 (attached as Ex. 57) (*hereinafter* "Notes Price History").

$450 million in cash on hand.[30]  Invitae Corp., Annual Report (Form 10-K) (Feb. 28, 2023).  At

the time of the exchange, Invitae was in the midst of a substantial cost-cutting effort.  The earnings

release that coincided with the announcement of the March Exchange reported adjusted ongoing

quarterly cash burn of $77 million, less than half the $186.1 million adjusted burn in the same

quarter the prior year.[31]  Invitae Corp., Current Report (Form 8-K) at *5 (Feb. 28, 2023); Invitae

Corp., Current Report (Form 8-K) at *4 (Feb. 24, 2022).

57.    Although some analyses forecasted that so long as Invitae executed on its cost-

cutting plan, it would have sufficient liquidity into 2025 without needing to raise additional capital,

(*See* Ex. 65), the exchange provided for three potential avenues for the Company to do so if needed:

the Company could (i) renegotiate its remaining unsecured debt, (ii) raise cash through the sale of

additional equity, or (iii) issue additional secured debt.

58.    ***First***, at the time of the March Exchange, documents show that the Company held

a reasonable belief that it would be able to refinance the 2028 Convertible Notes on more favorable

terms.  This analysis was informed by ongoing discussions with at least one holder of 2028

Convertible Notes, Baker Brothers, who, after repeatedly refusing to accept reasonable

concessions commensurate with the then-current value of the 2028 Convertible Notes and the

parties' respective negotiating positions, approached Invitae to resume discussions just days before

the March Exchange was announced.  *See* Ex. 16; 60-62.  Deerfield and the Company shared the

belief that addressing Invitae's most pressing problem (*i.e.*, the 2024 maturity) would allow Invitae

---

[30] Invitae Corp., Fourth Quarter 2022 Financial Results Conference Call Earnings Presentation at *10-11 (Feb. 28, 2023) available at https://ir.invitae.com/news-and-events/presentations/presentationdetails/2023/Fourth-Quarter-2022-Financial-Results-Conference-Call-Earnings-Presentation/default.aspxCurrent Report; Federal Reserve Bank of New York, Secured Overnight Financing Rate Data, available at https://www.newyorkfed.org/markets/reference-rates/sofr (showing an SOFR rate of 4.55%, greater than that of the 2028 Secured Notes).

[31] Invitae Corp., Current Report (Form 8-K) at Ex. 99.1 (Feb. 28, 2023) ("Invitae Reports $460.4 Million in Annual Revenue Driven by 1.17 Million in Billable Volume in 2021")

to negotiate refinancing terms with the holders of 2028 Convertible Notes from a position of comparative strength.

59.     **Second**, Invitae also held a reasonable belief that the March Exchange would boost its stock, which had experienced significant volatility in prior months.   The Company and its advisors concluded that equity investors were primarily concerned by Invitae's near-term debt overhang, causing the stock to approach all-time lows leading up to the exchange.   *See* Ex. 63. Deerfield agreed.   On the day the exchange was announced, Deerfield's updated price model

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████   Ex. 64-67.   The potential for substantial equity growth was further informed by the nature of Invitae's business.   Despite significant divestments, Invitae had retained core lines of businesses with substantial upside potential, the same potential that led sophisticated investors to provide $1.4 billion in unsecured convertible debt at remarkably favorable rates.   Six months earlier, after the announcement of major cost-cutting measures and a surprise earnings beat, the stock had surged by 277% overnight.[32]   If the Company had achieved even a fraction of the growth that it and Deerfield's models predicted, Invitae would have been able to renegotiate the terms of its remaining unsecured convertible debt from a stronger negotiating position or to sell additional equity to service its debts and fund ongoing operations.

60.     **Third**, along with the potential for raising new capital by refinancing the 2028 Convertible Notes or by selling additional equity, the March Exchange provided for an additional $245 million in first lien secured capacity.   As the Third Circuit has acknowledged, "[t]he ability to borrow money has considerable value in the commercial world."   *Mellon Bank*, 945 F.2d at 647.

---

[32] *See* FACTSET, Invitae Corp. (NVTA) Price History (attached as Ex. 69).

Even where a company's sole remaining source of capital was through the issuance of new debt, the Third Circuit has refused to conclude that a transaction left the company with unreasonably small capital. *Moody*, 971 F.2d at 1072.

61.     Given the March Exchange's aim to enhance the Company's financial conditions and the Company's continuing cost-cutting plan, Invitae reasonably believed that it would have sufficient liquidity to operate its business without needing to raise additional capital. And to the extent that the Company needed additional capital, the Company could access additional liquidity by (i) renegotiating its remaining unsecured debt, (ii) raising cash through the sale of additional equity, or (iii) issuing additional secured debt. Accordingly, it was not reasonably foreseeable to Invitae that the March Exchange would leave it with "an inability to generate enough cash flow to sustain operations." *Moody*, 971 F.2d at 1070.

62.     Therefore, the Capital Adequacy Test does not support that Invitae was insolvent at the time of the March Exchange.

63.     **The Cash Flow Test**. Under the last test for insolvency (the Cash Flow Test), a company is deemed insolvent upon a showing that it intended to incur or believed that it would incur debt beyond its ability to repay. 11 U.S.C. § 548(a)(1)(B)(ii)(III). The Cash Flow Test is "forward looking" and "requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred." *In re Opus E. LLC*, 698 F. App'x 711, 715 (3d Cir. 2017) (citing *In re Teleglobe Communications Corp.*, 392 B.R. 561, 602-03 (Bankr. D. Del. 2008)). In making this determination, a court may "take into account whether the debtor was 'able to pay, intended to pay, and . . . was paying its debts as they came due." *Id.* (citing *In re EBC I, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008)). A showing that the debtor "in fact was paying its debts as they came

due as of [the date of the challenged transfer]" supports a finding of solvency.  *In re EBC*, 380 B.R. at 359.

64.    In this case, the Committee cherry-picks a handful of out-of-context comments and the Company's most pessimistic cash flow projections to paint a picture of the Company incurring debt beyond what it believed it could repay.  But, in doing so, the Committee ignores the mountains of evidence suggesting that the Company intended the March Exchange to be part of its effort to remain solvent in the face of a looming debt overhang and extract better economics from other creditors if it needed access to more capital. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████ Additionally, the March Exchange itself, along with Invitae's repayment of the 2024 Term Loan, demonstrates that the Company "in fact was paying its debts" *before* they came due, and the Company specifically designed the March Exchange in a manner that was intended to provide it with the flexibility needed to repay or refinance its long-term debts.  *In re EBC*, 380 B.R. at 359.

65.    As for the Participating Noteholders, contemporaneous internal analyses indicated that, following the March Exchange, ███████████████████████████████████

_____

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

████████████████████████████████████████████ and, with the ████████████

████████ through the March Exchange, ████████████████████████████████

████████ Ex. 71.  Indeed, if Invitae and the Participating Noteholders understood that

bankruptcy was inevitable, they likely would not have wasted months negotiating terms like

████████████████████████████████████████████████████ or specific anti-

dilution protections to preserve the value of the notes' convertibility feature in future raises.  *See,*

*e.g.*, Ex. 72 (summarizing negotiations); March Exchange Agreement at 114.  Nor would the price

of the remaining 2024 Convertible Notes have increased from $79 pre-exchange to $89 after the

exchange was completed.  *See* Ex. 57, Notes Price History.  Moreover, if Invitae's intent was as

clear as the Committee contends, one would expect Baker Brothers—a sophisticated investor who

participated in the March Exchange, held hundreds of millions in Unsecured 2028 Notes, and

remained one of Invitae's largest shareholders until at least August 2023,[34]—to have taken some

action to reduce its exposure after a transaction that it allegedly "knew would only exacerbate the

Debtors['] liquidity issues and likely lead to a chapter 11 filing."  UCC Standing Mot. ¶ 91.

66.    Accordingly, the Cash Flow Test does not support that Invitae was insolvent at the

time of the March Exchange.

### 2.    The August Exchange Was Not a Constructive Fraudulent Transfer.

67.    The August Exchange provided the Company significant value by retiring $17.2

million of short-term debt without draining cash reserves or raising an at-the-market equity

offering.  In exchange, Deerfield received $16.7 million in stock and $100,000 in 2028 Secured

Convertible Notes.  The August Exchange was a *downtier* exchange—Deerfield exchanged debt

---

[34] *See, e.g.*, Baker Bros. Advisors LP, Form 13F-HR, Information Table (August 14, 2023) (noting that Baker Bros.
owned 8.8 million Invitae shares); Baker Bros. Advisors LP, Form 13F-HR, Information Table (February 14, 2023)
(noting that Baker Bros. owned 8.4 million Invitae shares).

for (lower priority) equity, foregoing a claim against the Company for an interest in the residual equity value. That the equity Deerfield received had value in the market is a red herring for purposes of determining reasonably equivalent value (although not for determining solvency). At root, the exchange equitized nearly half of the Company's short-term convertible debt while further deleveraging the Company, benefitting the Company and its remaining unsecured creditors. Further, the Committee is unable to demonstrate insolvency at the time of the August Exchange.

<blockquote>(a)   <strong>Invitae Received Reasonably Equivalent Value in the August Exchange.</strong></blockquote>

68.     In conclusory fashion, the Committee asserts that the 2024 Convertible Notes Deerfield exchanged in August 2023 "were soon to be worthless and were largely illiquid." UCC Standing Mot. ¶ 118. Were either true, Deerfield would not have acquired the notes on the secondary market (at an average price of $0.89 on the dollar) and held them for months without any assurance that the Company would exchange them for equity. *See* Ex. 57, Notes Price History (showing that note prices rose and remained at or near $0.89 cents on the dollar following the March Exchange). In a high interest rate environment, sellers of unsecured, "soon to be worthless" debt with only a 2.00% coupon and a 13-month maturity would not have demanded a secondary market price of just $0.11 on the dollar below face value. While the Committee claims the market for the notes was largely illiquid, the simple fact that Deerfield was able to acquire nearly half of the remaining tranche strongly suggests an active market.

69.     Deerfield agreed to exchange the notes (at a discount from face value) into common shares ranking lower in seniority. As Invitae's financial advisor noted at the time, Deerfield acquired these notes ███████████ and this was ███████████████████ ███████ Ex. 41. As opposed to the Committee's complaint about the March Exchange being an "*uptier*" transaction, the August Exchange was a *downtiering* transaction in which

Deerfield moved lower in the capital structure while helping the Company retire additional indebtedness. *See generally In re Rosen Auto Leasing, Inc.*, 346 B.R. 798, 805 (8th Cir. BAP 2006) ("For purposes of fraudulent transfer analysis, value includes the satisfaction of an antecedent debt."); *In re Agriprocessors, Inc.*, 490 B.R. 374, 382 (N.D. Iowa 2013) ("An economic benefit, and therefore reasonably equivalent value, exists when a debtor pays an antecedent debt."). The exchange allowed Invitae to retire an additional $17.2 million of short-term debt (and the interest payments the Company would otherwise pay), further deleveraging the Company while avoiding the need to pull from its cash reserves or attempt an at-the-market equity offering.

### (b)    Invitae Was Not Insolvent at the Time of the August Exchange.

70.     The Committee presumes, but does not engage in any analysis of, the Company's solvency at the time of the August Exchange. *Compare* Proposed Compl. ¶¶ 93-103 (applying each of the three tests for insolvency at the time of the March Exchange) *and* Proposed Compl. ¶ 194 (stating, without explanation or support, that the Company was insolvent at the time of the August Exchange). *See also In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) (noting that the plaintiff bears the burden of proving insolvency).

71.     The only effort the Committee makes to support its claim of insolvency at the time of the August Exchange is a reference to balance sheets dated weeks after the transaction was completed.[35]   UCC Standing Mot. ¶ 124. *See In re Trans World Airlines, Inc.*, 180 B.R. 389, 405 (Bankr. D. Del. 1994) ("[B]alance sheet asset numbers do not in fact reflect the fair value of the

---

[35] The Committee also points to the Company noting that its ability to raise additional financing was uncertain, a common risk factor that the Company had noted in its financial reports for years, including at the time it issued the 2028 Unsecured Notes. *See* UCC Standing Mot. ¶ 124; Invitae Corp., Quarterly Report (Form 10-Q) at 65 (May 4, 2021).

assets"); *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) ("[I]nsolvency is to be measured at the time the debtor transferred value").

72.     For the reasons already discussed in section I.A.1.b. *supra*, the Committee's reliance on book value in assessing the Company's solvency is flawed and has been rejected by courts in this Circuit.  With respect to the August Exchange, the Committee also misattributes statements made in the Company's *November 8, 2023 quarterly financials* regarding the Company's ability to continue as a going concern to its *August 8, 2023 financials*.[36] UCC Standing Mot. ¶ 119.  Based on a misreading of these financial statements, the Committee treats insolvency as a foregone conclusion even though investors who had access to those same financials valued the Company's unsecured notes (which carried a below-market coupon rate) at 89 cents on the day of the exchange and, after the November earnings release the Committee points to as indicative of insolvency, priced the bonds at an average of 87 cents over the remainder of the year.  *See Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991); Ex. 57, Notes Price History.

73.     Under the Capital Adequacy Test, the August Exchange did not leave the Company with "an inability to generate enough cash flow to sustain operations." *Moody* v. *Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  The exchange was specifically designed to allow the Company to retire nearly half of its remaining short-term convertible debt (at a discount from face value) without depleting the Company's cash reserves or requiring it to tap into the equity markets.  The Committee does not point to any evidence that the exchange, which retired $17.2 million of existing debt and issued a de minimis amount of $100,000 new debt, caused the

---

[36] Invitae Corp., Quarterly Report (Form 10-Q) (Nov. 8, 2023); Invitae Corp., Quarterly Report (Form 10-Q) (Aug. 8, 2023).

company to become insolvent. *See id.* at 1071 (noting the "standard of causation which looks for a link between the challenged conveyance and the debtor's insolvency").

74.    Under the Cash Flow Test, the Company would be insolvent only if it intended to incur, or believed that it would incur, debt beyond its ability to repay.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  Again, retirement of short-term debt (at a discount from face value) is not indicative of an intent to incur debt beyond the ability to repay, particularly where the debtor only exchanges the legacy debt for equity and a nominal amount of long-term debt ($100,000). *See In re EBC*, 380 B.R. at 359.

75.    Accordingly, the Committee fails to allege that the Company was insolvent at the time of the August Exchange.

### 3.    The Payment of Consent Fee Was Not a Constructive Fraudulent Transfer.

76.    To try to support its allegation that the estate did not receive reasonably equivalent value for the Consent Fee that it paid Deerfield in connection with the Second Supplemental Indenture,[37] the Committee conclusorily asserts that the consents granted by Deerfield were worth less than the Consent Fee.

77.    In doing so, the Committee offers no manner or methodology by which this Court should measure the value of these consents, nor does it provide evidence suggesting that the fees were exorbitant relative to the value of the consent.  To the contrary, the Committee merely states that the Company was "[w]ithout another option" when it executed to the Second Supplemental

---

[37] Inexplicably, the Committee includes over $3 million of fees and expenses paid to Deerfield's advisors in the 90-day period preceding the Petition Date as part of the "Consent Fee."  Those advisor fees and expenses were required to be paid pursuant to pre-existing reimbursement agreements entered into by the Company and Deerfield's advisors in connection with the negotiations with respect to potential restructuring and disposition transactions, and do not constitute fees paid to Deerfield in exchange for its consent in the Second Supplemental Indenture.

Indenture, which indicates that these consents were significantly valuable to the Company at the time of transfer.  UCC Standing Mot. ¶ 55.

78.     Assessing similar amendments, courts have routinely found that contractual waivers constitute material benefit of the estate.  *See, e.g.*, *In re Ward*, 36 B.R. 794, 799 (Bankr. D.S.D. 1984) (creditor's voluntary forbearance from pursuing remedies was reasonably equivalent value in exchange for debtor's mortgage to secure antecedent debt); *Anand* v. *National Republic Bank*, 239 B.R. 511, 517-19 (Bankr. N.D. Ill. 1999) (holding that the debtor received reasonably equivalent value when bank agreed to forbear on pursuing remedies for default, waived past-due principal payment, and extended maturity date of notes in return for debtor's assignment of interest in real property as collateral to secure loans); *Redmond* v. *SpiritBank (In re Brooke Corp.)*, 541 B.R. 492, 520 (Bankr. D. Kan. 2015) ("Forbearance of the enforcement of loans has been recognized as reasonably equivalent value for the granting of security interests in additional collateral and for the execution of a modification agreement that required the payment of an extension fee."); *Pembroke Dev. Corp.* v. *Commonwealth Savs. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400-01 (Bankr. S.D. Fla. 1991) (holding that a deferral of interest payments and extension of the maturity of the debtor's term loan constituted reasonably equivalent value).

79.     The Committee conveniently ignores the fact that the Debtors formed a special committee to evaluate restructuring activities in advance of the Second Supplemental Indenture and the eventual divestitures.  In the absence of a reliable method by which this Court can establish the value of the consents, it should rely on the procedural safeguards established by the Debtors to ensure a fair restructuring process.  The Second Supplemental Indenture allowed the Debtors to

sell valuable collateral and extend their cash runway.  Accordingly, the Consent Fee afforded to

Deerfield was highly valuable and was attained at relatively low cost to the Debtors.

### 4. Avoidance of Guarantees and Liens of the Debtor Subsidiaries (Count IV).

80.     Independent of the constructively fraudulent transfer claim alleged in Count I of

the Proposed Complaint, the Committee alleges that the guarantees issued and security interests

granted by seven of the Company's subsidiaries as part of the March Exchange were constructively

fraudulent and therefore should be avoided.  The Committee's conclusory assertions ignore that

the Plan provides for the payment in full of trade creditors of the Subsidiaries ahead of the

Prepetition Secured Parties.  As a result, there is no harm to be addressed from the guarantees

issued and liens granted by the Debtor Subsidiaries, and granting the Committee standing to pursue

claims when there is no addressable harm clearly provides no benefit to the Debtors' estate.

What's more, the Committee ignores the clear benefits received by Subsidiaries through the March

Exchange and asserts no facts to support the allegation that any subsidiary—much less all of

them—was insolvent at the time of the March Exchange or became insolvent as a result of the

transaction.

81.     First, the Term Loan Repayment, which the Committee includes as a component of

the overall Uptier Transaction,[38] provided substantial direct benefit to the Subsidiaries.  (*See*

Proposed Compl. ¶¶ 97; 173; UCC Standing Mot. ¶¶ 43; 100.[39]

---

[38] Proposed Compl. ¶ 96 ("*[a]s part of the Uptier Transaction*, the Company prepaid the Term Loan in two transactions: (a) a $50 million principal payment plus a $3 million prepayment fee and (b) a $85 million payment plus a $5.1 million prepayment fee") (emphasis added);  UCC Standing Mot. ¶ 42.

[39] The Third Circuit has long held that transactions may be collapsed when each transfer is a component part of an overarching, integrated transaction.  *See United States* v. *Tabor Ct. Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986); *see also In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 540-41 (Bankr. S.D.N.Y. 2016) (transfers must be evaluated in context, requiring the collapsing of "all transfers that are part of a single plan and viewing that single plan as a whole, with all its composite implications, for reasonably equivalent value and otherwise.")  (citing *Orr* v. *Kinderhill Corp.*,

82.     Second, separate from the Term Loan Repayment, the Subsidiaries received reasonably equivalent value in a transaction through *indirect* benefits conferred to the entity. *See In re R.M.L., Inc.*, 92 F.3d 139, 149-151 (3d Cir. 1996); *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).  The identity of interests rule "recognizes that if the debtor and the third party are so related or situated that they share an identity of interests, then what benefits one will, in such case, benefit the other to some degree." *See Telefest, Inc.* v. *VU-TV, Inc.*, 591 F. Supp. 1368, 1378 (D.N.J. 1984) (internal citations omitted).  Where affiliated entities are functionally identical such that conveying a benefit to one corporation equates to conveying a benefit to its affiliate, courts have rejected the argument that reasonably equivalent value was not exchanged merely because one entity conveyed value without receiving a direct benefit in return. *Id.* at 1379; *McNellis* v. *Raymond*, 287 F. Supp. 232 238-39 (N.D.N.Y. 1968).  Such a scenario exists where the two entities operate as a "single enterprise, sharing an identity of interest" such that where a parent receives a benefit, the subsidiary indirectly benefits as well. *In re PSN USA, Inc.*, 2011 WL 4031147, at *6 (Bankr. S.D. Fla. Sept. 9, 2011).  That is the case here where the Subsidiaries have minimal (and in some instances no) operations and where the Debtors operate as a single enterprise with Invitae Corp. as the face of the business. *See* First Day Decl. ¶¶ 45, 72.

83.     Moreover, a subsidiary that guarantees a loan to a parent may receive an indirect benefit where the loan "strengthen[s] the corporate group as a whole, so that the guarantor [subsidiary] would benefit from 'synergy' within the corporate group." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 578-79 (7th Cir. 1998) (citing *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 646-48 (3d Cir. 1991)).  Indirect benefits may result where "the transaction of which

---

991 F.2d 31, 35 (2d Cir. 1993)).  Deerfield reserves rights with respect to the application of the collapsing doctrine to include the Term Loan Repayment as part of the integrated transactions.

the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor.  Or substantial indirect benefits may result from the general relationship." *Telefest*, 591 F. Supp. at 1380-81.

84.     As discussed above, the March Exchange strengthened the Company by adding new capital to its balance sheet and exchanging nearly all of its short-term convertible debt for new, long-term debt at a coupon rate well below the prevailing risk-free rate.  Each subsidiary that guaranteed the 2028 Secured Convertible Notes relied upon the continued flow of capital from the Company and therefore benefitted from the Company's retirement of its near-term obligations, extension of debt maturity, and receipt of additional working capital.  *See In re R.M.L.*, 92 F.3d at 151-53.  The Committee's argument relies on an imagined requirement that each subsidiary must have directly benefitted from the March Exchange, a "notion that . . . is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans." *Telefest*, 591 F. Supp. at 1379.

> **B.     The March and August Exchanges and the Payment of the Consent Fee Are Protected by the Safe Harbor Under Section 546(e) of the Bankruptcy Code.**

85.     Even if the Committee's proposed constructive fraudulent transfer claims were colorable (which they are not), they would nonetheless be precluded by section 546(e) of the Bankruptcy Code.  In relevant part, section 546(e) provides that, other than in cases of actual fraud, "the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a . . . *financial institution* [or] *financial participant*" where that transfer is also (1) a "*settlement payment*" or a "*transfer payment*" that is (2) made "in connection with a *securities contract* . . . ."

86.     Courts in the Third Circuit have simplified section 546(e)'s terms, holding that the safe harbor "applies when two requirements are met:  (1) there is a *qualifying transaction* (i.e., there is a settlement payment or a transfer payment . . . made in connection with a securities

contract), and (2) there is a *qualifying participant* (i.e., the transfer was made by or to (or for the benefit of) a . . . financial institution, or financial participant)." *In re Quorum Health Corp.*, 2023 WL 2552399, at *7 (Bankr. D. Del. Mar. 16, 2023); *In re Mallinckrodt PLC*, 2024 WL 206682, at *14 (Bankr. D. Del. Jan. 18, 2024).

87.    These elements are clearly met here.

**1.    The March and August Exchanges and the Consent Fee Were Transfers Made in Connection with a Securities Contract.**

88.    The term "securities contract" is broadly defined and has been construed equally broadly.  Section 546(e) incorporates by reference the definition of "securities contract" found in section 741(7), which has been described by the Second Circuit as "capacious[]."  *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 81 (2d Cir. 2019).  The list of covered transactions begins with "a contract for the purchase . . . of a security," and ends with "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph."  11 U.S.C. § 741(7).  The term "security" is broadly defined in the Bankruptcy Code to include, among others, notes, stocks, treasury stocks, bonds, debentures, and any "other claim or interest commonly known as 'security.'"  11 U.S.C. § 101(49)(A).  Courts have generally declined to analyze this element of the safe harbor in detail because the contracts at issue rarely fall outside the definition.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 417-19 (2d Cir. 2014).  A transfer is considered to be "in connection with" a securities contract if it is "'related to' or 'associated with' the securities contract."  *Id.* at 421; *see also In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (noting that the "in connection with" language of Section 546(e) should be construed broadly and does not contain a temporal requirement).

89.    Each challenged transaction was made in connection with a securities contract.  The transfers associated with the March and August Exchanges were also settlement payments, which

are defined by the Third Circuit as any "transfer of cash or securities made to complete a transfer payment" and may be "the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and . . . transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand." *In re Plassein Int'l Corp.*, 590 F.3d 252, 258 (3d Cir. 2009); *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999).

      **(a)**     **The March Exchange Was a Qualifying Transaction Made in Connection with a Securities Contract.**

90.     When evaluating the applicability of the section 546(e) safe harbor, courts must look to "the overarching transfer that the trustee seeks to avoid." *See generally, Merit Management Group, LP* v. *FTI Consulting, Inc.*, 583 U.S. 366 (2018). In the present case, the Committee seeks to invalidate the exchange of 2028 Secured Notes and common stock for 2024 Unsecured Notes and cash. *See* Proposed Compl. ¶ 175.

91.     The exchanged stock and notes both clearly fall under section 101(49)(A)'s broad definition of "security," which includes notes, stocks, debentures, and any "other claim or interest commonly known as 'security.'" 11 U.S.C. § 101(49)(A). Accordingly, the March Exchange fits within section 741(7)'s broad definition of a securities contract that includes, among others, "a contract for the purchase, sale or loan of a security." 11 U.S.C. § 741(7). Accordingly, the March Exchange was both a "settlement payment" (satisfying the 2042 Convertible Notes) and a transfer in connection with securities transactions.

      **(b)**     **The August Exchange Was a Qualifying Transaction Made in Connection with a Securities Contract.**

92.     Section 741(7) includes in its definition of securities contract a "contract for the purchase [or] sale . . . of a security, . . . including *any repurchase* . . . transaction on any such

security." *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 81 (2d Cir. 2019) (holding that payments made for the redemption of securities were made in connection with a securities contract and therefore covered by the safe harbor).

93.     The August Exchange was executed according to the terms of the August Exchange Agreement.[40]  As the Committee states in the Proposed Complaint, the August Exchange entailed Deerfield's settlement and transfer of 2024 Unsecured Notes in exchange for Invitae common stock and 2028 Secured Notes.  *Id.*; Proposed Compl. ¶ 121.  Accordingly, the August Exchange qualifies as a settlement payment and a transfer in connection with a securities contract.

### (c)     The Consent Fee Is a Qualifying Transaction Made in Connection with a Securities Contract.

94.     The parties do not dispute that the Consent Fee the Committee seeks to avoid was paid in connection with the Second Supplemental Indenture.  *See* UCC Standing Mot. ¶ 120. Among other things, the Second Supplemental Indenture modified certain terms of the March Exchange Agreement, the overarching securities contract under which the 2028 Secured Notes were issued and are governed.[41]  The March Exchange Agreement provided that any terms and conditions of any supplemental indenture would "be deemed to be part of the terms and conditions of [the March Exchange Agreement] for any and all purposes."[42]  The conditions of the Second Supplemental Agreement, including the required payment of the Consent Fee, were therefore

---

[40] Invitae Corp., Current Report (Form 8-K) Ex. 10.1, Form of Exchange Agreement (August 23, 2023) (the "August Exchange Agreement").

[41] *See* Invitae Corp., Current Report (Form 8-K) Item 1.01 (Dec. 11, 2023) (summarizing the modifications made to the March Exchange Agreement).

[42] *See* the March Exchange Agreement, Article 10, Section 10.03 ("Upon the execution of any supplemental indenture . . . this Indenture shall be and be deemed to be modified and amended in accordance therewith and . . . all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes."); Invitae Corp., Current Report (Form 8-K) (March 8, 2023) at 2 (stating that the 2028 Secured Notes were issued pursuant to, and are governed by, the March Exchange Agreement).

incorporated into the March Exchange Agreement, and payment of those fees was therefore a

transfer made pursuant to and in connection with the March Exchange.[43]

95.     Furthermore, the Consent Fee is protected by Section 546(e) because it was "related

to" or "associated with" the March Exchange Agreement.  *In re Bernard L. Madoff Inv. Sec. LLC*,

773 F.3d 411, 421 (2d Cir. 2014) ("a transfer is considered to be in connection with a securities

contract if it is related to or associated with the securities contract.").  Courts construe the "in

connection with" language of Section 546(e) broadly and have refused to read a temporal

requirement into the statute.  *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 442 (Bankr.

S.D.N.Y. 2012); *In re Quebecor World (USA) Inc.*, 480 B.R. 468, 479 n.8 (S.D.N.Y. 2012), *aff'd*,

719 F.3d 94 (2d Cir. 2013) ("[O]n its face, Section 546(e) requires only that the transfer be made

in connection with . . . a contract that governs the purchase or sale of a security; it does not require

that the transfer be made in connection with the purchase or sale itself.").

96.     Finally, the Second Supplemental Indenture itself falls under Section 741(7)'s

broad definition of "securities contract," which includes "any security agreement or arrangement

or other credit enhancement related to any agreement or transaction referred to in this subparagraph

. . . ."  11 U.S.C. § 741(7)(xi).  In exchange for the risk associated with permitting the Company

to explore the disposition of certain assets, the Second Supplemental Indenture limited the

Company's ability to incur certain additional debts or expenses or to dispose of additional assets.

*See In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 808 n.9 (3d Cir. 2019) (noting that while "credit

enhancement" is not defined by the Bankruptcy Code, it "encompasses various ways that a

---

[43] *See* the March Exchange Agreement, Article 10, Section 10.02 ("[W]ith the consent of the Required Holders . . . the Company . . . at the Company's expense, may . . . enter into an indenture or indentures supplemental hereto, or any amendment or other supplements to the Notes Documents, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders, or waiving the Company's compliance in any instance with any provision of this Indenture or the Notes . . . [unless otherwise prohibited].").

borrower may improve its credit standing and reassure lenders that it will honor its debt obligations"). The Second Supplemental Indenture therefore constituted a security agreement or a credit enhancement and, because it modified the March Exchange Agreement, was related to an identified securities contract.

### 2.    Deerfield, Invitae and the 2028 Secured Convertible Notes Indenture Trustee and Collateral Agent Were Qualifying Participants.

97.    As is made clear in the Proposed Complaint as well as in filings with the SEC that show its broader holdings, Deerfield qualifies as a financial participant at all relevant times. While section 546(e) only requires that the transfer be made "by *or* to" a qualifying participant for the safe harbor to apply, the March Exchange is also protected by the safe harbor due to Invitae's use of U.S. Bank to act as its trustee and collateral agent in carrying out the March Exchange because Invitae qualifies as a customer of a financial institution.[44]  In addition, U.S. Bank, which was the Indenture Trustee and Collateral Agent, was appointed in connection with the issuance of the Secured Notes and, in such capacity, was a qualifying participant insofar as it was the actual recipient of the liens and claims granted in the March Exchange.[45]

### (a)    Deerfield Was a Financial Participant at All Relevant Times.

98.    A financial participant is an active participant in the financial markets that meets the significant activity thresholds specified in 11 U.S.C. § 101(22A).  In relevant part, a financial participant is defined as:

---

[44] *See* 11 U.S.C. §§ 101(22)(A) (defining "financial institution"); *Holliday v. Credit Suisse Securities (USA) LLC*, 2021 WL 4150523, *6 (S.D.N.Y., 2021) ("U.S. Bank is a financial institution for purposes of Section 546(e)'s safe harbor").

[45] There is no suggestion herein that U.S. Bank Trust Company, National Association, as Trustee and Collateral Agent, is a holder of the Secured Notes or participated in the March Exchange other than in its capacity as trustee and collateral agent.  The rights and duties of the Indenture Trustee and Collateral Agent in such capacity are as set forth in the governing documents and all rights are reserved by all parties with respect thereto.

[A]n entity that, at the time it enters into a *securities contract*, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, *has one or more [securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements and master netting agreements] with the debtor or any other entity* (other than an affiliate) of a *total gross dollar value of not less than $1,000,000,000* in notional or actual principal amount outstanding (aggregated across counterparties) *at such time or on any day during the 15-month period preceding the date of the filing of the petition,* **or** *has gross mark-to-market positions of not less than $100,000,000* (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) *at such time or on any day during the 15-month period preceding the date of the filing of the petition*.

11 U.S.C. § 101(22A) (emphasis added).

99.     Courts have held that where it is clear from the face of a complaint that an entity meets the requirements of Section 101(22A), no further factual development is necessary to determine that the entity qualifies as a financial participant. *Sec. Inv'r Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 505 B.R. 135, 148 (S.D.N.Y. 2013).[46]   In the Third Circuit, courts will consider an affirmative defense based on the section 546(e) safe harbor "only 'where the defense is clearly established on the face of the complaint.'"  *In re Mallinckrodt PLC*, 2024 WL 206682, at *14 (Bankr. D. Del. 2024) (quoting *Zazzali* v. *AFA Fin. Grp., LLC*, 2012 WL 4903593, at *11 (Bankr. D. Del. 2012)).  Courts may also take judicial notice of SEC filings to determine whether an entity had sufficient transactions to qualify as a financial participant.  *In re Quorum Health Corp.*, 2023 WL 2552399, at *7 n.45 (Bankr. D. Del. 2023) (citing *FTC* v. *Shire ViroPharmaInc.*, 917 F.3d 147, 151 n.5 (3d Cir. 2019) (taking judicial notice of a fact contained in an SEC filing when considering a motion to dismiss).

---

[46]  *See also Sec. Inv'r Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154, at *8 (S.D.N.Y. 2013) ("[W]here the Trustee alleges that a defendant entered into a swap agreement with collateral payments and reference amounts worth at least $100 million, the defendant may be deemed to constitute a protected . . . 'financial participant' for the purposes of Section 546(e) on the face of the complaint.").

100.    As the Proposed Complaint clearly states, Deerfield held a gross mark-to-market position of $100 million or more in securities contracts at all relevant times.  *See* Proposed Compl. ¶ 69; *id.* ¶ 44 (stating that Deerfield "has held the majority of the 2024 Unsecured Notes since at least August 2022").  At the time the March Exchange was agreed to, Deerfield held approximately $242 million of 2024 Unsecured Notes.  *Id.* at ¶ 69.  Secondary market prices for the 2024 Unsecured Notes indicate that the mark-to-market value of Deerfield's position was, at minimum, $180 million.[47]  As a result, on the face of the Committee's allegations in the Standing Motion, and the undisputed record of these chapter 11 cases, Deerfield qualifies as a financial participant for purposes of the section 546(e) safe harbor as of the March Exchange.

101.    In addition, at all relevant times after the March Exchange, including at the time of the August Exchange, the entry of the Second Supplemental Indenture, and the filing of the Petition, Deerfield held $240 million of 2028 Secured Notes.  *See* Proposed Compl. ¶ 96 (stating that the Company issued $305.3 million of 2028 Secured Notes); ¶ 15 ("Deerfield Partners, L.P. is the holder of 78% of the 2028 Senior Secured Notes . . . .").  While the 2028 Secured Notes did not trade on the secondary market, bid prices for the remaining 2024 Unsecured Notes averaged 87.4 cents from March 7, 2023 to February 14, 2024 and never fell below 60 cents.  *See* Ex. 57, Notes Price History.  As noted by the Committee, the value of the 2028 Secured Notes "exceeded the fair market value of the 2024 Unsecured Notes," suggesting that Deerfield's position in the 2028 Secured Notes exceeded $100 million at all relevant times.  Proposed Compl. ¶ 172.[48]

---

[47]  Estimate based on a mark-to-market value of $0.75 on the dollar.  Historical bid prices ranged from $0.7655 two days before the agreement to $0.7913 on the day the agreement was announced.  *See* Ex. 57, Notes Price History.

[48]  *See also* Ex. 79 (valuing the $305.2 million of outstanding 2028 Secured Notes at $249.6 million, or $0.81 on the dollar).

102.    Under Rule 201 of the Federal Rules of Evidence, the court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned."  SEC filings are "required by law to be filed with the SEC, and no serious questions as to their authenticity can exist."  *Oran* v. *Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (quoting *Kramer* v. *Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  The Third Circuit has explicitly taken notice of a fact from an SEC filing.  *FTC* v. *Shire ViroPharmaInc.*, 917 F.3d 147, 151 n.5 (3d Cir. 2019) (citing *Oran*, 226 F.3d at 289) ("We take judicial notice of this fact—which is not in the complaint—from Shire's Form 8-K filings with the Securities Exchange Commission.").  This same logic allows courts to take judicial notice of SEC filing to determine whether an entity qualifies as a financial participant.  *See In re Quorum Health Corp.*, 2023 WL 2552399, at *7 (Bankr. D. Del. 2023) (relying on two SEC filings submitted by the defendant to determine that the defendant qualified as a financial participant).

103.    While the determination that Deerfield qualified as a financial participant can be made on the face of the complaint, this determination can also be made using Deerfield's SEC filings.  *See* Deerfield Mgmt. Co., L.P., Holdings Report (Form 13F-HR) (Feb. 24, 2024) (listing all positions as of December 31, 2023, including multiple positions of $100,000,000 or more in notes or common stock and an aggregate value of $5,415,638,759).[49]

104.    Given Deerfield's status as a financial participant at all relevant times, the safe harbor applies to each challenged transfer.  *See* 11 U.S.C. § 546(e).

---

[49] Report available at https://www.sec.gov/Archives/edgar/data/1009258/000095015924000096000095015924 000096/0000950159-24-000096-index.html.

(b)    **Invitae Qualified as a Customer of a Financial Institution in
the March Exchange.**

105.    In relevant part, section 101(22) provides that "financial institution" includes a

"*customer*" of any "Federal reserve bank, or an entity that is a commercial or savings bank,

industrial savings bank, savings and loan association, trust company, federally-insured credit

union, or receiver, liquidating agent, or conservator for such entity," so long as that entity is acting

for the customer. *See In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 146 (2d Cir. 2023) (holding

that as a matter of law, a financial institution for the Debtor where it "made payments to, and

received information from" the Debtor's shareholders upon the tender of their stock certificates).

106.    Courts have held, consistent with the plain language of the Bankruptcy Code, that

a party qualifies as a financial institution based on its customer relationship with a financial

institution. *See Tribune II*, 946 F.3d at 77-80. For such a relationship to fall under the scope of

the safe harbor, (i) there must be a customer relationship with a financial institution, (ii) the

financial institution must act as the ultimate transferor's agent during the transaction, and (iii) the

transfer(s) must be made in connection with a securities contract. *Id.* at 78. A customer

relationship with a financial institution exists where "someone . . . buys goods or services" from a

bank or enters into an agreement with a bank pursuant to which "a bank has agreed to collect

items." *Id.* at 79. Based on conventional agency analysis, an agency relationship exists where

(i) a principal manifests assent for the agent to act on the principal's behalf and be subject to the

principal's control, (ii) the agent manifests assent or otherwise consents, and (iii) the principal

maintains control over key aspects of the undertaking. *Id.*

107.    Based on the Bankruptcy Code's definition of "customer-as-financial-institution,"

courts have held that a transferor's use of an intermediary financial institution in connection with

a securities contract qualifies the transferor itself as a financial institution for purposes of the safe harbor.[50]

108.    The Proposed Complaint and the March Exchange Agreement show that Invitae carried out the March Exchange through the appointment of its trustee and collateral agent, U.S. Bank Trust Company, National Association ("U.S. Bank").  As the Proposed Complaint states, "as part of the March Exchange, Invitae gave the Agent [U.S. Bank], for the benefit of the Participating 2024 Unsecured Noteholders, [$305.3 million in 2028 Secured Notes and 14,219,859 shares of common stock]." UCC Standing Mot. ¶ 80.  U.S. Bank received the 2024 Unsecured Notes from the Participating Noteholders on the Company's behalf, effected their cancellation, and executed, authenticated, and delivered the 2028 Secured Notes to the Participating Noteholders.[51]  These facts alone are sufficient to support the conclusion that U.S. Bank acted for the Company

109.    Therefore, the March Exchange transfers the Committee seeks to challenge also fall under the 546(e) safe harbor due to the Company's status as a customer of a qualifying financial institution that acted for the Company in executing transfers in connection with a securities contract.

**(c)**    **U.S. Bank Was a Qualifying Financial Institution and Financial Participant.**

110.    Finally, the March Exchange is protected from avoidance due to U.S. Bank's involvement in and participation in the transaction in its capacity as Trustee and Collateral Agent.

---

[50] *See In re Boston Generating LLC*, 617 B.R. 442 (Bankr. S.D.N.Y. 2020); *In re Nine West LBO Securities Litigation*, 482 F. Supp. 3d 187 (S.D.N.Y. 2020); *In re SunEdison, Inc.*, 620 B.R. 505 (Bankr. S.D.N.Y. 2020); *In re Fairfield Sentry Limited*, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020). More recently, the Eighth Circuit endorsed this argument.  *Kelley* v. *Safe Harbor Managed Acct.*, 31 F.4th 1058, 1065 (8th Cir. 2022).

[51] Invitae Corp., Current Report (Form 8-K) Ex. 10.1, Form of Purchase and Exchange Agreement (March 1, 2023) (the "Purchase and Exchange Agreement").

In this capacity, U.S. Bank received and was granted control over the liens and claims conveyed in the March Exchange.[52]

### C.    The March Exchange Was Not an Actual Fraudulent Transfer.

111.    Under section 548(a)(1)(A) of the Bankruptcy Code, any transfer made by a debtor—or any other obligation incurred by the debtor—within two years before the filing of the petition may be treated as actually fraudulent if it was made or incurred with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  The law is clear that it "is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code."  *In re Elrod Holdings Corp.*, 421 B.R. 700, 709 (Bankr. D. Del. 2010) (citing *Silverman* v. *Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005)).

112.    A party asserting a fraudulent conveyance claim "must state with particularity the circumstances constituting fraud."  *Friedberg* v. *Barefoot Architect Inc.*, 723 F. App'x 100, 103 (3d Cir. 2018) (citing Fed. R. Civ. P. 9(b)).  Although "[t]he rigor with which Rule 9(b) is applied has been relaxed in some instances 'where the factual information is peculiarly within the defendant's knowledge or control,'" the "complaint must delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity."  *Id.* (quoting *In re Burlington Coat Factory Secur. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)); *id.* (citing *Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992)).  In any case, "conclusory allegations will not suffice."  *Id.* (citing *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).

---

[52] Invitae Corp., Current Report (Form 8-K) Ex. 10.1, Form of Purchase and Exchange Agreement (March 1, 2023).

113.    Despite receiving tens of thousands of documents in discovery, the Committee still cannot point to any evidence, direct or indirect, of fraudulent intent, nor does it allege facts that give rise to an inference of fraudulent intent.  The Committee correctly identifies the eleven badges of fraud recognized by New Jersey courts yet only attempts to substantiate two:  insolvency and lack of reasonably equivalent value, which are simply the elements of a constructive fraudulent transfer and, as previously discussed, cannot be substantiated.  *See supra* Section I.A.1.  The Committee's failure to plead or substantiate the other badges "constitute[s] evidence that there was no intent to defraud."  *In re Trib. Co. Fraudulent Conv. Litig.*, 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017); *Adamson* v. *Bernier (In re Bernier)*, 282 B.R. 773, 782 (Bankr. D. Del. 2002) ("Indeed, the absence of several very significant badges of wrongful intent may disprove actual intent to hinder, delay or defraud.").  Absent additional factors, these two badges alone are not sufficient to support an allegation of actual fraud and imply the opposite conclusion.  *See In re Millennium Lab Holdings II, LLC*, 2019 Bankr. LEXIS 636, at *9) (stating that such a complaint does "not sufficiently allege[] a confluence of badges of fraud").

114.    Knowing that while "insolvency and indicia of an unequal exchange can be badges of fraud, they have no special weight compared with other badges, and indeed may be irrelevant if there is no other evidence, or contrary evidence, on intent," the Committee mischaracterizes the facts and the law to cast doubt on the integrity of the March Exchange.  *See* 5 Collier on Bankruptcy ¶ 548.04.

115.    *First*, the Committee misreads the badge of fraud with respect to concealed transactions to prohibit confidential negotiations.  Proposed Compl. ¶ 186.  Generally speaking,

concealed transfers are not preceded by joint press releases and detailed SEC filings.[53]  Because

prior to the closing of the March Exchange Invitae provided extensive disclosure regarding its

terms in its Form 8-K filing[54] and press release,[55] the March Exchange is not a concealed transfer.

116.    **Second**, without explanation, the Committee deems the fact that the March

Exchange was a non-ordinary-course transaction as a badge of fraud.  Proposed Compl. ¶ 186; *see*

11 U.S.C. § 548(a)(1)(B)(ii)(IV).   While non-ordinary-course transactions with insiders may

require special scrutiny (including under section 548(a)(1)(B)(ii)(IV) of the Bankruptcy Code), it

cannot be that all non-ordinary-course transactions are tagged with a badge of fraud given that all

liability management transactions or capital structure solutions fall outside of the ordinary course.

117.    **Third**, the Committee misrepresents the terms of the March Exchange

Agreement—which granted the 2028 Secured Noteholders input into future transactions—and

claims that these somehow fit within the confines of the badge describing scenarios in which "the

debtor retained possession or control of the property transferred after the transfer."  N.J. Stat. Ann.

§ 25:2-26(b).  To substantiate its claim of "reservation of benefits, control, or dominion *by the*

*debtor* over the property transferred," the Committee points to the debtor *giving up* "significant

control" over future transactions.  UCC Standing Mot. ¶¶ 106; 114 (emphasis added).  The scenario

the Committee describes is the exact opposite of what the badge is meant to detect.  *See Guarantee*

---

[53] Cases recognizing the presence of the concealment badge relate to attempts by the debtor to intentionally hide assets, transfers, or sales proceeds from creditors in order to obscure its own financial condition. *See, e.g.*, *Jurista* v. *Amerinox Processing, Inc.*, 492 B.R. 707, 748 (D.N.J. 2013) (finding concealment where a debtor's officers paid a $1 million dividend to themselves and misrepresented that the transfer was for payment of a trade debt); *United States* v. *Moody*, 923 F.2d 341, 348-50 (5th Cir. 1991) (transferring assets to an invalid trust).

[54] Invitae Corp., Current Report (Form 8-K) (March 1, 2023).

[55] Invitae Corp., Current Report (Form 8-K) at EX-99.1, Press release issued by Invitae Corporation dated February 28, 2023, *Invitae Announces Convertible Notes and Share Exchange and New Convertible Notes Issuance* (Feb. 28, 2023).

*Co. of N. Am. USA* v. *SBN Enterprises, Inc.*, 2011 WL 3205318, at *5 (D.N.J. July 27, 2011) (finding as indicative of fraud the fact that the debtors continued to reside at the transferred property after conveying the property to a trust in exchange for nominal value).

118.    **Fourth**, the Committee states that a transferee's fraudulent intent may be imputed onto the debtor where the transferee is in a position to control the transaction, seemingly implying that Deerfield exercised control over a transaction that the Committee elsewhere concedes was negotiated at arm's-length.   *See* UCC Standing Mot. ¶¶ 106; 92.   The only precedent the Committee cites in support of this proposition notes that the imputation of intent requires a showing that the transferee was "in a position to dominate or control [the debtor]." *In re Maxus Energy Corp.*, 641 B.R. 467, 513 (Bankr. D. Del. 2022).   The Committee asserts no facts to substantiate this assertion.  The March Exchange was negotiated between the Company and a third-party holder of its debt as a good faith, arm's-length transaction.

119.    **Finally**, the Committee, without authority or basis, expands the "essential assets" badge of fraud—which describes a debtor who transfers substantially all of its assets—to mean that the conveyance of any *security interest* in substantially all of a debtor's assets suggests fraudulent intent.  UCC Standing Mot. ¶ 14.  In doing so, the Committee expands the universe of actions purportedly indicative of fraud to include garden-variety financing agreements.  *See* UCC Standing Mot. ¶ 183.   Debtors regularly issue secured debt in exchange for more favorable financing terms.  That the grant of a security interest may later entitle a creditor to possession of a portion of the debtor's estate is nothing more than a common commercial term, not a harbinger of fraud.

120.    The Committee imagines improper intent where the parties' motives and conduct show the exact opposite.  If, as the Committee alleges, "[a]ll parties knew that the transaction

would only exacerbate the Debtors['] liquidity issues and likely lead to a chapter 11 filing," they would not have spent months haggling over terms like ███████████████████████ ██████████ or specific anti-dilution protections to preserve the value of the notes' convertibility feature in future raises. UCC Standing Mot. ¶ 91. *See, e.g.*, Ex. 72, internal e-mail correspondence of Deerfield, dated January 2, 2023 (summarizing negotiations); March Exchange Agreement at 114 (finalized terms). Baker Brothers would not have remained one of Invitae's largest shareholders for months after the March Exchange.[56] Deerfield would not have purchased an additional $17.2 million of 2024 Unsecured Notes that it "knew were soon to be worthless." UCC Standing Mot. ¶ 118. And the market price of the remaining 2024 Convertible Notes would not have risen from $79 the day before the announcement to $89 the day after the exchange was completed. *See* Ex. 57, Notes Price History.

121.    The Committee ignores Invitae's documented, valid business justifications for the exchange yet criticizes the Company for failing to accept its constituents' value destructive alternatives. With Deerfield's support, Invitae explored a more comprehensive exchange, and continued to evaluate alternatives no more than three days before the March Exchange was announced. However, after analyzing every proposal the Committee's constituents presented to them, Invitae and its advisors determined that if such a deal were even viable, it would not be as beneficial to the Company and its stakeholders as the March Exchange.

---

[56] Baker Bros. Advisors LP, Form 13F-HR, Information Table (February 14, 2023) (noting that Baker Bros. owned 8.4 million Invitae shares); Baker Bros. Advisors LP, Form 13F-HR, Information Table (August 14, 2023) (noting that Baker Bros. owned 8.8 million Invitae shares); Invitae Corp., Post-Effective Amendment to Form S-3 Registration Statement at 7 (Aug. 9, 2023)

**D.    Deerfield Did Not Aid or Abet Invitae's Officers' and Directors' Alleged Breach of Fiduciary Duties.**

122.    Similar to their other proposed claims, the Committee's aiding and abetting claims against Deerfield are meritless.  Under Delaware law,[57] in order to state a colorable claim against Deerfield for aiding and abetting a fiduciary duty breach, the Committee must first establish that a fiduciary duty was breached, and then establish that (i) Deerfield knowingly participated in the fiduciary duty breach, and (ii) damages were proximately caused by the breach.  *Malpiede* v. *Townson*, 780 A.2d 1075, 1096 (Del. 2001); *MSGI Liquidation Trust* v. *Modell*, 2023 WL 2961856, at *38 (Bkrtcy. D.N.J., 2023).

123.    As an initial matter, the Committee must first establish that a fiduciary duty was breached.  To establish a breach of fiduciary duty under Delaware law, the Committee must show: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc.* v. *Kates*, 8 A.3d 573, 601 (Del. Ch. Ct. 2010).  The Committee fails on both fronts.

124.    As more fully set forth in the Debtors' objection to the Standing Motion, the Debtors' directors and officers clearly discharged their fiduciary duties to both shareholders (and creditors, if such duties exist) in deciding to pursue the March Exchange and August Exchange. After running a fulsome negotiation process with multiple potential counterparties, including Baker Brothers, SoftBank, and Deerfield, Invitae's directors and officers determined that the Deerfield proposal best addressed the current needs of the Company by providing an immediate cash infusion and addressing the looming 2024 maturities. ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[57] Delaware law applies when a plaintiff alleges breach of fiduciary duty by directors or officers of a Delaware corporation.  *Steele* v. *Kencast, Inc.*, 2023 WL 8531834, at *4 n.5 (D.N.J. Feb. 28, 2023).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

125.     Courts will not address claims for aiding and abetting unless a plaintiff can establish an underlying breach of fiduciary duties. *See Crescent/Mach I Partners, L.P.* v. *Turner*, 846 A.2d 963, 990 (Del. Ch. Sept. 29, 2000); *Malpiede*, 780 A.2d at 1096-97.  Because the Committee has not met its threshold burden of establishing an underlying breach of fiduciary duties, the Court should not entertain the Committee's aiding-abetting claims against Deerfield.

126.     However, even if Invitae's directors and officers did breach their fiduciary duties (if any) to the unsecured creditors, the Committee must also establish that Deerfield knowingly participated in the breach and that the breach proximately caused damages.  To show a defendant's "knowing participation," a plaintiff must demonstrate that the aider and abettor acted "with the knowledge that the conduct advocated or assisted constitutes" a breach of the directors' fiduciary duties, *Malpiede*, 780 A.2d at 1097, or "for improper motives of its own, misleads the directors into breaching their duty of care." *In re Rural Metro Corp.*, 88 A.3d 54, 99 (Del. Ch. 2014), *decision clarified on denial of reargument sub nom. In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54 (Del. Ch. 2014).

127.    The Committee alleges no facts to suggest any "knowing participation" by Deerfield in any fiduciary-duty breach.  As the Committee itself acknowledges, the alleged "participation" here occurred during an arm's-length negotiation, and courts routinely find that a party bargaining in an arm's-length transaction cannot induce their counterparty to breach its fiduciary duties.  *See Morgan* v. *Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) (holding that "absent actual collusion and facilitation of fiduciary wrongdoing," aiding and abetting does not arise from arm's-length bargaining); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550 (D. Del. 2005), *aff'd sub nom. In re Hechinger Inv. Co. of Delaware, Inc.*, 278 F. App'x 125 (3d Cir. 2008) ("[A]rm's length negotiations are inconsistent with participation in a fiduciary breach."); *see also In re Our Alchemy, LLC*, 2019 WL 4447519 at *7 (Bankr. D. Del. Sept. 16, 2019) (citing that a conversation between executives emphasizing "how much more we need to negotiate" and "there is a way forward on the transaction" supported the determination that the transaction was at arm's-length).

128.    The Committee's baseless allegation that Deerfield directed and orchestrated "the negotiation, formulation, and effectuation of the Uptier Transaction and August Exchange" is belied by the extensive record developed in discovery.  Proposed Compl. ¶ 223.  Invitae and Deerfield were negotiating the terms of a potential refinancing transaction for approximately a year before the 2023 Exchange Transactions were effectuated.  *See* Ex. 83, email from Terence Fox-Karnal to Jason Wood on March 18, 2022.  During the course of negotiations leading up to the March Exchange, Invitae was running *simultaneous* negotiations with Baker Brothers and SoftBank, in the hopes of reaching a more comprehensive balance sheet restructuring.  *See* Ex. 11 (showing analysis of separate deal proposals presented by Baker Brothers and Deerfield).  Invitae was no hostage to Deerfield's desires during these negotiations; Invitae even walked away from

58

the Proposed May 2022 Transaction.  Ex. 8.  Even on February 25, 2023, a mere three days before

the March Exchange was announced on February 28, Invitae was actively evaluating alternative

options that excluded Deerfield entirely.  Ex. 30; 84.  The Exchange Transactions were clearly

arm's-length, and as such, the Committees' aiding and abetting claim against Deerfield is not

colorable.

### E.    The Purported Unencumbered Assets Are Subject to the Adequate Protection Liens and the Proceeds of Otherwise Unencumbered Commercial Tort Claims Are Subject to Prepetition Liens.

129.    The Committee fails to raise any colorable claims with respect to the purportedly

Unencumbered Assets.  Even if certain assets of the Debtors are not subject to Prepetition Liens

(which Deerfield disputes), the Final Cash Collateral Order grants to the Prepetition Secured Agent

adequate protection liens over all of the Debtors' assets, including previously unencumbered

assets.[58]

130.    Under the Final Cash Collateral Order, such interest is "perfected without the

necessity of the execution by the Debtors (or recordation or other filing) of security agreements,

control agreements, pledge agreements, financing statements, mortgages or other similar

documents, or by possession or control."  Final Cash Collateral Order ¶ 4(a).  The security interest

in the commercial tort claims against Natera therefore need not be listed on a schedule to the 2028

---

[58] *Final Order Pursuant to Sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure: (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 188] (the "Final Cash Collateral Order") ¶ 4(a) (granting "valid, binding, continuing, enforceable, fully-perfected, nonavoidable, first-priority senior . . . , additional and replacement security interests in and liens on . . . (i) the Prepetition Collateral and (ii) all of the Debtors' other now-owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including, without limitation, all prepetition property and postpetition property of the Debtors' estates, and the proceeds, products, rents and profits thereof . . . .").

Secured Notes Indenture or reported in a UCC-1.[59]  Proposed Compl. ¶¶ 166-67.  Nor does the

Agent need "control...sufficient to perfect [interests in the deposit accounts]" with regards to the

Committee's claims on unencumbered accounts.  *Id.* ¶ 161.

131.    The express language of the Cash Collateral Order makes clear that any

unencumbered commercial tort claims (and the proceeds thereof) are subject to liens held by the

Prepetition Secured Parties.[60]

## II.    THE DEBTORS JUSTIFIABLY DETERMINED TO SETTLE THE PROPOSED CAUSES OF ACTION.

132.    Even if the Proposed Complaint contained colorable claims, the Standing Motion

must still fail because the Debtors' decision to settle, rather than litigate, those claims is entirely

justified.  "[I]n determining whether a debtor unjustifiably refuses to bring proposed claims, the

court must perform a cost-benefit analysis."  *In re Diocese of Camden, New Jersey*, 2022 WL

884242, at *5 (Bankr. D.N.J. Mar. 24, 2022).  In conducting this cost-benefit analysis, "the court

should assure itself that there is a likelihood of success for the claims to justify the anticipated

delay and expense to the bankruptcy estate that the initiation and continuation of litigation will

---

[59] What's more, the Security Agreement, dated as of March 7, 2023, among Invitae Corporation and Each Other Grantor and U.S. Bank Trust Company (the "Security Agreement") grants a broad security interest in the Company's assets to secure the 2028 Secured Notes obligations. Any cash proceeds of commercial tort claims would constitute collateral subject to the prepetition liens securing the 2028 Secured Notes obligations.  *See* Security Agreement ¶ 3.1(e).

[60] Because the Committee's substantive claims all fail as a matter of law, its claims for disallowance (Claim 12) and setoff (Claim 13) necessarily fail as well.  *See In re Broadstripe, LLC*, 444 B.R. 51, 110 (Bankr. D. Del. 2010) (disallowance requires determination that entity is liable for fraudulent transfer); *In re Ultimate Acquisition Partners, LP*, 2012 WL 1556098, at *3 (Bankr. D. Del. May 1, 2012) ("The Court finds that the Trustee's 502(d) claim should be dismissed.  A debtor or trustee 'wishing to avail itself of the benefits of section 502(d) must first obtain a judicial determination on the preference complaint.'"); *In re Women First Healthcare, Inc.*, 345 B.R. 131, 134-35 (Bankr. D. Del. 2006) (in order to exercise right of setoff, debtor must first show that "the creditor owes [a debt] to the estate"); *see also* Proposed Compl. ¶ 264 (seeking setoff only "[t]o the extent that any damages are awarded to the Estates").  Deerfield reserves all rights with respect to any such objections to the Prepetition 2028 Secured Convertible Notes Claims.

likely produce." *Id.* at *9 (brackets omitted).  The party seeking standing bears the burden of proof. *Id.* at *5.

133.   First, the record shows that the Debtors deliberately evaluated potential claims against, among other parties, Deerfield and the Prepetition Secured Parties, and determined that the pursuit of those claims was not justified.  The Debtors' business judgment should be respected.

134.   Had the Debtors elected to pursue the claims in the Proposed Complaint against Deerfield, they would have faced enormous costs and challenges from day one of these chapter 11 cases.  Among other things, the Debtors would have (i) started these chapter 11 cases with a fight over non-consensual use of cash collateral and without any viable pathway to exit, (ii) had their sale process significantly disrupted as a result of the disputes with the Prepetition Secured Parties, (iii) as is clear from the foregoing, faced significant opposition to the validity of any pursued claims against the Prepetition Secured Parties, and incurred costs of litigating any such claims, and (iv) separate from actual costs of an adversary proceeding, would have incurred substantial litigation costs at every stage of these cases from the Prepetition Secured Parties, including additional administrative expense costs from likely delays to the chapter 11 process.  The Debtors' decision not to incur all of those costs and risks in pursuing meritless claims is entirely reasonable and was in the best interests of all stakeholders, including the Committee's constituency.

135.   That is particularly true in light of the benefits flowing directly to unsecured creditors as a result of the Transaction Support Agreement and the Plan, including payment in full of 94% of unsecured creditors, none of which would be available if the Debtors pursued claims against the Prepetition Secured Parties.  The Committee, however, argues that because the Prepetition Secured Parties are unimpaired, those benefits are illusory.  But the Committee is

wrong.  First, the Prepetition Secured Claims are not unimpaired under the Plan.[61]  In addition,

Deerfield has provided the Debtors with significant value in connection with these chapter 11

cases, including by entering into the Transaction Support Agreement that de-risked the Subsidiary

Unsecured Creditors and Convenience Class Creditors by providing them with 100% recovery

regardless of the total sale proceeds generated, ensured payment in full of all administrative and

priority claims, supported the Debtors' in-court marketing process to identify a value-maximizing

transaction, and gave consensual use of cash collateral through the Final Cash Collateral Order to

permit the Debtors to use cash collateral.[62]

136.    The Committee's insistence that the lien avoidance claims should be pursued

because they will generate value for the estate is also mistaken.  The *estate* is simply a collection

of property interests administered by the debtors-in-possession.  5 Collier on Bankruptcy P 541.02

(16th 2024) ("[T]he bankruptcy estate consists of all of the debtor's legal and equitable property

interests that existed as of the commencement of the case") (emphasis omitted); Stephen McJohn,

*Person or Property? On the Legal Nature of the Bankruptcy Estate*, 10 BANKR. DEV. J. 465, 475

(1993) ("Thus, a bankruptcy estate, like a decedent's estate, is simply a collection of property

interests.").  Lien avoidance will not increase the amount of assets distributed to creditors from the

estate. *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 570-71 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R.

211 (S.D.N.Y. 2016) ("[T]he Court must also consider the fact that any value 'realized' from

avoided liens would not be incremental value brought into the estates but instead would be a

reallocation of value from the New RBL Lenders to the unsecured creditors of the Legacy Sabine

---

[61] *See Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 471] (May 9, 2024) at Section III(A) (the "Plan").

[62]  See Invitae Corp., Current Report (Form 8-K) at 1.01 (Feb. 14, 2024).

Subsidiaries, *i.e.*, to the holders of the Legacy Sabine Notes."). Success in the Standing Motion would merely increase recoveries for *some creditors* (primarily holders of 2028 Convertible Notes) *at the expense of others* (including Subsidiary Unsecured Creditors and Convenience Class Creditors). As a result, the lien avoidance does not constitute "financial recovery" that could justify granting derivative standing. *In re Am. Hobby Ctr., Inc.*, 223 B.R. 275, 282 (S.D.N.Y. Bankr. 1998) ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery."). Further, the Committee's zero-sum exercise does not in fact benefit the estate. *In re AppliedTheory Corp.*, 493 F.3d 82, 86 (2d Cir. 2007) ("Requiring bankruptcy court approval conditioned upon the litigation's effect on the estate helps prevent committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but result in a net loss to the entire estate.").

137. The Committee also conveniently overlooks the other cost-benefit analysis factors with respect to a grant of derivative standing. Having already spent millions of dollars pursuing worthless claims, the Committee seeks to further gamble estate assets on speculative litigation. The Committee claims that it "cannot forecast" potential litigation expenses related to the claims in the Proposed Complaint, but if its current burn rate is any indication, it will likely cost tens of millions of dollars to further prosecute these claims with no cognizable benefit to the Debtors' estates.[63]

138. Taking into account both the costs and benefits of the Committee's alleged claims, including the insurmountable deficiencies identified above that are present in each of the alleged

---

[63] See *Monthly Fee Statement Cover Sheet for the Period from May 1, 2024 Through May 31, 2024 (Filed by John S. Mairo on Behalf of White & Case LLP)* [Docket No. 693] (showing White & Case LLP alone has incurred nearly $9 million of legal fees in the 3 months since being engaged by the Committee).

claims, the Debtors were clearly justified in exercising their business judgment not to pursue the claims in the Proposed Complaint.

### III.    THE OBJECTION TO THE MAKE WHOLE AMOUNT SHOULD BE OVERRULED.[64]

139.    The Committee objects to the Make Whole Amount on the grounds that it constitutes "unmatured interest" and should be disallowed under Section 502(b)(2), or, alternatively, should be disallowed under 506(b).  The Committee also argues that the Prepetition Secured Parties are not entitled to both the Make Whole Amount and post-petition interest.  The Committee's arguments fail as a matter of fact and law and the objection with respect to the Make Whole Amount should be overruled.

#### A.    The Make Whole Amount Is Not "Unmatured Interest" Under the Bankruptcy Code.

140.    Make wholes are common, highly negotiated provisions and important elements of the financial bargained-for deal struck between a company and its creditors.  The Committee, however, alleges the Make Whole Amount constitutes "unmatured interest" and should therefore be disallowed under Section 502(b)(2).  "Unmatured interest" is "consideration for the use or forbearance of another's money, which has not accrued or been earned as of a reference date." *In re Ultra Petroleum Corp.*, 624 B.R. 178, 187 (emphasis removed); *see also, e.g.*, *In re Sadler*, 2015 WL 9474174, at *6 (N.D. Ohio Dec. 29, 2015).

141.    As a threshold matter, the majority of courts have held that make wholes are enforceable as liquidated damages in chapter 11 and are not unmatured interest for purposes of Bankruptcy Code section 502(b)(2).  *See In re School Specialty, Inc.*, 2013 WL 1838513, at *5

---

[64] As noted above, the only parts of the Claim Objection going forward at the Standing Motion Hearing relates to the Make Whole Amount (Sections B and C of the Claim Objection).  Deerfield reserves all rights with respect to the remainder of the Claim Objection.

(Bankr. D. Del. Apr. 22, 2013) (agreeing with majority that make whole premiums are not unmatured interest); *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480 (Bankr. D. Del. 2011) (stating "substantial majority of courts considering this issue have concluded that make whole or prepayment obligations are in the nature of liquidated damages rather than unmatured interest"). This Court should follow the majority approach that make wholes are not unmatured interest for purposes of section 502(b)(2) of the Bankruptcy Code.

142.    But even those recent courts that have strayed from the majority view and found a make whole to be unmatured interest have clearly stated that whether a make whole is unmatured interest "depends on the facts of each case" and that courts must "look to economic substance of the transaction." *Wells Fargo Bank, N.A.* v. *Hertz Corp. (In re Hertz Corp.)*, 2022 Bankr. LEXIS 3358, at *9-10 (Bankr. D. Del. Nov. 21, 2022) ("*Hertz II*").

143.    Here, the calculation and composition of the Make Whole Amount demonstrate that it is neither unmatured interest nor the economic equivalent of interest.  In accordance with the 2028 Secured Convertible Notes Indenture, the Make Whole Amount is calculated as a fixed amount equal to 9% of the outstanding principal amount of the 2028 Secured Convertible Notes, or $27,482,130.  *See* 2028 Secured Convertible Notes Indenture, § 1.1.  Interest on the 2028 Secured Convertible Notes, which accrues at a non-default rate of 4.5% *per annum* (the "Contract Rate") and a default rate of 6.5% *per annum* (the "Default Rate"), is not an input in the calculation of the Make Whole Amount.  Thus, the calculation of the Make Whole Amount is entirely independent of any future interest payments on the 2028 Secured Convertible Notes.

144.    The Committee, however, points to inoperative language[65] in the definition of "Make Whole Amount" to mischaracterize the Make Whole Amount as "simply future interest payments subject to a 9% cap."  Claim Objection ¶ 48.  But the applicable language defining the Make Whole Amount refers only to the principal amount of the Notes outstanding.  The fact that under different circumstances the Make Whole Amount might be calculated as a function of interest is irrelevant.

145.    The Committee asserts, without any basis, that "the 9% cap is also tied to future interest payments—it is double the non-default contractual rate of 4.5% and, thus, reflects two years' worth of interest."  Claim Objection ¶ 48.  The fact that the fixed damages are 9% and that 9% happens to be a multiple of the non-default interest rate under the 2028 Secured Convertible Notes Indenture is not a basis on which to recharacterize the Make Whole Amount damages as unmatured interest.  By the Committee's logic, every liquidated damages provision could be construed as being "tied to future interest payments" by simply arbitrarily calculating such amount as a percentage of the principal amount and, in turn, some multiple of the interest rate.

146.    Moreover, unlike interest, the Make Whole Amount, which became due upon acceleration, does not compensate for the use of the holders' money over time, but for losses the holders suffered when the issuer prematurely stops using the holders' money.  *Cappellini* v. *Mellon Mortg. Co.*, 991 F. Supp. 31, 36 (D. Mass. 1997) (prepayment fee "developed in order to compensate lenders for costs associated with the unanticipated reinvestment of principal, presumptively at less favorable rates"); *see also Great Plains Real Estate Dev., L.L.C.* v. *Union*

---

[65] "Make Whole Amount" is defined in the 2028 Secured Convertible Notes Indenture as "an amount in cash equal to the lesser of (i) all required interest payments, fees, charges and premiums due on any of the Notes that are prepaid, paid, redeemed or repaid from the date of prepayment, payment, redemption or repayment (as applicable) through and including the Maturity Date applicable to such Notes . . . and (ii) nine percent (9%) of the principal amount prepaid, paid, redeemed or repaid of any of the Notes."  March Exchange Agreement, § 1.1 (emphasis added).  Because the calculation set forth in clause (ii) results in a lesser amount, the calculation set forth in clause (i) is inapplicable.

*Cent. Life Ins. Co.*, 2007 WL 6908824, at *7 (S.D. Iowa June 4, 2007), *aff'd*, 536 F.3d 939 (8th Cir. 2008) (prepayment provision "provides the lender with compensation for the early termination of the loan"); *Feldman* v. *Kings Highway Sav. Bank*, 102 N.Y.S.2d 306, 307 (N.Y. App. Div. 2d Dep't 1951), *aff'd*, 303 N.Y. 675 (1951) (prepayment privilege charge was "not in consideration of the making of a loan or of forbearance of money" but rather "[i]t was the converse, that is, for the making of a new and separate agreement, the termination of indebtedness" and "[a]ccordingly, it was not a payment of interest and therefore could not be the basis of a claim for usury").

147.    The Third Circuit has recognized the distinction between compensation for borrowing and compensation for premature termination of a loan. *Prudential Ins. Co. of Am.* v. *Comm'r*, 882 F.2d 832 (1989).   In *Prudential*, the court rejected the IRS's contention that "prepayment charges are interest equivalents."  *Id.* at 837.  The Third Circuit instead found that a premium paid upon redemption of a bond is "not compensation paid for the use of borrowed money," but rather is "in effect a bonus or premium for the premature relinquishment of the obligation in order that the debtor might be relieved of the obligation to pay interest in the future." *Dist. Bond Co.* v. *Comm'r*, 1 T.C. 837, 840 (1943); *see Prudential*, 882 F.2d at 837 (relying on *Bryant* v. *Comm'r*, 2 T.C. 789, 794 (1943), which reiterated District Bond Co.'s holding).

148.    Lastly, the Committee cites various cases attempting to equate the Make Whole Amount to original issue discount ("OID").  But those cases are entirely inapplicable to the Make Whole Amount.  Unlike OID, the Make Whole Amount is not earned over time but is a one-time fee triggered upon acceleration of the debt.

149.    Fundamentally, the Make Whole Amount is unrelated to the interest on the 2028 Secured Convertible Notes and represents a good faith estimate of the lost profits, losses, and other

damages of the holders as a result of the Company taking certain actions that are potentially harmful to the holders.

**B. Even if the Make Whole Amount Constitutes Interest, the Holders of the 2028 Secured Convertible Notes Are Entitled to the Make Whole Amount Under Section 506(b) of the Bankruptcy Code.**

150.    Even if the Make Whole Amount is deemed to be "unmatured interest," its payment would still be allowed under section 506(b) because, as the Committee concedes,[66] the Prepetition 2028 Secured Convertible Notes Claims are oversecured and therefore entitled to payment of all interest through the date of repayment.

151.    The Committee's reliance on *Ultra III* and *Hertz II* is entirely misplaced.  First, in those cases, the relevant debt obligations were unsecured claims, and therefore section 506(b), which applies only to oversecured claims, did not apply.  Moreover, in *Ultra III*, the court ultimately allowed the make-whole under the solvent debtor exception to payment of post-petition interest on account of unsecured claims, which is entirely analogous to section 506(b)'s requirement to pay post-petition interest on account of oversecured claims, as the Prepetition 2028 Secured Convertible Notes Claims are.  *See In re Ultra Petroleum Corp.*, 51 F.4th 138, 157 (5th Cir. 2022), *cert. denied sub nom. Ultra Petroleum Corp.* v. *Ad Hoc Comm. of OpCo Unsecured Creditors*, 143 S. Ct. 2495 (2023).

152.    Accordingly, even if the Make Whole Amount constitutes interest under the 2028 Secured Convertible Notes Indenture as the Committee has argued, it would still be allowed under section 506(b) of the Bankruptcy Code.[67]

---

[66] In the Claim Objection, the Committee acknowledges that the "price obtained from Labcorp, combined with the value of the Debtors' retained assets, renders the Secured Noteholders oversecured."  Claim Objection ¶ 29.

[67] The March Exchange Agreement, entered into prepetition, obligates the Debtors to pay the Make Whole Amount in certain circumstances, including after the initiation of a bankruptcy proceeding.  "A claim will have been deemed to have arisen prepetition if the relationship between the debtor and the creditor contained all of the elements necessary

**C.     The Make Whole Amount Is Not an Unenforceable Penalty Under Section 502(b)(1) of the Bankruptcy Code.**

153.    The Committee next argues that even if the Make Whole Amount is not unmatured interest and is payable under section 506(b) of the Bankruptcy Code then it should be disallowed as an unenforceable penalty under section 502(b)(1) of the Bankruptcy Code.  But the Make Whole Amount is reasonably proportionate to the probable loss resulting from a breach of the 2028 Secured Convertible Notes Indenture and, accordingly, is allowed under Bankruptcy Code section 502(b)(1).  Section 502(b)(1) "is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of Am.* v. *Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007).  A contractual provision fixing damages in the event of breach will be sustained under New York law, which governs the 2028 Secured Convertible Notes Indenture, if (1) the amount liquidated bears a reasonable proportion to the probable loss and (2) the amount of actual loss is incapable or difficult of precise estimation.  2028 Secured Convertible Notes Indenture § 19.04; *JMD Holding Corp.* v. *Cong. Fin. Corp.*, 4 N.Y.3d 373, 380-81 (2005).  If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a

---

to give rise to a legal obligation – a right to payment – under the relevant non-bankruptcy law." *Ogle* v. *Fidelity & Deposit Co. of Maryland*, 586 F.3d 143, 147 (2d Cir. 2009) (holding that creditor is entitled to recover postpetition attorney's fees that were authorized by an otherwise enforceable prepetition contract of indemnity but were contingent on postpetition events").  If the Debtors' obligation to pay the Make Whole Amount is determined to be a prepetition obligation, then the Make Whole Amount is not governed by section 506(b).  *See In re Vandeveer Estates Holdings, Inc.*, 283 B.R. 122, 131 (Bankr. E.D.N.Y. 2002) ("Thus, if VE is correct, and its claim for the Yield Maintenance Premium arose upon acceleration (a prepetition event), the allowability of the Yield Maintenance Premium is not governed by § 506(b), but by § 502.").  Yet even if the Make Whole Amount is determined to be a postpetition obligation, and, therefore, subject to section 506(b), the Make Whole Amount is allowable because it is reasonable. The Bankruptcy Code allows "reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose" to the extent that the allowed secured claim is oversecured.  11 U.S.C. § 506(b).  The analysis as to whether the Make Whole Amount is "reasonable" is like the analysis under section 502(b)(1), and courts analyzing make wholes in contracts governed by New York law consider permissibility under New York law to strongly suggest that the make whole provision is "reasonable." *See, e.g.*, *Sch. Specialty, Inc.*, 2013 WL 1838513, at *5 (dismissing the need to conduct a separate analysis under § 506(b) after determining that the make whole provision is enforceable under New York law); *Wetzel* v. *Advocate Realty Inv., LLC*, 275 F.3d 1308, 1318 (11th Cir. 2001) (deciding that § 502 and § 506 "should be read in tandem with one another").

penalty and will not be enforced.  *Id.*  "When determining whether a prepayment penalty is 'plainly disproportionate' to a lender's probable loss, courts interpreting New York law have considered (i) whether the prepayment fee is calculated so that the lender will receive its bargained-for yield, and (ii) whether the prepayment fee is the result of an arms-length transaction between represented sophisticated parties." *In re Sch. Specialty, Inc.*, 2013 WL 1838513, at *3;  *see In re South Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011), *aff'd*, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012).

154.    Here, the issuance of the 2028 Secured Convertible Notes was the result of an arm's-length transaction between sophisticated parties and their sophisticated advisors.  In fact, the definition of "Make Whole Amount" states:

> Each Note Party further acknowledges and agrees . . . that payment of such amount does not constitute a penalty or an otherwise unenforceable or invalid obligation. Each Note Party expressly agrees that (i) the Make Whole Amount is reasonable and is the product of an arm's-length transaction between sophisticated businesspeople, ably represented by counsel . . . [and] there has been a course of conduct between the Holders and the Note Parties giving specific consideration in this transaction for such agreement to pay the Make Whole Amount.

2028 Secured Convertible Notes Indenture § 1.01.

155.    Further, the Make Whole Amount is reasonably proportionate to the probable loss expected by the holders of the 2028 Secured Convertible Notes resulting from a breach of the 2028 Secured Convertible Notes Indenture.  The Make Whole Amount was negotiated to compensate holders of the 2028 Secured Convertible Notes for, among other things, costs related to the redeployment of their capital, risks related to enforcement and the availability and adequacy of the collateral and the loss of option value inherent in the extinguishment of a convertible instrument, factors which would have been difficult for investors to foresee at the time the 2028 Secured Convertible Notes Indenture was negotiated and executed.  The Make Whole Amount was thus a

reasonable approximation of the probable loss that would result from a future breach of the 2028

Secured Convertible Notes Indenture, and it is consistent with other make-whole provisions that

courts have determined to be reasonable. *See, e.g.*, *In re Brandywine Townhouses, Inc.*, 518 B.R.

671, 678 (Bankr. N.D. Ga. 2014) (36% as reasonable); *Sch. Specialty, Inc.*, 2013 WL 1838513, at

*2 (greater than 30% as reasonable); *In re Fin. Ctr. Assocs. of E. Meadow, L.P.*, 140 B.R. 829, 839

(Bankr. E.D.N.Y. 1992) (25% as reasonable).

### D. The Prepetition Secured Parties Are Entitled to Both the Make Whole Amount and Post-Petition Interest.

156.    In addition to arguing that the Make Whole Amount shouldn't be allowed, the

Committee argues that if it is allowed (as it should be), then the Prepetition Secured Parties are not

entitled to both the Make Whole Amount and post-petition interest.  But the Fifth Circuit in *Ultra*

*III* found that that argument "withers under scrutiny" because the "Make-Whole Amount and post-

petition interest address two different harms" and that "[s]eparate harms warrant separate

recoveries." *See In re Ultra Petroleum Corp.*, 51 F.4th at 145.  Accordingly, the Prepetition

Secured Parties are entitled to both post-petition interest and the Make Whole Amount in

accordance with the express terms of the 2028 Secured Convertible Notes Indenture.

*[Remainder of page intentionally left blank.]*

71

## CONCLUSION

**WHEREFORE**, based on the foregoing, Deerfield respectfully requests that the Court deny the Standing Motion and grant Deerfield such other, further, or different relief as is just and proper.

Dated: July 2, 2024

*/s/ James N. Lawlor*

**WOLLMUTH MAHER & DEUTSCH LLP**
James N. Lawlor
500 Fifth Avenue
New York, NY 10110
Telephone: (212) 382-3300
Facsimile: (973) 741-2398
Email: jlawlor@wmd-law.com

**SULLIVAN & CROMWELL LLP**
Justin DeCamp (admitted *pro hac vice*)
Ari Blaut (admitted *pro hac vice*)
Benjamin Beller (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: blauta@sullcrom.com
　　　decampj@sullcrom.com
　　　bellerb@sullcrom.com

*Counsel to Deerfield Partners, L.P.*