UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
Lauren Bielskie, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: jeffrey.m.sponder@usdoj.gov
        lauren.bielskie@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 24-11362 (MBK) |
| Invitae Corporation, *et al.,* | : | |
| | : | The Honorable Michael B. Kaplan |
| Debtors.[1] | : | |
| | : | Hearing Date: July 22, 2024 at 10:00 a.m. |

**UNITED STATES TRUSTEE'S OBJECTION TO THE SECOND AMENDED JOINT PLAN OF INVITAE CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

The United States Trustee (the "U.S. Trustee"), by and through counsel, in furtherance of his duties and responsibilities under 28 U.S.C. § 586(a)(3) and (5), hereby submits this objection (the "Objection") to confirmation of the *Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Second Amended Joint Plan") (Dkt. 791),[2] and respectfully states as follows:

---

[1] The last four digits of Debtor Invitae Corporation's tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Second Amended Joint Plan.

## PRELIMINARY STATEMENT

1.       The Second Amended Joint Plan filed by Invitae Corporation and related entities (collectively, the "Debtors") contains several provisions the U.S. Trustee finds objectionable.

2.       The Second Amended Joint Plan's third-party release provisions are objectionable because they impose releases on claimants without obtaining their affirmative consent, and also because they extend to an unknown number of unnamed released parties.

3.       The Second Amended Joint Plan is also objectionable because it contains an impermissible "gatekeeping provision."

4.       The Second Amended Joint Plan's exculpation provision is objectionable because it is not limited to fiduciaries of the Debtors' bankruptcy estate.

5.       The Second Amended Joint Plan also contains several objectional provisions whereby the third-party release provisions, and even the Second Amended Joint Plan as a whole, are treated as "settlements" subject to approval under Federal Rule of Bankruptcy Procedure 9019.

6.       The Second Amended Joint Plan's financial reporting and statutory fee payment provisions must be revised to require both the Debtors and the Wind-Down Debtors to carry out all reporting and fee payment duties.

7.       For these reasons, the Second Amended Joint Plan cannot be confirmed in its present form.

## JURISDICTION

8.       This Court has jurisdiction under 28 U.S.C. §§ 157(a) and (b) to hear and determine this Objection.

9.       Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative oversight of cases commenced under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  This duty is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Sys., Inc.* (*In re Columbia Gas Sys., Inc.*), 33 F.3d 294, 295-96 (3d Cir. 1994) (the U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc.* (*In re Revco D.S., Inc.*), 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

10.     Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

11.     Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard regarding this Objection.

## BACKGROUND

12.     On February 13, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Dkt. 1.

13.     On February 16, 2024, this Court entered an Order directing that these cases be jointly administered.  Dkt. 54.

14.     The Debtors continue to operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

15.     No trustee or examiner has been appointed in these cases.

16.     On March 1, 2024, the U.S. Trustee appointed a committee of unsecured creditors in these cases (the "Committee").  Dkt. 131.

17.     According to the Debtors, Invitae is a leading medical genetics company that is in the business of delivering genetic testing services, digital health solutions, and health data services that support a lifetime of patient care and improved outcomes. Invitae offers genetic testing across

multiple clinical areas, including hereditary cancer, precision oncology, and rare diseases. Invitae applies proprietary design, process automation, robotics and bioinformatics software solutions to expand the use and impact of genetic information and achieve efficiencies in sample processing and complex variant interpretation, allowing medical interpretation at scale. With the help of Invitae's genetic information, healthcare providers can assist patients in better understanding their susceptibility to a variety of diseases, which may lead to making more informed, sometimes lifesaving, decisions about their health and medical care.  Dkt. 472 at page 11 of 131.

18.    On May 9, 2024, the Debtors filed a Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and a Disclosure Statement Relating to the Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.  Dkts. 471 and 472.

19.    Also, on May 9, 2024, the Debtors filed a Motion For Entry of an Order Approving (i) the Adequacy of the Disclosure Statement, (ii) the Solicitation and Voting Procedures, (iii) the Forms of Ballots and Notice in Connection Therewith, and (iv) Certain Dates with Respect Thereto (the "Solicitation Procedures Motion").  Dkt. 470.

20.    On June 11, 2024, the Debtors filed an Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and a Disclosure Statement Relating to the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.  Dkts. 614 and 615.

21.    On June 13, 2024, the Court entered an Order Approving (i) the Adequacy of the Disclosure Statement, (ii) the Solicitation and Voting Procedures, (iii) the Forms of Ballots and Notices in Connection Therewith, and (iv) Certain Dates With Respect Thereto (the "Solicitation Procedures Order").  Dkt. 633.

22.     Pursuant to the Solicitation Procedures Order, a solicitation package that included a Ballot for Voting on the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Ballot") was sent to members of the Voting Classes including Classes 3, 4, 5, 6, and 11, and a Notice of Non-Voting Status to Holders or Potential Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan, Holders or Potential Holders of Impaired Claims Conclusively Deemed to Reject the Plan, and Holders or Potential Holders of Disputed Claims (the "Notice of Non-Voting Status") was sent to members of the Non-Voting Classes.  *See* Dkt. 633, Exh. 2 (Notice of Non-Voting Status) & Exh. 3 (Ballots).

23.     On July 8, 2024, the Debtors filed a Plan Supplement For the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan Supplement").  Dkt. 761.

24.     On July 12, 2024, the Debtors filed the Second Amended Joint Plan.  Dkt. 791.  The Second Amended Joint Plan places Holders of Claims and Equity Interests into 11 separate Classes. *Id*., Art. III.A at 25-26 of 123.  Of these, Classes 1 and 2 are presumed to have accepted the Second Amended Joint Plan, and as such are not permitted to vote to accept or reject the Second Amended Joint Plan (the "Non-Voting Classes").  *Id*.  Class 3 is entitled to vote, Class 4 is permitted to vote and presumed to accept the Second Amended Joint Plan, Class 5 is permitted to vote and deemed to reject the Second Amended Joint Plan, Class 6 is permitted to vote and deemed to reject the Second Amended Joint Plan, Classes 7 and 8 are not entitled to vote and are either presumed to accept or deemed to reject the Second Amended Joint Plan, Classes 9 and 10 are deemed to reject and not entitled to vote to accept the Second Amended Joint Plan and Class 11 is permitted to vote and deemed to reject the Second Amended Joint Plan.  *Id*.

## ARGUMENT

### I.    Confirmation Standard

25.    A chapter 11 plan cannot be confirmed unless this Court finds the plan complies

with the provisions of 11 U.S.C. § 1129(a).  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R.

213, 220-21 (Bankr. D.N.J. 2000).  A plan proponent bears the burden of proof with respect to each

element of section 1129(a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D.

Del. 2001).

26.    For the following reasons, the Second Amended Joint Plan cannot be confirmed in

its present form.

### II.    The Second Amended Joint Plan Cannot be Confirmed Because it Contains Third-Party Release Provisions that are Impermissible Under Applicable Law

27.    Complying with section 1129(a) requires that a plan not include improper release

language.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) ("Release . . .

clauses have also been found to be subject to review pursuant to section 1129(a)(1).").

28.    Article VIII.D of the Second Amended Joint Plan provides that certain Releasing

Parties[3] will conclusively, absolutely, unconditionally, irrevocably, and forever release and

discharge each Debtor, Wind-Down Debtor, and Released Party from any and all Claims[4] and

---

[3] The Second Amended Joint Plan defines "Releasing Party" as including "(h) all Holders of Claims that vote to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (i) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (j) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all holders of Interests; (m) each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) each Related Party of each Entity in clauses (a) through this clause (n); *provided, however*, that each Entity that (x) elects to opt out of the releases contained in Article VIII.D of the Plan or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation shall not be a Releasing Party."  Dkt. 791, Art. I.A ¶ 133 at 19 of 123.

[4] The Second Amended Joint Plan defines "Claims" as any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.  *Id.*, Art I.A. ¶ 39 at 12 of 123.

Causes of Action.[5]  Dkt. 791, Art. VIII.D at 51 of 123.  These include Claims and Causes of Action

that are "known or unknown**,** foreseen or unforeseen, matured or unmatured, existing or hereafter

arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or

assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable)."  *Id*.

And the Released Parties as to which claims are being released include, among many others, several

entities' "respective successors, assigns, and representatives[6] and Related Parties[7] of the Released

Parties. *Id.*

---

[5] The Second Amended Joint Plan defines "Causes of Action" as "any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws). Causes of Action also include: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim." *Id.*, Art. I.A ¶ 37 at 12 of 123.

[6] The Second Amended Joint Plan defines "Released Party" as "collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Wind-Down Debtor; (c) the Consenting Stakeholders; (d) the 2028 Senior Secured Notes Trustee; (e) the 2028 Senior Secured Notes Collateral Agent; (f) the Plan Administrator; (g) each Company Party; (h) the Purchaser; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j); *provided, however*, that each Entity that (x) elects to opt out of the releases described in Article VIII.D of the Plan or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation shall not be a Released Party." *Id.*, at Art. I.A ¶ 132 at 19 of 123.

[7] The Second Amended Joint Plan defines "Related Party" as "collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including the Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, representatives advisors, predecessors, successors, and assigns, each solely in their capacity as such (including any attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing."

A.    <u>**The Failure to Opt-Out Is Insufficient to Establish Consent to the Third-Party Releases**</u>

29.    The Second Amended Joint Plan's definition of Releasing Party includes:  (i) members of the Voting Classes that vote to accept the Second Amended Joint Plan but do not affirmatively opt out of the releases provided by the Second Amended Joint Plan; (ii) members of the Voting Classes that "abstain" from voting on the Second Amended Joint Plan and do not return a Ballot with the "opt out" box checked; (iii) members of the Voting Classes that vote to reject the Second Amended Joint Plan and do not affirmatively opt out of the releases provided by the Second Amended Joint Plan; and (iv) members of the Non-Voting Classes that do not return a Notice with the "opt out" box checked.  *See* Dkt. 791, Art. I.A ¶ 133 at 19 of 123.

30.    As a result, the third-party release contained in Article VIII.D of the Second Amended Joint Plan would bind all claimholders who—regardless of whether and how they vote on the Second Amended Joint Plan —do not check the "opt out" box on their Ballot or Notice; indeed, as proposed the release provisions would even bind claimholders that did not receive a solicitation package or Notice.

31.    Previously, in a world where even nonconsensual third-party releases were allowed, it might have made sense to treat the failure to opt out of releases, without more, as sufficient evidence of "consent" to the releases.  But we no longer live in that world after the Supreme Court's *Purdue Pharma* decision.  It is now clear that releases by nondebtors of nondebtors can only be included in a plan if they are consensual.  *Purdue Pharma*, No. 23-124, 2024 WL 3187799, at *6 n.2 (holding that "§ 105(a) alone cannot justify the imposition of nonconsensual third-party releases because it serves only to carry out authorities expressly conferred elsewhere in the code") (internal quotation marks omitted); *id*. at *8 ("[P]recisely nothing in § 1123(b) suggests [claims against the Sacklers that belong to their victims] can be bargained away without the consent of those

affected[.]"); *id*. ("[A] bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors . . . against other nondebtors[.]"); *id*. at *10 (holding that "nothing in the bankruptcy code contemplates (much less authorizes)" a nonconsensual release of direct claims held by creditors against nondebtor third parties).   To the extent some bankruptcy courts might have gone too far pre-*Purdue Pharma* in determining what constitutes "consent," the issue must now be revisited.

32.     The Supreme Court in *Purdue Pharma* did not "express a view on what qualifies as a consensual release." *Id*. at *11.  But bankruptcy courts within this District and elsewhere within the Third Circuit have rendered decisions that provide guidance as to how the concept of "consent" should be cabined.  Under those decisions, the Second Amended Joint Plan's third-party release provision must be stricken because it would allow such release even where a so-called "Releasing Party" has not affirmatively agreed to it.

33.     As an initial matter, given the *Purdue Pharma* Court's emphasis on obtaining a claimant's consent before its claims are "bargained away" (*id*. at *8) or otherwise "extinguished" (*id*.), it is clear that merely voting for a plan is not sufficient to evince a claimant's affirmative consent to third-party releases.  Indeed, before the now-extinct "nonconsensual release" craze took hold, several bankruptcy judges in this District held exactly that.  *See, e.g.*, *In re Congoleum Corp*., 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (Ferguson, J.) ("[T]his Court agrees with those courts that have held that a consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp*., 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (Gindin, C.J.) ("[I]t is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan". . . . Thus, the court must ascertain whether the creditor unambiguously manifested assent to the release of the nondebtor from liability on its debt."); *In re Elsinore Shore Assocs*., 91 B.R. 238, 247 (Bankr.

D.N.J. 1988) (Gambardella, J.) ("'A creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings[.]'") (quoting *Union Carbide Corp. v. Newboles*, 86 F.2d 593, 595 (7th Cir. 1982)) (analyzing section 16 of the Bankruptcy Act of 1898, precursor to 11 U.S.C. § 524(e)); *id*. at 252 (holding that, as "[a] voluntary election to release non-debtors is not present in the present plan before the court . . . the release provisions in the Second Amended Joint Plan are prohibited by the Bankruptcy Code and relevant case law").

34.    In addition, merely providing an "opt out" box, in and of itself, is not sufficient to establish "consent" to third-party releases by any of the Debtors' claimants that do not return a Ballot or Notice with the "opt out" box checked.

35.    In *Emerge Energy Services LP*, the ballot and opt-out forms "provided conspicuous notice of how to opt-out *and the implication of the failure to do so*." *Emerge Energy Services LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *17 (Bankr. D. Del. Dec. 5, 2019) (emphasis added). The plan in that case provided that, "unless they complete a form . . . or ballot indicating their affirmative opt-out," holders of general unsecured claims (who were eligible to vote and received a ballot) and holders of equity interests (who were not entitled to vote and so received "opt out forms") "w[ould] be deemed to have consented to the release and waiver of current and future claims against the 'Released Parties.'" *Id*.  The Honorable Karen B. Owens of the United States Bankruptcy Court for the District of Delaware rejected the debtors' argument that deeming consent from silence "should be approved as typical, customary, and routine." *Id*. at *18.  Instead, Judge Owens found that "it cannot be said with certainty that those failing to return a ballot or Opt-Out Form did so intentionally to give the third-party release[.]"  *Id*.  As a result, Judge Owens determined that, "while the Debtors included on the ballot and Opt-Out Form notice to the recipients

of the implications of the failure to opt-out, the Court cannot on the record before it finds that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release." *Id*. After all, "[c]arelessness, inattentiveness, or mistake are three reasonable alternative explanations." *Id*. Thus, Judge Owens held that "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" to treat "a party's silence or inaction" as the necessary "affirmative consent." *Id*.

36.     Even if voting to accept the Second Amended Joint Plan without opting out was sufficient to evince affirmative consent to a plan's third party release provisions—which it is not— "consent" cannot be adduced by a Voting Class member's decision to abstain from voting without returning the Ballot with the opt-out box checked, or by a Non-Voting Class member's failure to return the Notice with the opt-out box checked. *See, e.g.*, *In re Washington Mutual, Inc*., 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("[T]he opt out mechanism is not sufficient to support the third party releases. . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third party release."); *see also Arrowmill Dev Corp*., 211 B.R. at 507 (holding that "it is not enough for a creditor to abstain from voting for a plan," and requiring "creditor [to have] unambiguously manifested assent to the release").

37.     In addition, the Ballots sent to members of the Voting Classes provide a box that, when checked, indicates an affirmative intent to opt out of the proposed releases. As a result, a member of the Voting Classes who returns a Ballot on which it checked the box to accept the Second Amended Joint Plan but also checked the opt out box is apparently indicating that it approves of everything in the Second Amended Joint Plan *other than* the so-called "consensual"

third party releases.  That is a valid choice a claimant could make based on the opportunity afforded by the Ballot to check, or not check, the opt out box.  There is certainly nothing in the Ballot or attached instructions that warns a claimant that its vote will not be counted if it checks the opt-out box, or that its opt-out choice will be disregarded if it also checks the box accepting the Second Amended Joint Plan.  But, it is unclear from the Second Amended Joint Plan as presented whether a Ballot returned by a claimant that both votes to accept the Second Amended Joint Plan and also checks the opt out box will be treated as voting to accept the Second Amended Joint Plan (making the claimant a Releasing Party) or as "abstaining" from voting and successfully opting out of the Second Amended Joint Plan's release provisions.  *See* Dkt. 791, Art. I.A ¶ 133 at 19 of 123.

38.    As presented, to the extent their treatment of members of the Voting Classes and Non-Voting Classes is clear, the Second Amended Joint Plan's third-party release provisions essentially "discharge" Claims for the benefit of nondebtors.  Calling such protections by another name is merely "word games."  *See Purdue Pharma*, 2024 WL 3187799, at *15-16.  As *Purdue Pharma* makes clear, 11 U.S.C. § 524(e) means what it says:  a discharge of claims for the benefit of the debtor does not extend to any other entity.  *Id*. at *7.

39.    In light of the foregoing, the Second Amended Joint Plan cannot be confirmed unless the release provision contained in Article VIII.D is stricken from the Second Amended Joint Plan.

**B.    The Second Amended Joint Plan's Third-Party Releases Extend to an Unknown Number of Unnamed Released Parties**

40.    The Second Amended Joint Plan's proposal in Article VIII.D to treat Releasing Parties as agreeing to the Second Amended Joint Plan's third-party release provisions without requiring their affirmative consent to the releases is particularly problematic because the release provisions do not enable a reader of the Second Amended Joint Plan to discern precisely what Claims and Causes of Action are being released, or exactly who is receiving the releases.

41.    The expansiveness of the defined term "Released Party" extends the proposed third-party release into the unknown—indeed, the unknowable—regarding the entities that will be receiving releases.  This Court cannot find that a creditor is granting a "consensual" release to an existing or past person or entity that is not even identified in the Second Amended Joint Plan, much less one that does not yet exist.

42.    Accordingly, to the extent any release is considered for approval, it must be limited to parties that are expressly identified in the Second Amended Joint Plan.

### III.    The Second Amended Joint Plan Cannot be Confirmed Because it Contains a Gatekeeping Provision

43.    Article VIII.D's third paragraph (the "Gatekeeping Provision") provides that "any Entity (i) that opted out of the releases contained in this Article VIII.D or (ii) was deemed to reject the Second Amended Joint Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Second Amended Joint Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Second Amended Joint Plan, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Second Amended Joint Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action."  Dkt. 791 Art. VIII.D at 51-52 of 123.

44.    This language creates a "gatekeeper" role for this Court that forces a nondebtor who wishes to pursue a Claim or Cause of Action against another nondebtor to come to this Court—and

only this Court—for a determination of whether such Claim or Cause of Action is released.  By specifying that this Court "shall determine" whether a claimant can proceed, the Second Amended Joint Plan's Gatekeeping Provision effectively grants this Court exclusive jurisdiction to adjudicate the Claim or Cause of Action.  The Gatekeeping Provision would apply even after the Debtors' bankruptcy cases have been closed, which would require a nondebtor seeking to pursue a claim against another nondebtor to first move to reopen the bankruptcy cases.

45.     The procedure proposed by the Gatekeeping Provision—which is akin to that to be followed prior to suing a bankruptcy trustee under *Barton v. Barbour*, 104 U.S. 126 (1881)—should not be permitted.  The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal.  Affirmative defenses cannot be adjudicated prior to the filing of the action to which they relate.  Moreover, as to claims between nondebtors, there is no reason why the court in which the relevant action has been filed cannot determine whether the claim was released under the Second Amended Joint Plan.

46.     A similar provision was rejected by Judge Owens in the Bankruptcy Court for the District of Delaware in *In re Gulf Coast Health Care, LLC*, where she noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed."  *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO), Dkt. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

47.     In light of the foregoing, the Gatekeeping Provision should be stricken from the Second Amended Joint Plan.

IV. **The Second Amended Joint Plan Cannot be Confirmed Because it Contains an Impermissibly Broad Exculpation Provision**

48.     Complying with section 1129(a) requires that a plan not include improper exculpation language.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) ("[E]xculpation clauses have also been found to be subject to review pursuant to section 1129(a)(1).").

49.     The Second Amended Joint Plan's exculpation provision is impermissibly broad under controlling case law because it is not limited to estate fiduciaries.  *See* Dkt. 791, Art. VIII.E at 52 of 123.

50.     The Second Amended Joint Plan defines "Exculpated Parties" as "collectively: (a) the Debtors; (b) the Wind-Down Debtors, (c) the Plan Administrator; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons, directors, members of any committees of any Entity's board of directors or managers, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such."  *Id.*, Art. I.A ¶ 80 at 15 of 123.

51.     In *PWS Holding Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could be exculpated, and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).  As a result, an "exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceedings: estate

15

professionals, the Committees and their members, and the Debtors' directors and officers." *Wash.*

*Mut.*, 442 B.R. at 350-51; *see also In re Diocese of Camden, N.J.*, 653 B.R. 309, 359 (Bankr. D.N.J.

2023) ("[T]he estate itself cannot be granted immunity, nor can consultative bodies that do not

qualify as 'fiduciaries' under the Bankruptcy Code."); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr.

D. Del. 2011) (holding that exculpation clause in Tribune "must exclude non-fiduciaries").

52.     Contrary to these limits, the Second Amended Joint Plan includes as "Exculpated

Parties" numerous entities that are not fiduciaries of the estate.  The Exculpated Parties must be

limited to estate fiduciaries.  As such, the Second Amended Joint Plan cannot be confirmed unless

its definition of Exculpated Parties is limited to: **(i)** the Debtors; **(ii)** the directors and officers of the

Debtors who served during any portion of the cases prior to the Effective Date; and **(iii)** the

professionals retained in these cases by the Debtors.  *See Wash. Mut.*, 442 B.R. at 350-51 ("The

exculpation clause must be limited to the fiduciaries who have served during the chapter 11

proceeding: estate professionals, the Committees and their members, and the Debtors' directors and

officers.").

53.     Accordingly, the Second Amended Joint Plan cannot be confirmed unless the

exculpation provision is limited to estate fiduciaries.[8]

## V.     The Second Amended Joint Plan Cannot be Confirmed Because it is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019

54.     The Second Amended Joint Plan also cannot be confirmed because it purports to

contain "settlements," and to be itself a "settlement," with Releasing Parties that have no formal

agreements with the Debtors or the many non-debtors receiving releases.

---

[8] The term "released" in the second line of Article VIII.E should be removed as Exculpated Parties are receiving an exculpation not a release.

55.     A "settlement" is "an agreement ending a dispute or lawsuit."  Black's Law Dictionary (12th ed. 2024).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

56.     Under 11 U.S.C. § 1123(b)(3)(A), a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  But section 1123(b)(3) only allows a debtor to settle claims it has against others (*i.e.*, those "belonging to the debtor or to the estate").  It does not authorize a debtor to "settle" claims that its creditors and equity security holders hold against nondebtor third parties.

57.     In addition, while a plan may incorporate one or more negotiated settlements, a plan is not itself a settlement.  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" is different from what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code.  *See, e.g., Tribune*, 464 B.R. at 176 (concluding at confirmation stage that a negotiated settlement could be approved because it was fair, reasonable and in the best interest of the Debtors' estates and making an express finding that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)).

58.     Articles IV.A, VIII.A, VIII.C and VIII.D invoke Federal Rule of Bankruptcy Procedure 9019, which confers discretion on this Court to approve a compromise or settlement on motion after notice and a hearing.  Fed. R. Bankr. P. 9019(a).  "In making its evaluation, the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Wash. Mut.*, 442 B.R. at 328 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

59.     The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

60.     Because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing generalized "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" any claim.

61.     Here, the second paragraph of Article VIII.D would have this Court approve the Second Amended Joint Plan's third-party release provisions as a settlement under Rule 9019. But, there is no privity between the Released Parties and the creditors who are being forced into the Second Amended Joint Plan's third-party release provisions without their consent. Accordingly, the proposal that the third-party releases be approved as a settlement under Rule 9019 must be stricken from the Second Amended Joint Plan. In addition, Article VIII.C provides that entry into the confirmation order constitutes the Court's approval of the Debtor Releases pursuant to Bankruptcy Rule 9019. Further, Article VIII.A provides that the "distribution, rights, and treatment that are provided in the Second Amended Joint Plan shall be in complete settlement, compromise, and releases, effective as of the Effective Date, of Claims, Intercompany Claims resolved or compromised after the Effective Date by the Debtors, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date." Dkt. 971 Art. VIII.A at 49 of 123.

62.     In addition, Article IV.A of the Second Amended Joint Plan, entitled "General Settlement of Claims and Interests," provides that, "[t]o the greatest extent permissible under the Bankruptcy Code, and in consideration of the classification, distributions, releases, and other benefits provided under the Second Amended Joint Plan, upon the Effective Date, the provisions of the Second Amended Joint Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Second Amended Joint Plan.  Dkt. 791 Art. IV.A at 31 of 123.

63.     Thus, the Second Amended Joint Plan proposes that "[t]o the greatest extent permissible under the Bankruptcy Code, the Second Amended Joint Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final." *Id.*

64.     The language in Article IV.A suggests that the Second Amended Joint Plan itself is a settlement agreement subject to approval under Rule 9019.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating and executing a settlement between themselves.

65.     Further, Article IV.A does not appear limited to the settlement of claims belonging to the Debtors or the estates and is therefore not permissible under section 1123(b)(3)(A).  For a

plan to incorporate a settlement of claims or causes of action of other parties, those parties must

have expressly agreed to settle or compromise those items.

66.     Article IV.A purports to treat the distributive provisions of the Second Amended

Joint Plan (which would include the impermissible third-party releases and exculpation provisions

discussed above), as if they were a Rule 9019 "settlement."  Here, the Debtors have not articulated

any justification for the request for additional relief under Rule 9019.

67.     In light of the foregoing, the Second Amended Joint Plan cannot be confirmed unless

the provisions seeking to approve the third-party releases, and confirmation of the Second Amended

Joint Plan as a whole, as a "settlement" under Rule 9019 are stricken from the Second Amended

Joint Plan.

## VI.     The Second Amended Joint Plan Cannot be Confirmed Because the Financial Reporting and Statutory Fees Provision Must Be Revised

68.     Article XII.C of the Second Amended Joint Plan provides that the Debtors shall pay

any and all Quarterly Fees due before the Effective Date and that the Wind-Down Debtors and/or

the Debtors shall pay any and all Quarterly Fees due and payable on or after the Effective Date.

Dkt. 791, Art. XII.C at 57 of 123.

69.     Although the language proposed in Article XII.C requires the Debtors to pay

Quarterly Fees before the Effective Date and the Wind-Down Debtors and/or the Debtors to pay

Quarterly Fees after the Effective Date, the U.S. Trustee requests the following alternate language:

> All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors, the Wind-Down Debtors, and any entity making disbursements on behalf of any Debtor or any Wind-Down Debtor, or making disbursements on account of an obligation of any Debtor or any Wind-Down Debtor (each a "Disbursing Entity"), shall be jointly and severally liable to pay Quarterly Fees when

due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, the Wind-Down Debtors and any entity making disbursements on behalf of any Debtor or any Wind-Down Debtor, or making disbursements on account of an obligation of any Debtor or any Wind-Down Debtor, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Wind-Down Debtors and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

70.     In addition, Article IV.F provides "[t]he filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator." Dkt. 791, Art. IV.F at 96 of 123. However, the Debtors and the Wind-Down Debtors together with the Plan Administrator are all responsible for filing the final monthly operating report.

71.     Further, the U.S. Trustee reserves all rights as to the contents of monthly operating reports and post-confirmation reports, including but not limited to the issue of whether necessary information is provided to determine disbursements of each Debtor and each Post-Effective Date Debtor for the purposes of calculating statutory fees. Quarterly fees are calculated as mandated by 28 U.S.C. § 1930(a)(6), and are not subject to negotiation or court order.

## VII. The Injunction Provision in the Second Amended Joint Plan is Not Appropriate For a Liquidating Plan.

72.      The Second Amended Joint Plan includes a section entitled "**Injunction**" that would enjoin a myriad of actions.[9]

73.      Pursuant to section 524(a)(3), confirmation of a plan does not operate as an injunction. Only a discharge operates as an injunction. Instead, pursuant to section 362(c), the automatic stay remains in effect until such time as a discharge is granted or the case is closed. Additionally, pursuant to section 1141(a), the provisions of a confirmed plan bind all parties, including debtors and creditors, to the terms of the plan.

74.      Because the Bankruptcy Code protects the Debtors by continuing the automatic stay until the earlier of entry of a discharge or the case is closed (11 U.S.C. § 362(c)), and by binding all parties to the terms of the Second Amended Joint Plan (11 U.S.C. § 1141(a)), the U.S. Trustee submits that Art. VIII.F be removed.

---

[9] The "Injunction" section of the Second Amended Joint Plan provides: "Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, compromised, settled, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Related Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, compromised, or settled pursuant to the Plan. Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F." Dkt. 791, Art. VIII.F.

## VIII.  **Miscellaneous Objections**

75.    The Plan Supplement does not contain Retained Causes of Action or the Plan Administrator Agreement and Identity of the Plan Administrator.  Such information should be disclosed prior to confirmation.

## RESERVATION OF RIGHTS

76.    The U.S. Trustee leaves the Debtors to meet their burden and reserves all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter, or modify this Objection.

## CONCLUSION

For the reasons set forth above, the U.S. Trustee respectfully requests that the Court deny confirmation of the Second Amended Joint Plan and grant such other relief as the Court deems just and proper.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

*/s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney

*/s/ Lauren Bielskie*
Lauren Bielskie
Trial Attorney

Dated: July 15, 2024