UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
J. Christopher Shore, Esq. (admitted *pro hac vice*)
(cshore@whitecase.com)
Harrison Denman, Esq. (admitted *pro hac vice*)
(harrison.denman@whitecase.com)
Andrew Zatz, Esq. (admitted *pro hac vice*)
(azatz@whitecase.com)
Samuel P. Hershey, Esq. (admitted *pro hac vice*)
(sam.hershey@whitecase.com)
Ashley Chase, Esq. (admitted *pro hac vice*)
(ashley.chase@whitecase.com)
Brett Bakemeyer, Esq. (admitted *pro hac vice*)
(brett.bakemeyer@whitecase.com)

**WHITE & CASE LLP**
555 S. Flower St., Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Aaron Colodny, Esq. (admitted *pro hac vice*)
(aaron.colodny@whitecase.com)

- and -

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
Telephone: (973) 538-4006
Warren J. Martin Jr., Esq. (wjmartin@pbnlaw.com)
John S. Mairo, Esq. (jsmairo@pbnlaw.com)
Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)

*Co-Counsel to the Official Committee of Unsecured
Creditors*

**Hearing Date:**
**July 22, 2024, at 10:00 a.m. (ET)**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OBJECTION TO CONFIRMATION OF THE SECOND AMENDED JOINT PLAN
OF INVITAE CORPORATION AND ITS DEBTOR AFFILIATES
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of the above-captioned Debtors, by and through its undersigned counsel, hereby files this objection (the "**Objection**") to confirmation of the *Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 791] (the "**Plan**") and all amendments and supplements thereto. In support of this Objection, the Committee respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.      These cases have always centered on the propriety of the Debtors deciding which of its creditors it wants to pay and which it doesn't, irrespective of the priority scheme embodied in the Bankruptcy Code. The problem started prior to the Petition Date when the Debtors entered into an exchange transaction that made the Debtors' bankruptcy filing inevitable and benefitted a small minority of their unsecured creditors – a select group of holders of the 2024 Convertible

---

[1]     The last four digits of Debtor Invitae Corporation's ("**Invitae**," and with its subsidiary debtors, the "**Debtors**") tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

[2]     Capitalized terms used but not defined herein shall have the meanings set forth in the Plan, the *Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Dkt. No. 526] (the "**Standing Motion**"), the proposed complaint attached thereto (the "**Proposed Complaint**"), or the *Official Committee of Unsecured Creditors' Objection to the 2028 Senior Secured Note Claims [Claim Nos. 360, 378, 379, 380, 381, 382]* [Dkt. No. 528] (the "**Claim Objection**"), as applicable.

AMERICAS 127542203

Notes – at the expense of all of their other unsecured creditors.  The problem was then exacerbated when the Debtors sought to "settle" with their secured creditors and use available cash to ensure that other unsecured creditors – namely, the holders of Convenience Class Claims and Subsidiary Unsecured Claims – would, in exchange for payment in full, stay silent throughout these cases. And now, after having intentionally isolated the largest unsecured creditors – namely the holders of 2028 unsecured bonds and rejection damage claims at the parent – the problem persists.  Based on the amended Plan on file, it is clear that the Debtors have run these Chapter 11 Cases not as a means of maximizing the value of equity in their assets but, rather, as a means to orchestrate an organized foreclosure for the benefit of the now senior secured noteholders who will receive payment in full while more than $1 billion in both funded and unliquidated unsecured debt will receive a *de minimis* recovery.  And, to top things off, the Debtor's board, management and advisors that ran that creditor-directed process all must receive free blanket releases if the Debtors are to exit from chapter 11.

2.      The Debtors' attempts to disenfranchise their unsecured creditors needs to stop. The Debtors' decision to press forward with their Plan without approval from any class of unsecured creditors makes the Plan unconfirmable for a number of reasons.  First, the last-minute modifications to the Plan with respect to treatment of Subsidiary Unsecured Claims are inappropriate.  Second, the Make-Whole Amount and interest thereon cannot be allowed, as the Plan dictates.  Third, the Secured Noteholders, as noted, will be paid in full.  Therefore, there is no impaired accepting class and the Secured Noteholders' votes cannot properly be used to cram down dissenting unsecured creditors holding claims totaling over a billion of dollars.  Fourth, the unqualified and expansive release of Debtor claims, and any associated purported settlements, cannot be approved because (1) none of the Released Parties have made a contribution to these

3

Estates, (2) the abandonment of valuable claims for zero consideration by conflicted fiduciaries is neither reasonable, fair, nor equitable, (3) the releases are not necessary to the Debtors' liquidation, (4) unsecured creditors do not support the releases, and (5) the Debtors do not even come close to paying all of their creditors.  Finally, the Debtors' classification and proposed payment in full of certain unsecured creditors with claims under $250,000 is inappropriate on the record created by the Debtors.  Confirmation should be denied.

## **BACKGROUND**

### A.    GENERAL BACKGROUND

3.    On February 13, 2024, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

4.    On March 1, 2024, the United States Trustee appointed the Committee, which consists of (i) Wilmington Savings Fund Society, Federal Savings Bank, (ii) Chimetech Holding Ltd, and (iii) Workday, Inc.

5.    The Committee incorporates by reference the description of the general background of these Chapter 11 Cases, the prepetition transactions involving the Debtors, and the Debtors' capital structure contained in the Standing Motion, the Proposed Complaint, and the Claim Objection.

6.    On May 7, 2024, the Court approved the sale of substantially all of the Debtors business to Labcorp Genetics, Inc. for a headline price of $239 million [Dkt. No. 463].  Certain assets, including the Debtors' cash, outstanding accounts receivable, and, with certain exceptions,

4

chapter 5 claims and causes of action and all other litigation claims of the Debtors' Estates, are not being sold.  The Debtors have received all regulatory approvals, and the Labcorp sale is expected to close on August 5, 2024.  *See* July 9, 2024 Hr'g Tr. 5:2-8, *In re Invitae Corp., et al.*, Case No. 24-11362 (MBK) (Bankr. D.N.J. July 11, 2024) ("**July 9 Hr'g Tr.**").

**B.**     **THE DEBTORS' PROPOSED PLAN**

7.      On May 9, 2024, the Debtors filed their initial proposed plan [Dkt. No. 471] and disclosure statement [Dkt. No. 472] (the "**Disclosure Statement**").  On June 13, 2024, the Court entered an order approving the Disclosure Statement and scheduling the confirmation hearing for July 22, 2024 [Dkt. No. 633].  The same day, the Debtors filed a solicitation version of the initial Plan and Disclosure Statement [Dkt. Nos. 630 & 631].

8.      The Plan is a plan of liquidation.  The primary purpose of the Plan is to distribute the proceeds of the sale of the Debtors' assets among the Debtors' stakeholders and wind down the Debtor entities.  After the sale is consummated in early August, the Debtors will no longer operate a business.  *See* Disclosure Statement, at 44.

9.      On July 8, 2024, the Debtors filed the Plan Supplement [Dkt. No. 761].  The Plan Supplement does not include (i) the Schedule of Retained Causes of Action (which under the Debtors' projections will be the only source of recovery for unsecured creditors) or (ii) the Plan Administrator Agreement or identity of the Plan Administrator (who will be charged with recovering value for unsecured creditors).

10.     On July 12, 2024, less than one business day before the objection and voting deadline, the Debtors filed the second amended version of the Plan.  The modifications therein changed, among other things, the treatment of Subsidiary Unsecured Claims in Class 5.  All prior versions of the Plan provided that all Holders of Subsidiary Unsecured Claims would be paid in

AMERICAS 127542203

full and ahead of the 2028 Senior Secured Notes Claims.  Under the second amended Plan, Class 5 "shall receive its Pro Rata share of each of (i) any Distributable Value allocable to the applicable Debtor subsidiary following payment in full of Classes 1, 2, 3 and 4 Claims and (ii) the GUC Distribution Reserve."  Plan § III.B.5.  The Debtors also changed the voting status of Holders of Subsidiary Unsecured Claims from "deemed to accept" to "deemed to reject."  *Id.*  The Plan does not provide (1) what amount will be placed in the GUC Distribution Reserve (it will be determined by the Debtors subject to Deerfield's consent) or (2) how value will be allocated between Invitae and the Debtor subsidiaries.  Based on the current version of the Plan, it is impossible to know the projected recoveries of general unsecured creditors outside the convenience class.

11.     **Treatment of the 2028 Senior Secured Notes Claims**.  The Plan provides that the 2028 Senior Secured Notes Claims shall be "[a]llowed in the aggregate principal amount of approximately $305,000,000, plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the 2028 Senior Secured Notes Indenture or related documents (including post-petition interest at the non-default contract rate) through and including the date of payment" of the 2028 Senior Secured Notes Claims."  Plan § III.C.3.  On May 9, 2024, the Committee objected to the 2028 Senior Secured Notes Claims, including the allowance of the Make-Whole Amount and interest on the Make-Whole Amount.  *See generally* Claim Objection.  Those objections have not yet been resolved.

12.     The Plan provides that Holders of the 2028 Senior Secured Notes Claims (the "**Secured Noteholders**") will receive the Distributable Value of the Debtors (*i.e.*, the amount of cash left and generated from the sale and collection of outstanding receivables) following the payment in full of (1) Administrative Claims, (2) Class 1 (Other Secured Claims), (3) Class 2 (Other Priority Claims), and (4) Class 4 (Convenience Class Creditors).  Plan § III.C.3.  The Debtors

6

do not anticipate that there will be any Class 1 or Class 2 claims.  Disclosure Statement, at 29.

13.      The Debtors estimate the Secured Noteholders will receive a distribution of $302.8–315.6 million in cash on account of their approximately $305 million claim principal amount.  This would increase to $311.2–324.0 million if the $8.4 million that otherwise would have been paid to subsidiary unsecured creditors is instead paid to the Secured Noteholders.  *See* Plan Supplement, Ex. F (Wind-Down Budget), § IV.

14.      The Debtors seek to allow the 2028 Senior Secured Notes Claims in the amount of $335.6 million, which includes the approximately $27.5 million Make-Whole Amount and accrued and unpaid postpetition interest.  The Make-Whole Amount purportedly owed under the 2028 Senior Secured Notes Indenture should be disallowed under section 502 or 506 of the Bankruptcy Code as the economic equivalent of unmatured interest or, in the alternative, as an unenforceable penalty or unreasonable fee or charge.  *See* Claim Objection.  If the Court were to disallow the Make-Whole Amount, the Debtors project that the Plan will provide the Secured Noteholders with a 99.1%–100% recovery on their claim, including postpetition interest (100% if the $7.1 million previously allocated to subsidiary unsecured claims is instead paid to the Secured Noteholders).

15.      **Classification and Treatment of Unsecured Claims**.  The Plan classifies unsecured claims against the Debtors in four separate classes, as follows:

| Class | Description | Amount | Projected Recovery |
|---|---|---|---|
| *Class 4* <br> Convenience Class Claims | Allowed General Unsecured Claims in an amount less than $250,000 or that elect to reduce their Allowed General Unsecured Claims to $250,000 | $8.8 million[3] | 100% |

---

[3]      Includes an assumed 16 Holders of Class 6 Claims electing to receive the Convenience Class treatment.

7

| Class | Description | Amount | Projected Recovery |
|---|---|---|---|
| *Class 5* Subsidiary Unsecured Claims | Any General Unsecured Claim against any Debtor other than Invitae that is not a Contingent Subsidiary Unsecured Claim | $8.4 million[4] | TBD (the projected recovery was 100% in all iterations of the Plan prior to July 12, 2024) |
| *Class 6* Parent Unsecured Claims | Any General Unsecured Claim that is not a Class 4, Class 5, or Class 7 claim, including the 2024 Convertible Note Claims and 2028 Convertible Note Claims | $1,183.7 million | TBD (the projected recovery was 0% in all iterations of the Plan prior to July 12, 2024) |
| *Class 11* Contingent Subsidiary Unsecured Claims | Any contingent, unliquidated, or disputed litigation General Unsecured Claims against one or more Debtors that includes at least one Debtor other than Invitae | Uncertain[5] | TBD (the projected recovery was 0% in all iterations of the Plan prior to July 12, 2024) |

16.     Ms. Frizzley, an independent member of Invitae's board of directors (the "**Board**") and a member of the Special Committee of the Board, testified that the Debtors set the $250,000 threshold for Convenience Class Claims to provide as many General Unsecured Claims as possible in number with a full recovery, despite the Debtors projecting that holders of Parent Unsecured Claims will receive nothing.  July 9 Hr'g Tr. 109:14–111:2.

17.     **Wind-Down Mechanics**.  The Plan provides that on the Effective Date, at least one Debtor (the "**Wind-Down Debtor**") will remain in existence to adjudicate claims, make distributions, file tax returns, bring claims and causes of action, and wind down the Debtors'

---

[4]     The Subsidiary Unsecured Claims include two large rejection damage claims.

[5]     Tecan Genomics Inc. has moved to estimate its claims against the Debtors, arguing "that its prepetition general unsecured claims against the Debtor Defendants are in the amount of tens of millions of dollars.  *Motion of Tecan Genomics, Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) Estimating Tecan's Claims for All Purposes in These Chapter 11 Bankruptcy Cases* [Dkt. No. 758] ¶ 15.

AMERICAS 127542203

affairs.  *See* Plan §§ IV.B, IV.D.  The Plan provides that the Wind-Down Debtor will be overseen

by an individual or an entity appointed by the Debtors in consultation with the Required

Consenting Stakeholders (*i.e.*, Deerfield).  Plan § I.A.113 (definition of "Plan Administrator").

The Debtors state that the Plan Administrator will be identified in the Plan Supplement, but the

current Plan Supplement does not identify the Plan Administrator.  Plan Supplement, Ex. D.  The

Debtors estimate that approximately $13.6 million will be reserved to wind down the Debtors.  *Id.*,

Ex. F.

18.    **Release and Injunction Provisions.**    The Plan contains broad releases of the

following parties by the Debtors and all parties that do not opt out of the releases:

- Each Debtor;

- All current and former directors, managers, officers, employees, advisors, direct or indirect equity holders of the Debtors (in their capacities as "Related Parties");[6]

- The Wind-Down Debtor;

- Deerfield (in its capacity as Consenting Stakeholder);

- The 2028 Senior Secured Notes Trustee;

- The 2028 Senior Secured Notes Collateral Agent; and

- Any Related Party or Affiliate of the foregoing.

Plan § VIII.C (Releases by Debtors); VIII.D (Releases by Holders of Claims and Interests).  The

Debtors argue that (i) Deerfield, (ii) the 2028 Senior Secured Notes Trustee and the 2028 Senior

---

[6]    The Plan defines "**Related Party**" to include "collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including the Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, representatives advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any attorneys or professionals retained by any current or former directors or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the forgoing."  Plan § I.A.131.

9

Secured Notes Collateral Agent (together, the "**Agent**"), and (iii) their respective Related Parties and Affiliates have settled claims against them and, thus, deserve releases because they have agreed to receive a recovery under the Plan after administrative priority and convenience claims are paid and had previously agreed to the Debtors' use of cash collateral. *See* Disclosure Statement, at 37–38. The Debtors' officers, directors, and advisors have not made any contribution in exchange for their releases. July 9 Hr'g Tr. 72:8-11, 72:16-19 (Dr. Scott testifying that "nobody [] asked in form or substance that any director provide any monetary consideration" in connection with the releases provided in the TSA and the Plan).

19.     The Plan also contains an injunction that would enjoin "all Entities who have held, hold, or may hold Claims . . . that have been released, compromised, settled, or are subject to exculpation" from, among other things, "commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests . . . ." Plan § VIII.F.

20.     According to the Disclosure Statement, "the Board authorized the Special Committee to commence an investigation relating to the Company's restructuring efforts and any potential claims and causes of action arising therefrom, specifically any potential Company claims or causes of action arising under the Company's prior transactions." Disclosure Statement, at 69. The Company engaged Ms. Frizzley, who "with K&E's assistance, oversaw and directed the Special Committee's Investigation of certain transactions." *Id.*, at 70. The investigation reviewed four transactions: (1) the March 2023 Uptier Transaction, (2) the August 2023 Exchange, (3) the Debtors' divestiture of One Codex in September 2022, and (4) the Debtors' sale of the ROUKit Assets associated with its ArcherDX business. *Id.* The Special Committee did not investigate any claims against the Debtors' officers and directors related to the Debtors' failure or the acquisitions

and mismanagement that caused the Debtors to not be able to repay their debts.

21.     Ms. Frizzley was one of the five (and later—four) members of the Special Committee.  With the exception of Ms. Frizzley, each of the directors on the Special Committee was on the Board at the time of—and approved—each of the prepetition transactions subject of the Special Committee's investigation.  Ms. Frizzley was unaware of any corporate governance documents that vested her with the sole responsibility to investigate claims and causes of action related to the prepetition transactions. July 9 Hr'g Tr. 96:10–98:11.  She also confirmed that no member of the Special Committee recused themselves from any meeting. *Id*. at 96:3–7.  Ms. Frizzley admitted that she did not have authority to prosecute or compromise any claims to the extent she found such claims colorable. *Id*. at 98:12–99:4.  Rather, she stated that she would have had to ask the other Special Committee members—*i.e.*, the defendants—for authority to sue them if she discovered any misconduct. *Id.*  Additionally, Dr. Scott and Ms. Frizzley testified that the same directors that approved both the prepetition bonuses also released the executives who received the bonuses and themselves from any avoidance action or liability with respect to that decision. *Id*. at 72:12–15.

## C.     THE COMMITTEE'S INVESTIGATION AND STANDING MOTION

22.     After its appointment, the Committee investigated the prepetition conduct of the Debtors, their directors and officers, and their prepetition secured creditors relating to the March Exchange, the August Exchange, and the events leading up to these Chapter 11 Cases.  The Committee asserts that the Estates have valuable claims with respect to the March 2023 Uptier Transaction, including fraudulent transfer and breach of fiduciary duty claims. *See generally* Proposed Complaint.  The Committee also asserts that the millions of dollars in bonus payments issued in anticipation of filing for bankruptcy should be avoided and returned. *Id.* §§ 238–255.

AMERICAS 127542203

On May 21, 2024, the Committee filed its Standing Motion and the Proposed Complaint alleging those claims.

23.     On July 9, 2024, the Court held a hearing on the Standing Motion.  On July 12, 2024, the Court issued a preliminary ruling that it intended to deny the Standing Motion because there were many "hurdles" that the Committee would need to surmount for its colorable claims to be successful.  The Court stated that its ruling was preliminary and would be subject to a determination at the confirmation hearing with respect to the value received by the Debtors' Estates through the purported settlement of the claims under the Plan.  Notably, the Court did not make a finding that the claims at issue were not colorable or could not be monetized but, rather, that the hurdles identified would be difficult to surmount.

## OBJECTION

### I.     THE DEBTORS' PLAN MODIFICATIONS VIOLATE SECTIONS 1125 AND 1127 OF THE BANKRUPTCY CODE

24.     All of the prior iterations of the Plan have provided that members of Class 5 (Subsidiary Unsecured Claims) would receive payment in full.  The Committee has repeatedly asked the Debtors for the justification for that classification and treatment months ago, so that it could assess the legality of the Debtors' proposed classification and treatment scheme.  The Committee also asked who negotiated that treatment on behalf of the Debtor subsidiaries.  No explanation was ever provided by the Debtors other than their desire to pay as many unsecured claims (in quantity, not size) as possible.  Ms. Frizzley has now admitted that no one negotiated on behalf of the Debtor subsidiaries; rather Invitae's Board simply gave an estimated $8.4 million of value to creditors of Invitae's Debtor subsidiaries.

25.     On July 12, 2024, less than one business day before the objection deadline, the Debtors amended the Plan to revise the treatment of Subsidiary Unsecured Claims such that they

12

would receive a share of a newly-created GUC Distribution Reserve.  The amount of the GUC Distribution Reserve is not specified and is subject to Deerfield's consent.  This amount will likely be meaningfully less than what Holders of Subsidiary Unsecured Claims would have expected under prior iterations of the Plan.  This modification violates sections 1125 and 1127(a) of the Bankruptcy Code because it substantially changes the treatment of Subsidiary Unsecured Claims without sufficient time for such claimants to vote, opt out of the releases, or object to confirmation. *See, e.g.*, *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1024 (Bankr. D. Colo. 1988) (denying confirmation of a modified plan that altered the treatment of creditors from receipt of cash to a distribution of a combination of cash and notes if the creditor did not elect to receive payment in cash for their claims).

26.     The Plan does not provide the disclosure necessary for creditors to evaluate the Plan because the GUC Distribution Reserve amount is unknown.  Section 1127(c) of the Bankruptcy Code provides that "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified," and section 1125 of the Bankruptcy Code, in turn, requires that a debtor provide adequate information with respect to the plan it is soliciting, such that a hypothetical investor can make an informed judgment about the plan.  It is impossible from the Plan and the Plan Supplement for general unsecured creditors other than those in the convenience class to know what they can expect to receive under the Plan.

27.     Section 1127(a) of the Bankruptcy Code provides a plan proponent with the ability to modify a proposed plan prior to confirmation.  Bankruptcy Rule 3019(a) specifies that post-solicitation plan modifications do not require resolicitation if the modifications do not adversely change the treatment of parties who previously voted for the plan.  As such, courts have found that only "material" and "adverse" modifications require resolicitation.  *See, e.g.*, *In re Fed.-Mogul*

*Glob. Inc.*, 2007 WL 4180545, at \*39 (Bankr. D. Del. Nov. 16, 2007); *In re Century Glove, Inc.*, 1993 WL 239489, at \*3 (D. Del. Feb. 10, 1993).  "A plan modification is immaterial unless it will 'so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.'"  *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B.R. 87, 168 (Bankr. D. Del. 2023) (citing *In re Am. Solar King*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988)).

28.      Here, the Plan modifications with respect to Holders of Subsidiary Unsecured Claims materially and negatively affects their treatment and flips their voting status from deemed to accept to deemed to reject.  That change will no doubt affect how those creditors would vote on the Plan (if able), whether they would object to the Plan, and whether they would opt out of the releases in the Plan.  The Debtors' last-second change violates those creditors' due process rights.

29.      Finally, this late amendment violates Bankruptcy Rule 2002(b)(2), which requires 28 days' notice for creditors to file objections to confirmations of chapter 11 plans, and Bankruptcy Rule 2002(a)(5), which requires 21 days' notice to accept or reject a proposed modification of a plan.  Because of these violations of the Bankruptcy Code and the Bankruptcy Rules, the Plan does not meet the requirements of section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed.

## II.      THE PLAN IMPROPERLY ALLOWS THE MAKE-WHOLE AMOUNT AND OTHER POSTPETITION ENTITLEMENTS

30.      The Plan would allow in full the Make-Whole Amount and all other postpetition entitlements of the Secured Noteholders.  Plan § III.C.3(b).  According to the proofs of claim filed by the Agent, that includes interest on the Make-Whole Amount itself.  As set forth in the Committee's Claim Objection, the Make-Whole Amount should not be allowed, nor should interest on the Make-Whole Amount.  The Committee incorporates all arguments and support for them in the Claim Objection in this Objection on these points.  Any plan that allows these

14

postpetition entitlements thus cannot be confirmed.  In any event, the Plan cannot be confirmed until the Claim Objection is fully adjudicated.[7]

### III.   THE PLAN HAS NO IMPAIRED ACCEPTING CLASS OR, ALTERNATIVELY, SHOULD NOT PROVIDE FOR POST-EFFECTIVE DATE INTEREST

31.    The Debtors project that there will be approximately $312 million of cash available to distribute to the Secured Noteholders after the payment of Convenience Class Claims and the amounts that formerly were to be distributed to Holders of Subsidiary Unsecured Claims.  *See* Plan Supplement, Ex. F (Wind-Down Budget).  If the Committee's Claim Objection is successful and the Make-Whole Amount and interest thereon is disallowed, the Secured Noteholders' claim amount will be approximately $305.4 million.  The Debtors expect it to take nine months to make distributions, which under the Debtors' proposed wind-down budget will cause the Secured Noteholders to accrue an additional $2.2 million of interest at the non-default rate.  *Id.*  Using the Debtors' projections, this would pay the Secured Noteholders in full and leave approximately $4.7 million for distribution to unsecured creditors.

32.    Recoveries could be improved beyond the Debtors' projections in a number of meaningful ways.  First, the Debtors are not projecting to get any benefit from the approximately $60.0 million of cash that they intend to hold in reserve during the 9-month period until final distributions[8].  If the Debtors were to set aside $20 million of cash for operations and put the approximately $40.0 million of excess cash in an account yielding interest at a one-month treasury

---

[7]    The Committee also objects in the Claim Objection to accrual of postpetition interest at the default rate.  The Plan, as recently modified, explicitly does not provide for the payment of default interest.  Therefore, if the Secured Noteholder class votes to accept the Plan (as is expected), they will be agreeing to waive default interest, rendering the objection to accrual of postpetition interest at the default rate moot.  But, to the extent that is not the case or circumstances change, the Committee reserves all rights on this point.

[8]    The Debtors' wind down budget has an average cash balance of approximately $66.4 million between months two and eight.

AMERICAS 127542203

rate of 5.368%[9], the Debtors would receive an additional $1.6 million for distributions.  Second, the Debtors estimate wind-down expenses that are too high.  There are potentially up to $3.0 million of savings that could be obtained with a more appropriate wind-down budget.  Third, and an independent plan administrator could recover significant amounts from large contingent receivables and preserved claims and causes of action, including claims against the Debtors' directors and officers and UnitedHealth.

33.    The fact that the Secured Noteholders have to wait until after the Effective Date to receive their recovery is not grounds for impairment because they will continue receiving interest during such delay.  *See In re PPI Enterprises*, 324 F.3d 197, 206-07 (3d Cir. 2003) (finding landlord who would receive cash equal to its allowed claim with postpetition interest was unimpaired); *In re Lettick Typografic, Inc.,* 103 B.R. 32, 38–39 (Bankr. D. Conn. 1989) (debtor paying creditors in full just two weeks after the effective date constituted artificial impairment).  If the Debtors, Deerfield, or the Agent were to argue that impairment takes the form of the Secured Noteholders receiving interest at the non-default, rather than the default, rate, this arguments fails for the reasons set forth in Section D of the Claim Objection.

34.    Under section 1129(a)(8) of the Bankruptcy Code, a plan must have at least one impaired accepting class to be confirmed.  The vote of the Secured Noteholders cannot satisfy this requirement because they will be paid in full and are, thus, unimpaired.  The Debtors, therefore, do not have an impaired accepting class.  Further, the Committee believes that using the Secured Noteholders' class to cram down more than a billion dollars of unsecured claims is not warranted here.

35.    If, notwithstanding the arguments above, the Court determines that the Secured

---

[9]    As of July 15, 2024. *See* CNBC https://www.cnbc.com/quotes/US1M.

AMERICAS 127542203

Noteholders are impaired under the Plan, they should not receive interest after the Effective Date.

Courts have consistently held that, while an oversecured creditor is entitled to postpetition interest

under section 506(b) of the Bankruptcy Code, it is not entitled to payment of interest beyond the

effective date of a plan.  *See In re Nixon*, 404 F. App'x 575, 578–79 (3d Cir. 2010) ("The

Bankruptcy Code does not specify, however, that an oversecured creditor must receive interest

indefinitely or at the contract rate."); *Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d

420, 423 (2d Cir. 1998) ("'It is generally recognized that the interest allowed by § 506(b) will

accrue until payment of the secured claim or until the effective date of the plan.'") (quoting *Rake

v. Wade*, 508 U.S. 464, 468 (1993)).  Payment of interest beyond the Effective Date here is

warranted to unimpair the Secured Noteholders but otherwise should not be permitted.

## IV.    THE "SETTLEMENTS" EMBODIED IN THE PLAN ARE NOT FAIR AND REASONABLE

36.    The Plan does not identify any particular settlements that are embodied in the Plan.

Rather, the Plan only provides a generic statement that the Plan itself is a settlement of all

outstanding claims and controversies.  Plan § IV.A.  But a Plan is not a settlement and, in the

absence of any specifics regarding what is purported to be settled by the Debtors and what

consideration it is receiving in exchange for such settlements, no settlements under the Plan can

be approved.  Further, the Plan Supplement does not identify claims and causes of action the

Debtors intend to retain, the rest of which are deemed released.  So, stakeholders cannot determine

what claims or causes of action are purported to be settled, let alone why.  This alone renders the

Plan unconfirmable.

37.    The Plan provides that broad releases will be provided to the Debtors' current and

former officers, directors, and advisors and to Deerfield and the Agent.  To the extent the Debtors

intend to justify such releases as the product of settlements, neither the Plan nor the Disclosure

AMERICAS 127542203

Statement explain what the consideration is for these purported settlements.

38.     The Debtors' current and former officers, directors, and advisors are not providing any consideration for their releases.  Showing up for work is not enough, and the executives have been paid well for their efforts.  Under these circumstances, where the Debtors are on the verge of selling their business and any indemnification claims by officers and directors would be only additional unsecured claims (potentially covered by insurance), there is no basis on which to view the proposed releases of current and former officers and directors as a settlement.

39.     As set forth in the Standing Motion and the Proposed Complaint, there are numerous valuable claims against the Secured Noteholders, including claims for actual fraudulent transfer, constructive fraudulent transfer, and aiding and abetting breaches of fiduciary duties.  In issuing its preliminary ruling denying the Standing Motion, the Court found that the claims were colorable but that the Debtors were justified in their refusal not to pursue them.  The Court said it would evaluate at confirmation whether the settlement that was reached by the Debtors was appropriate.  The Court should not approve any purported settlements with the Secured Noteholders under the Plan because the value of the colorable claims identified by the Committee well exceeds any purported value that the Secured Noteholders are providing under the Plan.

40.     Everything that Deerfield and the other Secured Noteholders have provided to the Debtors has already been paid for by the Debtors.  The Secured Noteholders agreed to the use of their cash collateral, for which the Debtors agreed to pay them postpetition interest throughout these cases and counsel and other advisor fees for the Agent and Deerfield.

41.     Since the March Exchange, the Secured Noteholders have not contributed any tangible value to the Debtors' Estates, nor are they contemplated to contribute anything under the Plan.  Deerfield has agreed to support a Plan that subordinates the Secured Noteholders' recovery

18

to administrative, priority, and convenience claims but, as set forth in Section III above, if the Claim Objection is successful and the Make-Whole Amount and related postpetition entitlements are disallowed, this agreement adds no value as there will still be enough cash to pay the Secured Noteholders' claims in full.  This renders any supposed contribution by the Secured Noteholders under the Plan illusory.  Even if all components of the Secured Noteholders' claims are allowed, the amount of cash the Secured Noteholders are allowing to be paid ahead of their claims pales in comparison to a potential liabilities associated with the potential claims and causes of action against them.

42.     Further, the Plan settlements should not be approved because they were agreed to by the Debtors' conflicted board of directors and are not entirely fair.  Courts do not defer to a debtor's board's business judgment where "the directors were not disinterested or independent." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).  Here, the Debtors' settlements were the product of a conflicted decision-making process.

43.     The Debtors ask the Court to defer to the Special Committee's investigation of four transactions: (i) the March 2023 Uptier Transaction; (ii) the August 2023 Exchange; (iii) One Codex Acquisition; and (iv) ArcherDX Acquisition.  Disclosure Statement, at 70.  The Debtors assert that "[b]ased on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the estates."  *Id.*  However, as described in detail in the Committee's Standing Motion and as the Court heard at the July 9 hearing, the Special Committee's investigation was flawed.

44.     The Special Committee always controlled the claims where its members were implicated.  July 9 Hr'g Tr. 96:11–14 (Mr. Shore: "You understood that you had authority to investigate claims and cause of action, right?"  Ms. Frizzley: "Yes."); *id.* at 96:20–25 (Mr. Shore:

AMERICAS 127542203

"Is there a document which reflects your understanding?"  Ms. Frizzley: "I don't know."  Mr.

Shore: "Is there a document which reflects any ability on your part to negotiate for the resolution

of estate causes of action without regard to the Special Committee itself?"  Ms. Frizzley: "I do not

know."); *id.* at 98:12–17 (Mr. Shore: "And so if Jill Frizzley had just decided I'm going to sue

Deerfield.  I'm going to -- Kirkland & Ellis draft a complaint, sue Deerfield.  Do you believe you

have authority under a written corporate document to direct Kirkland to do that?"  Ms. Frizzley:

"No.").  Ms. Frizzley's understanding does not change the fact that she never had authority with

respect to the claims.  *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 433 (Del. Ch. 2020)

(rejecting director's argument that purporting to act as the "sole remaining director" and making

decisions without a quorum of the three-director board constituted an implicit amendment of the

company bylaws); *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co*., 310 A.3d 985,

1000 (Del. Ch. 2024) (rejecting argument that the company's corporate governance regime was

implicitly amended by conduct).

45.     Kirkland & Ellis also represents the Debtors, including its Board (*i.e.*, the proposed

defendants), so it too was conflicted.  *See The Debtors', The Official Committee of Unsecured

Creditors', and the United States Trustee's Joint Stipulation of Undisputed Facts Related to the

Debtors' Application to Retain Kirkland & Ellis LLP and Kirkland & Ellis International LLP as

Attorneys for the Debtors and Debtors-In-Possession* [Dkt. No. 454] ¶ 5.  No lawyer wants its

client to get sued.  That is why separate counsel was required if the Debtors wanted the Court to

defer to their judgment.

46.     Here, the Debtors' process and the Special Committee's approval of the settlement

was not disinterested as the independent director did not have authority to control the claims and

the claims were ultimately settled by majority vote of the Special Committee who were interested

AMERICAS 127542203

in the transaction.  The Debtors have not disclosed the details of their investigation, let alone the factual results thereof.  The Court should not defer to their conclusions.  *See Official Unsecured Creditors' Comm. v. Penn. Truck Lines, Inc. (In re Penn.Truck Lines, Inc.)*, 150 B.R. 595, 598–99 (E.D. Pa. 1992) *aff'd*, 8 F.3d 812 (3d Cir. 1993) (finding that negotiations to secure releases for insiders require a higher level of scrutiny by courts).

47.    Any purported settlement with (and release of) the Debtors' officers and directors is entirely unjustified but also does not withstand the heightened scrutiny that insider dealings in bankruptcy are subject to.  *Pepper v. Litton*, 308 U.S. 295, 306 (1939) (holding that officers' and directors' "dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation [are] challenged the burden is on the director or stockholder not only to prove good faith . . . but also to show its inherent fairness from the viewpoint of the corporation and those interested therein").

48.    The same "[h]eightened scrutiny" described by the Supreme Court in *Pepper v. Litton* is "warranted when an insider benefits from a compromise or release that a debtor in possession proposes on behalf of its bankruptcy estate."  *In re Astria Health*, 623 B.R. 793, 801 (Bankr. E.D. Wash. 2021).  This Court has found that courts should be "loath[] to eradicate even potential causes of action because it is simply bad public policy to allow Chapter 11 to be used to insulate corporate directors or their professionals from the consequences of their actions."  *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007); *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) ("The court's scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims."); *Cf. In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012) (settlements with former partners were "not related party transactions that, in other contexts, make application of the

21

entire fairness doctrine appropriate"); *see also In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 600 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993) (noting that "higher scrutiny may well be appropriate for settlements negotiated by insiders" but finding that the circumstances of the case before the court did not warrant applying this heightened standard because the "'insider' benefits in [the] deal—the full releases of the affiliates and of Cunningham—were not in the [agreement subject to approval] at all, but in the affiliates agreement, which was independent of the bankruptcy court and which had already gone into effect").[10]

49.     Even when courts defer to a debtor's investigation, they refuse to approve releases when an appropriate investigation has not been conducted.  *See, e.g.*, *In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 131-32 (Bankr. S.D.N.Y. 2023) (declining approval of "extremely broad" releases for "all directors, officers, and Persons employed by each of the Debtors and their Affiliates" and finding that the "evidence before [the court] did not suggest that the Debtors had done any investigation, or made any careful consideration, of all of the types of claims that would be covered by [the release's] sweeping language").

50.     The releases would bar ***any*** claims against the Debtors' officers, directors, advisors, lenders, and counterparties.  However, the Special Committee only investigated four transactions. *Cf.* Disclosure Statement, at 70 (listing transactions that were subject of the Special Committee's investigation).  In other words, the Debtors have not provided any basis under which this Court should release these parties from claims the conflicted Special Committee unilaterally chose not to investigate.  Such claims that were not investigated include claims associated with the thirteen

---

[10]   Heightened scrutiny is required even if the "settlements" are evaluated under Bankruptcy Rule 9019.  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015) (citing *In re Charter Commc'ns*, 419 B.R. 221, 240 (Bankr.S.D.N.Y.2009)) ("[S]ince the settlement here is with the Debtors' parent (Platinum), the Court agrees that it is proper to apply 'heightened scrutiny and some skepticism' in considering the settlement terms.")

22

failed acquisitions the Debtors effectuated between 2019 and 2021.

51.    Here, due to the fact that the Debtors' current and former directors, officers, and advisors have not made any contribution to the Estates, there is no argument that any settlement vis-à-vis each of them is entirely fair or even falls above the lowest rung in a Rule 9019 analysis. The minimal concessions by Deerfield also come nowhere close to meeting the mark. Even though there may be legal hurdles to the Committee's claims, a less than 1% chance of success would warrant more consideration than the Debtors were able to negotiate with Deerfield.

## V.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT CONTAINS IMPROPER RELEASES AND INJUNCTION PROVISIONS

52.    The releases contained in Article VIII of the Plan provide that the "Released Parties," including Deerfield, the Agent, and all current and former directors, officers, advisors, and counterparties of the Debtors, will be released from all claims by the Debtors and third parties that do not specifically opt-out or object to the releases. The releases are not necessary to the Debtors' liquidation and are impermissible.

53.    A plan may provide for the settlement or release of estate claims. 11 U.S.C. § 1123(b)(3)(A). However, such releases must be "fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)). Courts evaluating whether a debtor's release of a non-debtor is appropriate analyze the *Master Mortgage* factors. *See e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)). The *Master Mortgage* factors consider:

(1)    The identity of interest between the debtor and non-debtor released party such that a suit against the non-debtor will deplete the estate's resources;

(2)    The substantial contribution to the plan made by the non-debtor

23

released party;

(3)    The necessity of the release to the reorganization;

(4)    The overwhelming acceptance of the plan and release by creditors
and interest holders; and

(5)    The payment of all or substantially all of the claims of creditors and
interest holders under the plan.

*In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).  These factors are neither

exclusive nor conjunctive requirements.  *Wash. Mut.*, 442 B.R. at 346.  Courts may consider other

factors, including whether the creditors' committee is supportive of the releases.  *See In re Abeinsa*

*Holding, Inc.*, 562 B.R. 265, 285 (Bankr. D. Del. 2016) (recognizing this as a consideration

because a creditors' committee "has the greatest incentive to limit the Debtors' Release to preserve

any potential claims.").  Here, each of the *Master Mortgage* factors all weigh against the Debtor

Release.

### i.    There Is No Identity of Interest Between the Debtors and the Released Parties

54.    An "identity of interest" exists when claims "will deplete the estate's resources" if

not released or where a suit against the released party would be, in essence, a suit against the

debtor.  *Wash. Mut.*, 442 B.R. at 346.  The Debtors do not share an identity of interest with the

parties primarily benefiting from the Debtor Release—the Debtors' current and former officers

and directors, Deerfield, the Agent,[11] and all of their "Related Parties."[12]

---

[11]    The Agent admitted that it is acting at the direction of Deerfield.  *See, e.g.*, *Joinder and Supplemental Statement of U.S. Bank Trust Company, National Association, as Trustee and Collateral Agent, to Deerfield Partners L.P.'s (I) Objection to the Committee's Standing Motion and (II) Response to the Committee's Objections to the Make Whole Amount* [Dkt. No. 720] ¶ 3 (stating that it is "to exercise the rights and powers under the Indenture solely at the discretion" of Deerfield).

[12]    The breadth of the proposed Debtor release renders the evidentiary showing required to establish an identity of interests with respect to many Released Parties impossible.  The definition of "Related Parties" includes sweeping categories of parties.  This Court has rejected similar releases.  *See, e.g.*, *In re Congoleum Corp.*, 362 B.R. at 192 ("[T]he Debtors state that 'a suit against any of the Representatives for alleged liability related to the Debtors' reorganization would necessarily implicate the Debtors . . . .'  Given the expansive definition of 'Representatives,' that statement is simply not accurate.").  Courts have also noted, when deciding whether to extend the automatic

24

55. **Current and former directors, officers, and advisors**. As an initial matter, the Debtors' directors and officers may have access to the proceeds of director and officer insurance policies. Indeed, the Plan specifically circumscribes any Debtor indemnification obligations to the extent of coverage available under any such policies. *See* Plan § V.B. In the event that the Debtors allege they may be required to indemnify any of the released parties outside of or above any available insurance, this alleged obligation would be based on a prepetition employment contract and, therefore, would be an unsecured claim. *See In re Philadelphia Mortg. Tr.*, 117 B.R. 820, 829 (Bankr. E.D. Pa. 1990) (citing *In re Christian Life Ctr.*, 821 F.2d 1370, 1374 (9th Cir. 1987)) ("[The officer] was sued [postpetition] for his pre-petition actions . . . Any duty of the [debtor] to reimburse or indemnify [the officer] for his legal expenses arises from these pre-petition services . . . . Thus [the] claim is at most a general unsecured claim"); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 51–52 (Bankr. D. Del. 2001). Notably, the Debtors would not owe any indemnification obligations to its attorneys or accountants. *In re Congoleum Corp.*, 362 B.R. at 192.

56. **Deerfield and the Agent**. The Debtors similarly share no interest with Deerfield or the Agent, each of whom are not affiliated with the Debtors. As the Debtors have acknowledged, any estate claims and causes of action against the Secured Noteholders would serve only to reallocate the distribution of a pot of cash from one group of creditors to another. *See Debtors' Objection to the Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Exclusive Settlement Authority* [Dkt. No. 713] ¶¶ 175, 192.

---

stay to third parties (which also requires an "identity of interest"), that a court must make specific factual findings that there is an identity of interest and cannot make sure a finding between a debtor and unidentified parties. *See* Hr'g Tr. 39:3–9, *In re Gulf Coast Health Care*, No. 21-11336 (KBO) (Bankr. D. Del. Dec. 3, 2021) [Dkt. No. 500] ("I don't think that I could find that there's an identity of interests between the debtor and most of the third parties here. I think issue number one is that [] specific parties are not identified in the motion.").

25

And, while the Debtors may have certain indemnification obligations to the Agent and Deerfield, all such obligations are either based on prepetition contracts and would be prepetition claims or are limited in scope.

57.     Even if there were an identify of interests among the Debtors and the Released Parties, satisfaction of this prong alone is not sufficient to justify the releases. *Wash. Mut.*, 442 B.R. at 349–50 ("to hold otherwise would eliminate the other four factors and would justify the releases of directors and officers in every bankruptcy case. That is not the law.") (citing *In re Continental Airlines*, 203 F.3d 203, 216 (3d Cir. 2000)).

> ### ii.     *The Released Parties Have Not Made a Substantial Contribution to the Plan*

58.     The Plan fails to provide any analysis as to why the releases are essential to the reorganization and/or how each of the Released Parties have made a "substantial contribution" to support the proposed releases. *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (holding that releases must be given in exchange for fair consideration); *Wash. Mut.*, 442 B.R. at 349–50 (approving releases of parties that had waived significant claims against the debtors' assets and the estates but concluding that "there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals . . . current or former . . . [because] there has been no evidence presented of any 'substantial contribution' made to the case by the directors, officers or professionals, justifying releases for those parties.").

59.     **Current and former officers, directors, and advisors**. The Debtors' directors and officers have not made any contribution to the Debtors' Estates outside of work they have already been compensated for.[13] To be clear, the Debtors' officers have been paid handsomely for

---

[13]   There is no argument that the Debtors' former officers and directors have contributed to the reorganization and any release of such officers and directors should be stricken.

AMERICAS 127542203

their efforts during these cases, including their salaries and multi-million-dollar retention bonuses paid prepetition explicitly to avoid the scrutiny of section 503(c) of the Bankruptcy Code.  July 9 Hr'g Tr. 85:6-14 (Mr. Shore: "Chapter 11 proceedings could exceed nine months, create risks that Invitae could be under court supervision, and new retention would be prohibited.  Do you see that?"  Dr. Scott: "Yes."  Mr. Shore: "Okay.  Do you recall that one of the things that was being discussed when these bonuses were being paid the day before the bankruptcy, that if you waited until the day after bankruptcy, they might not be approved."  Dr. Scott: "Yes.").

60.    Courts have repeatedly rejected the idea that participation in the restructuring without more qualifies as a substantial contribution.  *See, e.g.*, *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606–07 (Bankr. D. Del. 2001) (although management "no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring" and "negotiating the financial restructuring with parties in interest," they had "been otherwise compensated for their contributions" and "management functions they performed do not constitute contributions"); Hr'g Tr. 9:16–19, *In re Boomerang Tube, LLC*, No. 15-11247-MFW (Bankr D. Del. Nov. 9, 2015) [Dkt. No. 688] (noting that "negotiating a plan is not a sufficient substantial contribution by a director and officer, such as to warrant a release"); *In re Aegean Marine Petroleum Network*, 599 B.R. 717, 729 (Bankr. S.D.N.Y. 2019) (stating that "directors did what they were paid to do, and that does not mean they are entitled to releases of third-party claims"). In *Aegean Marine Petroleum Network*, the court denied a release to insiders, stating:

> I am told that the directors in this case had to navigate through many troubles, and that in return they have earned the right to be freed of litigation claims relating to pre-bankruptcy matters. Frankly, that just does not follow.  There are plenty of officers and directors of non-bankrupt companies who have to steer their companies through difficult situations. I am sure that they would also like to dispose of potential litigation claims against them as a reward for the work that they have done.  But that is not recognized as a ground on which to terminate litigation claims outside of

27

bankruptcy. There is no reason why it should constitute an excuse to terminate litigation claims just because a company is emerging from bankruptcy.

599R. at 728–29.

61. Here, the Debtors' former officers, directors, and advisors have not made any contribution to the Estates to warrant the proposed releases. *See, e.g.,* July 9 Hr'g Tr. at 72:8-19 (Mr. Shore: "And as far as you know, nobody has asked in form or substance that any director provide any monetary consideration for such releases, right?" Dr. Scott: "Correct"). The same is true for the Debtors' professionals. *In re Congoleum Corp.*, 362 B.R. at 193.

62. **Deerfield and the Agent**. Deerfield and the Agent similarly have not provided a substantial contribution to the Debtors' Estates. For the reasons stated in Section IV above, the Secured Noteholders' so-called contribution to the Estates (which is neither a cash contribution nor a reduction of their claim) does not constitute the requisite "substantial contribution." Rather, allowing the Debtors to use their cash collateral, supporting the Debtors' Plan, and agreeing to "subordinate" some of their claims pales in comparison to the value of the potential claims against Deerfield and the Agent. *See* July 9 Hr'g Tr. 107:21-108:7, 112:18–22 & 114:17–115:9. This is particularly true given that the Secured Noteholders will get paid in full if the Make-Whole Amount is disallowed, as set forth in Section III above.

### iii.    *The Releases Are Not Necessary to the Liquidation*

63. Courts consider whether a release is "essential" to the "reorganization," such that, without it, "there is little likelihood of success." *Zenith,* 241 B.R. at 110. Here, there is no reorganization. Thus, the releases are not necessary. *See In re Nickels Midway Pier, LLC*, Case No. 03-49462 (GMB), 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (finding third-party releases were impermissible where no consideration was going to the releasing parties who

had objected and they were not necessary to the debtor's reorganization because it was liquidating);

*In re SL Liquidating, Inc.*, 428 B.R. 799, 803 (Bankr. S.D. Ohio 2010) (only "a reorganizing

debtor" must "be protected from suits that may deplete its assets so that it can, in fact, reorganize").

### iv.    The Releases Are Not Supported by the Debtors' Creditors

64.    In evaluating this factor, courts consider whether the "substantial majority" of

creditors support the release, as evidenced by "overwhelming" support for the plan.  *See Zenith*,

241 B.R. at 110.  Here, only one creditor group will vote in favor of the Plan—Deerfield and the

other Secured Noteholders—i.e., certain Released Parties.  They are slated to be paid in full.  The

Debtors' proposed convenience class is also deemed to accept the Plan because the Debtors have

also proposed to pay them in full.  The amount paid for "consent" should not be considered.

Looking to other creditors, Holders of Parent Unsecured Claims are expected to overwhelmingly

vote to reject the Plan and, with the Debtors' last-minute changes to their treatment, Holders of

Subsidiary Unsecured Claims will likely too.  Accordingly, the vast majority of the claims against

the Debtors' estate will reject the releases.  *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 43

(Bankr. D. Del. 2000) (holding that the "overwhelming support" factor articulated in *Master*

*Mortgage* "requires that the affected class accept the plan by at least the percentages required by

section 1126 of the Bankruptcy Code").

### v.    The Debtors Are Not Paying More than a $1 Billion in Debt

65.    Courts consider whether a plan provides for payment of "all or substantially all"

creditor claims.  *See Zenith*, 241 B.R. at 110.  Here the Debtors are not even close, leaving nearly

$1.2 billion of Parent Unsecured Claims and an uncertain amount of other unsecured claims with

no or a *de minimis* recovery according to the Debtors' projections.  Paying the most people by

number does not satisfy the last *Master Mortgage* factor when it only represents approximately

AMERICAS 127542203

1% of the total claims.  *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. at 43.

**VI.    THE PLAN'S IMPROPER CLASSIFICATION OF CLAIMS VIOLATES SECTIONS 1122 AND 1129(A)(1) OF THE BANKRUPTCY CODE AND IS NOT IN GOOD FAITH**

66.    Section 1122(b) of the Bankruptcy Code permits a plan proponent to designate a separate class for all unsecured creditors that hold claims that are (i) less than a specified dollar amount or (ii) reduced to such amount, provided that the court approves such classification as being reasonable and necessary for administrative convenience.  "Generally, an administrative convenience class is one where the claims are so small in amount and large in number as to make dealing with them burdensome."  *Oxford Life Ins. Co. v. Tucson Self-Storage, Inc.* (*In re Tucson Self-Storage, Inc.*), 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994).  The typical convenience treatment is payment of a percentage of those claims in cash on the effective date to avoid the administrative hassle of providing those creditors with fractional interests in the debtor's estate and administering distributions to those creditors over time.  Often, convenience class creditors receive a lower percentage recovery than other unsecured creditors because they are receiving better currency (*i.e.*, cash).

67.    The Debtors have established a $250,000 threshold for the convenience class and will pay any claim within that threshold (or claim reduced to that threshold) in full.  *See* Disclosure Statement, at 29.  The Debtors selected that threshold not for administrative convenience but, rather, to pay a substantial amount (in quantity, not size) of unsecured claims.  July 9 Hr'g Tr. 111:3–10 (Mr. Shore: "And that was based upon your assessment of the difference in nature between a person who holds a $250,000 claim and a person who holds a $10 million claim, right?" Ms. Frizzley: "Not only.  We looked at structural subordination.  We looked at where claim amounts fell, where were their breaks, where are their large amounts, you know, that drop off suddenly.  So we looked at the totality of the claims base and tried to get as much money as we

30

could to unsecureds.").  This justification does not pass muster, as there is no legitimate reason to pay unsecured creditors with smaller claims in full and unsecured creditors with larger claims almost nothing, particularly where both classes are to receive cash.  *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 204 n.107 (Bankr. S.D.N.Y. 2009) (noting that separate classification of large and small unsecured claims was "easy . . . to understand and approve" where the "plan provides for the delivery of common stock and warrants to the holders of larger claims, and doing so for unsecured creditors with the much smaller claims that would put them in the convenience class would result in the issuance of fractional shares and warrants" and granting the "reasonable and necessary" finding under section 1122 of the Bankruptcy Code), *aff'd in part, rev'd in part on other grounds*, 634 F.3d 79 (2d Cir. 2010).  Moreover, given that this justification is not rooted in administrative convenience, it does not satisfy the requirements of section 1122(b).

68.     To the extent the purpose of establishing the separate convenience class here was to buy off and silence one group of unsecured creditors, such conduct was done in bad faith and, thus, the Plan also cannot be confirmed under section 1129(a)(3) of the Bankruptcy Code.

## VII.    ADDITIONAL OBJECTIONS

69.     In addition to the concerns raised above, the following additional provisions of the Plan are objectionable and should be modified to the extent the Court is inclined to confirm the Plan:

- **Post-Effective Date Governance.**  The Plan provides that, following the Effective Date, the Plan Administrator will administer the Debtors' Estates, including prosecuting claims, collecting receivables, and making distributions.  Plan § IV.E.  The Plan Administrator is to be selected by the Debtors in consultation with the Required Consenting Stakeholders (*i.e.*, Deerfield).  *Id.* § I.A.99.  The Debtors will have no further interest in their Estates after the Effective Date and unsecured creditors will be the primary beneficiary of any value obtained by the Plan Administrator.  As such, the Plan Administrator should be an entity jointly selected by the Agent for the benefit of the Secured Noteholders and the Committee (or from a slate of disinterested candidates submitted to the Court if no agreement can be reached).  Further, the Secured

31

Noteholders' rights should terminate once they are paid in full. And a creditor representative should have a consent right with respect to any settlement with any party to a non-released claims or cause of action. Finally, any proposed Confirmation Order should include a provision that explicitly provides that the Plan Administrator owes fiduciary duties of care and loyalty to all of the Debtors' creditors and must file quarterly reports on the docket to inform creditors of its progress in winding down the Debtors' Estates, liquidating claims and making disbursements, and pursuing Retained Causes of Action.

- **Third Party Releases.** The Plan contains third party releases that are overbroad and should be limited in light of, among other things, the recent decision in *Harrington v. Purdue Pharma L.P.* where the Supreme Court held that non-consensual third-party releases are not permitted by the Bankruptcy Code. 144 S.Ct. 2071, 2088 (2024). The Supreme Court clarified that, absent consent, claims of creditors against non-debtor third parties may only be released to the extent they are "[derivative] claims" because "[i]n a derivative action, the named plaintiff 'is only a nominal plaintiff. The substantive claim belongs to the corporation.'" *Id.*, at 2083 (internal citations omitted). Here, creditors have state law claims for fraudulent transfer. *See, e.g.*, NYDCL § 273; *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.*), 226 F.3d 237, 242–43 (3d Cir. 2000) (explaining that a chapter 11 debtor does not acquire its creditors prepetition fraudulent transfer claims). As such, the release and injunction provisions of the Plan should include the following disclaimer that the Debtor Release and the Third-Party Release do not release any direct claims of creditors against the Released Parties:

  > Notwithstanding anything to the contrary in this Plan, nothing in the release and injunction provisions bars any claims that may be brought by a creditor in its personal capacity and was not consensually released by such creditor through this Plan, including without limitation any direct claims held by creditors against Deerfield.

  The release and exculpation provisions must also carve out claims for gross negligence, bad faith, and willful misconduct. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (setting forth a standard for exculpation and holding that that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence). As recognized by the court in *Washington Mutual*, parties who are fiduciaries of the estate are receiving exculpations cannot circumvent the binding restrictions on exculpations by simply putting them in a release. *Wash. Mut.*, 442 B.R. at 350.

- **Dissolution of the Committee**. Section XII.D of the Plan provides that on the Effective Date, the Committee shall automatically dissolve and the Wind-Down Debtors "shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date." The Plan should provide that, notwithstanding the Committee's dissolution, the Committee shall remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise

32

participating in, any outstanding appeals in these Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

- **Exculpation Provision**. The Plan's definition of "Exculpated Parties" only includes the Debtors, the Wind-Down Debtors, the Plan Administrator, and their related persons and advisors and does not include the Committee or any of its members. Plan § I.A.69. The Third Circuit has held that, by virtue of section 1103(c) of the Bankruptcy Code, members of statutory creditors' committees have a qualified immunity for actions within the scope of their duties and may be exculpated through a chapter 11 plan. *In re PWS Holding Corp.*, 228 F.3d at 246. This qualified immunity should not be tied to the Committee's approval or disapproval of the Plan. The Plan's definition of Exculpated Parties is, thus, contrary to section 1103(c) and equitable principles that underpin the Bankruptcy Code. This definition, therefore, should be revised to include the Committee and its members in their capacities as such. Otherwise, the Plan cannot be confirmed under section 1129(a)(1) of the Bankruptcy Code requiring the Plan to "compl[y] with the applicable provisions of [the Bankruptcy Code]." *Id.* at 243 (considering, in connection with determining the plan's compliance with section 1129(a)(1), a plan provision that exculpated the statutory creditors' committee and its members).

## RESERVATION OF RIGHTS

70. The Committee reserves all rights with respect to the Plan, including any revised, amended, or modified plan the Debtors may file. The Committee submits this Objection without prejudice to, and with a full reservation of, the Committee's rights to supplement or amend this Objection at or before the confirmation hearing and present evidence at such hearing. Nothing herein is intended to be a waiver by the Committee of any right, objection, argument, claim or defense with respect to any matter, including matters involving the Plan, any revised, amended, or modified versions thereof, the Standing Motion, or the Claim Objection, all of which are hereby expressly reserved.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, the Committee respectfully requests that the Court enter an Order (i) denying confirmation of the Plan and (ii) granting the Committee such other and further relief as the Court deems just and proper.

33

Dated: July 15, 2024

By: */s/ John S. Mairo, Esq.*
John S. Mairo, Esq.
Warren J. Martin Jr., Esq.
Christopher P. Mazza, Esq.
**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Email: wjmartin@pbnlaw.com
        jsmairo@pbnlaw.com
        cpmazza@pbnlaw.com

        -and-

J. Christopher Shore, Esq. (admitted *pro hac vice*)
Harrison Denman, Esq. (admitted *pro hac vice*)
Andrew Zatz, Esq. (admitted *pro hac vice*)
Samuel P. Hershey, Esq. (admitted *pro hac vice*)
Ashley Chase, Esq. (admitted *pro hac vice*)
Brett Bakemeyer, Esq. (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: cshore@whitecase.com
        harrison.denman@whitecase.com
        azatz@whitecase.com
        sam.hershey@whitecase.com
        ashley.chase@whitecase.com
        brett.bakemeyer@whitecase.com

Aaron Colodny, Esq. (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 S. Flower St., Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7706
Email: aaron.colodny@whitecase.com

*Co-Counsel to the Official Committee of
Unsecured Creditors*