**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
nicole.greenblatt@kirkland.com
francis.petrie@kirkland.com
jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
William E. Arnault, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
spencer.winters@kirkland.com
william.arnault@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| INVITAE CORPORATION, *et al.*, | Case No. 24-11362 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DEBTORS' MEMORANDUM OF LAW
# IN SUPPORT OF THE DEBTORS' SECOND AMENDED
# JOINT PLAN OF INVITAE CORPORATION AND ITS DEBTOR
# AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1]   The last four digits of Debtor Invitae Corporation's tax identification number are 1898. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/invitae. The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

I.      PROCEDURAL HISTORY OF THE PLAN AND OBJECTIONS. ...............................11

        A.      Procedural History. ...................................................................................11

        B.      The Plan Solicitation and Notification Process. ....................................16

        C.      The Objections...........................................................................................18

ARGUMENT ............................................................................................................19

II.     THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION.................19

        A.      The Plan Complies with the Applicable Provisions of the Bankruptcy
                Code (Section 1129(a)(1)). .......................................................................20

                1.      The Plan Satisfies the Classification Requirements of Section 1122
                        of the Bankruptcy Code. ................................................................20

                2.      The Plan Satisfies the Mandatory Plan Requirements of
                        Section 1123(a) of the Bankruptcy Code.....................................26

                3.      The Plan Complies with the Discretionary Provisions of
                        Section 1123(b) of the Bankruptcy Code. ...................................28

                4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code...........30

        B.      The Debtors Have Complied with the Applicable Provisions of the
                Bankruptcy Code (Section 1129(a)(2)). .................................................31

                1.      The Debtors Have Complied with the Disclosure and Solicitation
                        Requirements of Section 1125..................................................32

                2.      The Debtors Have Satisfied the Plan Acceptance Requirements of
                        Section 1126. ................................................................................33

        C.      The Debtors Proposed the Plan in Good Faith and Not by Any Means
                Forbidden by Law (Section 1129(a)(3)). ...............................................35

        D.      The Plan Provides That the Debtors' Payment of Professional Fees and
                Expenses Are Subject to Court Approval (Section 1129(a)(4)). ...........36

        E.      The Plan Does Not Require Additional Disclosures Regarding Directors,
                Officers, and Insiders (Section 1129(a)(5)). .........................................37

## TABLE OF CONTENTS (CONT'D)

<u>Page</u>

F.    The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)) ........................................................................... 38

G.    The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)) ........................................................................... 38

H.    The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code. ..................................... 40

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)) ........................................................................... 40

J.    At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10)) ......................................................................... 42

K.    The Plan Is Feasible and Is Not Likely to Be Followed By The Need For Further Financial Reorganization (Section 1129(a)(11)). ................... 44

L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)) ......................................................................... 45

M.    Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ........................................................................ 46

N.    The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ................... 46

    1.    The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)). ................... 47

    2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (Section 1129(b)(1)). ................................................................ 48

O.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). ............................................ 49

P.    The Plan Modifications Do Not Require Resolicitation or an Additional Disclosure Statement. ........................................................................... 50

Q.    The Plan Appropriately Incorporates Settlements of Claims and Interests. ........... 54

III.    THE PLAN'S RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SATISFY SECTION 1123(B) OF THE BANKRUPTCY CODE. ................................. 58

A.    The Debtor Release Is Appropriate. ........................................................ 66

B.    The Exculpation Provision Is Appropriate. ........................................... 73

C.    The Injunction Provision is Appropriate. ............................................... 76

**TABLE OF CONTENTS (CONT'D)**

                                                                                    **Page**

IV.    THE REMAINING OBJECTIONS SHOULD BE OVERRULED. .................................77

    A.    The Gatekeeping Provision Is Integral to the Plan and Should be
       Approved. ...............................................................................................78

    B.    Each of the Committee Objection and Baker Bros. Joinder Should be
       Overruled. ...............................................................................................86

       1.    The Make-Whole Amount is Not a Confirmation Issue. ...........................86

       2.    Payment of Post-Petition Interest to Class 3 is Permissible. ....................86

       3.    The Committee's Additional Objections Should be Overruled. ................88

    C.    The Remaining Objections Are Not Confirmation Issues, or Should be
       Overruled. ...............................................................................................89

       1.    The IDT Objection is a Cure Dispute and Should Not be Heard at
          the Confirmation Hearing. ..........................................................89

       2.    The Tecan Objection Should Not be Heard at the Confirmation
          Hearing. ...............................................................................90

       3.    The WSFS Objection Should be Overruled. ..............................................90

       4.    The Lift Stay Objection Should Not be Heard at the Confirmation
          Hearing. ...............................................................................91

       5.    Dr. Soldin's Objection Should Be Overruled. ..........................................92

WAIVER OF BANKRUPTCY RULE 3020(E) ..............................................................93

CONCLUSION ..............................................................................................94

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 500 Fifth Ave. Assocs.*,
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 Civ. 844 (LJF), 1993
  WL 316183 (S.D.N.Y. May 21, 1993) .................................................................................16

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
  No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ...............................52

*In re Aegean Marine Petroleum Network, Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ................................................................................58

*In re A.H. Robins Co., Inc.*
  88 B.R. 742 (Bankr. E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989) .......................42, 82

*In re Aleris Int'l, Inc.*,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ......................36, 79

*In re Alex & Ani, LLC*,
  No. 21-10918 (CTG) (Bankr. D. Del. Sept. 9, 2021) .......................................................50, 61

*In re Am. Solar King Corp.*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988) .................................................................................43

*In re Arsenal Intermediate Holdings, LLC*,
  No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)...........................48

*In re Avaya Inc.*,
  No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) ......................................................69

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)......................................................................................................31, 39

*Baron v. Sherman (In re Ondova Co.)*,
  2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017) ....................................................70

*Barton v. Barbour*,
  104 U.S. 126 (1881)...........................................................................................................70

*In re Bed Bath & Beyond Inc.*,
  No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023)............................................*passim*

*Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden
  Motel & Apartments)*,
  195 B.R. 294 (D.N.J. 1996) ................................................................................................35

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re BlockFi Inc.*,
No. 22-19361 (MBK) (Bankr. D.N.J. Aug. 3, 2023) .......................................................*passim*

*Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr. Inc.)*,
410 F.3d 100 (1st Cir. 2005) ...................................................................................72

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011)…………………24

*In re Carestream Health, Inc.*,
No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) .......................................................49, 61

*Carter v. Rodgers*,
220 F.3d 1249 (11th Cir. 2000) ...................................................................................70

*In re Ctr. For Autism & Related Disorders, LLC*,
No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) ...................................................50, 61

*In re Celsius Network, LLC*,
No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023)…………………………………………75

*In re Century Glove, Inc.*,
No. Civ. A. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) ..............................28, 43

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) ...................................................................................29

*In re Cineworld Grp. plc*,
No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) .................................................50, 61, 69

*In re Claire's Stores, Inc.*,
No. 18-10584 (MFW) (Bankr. D. Del. Sep. 11, 2018)…………………………………………95

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) ...........................................................................49, 57, 67

*In re Conseco, Inc.*,
301 B.R. 525 (Bankr. N.D. Ill. 2003) ...................................................................................62

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...................................................................................54

*Crestar Bank v. Walker (In re Walker)*,
165 B.R. 994 (E.D. Va. 1994)...................................................................................35

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ...................................................................................31

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) *aff'd*, No. 09 Civ. 10156 (LAK), 2010
WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other
grounds*, 627 F.3d 496 (2d Cir. 2010) ......................................................................62

*In re Diocese of Camden, N.J.*,
No. 20-21257 (JNP), 2023 WL 5605156 (Bankr. D.N.J. Aug. 29, 2023) .............................28

*In re Dow Corning Corp.*,
237 B.R. 374 (Bankr. E.D. Mich. 1999) ..........................................................................42, 82

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................................................16

*In re Emerge Energy Servs. LP*,
No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ............................62

*In re E.S. Bankest, L.C.*,
321 B.R. 590, 595 (Bankr. S.D. Fla. 2005) ...........................................................................44

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ........................................................................................67

*In re Extraction Oil & Gas, Inc.*,
No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) .....................................................50, 61

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
Ltd. P'ship)*
116 F.3d 790 (5th Cir. 1997) ................................................................................................28

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993) ...................................................................................................16

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988) ...................................................................................29

*In re G–I Holdings Inc.*,
420 B.R. 216 (D.N.J. 2009) .......................................................................................35, 43, 44

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) .........................................................................66, 77, 78

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
203 F.3d 203 (3d Cir. 2000) ..................................................................................................66

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................................................17

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*,
  167 B.R. 389 (Bankr. D. Md. 1994) ......................................................................70

*Helmer v. Pogue*,
  2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) ...................................70

*In re Hercules Offshore, Inc.*,
  565 B.R. 732 (Bankr. D. Del. 2016) ........................................................54, 67, 68

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007)..................................................................16

*In re Highland Cap. Mgmt., L.P.*,
  No.19-34054-SGJ (Bankr. N.D. Tex. Nov. 24, 2020) ...........................................78

*In re Indianapolis Downs*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...............................................................passim

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987)................................................................................18

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37 Bus.*
  *Park Assocs.)*,
  987 F.2d 154 (3d Cir. 1993)...........................................................................18, 37

*In re Lannett Co.*,
  No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) .......................................passim

*In re Lettick Typografic, Inc.*,
  103 B.R. 32 (Bankr. D. Conn. 1989)……………………………………………..43

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
  329 B.R. 491 (Bankr. D.N.J. 2005) ......................................................................28

*Lowenbraun v. Canary (In re Lowenbraun)*,
  453 F.3d 314 (6th Cir. 2006) ................................................................................79

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994)..................................................................51

*In re Mallinckrodt PLC*,
  639 B.R. 837 (Bankr. D. Del. 2022) ...............................................................passim

*In re Mallinckrodt PLC*,
  No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022).......................................passim

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Midway Gold US, Inc.*,
575 B.R. 475 (Bankr. D. Colo. 2017) ........................................................................53

*Key Bank Nat'l Ass'n v. Milham* (*In re Milham*),
141 F.3d 420, 423 (2d Cir.
1998)………………………………………………………………91*In re
Modell's Sporting Goods, Inc.*,
No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 13, 2020)................................................80

*In re Motors Liquidation Co.*,
541 B.R. 104 (Bankr. S.D.N.Y. 2015) ....................................................................80

*In re MVK FarmCo LLC*,
No. 23-11721 (LSS) (Bankr. D. Del. Mar. 29, 2024)……………………….…………78, 80, 93

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996)......................................................................41, 46, 51

*In re Nat'l Realty Inv. Advisors, LLC*,
No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) ................................................78

*In re Nautical Sols., L.L.C.*,
No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) .........................................79

*NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital
Mgmt, L.P.)*,
48 F.4th 419 (5th Cir. 2022) ............................................................................69, 73

*In re Nickels Midway Pier, LLC*,
No. 03-49462 (GMB), 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ............................17

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) .......................................................................28

*In re Nixon*,
404 F. App'x 575 (3d Cir. 2010)………………………………………………………………….91

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................16

*In re Ocean View Motel, LLC*,
No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) ........................40

*In re: One2One Commc'ns, LLC*,
No. 12-27311, 2016 WL 3398580 (D.N.J. June 14, 2016)……………………….…….…….71

*In re PPI Enterprises (U.S.), Inc.*,

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

324 F.3d 197 (3d Cir. 2003)………………………………………………………………………43

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968)......................................................................................46, 52

*In re Premier Int'l Holdings, Inc.*,
2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ....................................15, 53, 58

*In re Princeton Alt. Income Fund, LP*,
No. 18-14603 (MBK) (Bankr. D.N.J. Feb. 19, 2020) ..............................................69

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ..................................................................35

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000).................................................................24, 28, 58, 59

*In re Riverbed Tech., Inc.*,
No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) ........................................50, 61

*In re Rochem, Ltd.*,
58 B.R. 641 (Bankr. D.N.J. 1985) .......................................................................16

*In re rue21, inc.*,
575 B.R. 314 (Bankr. W.D. Pa. 2017) ............................................................67, 68

*In re S & W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984)………………………………………………………20

*In re S B Bldg. Assocs. Ltd. P'ship*,
621 B.R. 330 (Bankr. D.N.J. 2020) ...................................................38, 40, 45, 51

*SEC v. Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp.)*,
960 F.2d 285 (2d Cir. 1992)...............................................................................60

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
546 B.R. 284 (Bankr. S.D.N.Y. 2016) .................................................................71

*In re Sentinel Mgmt. Grp., Inc.*,
398 B.R. 281 (Bankr. N.D. Ill. 2008) ..............................................................42, 82

*In re SiO2 Med. Prods., Inc.*,
No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) ........................................49, 61

*In re SLT Holdco, Inc.*,
No 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) .........................................49, 61

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re S. Aiken, Ltd.*,
    121 B.R. 7 (Bankr. W.D. Pa. 1990)…………………………………………………….24

*In re S. Canaan Cellular Invs., Inc.*,
    427 B.R. 44 (Bankr. E.D. Pa. 2010)……………………………………………………36, 91

*In re Spansion, Inc.*,
    No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) ...........................................58

*Su v. Offshore Inv. Ltd. (In re Vantage Drilling Int'l)*,
    603 B.R. 538 (D. Del. 2019).................................................................................54, 67

*In re Swan Transp. Co.*,
    596 B.R. 127 (Bankr. D. Del. 2018) .......................................................................70

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) .......................................................................*passim*

*In re Temple Zion*,
    125 B.R. 910 (Bankr. E.D. Pa. 1991)……………………………………………………..43

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
    B.R. 208 (Bankr. D. Del. 2011) ...................................................................33, 53, 67

*In re Union Cnty. Wholesale Tobacco & Candy Co.*,
    8 B.R. 442 (Bankr. D.N.J. 1981) .........................................................................25

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*,
    426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................48, 52

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013) ...........................................28

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .....................................................................48, 52, 58

*In re WebSci Techns., Inc.*,
    234 Fed. Appx. 26 (3d Cir. 2007) .......................................................................46, 51

*In re WeWork Inc.*,
    No. 23-19865 (JKS) (Bankr. D.N.J. May, 29, 2024)…………………………………………*passim*

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
    434 F.3d 639 (3d Cir. 2006)...............................................................................45, 51

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ................................................................*passim*

**Statutes**

11 U.S.C. §§ 101-1532 ........................................................................................1

11 U.S.C. § 365(f) ..............................................................................................83

11 U.S.C. § 503(b) ..........................................................................................6, 33

11 U.S.C. § 507(a)(1) ........................................................................................33

11 U.S.C. § 507(a)(2) ....................................................................................33, 37

11 U.S.C. § 507(a)(8) ........................................................................................34

11 U.S.C. § 1114(a) ..........................................................................................37

11 U.S.C. § 1122 ...........................................................................................*passim*

11 U.S.C. § 1122(a) ..........................................................................................16

11 U.S.C. § 1123(a)(1) ......................................................................................19

11 U.S.C. § 1123(a)(4) ......................................................................................19

11 U.S.C. § 1123(a)(5) ..................................................................................19, 20

11 U.S.C. § 1123(a)(6) ..................................................................................20, 21

11 U.S.C. § 1123(a)(7) ......................................................................................21

11 U.S.C. § 1123(a)(8) ......................................................................................19

11 U.S.C. § 1123(b) ......................................................................................*passim*

11 U.S.C. § 1123(b)(3) ............................................................................45, 51, 52

11 U.S.C. § 1123(b)(3)(A) ......................................................................45, 51, 52

11 U.S.C. § 1123(b)(6) ......................................................................................69

11 U.S.C. § 1123(d) ......................................................................................23, 24

11 U.S.C. § 1125(a) ..........................................................................................26

11 U.S.C. § 1125(b) ..........................................................................................25

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 1125(c) ................................................................................................25

11 U.S.C. § 1126 ............................................................................................*passim*

11 U.S.C. § 1126(c) ................................................................................................27

11 U.S.C. § 1126(g) ..........................................................................................26, 27

11 U.S.C. § 1126(f) .................................................................................................26

11 U.S.C. § 1127(a) ..........................................................................................42, 82

11 U.S.C. § 1129(a)(1) ...............................................................................15, 16, 60

11 U.S.C. § 1129(a)(2) ...............................................................................24, 28, 58

11 U.S.C. § 1129(a)(3) ...............................................................................28, 29, 58

11 U.S.C. § 1129(a)(4) ..........................................................................................29, 30

11 U.S.C. § 1129(a)(5) ..........................................................................................30, 31

11 U.S.C. § 1129(a)(5)(A)(i) ..................................................................................30

11 U.S.C. § 1129(a)(5)(A)(ii) .................................................................................30

11 U.S.C. § 1129(a)(6) ............................................................................................31

11 U.S.C. § 1129(a)(7) ......................................................................................31, 32

11 U.S.C. § 1129(a)(8) ....................................................................................*passim*

11 U.S.C. § 1129(a)(9)(A) ................................................................................33, 34

11 U.S.C. § 1129(a)(9)(B) ................................................................................33, 34

11 U.S.C. § 1129(a)(9)(C) .......................................................................................34

11 U.S.C. § 1129(a)(10) ....................................................................................34, 35

11 U.S.C. § 1129(a)(11) ....................................................................................35, 36

11 U.S.C. § 1129(a)(12) ...........................................................................................37

11 U.S.C. § 1129(a)(13) ....................................................................................37, 38

11 U.S.C. § 1129(a)(14) ...........................................................................................38

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 1129(a)(15)..................................................................................................38

11 U.S.C. § 1129(a)(16)............................................................................................37, 38

11 U.S.C. § 1129(b).................................................................................................*passim*

11 U.S.C. § 1129(b)(1) ..............................................................................38, 39, 40, 41

11 U.S.C. § 1129(b)(2)(B)(i) ......................................................................................39

11 U.S.C. § 1129(b)(2)(B)(ii) .....................................................................................39

11 U.S.C. § 1129(c)....................................................................................................41

11 U.S.C. § 1129(d)....................................................................................................41

11 U.S.C. § 1129(e)....................................................................................................41

11 U.S.C. § 1141(a)–(c)..............................................................................................69

28 U.S.C. § 1930........................................................................................................37

Bankruptcy Code chapter 7...................................................................................*passim*

Bankruptcy Code chapter 11.................................................................................*passim*

Securities Act of 1933 section 5 ...............................................................................41

**Rules**

Bankruptcy Rule 3019 ....................................................................................42, 43, 82

Bankruptcy Rule 3020(e).............................................................................................83

Bankruptcy Rule 6004(h)............................................................................................83

Bankruptcy Rule 6006(d)............................................................................................83

Bankruptcy Rule 9019 ....................................................................................45, 47, 51

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

**Hearing Transcripts**

*In re Bed Bath & Beyond Inc.*,
   No. 23-13359 (VFP) Hr'g Tr. (Bankr. D.N.J. Sept. 12, 2023) ....................................50, 63, 74

*In re BlockFi Inc.*,
   No. 22-19361 (MBK) Hr'g Tr. (Bankr. D.N.J. Sept. 26, 2023) ........................................64, 75

*In re EV Energy Partners*,
   No. 18-10814 (CSS), Hr'g Tr. (Bankr. D. Del. May 16, 2018)................................................48

*In re RCS Cap. Corp.*,
   No. 16-10223 (MFW), Hr'g Tr. (Bankr. D. Del. Mar. 21, 2016) ..........................................65

*In re Invitae Corp.*,
   No. 24-11362 (MBK), Hr'g Tr. Bankr. D.N.J. July 9, 2024) ………………………….....51

*In re Saint Michael's Med. Ctr.*,
   No. 15-24999 (VFP) Hr'g Tr. (Jan. 12, 2017) …………………………………………62

*In re Lannett Co., Inc.*,
   No. 23-10559 (JKS) Hr'g Tr. (Bankr. D. Del. Jun. 8, 2023)……………………………...63

*In re Rite Aid Corp.*,
   No. 23-18993 (MBK) Hr'g Tr. (Bankr. D.N.J. June 28, 2024)……………………………...66

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978
   U.S.C.C.A.N. 5936 ...........................................................................................................15, 24

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978
   U.S.C.C.A.N. 5787 ...........................................................................................................15, 24

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of confirmation of the *Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 791] (as modified, amended, or supplemented from time to time, the "Plan") pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").[2]  In support of confirmation of the Plan, and in response to the Objections thereto, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.    The Debtors seek to confirm a Plan that reflects the best and only resolution of these chapter 11 cases by ensuring an efficient and orderly wind-down process that maximizes Distributable Value and near-term recoveries to the Debtors' stakeholders. Indeed, notwithstanding the liquidating nature of these cases, an overwhelming number of unsecured creditors are projected to receive a meaningful payout: more than 93 percent of the Debtors' unsecured creditors are projected to recover in full through the Convenience Class, and the Plan now provides a minimum ***guaranteed*** recovery to ***all*** other unsecured claimants through the GUC Distribution Reserve.  That result is due primarily to bargained-for concessions that the

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Ana Schrank, Chief Financial Officer of Invitae Corporation, in Support of Chapter 11 Filing, First Day Motions, and Access to Cash Collateral* (the "First Day Declaration") [Docket No. 21].  On February 13, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On February 16, 2024, the Court entered an order [Docket No. 54] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  On March 1, 2024, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 131].

Debtors obtained through hard-fought negotiations that led to the Transaction Support Agreement (the "TSA"), and negotiations and concessions that have continued in the months after the Debtors entered chapter 11.  Specifically, under the terms of the TSA, the Holders of the 2028 Senior Secured Notes agreed at the outset of these cases to subordinate their recovery under the Plan to the administrative costs of these cases (ensuring that the Debtors would have a path out of chapter 11) and to multiple classes of unsecured creditors, effectively backstopping those recoveries and forfeiting or delaying recovery to which they would otherwise be entitled by virtue of their secured status.

2.      With the TSA infrastructure in place, the Debtors still needed to complete a massive amount of work after entering chapter 11 to secure and maximize value to distribute under the TSA structure.  Achieving meaningful and concrete value was far from certain, particularly because the Debtors entered chapter 11 with no stalking horse, no option to toggle to a recapitalization supported by existing stakeholders, and no guaranteed credit bid from their secured lenders.  Over the course of several months post-petition, the Debtors—led by their board and key executives who have been actively engaged stewards throughout the restructuring process—worked to preserve value through a comprehensive marketing process that involved discussions with dozens of potential buyers and consultation with both the Holders of the 2028 Senior Secured Notes and the Committee to determine the highest and best available bid.  At the same time, to maximize attractiveness to Bidders and ensure that the Debtors could effectuate a sale of the whole company, the Debtors' management team also continued to improve the operating performance of their highly-regulated, technologically advanced business, despite the burdens of operating in chapter 11.

3.       On April 24, 2024, following a competitive multi-day auction—made all the more competitive by virtue of a credit bid of the 2028 Senior Secured Notes led by Deerfield, which materially increased the ultimate sale price for the Debtors' business—the Debtors accepted a $239 million bid from Labcorp Genetics Inc. ("Labcorp") for substantially all of the Debtors' assets (the "Sale Transaction").

4.       With the Sale Transaction projected to close in early August, the path forward is simple and the Debtors' stakeholders stand poised to reap the benefits envisioned by the TSA and the Plan:

- the Debtors will close the Sale Transaction, and the Debtors' business operations and most of its employees will transition to Labcorp;

- the sale proceeds will come into the Estates, and those proceeds, together with cash remaining on hand, will be distributed (after setting aside the Wind-Down Reserve) to the limited universe of the Debtors' creditors (on the Effective Date or as soon thereafter as practicable) in accordance with the waterfall (and priorities) set forth in the Plan;[3] and

- the Debtors' remaining Estates will then enter a wind-down phase over the next nine months, during which time the Plan Administrator, with a limited budget, will endeavor to realize any additional value from accounts receivable collections and other contingent value sources, and will distribute that incremental value (plus any excess reserves) to creditors in accordance with the Plan.

5.       But aside from those buckets of Distributable Value (the sale proceeds, cash on hand and contingent assets), there is no other value to deal with in the Plan. The business is being

---

[3]      Attached as **Exhibit A** is an illustration of the proposed Plan distribution scheme.

sold and can no longer generate value for these Estates; there are no colorable estate claims and causes of action that would increase Distributable Value; and there is no funding to pursue baseless litigation claims, including against the parties being released under the Plan who have made significant contributions to these cases. The proposed Plan ensures the preservation of the actual, finite Distributable Value available and an efficient process for delivering that Distributable Value to the Debtors' stakeholders, consistent with both the letter and spirt of the Bankruptcy Code.

6.      While the Debtors have spent the past year developing their restructuring options, and the past five months running their business, preparing for and consummating a successful sale of that business, working to build consensus and forge compromises, and creating value for creditors where there might have been none, the Committee has taken a very different approach to this case. Ignoring the substantial benefits that the Debtors' Plan provides to ***over 90 percent of the Committee's own constituents***, the Committee seeks to disrupt a relatively simple sale and wind-down transaction in favor of pursuing wildly speculative litigation that, even if successful, would benefit only a handful of creditors (primarily sophisticated financial credit investors), to the detriment of all others. The Committee's strategy is premised on a set of meritless claims that the Committee serially sought court permission to pursue, including even before its investigation into those claims was complete. Indeed, the Committee has objected to the Debtors' actions at nearly every stage of the chapter 11 process, giving rise to substantial motion practice, discovery, and multiple evidentiary trials, all of which has caused significant administrative burn that has exceeded the case budget by millions per month (depleting Distributable Value that would otherwise have flowed directly to its constituents under the Plan's waterfall), and all with no corresponding benefit to the Debtors' Estates or their stakeholders.

7.       The Committee's objections to the Plan are a continuation of the scorched-earth approach it has taken since these cases were filed:  once again, the Committee seeks to upend the viable, confirmable and value-maximizing path proposed by the Debtors with meritless legal arguments and without offering any actionable alternatives.  If the Committee has its way and the Court sustains the Committee's objections and denies confirmation of the Debtors' hard-fought Plan, it will doom the Estates to months of additional litigation and administrative fee burn, on a long road to nowhere that would virtually guarantee that the value-maximizing recoveries the Debtors have secured for the vast majority of their creditors will be permanently wiped out Fortunately for the Court, the Debtors, and the Debtors' stakeholders, the Committee's objections are legally and factually meritless.

8.       At bottom, it appears that, notwithstanding months of extensive diligence by the Committee's professionals regarding the projected waterfall recoveries in these cases, the Committee fundamentally misunderstands the Plan and the creditor profile of these Debtors.  First, the Committee takes issue with modifications to Class 5 treatment for Subsidiary Unsecured Claims, asserting, for example, that the amount of the GUC Distribution Reserve "will likely be meaningfully less than what Holders of Subsidiary Unsecured Claims would have expected under prior iterations of the Plan."  Allegations like this are both misinformed and demonstrably false.  Although the Plan contains modifications from the solicitation version—modifications prompted by and made to address the Committee's own complaints—these changes indisputably have a net *positive* effect on the Debtors' unsecured creditors.  Rather than payment in full to only Class 5 claims as contemplated under the TSA, the Plan as amended now allows Holders of Class 5 Claims, Class 6 Claims, and Class 11 Claims to share *pro rata* in a guaranteed minimum payout (the GUC Distribution Reserve), as well as any excess Distributable Value that can be realized

after senior classes are paid in full.  That all of these Holders of General Unsecured Claims will now have equal treatment under the Plan should obviate any allegations of unfair discrimination that could be raised by the Committee, and represents an effort to eliminate any classification issues surrounding Holders of Class 5 Subsidiary General Unsecured Claims receiving special treatment.  Moreover, the Debtors made this accommodation while expressly preserving the full value of the bargained-for "gift" to unsecured creditors under Deerfield's subordination agreement:  the new GUC Distribution Reserve feature is expressly sized to capture any value that would have otherwise been distributed solely to Class 5 (assumed to be in the range of $6.8 – $7.3 million, depending on Convenience Class elections) for *pro rata* allocation to all of the non-convenience unsecured creditor classes.  In other words, there is now a guaranteed recovery for *all* general unsecured creditors, rather than a speculative one for certain classes in the prior iteration of the Plan.

9.      Ignoring the net benefits to its own constituents, or perhaps recognizing the absurdity of its arguing against this improved treatment, the Committee further objects to the amendments on notice grounds, once again trying to create hypothetical problems rather than acknowledge practical solutions available on the facts of ***these*** cases.  As a legal matter, the Holders of Class 5 Claims were always in a non-voting class—both before and after the revision—so resolicitation is unnecessary.  Moreover, the handful of Class 5 Claims that are affected by this change were served with the Plan, and the proposed Confirmation Order will allow an extended twenty-eight (28)-day time frame post-confirmation by which they can either make a Convenience Class election or opt out of the Third-Party Releases.

10.     Importantly, as a practical matter, the Debtors estimate that the majority of the (fewer than ten) Holders of Class 5 Claims are beneath the appropriate threshold and will be paid

in full as Class 4 Convenience Claims in any event.  Of the ***only three Class 5 Holders*** above the Convenience Class threshold—none of whom raised any issue with the Plan's classification scheme or to the revision to Class 5 treatment—one has already indicated its intention to elect convenience class treatment.  The other two holders have the same election right and, ultimately may not even have contract rejection claims if their contracts are assumed and cured by Labcorp, which is a decision Labcorp can make up to two days before closing under the Asset Purchase Agreement.

11.    Second, the Committee takes issue with the Plan's inclusion of Debtor and Third-Party Releases.  As to the Debtor Release, this attempt to relitigate the Standing Motion fails.  The Court has already received substantial evidence demonstrating that the only claims identified by the Committee after its multi-million-dollar investigation and evidentiary trial are legally and factually meritless. In addition, the Court recognized in its preliminary ruling the many hurdles that the Committee's derivative claims would face—hurdles that include not only the substantial price tag of any such litigation, but also the "high threshold" afforded to the Debtors' "business judgment decisions" that any such claims would need to overcome, the lack of any asserted contractual breaches, and the non-insider status of the litigation's primary target, Deerfield.[4]  Those hurdles are equally relevant to the Plan's proposal to release any claims or causes of action against the Released Parties.  Put another way, because the Committee's proposed

---

[4]    Though Deerfield was the primary target of the Committee's proposed claims relating to the uptier transaction, the same hurdles and evidence that the Court identified equally apply to the breach of fiduciary duty claims the Committee asserted against the Debtors' directors and officers relating to that transaction – i.e., the Debtors' directors and officers properly exercised their business judgment in connection with a permissible transaction that was intended to benefit the Company. Having seen those claims fail, in a last-ditch effort the Committee now points to claims against the directors and officers relating to other historical transactions—which it admittedly has not investigated—and tellingly did not bring as part of its Standing Motion. In fact, no one has ever asserted or brought any claims on account of those transactions. This makes sense. They are time barred and were all third-party transactions negotiated at arm's length and publicly disclosed.

claims face a number of significant hurdles, releasing these claims is fair and reasonable—particularly in light of the consideration provided by the Releasing Parties. Moreover, they are an essential part of the comprehensive deal the Debtors reached that have enabled them to realize the most available value for their creditors, rather than pursuing meritless and value-destructive litigation that could eviscerate those recoveries entirely.

12.     Although the Plan is already supported by sufficient consideration to support the releases, the Debtors have worked with Deerfield to develop a construct for settling the remaining legal dispute in these cases (pending a decision on the Committee Objection to inclusion of the Make-Whole Amount in the Class 3 Claim) in a manner that would guarantee even ***more*** consideration to unsecured creditors and provide the Court with additional comfort in approving the Plan releases.  The Debtors (with Deerfield's support) propose the following:

- Class 3's Claim will be reduced by approximately $13.74 million, reflecting a waiver of half of the $27.5 million Make-Whole Amount; and

- with respect to the remaining $13.74 million of the Make-Whole Amount, Class 3 agrees to split recoveries on such claim with unsecured creditors on a 75/25 basis, such that Class 3 would receive $0.75 of every dollar available to satisfy the remaining Make-Whole Amount and $0.25 of every dollar would be used to increase the GUC Distribution Reserve (*i.e.*, Class 3 would receive up to $10.30 million of the Make-Whole Amount and Classes 5, 6, and 11 will receive up to $3.44 million).

13.     This new concession reflects in the aggregate an additional $17.18 million in value. This is in addition to the foregoing concessions of $17.2 million that have already been gifted to the unsecured creditor body as a result of the subordination of secured recoveries including to Convenience Class Claims and the initial amounts in the GUC Distribution Reserve.  If the Court is amenable to allowing this sharing construct on the Make-Whole Amount, unsecured creditors are projected to receive material aggregate value under the Plan—particularly if the Committee is correct that there is significant value that can be realized during the Wind-Down process.  This is

sufficient consideration to support the releases under the heavily developed record regarding the viability of alleged estate claims and causes of action.

14.     Finally, the Committee asserts a hodgepodge of additional objections, none of which hold water.  First, the Committee argues that there is no impaired accepting class.  Wrong. Class 3 is decidedly impaired, including because there will not be sufficient Distributable Value on the Effective Date to satisfy the entirety of Class 3's claim.  Second, the Committee takes aim at its own constituents by claiming that the Convenience Class—which provides full recoveries to more than 90 percent of unsecured creditors—is inappropriate.  The Committee is wrong again. The threshold for the Convenience Class was sized to reasonably maximize value that could be allocated for trade vendors who are integral to the Debtors' operations and ensure minimal business disruption.  It also allows for the administrative convenience of distributing cash to lower dollar claims.  And, of course courts routinely approve convenience classes with similar and higher thresholds.  Third, the Committee recycles arguments from the Claim Objection in asserting that the 2028 Senior Secured Noteholders are not entitled to the Make-Whole Amount and other post-petition entitlements.  This issue has been briefed and argued. Regardless Deerfield has agreed to compromise the Make-Whole as additional consideration as discussed above.

15.     In addition to the Committee, six additional formal objections to Confirmation of the Plan were filed.  As of the filing of this Memorandum, the Debtors have resolved certain of these Objections through mutually agreed language in the Confirmation Order or through other documentation.[5]   As explained in detail below, to the extent not resolved prior to the Confirmation Hearing, the Court should overrule these Objections, confirm the Plan, and set in

---

[5]   A summary of the Objections to the Plan and the Debtors' responses thereto are attached as **Exhibit B** (the "Objection Chart").

motion the final steps needed to close the Sale Transaction and bring these chapter 11 cases to conclusion with maximum Distributable Value intact.

16.    This Memorandum is divided into four parts. Part 1 provides the procedural history of the Plan, the Debtors' solicitation efforts and voting results, and a summary of the various Objections filed with respect to the Plan. Part II and Part III establish the Plan's compliance with each of the applicable requirements for Confirmation, including that certain of the discretionary contents of the Plan, such as the Releases, are appropriate and should be approved. Part IV establishes that the Objections to the Plan should be overruled.

17.    In further support of Confirmation of the Plan, the Debtors have filed contemporaneously herewith:

- the *Declaration of James Lee with Respect to the Tabulation of Votes on the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Report");

- the *Declaration of Ana Schrank, Chief Financial Officer of Invitae Corporation, in Support of Confirmation of the Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Schrank Declaration");

- the *Declaration of Andrew Swift in Support of the Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Swift Declaration"); and

- the *Declaration of Andrew Spirito, Managing Director of FTI Consulting, in Support of Confirmation of the Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Spirito Declaration").[6]

18.    For the reasons stated herein, the Debtors respectfully request that the Court find that the Debtors have satisfied all relevant burdens and confirm the Plan.

---

[6]    In addition, the Debtors submit in support of confirmation the *Declaration of Jill Frizzley* [Docket No. 735] and the *Declaration of Randy Scott* [Docket No. 736], their testimony from the Standing Hearing and the exhibits attached to their declarations, which the Debtors previously submitted in support of their opposition to the Committee's Standing Motion.

## I.      PROCEDURAL HISTORY OF THE PLAN AND OBJECTIONS.

### A.      Procedural History.

19.      On February 13, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[7]

20.      On February 14, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, and (IV) Approving Notice Thereof.*[8]   On March 18, 2024, the Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, and (IV) Approving Notice Thereof* (the "Bar Date Order"),[9] which established April 15, 2024, as the General Claims Bar Date and August 11, 2024, as the Governmental Bar Date (each as defined therein) and provided that any Holder of a Claim that fails to timely submit a Proof of Claim by the applicable bar date shall not be treated as a creditor with respect to such Claim for the purposes of:  (a) voting on any plan of reorganization filed in these chapter 11 cases on account of such Claim; (b) participating in any distribution in the Debtors' chapter 11 cases on account of such Claim; or (c) receiving further notices regarding such Claim, unless otherwise ordered by the Court.

---

[7]      [Docket No. 1].

[8]      [Docket No. 24].

[9]      [Docket No. 189].

21.     On May 9, 2024, the Debtors filed the (a) *Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*;[10] (b) *Disclosure Statement Relating to the Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*;[11] and (c) *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto*.[12]

22.     On June 11, 2024, the Debtors filed the (a) *Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*,[13] (b) *Disclosure Statement Relating to the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Disclosure Statement"),[14] and (c)  *Revised Proposed Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto*.[15]   The Disclosure Statement resolved the Committee's objection to the Debtors' originally filed disclosure statement by providing for the solicitation of additional classes and incorporating a statement from the Committee in opposition to the Plan.

---

[10]   [Docket No. 471].

[11]   [Docket No. 472].

[12]   [Docket No. 470].

[13]   [Docket No. 615].

[14]   [Docket No. 614].

[15]   [Docket No. 616].

23.     On June 13, 2024, the Court entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "Disclosure Statement Order")[16] approving: (i) the adequacy of the Disclosure Statement; (ii) the Solicitation and Voting Procedures; (iii) the Ballots; (iv) the Solicitation Packages; (v) the Notice of Non-Voting Status; (vi) the Opt Out Forms; (vii) the Confirmation Hearing Notice; (viii) the Publication Notice; (ix) the Cover Letter; (x) the Plan Supplement Notice; (xi) the Assumption Notice; (xii) any other notices in connection therewith; and (xiii) certain dates with respect thereto.

24.     Also on June 13, 2024, the Debtors filed the (i) *Solicitation Version of the Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*,[17] and (ii) *Solicitation Version of Disclosure Statement Relating to the Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*.[18]

25.     On June 17, 2024, the Debtors caused the Claims and Noticing Agent to serve the Solicitation Package in accordance with the terms of the Disclosure Statement Order.[19] Simultaneously, the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Deadlines* was posted to the website maintained by the Claims and Noticing Agent in these chapter 11 cases.[20]  Further, on June 19, 2024, the Debtors published the

---

[16]    [Docket No. 633].

[17]    [Docket No. 630].

[18]    [Docket No. 631].

[19]    *See Certificate of Service* [Docket No. 729] (the "Certificate of Service").

[20]    *See id.*

Publication Notice (as defined in the Disclosure Statement Order) in *The New York Times*, as evidenced by the *Affidavit of Publication*.[21]

26.     On July 8, 2024, the Debtors filed the *Plan Supplement for the Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan Supplement"),[22] which included (i) the Schedule of Retained Causes of Action; (ii) the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) the Schedule of Rejected Executory Contracts and Unexpired Leases; (iv) the Plan Administrator Agreement; (v) the Asset Purchase Agreement; (vi) the Wind-Down Budget; and (vii) the Transaction Steps Memorandum.

27.     On July 1, 2024, and July 3, 2024, the Debtors, Deerfield, U.S. Bank Trust Company, National Association (as trustee and collateral agent for the 2028 Senior Secured Notes), and the Committee participated in a Court-ordered mediation through which the parties attempted to reach a settlement regarding both the Committee's Standing Motion and other issues surrounding the Plan.  Unfortunately, this mediation was not successful.

28.     On July 9, 2024, the Court heard arguments from the Committee and the Debtors regarding the *Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* (the "Standing Motion").[23]  At the conclusion of the hearing, the Court encouraged the parties to engage in another round of mediation, which occurred on July 11, 2024, and similarly did not result in a settlement.  On July

---

[21]     [Docket No. 680].

[22]     [Docket No. 761].

[23]     [Docket No. 526].

12, 2024, the Court issued a preliminary ruling in favor of the Debtors, denying the Committee's Standing Motion and finding that, among other things, the Committee was unable to establish that the Debtors' decision not to pursue the claims against the directors and officers, Deerfield, and the other proposed defendants associated with the prepetition transactions was "unjustifiable" in light of the significant "hurdles" any such claims would face.[24]

29.    On July 12, 2024, the Debtors filed the Plan.[25] In an effort to limit the classification issues previously raised by the Committee throughout the process, the Debtors modified the Plan in order to allow Holders of Class 5 Claims, Class 6 Claims, and Class 11 Claims to share *pro rata* in the same level of priority, a recovery that is guaranteed to include the GUC Distribution Amount as well as any excess Distributable Value.  Accordingly, Holders of Class 5 Claims will not be paid in full on the Effective Date and are now Impaired and, like Class 6 and Class 11, are deemed to reject the Plan.

30.    The deadline (a) to file objections to the Plan and (b) for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was July 15, 2024, at 4:00 p.m., prevailing Eastern Time.  The Confirmation Hearing is scheduled for July 22, 2024, at 9:00 a.m., prevailing Eastern Time.  In advance of the Confirmation Hearing the Debtors will submit the proposed *Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended or modified, the "Confirmation Order").

---

[24]    [Docket No. 793].

[25]    [Docket No. 791].

**B.      The Plan Solicitation and Notification Process.**

31.     In compliance with the Bankruptcy Code, Holders of Claims in the only

impaired class receiving or retaining property on account of such Claims—Class 3—were the only

Holders entitled to vote on the Plan.[26]   Holders in the remaining classes of both Claims and

Interests were not entitled to vote if their rights were Unimpaired or if they were not receiving or

retaining any property under the Plan.   Additionally, solely to resolve the Committee's objection

to the Disclosure Statement, the Debtors provided Ballots to Holders of Claims in Classes 4, 5, 6,

and 11 and permitted such Holders to submit votes on the Plan.[27]   Notwithstanding this fact, it

remains undisputed that the below Classes of Claims and Interests were ***not*** entitled to vote on the

Plan and the Debtors did not solicit votes from Holders of such Claims and Interests for purposes

of meeting the legal standard for confirmation of the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interest | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

32.     The Debtors solicited votes on confirmation of the Plan from Holders of Claims in

Class 3 (2028 Senior Secured Notes Claims), and permitted the following classes to cast votes:

Class 4 (Convenience Class Claims); Class 5 (Subsidiary Unsecured Claims); Class 6 (Parent

---

[26]   *See* 11 U.S.C. § 1126; Plan, Art. III.C.

[27]   The Debtors believe that Class 4 is Unimpaired and therefore presumed to accept the Plan.   The Debtors also have
determined that Classes 5, 6, and 11 may or may not receive a recovery under the Plan and are therefore deemed
to reject.

Unsecured Claims); and Class 11 (Contingent Subsidiary Unsecured Claims) (collectively, the "Voting Classes"). The Debtors believe that only Class 3 is entitled to vote to accept or reject the Plan (the "Allowed Voting Class").[28] The relevant voting results, as reflected in the Voting Report, are summarized as follows:

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3–2028 Senior Secured Notes Claims | 96.39% | 66.67% | 3.61% | 33.33% |

33.    As reflected in the Voting Report, the Voting Classes that were merely permitted to vote were also provided notice and opportunity to "opt out" of the Third-Party Release by checking the appropriate box on the Ballots.[29] All non-voting stakeholders were also given the opportunity to opt out of the Third-Party Release and received notice and instructions for doing so in their applicable Notice of Non-Voting Status. Such stakeholders could opt out by checking the appropriate box on the Notice of Non-Voting Status or objecting on or before the Opt Out Deadline (July 15, 2024, at 4:00 p.m., prevailing Eastern Time). The Ballots also contained a Convenience Claim Election, whereby Holders of Class 6 (Parent Unsecured Claims) and Class 11 (Contingent

---

[28]    For the avoidance of doubt, the Debtors are not counting votes of the Classes that were permitted, but not entitled to vote—Classes 4, 5, 6, and 11.

[29]    After certain modifications to the Plan that changed their treatment, the Holders of Claims in Class 5 (Subsidiary Unsecured Claims) will be provided additional time to opt out of the Third-Party Releases and the opportunity to make the Convenience Class Claim election within twenty-eight (28) days of service of a supplemental ballot following entry of the Confirmation Order. Upon the filing of the Second Amended Plan, which evidenced this change, the Debtors were in consistent contact with all ten (10) Holders of Class 5 Claims and notified such Holders of the change in their treatment from deemed to accept to deemed to reject.

Subsidiary Unsecured Claims) were given the option to irrevocably elect to have such Claim treated as Class 4 (Convenience Class Claims).[30]  The voting results for these classes is below:

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 4 – Convenience Class Claims | 96.94% | 94.59% | 3.06% | 5.41% |
| Class 5 – Subsidiary Unsecured Claims | 0% | 0% | 100% | 100% |
| Class 6 – Parent Unsecured Claims | 8.73% | 65.00% | 91.27% | 35.00% |
| Class 11 – Contingent Subsidiary Unsecured Claims | 0% | 0% | 100% | 100% |

34.    The Debtors strongly believe that the Plan is in the best interests of the Debtors, their Estates, and other parties in interest.  The Sale Transaction and subsequent Wind-Down Transactions embodied in the Plan represent a significant achievement for the Debtors and the most value-maximizing path forward for all stakeholders.  The voting results demonstrate that the requisite amount and number of stakeholders entitled to vote that are necessary to confirm the Plan have submitted Ballots in favor of that result.  The Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests.

**C.    The Objections.**

35.    Formal objections were filed by (i) the Committee (the "Committee Objection");[31] (ii) the U.S. Trustee (the "U.S. Trustee Objection");[32] (iii) Ravi Theja Kambhampati and Meghana

---

[30]    As discussed above, Holders of Class 5 Claims will also be entitled to make the Convenience Claim Election after due and proper notice following entry of the Confirmation Order.

[31]    [Docket No. 801].

[32]    [Docket No. 796].

Seethamraju (the "Lift Stay Objection");[33] (iv) Integrated DNA Technologies, Inc. (the "IDT Objection");[34] (v) Tecan Genomics, Inc. (the "Tecan Objection");[35] (vi) Baker Bros. Advisors LP's Joinder to the Committee Objection (the "Baker Bros. Joinder");[36] and (vii) Wilmington Savings Fund Society, FSB's Joinder to the Committee Objection (such objection, the "WSFS Objection").[37]   Additionally, the Debtors received an informal objection from Dr. Ryan Soldin (the "Soldin Objection," together with the Committee Objection, the U.S. Trustee Objection, the Lift Stay Objection, the IDT Objection, the Tecan Objection, the Baker Bros. Joinder, and the WSFS Objection, the "Objections").

36.     To the extent the Debtors are unable to consensually resolve such Objections prior to the Confirmation Hearing, the Debtors request that the Court overrule such Objections.   A detailed response to each of the outstanding Objections is set forth in Part IV of this Memorandum.

## ARGUMENT

37.     For the reasons set forth herein, the Debtors respectfully request that the Court overrule the remaining Objections and confirm the Plan.

## II.     THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION.

38.     To confirm the Plan, the Court must find that the Debtors have satisfied the requirements of section 1129 of the Bankruptcy Code.[38]   As described in detail below, the Plan

---

[33]   [Docket No. 797].

[34]   [Docket No. 798].

[35]   [Docket No. 799].

[36]   [Docket No. 802].

[37]   [Docket No. 806].

[38]   *See In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 'plan has a

complies with all relevant provisions of the Bankruptcy Code and all other applicable law.

**A.** **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

39.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[39]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[40]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 in all respects.

**1.** **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

40.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[41]

41.     Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational

---

reasonable probability of success, and is more than a visionary scheme [].'") (citing *Wiersma v. Bank of the West (In re Wiersma)*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal quotation marks omitted).

[39]   11 U.S.C. § 1129(a)(1).

[40]   S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("As confirmed by legislative history, 11 U.S.C. § 1129(a)(1), which provides that the plan must 'compl[y] with the applicable provisions of this title,' requires that a plan comply with 11 U.S.C. §§ 1122 and 1123.").

[41]   11 U.S.C. § 1122(a).

basis to do so.[42]  Moreover, the requirement of substantial similarity does not mean that claims or

interests within a particular class must be identical or that all similarly situated claims must receive

the same treatment under a plan.[43]

42.    The Plan's classification of Claims and Interests satisfies the requirements of

section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into

eleven (11) separate Classes, with Claims and Interests in each Class differing from the Claims

and Interests in each other Class in a legal or factual way or based on other relevant criteria.[44]

Specifically, the Plan provides for the separate classification of Claims and Interests into the

following Classes:

---

[42]  *See, e.g.*, *In re Rochem, Ltd.*, 58 B.R. 641, 642 (Bankr. D.N.J. 1985) ("Although Section 1122(a) of the Code
requires that claims be substantially similar within a particular class, there is no requirement within Section 1122
or elsewhere in the Code that all substantially similar claims be included within a particular class."). Courts have
identified grounds justifying separate classification, including:  (a) where members of a class possess different
legal rights, and (b) where there are good business reasons for separate classification.  *See John Hancock Mut.
Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir. 1993)
(holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit
separate voice in the decision whether the proposed reorganization should proceed," the classification is proper);
*In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must
be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc.
v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification
appropriate because classification scheme had a rational basis related to the bankruptcy court-approved
settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only
express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a
reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that,
although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to
classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted),
*aff'd*, No. 93 Civ. 844 (LJF), 1993 WL 316183 (S.D.N.Y. May 21, 1993); *In re Drexel Burnham Lambert Grp.
Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the
identical classification of dissimilar claims.  It does not require that similar classes be grouped together.").

[43]  *See, e.g.*, *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) ("Separate classification
of similar claims has been found to be permissible where the classification is offered in good faith, does not foster
an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11."); *In re Nickels Midway
Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542, at *7 (Bankr. D.N.J. May 21, 2010) (proffering just one
rule regarding classification of separate classification of similar classes under section 1122, which is that "thou
shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[44]  *See* Plan, Art. III.

| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | 2028 Senior Secured Notes Claims |
| Class 4 | Convenience Class Claims |
| Class 5 | Subsidiary Unsecured Claims |
| Class 6 | Parent Unsecured Claims |
| Class 7 | Intercompany Claims |
| Class 8 | Intercompany Interests |
| Class 9 | Section 510(b) Claims |
| Class 10 | Equity Interests |
| Class 11 | Contingent Subsidiary Unsecured Claims |

43.    Here, each of the Claims and Interests in each particular Class is substantially similar to the other Claims and Interests in such Class.[45]   The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims.   Other aspects of the classification scheme are related to the different administrative, legal, or factual circumstances of the Claims or Interests within each Class.[46] For instance, Class 3 (2028 Senior Secured Notes Claims) consists of secured Claims arising out of the 2028 Secured Notes Indenture, while Class 1 (Other Secured Claims) consists of all other secured claims.   Although both Classes of Claims are secured, Holders of 2028 Senior Secured Notes Claims are the Debtors' largest group of secured stakeholders in these chapter 11 cases and were bound to support the Debtors through the restructuring process via the TSA.

44.    Other aspects of the classification scheme recognize the different legal or factual nature of Claims or Interests.   Namely, Convenience Class Claims are classified separately for administrative convenience.   The holders of Convenience Class Claims, either by amount or

---

[45]    *See* Spirito Decl. ¶ 32.

[46]    *See* Spirito Decl. ¶ 33.

election, will be entitled to a one-time payment of no greater than $250,000 of their Allowed

General Unsecured Claim to ease the administrative burdens on the Debtors, generate cost savings

for the Estates, and ensure these chapter 11 cases did not disrupt daily operations.[47]

45.     The Committee takes issue with the Plan's classification scheme as it relates to

Class 4.  Courts in this Circuit and others have approved chapter 11 plans with convenience classes

similar to Class 4, including with similar and higher threshold amounts.[48]  As provided in Articles

I and III of the Plan, any Holder of an Allowed General Unsecured Claim in excess of $250,000

may elect on its Ballot to have such claim reduced to $250,000 and treated as a Convenience Class

Claim.  While the Committee complains that this threshold is an *amount* rather than a percentage,

however, there is no rule that says a threshold must be so, nor that "convenience class creditors

must receive a lower percentage recovery than other unsecured creditors because they are receiving

better currency."[49]

---

[47]  *See* Spirito Decl. ¶ 35.

[48]  *See, e.g., In re Celsius Network, LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) (approving a chapter 11 plan with a convenience class); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. Dec. 17, 2021) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $1,000,000); *In re Gulfport Energy Corp.*, No. 20-35562 (DRJ) (Bankr. S.D. Tex. Apr. 27, 2021) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $300,000); *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. Jan. 16, 2021) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $1,000,000); *In re Tailored Brands, Inc.*, No. 20-33900 (MI) (Bankr. S.D. Tex. Nov. 13, 2020) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $500); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $2,500); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $15,000); *In re Penn. Va. Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. Aug. 16, 2016) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $2,500,000); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $50); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168 (D. Del. 2006) (approving a chapter 11 plan with a convenience class over an objection related to unfair discrimination).

[49]  *See* Committee Obj. ¶ 66.

23

46.     The Debtors satisfy the legal standard for approval of convenience classes in this circuit, and the Convenience Class as provided in the Plan is well within the range of comparable classes.  Courts in this Circuit generally analyze convenience claims under Section 1122(b), which provides that plans may designate a class consisting of only every unsecured claim less than or reduced to an amount approved by the court as reasonable and necessary for administrative convenience.[50]  Under Section 1122(b), courts look to whether the convenience class at issue "reduces the administrative burden and expense" in administering the chapter 11 case.[51]  The classification of Class 4 (Convenience Class Claims) is appropriate here and the class was designed to address the claims of numerous and small creditors.  The messaging surrounding the payment in full of these majority trade claims at the outset of these cases also allowed the company to continue doing business as usual, rather than finding themselves engaged in a lengthy vendor negotiation process while trying to sell the company.  Classification of Convenience Class Claims was also necessary in order to continue business operations with little to no disruption as there is an overwhelming amount of trade creditors, whose continued relationships with the Debtors are crucial to maintain the going-concern value of the Debtors' assets and help to justify the consideration in the Asset Purchase Agreement.[52]  Courts in this Circuit look to this consideration favorably.[53]  And moreover, this was a concession that the Debtors extracted from the 2028 Senior

---

[50]   *See* 11 U.S.C. § 1122(b); *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010); *In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011); *see also In re South Aiken, Ltd.*, 121 B.R. 7 (Bankr. W.D. Pa. 1990).

[51]   *See In re Aleris*, 2010 WL 3492664 at 12-13 (noting that a convenience class representing 63.5% of general unsecured claims and 1.75% of in amount of general unsecured claims, reduces "the administrative burden and expense of making multiple distributions"); *In re Capmark*, 2011 WL 6013718 at 8, 22 (noting that preventing multiple distributions to small unsecured creditors comports with the intent of section 1122(b)).

[52]   *See* Spirito Decl. ¶¶ 35-36.

[53]   *See In re Aleris Int'l* 2010 WL 3492664, at *13 (convenience class treatment may also have "the added benefit of improving relationships with trade creditors.").

Secured Noteholders in an effort to ensure that as much value as possible could flow to general unsecured creditors. These considerations of administrative efficiency—certainly not the "bad faith" claimed by the Committee[54]—are what motivated the inclusion of the Convenience Class.

47.     Moreover, by offering all Holders of General Unsecured Claims the option to elect into this convenience class, the Debtors saved time and money that it would have spent negotiating and litigating larger claims in the claims reconciliation process when available funds will be highly limited—some of which claims would otherwise be disputed by millions of dollars. The existence of Class 4 will ultimately result in cost savings for the Debtors' Estates in the go-forward wind-down. The savings that the Debtors will achieve by avoiding a costly claims reconciliation process are especially relevant given the increased costs that the Debtors have encountered in other areas of administering their Estates.

48.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class, and the distinctions among Classes are based on reasonable and valid business, factual, and legal distinctions. The Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and the Committee Objection, which asserts otherwise, should be overruled.

---

[54]   Committee Obj. ¶ 68.

**2.      The  Plan  Satisfies  the  Mandatory  Plan  Requirements  of
Section 1123(a) of the Bankruptcy Code.**

49.      Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every
chapter 11 plan must satisfy.[55]  The Plan satisfies each of these requirements.

50.      ***Specification of Classes, Impairment, and Treatment***.    The first three
requirements of section 1123(a)(1)-(3) are that the plan specify (a) the classification of claims and
interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise
nature of their treatment under the Plan.[56]  Article III of the Plan satisfies these requirements by
setting forth these specifications in detail, and no party has asserted otherwise.[57]

51.      ***Equal Treatment***.  Section 1123(a)(4) of the Bankruptcy Code requires that the
Plan "provide the same treatment for each claim or interest of a particular class, unless the holder
of a particular claim or interest agrees to a less favorable treatment of such particular claim or
interest."[58]  The Plan meets this requirement because Holders of Allowed Claims or Interests will
receive the same rights and treatment as other Holders of Allowed Claims or Interests within such
Holders' respective Class.[59]

52.      ***Means for Implementation***.  Section 1123(a)(5) of the Bankruptcy Code requires
that the Plan provide "adequate means" for its implementation.[60]    The Plan satisfies this
requirement because Article IV of the Plan, as well as other provisions thereof, specifically

---

[55]    11 U.S.C. § 1123(a)(1)–(7).  Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[56]    11 U.S.C. § 1123(a)(1)–(3).

[57]    *See* Plan, Art. III.

[58]    11 U.S.C. § 1123(a)(4).

[59]    *See* Plan, Art. III.

[60]    11 U.S.C. § 1123(a)(5).

provides for the means by which the Plan will be implemented.[61]  Among other things, <u>Article IV</u> of the Plan provides for:

- the general settlement of Claims and Interests;[62]

- the means for implementing the Wind-Down Transactions, including the sources of consideration under the Plan and distributions related thereto, the existence of the Wind-Down Debtors, the appointment of a Plan Administrator for the purpose of, among other things, winding down the business and affairs of the Debtors and the Wind-Down Debtors, and the authorization for the Debtors, or Wind-Down Debtors, as applicable, to take corporate actions necessary to effectuate the Plan;[63]

- the preservation of certain Causes of Action not otherwise assigned via the Asset Purchase Agreement or released or exculpated under the Plan;[64]

- the cancellation of certain notes, agreements, instruments, certificates, and other documents;[65] and

- the vesting of Assets in the Wind-Down Debtors.[66]

53.      The terms governing the execution of these transactions are set forth in greater detail in the Plan and the Plan Supplement,[67] as applicable.    Thus, the Plan satisfies section 1123(a)(5), and no party has asserted otherwise.

54.      ***Non-Voting Stock***.   Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[68]

---

[61]   *See* Plan, Art. IV.

[62]   *See* Plan, Art. IV.A.

[63]   *See id.* Arts. IV.B. – F, J.

[64]   *See id.* Art. IV.G.

[65]   *See id.* Art. IV.H.

[66]   *See id.* Art. IV.M.

[67]   *See* Plan Supplement.

[68]   11 U.S.C. § 1123(a)(6).

As the Debtors and the Wind-Down Debtors, as applicable, will be dissolved, there will not be any issuance of non-voting equity securities.[69]   Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code, and no parties have asserted otherwise.

55.     ***Selection of Officers and Directors***.  Section 1123(a)(7) of the Bankruptcy Code requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[70]   The Plan satisfies this requirement by providing for the resignation of all of the Wind-Down Debtors' directors, managers, and officers from their duties and the appointment of the Plan Administrator, who will serve as the sole manager, director, and officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.[71]    The Plan Supplement identifies the Plan Administrator and sets forth the terms of the compensation thereof.[72]   Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

### 3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

56.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) modify, impair, or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of claims against or interests in a

---

[69]   *See generally* Plan.

[70]   11 U.S.C. § 1123(a)(7).

[71]   *See* Plan, Art. IV.E.

[72]   *See* Plan Supplement, <u>Exhibit D</u>.

debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the sale of all or substantially all of the property of the Debtors' Estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (e) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[73]

57.     The Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically, under <u>Article III</u> of the Plan, Class 1 (Other Secured Claims); Class 2 (Other Priority Claims); and Class 4 (Convenience Class Claims) are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.[74]   On the other hand, Classes 3, 5, 6, 9, 10, and 11 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[75]   Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.[76]

58.     In addition, and under section 1123(b)(2) of the Bankruptcy Code, <u>Article V.A</u> of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases not previously assumed, assumed and assigned, or rejected shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.[77]

---

[73]   *See* 11 U.S.C. § 1123(b)(1)–(6).

[74]   *See* Plan, Art. III.C.

[75]   *See id.*

[76]   *See id.*

[77]   *See* Plan, Art. V.A.

59.     As more fully discussed below, the Plan also contains provisions implementing

certain releases and exculpations, compromising claims and interests, and enjoining certain causes

of action.   These provisions are substantially consistent with those approved by the Court in

precedent chapter 11 plans.[78]  As detailed further below, each of these provisions is appropriate

because, as applicable, they (a) are the product of arm's-length negotiations; (b) were critical to

obtaining the support of the various constituencies for the Plan; (c) are given for valuable

consideration; (d) are fair and equitable and in the best interests of the Debtors, their Estates, and

these chapter 11 cases; and (e) are consistent with the relevant provisions of the Bankruptcy Code

and Third Circuit law.[79]

### 4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.

60.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to

cure a default the amount necessary to cure the default shall be determined in accordance with the

underlying agreement and nonbankruptcy law."[80]

61.     The Plan complies with section 1123(d) of the Bankruptcy Code.   The Plan

provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired

Lease to be assumed under the Plan by payment of the default amount, if any, on the

Effective Date, subject to the limitations described in <u>Article V.D</u> of the Plan or the Confirmation

---

[78]   *See, e.g.*, *In re Thrasio*, No. 24-11840 (CMG) (Bankr. D.N.J. June 13, 2024) (confirming chapter 11 plan with
third-party and debtor releases substantially consistent with those in the Plan); *In re WeWork, Inc.*, No. 23-19865
(JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J.
May 30, 2024) (same); *In re BlockFi Inc.*, No-22 19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming
liquidating chapter 11 plan with third-party and debtor releases substantially consistent with those in the Plan);
*In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr D.N.J. Nov. 17, 2023) (same); *In re Bed Bath & Beyond
Inc.*, No. 23-13359 (VFP) (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

[79]   *See infra* Part III.

[80]   11 U.S.C. § 1123(d).

Order.[81]  In accordance with <u>Article V.D</u> of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.   The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event they object to the proposed cure amounts provided by the Debtors.

62.    Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

**B.     The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

63.    The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[82]  The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[83]  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the

---

[81]    *See* Plan, Art. V.D.

[82]    *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 170 (Bankr. D.N.J. 2010) ("Section 1129(a)(2) requires that '[t]he proponent of the plan compl[y] with the applicable provisions of this title.'") (citing 11 U.S.C. § 1129(a)(2)); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("§ 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125").

[83]    *See In re TCI 2 Holdings*, 428 B.R at 170; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936; S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (collectively, the legislative history refers to section 1125, regarding disclosure, as an example of one of those "applicable provisions").

Disclosure Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in accordance with the Disclosure Statement Order.[84]

### 1. The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.

64. Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[85] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[86]

65. Section 1125 is satisfied here. Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement.[87] The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan (including Classes 4, 5, 6, and 11, which the Debtors believe are either presumed to accept or deemed to reject under the Plan but were permitted to vote on the Plan); the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[88] As stated in the Voting Report, the Debtors, through the Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order, satisfying sections 1125(a) and (b) of

---

[84] *See* Voting Report ¶ 5.

[85] 11 U.S.C. § 1125(b).

[86] *See In re Union Cnty. Wholesale Tobacco & Candy Co.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (holding that the standards of section 1125 "essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment re acceptance or rejection of the plan").

[87] *See* Disclosure Statement Order.

[88] *See generally* Disclosure Statement Order.

the Bankruptcy Code.[89]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and all parties presumed to accept or deemed to reject the Plan.[90]

66.     Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 2.     The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.

67.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[91]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[92]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.  Pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, Holders of Claims in Classes 7 and 8 are presumed to

---

[89]   *See* Voting Report; *see also* Certificate of Service.

[90]   *See* Voting Report; *see also generally* Certificate of Service.

[91]   *See* 11 U.S.C. § 1126.

[92]   *See* Plan, Art. III.C.  In addition, although the Debtors solicited votes for Class 4 (Convenience Class Claims), such class is an Unimpaired Class.

have accepted the Plan or deemed to have rejected the Plan, as applicable, and, therefore, were not entitled to vote on the Plan.[93]

- Class 9 (Section 510(b) Claims) and Class 10 (Equity Interests), which are Impaired and receiving no recovery under the Plan (collectively with Class 5 (Subsidiary Unsecured Claims), Class 6 (Parent Unsecured Claims), and Class 11 (Contingent Subsidiary Unsecured Claims), the "Deemed Rejecting Classes"). Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Class are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan. [94]

68.     Accordingly, the Debtors solicited votes from Holders of Allowed Claims in Class 3 (2028 Senior Secured Notes Claims) because this Class is Impaired and entitled to receive a distribution under the Plan.

69.     The Debtors also permitted Classes 4, 5, 6, and 11 to vote in order to resolve the Committee's objection to the Disclosure Statement.[95]   With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[96]

70.     The Voting Report, summarized above, demonstrates that the Plan has been accepted by the Holders in the only Allowed Voting Class entitled to vote on the Plan (*i.e.*, Class 3)

---

[93]   *See id.*

[94]   *See id.*  In addition, although the Debtors permitted Class 5 (Subsidiary Unsecured Claims), Class 6 (Parent Unsecured Claims), and Class 11 (Contingent Subsidiary Unsecured Claims) to vote, such classes are Impaired and are deemed to reject the Plan.

[95]   *See* Plan, Art. III.A. – B.*; see generally* Certificate of Service.  For the avoidance of doubt, the Debtors are not counting the votes solicited in Classes 4, 5, 6, and 11 due to the fact that they are presumed to accept or deemed to reject the Plan (as applicable).

[96]   11 U.S.C. § 1126(c).

in accordance with section 1126 of the Bankruptcy Code.[97]  Acceptance of this impaired class is all that is necessary.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

### C. The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

71.      Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[98]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[99]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the Plan.[100]

72.      The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries.  As further discussed herein, throughout these chapter 11 cases, the Debtors, the Debtors' board of directors, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.

---

[97]   *See generally* Voting Report, <u>Exhibit A</u>.

[98]   11 U.S.C. § 1129(a)(3); *see also In re Diocese of Camden, N.J.*, No. 20-21257 (JNP), 2023 WL 5605156, at *25 (Bankr. D.N.J. Aug. 29, 2023) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *In re TCI 2 Holdings*, 428 B.R. at 134.

[99]   *See, e.g., In re PWS Holding*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re Century Glove, Inc.*, No. Civ. A. 90-400, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[100]   *See, e.g., Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013); *In re Century Glove*, 1993 WL 239489, at *4.

73. The fact that a debtor proposes a plan through which it binds dissenting creditors is *not* an indication of bad faith.[101] These chapter 11 cases, which culminate with the Plan, are a model for a how a debtor should use the tools at its disposal in chapter 11 to maximize value for all creditors. As the evidence will show, no party can credibly assert that the Plan was not filed with the intent to, or will not in fact, foster the best option for the Debtors to consummate a value-maximizing Sale Transaction, preserve the vast majority of their employees' jobs, and effectuate the efficient and orderly wind down of the Debtors' operations.

74. Importantly, the Plan is supported by the one allowed Voting Class consisting of Class 3. Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

**D.      The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4))**.

75. Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[102] Courts in this district and elsewhere have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[103]

---

[101] *See In re W.R. Grace & Co.*, 475 B.R. 34, 90 (D. Del. 2012) (finding that no bad faith existed where the Debtors proposed the plan "with the legitimate purpose of restructuring. . . ."); *In re S. Canaan Cellular Invs., Inc.*, 427 B.R. 44, 74 (Bankr. E.D. Pa. 2010) ("A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.") (citing *In re United Marine, Inc.*, 197 B.R. 942, 946 (Bankr.S.D.Fla.1996)).

[102] 11 U.S.C. § 1129(a)(4).

[103] *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

76.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[104]   Article II.B.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than forty-five (45) days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.[105]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

**E.     The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (Section 1129(a)(5))**.

77.     The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[106]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[107]

78.     The Plan provides that on the Effective Date, the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and the Debtors shall have disclosed the identity of the Plan Administrator and the responsibilities and

---

[104]   *See* Plan, Art. II.

[105]   *See id.*

[106]   11 U.S.C. § 1129(a)(5)(A)(i).

[107]   11 U.S.C. § 1129(a)(5)(A)(ii).

compensation thereof, in the Plan Supplement.[108]   Therefore, the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied, and no party has asserted otherwise.

**F.      The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

79.      Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  The Plan does not provide for any rate changes and the Debtors are not subject to any such regulation.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

**G.      The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)).**

80.      The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than that which such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[109]

---

[108]   *See* Plan, Art. IV.E.; Plan Supplement, Exhibit D.

[109]   *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

81.     To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of FTI Consulting, Inc., the Debtors' financial advisors, prepared a liquidation analysis (the "Liquidation Analysis"),[110] which is discussed further in the Spirito Declaration.[111]  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[112]  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions regarding a hypothetical conversion to a chapter 7 liquidation as of a certain date.[113]

82.     Based on and as provided in the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan that has not otherwise consented to the terms of the Plan[114] and with respect to Holders of Claims or Interests in Class 3, each Holder has either (i) accepted the Plan or (ii) will receive or retain, as of the Effective Date, an amount that is not less than the amount that such Holder would receive or retain in a liquidation under chapter 7.[115] Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

---

[110]  *See* [Docket No. 535], as further supplemented by Exhibit D of the Disclosure Statement [Docket No. 631].

[111]  *See* Spirito Decl. ¶¶ 9-30.

[112]  *See id.* ¶ 22.

[113]  *See id.* ¶ 10-13.

[114]  *See id.* ¶ 23.

[115]  *Id.*

**H.     The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code**.

83.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[116]  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[117]  Because certain Classes are deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.  However, as discussed below, the Debtors still satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes.[118]

**I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9))**.

84.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[119]  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of administrative claims allowed under section 503(b) of the Bankruptcy Code must receive on the effective date cash equal to the allowed amount of such claims.[120]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage,

---

[116]   11 U.S.C. § 1129(a)(8).

[117]   *See* 11 U.S.C. § 1129(b).

[118]   *See infra*, ¶¶ 92 – 99.

[119]   11 U.S.C. § 1129(a)(9).

[120]   11 U.S.C. § 1129(a)(9)(A) (citing 11 U.S.C. § 507(a)(2), which in turn cites 11 U.S.C. § 503(b)).

employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

85.      The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.  *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.[121]  *Third*, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

---

[121]  *See* 11 U.S.C. § 1129(a)(9)(A).

**J.     At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10))**.

86.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[122]  The Committee asserts that Class 3 is Unimpaired, and thus the Plan violates section 1129(a)(10).  The Debtors reject this assertion.

87.     Section 1124(1) defines "impairment" of a claim as the alteration of "legal, equitable, and contractual rights."[123]  The standard of impairment pursuant to section 1124(1) of the Bankruptcy Code is quite broad, as any alteration of a class of creditors' rights under a plan will render it impaired.[124]  Only classes that are impaired can vote on a plan, and unimpaired classes are presumed to have accepted the plan.  The plain text of section 1124(1) of the Bankruptcy Code provides that for a claim to be impaired due to a change in "legal, equitable, and contractual rights."[125] Here, Class 3 Holders of 2028 Senior Secured Notes Claims have:  (i) a delayed recovery by nine months; (ii) a source of distributions that is not cash, but far riskier contingent accounts receivable collections; and (iii) are not receiving post-petition interest at the default rate but at the non-default contract rate; and (iv) are subordinated to other classes, namely,

---

[122]   11 U.S.C. § 1129(a)(10).

[123]   11 U.S.C. § 1124(1); *see* Committee Obj. ¶ 41.

[124]   *See supra* note 115; *In re Union Meeting Partners*, 160 B.R. 757 (Bankr. E.D. Pa. 1993); *In re L & J Anaheim Assocs.*, 995 F.2d 940 (9th Cir. 1993).

[125]   11 U.S.C. § 1124(1).

Class 4.[126]  Even slight alterations in the rights of the creditor class will satisfy this definition. Accordingly, Class 3 is impaired under the Bankruptcy Code.[127]

88.     In its objection, the Committee relies on two cases that do not actually support its claim that Class 3 is not impaired.  Its reliance on *In re PPI* does not apply: in that case, a landlord was considered not "impaired" when its damages claim was statutorily capped outside of the confines of a Plan; and there, as the Third Circuit, noted, "'[i]mpairment results from what the *plan* does, not what the statute does.'"[128]  Here, Class 3's rights are explicitly altered by the Plan rather than by a statutory limitation.  And *In re Lettick* involved a last-minute amendment that created an "artificial" impairment to "stage compliance with" section 1129(a)(10). [129]   Here, Class 3's impairment has been a consistent Plan provision since the TSA stage, and is the result of the practicalities and timing of receipt of contingent accounts receivable proceeds, and results from a delay of as long as nine months, in contrast to any artificial two-week delay in *In re Lettick.* Accordingly, the Court should deny the Committee's objection.

89.     As set forth above, Holders of Claims in Class 3 have voted to accept the Plan independent of any insiders' votes.[130]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

---

[126]   *See* Disclosure Statement, Art. IV.E.

[127]   *See In re Temple Zion*, 125 B.R. 910, 919 (Bankr. E.D. Pa. 1991) ("any alteration of the rights constitutes impairment even if the value of the rights is enhanced.").

[128]   *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 204 (3d Cir. 2003) (citation omitted, emphasis in original).

[129]   *See In re Lettick Typografic, Inc.*, 103 B.R. 32 (Bankr. D. Conn. 1989).

[130]   *See* Voting Report, Exhibit A.

**K.** **The Plan Is Feasible and Is Not Likely to Be Followed By The Need For Further Financial Reorganization (Section 1129(a)(11)).**

90.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in

relevant part, that confirmation is not likely to be followed by the liquidation or further financial

reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization

is proposed in the Plan.    There is a relatively low threshold of proof necessary to satisfy the

feasibility requirement.[131]    The Court need not require a guarantee of success to find the Plan

feasible,[132] and instead must only find that the "plan offers a reasonable expectation of success."[133]

91.    In determining standards of feasibility, courts have identified the following

probative factors:

- the adequacy of the capital structure;

- the earning power of the business;

- the economic conditions;

- the ability of management;

- the probability of the continuation of the same management; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[134]

---

[131]    *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *Berkley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

[132]    *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1004 (E.D. Va. 1994) (noting that the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success").

[133]    *See In re G–I Holdings Inc.,* 420 B.R. 216, 267 (D.N.J. 2009) ("[The] key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed.").

[134]    *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

92.     The Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code and should be confirmed.  Following consummation of the Sale Transaction, the Plan provides for an orderly wind down and dissolution of the Debtors and the Wind-Down Debtors.  The Debtors project that the Sale Transaction will provide sufficient value to satisfy all Priority and Administrative Claims under the Plan, including all Professional Fee Claims.[135]  The Debtors have worked with their advisors to ensure that the Wind-Down Debtors maintain, with the leadership of the Plan Administrator, adequate liquidity and the necessary staffing in order to effectively wind down the Debtors' Estates.  The Plan provides closure and assurance that the assets of the Debtors' Estates are being distributed to creditors in a value maximizing manner without the need for any further financial restructuring.  Thus, if confirmed as proposed, the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code.

**L.     The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12))**.

93.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

94.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.D of the Plan provides that all fees due and payable pursuant to section 1930 of the United States Code and 31 U.S.C. § 3717, as applicable, as determined by the Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Debtors or Wind-Down

---

[135]   *See* Spirito Decl. ¶ 37.

Debtors (or the Disbursing Agent on behalf of the Wind-Down Debtors) for each quarter (including any fraction thereof) until these chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

95.     Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.     Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan**.

96.     Several of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).[136]  The Debtors have no obligations to pay retiree benefits and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[137]  Section 1129(a)(15) is inapplicable to the Plan because none of the Debtors are "individuals" as that term is defined in the Bankruptcy Code.[138]  Section 1129(a)(16) of the Bankruptcy Code is also inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[139]

**N.     The Plan Satisfies the Cramdown Requirements (Section 1129(b))**.

---

[136]   11 U.S.C. § 1129(a)(13).  Section 1114(a) of the Bankruptcy Code defines "retiree benefits" as:  "[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(a).

[137]   11 U.S.C. § 1129(a)(14).

[138]   11 U.S.C. § 1129(a)(15).

[139]   *See id.* § 1129(a)(16).

97.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[140]

98.     The Impaired class of Claims entitled to vote on the Plan (the Allowed Voting Class—Class 3) voted in favor of the Plan.  The Deemed Rejecting Classes are deemed to have rejected the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

### 1.     The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)).

99.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[141] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[142]

---

[140]   *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (holding that a plan must be "'fair and equitable' and may not unfair[ly] discriminat[e] under the requirements of section 1129(b)").

[141]   *Bank of Am. Nat. Trust & Sav. Ass'n*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[142]   11 U.S.C. § 1129(b)(2)(B).

100.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the

fact that the Deemed Rejecting Classes are deemed to have rejected the Plan, the Plan is

confirmable.  There is no Class receiving more than a 100 percent recovery and no junior Class is

receiving a Distribution under the Plan until all senior Classes have received a 100 percent

recovery or such senior Classes have agreed to receive a different treatment under the Plan.

> **2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired
> Classes That Have Not Voted to Accept the Plan (Section 1129(b)(1)).**

101.    Unlike the concept of "fair and equitable," which is defined under the Bankruptcy

Code, the Bankruptcy Code does not provide a standard for determining when "unfair

discrimination" exists.  Courts typically examine the facts and circumstances of the particular case

to make the determination.[143]   In general, courts have held that a plan unfairly discriminates in

violation of section 1129(b) of the Bankruptcy Code only if it provides materially different

treatment for creditors and interest holders with similar legal rights without compelling

justifications for doing so.[144]   A threshold inquiry to assessing whether a proposed chapter 11 plan

unfairly discriminates against a dissenting class is whether the dissenting class is equally situated

to a class allegedly receiving more favorable treatment.[145]

102.    Here, the Plan's treatment of the non-accepting impaired classes (*i.e.*, Class 5,

Class 6, Class 11, and the other Deemed Rejecting Classes) is proper because all similarly situated

---

[143]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 158 (Bankr. D.N.J. 2010) (neglecting to apply a set standard or test
to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general
analysis of unfair discrimination including whether the discrimination is "supported by a reasonable basis" and is
"proposed in good faith"); *In re S B Bldg. Assocs.*, 621 B.R. at 375 (considering the unique factual circumstances
to determine whether the requirements of section 1129(b) are satisfied).

[144]   *See In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022)
(stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently
without a reasonable basis for the disparate treatment") (internal citations omitted).

[145]   *See Aleris Int'l*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. 111, 121
(Bankr. D. Del. 2006)).

Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale. Claims in the Deemed Rejecting Classes are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests. The Plan's treatment of the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment without compelling justification. Furthermore, where the Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

103. As discussed more fully in <u>Part IV</u>, this applies with respect to Class 4, in which one class of creditors has "horizontally" gifted a portion of their recovery to another. The Committee Objection makes this argument, but neglects to address the (i) benefits of classifying a Convenience Class, including easing the administrative burden on the Estates, in compliance with section 1122(b) of the Bankruptcy Code, (ii) the relevant caselaw that permits such classification, and (iii) that all Holders of General Unsecured Claims were given the opportunity to elect to receive themselves to receive the Class 4 treatment.

104. For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

**O.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

105. The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. *First*, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan. *Second*, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the

Bankruptcy Code.  *Finally*, section 1129(e) of the Bankruptcy Code is inapplicable because none

of the Debtors' chapter 11 cases are a "small business case."  Accordingly, the Plan satisfies the

requirements of section 1129(c), (d), and (e) of the Bankruptcy Code, and no party has asserted

otherwise.

> **P.    The Plan Modifications Do Not Require Resolicitation or an Additional Disclosure Statement.**

106.    Section 1127(a) of the Bankruptcy Code permits plan modifications to a chapter 11

plan where votes have been solicited before confirmation so long as the modifications comply with

sections 1122 and 1123 of the Bankruptcy Code.[146]  Once filed, "the plan as modified becomes the

plan."[147]  Further, Bankruptcy Rule 3019 establishes that after a plan has been accepted and before

its confirmation, the proponent may file a modified plan if the Court finds that the proposed

modification does not adversely change the treatment of the claim of any creditor and such

modification shall be deemed accepted by all creditors who previously accepted the plan.[148]  The

Committee asserts that the modifications to Class 5 are inappropriate and require additional

disclosure and resolicitation.

107.    As discussed above, following solicitation, the Debtors made certain modifications

to the Plan as a further show of good faith, in the spirit of settlement, since the Committee has

---

[146]  11 U.S.C. § 1127(a).

[147]  *Id.*

[148]  *See* F. R. Bankr. P. 3019(a); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class's distribution was not sufficiently material to require re-solicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are presumed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Bankruptcy Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan."), *aff'd*, 880 F.2d 694 (4th Cir. 1989).

previously taken issue with the treatment of Class 5 Claims.[149]  These modifications to the Plan to clarify certain provisions and to resolve formal and informal comments to the Plan including, among other things, the establishment of the GUC Distribution Reserve and the change in treatment to Class 5 (Subsidiary Unsecured Claims) from presumed to accept to deemed to reject. Namely, Class 5 will share *pro rata* in the distribution of any Distributable Value and the GUC Distribution Reserve with the other General Unsecured Creditors in Classes 6 and 11.

108.    These modifications solely affect Class 5, a non-voting class, and therefore they have no impact (much less a material and adverse impact) on creditors that were never entitled to vote on the Plan.  Courts in this Circuit have not interpreted Bankruptcy Rule 3019(a) to require resolicitation and additional disclosure to mean *any* material and adverse change to *any* creditor.[150] The seminal case on resolicitation recognizes that "a literal reading of [Bankruptcy Rule 3019] would prevent a modified plan from being deemed accepted if it adversely affected the treatment of *any* claim in *any* way."[151]  The court decision sought to give effect to legislative intent by ensuring that creditors who voted for an un-modified plan had the opportunity to change their vote,[152] and ultimately held that additional disclosure and resolicitation was only required where "and to the extent the debtor intends to solicit votes from previously dissenting creditors or when

---

[149]  *See* Standing Motion at ¶ 40 ("The Debtors have provided no basis for paying unsecured creditors at the subsidiaries 100%."); *see also In re Invitae Corp.*, No. 24-11362 (MBK), Hr'g Tr. at 122:8-22 (Bankr. D.N.J. July 9, 2024) (Committee counsel questioning the reasoning behind decision to pay Holders of Class 5 Claims "100 cents on the dollar.").

[150]  *See In re G-I Holdings Inc.*, 420 B.R. 216 (D.N.J. 2009) (holding that resolicitation was not required where the objecting creditor's claims were not entitled to vote, either before or after modification, and further balloting was unnecessary); *In re Century Glove, Inc.*, No. Civ. A. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993).

[151]  *In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (quoting S.Rep. No. 989, 95th Cong, 2d Sess 124 (1978)).

[152]  *See id.*

51

the modification materially and adversely impacts parties *who previously voted for the plan*."[153]
The legal standard set out by courts in this Circuit have asked whether creditors would reconsider
their vote based on the modification at issue.[154]

109.    Here, the only class being solicited and entitled to vote on the Plan is Class 3—and
therefore this is the only class of creditors that is relevant under Bankruptcy Rule 3019 and section
1127 of the Bankruptcy Code.  Holders of Class 3 Claims, who are themselves consent parties to
the Plan, are unlikely to reconsider their votes based on modifications they themselves consented
to and that did not materially and adversely impact their own pecuniary interests in the Plan.[155]

110.    While the Holders of Class 5 (Subsidiary Unsecured Claims) were "permitted" to
vote on the Plan to resolve a Committee objection to the Disclosure Statement, they were never
entitled to vote under the Plan (either before or after the modifications), a construct that was clear
in the Disclosure Statement, which provided multiple disclaimers that certain classes of unsecured
creditors, including Class 5, were not entitled to vote, and served on all Voting Classes.[156]

111.    Additionally, as discussed earlier in this Memorandum, the minimal number of
Holders of Claims in Class 5 were provided with notice of the Plan including the modifications
and, pursuant to the Confirmation Order, will be provided additional time if they choose to opt out
of the Third-Party Releases or to elect into the Convenience Class Election for twenty-eight

---

[153]    *See id.*; *see also In re Century Glove* 1993 WL 239489 at *3 (citing *In re Am. Solar King*) (holding that additional
disclosure was not warranted where "the debtors did not *intend to solicit votes* from previously dissenting
creditors . . . .").

[154]    *See In re G-I Holdings*, 420 B.R. 216 at 256.

[155]    *See id.* at 240 ("In the context of . . . confirmation hearings, 'creditors have standing only to challenge those parts
of a reorganization plan that affect their direct interests.'") (quoting *In re E.S. Bankest, L.C.*, 321 B.R. 590, 595
(Bankr.S.D.Fla.2005)).

[156]    *See* Disclosure Statement, Arts. III.A.2., V.A., B. (notifying Holders of Class 5 Claims, and other classes of
General Unsecured Claims, in plain language, that their votes "would not count towards confirmation" of
the Plan).

(28) days following entry of the Confirmation Order.  Through the extended post-confirmation period, the Debtors have ensured that an appropriate time frame to reconsider any issues is provided for these Holders, and that, though this is not a solicitation or Plan voting issue, all statutory requirements relating to notice and timing to opt out of the Third-Party Releases or make the Convenience Claim Election were strictly adhered to.

112.    The modifications are either immaterial or do not materially and adversely affect the treatment of Holders of Class 3 Claims—the only class ever entitled to vote on any iteration of the Plan—such that resolicitation would be required.  More specifically, Class 3 is unlikely to reconsider their acceptance of the Plan due to the modifications discussed herein.  Therefore, the modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

113.    The Committee Objection is misguided and should be overruled, as it hinges on the assumption that creditors who are not entitled to vote, such as those creditors in Class 5, require the same treatment as those entitled to vote.  In this Circuit, they do not—courts consider the materiality and adversity of the modification on creditors *entitled to vote* out of concern about whether it would affect their decision to accept or reject a plan.  Indeed, even the Committee's own authority makes clear that only modifications that would make a creditor "who has accepted the plan" change their vote are material and could potentially require resolicitation.[157]  Because Holders of Class 5 Claims do not have the right to cast a vote that may be counted towards acceptance of the Plan, the question of resolicitation is not relevant.[158]

---

[157]  *See In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B.R. 87, 168 (Bankr. D. Del. 2023) (cited in Committee Obj. ¶ 27).

[158]  The decision of the Debtors to *permit* Holders of Class 5 Claims to vote, which was done purely out of cooperation, good-faith, and the Debtors' long-lasting attempts at compromise, should not be held against them. But make no mistake:  these Holders are not and were never entitled to vote.  *See* Disclosure Statement, Art. III.A.2., V.A., B. (notifying Holders of Class 5 Claims, and other classes of General Unsecured Claims, in plain language, that their votes would "not count towards confirmation" of the Plan).

114.    Moreover, Bankruptcy Rule 2002(b) does not require that the clock resets upon every plan modification.  However, to address any of the Committee's concerns about notice of the modifications, the Confirmation Order provides that Holders of Class 5 Claims will have an additional twenty-eight (28) days to opt out of the Third-Party Releases or make the Convenience Claim Election.   Additionally, the Debtors disclosed various Risk Factors in the Disclosure Statement served on Holders of Class 5 Claims and all other classes, including the risks of a contested confirmation hearing and the risk that a Committee objection or the Committee's Standing Motion could, among other things, change their estimated recoveries and throw off the confirmation timeline.[159]  Moreover, not only has notice been given, but the Debtors also have engaged with these limited number of creditors (one of whom has already objected to the Plan, another of whom already elected into the Convenience Class) and have not received any complaints as to their treatment.

115.    Ultimately, and as further detailed in the Spirito Declaration, aside from these Class 5 Holders, the modifications either have no effect on or result in a net benefit to the remaining general unsecured classes.[160]  Accordingly, no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed rejected or presumed accepted, accordingly, by all non-voting creditors.

**Q.    The Plan Appropriately Incorporates Settlements of Claims and Interests.**

116.    The Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[161]  Article IV.A of the

---

[159]   *See* Disclosure Statement, Art. X.

[160]   *See* Spirito Decl. ¶¶ 28-30.

[161]   11 U.S.C. § 1123(b)(3)(A).

Plan provides for a general settlement of all Claims and Interests to the extent provided for by the Bankruptcy Code.

117.    The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.[162] Generally, courts in the Third Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."[163]  The Third Circuit has provided the following four criteria that a bankruptcy court should consider when approving a settlement pursuant to Bankruptcy Rule 9019:  (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of creditors.[164] In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.[165]

118.    The settlements embodied in the Plan satisfy the above factors.  The Plan and Confirmation Order embody certain settlement of Claims and Interests between the Debtors and certain other parties in interest, including the Debtors, the Debtors' directors and officers, and the Required Holders under the TSA.  The settlements are fair and equitable and consistent with the Bankruptcy Code.  The Plan and Confirmation Order resolve a host of alleged Claims and Interests,

---

[162]  *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3).").

[163]  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

[164]  *See In re WebSci Techns., Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).

[165]  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

which were thoroughly analyzed by the Debtors, the Special Committee, the Required Consenting Stakeholders, and each of their advisors.

119.    The Debtors and their advisors worked diligently to ensure the Debtors' creditors are receiving the greatest value possible on their Claims or Interests through the Plan, and are in the best interest of all stakeholders.  If the Debtors were forced to litigate the issues necessary to resolve such Claims and Interests outside of the Plan, such litigation would be costly, protracted, inherently uncertain, and would leave the Debtors and all stakeholders in a substantially worse position.  Litigation would prolong the Debtors' bankruptcy process, draining the Debtors' Estates and distracting the Debtors' key personnel and advisors, who would otherwise be focused on winding down the Debtors' Estates.  As reflected by the support of creditors for the Plan, this settlement is in the best interests of creditors and all parties in interest.

120.    The Committee objects on the grounds that the settlements are not fair or reasonable.  The Debtors wholeheartedly reject the Committee's assertion.  The Debtor Release includes the release of parties that were integral to the achievements of these chapter 11 cases thus far, including the Sale Transaction, that have culminated in the most value-maximizing Plan available to the Debtors.  The Committee has made it clear it is not satisfied with the invaluable, months-long efforts that all of the named parties in the "Released Party" definition have contributed to these chapter 11 cases—but it is equally clear that *nothing* the parties could have done would satisfy the Committee unless it was a full capitulation to the Committee's demands that it be permitted to gamble the Estates' diminishing resources pursuing frivolous litigation that, in the extraordinarily unlikely event it were to be successful, would only benefit a handful of the Debtors' creditors.  And, in any event, it is not the Committee's opinion alone that can dictate what consideration is enough to warrant a settlement.  As discussed herein, the Executives and the

Holders of the 2028 Senior Secured Notes have made substantial contributions warranting a settlement, which are fair and reasonable.

121.   As evidenced by the Schrank Declaration, the Debtors' executives went far beyond merely "showing up for work," as the Committee contends.[166]   In addition to their "day jobs" managing the Debtors' ongoing business—a complex, highly regulated life sciences company— the executives played key roles in working with the Debtors' advisors to develop and execute a customer and employee retention strategy, manage external and internal communications, execute on, and continue to improve, operational performance, and facilitate the Debtors' marketing, sale, and regulatory approval process.[167]   Some of these executives attended numerous meetings before these chapter 11 cases even began in an effort to find a restructuring solution, and all of them have remained a key resource for the Debtors' advisors during the pendency of these chapter 11 cases.[168] Their work was instrumental in helping the Debtors achieve consensus on the TSA and the value-maximizing Sale Transaction, and positioning the Debtors for a successful confirmation.

122.   Deerfield and the 2028 Senior Secured Notes Indenture Trustee and Collateral Agent have also contributed invaluable time, effort, and money to ensure the success of these chapter 11 cases.   In addition to participating in good-faith negotiations for approximately the last nine months, Deerfield agreed to the TSA, and has supported a Plan in which Deerfield's own claim is subordinated to that of another class, rendering their claim impaired.   Deerfield has supported the Debtors and these chapter 11 cases against the onslaught of unfair accusations and attacks from the Committee. The other Holders of the 2028 Senior Secured Notes have also

---

[166]   Committee Obj. ¶ 38.

[167]   Schrank Decl. ¶ 6.

[168]   *See id.*

contributed by nature of their implicit support for the agreements reached between Deerfield and the Debtors, including through voting in support of the Plan as a class.

123.     Further, despite the Committee's numerous attempts to convince the Court otherwise, the Debtors' board of directors is not conflicted. In any event, the reasonableness of the settlement is for the Court to decide.

124.     Here, the Court should find that given the potential claims and the nature of the settlement and benefits thereto, the settlement is fair and appropriate.  The Court should also find that, among other things, given the benefits and tangible concessions from Deerfield in the TSA and the contributions of the directors and officers, the settlement is fair and reasonable.[169]

125.     The Committee's Objection to the settlement should be overruled and the Court should find that the Plan's discretionary general settlement provision satisfies the requirements of section 1123.

## III.   THE PLAN'S RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS SATISFY SECTION 1123(B) OF THE BANKRUPTCY CODE.

### A.     The Third-Party Release Is Consensual and Appropriate.

126.     The Plan provides for the Releasing Parties' release of the Released Parties to the extent set forth in the Plan (the "Third-Party Release").[170]  Courts in the Third Circuit routinely approve release provisions if they are consensual and appropriately tailored.[171]  The Third-Party Release in the Plan is both.

---

[169]   *See generally* Frizzley Decl. and Schrank Decl.

[170]   *See* Plan, Art. VIII.D.

[171]   *See, e.g.*, *In re Indianapolis Downs,* 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims presumed to accept the plan as consensual); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same); *In re Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan); *In re Mallinckrodt PLC*, 639 B.R. at 877(approving third-party release that applied to shareholders deemed

127.    The U.S. Trustee has objected to the Plan's Third-Party Release, arguing that it is not consensual.[172]  The determination as to whether a third-party release is consensual depends on the particular circumstances at issue in a particular case.[173]  Affirmative consent to a third-party release is not required for such release to be "consensual."[174]  Rather, a third-party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.[175]  Courts recognize that "shareholders and creditors have an obligation to read their mail."[176]

128.    Here, all parties in interest had ample opportunity to evaluate and opt out of the Third-Party Release.  For example, stakeholders in the Voting Classes had notice and opportunity to "opt out" of the Third-Party Release by checking the appropriate box on the Ballots, and the requisite number of stakeholders voted in favor of the Plan, which included the Third-Party Release.  As described above, the Claims and Noticing Agent served the Solicitation Packages as instructed,[177] the Publication Notice (as defined in the Disclosure Statement Order) was published in *The New York Times*,[178] and the *Notice of Hearing to Consider Confirmation of the Chapter 11*

---

to reject the plan and unsecured creditors who were unimpaired or who did not return a ballot with the opt out box checked or otherwise submit an opt out form as consensual).

[172]    U.S. Trustee Obj. ¶¶ 29–39.

[173]    *See In re Indianapolis Downs*, 486 B.R. at 305.

[174]    *See id.*; *U.S. Bank*, 426 B.R. at 144.

[175]    *See In re Indianapolis Downs*, 486 B.R. at 305–06; *U.S. Bank*, 426 B.R. at 144.

[176]    *In re Mallinckrodt PLC*, 639 B.R. at 880  (quoting *In re EV Energy Partners*, No. 18-10814 (CSS), Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is.  And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.")); *see also In re Arsenal Intermediate Holdings, LLC,* No. 23-10097 (CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he creditor who throws away the plan unopened is barred from arguing that the third-party release failed to meet the *Continental* standard.").

[177]    *See* Certificate of Service.

[178]    *See Affidavit of Publication* [Docket No. 680].

*Plan Filed by the Debtors and Related Deadlines* was posted to the website maintained by the Claims and Noticing Agent in these chapter 11 cases.[179]

129.    Furthermore, all voting stakeholders have certified that they read and understood the election they were making in the Ballot.  All non-voting stakeholders were given the opportunity to opt out of the Third-Party Release and received notice and instructions for doing so in their applicable Notice of Non-Voting Status.  Such stakeholders could opt out by checking the appropriate box on the Notice of Non-Voting Status or objecting on or before the Opt Out Deadline (July 15, 2024, at 4:00 p.m., prevailing Eastern Time).  Thus far, well over 2,000 parties, including 2,044 Holders of Equity Interests, have exercised their right to opt out of the Third-Party Release, so these notice measures clearly worked.[180]

130.    Even where Holders fail to vote, or vote to reject the Plan, the overwhelming weight of authority in this district suggests that the Third-Party Release would be consensual, and most judges in New Jersey, the Third Circuit, and across the country have found that opt out mechanisms such as the one included in the Plan constitute consensual releases.[181]  For example, in *Saint*

---

[179]  *See* https://veritaglobal.net/invitae.

[180]  *See* Voting Report, Exhibit A.

[181]  *See, e.g., In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. June 13, 2024) (confirming a plan stating that all holders of claims or interests entitled to vote on the plan or deemed to accept the plan were deemed to consent to the releases unless and until they affirmatively opted out or objected to the releases); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 30, 2024); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023); *In re Congoleum Corp.*, No. 20-18488 (MBK) (Bankr. D.N.J. Jan. 25, 2021); *In re Modell's Sporting Goods, Inc.,* No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 13, 2020); *In re SLT Holdco, Inc.*, No 20-18368 (MBK) (Bankr. D.N.J. Oct. 21, 2020); *In re Aceto Corp.*, No. 19-13448 (VFP) (Bankr D.N.J. Sept. 18, 2019); *In re Saint Michael's Med. Ctr., Inc.*, No. 15-24999 (VFP) (Bankr D.N.J. Jan. 12, 2017); *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023); *In re Carestream Health, Inc.*, No. 23-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 2, 2022); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 22, 2021); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020); *In re Ctr. For Autism & Related Disorders, LLC,*

---

*Michael's Medical Center*, the court recognized that releases provided through an opt out mechanism were "largely consensual," pointing to the numerous creditors who availed themselves of the right to opt out.[182]    And in *Aceto Corporation*, the court approved third-party releases from all parties who: (a) voted to accept the plan; (b) abstained from voting on the plan, but failed to return an opt out form; and (c) voted to reject the plan but did not elect on their ballot to opt out of the third-party release.[183]

131.    Courts throughout this Circuit follow similar reasoning.    Recent cases have upheld the notion that a non-debtor release is consensual where (as here) holders of claims and interests are provided the opportunity to opt out, even where the holders in such classes did not affirmatively opt out.[184]    Here, the Third-Party Release applies to those Holders of Claims of the Voting Record Date that received an opt out election form ***only if*** such Holders did not elect to exercise an opt out.    The Debtors provided the Holders of Claims and Interests with clear and conspicuous notice of the Third-Party Release via the Ballots and the Opt Out Form.[185]    The opportunity to opt out was clear to all Releasing Parties under the Plan.

---

No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023).

[182]    *In re Saint Michael's Med. Ctr.*, Hr'g Tr. 3:13-15 (Jan. 12, 2017).

[183]    *In re Aceto Corp.*, No. 15-24999 (VFP) (Bankr D.N.J. Jan. 12, 2017).

[184]    *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) Hr'g Tr. 39: 17-19 (Bankr. D.N.J. Sept. 12, 2023) ("The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots.  It should come as no surprise. . . . [W]e seem to accept a very low threshold for notice these days. . . . This is not the situation here with these notices.  Again, they've been conspicuous.  They've been clear.  I don't view it as burdensome. . . ."); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) Hr'g Tr. 36: 2-8 (Bankr. D. Del. Jun. 8, 2023) ("As I and others on this Court have previously ruled, when a disclosure is prominent and conspicuous an opt-out mechanism is a valid means of obtaining consent.  It is incumbent on effected parties who have been properly served to protect their own rights.  Parties that fail to act in response to a judicial process are routinely bound by the results of the process.").

[185]    *See* Disclosure Statement Order, Exhibit 2A, Exhibit 2B, and Exhibit 2C.

132.    In its objection, the U.S. Trustee takes issue with the Third-Party Releases, stating that such releases should be "stricken from the [Plan]."[186]  Notwithstanding the U.S. Trustee's concerns, the Third-Party Release complies with Third Circuit law and is supported by the facts and circumstances of these chapter 11 cases.  The Court unambiguously has the authority to approve the Third-Party Release, and courts in this district, other courts in the Third Circuit, and courts across the country routinely exercise that authority by confirming plans containing third-party releases similar to those contained in the Plan.[187]

133.    The U.S. Trustee's Objection is misplaced and mischaracterizes the weight of authority in the Third Circuit that has approved opt out procedures.[188]  Further, the U.S. Trustee's contention that the Third-Party Release is not consensual[189] is belied by the plain language of the Plan; the robust service of the Court-approved Opt Out Forms to Holders of Claims and Interests alerting them to the Third-Party Release and the procedures for exercising their right to opt out; and the fact that over 2,000 parties in interest have availed themselves of the opt out mechanism to opt out of the Third-Party Release.  The law is clear that a release is consensual where parties have received sufficient notice of a plan's release provisions and have had an opportunity to object to or opt out of the release and failed to do so (including where such holder abstains from voting altogether).[190]

---

[186]    U.S. Trustee Obj. ¶ 39.

[187]    *See supra* note 158.

[188]    *Cf. In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (recognizing that not inferring consent from the nonresponsive creditors and equity holders "is a minority [position] amongst the judges in this District").

[189]    *See* U.S. Trustee Obj. ¶ 37.

[190]    *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third-Party Releases may be

134.    Indeed, courts in this jurisdiction, including this Court, have overruled similar objections by the U.S. Trustee in several recent cases.  In *Bed Bath & Beyond*, for example, the debtors sought approval of a plan that included an opt out mechanism for holders of claims deemed to accept the plan or those who voted to reject the plan but who did not opt out.[191]  The court overruled the U.S. Trustee's objection to the third-party releases, holding that:

> The requirement to check a box electronically or on paper is minimal.  It's a minimal task to preserve one's rights when faced with the need to protect one's interests.  Within the law, we expect that of parties all the time . . . .  What is essential, though, is that the parties be given notice of that obligation.  That is critical.  And here there can be no question that there was adequate clear and conspicuous notice.  The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots.  It should come as no surprise.  And I'll note, anecdotally, again, we seem to accept a very low threshold for notice these days.  You can scroll through on your phone an agreement and just scrolling through is deemed it gives you sufficient notice.  Anybody who watches TV sees the tiniest of print, disclaimers, boilerplate, that last on a screen for 25 milliseconds and that's deemed sufficient notice.  Let alone, those who listen on a radio and hear voice overs do disclaimers that are virtually incomprehensible they're so quick.  This is not the situation here with these notices.  Again, they've been conspicuous.  They've been clear.  There's transparency and I don't view it as burdensome in order to protect their interests.  The ability to opt out and pursue claims exists.  It takes the simple task of reading a document, either digitally or in paper, and exercising opt out.  So, I'm overruling the objections consistent with prior ruling within this circuit, prior rulings within this court and, specifically prior cases that I've had.[192]

---

properly characterized as consensual and will be approved."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218–19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third-Party Release provision consensual and within the scope of releases permitted in the Second Circuit.") *aff'd*, No. 09 Civ. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the Article X release is purely consensual and within the scope of releases that Specialty Equipment permits.").

[191]  *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

[192]  *Id.,* Hr'g Tr. at 38–40 (Bankr. D.N.J. Sept. 12, 2023).

135.     Similarly, in *BlockFi*, the debtors sought approval of a plan that included an opt out

mechanism.[193]  The "Releasing Parties" under the *BlockFi* Plan were defined to include "all

Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the

releases provided by the Plan; . . . all Holders of Claims who abstain from voting on the Plan and

who do not affirmatively opt out of the releases provided by the Plan [and] . . . all Holders of

Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided

by the Plan."[194]  Once again, this Court overruled the U.S. Trustee's objection, holding that:

> I expect, and I think as a society – and I said this at the Bed Bath &
> Beyond hearing – we have a number of examples where expect
> action to preserve your rights.  You have to answer a summons or
> complaint.  You have to respond to a jury demand.  You have to
> unsubscribe.  You have to reject cookies.  There are things you have
> to do, and we do it all the time.  And simply checking a box to
> preserve your right is not onerous, is not an obstacle, and is not a
> hindrance as long as you're on notice of the need to do so.[195]

136.     Both the Committee and the U.S. Trustee object to the Third-Party Release in light

of the Supreme Court's recent decision in the *Purdue Pharma* case.[196]  Importantly, in *Rite Aid

Corp.*, though the U.S. Trustee's Objection regarding the third-party release and opt out

mechanism was ultimately mooted, this Court still confirmed that:

> "[t]he Court will not address at length the objections raised with
> respect to third-party releases, the debtors' release, the gatekeeping
> function.  The Court's views on these issues, as noted by the U.S.
> Trustee, are well known and apparently well documented.  I keep
> reading them.  The Court sees no reason to deviate from its position
> as to the appropriateness of these tools and mechanisms, even taking
> into account the Supreme Court's recent pronouncement in

---

[193]   *In re BlockFi Inc.* No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023).

[194]   *Id.* at [Docket No. 1309].

[195]   *Id.*, Hr'g Tr. at 110-11 (MBK) (Bankr. D.N.J. Sept. 26, 2023).

[196]   Committee Obj. ¶ 69 (stating that the Third-Party Release is "overbroad and should be limited in light of, among
other things, the recent decision in [*Purdue Pharma*]"); *see also* U.S. Trustee Obj. ¶ 31.

*Purdue*." (referencing *Harrington v. Purdue Pharma L. P.*, No. 23-124, 2024 WL 3187799 (U.S. June 27, 2024)).[197]

137.    Here, the Debtors clearly and conspicuously included the full text of the Third-Party Release language in the Opt Out Form, and the Notice of Non-Voting Status, which were sent to all creditors and equity holders, as applicable, and explicitly alerted such parties (i) of the deadlines to vote on and object to the Plan and (ii) that unless a party expressly opts-out, it shall be deemed a Releasing Party under the Plan.[198]   All stakeholders had proper notice of their rights and could have chosen to object to the release, opt out of the release, or object to confirmation of the Plan. There is no question that all applicable stakeholders had proper notice of their rights and could have chosen to opt out of the Third-Party Release.   Further, because the Third-Party Release applies only to Holders of Claims that are deemed to accept and do not opt out, Holders of Claims who abstain from voting and do not opt out, and Holders of Claims who vote to reject and do not opt out, it is consensual under the weight of authority (in this district and others) of what constitutes consent in the context of a third-party release.[199]

---

[197]   *In re Rite Aid Corp.*, No. 23-18993 Hr'g Tr. at 93:7-14 (MBK) (Bankr. D.N.J. June 28, 2024) (referencing *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024)).

[198]   *See* Certificate of Service.

[199]   *In re Lannett Company, Inc.*, Hr'g Tr. at 36:2-8, No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) ("As I and others on this Court have previously ruled, when a disclosure is prominent and conspicuous an opt-out mechanism is a valid means of obtaining consent.   It is incumbent on effected parties who have been properly served to protect their own rights.   Parties that fail to act in response to a judicial process are routinely bound by the result of the process."); *In re RCS Cap. Corp.*, No. 16-10223 (MFW), Hr'g Tr. 59:21–60:2 (Bankr. D. Del. Mar. 21, 2016) ("[T]here's enough affirmative action required to allow the mechanism the debtor is suggesting because it's clear in the ballot that, if they vote yes on the plan, they are granting a release.   If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote.   So I think affirmatively voting on the plan is enough action to be an acceptance of third-party releases"); *In re Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.   Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved.").

138.    Additionally, the Deemed Rejecting Classes, other than General Unsecured Claims (*e.g.*, Holders of Equity Interests in Invitae), are not Releasing Parties under the Plan. The Third-Party Release releases Claims held by Holders in the Voting Classes and the Unimpaired Classes ***only if*** such Holders do not opt out of the Third-Party Release. The Debtors have provided the Holders of Claims in the Voting Classes and the Unimpaired Classes with clear and conspicuous notice of the Third-Party Release via the Opt Out Form.[200]

139.    The Third-Party Release is consensual, and the scope of the Third-Party Release here is necessary for the consummation of the Plan, warranted under the circumstances, clearly permitted by the applicable law, and should be approved as contemplated. For these reasons, and as this court and the Third Circuit have held, the U.S. Trustee Objection should be overruled and the Third-Party Release should be approved as consensual as to all creditors and interest holders who did not opt out or object, including those deemed to reject the Plan.

**B.    The Debtor Release Is Appropriate.**

140.    Article VIII.C of the Plan also provides for releases by the Debtors, the Wind-Down Debtors, and their Estates of Claims and Causes of Action against each Released Party (the "Debtor Release"). The Committee's objection to the Debtor Release relies on tired arguments that have been rejected by this Court at the Standing Hearing and misrepresents and undervalues the efforts of the Debtors, their management team, and their advisors to push this confirmation process forward.

141.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the

---

[200]    *See* Disclosure Statement Order, Exhibit 2A, Exhibit 2B, and Exhibit 2C; Certificate of Service.

estate."[201]   A debtor may release claims under section 1123(b)(3)(A) if the release is fair, reasonable, and in the best interests of the estate.[202]

142.   Courts in this jurisdiction and elsewhere generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[203]  The analysis includes an inquiry into whether there is:  (1) identity of interest between the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[204]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as

---

[201]   *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) ("The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3)."). Generally, courts in the Third Circuit will approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Additionally, the Third Circuit has held that, to approve a settlement pursuant to Rule 9019, the court must balance:  "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'"  *In re WebSci Techns., Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (quoting *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).  In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.  *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

[202]   *U.S. Bank*, 426 B.R. at 143; *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[203]   *See In re Indianapolis Down*, 486 B.R. at 303 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).  The *Master Mortgage* factors have been adopted by the Third Circuit, including application by the Bankruptcy Court of the District of New Jersey as "neither exclusive nor conjunctive requirements, but . . . guidance in the Court's determination of fairness."  *See In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Wash. Mut.*, 442 B.R. at 346).

[204]   *See In re Wash. Mut.*, 442 B.R. at 346 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110; *In re Master Mortg.*, 168 B.R. at 937).

guidance to courts in determining fairness of a debtor's releases.[205]  The Debtor Release easily

meets the applicable standard and should be approved.

143.  ***First***, an identity of interest exists between the Debtors and the parties to be

released, namely the Debtors' directors and officers and the Holders of 2028 Senior Secured Notes.

The directors and officers, as stakeholders and critical participants in the Plan process, share a

common goal with the Debtors in seeing the Plan succeed and would have been highly unlikely to

participate in the negotiations and compromises that led to the ultimate formation of the Plan (or

to participate in the ultimate implementation of it) without the Debtor Release.  Moreover, with

respect to certain of the releases—*e.g.*, those releasing the Debtors' current and former directors

and officers—there is a clear identity of interest supporting the releases because the Debtors will

assume certain indemnification obligations under the Plan that will be honored by the

Wind-Down Debtors and/or the Plan Administrator.[206]  Further, the mere fact that the Debtors and

the Holders of the 2028 Senior Secured Notes are not affiliated ignores the relationship between

the parties after the restructuring process was underway.  The Holders of the 2028 Senior Secured

Notes were party to the TSA, supported the Plan, and supported the Sale Transaction embodied in

the Plan.  The Debtor Release provides finality to those parties critical to effectuating the Sale

Transaction and to the wind down efforts of the Debtors, underpins the settlement and compromise

of issues achieved by the Plan, maximizes value for creditors, and permits the Estates to

consummate the Plan.  Therefore, the inclusion of the Debtor Release inures to the benefit of all

---

[205]  *Id.* at 346 (citing *In re Master Mortg.*, 168 B.R. at 935).

[206]  *See In re Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the
debtor has a duty to indemnify the nondebtor receiving the release.") *see also* Plan, Art. V.B.

the Debtors' stakeholders, and the Debtors and the directors and officers plainly share an identity

of interests.

144.    **Second**, the substantial contributions by Deerfield and the officers and directors are

clear.  In fact, as courts in this jurisdiction have recognized, the efforts of management may

constitute a substantial contribution.[207]  In these cases, and in addition to their day-to-day roles,

the Debtors' directors and officers, among other things, prepared the Debtors' bankruptcy

schedules, negotiated with stakeholders, oversaw the Company's communications strategy, and

met with customers.  The Debtors' directors and officers played a crucial role in the sale process

as well, by responding to significant diligence requests, meeting with potential purchasers,

preparing for, assisting, and attending the auction, and assisting on the integration of the

Company's business with Labcorp.[208]  In the absence of these parties' contributions, the

transactions contemplated by the Plan would not be possible.

145.    Courts in this Circuit have also found that a wide variety of acts may illustrate a

substantial contribution to a debtor's reorganization.[209]  The Committee's assertion that the

---

[207]    *See Su v. Offshore Inv. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757–58 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the special committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders").

[208]    *See* Schrank Decl. ¶ 8.

[209]    *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring, (b) plan sponsor funded the plan and agreed to compromise its claim, and (c) a committee negotiated the plan and assisted in the solicitation of its constituents); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (finding non-debtor party had substantially contributed where non-debtor parties entered into a settlement where non-debtor parties agreed to

Debtors' directors and officers, Deerfield and the other Released Parties did not provide *any* substantial contribution to the Plan is as dismissive of their efforts as it is wrong on the facts. For example, the Debtor Release was an important inducement in negotiations with the Required Holders. Without the Debtor Release, it is highly unlikely that the Required Holders would have permitted the Debtors' use of the Cash Collateral, which granted them access to approximately $142 million of liquidity to fund the Debtors' operations during these chapter 11 cases.[210] Likewise, Labcorp—another Released Party—has proposed, negotiated in good faith, and ultimately will consummate the value-maximizing Sale Transaction, the proceeds of which comprise the primary pool of Distributable Value for the Plan that the Debtors propose to confirm for the benefit of the Debtors, their Estates, and all parties in interest. In sum, the Debtor Release has been and is essential to the Debtors' restructuring.[211]

146.  **Third**, the Debtor Release is essential to the success of the Debtors' Plan. Absent the Debtor Release, it is highly unlikely Deerfield would have agreed to support the Plan, and highly unlikely that the TSA, the Asset Purchase Agreement, or the Plan would exist at all. As described above, the Debtors' directors and officers contributed substantial value to these chapter 11 cases and did so with the understanding that they would receive releases from the Debtors. In arguing that the Debtor Release is not necessary, the Committee once again ignores the fact that

---

reduce their claim); *In re Long Ridge Road*, 2014 WL 886433, at *14 (finding that the non-debtor party had substantially contributed by providing financial support, without which the plan would not be feasible).

[210]  *See In re Midway Gold US, Inc.*, 575 B.R. 475, 510 (Bankr. D. Colo. 2017) (finding that without the contributions of the third parties being granted releases by the debtors, which include the provision of financing for the chapter 11 cases and consent to the use of their cash collateral by the debtors, the chapter 11 cases would not likely have reached confirmation); *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) ("[T]he releases are an integral part of the agreement with the [non-debtor parties] to finance the chapter 11 cases and to fund the [p]lan.").

[211]  *See In re Long Ridge Road*, 2014 WL 886433, at *14 (finding that providing funding so as to provide distributions to claimants under the plan was a substantial contribution); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (same).

there may not be a Plan without the ability to use the Debtor Release as an inducement to secure support for the key agreements in these cases. Instead, the Committee argues solely that releases cannot be necessary to a liquidating plan as a matter of law. But this Court, and courts in this Circuit, have recently approved liquidating plans with similar Debtor Release.[212] In absence of the support that the Debtors have garnered through these cases, of which the Debtor Release was a key driver, the Debtors would not be in a position to confirm the Plan, consummate the Sale Transaction, implement the Plan, and maximize value for creditors. The Debtor Release, therefore, is essential to the Debtors' Wind-Down Transactions.

147.     **Fourth**, as evidenced by the Voting Report and discussed herein, the Debtors' stakeholders support the Plan. Notably, the only Voting Class that the Debtors believe is Impaired and entitled to vote accepted the Plan.[213] The Committee claims the "vast majority" of the creditor body objects to the Debtor Release, pointing solely to the non-controversial fact that "only one creditor group will vote in favor of the Plan."[214] Of course, only one creditor group is entitled to vote on the Plan; and the majority of creditors entitled to vote accepting the Plan is, indeed, the requisite show of support. Surely, if the creditor body was concerned about the Debtor release, there would be more than one objection to its inclusion.

148.     **Fifth**, the Plan provides for meaningful recoveries for creditors, including 100-cent recoveries for **over 90 percent** of the Debtors' creditors who are expected to get Class 4 Convenience Class treatment. As demonstrated by the Liquidation Analysis, the ranges of

---

[212]    *See In re BlockFi Inc.*, No 22 19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming liquidating chapter 11 plan with debtor releases); *In re Cyxtera Techs., Inc.*, No. 23 14853 (JKS) (Bankr D.N.J. Nov. 17, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23 13359 (VFP) (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

[213]    *See* Voting Report, Exhibit A.

[214]    *See* Committee Obj. ¶ 64.

recoveries for those Holders of unsecured Claims and Interests are higher under the Plan than they would have been in a chapter 7 liquidation scenario.[215]  The Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

149.    These recoveries are available solely because the Debtors have agreed, among other things, to give up potential claims that range from weak to frivolous.  This Court has already identified many of the significant hurdles that the Debtors (or any other party that would have standing) would face in pursuing these claims.[216]  Based on these hurdles, the Debtor Release was worth the significant benefits the Debtors received in exchange, including full payment of the claims of over 90 percent of the Debtors' creditors.

150.    The Committee asserts that the Debtors' Plan does not come "even close" to paying "all or substantially all" claims.[217]  But that assertion relies on a literal reading of the *Zenith* factors that would render debtor releases wholly unavailable in most restructuring contexts.  As discussed above, debtor releases are often a key inducement in negotiations between debtors and their stakeholders.  Under the Committee's logic, in order to approve a debtor release, the payment in full of "all or substantially all" creditor claims *in amount* is required regardless of the value available to distribute. Logically, most courts in this Circuit and others have rejected arguments like the Committee's reductive and prejudicial interpretation(and the consequences that it would cause) and regularly approve plans with debtor releases that feature a large number of unsecured creditors that receive a high recovery, and certain other classes of unsecured creditors that receive

---

[215]  *See* Spirito Decl. at ¶ 22.

[216]  [Docket No. 793].

[217]  Committee Obj. ¶ 65.

low to no recovery.[218]   Further, the Committee's assertion is highly prejudicial to an overwhelming majority of their constituents.  As stated above, over 90 percent of the unsecured creditor base is expected to get 100 cents on the dollar based on the Convenience Class treatment under the Plan but the Committee is implying that full recovery for these constituents with smaller claims has no weight.

151.    For the reasons set forth above, the *Zenith* factors support approval of the Debtor Release.  The Debtors have easily satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release is fair, reasonable, supported by the requisite amount of creditors, and in the best interests of the Debtors' Estates.  For these reasons, the Debtors' agreement to provide the Debtor Release is in the best interests of creditors and all stakeholders and is an integral part of the Plan.  The Debtor Release should be approved.

### C.    The Exculpation Provision Is Appropriate.

152.    Article VIII.E of the Plan provides that each Exculpated Party shall be exculpated, "to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release,"[219] from any Cause of Action arising out of acts or omissions in connection with these chapter 11 cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation").  The Exculpation is intended to prevent collateral attacks against estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring. The Exculpation is an integral part of the Plan and otherwise satisfies the governing standards in

---

[218]   *See In re Celsius Network, LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) (approving a plan with debtor releases, where a large number of unsecured creditors received a recovery and certain classes of unsecured creditors received low or no recovery); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same).

[219]   Plan, Art. VIII.E.

the Third Circuit. This provision provides necessary and customary protections to estate fiduciaries whose efforts were and continue to be vital to implementing the Plan.

153. In the Third Circuit, exculpation provisions like the one set forth in the Plan are regularly approved.[220] Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[221] Exculpation provisions that are limited to claims not involving a criminal act, actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[222] Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[223] Exculpation for parties participating in the Plan

---

[220] *See In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (approving a chapter 11 plan with a similar exculpation provision to the Plan); *In re BlockFi Inc.*, No. 22 19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same); *In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).

[221] *See In re Congoleum Corp.*, 362 B.R. 167, 195–97 (Bankr. D.N.J. 2007) (evaluating the appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the negotiations that led to the plan and whether the exculpation is necessary to the plan).

[222] *See In re Wash. Mut., Inc.,* 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming plan where exculpation provision covered the debtors and wind down debtors, the creditors' committee, and related parties, including current and former control persons and professionals); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same).

[223] *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as

process is appropriate where Plan negotiations could not have occurred without protection from liability.[224]

154.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.  Moreover, the Exculpation provision and the liability standard it sets represent a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

155.    Here, the Debtors and their officers, directors, and professionals actively negotiated the Plan with the Consenting Stakeholders under the TSA, certain objecting parties, and other parties in interest.[225]  Those negotiations were extensive and included modifications responsive to the Committee's issues, and thus the resulting Plan will maximize value for all stakeholders, enable the Debtors to emerge swiftly from chapter 11 and distribute proceeds and other recoveries ,begin their Wind-Down process, and provide giving finality to all stakeholders.  Furthermore, the

---

that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[224]    *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

[225]    *See id.*

Exculpation provision is limited to acts during these chapter 11 cases and does not extend beyond

such time period.  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' chapter

11 cases should also extend to the Exculpated Parties.  Under the circumstances, it is appropriate

for the Court to approve the Exculpation Provision and to find that the Exculpated Parties have

acted in good faith and in compliance with the law.[226]

### D.   The Injunction Provision is Appropriate.

156.    The injunction provision set forth in <u>Article VIII.F</u> of the Plan (the "<u>Injunction</u>

<u>Provision</u>") implements the Plan's release, general settlement, and exculpation provisions by

permanently enjoining all Entities from commencing or pursuing any action against the Debtors,

the Wind-Down Debtors, the Related Parties, or the Released Parties that relates to or is reasonably

likely to relate to any act or omission in connection with, or arising out of Claims or Interests

released, compromised, or settled pursuant to the Plan.  Thus, the Injunction Provision is a

necessary part of the Plan precisely because it enforces the discharge, release, and exculpation

provisions that are centrally important to the Plan.[227]  Further, the injunction provided for in the

Plan is narrowly tailored to achieve its purpose.

157.    To the extent the Court finds that the Plan's exculpation and release provisions are

appropriate, the Court should approve the Injunction Provision.  The discretionary provisions of

the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.  In

light of the foregoing, because the Plan fully complies with sections 1122 and 1123 of the

---

[226]   *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

[227]   *See SEC v. Drexel Burnham Lambert Grp. (In re Drexel Burnham Lambert Grp.)*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve an injunction provision where such provision "plays an important part in the debtor's reorganization plan").

Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## IV.   THE REMAINING OBJECTIONS SHOULD BE OVERRULED.

158.   As of the filing of this Memorandum, the Debtors have resolved certain of the formal and informal Objections received.   The Debtors continue to work diligently with all objecting parties and seek to resolve their remaining Objections before the Confirmation Hearing. The Committee Objection will remain outstanding, particularly its concerns regarding the plan modifications; the Make-Whole Amount; the distribution scheme as it relates to Class 3; the settlements embodied by the Plan; the Release and Injunction provisions; the Plan's classification scheme; and various additional items discussed herein.   However, after discussions, the Debtors believe that the U.S. Trustee's Objection can be substantially narrowed, and it is the Debtors' understanding that the only remaining issues will be about the inclusion of the Third-Party Release (discussed above), and the "gatekeeper" provision.   The Tecan Objection and IDT Objection are not confirmation issues, and should be properly dealt with during the claims reconciliation process. The Debtors believe the WSFS Objection has been resolved, and further believe that the Lift Stay Objection, to the extent it remains outstanding, will be resolved via a separate stipulation or language in the Confirmation Order.   Nonetheless, as discussed below, to the extent outstanding all of the Objections should be overruled.[228]

### A.   The Gatekeeping Provision Is Integral to the Plan and Should be Approved.

159.   The   U.S.   Trustee   objected   to   the   so-called   "gatekeeping"   provision (the "Gatekeeping Provision"), which provides that:

---

[228]   The Debtors continue to engage with certain parties regarding language to be included in the Confirmation Order to resolve such parties' objections.   To the extent not resolved prior to the Confirmation Hearing, the Debtors are prepared to present oral argument in response to the Objections.

From and after the Effective Date, any Entity (i) that opted out of the releases contained in Article VIII.D or (ii) was deemed to reject the Plan may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in Article VIII.C of the Plan, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable, and, only, to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.[229]

160.    The Gatekeeping Provision is a legitimate exercise of this Court's power under sections 105, 1123(b)(6), and 1141(a), (b), and (c) of the Bankruptcy Code. The purpose of the Gatekeeping Provision is to ensure that the Debtors or other Released Parties do not become bogged down in vexatious, meritless litigation of claims that have been released under the Plan, in courts that are unfamiliar with these chapter 11 proceedings and the releases and exculpation provisions contained in the Plan approved by this Court. Gatekeeping Provisions have been utilized by many courts to provide a threshold level of review following confirmation of a chapter 11 plan. Under this construct, which has been approved in numerous jurisdictions (including this district),[230] the Court interprets its own order in the first instance and determines whether a litigant has a colorable claim that remains assertable following confirmation of the Plan.

---

[229]    Plan, Art. VIII.D.

[230]    *See, e.g.*, *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Jun. 13, 2024) (approving a similar gatekeeping provision); *In re WeWork Inc.*, No, 23-19865 (JKS) (Bankr. D.N.J. May 31, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (same); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Nat'l Realty Inv. Advisors, LLC*, No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) (providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter 11 case on a post-effective date basis); *In re Princeton Alt. Income Fund, LP*, No. 18-14603 (MBK)

161.    To be clear, it is not necessarily contemplated that the Court is ruling on the underlying merits of the action.  Rather, the Court is making an inquiry into whether or not there is an ability to bring the action or whether it has been addressed already as part of the Plan or Confirmation Order.  The Court is being asked to make an initial threshold inquiry and engage in the construction of the terms of the Plan, and to interpret those terms in conjunction with the Confirmation Order.  The Court is undoubtably the best forum to accurately construe the language of its own plan and confirmation order.

162.    The Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine" established by the Supreme Court in *Barton v. Barbour*.[231]  The Barton Doctrine provides that, as a general rule, before a suit may be brough against a trustee, leave of the appointing court must be obtained.[232]  While the Barton Doctrine originated as a protection for federal receivers, courts have applied the concept to various participants in chapter 11 cases, including debtors in possession,[233] trustees appointed to administer post-confirmation liquidation of the bankruptcy Estate,[234] officers

---

(Bankr. D.N.J. Mar. 13, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits); *In re Cineworld Grp. plc*, No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 28, 2023) (approving a similar gatekeeping provision); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) (same); *In re Nautical Sols., L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 16, 2023) (same); *In re Highland Cap. Mgmt., L.P.*, No.19-34054 (SGJ) (Bankr. N.D. Tex. Feb. 22, 2021) (same).

[231]    104 U.S. 126 (1881).

[232]    *Baron v. Sherman (In re Ondova Co.*), 2017 Bankr. LEXIS 325, at *29 (Bankr. N.D. Tex. Feb. 1, 2017).

[233]    *Helmer v. Pogue*, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to a debtor in possession).

[234]    *In re Swan Transp. Co.*, 596 B.R. 127, 137 (Bankr. D. Del. 2018) (citing *Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 489-98 (Bankr. D. Del. 2012)).

and directors of a debtor,[235] and professionals retained by the debtors.[236]  By requiring claimants to seek leave of the Court before pursuing actions against the Debtors and its successors in interest, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine.

163.    The gatekeeping role is one played by Bankruptcy Courts in numerous contexts. In the *Madoff* cases, the Court served as a gatekeeper to determine whether claims against certain Madoff funds were direct or derivative claims.[237]  In *Motors Liquidation Co.*, the Court serves as a gatekeeper to determine whether claims may properly be asserted against the pre- or post-reorganization General Motors entity.[238]  Under this construct, the Court effectively serves the same role as it does when it determines whether a statutory committee should be granted standing to file litigation on behalf of a debtor; that is, the Court is asked to make a determination as to whether the claim at issue is colorable.

164.    The Gatekeeping Provision is not an attempt to impermissibly extend the Court's jurisdiction past its limits.  Courts in this Circuit have confirmed plans on numerous occasions that provide permanent Bankruptcy Court jurisdiction over matters arising out of the chapter 11 cases, recognizing that Bankruptcy Courts may continue to exclusively adjudicate issues related to the

---

[235] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (holding that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (applying Barton Doctrine to president of the debtor).

[236] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (applying Barton Doctrine to trustees' counsel).

[237] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff),* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussing the bankruptcy court's gatekeeper role).

[238] *See In re Motors Liquidation Co.*, 541 B.R. 104, 113 (Bankr. S.D.N.Y. 2015), *vacated and remanded on other grounds*, 590 B.R. 39 (S.D.N.Y. 2018) (discussing bankruptcy court's gatekeeper role).

chapter 11 cases on a post-emergence basis.[239]   Furthermore, courts have acknowledged that Bankruptcy Court jurisdiction over matters arising out of chapter 11 cases may extend even further where the debtor is liquidating its assets, as is the case here.  For example, in *Boston Regional Medical Center Inc. v. Reynolds*, the First Circuit acknowledged that a "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court," and "[a]ny litigation involving such a debtor thus relates much more directly to a proceeding under title 11."[240]

165.   Furthermore, contrary to the assertions of the U.S. Trustee,[241] the Gatekeeping Provision does not impose any greater burden or administrative hurdle on claimholders than the Plan would impose without the Gatekeeping Provision.   Nearly all chapter 11 plans in complex cases, including the Plan, contain an injunction permanently preventing parties from asserting released claims against released parties.  If a claimant seeks to assert a claim following the Effective Date of the Plan but is unsure whether that claim constitutes a colorable claim that has not been released, the claimant will need a judicial determination that the claim was not released under the Plan; otherwise, the claim could not be properly asserted. The Gatekeeping Provision ensures that the Court—the court most familiar with the facts and circumstances of these chapter 11 cases, and the court best-positioned to determine as to whether

---

[239]   *See, e.g., In re Thrasio Holdings, Inc.*, No. 24-11840 (Bankr. D.N.J. June 13, 2024) (providing that the bankruptcy court will have sole and exclusive jurisdiction to determine whether a claim or cause of action constitutes a direct or derivative claim, is colorable and, to adjudicate the underlying claim or cause of action); *In re WeWork Inc.*, No, 23-19865 (JKS) (Bankr. D.N.J. May 31, 2024) (same); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 30, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (same); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 13, 2020) (providing that the bankruptcy court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the chapter 11 cases and the plan); *In re Lannett Co.*, No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) (same).

[240]   *Boston Reg'l Med. Ctr. Inc. v Reynolds (In re Boston Reg'l Med. Ctr. Inc.)*, 410 F.3d 100, 107 (1st Cir. 2005).

[241]   U.S. Trustee Obj. ¶46.

the claim may be asserted in the first place—is the court making that determination.  This inures

to the benefit of all parties, including potential claimants.

166.    The propriety of gatekeeping provisions was recently litigated in the Fifth Circuit

in *Highland Capital*.  There, the debtors sought approval of a provision nearly identical to the

Gatekeeping Provision in the Plan.  In upholding confirmation of the plan, the Fifth Circuit

recognized that the Gatekeeping Provision was necessary to ensure the effectiveness of the

debtors' plan by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its

successors, and other bankruptcy participants."[242]  Indeed, following confirmation of the plan, the

U.S. Bankruptcy Court for the Northern District of Texas exercised the gatekeeper provision by

denying a suit by a non-debtor against the debtors' former chief executive officer.[243]

167.    This Court has recently approved gatekeeping provisions consistent with the

language in the Plan.[244]  For example, the *In re Bed Bath & Beyond Inc.* gatekeeping provision

provided that:

> From and after the Effective Date, any Entity (other than the DIP
> Agent, the DIP Lenders, the ABL Agent, the FILO Lenders, or the
> FILO Agent) that opted out of (or otherwise did not participate in)
> the releases contained in this Article X.D may not assert any claim
> or other Cause of Action against any Released Party for which it is
> asserted or implied that such claim or Cause of Action is not subject
> to the releases contained in Article X.C of the Plan without first
> obtaining a Final Order from the Bankruptcy Court (a) determining,
> after notice and a hearing, that such claim or Cause of Action is not
> subject to the releases contained in Article X.C of the Plan and

---

[242]  *NextPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt, L.P.)*, 48 F.4th 419, 435
(5th Cir. 2022).

[243]  *In re Highland Cap. Mgmt., L.P.,* No.19-34054 (SGJ) (Bankr. N.D. Tex. Feb. 22, 2021).

[244]  *See, e.g., In re Thrasio Holdings, Inc.*, No. 24-11840 (Bankr. D.N.J. June 13, 2024); *In re WeWork Inc.*, No, 23-
19865 (JKS) (Bankr. D.N.J. May 30, 2024); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J.
May 30, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr D.N.J. Nov. 17, 2023); *In re BlockFi Inc.*,
No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK)
(Bankr. D.N.J. Sept. 14, 2023).

(b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. . . . The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XIII of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[245]

168.   In overruling the U.S. Trustee's objection to this provision and approving the provision, the *Bed Bath* court recognized that, absent a gatekeeping function, courts across the country are likely to "construe and interpret the language of a plan and a confirmation order in inconsistent fashion."[246]   The *Bed Bath* court also recognized the minimal burden imposed on the court in acting as a gatekeeper because "in all likelihood in all of these situations it's coming back before the bankruptcy court anyway."[247]

169.   Similarly, the *In re BlockFi Inc.* gatekeeping provision stated that:

From and after the Effective Date, any Entity (i) that opted out of the releases contained in this Article VIII.B or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or

---

[245]   *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

[246]   *Id.*, Hr'g Tr. 41:17–42:1 (Bankr. D.N.J. Sept. 12, 2023) ("Absent a gatekeeping function, there is a risk that you're going to have courts across this country construe and interpret the language of a plan and a confirmation order in inconsistent fashion.  That's disservice to those plaintiffs.  It's a disservice to those who were under the impression they were benefitting by making a contribution to the reorganization and getting certain protections.").

[247]   *Id.* at 42:2–9 ("The ability of a single court to take on a limited burden, and let's be clear -- it's minimal.  Let's be clear, in all likelihood in all of these situations it's coming back before the bankruptcy court anyway.  It's either the defendant is going to come back before the court to ask for clarity and enforcement of a confirmation order, enforcement of a discharge or one of the other parties to the litigation.  And that's the way it should be because the courts will have a familiarity.").

> Cause of Action constitutes a direct or derivative claim, is colorable
> and, only to the extent legally permissible and as provided for in
> Article XI of the Plan, the Bankruptcy Court shall have jurisdiction
> to adjudicate the underlying claim or Cause of Action.[248]

170.    In overruling the U.S. Trustee's objection, the *BlockFi* court expanded on the court's reasoning in *Bed Bath*, observing that the gatekeeping provision is not an assertion of jurisdiction the court does not have, and is instead limited to what the Bankruptcy Code and the judicial code already allows the court to decide.[249]   The court reasoned that the gatekeeper function preserves both judicial economy and the centrality of the bankruptcy court as an appropriate forum to decide the meaning of the plan and confirmation order, and how potential claims fall within such documents.[250]  "It makes no sense to urge parties to make contributions to a Chapter 11 case and in return secure releases or secure certain rights that will be undercut by then having to defend their position all across the country in front of separate courts in separate forums, with inconsistent results."[251]

171.    The Court should approve the Gatekeeping Provision for the same reasons identified by the Northern District of Texas in *Highland Capital* and consistent with the prior decisions *Bed Bath & Beyond* and *BlockFi*.  Rather than seeking to shift the burden of proof to claimants or provide a further release of claims or causes of action under the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan.  In the absence of the Gatekeeping Provision, it is entirely possible that parties subject to the Plan's release and exculpation provisions will seek to assert frivolous claims, or claims barred by

---

[248]   *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023).

[249]   *Id.,* Hr'g Tr. at 111:23–25 (Bankr. D.N.J. Sept. 26, 2023).

[250]   *Id.* at 111:25–112:6.

[251]   *Id.* at 112:15–20.

the Plan's injunction provisions, hindering the effectiveness of the Debtors' Plan.  Critically, the

absence of the Gatekeeper Provision would not hinder creditors from bringing actions related to

claim disputes in front of this Court.  Bankruptcy Code 502(a) preserves the ability for any party

to object to a claim, even post confirmation.  As the Court noted in its ruling on the gatekeeping

provision in *In re BlockFi*:

> [a]s I said in other hearings, we end up in the same place anywhere.
> When these actions are brought, somebody is bringing it back to the
> bankruptcy court to determine whether or not it's a discharge
> injunction, it's a plan injunction . . . . It comes back to this court
> anyway.  So we're just putting in place in language what it is the
> practice.  I have no issue with the scope or the provisions of the
> gatekeeping function.[252]

172.    The Gatekeeping Provision represents a permissible exercise of the Court's

jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential

claimants.  Accordingly, the Court should overrule the U.S. Trustee Objection and approve the

Gatekeeping Provision which "serves the interests of those who bargained for certain rights in

making contributions and it serves the interest of even the plaintiffs in not spending time and

money on a claim that will have no traction."[253]  Further, as observed by courts in this district, this

Court, "the court with close[] hands-on [] understanding of the plan and the terms of the

confirmation order,"[254] is the appropriate forum to decide what the meaning of the Plan and

Confirmation Order is and how potential claims may fall within these documents.

---

[252] *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Sept. 26, 2023) Hr'g Tr. 113:5–16.

[253]    *Id.* at 113:1–4.

[254]    *Id.* at 112:21–25.

**B.** **Each of the Committee Objection and Baker Bros. Joinder Should be Overruled.**

**1.** **The Make-Whole Amount is Not a Confirmation Issue.**

173. The Plan can be confirmed even if the Claims Objection surrounding the Make-Whole is not fully adjudicated at the Confirmation Hearing.  As stated herein, although the Committee contends that the 2028 Senior Secured Noteholders are not entitled to the Make-Whole Amount, that is a decision that the Court will soon make, it has been fully briefed and substantially argued.  The Debtors' position on the Make-Whole Amount is unchanged since the Debtors filed joinders in support. The Make-Whole Amount is reasonable and an allowed portion of Deerfield's claim.[255]  And either way, all projections demonstrate that the Distributable Value available on the Effective Date will break somewhere in the principal amount of the Class 3 secured claim, thus not even making the Make-Whole an issue for confirmation.  Regardless as to the Court's ruling on the matter, the Make-Whole is ultimately an issue of claim sizing and does not mean that the Plan should not be confirmed.

**2.** **Payment of Post-Petition Interest to Class 3 is Permissible.[256]**

174. First, post-petition interest attributable to Class 3, under the Second Amended Plan, is contemplated as being paid at the non-default rate despite their entitlement to receive interest at the default right, a modification of those Holders' legal rights that negates any argument that these Holders are Unimpaired.  The Committee's reliance of cases that suggest that payment of *any* post-

---

[255] For the avoidance of doubt, the Debtors incorporate all of their arguments from the *Debtors' Joinder to Deerfield Partners, L.P.'s Response to the Committee's Claim Objection* [Docket No. 751] (the "Claim Objection").

[256] In Section III of the Committee Objection, the Committee purports to advise the Debtors concerning how "recoveries could be improved . . . in a number of meaningful ways." *See* Committee Obj. ¶ 31.  Consistent with its approach throughout these cases, the Committee does not offer any productive feedback or solutions or any backup to their suggestions, and the Court should disregard the Committee's fruitless attempt to pick apart the Debtors' Plan.

petition interest would render Class 3 unimpaired relies on cases that are clearly distinguishable. *In re Nixon* was a chapter 13 case that featured a judgment creditor that the district court determined was delaying collecting the judgment in order to collect more post-judgment interest, in which case the district court appropriately concluded that the Court is permitted to use its equitable powers to prevent abuse of the bankruptcy process.[257]   The facts of that case bear no resemblance to those here.   The Committee's citation to *In re Milham* is similarly inapplicable— that case merely stands for the power of a Court to allow "pendency" interest (accrued after the filing of a petition but prior to the effective date of a reorganization plan),[258] which the court contrasted with "interest to accrue under the terms of a [plan]."[259]   Plan interest—the interest at issue here—is a function of the present value requirement of the cramdown provision[260]. *In re Milham* is inapplicable to this case.   Any assertion by the Committee's that Holders of the 2028 Senior Secured Notes cannot be paid any post-petition interest as part of its claim is contrary to case law, and courts in this Circuit have often confirmed plans that contemplate the distribution of interest even after the effective date.[261]   Accordingly, the Committee's argument that Class 3 is Unimpaired on these grounds or otherwise is not entitled to receive post-petition interest should be overruled.

---

[257]   *See In re Nixon*, 404 F. App'x 575, 576 (3d Cir. 2010).

[258]   *See Key Bank Nat'l Ass'n v. Milham* (*In re Milham*), 141 F.3d 420, 423 (2d Cir. 1998).

[259]   *Id.*

[260]   *See id.* at 424.

[261]   *See In re S. Canaan Cellular Invs., Inc.,* 427 B.R. 44, 77 (Bankr. E.D. Pa. 2010) (confirming a chapter 11 plan with post-effective date interest, stating that "[d]uring the post-effective date period, section 1129(b)(2)(A) refers to an interest rate that results in payment of the present value of the secured claim.").

### 3.   The Committee's Additional Objections Should be Overruled.

175.   ***Post-Effective Governance***.   As discussed above, Class 3 is Impaired, and subordinated its recovery to the administrative costs of the Estates, making their consent over the Wind-Down process and identity and scope of responsibilities Plan Administrator appropriate, as the budget for both comes directly out of amounts that Class 3 would have otherwise been entitled to.   Accordingly, the Court should disregard the Committee's request to change what party is entitled to have consent over the Plan Administrator and go-forward process.

176.   ***Third-Party Releases***.   As discussed at length in Part III.A of this Memorandum, the Third-Party Release is not overbroad and the Supreme Court's recent decision in *Purdue* is not applicable to wholly consensual third-party releases.   The Disclosure Statement provided notice and adequate information regarding the Third-Party Releases, which did not include any carve outs, and all parties were able to make an informed decision as to whether they would consent to that form of release.   Additionally, any direct claims that the Committee's constituents would be able to bring are not released under the Plan.[262]

177.   In addition, it is important to underscore that the Exculpation Provision sets a standard of care of gross negligence or actual fraud in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' chapter 11 proceedings.[263]   As such, an exculpation provision represents a legal conclusion that that obviates the need for such any gross negligence carve-out in the Releases.   Once the Court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.

---

[262]   *See* Disclosure Statement, Art. IV.M; *see generally* Plan, Art. VII.

[263]   *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "states the standard of liability under the Code.").

Accordingly, the Court should disregard the Committee's Objection to wording of the Plan's Release provisions.

178. **_Dissolution of the Committee_**.  Courts in this Circuit have routinely dissolved Committees under liquidating plans with carve-outs narrower in scope than what the Committee is requesting.[264]  Therefore, there is no basis to agree to the Committee's request that the Committee not be dissolved and doing so will would be an unnecessary drain on the Debtors' Estates.  This is especially true here, where the litigious Committee's fees that may be accrued by appealing the Confirmation Order or Standing Motion may threaten to subsume the Wind-Down Debtors' Estates in legal fees.

179. **_Exculpation Provision_**.  The Committee has wholeheartedly disagreed with the Plan, and has challenged the Debtors' process continually.  Accordingly, the Committee should not then seek to gain the benefits that the Plan affords through provisions such as the Exculpation provision.

## C. The Remaining Objections Are Not Confirmation Issues, or Should be Overruled.

### 1. The IDT Objection is a Cure Dispute and Should Not be Heard at the Confirmation Hearing.

180. The IDT Objection concerns disputes with respect to various claims issues and associated indemnification obligations.  The Debtors have engaged with IDT regarding its issues and the parties have agreed to reserve all rights to deal with the claims issues through the claims reconciliation process or through the closing of the Sale Transaction, not the confirmation process.

---

[264] *See In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 29, 2024) [Docket No. 858, §RR] (entering a confirmation order dissolving the Committee upon the Effective Date except for filing final fee applications and the resolution of appeals.); *In re Bed Bath & Beyond Inc.*, No. 23 13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023) [Docket No. 2172, §FF] (entering a confirmation order dissolving the Committee entirely upon the Effective Date).

Accordingly, by mutual agreement, the IDT Objection is not one that is to be properly dealt with at the Confirmation Hearing.

### 2. The Tecan Objection Should Not be Heard at the Confirmation Hearing.

181.    The Debtors have engaged with Tecan regarding the terms of its Objection, which primarily concerns disputes with respect to their administrative expense claims and alleges that the Plan fails under Section 1129(a)(9) of the Bankruptcy Code because their administrative expense claims are not paid in full in cash.  However, Section 1129(a)(9) of the Bankruptcy Code only requires administrative expense claims be paid in full cash if and when they are *allowed*. Currently, Tecan's administrative expense claims for post-petition infringement are simply asserted – they are disputed and subject to a patent infringement suit that arose prepetition.  No judgment on the litigation has been rendered.  Therefore, no such claims for ongoing post-petition infringement are yet allowed and payable at this time.  Accordingly, the claims and issues raised in the Tecan Objection do not relate to any substantive concern with the Plan, and can and will be resolved through the claims' reconciliation process.  The Debtors continue to dispute that Tecan is entitled to administrative priority given their claims are premised on a prepetition patent infringement suit, where no judgment has been rendered, but in any event there are sufficient amounts to properly address the dispute with available assets during the claims reconciliation process.  Accordingly, the Court should overrule the Tecan Objection as it relates to the Plan.

### 3. The WSFS Objection Should be Overruled.

182.    WSFS submitted both a joinder to the Committee Objection and the WSFS Objection.  The WSFS Objection primarily concerns a disagreement with respect to the payment of the Convertible Notes Trustee's fees and expenses and the fact that WSFS is not included as a Released Party.  The Debtors have engaged with WSFS regarding the fee dispute and are

committed to finding a consensual resolution, and will ensure that a reasonable estimate of their fees are appropriately part of the go-forward Wind-Down budget.

183.     However, with respect to releases, the Convertible Notes Trustee was provided, at their request, an Opt Out Form and chose to opt out of the Third-Party Release.[265]  The Disclosure Statement makes clear that this is a mutual release, and that "[e]ach Holder of a Claim entitled to opt out of the releases that elects not to exercise such opt out, will become a Released Party under the Plan."[266]  WSFS cannot also claim that being a Released Party would be a valid exercise of the Debtors' business judgment when WSFS is unable to articulate in its own objection why that should be the case here, when there is no settlement with its constituency, beyond pointing to its participation in multiparty settlements,[267] and rational basis exists such that they should be afforded to special treatment.  Accordingly, WSFS was aware of the consequences of opting out of the releases in the Plan and chose to do so.  The Court should therefore overrule this Objection to the extent it remains outstanding.

### 4.     The Lift Stay Objection Should Not be Heard at the Confirmation Hearing.

184.     The Lift Stay Objection primarily concerns: (i) an assertion that the Plan provides no avenue for a Holder of a Claim to exhaust insurance nor provide how the Family's claims will be liquidated; (ii) a request for Plan and Confirmation Order language preserving the ability of Holders of Claims to pursue insurers; and (iii) a request that the Debtors lift the injunction relating to state court litigation.  Addressed at length above, the Injunction provision is proper in scope.

---

[265]   *See* Disclosure Statement Order, ¶ 20, fn.4.

[266]   *See* Disclosure Statement, Art. IV.O.

[267]   *See In re WeWork Inc.*, No. 23-19865 at ¶ 25 (JKS) (Bankr. D.N.J. May, 29, 2024) [Docket No. 2036] (noting the unsecured notes trustee as a member of multiparty settlement); *In re Claire's Stores, Inc.*, No. 18-10584 at ¶ 17, 46 (MFW) (Bankr. D. Del. Sep. 11, 2018) [Docket No. 965] (same).

The Plan already properly establishes that all of the Debtors' insurance policies are assumed and that such insurance coverage and the duty of the insurers to pay claims are unaltered.[268]   The remainder of the Lift Stay Objection is not proper for the Confirmation Hearing, because the majority of the issues raised in the Lift Stay Objection do not relate to any substantive concern with the Plan, but are claims reconciliation issues that can be handled by a Plan Administrator via the disputed claims process.   The movant should wait to have its claim liquidated, and seek any insurance proceeds therefrom, like every other creditor with a contingent and disputed claim. The Debtors have engaged with the movant regarding these disputes and are committed to finding a consensual resolution, although, the Debtors do not plan to lift the automatic stay or modify the injunction at this time without any valid basis to do so.   Accordingly, the Court should decline to hear the Lift Stay Objection at the Confirmation Hearing and rather, to the extent it remains outstanding, schedule it to go forward at a future omnibus date.

### 5.      Dr. Soldin's Objection Should Be Overruled.

185.      On July 3, 2024, an individual named Dr. Soldin asserted in an email to Debtors' counsel and the U.S. Trustee that he objects to the legal proceedings on the basis that (a) the Opt Out Form he received was designed to confuse creditors, (b) the Plan pays out certain noteholders while holders of Equity Interests will get zero value, and (c) the Debtors' employees all received full compensation for their time and efforts during the chapter 11 cases.   Dr. Soldin also questioned whether any investigation had taken place, how the Opt Out Form is beneficial in any way to holders of Equity Interests, and who is looking after the best interests of the holders of Equity Interests.   The Debtors replied to Dr. Soldin's email and responded to his inquiries, pointing him, in particular to the Disclosure Statement, where the majority of his issues are addressed.

---

[268]   *See* Plan Article V.E.

186.     Nonetheless, the record demonstrates the propriety of the Debtors' process, and the Debtors and their advisors have worked diligently to put forth a Plan that maximizes value and complies with the requirements of the Bankruptcy Code, as discussed throughout this Memorandum.  Accordingly, to the  Soldin Objection should be overruled and the Plan should be confirmed.

## WAIVER OF BANKRUPTCY RULE 3020(E)

187.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[269] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

188.     To implement the Plan, the Debtors seek a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e).  Given the complexity of the Plan and the various transactions implicated by the Plan, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur promptly.  Therefore, good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## CONCLUSION

189.     For the reasons set forth herein, the Debtors respectfully request that the Court overrule the outstanding Objections and enter the Confirmation Order.

---

[269]   *See* Bankruptcy Rule 3020(e).

Dated: July 18, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Daniel J. Harris, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:        msirota@coleschotz.com
                 wusatine@coleschotz.com
                 fyudkin@coleschotz.com
                 dharris@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Jeffrey Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:        joshua.sussberg@kirkland.com
                 nicole.greenblatt@kirkland.com
                 francis.petrie@kirkland.com
                 jeffrey.goldfine@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
William E. Arnault, P.C. (admitted pro hac vice)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:        spencer.winters@kirkland.com
                 william.arnault@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## **Exhibit A**

**Proposed Plan Distribution Scheme**

# Plan Comparison

Second Amended Plan preserves $17.2mm of total value provided to Unsecured on a senior basis, and enhances the value for General Unsecured Claims by $6.8mm

($ in mm)



Source: Debtor Waterfall Analysis
Note: Class 4 and Class 5 treatment estimated based upon assumptions of claimants opting in to Convenience Class; figures reflect high end of Debtor Waterfall Analysis as of 7/16/24 assume 2028 Secured Notes make-whole claim is allowed to be asserted in full

1

# Updated Plan Waterfall & Impact of Class 5 Reallocation

Amendment to Class 5 claim treatment only impacts 3 claims (Integrated DNA Technologies, Reef Flatiron and Royal Marsden NHS Foundation trust; Reef has already opted in to convenience class treatment)



($ in mm)

**Sale Proceeds[1]** $242.3

**Cash at Effective Date** $96.3

**Contingent Assets to Collect over 9 Month Wind-Down[2]** $76.5

**Illustrative Value of Debtor Waterfall** $415.1

**Admin & Priority Claims** ($64.8)

**Wind-Down Costs** ($12.9)

**Net Distributable Value** $337.4

*Net Distributable Value at Effective Date: $243.7*

### Recovery by Creditor Constituency

**Class 4 Convenience Class** $10.4

**Class 3 Secured Claims** $320.2

**Classes 5/6/11 General Unsecured Pool** $6.8

**GUC Distribution Reserve** $6.8

($ in thousands)

| | Class 5: Subsidiary Unsecured Claims | | | |
|---|---|---|---|---|
| # | Claimant | Basis of Claim | Gross Claim Amount | Net Claim Amount (Con. Class Cap Adj.) |
| 1 | Integrated DNA Technologies, Inc. | Contract Spend Requirement | $3,500 | $250 |
| 2 | Reef Flatiron LLC (Boulder, CO) | 502(b)(6) | 2,537 | 250 |
| 3 | The Royal Marsden NHS Foundation Trust | Study Milestone | 1,557 | 250 |
| 4 | Streck LLC | Trade | 250 | 250 |
| 5 | Mass General Hospital | Study Milestone | 211 | 211 |
| 6 | CellCarta Logistics ULC | Trade | 130 | 130 |
| 7 | Centennial Owner LLC (Louisville, CO) | 502(b)(6) | 98 | 98 |
| 8 | National Cancer Center | Study Milestone | 72 | 72 |
| 9 | Amacon Wespark Investment Corp (Golden, CO) | 502(b)(6) | 43 | 43 |
| 10 | Duplicate Insurance Claim(s) | Duplicative C/U/D | C/U/D | – |
| | Class 5 Total | | $8,399 | $1,554 |

Difference between gross ($8.4mm) and net claim ($1.6mm) amounts reflects gift value preserved by transfer to GUC Distribution Reserve ($6.8mm)

$1,554k reflects former Class 5 claims shifted to Class 4 based on estimated claim size and assumed Class 4 treatment

Reef Flatiron has already opted in to Convenience Class and Integrated DNA Technologies / Royal Marsden are assumed to opt in

Source:    Debtor Waterfall Analysis
Note:       Figures reflect high end of Debtor Waterfall Analysis as of 7/16/24 and assume 2028 Secured Notes make-whole claim is allowed to be asserted in full. Claim reconciliation efforts are ongoing. Reflects preliminary buyer assumption/cure determination. Figures are subject to change.
1.    Includes $3.3mm of contract cure amounts
2.    Includes insurance, institutional and other AR as well as Natera / WH's contingent earnout

# UCC's Flawed Arguments Against GUC Distribution Reserve

The UCC's plan objection makes several inaccurate statements regarding the GUC Distribution Reserve

| UCC Statement | Corrections |
|---|---|
| ¶ 25. On July 12, 2024, less than one business day before the objection deadline, the Debtors amended the Plan to revise the treatment of Subsidiary Unsecured Claims such that they would receive a share of a newly-created GUC Distribution Reserve. | • Subsidiary Unsecured Claims will receive a pro rata share of **both** (i) additional Distributable Value allocable to the applicable Debtor subsidiary following payment in full of Classes 1, 2, 3 and 4 Claims **and** (ii) the GUC Distribution Reserve<br><br>• Only impacts three Subsidiary Unsecured Claims (as remainder are <$250k & receive economically identical treatment in Class 4) |
| ¶ 25. The amount of the GUC Distribution Reserve is not specified and is subject to Deerfield's consent. | • GUC Distribution Reserve will equal (i) aggregate payments estimated to be made to Class 5 claims under the prior Plan less (ii) estimated payments to former Class 5 claims which are re-classified as Class 4 claims<br><br>• Amount equals **$6.8mm** (*calculation detailed on prior page*) |
| ¶ 25. This amount will likely be meaningfully less than what Holders of Subsidiary Unsecured Claims would have expected under prior iterations of the Plan. | • Aggregate recovery to all unsecured claims will not be changed by this revised treatment as aggregate gifted value is being preserved<br><br>• Implied total recovery to all unsecured claims of **$17.2mm** (sum of (i) **$10.4mm** to Class 4 and (ii) **$6.8mm** to Classes 5 / 6 / 11) is unchanged vs. prior Plan |

Source:      Debtor Waterfall Analysis; UCC Objection to Confirmation of Second Amended Joint Plan [Docket 801]
Note:        Figures reflect high end of Debtor Waterfall Analysis as of 7/16/24 and assume 2028 Secured Notes make-whole claim is allowed to be asserted in full

3

## **Exhibit B**

**Objection Chart**

**IN RE INVITAE CORPORATION, ET AL.,**
**CASE NO. 24-11362 (MBK) OBJECTION CHART AND PROPOSED**
**RESPONSES TO THE SECOND AMENDED JOINT PLAN OF INVITAE CORPORATION**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN")[1]**

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 801 | The Committee | The expansive Debtor Releases cannot be approved. | The Debtor Release is appropriate. *See* Part III.B. |
| | | The modifications the Debtors made to Class 5 are inappropriate because they changed Class 5's Treatment without enough time for Class 5 to vote, opt out, or object, without proper disclosure, and violative of the Bankruptcy Rules. | The Plan modifications do not materially and adversely affect Holders of Class 3 Claims—the only class entitled to vote. Class 3 is unlikely to reconsider their acceptance based on the Plan modifications. *See* Part II.P. |
| | | The Make Whole Amount and related interest cannot be allowed, and the Plan cannot be confirmed until the claim objection relating to the Make Whole Amount is adjudicated. | The Debtors' position on the Make-Whole Amount is unchanged and is not a plan confirmation issue. *See* Part IV.B.1. |
| | | There is no impaired accepting class. Alternatively, the Plan should not provide for post-Effective Date interest. | Class 3 is impaired here, including because its distribution features (i) a delayed recovery; (ii) a risky source of funds; and (iii) are subordinated to other classes. Moreover, post-petition interest is permitted and courts in this circuit have often confirmed plans that contemplate the distribution of such interest even after the effective date. *See* Parts II.J and IV.B.2. |

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Objections, as applicable.

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | The settlements in the Plan are not identified, fair, or reasonable. | Given the benefits and tangible concessions from Deerfield in the TSA and the Plan, and the contributions of the directors and officers, the settlement is fair and reasonable. *See* Part II.Q. |
| | | The Release and Injunction Provisions are too expansive and inappropriate. | The Release and Injunction Provisions are appropriate. *See* Part IV. A, and Part IV. C. |
| | | The Convenience Class is improper, in bad faith, and violates sections 1122 and 1129(a)(1) of the Bankruptcy Code. | The Plan's classification scheme is proper where the Convenience Class "reduces the administrative burden and expense" in administering the case and helps to maintain the going-concern value of the Debtors' assets. *See* Part II.A.1. |
| | | Deerfield should not have any rights after they are paid in full. The Committee should have a say in who is the Plan Administrator, and the Plan Administrator should have to file quarterly reports and have duties to unsecured creditors. | Class 3 having consent rights over the wind-down process is appropriate because Class 3 recoveries are subordinated to the costs of funding the Wind-Down. *See* Part IV.B.3. |
| | | Committee should not dissolve post-Effective Date. | The Committee's ongoing existence would present an unnecessary drain on the Wind-Down Estates. *See* Part IV.B.3. |
| | | The Committee should be part of the Exculpated Parties definition. | The Exculpation provision is appropriately tailored. *See* Part IV.B.3. |
| 796 | U.S. Trustee | The Third-Party Release is impermissible because it is nonconsensual and extends to an unknown number of unnamed released parties. | Here, all parties in interest had ample notice and opportunity to evaluate and opt out of the Third-Party Release. Accordingly, under Third Circuit law, the Third-Party Release is consensual. *See* Part III.A. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | The Gatekeeping Provision impermissibly gives the Bankruptcy Court exclusive jurisdiction to adjudicate claims. | The Gatekeeping Provision is a legitimate exercise of the Bankruptcy Court's powers under the Bankruptcy Code.  The Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan.  Courts have recently approved gatekeeping provisions consistent with the Gatekeeping Provision. *See* Part IV.A. |
| | | The Exculpation Provision is objectionable because it is not limited to fiduciaries of the bankruptcy estate. | The Debtors proposed revisions to the Plan that the U.S. Trustee is reviewing. |
| | | The Plan cannot be confirmed unless the provisions seeking to approve Third-Party Releases, and confirmation of the Plan, as a "settlement" under Rule 9019 are stricken.<br><br>The Injunction Provision is inappropriate because the Debtors are liquidating and not receiving a discharge. | The Debtors proposed revisions to the Plan and Confirmation Order that the U.S. Trustee is reviewing. |
| | | The Plan's financial reporting and statutory fee payment provisions must be revised to require the Debtors and the Wind Down Debtors to carry out all reporting and fee payment duties. | The Debtors proposed revisions to the Plan that the U.S. Trustee is reviewing. |
| | | The Plan Supplement does not contain Retained Causes of Action, the Plan Administrator Agreement, or the Identity of the Plan Administrator. | The Debtors will disclose the identity and agreement of the Plan Administrator and Schedule of Retained Causes of Action that the Debtors will file prior to the Confirmation Hearing. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 798 | Integrated DNA Technologies, Inc. ("IDT") | IDT objects to the Plan to the extent IDT's asserted administrative expenses are not treated as such under the Plan. | Resolved.  The parties agree that all rights are reserved on the claims disputes and will be dealt with in the claims reconciliation process.  *See* Part IV.C.1. |
| | | IDT objects to the Plan to the extent IDT's claims related to the APA Transaction are not classified as Class 5 and Class 6 Claims and provided associated treatment notwithstanding their contingent nature. | |
| | | To the extent there are post-petition indemnifications obligations of the Debtors to IDT that arise in connection with the Tecan Action, IDT asserts such indemnification obligations as administrative expenses against the Debtors, as well as a rejection damage claims against both ArcherDX, LLC and Invitae Corporation if relevant agreements are not assumed. | |
| 799 | Tecan Genomics, Inc. ("Tecan") | The Plan fails the requirements of section 1129(a)(9) of the Bankruptcy Code by failing to pay for in full, or reserve for, Tecan's administrative expense claims against Invitae Corporation and ArcherDX, LLC. | This is not a confirmation issue.  The Debtors dispute that Tecan's claims are entitled to administrative priority because their claims are premised on patent infringement lawsuit where no judgment has been rendered yet.  Accordingly, this claim is contingent and disputed.  Therefore, section 1129(a) does not apply unless and until such claims are deemed Allowed Administrative Claims.  *See* Part IV.C.2. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | Tecan objects specifically to their lack of inclusion in the Priority Claims Reserve and argues that its claims for post-petition patent infringement relate to the Debtors' ordinary course transactions and are entitled to administrative expense treatment. | Given that the Debtors dispute the merits of Tecan's Administrative Claims, the Plan properly excludes such claims from the Priority Claims Reserve. The Debtors have sufficient amounts to address the dispute with available assets during the claims reconciliation process. *See* Part IV.C.2.

The Debtors have been engaging with Tecan in an attempt to resolve their objection prior to the Confirmation Hearing. |
| 806 | Wilmington Savings Fund Society, FSB | The Plan does not provide for payment of the Convertible Notes Trustee's fees and expenses in cash on the Effective Date.

The Plan does not include the Convertible Notes Trustees as a Released Party. | The Debtors believe they are resolved, but to the extent they are not, this issue is addressed in Part IV.C.3 of the Memorandum. |
| 797 | Ravi Theja Kambhampati and Meghana Seethamraju (the "Lift Stay Movants") | The Lift Stay Movants request that the Plan be amended to provided that "nothing in the Plan or Confirmation Order, or any document related thereto, shall prevent a Holder of a Claim from seeking coverage through one or more of the Debtors' insurers." They also request that the Debtors lift an injunction relating to certain state court litigation on following the Effective Date of the Plan. | The Lift Stay Movants do not have any substantive complaint with the Plan. This is not a confirmation issue. The Debtors issues raised are claims reconciliation issues that can be handled by a Plan Administrator via the disputed claims process. *See* Part IV.C.4. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| Informal objection | Dr. Ryan Soldin | The Opt Out Forms were designed to confuse creditors. The Plan pays out certain noteholders while holders of Equity Interests will get zero value. The Debtors' employees all received full compensation for their time and efforts during the chapter 11 cases.<br><br>No one is looking after the interests of various creditors or into the behavior of the Debtors' management team and Board of Directors. | The Debtors also engaged Mr. Soldin on his questions and concerns and have not received a response. The Debtors have and will carry their burden that the process is fair. *See* Part IV.C.5. |