| | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (admitted *pro hac vice*)<br>Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)<br>Francis Petrie (admitted *pro hac vice*)<br>Jeffrey Goldfine (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile:  (212) 446-4900<br>joshua.sussberg@kirkland.com<br>nicole.greenblatt@kirkland.com<br>francis.petrie@kirkland.com<br>jeffrey.goldfine@kirkland.com<br><br>-and-<br><br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Spencer A. Winters, P.C. (admitted *pro hac vice*)<br>William E. Arnault, P.C. (admitted *pro hac vice*)<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile:  (312) 862-2200<br>spencer.winters@kirkland.com<br>william.arnault@kirkland.com<br><br>*Co-Counsel to the Debtors and*<br>*Debtors in Possession* | **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Daniel J. Harris, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br>dharris@coleschotz.com<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Co-Counsel to the Debtors and*<br>*Debtors in Possession* |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>INVITAE CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11362 (MBK)<br><br>(Jointly Administered) |

---

[1] The last four digits of Debtor Invitae Corporation's tax identification number are 1898.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/invitae.  The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

**DECLARATION OF ANDREW SPIRITO, MANAGING DIRECTOR
OF FTI CONSULTING, IN SUPPORT OF CONFIRMATION OF THE
SECOND AMENDED JOINT PLAN OF INVITAE CORPORATION AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Andrew Spirito, hereby declare under penalty of perjury as follows:

**Background and Qualifications**

1. I am a Managing Director with FTI Consulting, Inc. ("FTI"), and I serve as a financial advisor to Invitae Corporation, a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I have more than twelve years of experience advising companies, lenders, creditors, and equity sponsors across a diverse range of industries on both in- and out-of-court restructuring matters. As an advisor, I have assisted clients on business strategy and planning, financial analysis, crisis management, cash and liquidity management, and operational restructuring. I have held a variety of interim roles within the finance, planning and transformation functions of the clients I have served. As an advisor, I have also conducted numerous financial, valuation, and/or liquidation analyses for various companies and have been retained as financial advisor in numerous chapter 11 cases, including, among others, the following: *In re Mountain Express Oil Comp.*, Case No. 23-90147 (DRJ) (Bankr. S.D. Tex. Mar. 18, 2023); *In re Frontier Communications Corp.*, Case No. 20-22476 (RDD) (Bankr. S.D.N.Y. Apr. 14, 2020); *In re Paragon Offshore PLC*, Case No. 16-10386 (CSS) (Bankr. D. Del. Feb. 14, 2016); *In re Caesars Entertainment Operating Comp.*, Case No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 15, 2015); *In re Dendreon Corp.*, Case No. 14-12515 (LSS) (Bankr. D. Del. Nov. 10, 2014); and *In re AFA Investment Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 2, 2012).

3. FTI is comprised of a worldwide network of more than 8,000 employees in 33 countries on 6 continents and has extensive experience providing financial advisory services in

restructurings and reorganizations. FTI has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases, including those of similar size and complexity to these chapter 11 cases. FTI provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including short-term cash management and monitoring, cash flow forecasting, liquidity enhancement initiatives, working capital management, vendor management, business plan analysis and development, metrics, measurement and accountability, benchmarking, turnaround strategy development and execution, and estate wind-down and trustee related services. Additionally, FTI provides advice on specific aspects of the turnaround process and helps manage complex capital solutions.

4. I submit this declaration (this "Declaration") in support of confirmation of the *Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 791] (as modified, amended, or supplemented from time to time in accordance with its terms, the "Plan").[2]

5. FTI has been engaged with the Company on a potential restructuring since September 2023. Since that time, I have been working hand in hand with the Company's advisors and management, including weekly meetings with members of the executive leadership team and the board of directors. My team and I have broadly supported the contingency planning process including creditor negotiations, the sale process, business planning and liquidity forecasting, as well as general operational readiness leading up to the eventual chapter 11 filings.

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or the *Debtors' Memorandum of Law in Support of the Debtors' Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief"), filed contemporaneously herewith, as applicable.

3

6.      Since February 8, 2024, FTI has been one of the principal restructuring advisors to the Debtors.[3] In addition to being involved in the matters leading up to the Debtors' chapter 11 filings, FTI has been involved in the day-to-day operations of these Chapter 11 Cases and preparing the Disclosure Statement and Liquidation Analysis. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

7.      The statements in this Declaration are, except where specifically noted or otherwise stated herein, based on my personal knowledge or opinion, information that I have received from the Debtors' employees or advisors, or employees of FTI working directly with me or under my supervision or direction, or from the Debtors' books and records. If called to testify, I would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

8.      Neither FTI nor I am being specifically compensated for this testimony other than pursuant to FTI's engagement letter with the Debtors.

## The Liquidation Analysis

9.      I have reviewed the classification of Claims and Interests under the Plan and the proposed distributions to each Class of Claims. The projected recoveries for the creditors under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation. The Debtors prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit C [Docket No. 535] (the "Original Liquidation Analysis"). On June 11, 2024, the Debtors filed a supplemental liquidation analysis [Docket No. 614] (the "Supplemental Liquidation Analysis", and together with the Original Liquidation Analysis, the "Liquidation Analysis").

---

[3] Pursuant to the terms of that certain engagement letter between the Debtors and FTI dated February 8, 2024. On April 23, 2024, the Bankruptcy Court entered the *Order Authorizing the Employment and Retention of FTI Consulting, Inc. as Financial Advisor* [Docket No. 353].

4

I oversaw the preparation of the Liquidation Analysis and worked closely with a team of FTI professionals in its development.

I.   **General Assumptions.**

10.   The Liquidation Analysis estimates the projected recoveries that would result from the liquidation of the Debtors in a hypothetical conversion to chapter 7 of the Bankruptcy Code. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of August 2, 2024 (the "Conversion Date") and the net costs to execute the administration of the wind-down of the Estates.  At the time I oversaw the preparation of the Liquidation Analysis, and at the time of filing the Liquidation Analysis, the closing of the approved sale to Labcorp Genetics Inc. (the "Closing Date") was expected to occur on August 1, 2024, and the Conversion Date was expected immediately followed the Closing Date.  The Closing Date is now anticipated to occur on August 5, 2024.  The difference between the August 2, 2024, and August 5, 2024 Closing Date does not materially impact the Liquidation Analysis.

11.   The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a court appointed chapter 7 trustee.  The Liquidation Analysis reflects the wind-down and liquidation of the Debtors' remaining assets not included in the sale, and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date (the "Wind-Down").

12.   The Liquidation Analysis was completed following due diligence performed by the FTI team, including a review of the Debtors' unaudited financial statements and balance sheets.

13.   The Debtors do not maintain financials on a legal entity-by-entity basis.  As a result, the Liquidation Analysis is presented on a consolidated basis.  The Liquidation Analysis provides estimates for subsidiary claims arising from contract cures, damages arising under section 502(b)(6) of the Bankruptcy Code, and other litigation asserted by counterparties at

5

subsidiary Debtor, ArcherDX, LLC. While subsidiary Debtors possess patents and intellectual property, no value is ascribed to these assets in a liquidation. The Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon a chapter 7 liquidations or liabilities that may arise as a result of litigation, certain new tax assessments, or other potential claims.

### II. Net Liquidation Proceeds.

14. I calculated the net proceeds available upon a hypothetical chapter 7 liquidation (the "Net Liquidation Proceeds") based on the projected value of the Debtors' assets as of the Conversion Date.

15. *Sale Value.* The purchase price as set forth in the Asset Purchase Agreement.

16. *Cash and Cash Equivalents.* Projected Cash and Cash Equivalents per the Collateral Budget delivered May 22, 2024, includes restricted cash, which is a letter of credit that is assumed to be reposted upon consummation of the sale transaction.

17. *Contingent Accounts Receivable.* The Asset Purchase Agreement includes a reverse transition services agreement construct for the collection and remittance of accounts receivable. Illustratively, recoveries range between 85% – 90%. Collection of accounts receivable is contingent and expected to be completed over a nine-month period post-Conversion Date. As such, value from contingent accounts receivable is not available for distribution on the Conversion Date.

18. *Contingent Earnout from Sale of Women's Health.* The Debtors are entitled to a contingent, volume-based retention earnout from the prepetition sale of their Women's Health business. Collection of the earnout is contingent and subject to reconciliation. As such, value from the contingent earnout is not available for distribution on the Conversion Date.

### III. Liquidation Costs.

19. *Estate Wind-Down Costs.* In preparing the Liquidation Analysis, my team and I also made certain assumptions and estimations regarding the costs of a hypothetical chapter 7 liquidation. In making such estimations, I assumed that a hypothetical chapter 7 would last approximately twelve months. The Debtors assume an additional three months of wind-down costs are incurred relative to the Wind-Down Budget on account of the chapter 7 trustee's lack of institutional knowledge of the Debtors' affairs. In an actual chapter 7 liquidation, the length of the wind-down could vary, which would impact recoveries. The estimated costs of the hypothetical chapter 7 liquidation contemplated under the Liquidation Analysis are as follows.

20. *Chapter 7 Professional and Sale Transaction Fees.* The estimated professional fees included costs to retain professionals supporting the chapter 7 trustee during the estate wind-down and a 2.0% sale transaction fee from the Distributable Value, gross payable to Debtors' investment bank advisors Moelis & Company ("Moelis").

21. *Chapter 7 Trustee Fees.* The chapter 7 trustee fees were estimated at 3.0% of the gross liquidation proceeds in the excess of $1 million. The same rate was calculated on amounts under $1 million.

### IV. Analysis of Impaired Classes.

22. Pursuant to the assumptions and estimations discussed above, my team and I calculated the potential high-end and low-end recoveries for each Class of Claims under the Plan and in a chapter 7 liquidation. An illustration of the estimated recoveries for the Impaired Classes under the Plan and in a chapter 7 liquidation, according to the Liquidation Analysis, is depicted below:

| Results of Best Interests Test by Plan Class | | | | | |
|---|---|---|---|---|---|
| Class Name | Class | Plan Recovery | Chapter 7 Recovery Low | High | Pass / Fail |
| 2028 Senior Secured Notes Claims[4] | Class 3 | 91.0% – 94.8% | 100.0% | 100.0% | n/a |
| Other Secured Claims | Class 1 | 100.0% | n/a | n/a | Pass |
| Administrative Claims | Unclassified | 100.0% | 50.3% | 76.4% | Pass |
| Other Priority Claims | Class 2 | 100.0% | – | – | Pass |
| Priority Tax Claims | Unclassified | 100.0% | – | – | Pass |
| Convenience Class Claims | Class 4 | 100.0% | – | – | Pass |
| Subsidiary Unsecured Claims | Class 5 | 100.0% | – | – | Pass |
| Parent Unsecured Claims | Class 6 | – | – | – | Pass |
| Contingent Subsidiary Unsecured Claims | Class 11 | – | – | – | Pass |
| Intercompany Claims | Class 7 | n/a | n/a | n/a | n/a |
| Intercompany Interests | Class 8 | n/a | n/a | n/a | n/a |
| Section 510(b) Claims | Class 9 | n/a | n/a | n/a | n/a |
| Equity Interests | Class 10 | n/a | n/a | n/a | n/a |

23. Based on, and as provided in the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan that has not otherwise consented to the terms of the Plan, and with respect to Holders of Claims or Interests in Class 3, each Holder has either (i) accepted the Plan or (ii) will receive or retain, as of the Effective Date, an amount that is not less than the amount that such Holder would receive or retain in a liquidation under chapter 7.

---

[4] Secured component of claim includes the Make Whole Amount pursuant to Section 2.13 of the 2028 Senior Secured Notes Indenture, accrued and unpaid interest, as well as adequate assurance. Other amounts that could be due and payable under the 2028 Senior Secured Notes Indenture are excluded.

### V. The Committee's Alternative Plan.

24. On May 22, 2024, the board of directors received a letter from the Committee that detailed an alternative plan construct. My team and I analyzed the Committee's alternative plan construct with Moelis, including the waterfall provided therewith. Based on our analysis, we identified a number of flawed assumptions, the most notable of which were with respect to incremental value received from contingent consideration, the opportunity for professional fee savings, and incremental interest income. Nearly all of the Committee's adjustments assume increased value available after the Effective Date. Based on FTI's analysis, the Committee overestimates distributable value.

25. To be clear, based on the Debtors' waterfall there is a finite pool of value to be distributed on the Effective Date. This consists of approximately: $242.3 million in sale proceeds and approximately $96.3 million in cash and cash equivalents. After reserving for wind-down costs ($12.9 million), administrative and priority claims ($64.8 million), and Convenience Class and GUC Distribution Reserve ($17.2 million), there will be approximately $243 million available for distribution to creditors on the Effective Date.

26. After receiving the Committee's alternative plan, an all-advisors meeting was called on June 4, 2024, whereby representatives from Kirkland, Moelis, and FTI met with the Committee's advisors, including White & Case, Province, and Ducera Partners. At that meeting, the collective advisors walked through the disparities between the Debtors' waterfall and the Committee's waterfall. Separately, FTI met with Province to walk through the waterfall in more detail and to discuss the wind-down budget.

27. Since this meeting, the Debtors have not received a refreshed alternative plan from the Committee, and the Committee has not proposed any changes to the waterfall or wind-down budget.

9

### VI.  Class 5 Subsidiary Unsecured Claims.

28. The Debtors made certain modification to the Plan to resolve formal and informal comments to the Plan, including, among other things, establishing the GUC Distribution Reserve and changing the treatment of Class 5 Subsidiary Unsecured Claims from presumed to accept to deemed to reject. Class 5 Subsidiary Unsecured Claims will share *pro rata* in the distribution of any Distributable Value and the GUC Distribution Reserve with the other General Unsecured Creditors in Classes 6 and 11.

29. Of the ten total holders of Class 5 Subsidiary Unsecured Claims as of the Record Date, seven asserted claims below $250,000 and will be paid in full as Class 4 Convenience Class Claims. Of the remaining three Class 5 Subsidiary Unsecured Claim Holders, one asserted a $2.3 million rejection damage claim but has already indicated its intention to elect Class 4 Convenience Class Claim treatment. This will cap its claim at $250,000, which will increase the consideration that will now be allocated to Class 4. The Debtors anticipate that the remaining two Holders of Class 5 Subsidiary Unsecured Claims will either make a convenience class election or have their contract claims cured if they are assumed in connection with the Sale Transaction (although a decision on whether such contracts will be assumed is still pending).

30. Accordingly, the net impact of the proposed Plan is expected to decrease—and not in any way dilute recoveries to—the total General Unsecured Creditor pool and increase recoveries to non-convenience class unsecured claim Holders. In addition, to ensure that the full value of the "gift" to Classes 4 and 5 that was secured in the TSA is preserved, the Debtors established the "GUC Distribution Reserve" feature. This feature guarantees that any value that would have otherwise been distributed solely to Class 5 Subsidiary Unsecured Claim Holders—currently assumed to be $6.8 million—will be preserved and allocated *pro rata* to all non-convenience unsecured creditor classes. As a result, the Debtors expect no fewer than 93% of the total number

of unsecured creditors to be paid in full under the Plan as part of the Convenience Class. The remaining 7% are now also guaranteed some recovery because they will either elect into the convenience class treatment or share in the GUC Distribution Reserve and any additional Distributable Value.

### The Plan

**I.  Claims and Interests.**

31. Under Article III of the Plan, Claims and Interests are classified as follows:

| | |
|---|---|
| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | 2028 Senior Secured Notes Claims |
| Class 4 | Convenience Class Claims |
| Class 5 | Subsidiary Unsecured Claims |
| Class 6 | Parent Unsecured Claims |
| Class 7 | Intercompany Claims |
| Class 8 | Intercompany Interest |
| Class 9 | Section 510(b) Claims |
| Class 10 | Equity Interests |
| Class 11 | Contingent Subsidiary Unsecured Claims |

32. The Claims and Interests assigned to each Class listed above are substantially similar to the other Claims and Interests in that Class. The Plan separately classifies Claims and Interests because each Holder of such Claims or Interests is dissimilar to the Claims or Interests in other Classes or because administrative convenience results from such separate classification.

33. The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests,

including the relative priority between secured and unsecured claims. Other aspects of the classification scheme reasonably recognize the different nature of Claims or Interests, such as structural seniority. For instance, Class 3 (2028 Senior Secured Notes Claims) consists of secured Claims arising out of the 2028 Secured Notes Indenture, while Class 1 (Other Secured Claims) consists of all other secured claims with liens on specific collateral. Class 3 and Class 1 claims are classified separately due to their different nature. The 2028 Senior Secured Notes Claims in Class 3 are the largest group of secured stakeholders in these chapter 11 cases and were bound to support the Debtors through their restructuring process via the TSA.

34. General Unsecured Claims are broken into three classes. Holders of Class 5 Subsidiary Unsecured Claims and Class 6 Parent Unsecured Claims are classified separately to account for the fact that Holders of such claims have recourse against different Debtor entities. Among the unsecured claims, Holders of Class 5 Subsidiary Unsecured Claims and Class 6 Parent Unsecured Claims are classified separately from Holders of Class 11 Contingent Subsidiary Unsecured Claims due to the contingent, unliquidated, and disputed nature of the Contingent Subsidiary Unsecured Claims, which consists of claims arising from unsettled litigation.

35. Other aspects of the classification scheme recognize the different nature of Claims or Interests. The Convenience Class Claims are classified separately for administrative convenience. The holders of Convenience Class Claims, either by amount or election, will be entitled to a one-time payment of no greater than $250,000 of their Allowed General Unsecured Claim to ease the administrative burdens on the Debtors, generate cost savings for the Estates, and ensure these chapter 11 cases did not disrupt daily operations. Any holder of an Allowed General Unsecured Claim in excess of $250,000 may irrevocably elect on its Ballot to have such claim reduced to $250,000 and treated as a Convenience Class Claim. The administrative savings

resulting from the Convenience Class were largely realized at the outset of these chapter 11 cases as a result of the vendor negotiation process. Because FTI and the Company were able to communicate the mechanics of the contemplated convenience class to the Company's vendors, the Debtors were better able to maintain continuity of service and prevent operational disruption.

36. The $250,000 threshold was sized to reasonably maximize value that could be allocated for trade vendors who are integral to the Company's operations and ensure minimal business disruption. FTI was asked to size the convenience class to minimize impairment for trade vendors. In doing so, my team and I analyzed the Company's trade payables and determined that the overwhelming majority were below this threshold or would be afforded priority treatment under the applicable first day relief.

**II.    Wind-Down Budget.**

37. After the Debtors close the Sale Transaction, the sale proceeds of approximately $242.3 million will come into the Estates coupled with projected cash on hand of approximately $96.3 million. The Debtors will then set aside the amounts necessary to fund the Wind-Down Reserve in accordance with the Wind-Down Budget ($12.9 million), administrative and priority claims ($64.8 million), and Convenience Class and GUC Distribution Reserve ($17.2 million). The remaining cash will be distributed to the Debtors' creditors in accordance with the waterfall and priorities set forth in the Plan. On the Effective Date, $240 million will be distributed to Class 3 creditors.

38. Next, the Debtors' remaining Estates will enter into a wind-down phase over the next nine months. I will serve as Plan Administrator, and will endeavor to realize any additional value from accounts receivable collections and other contingent value sources (which are projected to ultimately flow to general unsecured creditors), and will distribute that incremental value, plus

13

any excess reserves to creditors. As Plan Administrator I will also maintain the Wind-Down Reserve.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing Declaration are true and correct.

Dated: July 18, 2024

/s/ *Andrew Spirito*
Andrew Spirito
Managing Director
FTI Consulting, Inc.