| | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (admitted *pro hac vice*)<br>Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)<br>Francis Petrie (admitted *pro hac vice*)<br>Jeffrey Goldfine (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>joshua.sussberg@kirkland.com<br>nicole.greenblatt@kirkland.com<br>francis.petrie@kirkland.com<br>jeffrey.goldfine@kirkland.com | **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Daniel J. Harris, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br>dharris@coleschotz.com |

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Spencer A. Winters, P.C. (admitted *pro hac vice*)
William E. Arnault, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
spencer.winters@kirkland.com
william.arnault@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

*Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>INVITAE CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11362 (MBK)<br><br>(Jointly Administered) |

---

[1] The last four digits of Debtor Invitae Corporation's tax identification number are 1898.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/invitae.  The Debtors' service address in these chapter 11 cases is 1400 16th Street, San Francisco, California 94103.

**DECLARATION OF ANDREW SWIFT
IN SUPPORT OF CONFIRMATION OF THE
SECOND AMENDED JOINT PLAN OF INVITAE CORPORATION AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Andrew Swift, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Moelis & Company LLC ("Moelis"), the investment banker, capital markets advisor, and financial advisor for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors," and together with their non-debtor affiliates, the "Company"). I submit this declaration (this "Declaration") in support of confirmation of the *Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 791] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2] Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my involvement with the Debtors' restructuring process, information provided to me by the other professionals in these cases and/or employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.

2. I have more than twelve (12) years of investment banking experience. I have led engagement teams in complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities. In particular, I have provided services to debtors and other constituencies in numerous restructuring engagements, including, among others: *In re Diamond Sports Group LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. 2023); *In re Cyxtera Tech., Inc.*,

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or the *Debtors' Memorandum of Law in Support of the Debtors' Second Amended Joint Plan of Invitae Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief"), filed contemporaneously herewith, as applicable.

No. 23-14853 (JKS) (Bankr. D.N.J. 2023); *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. 2023); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. 2019); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. 2018); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. 2016); and *In re Trinity Coal Corp.*, No. 13-50364 (TNW) (Bankr. E.D. Ky. 2013).

3. I have been with Moelis since the start of my career. I hold a Bachelor of Arts in history from the University of Michigan.

4. Moelis is a leading international investment banking and financial advisory firm (NYSE: MC) with approximately 1,200 employees in locations around the world. Moelis provides a broad range of investment banking and financial advisory services, including (a) mergers and acquisitions, (b) recapitalization and restructuring, (c) capital markets advisory, and (d) private funds advisory. Moelis has been, and is, involved in large and complex restructuring cases throughout the United States, including representing debtors, creditors, acquirers, and official committees in numerous chapter 11 cases in this and other districts.

5. On April 23, 2024, the Court entered the *Order Authorizing the Retention and Employment of Moelis & Company LLC as Investment Banker, Capital Markets Advisor, and Financial Advisor to the Debtors and Debtors in Possession Effective as of the Petition Date* [Docket No. 351].

6. Although Moelis is expected to be compensated for its work as the Debtors' financial advisor and investment banker in these chapter 11 cases, I am not being compensated separately for this declaration or testimony. I am over the age of 18 years old and authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3

**Prepetition Stakeholder Negotiations**

7. The Company engaged Moelis in September 2023 to provide advisory services in connection with the Debtors' restructuring efforts. In response to the Company's liquidity challenges, Moelis worked with the Company to initiate an external marketing process to generate and evaluate potential third-party interest in the Company and to interface with holders throughout its capital structure on a potential restructuring transaction. Specifically, the Company engaged with its largest 2028 Senior Secured Noteholder, Deerfield Partners, L.P. ("Deerfield") and certain holders of the 2028 Convertible Senior Unsecured Notes (the "Unsecured Ad Hoc Group") on strategic alternatives to address the Company's immediate cash burn and longer-term balance sheet issues. Over the course of this engagement, the Company provided approximately 2,900 documents to a virtual data room accessible by third parties and existing stakeholders to assist with their diligence.

8. In September 2023, to enhance liquidity, decrease cash burn, and ultimately continue its operational restructuring efforts, the Company commenced negotiations with Deerfield to obtain the consent required under its indenture to wind-down or divest non-core and cash-intensive business segments, including its reproductive health business segment ("Women's Health") and patient network business ("Ciitizen").

9. On October 20, 2023, Deerfield sent the Company a preliminary restructuring term sheet contemplating a near-term chapter 11 filing and subsequent postpetition sale process funded by cash collateral. Given that the Company's short-term liquidity position did not at that time necessitate a chapter 11 filing on the timeline contemplated by Deerfield, and financial projections indicated that winding down Women's Health and Ciitizen would provide the Company with substantial savings while incurring manageable costs to wind-down the business

4

lines, the Board, after consultation with the Company's advisors, elected to move forward with the business-line realignment separately from a broader restructuring transaction.

10. To that end, the Company provided Deerfield with voluminous diligence and financial analyses regarding the wind-down of Women's Health and Ciitizen, and, with the assistance of its advisors, continued negotiations with Deerfield for the requisite consent to divest from these unprofitable and cash-intensive business lines. On December 8, 2023, the Company entered into that certain second supplemental indenture, by and among Invitae Corporation and U.S. National Bank Association, as trustee and collateral agent, in which Deerfield granted the Company consent to wind down Women's Health and Ciitizen. In exchange for the consent, the Company and Deerfield agreed on certain restructuring milestones, including milestones to commence a prepetition marketing process and a milestone to execute a mutually agreed-upon transaction with Deerfield pursuant to a transaction support agreement. The Company, with the assistance of Moelis, launched a third-party marketing process to gauge the market's appetite to purchase some or all of the Company's assets. On January 12, 2024 certain of these milestones were extended pursuant to a third supplemental indenture.

11. In parallel, starting in October 2023, the Company and its advisors engaged with Deerfield and the Unsecured Ad Hoc Group in an effort to reach a broader restructuring transaction. Over the course of several months, the Company and its advisors discussed the structure of a potential transaction and the Company's go-forward business plan with Deerfield and the Unsecured Ad Hoc Group. The Company through its advisors also produced voluminous diligence to both Deerfield and the Unsecured Ad Hoc Group.

12. On December 5, 2023, the Unsecured Ad Hoc Group sent the Company a proposal for a restructuring support agreement between the Unsecured Ad Hoc Group, the

Company, and Deerfield providing, among other things, a recapitalization transaction and the issuance of new preferred equity. On December 13, 2023, the Company, Deerfield, the Unsecured Ad Hoc Group, and their respective advisors met in person to discuss the proposal and the Company's potential go-forward business plan. In response to the Unsecured Ad Hoc Group's proposal, Deerfield countered with a transaction structured around a possible in-court sale process and proposed a waterfall to allocate the sale proceeds among creditors. After comparing the various proposals and consulting with its advisors, the Company determined that the Unsecured Ad Hoc Group's proposal was unactionable. Notwithstanding this unactionable proposal, the Company continued to discuss its path forward with the Unsecured Ad Hoc Group up until the days leading up to the Petition Date in an effort to obtain an alternative proposal, either on a standalone basis, in conjunction with Deerfield, or with a third party. At the same time, in January 2024 the Debtors and Deerfield began negotiating the TSA in earnest to satisfy the milestone under the Second Supplemental Indenture.

### The TSA

13. After several months of arms-length and good faith negotiations with stakeholder groups that included the production of extensive diligence to, and several meetings with, Deerfield and the Unsecured Ad Hoc Group, on February 13, 2024, the Debtors and approximately 78 percent of the holders of the 2028 Senior Secured Notes entered into the Transaction Support Agreement (including all exhibits attached thereto, the "TSA"). The TSA contemplated that, with the support of Deerfield, the Debtors would initiate these chapter 11 cases. Absent a chapter 11 filing, the Debtors believed they would have imminently tripped the $150 million minimum liquidity covenant in the operative indenture, which Deerfield indicated they were unwilling to waive. The TSA further contemplated the continuance of the

6

Debtors' prepetition marketing efforts in chapter 11 to sell their businesses through a court-overseen sale and auction process designed to maximize value for the Debtors' businesses, and the terms of the subsequent allocation of sale proceeds pursuant to a plan confirmation process.

14. Notably, after arms-length and good faith negotiations Deerfield agreed to a classification scheme and allocation of proceeds under the TSA that provided for (i) its subordination to the payment of the administrative costs of these chapter 11 cases and priority tax claims (currently estimated to be $64.8 million) and wind-down costs (currently estimated to be $13-15 million); and (ii) its uncapped subordination providing for full payment to all general unsecured creditors at all Debtors other than Invitae Corporation and to a Convenience Class of all general unsecured creditors at Invitae Corporation that hold a claim (or elect to reduce their claim) in an amount less than $250,000 (collectively projected to be $17.2 million in payouts). As a result of these concessions by Deerfield, the vast majority of general unsecured creditors, including many trade vendors and other operational claimants were expected to receive payment in full. However, in response to complaints raised by the Official Committee of Unsecured Creditors (the "Committee") to the priority treatment of Class 5 Subsidiary General Unsecured Creditors, the Debtors filed the Second Amended Plan, which eliminated any favorable treatment among non-Convenience Class general unsecured creditors. The Debtors negotiated with Deerfield to ensure this change was made without sacrificing any of the initially projected $17.2 million in value provided by Deerfield on a senior basis to unsecured creditors in the initial plan. Specifically, the Second Amended Plan instead features a "GUC Distribution Reserve" (estimated to be no less than $6.8 million), which provides a minimum, senior recovery to all Holders of non-Convenience Class General Unsecured Claims.

15. The TSA also preserved Deerfield's right to credit bid, which generated substantial value for the estates. At the outset of the auction, the Debtors only had one qualified bid for $180 million from Labcorp. Deerfield submitted an initial topping credit bid that caused Labcorp to ultimately increase its bid to $239 million, increasing the final headline sale price by $59 million. The Debtors allowed Deerfield's participation in the auction over the objection of the Committee, resulting in the aforementioned outcome.

16. The TSA included milestones for a sale process timeline that were negotiated and designed to allow the Debtors to move through these chapter 11 cases as quickly and efficiently as possible under the circumstances given the Company's cash burn profile. At the same time, after heavy negotiation and at the insistence of the Debtors, Deerfield agreed to a timeline that provided the Debtors sufficient time for the many parties already active in the process and afforded additional parties reasonable time to submit bids. During the sale process, the Company, and Moelis, as the Company's advisor, collectively had conversations with 70+ potential third party investors in total, including 25 and 45+ on a pre- and post-petition basis, respectively. In conjunction with the TSA negotiations, the Debtors also reached agreement with Deerfield for the consensual use of its cash collateral. The Debtors' cash-on-hand at that time was projected to be sufficient to maintain operations through the roughly five-month sale and plan confirmation process contemplated by the milestones in the TSA, and the cash collateral order and budget negotiated with Deerfield were consistent with that timeline.

17. The TSA contained certain release, exculpation, and injunction provisions effective upon consummation of the Debtors' chapter 11 plan. As described above, I understand that Deerfield has provided various concessions and contributions to these chapter 11 cases in exchange for the negotiated releases.

18. Based on my experience and involvement with the negotiations surrounding the execution of the TSA, I believe that the process through which the TSA was negotiated and executed was thorough and fair, and conducted in good faith between sophisticated parties represented by counsel. The Company and its advisors engaged with Deerfield, the Unsecured Ad Hoc Group, and third-parties over the course of several months and received multiple proposals and counterproposals from such parties. Since Moelis has been engaged by the Company, Moelis has participated in many formal and informal meetings with the Debtors' Board of Directors, individual members of the Board and key executives. The decision to enter into the TSA and commence these chapter 11 cases was the culmination of months of strategic review, including regular meetings of the Debtors' Special Committee, the Board, management, and advisors.

19. Furthermore, pursuant to the TSA, Deerfield agreed to vote in favor of the Plan, support the sale process, and allocate sale proceeds under the Plan to administrative and wind down costs of the Debtors' estates and to holders of general unsecured claims, paying all holders of general unsecured claims valued less than $250,000 in full before being entitled to its recovery. The concessions provided by Deerfield under the TSA—along with the consensual use of cash collateral consented to by Deerfield during these chapter 11 cases—supported the Debtors' entry into chapter 11, allowed the Debtors the opportunity to move expeditiously through these chapter 11 cases with sufficient funding to continue operating in the ordinary course of business, increased the headline value of Labcorp's bid by $59 million as a result of Deerfield's credit bid, and ultimately allowed the Debtors to conduct a sale process that led to material recoveries for the vast majority of its stakeholders, including unsecured creditors.

20. The Debtors have continued discussions with their stakeholder representatives throughout these chapter 11 proceedings, and have been able to extract further concessions from Deerfield for the benefit of the Debtors' unsecured creditors. This week, it is my understanding that Deerfield agreed to a proposed resolution of the outstanding dispute regarding allowance of the Class 3 make-whole claim to further enhance potential recoveries to unsecured creditors. Specifically, Deerfield will agree to (i) reduce the total $27.5 million make-whole claim by half, waiving $13.74 million, and (ii) with respect to the remaining $13.74 million claim, will allocate 25% of any recovery (*i.e.*, up to $3.44 million) to unsecured creditors by increasing the GUC Distribution Reserve. This new concession could provide general unsecured creditors up to $17.18 million in incremental consideration.

21. Ultimately, I believe the transactions contemplated by the TSA, and entering chapter 11 with the support and consent of Deerfield, provided the best path forward under the circumstances for the Debtors to continue operating their business and pursue their sale process, which culminated in a sale of the Debtors' business and a Plan for the benefit of the Debtors' stakeholders. To my knowledge and belief, the negotiations leading to execution of the TSA were arms-length, were conducted in good faith, and resulted in the transaction contemplated by the TSA and the Plan.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 18, 2024  
      New York, New York

By:    */s/ Andrew Swift*  
      Andrew Swift  
      Managing Director  
      Moelis & Company LLC