**NOT FOR PUBLICATION**

| |
|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY **Caption in Compliance with D.N.J. LBR 9004-1(b)** |
| In Re: INVITAE CORPORATION, et al., <div align=right>Debtors</div> |

Case No. 24-11362 (MBK)

Hearing Date:

Chapter 11

Judge:  Michael B. Kaplan

*All Counsel of Record*

## SUPPLEMENTAL FINDINGS OF FACT AND ANALYSIS PURSUANT TO ORDER OF REMAND, DATED JUNE 25, 2025

This matter comes before the Court on REMAND from the District Court, pursuant to Order dated June 25, 2025 ("Remand Order") , in which the District Court remanded to this Court the Order Denying the Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims  and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority, dated August 2, 2024 ("Standing Motion") ("Standing Order") and this Court's Order Confirming the Third Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code ("Plan"), dated August 2, 2024 ("Confirmation Order") (Collectively, "Orders on Appeal"). In the Remand Order, the District Court directed this Court to issue supplemental findings and analysis on the current record with respect to the Orders on Appeal.

The Court makes the following additional findings of fact and, where necessary, limited conclusions of law, intended to supplement the Court's rulings made on a preliminary basis at the

conclusion of the hearing held on July 12, 2024, with respect to the Standing Motion and such factual findings and conclusions of law recited on record following the Confirmation hearing held on July 22, 2024, and set forth at length in the Confirmation Order. The supplemental findings made herein are issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. Likewise, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## I.    Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, and June 6, 2025, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## II.    Relevant Background and Procedural History

With respect to the proceedings leading to the Orders on Appeal, this Court:

a. Entered, on June 13, 2024, the Disclosure Statement Order, among other things, approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code.

b. Set July 15, 2024, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Plan (the "Plan Objection Deadline").

c. Set July 15, 2024, at 4:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan (the "Voting Deadline").

d. Set July 22, 2024, as the date for the commencement of the Confirmation Hearing, pursuant to Federal Rules of Bankruptcy Procedure 3017 and 3018 and sections 1125, 1126, 1128, and 1129 of the Bankruptcy Code.

e. Held an evidentiary hearing on July 12, 2024, with respect to the Standing Motion at which the Court considered the objections and competing arguments offered by the Debtors, Deerfield Partners, LP ("Deerfield"), U.S. Bank, the Official Committee of General Unsecured Creditors ("Committee"), and the U.S. Trustee, and thereafter denied the Standing Motion on a preliminary basis.

f. Reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Report, the Confirmation Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments relative to Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases.

g. Held the Confirmation Hearing beginning July 22, 2024, at 9:00 a.m., prevailing Eastern Time.

h. Considered the statements and oral arguments made by counsel with respect to Confirmation of the Plan.

i. Considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing.

j. Overruled all objections to the Plan and confirmation thereof, and all statements and reservations of rights not consensually resolved or withdrawn.

k. Took judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

**III.    Supplemental Findings of Fact and Analysis**

This Court makes and issues the following supplemental findings of fact with respect to both Orders on Appeal. Inasmuch as the Court considered argument and evidence relative to the Standing Motion at both the evidentiary hearings held on July 12,2024 and July 22, 2024, the Court will reference the testimony presented and evidence submitted at both hearings, collectively. In this regard, the Court notes that it heard testimony (through written declarations and cross/redirect examinations) of the following witnesses at the six-hour, July 12,2024 hearing:

- David Dunn, Principal at Province, LLC, financial advisor for the Committee

- Randy Scott, a Co-founder and Chairperson of Invitae

- Jill Frizzley, an independent director

- Terence Fox-Karnal, a partner at Deerfield

Additionally, the Court admitted into evidence over two hundred (200) exhibits at the hearing. Likewise, at the Confirmation Hearing held on July 22, 2024, the Court considered approximately three hundred (300) exhibits and heard testimony (through written declarations and cross/ redirect examinations) of the following relevant witnesses:

- David Dunn, Principal at Province, LLC, financial advisor for the Committee

- Jill Frizzley, Invitae's independent director

- Randy Scott, a Co-founder and Chairperson of Invitae

- Ana Schrank, Invitae Chief Financial Officer ("CFO")

- Andrew Spirito, Managing Director of FTI Consulting

- Andrew Swift, Managing Director of Moelis & Company

In making the findings previously placed on record, as well as the supplemental finding below, the Court relies extensively on the testimony of Jill Frizzley, the independent director, Randy Scott, Co-founder and Chairperson of Invitae, Ana Schrank, the Invitae CFO, and Andrew Swift of Moelis & Company. All these witnesses were highly credible, persuasive and comprehensive in their testimony and detailed explanations as to the underlying exercise of business judgment by Debtors' management and their professionals in (1) electing to pursue the Transaction Support Agreement ("TSA") transaction with Deerfield, in lieu of costly and uncertain litigation, and (2) opting to grant the Debtor Releases of claims against certain members of management and stakeholders. As such, the Court makes the following supplemental findings, bottomed primarily upon the unrebutted and credible testimony of these witnesses and exhibits placed into evidence:

## A.  Standing Motion

1.  In the Spring of 2022, Invitae's Board hired experienced independent advisors to address the Company's potential liquidity issues. *Declaration of Randy Scott ("Scott Decl.")* ¶¶ 17-23, ECF No. 736.  Invitae engaged J. Wood Capital ("J. Wood") and Perella Weinberg Partners ("Perella") for advice on potential restructuring opportunities with creditors that would extend the Company's nearest-term debt maturities, and in particular the 2024 Unsecured Notes. *Board Minutes dated October 13, 2022*, admitted into evidence as DX-

35.[1] In late summer 2022, Invitae engaged Goldman Sachs to hold additional discussions with Invitae's creditors regarding potential transactions involving the 2024 Unsecured Notes and/or 2028 Unsecured Notes, with the primary goal of addressing the maturities that were coming up in 2024. *Scott Decl*. at ¶ 30. At the same time, Invitae sought additional capital to increase its cash runway toward profitability. *Board Minutes dated February 25, 2023*, DX-055.

2. Throughout January and February of 2023, Invitae and its advisors continued to evaluate creditors' interest in potential transactions involving their outstanding debt. *Finance Committee Minutes dated February 10, 2023*, DX-049. Addressing the 2024 debt maturity overhang remained at the forefront of the Company's priority list. *Presentation to Invitae Board dated January 26, 2023*, DX-044. By early 2023, Deerfield had provided the only actionable proposal that would adequately address this issue without unnecessarily exorbitant shareholder dilution—what would come to be known as the "March Exchange". *Id.* In evaluating a potential debt exchange transaction with the 2024 Unsecured Noteholders, the Invitae board of directors ("Board") formed the Pricing Committee, which had the power to negotiate the terms and conditions of a potential transaction. *See Scott Decl*. at ¶ 37; *see also Presentation to Pricing Committee dated February 28, 2023*, DX-058.

3. In February 2023, the Company Board and its Pricing and Finance Committees engaged in a robust governance process, holding eight meetings to consider transaction alternatives from unsecured noteholders and ultimately to finalize the March Exchange terms in a manner that was most beneficial to the Company's stakeholders. *Scott Decl*. ¶¶ 38-43. Third-party advisors from J. Wood were present at a number of these meetings and engaged

---

[1] Citations to documents with a "DX" prefix refer to documents admitted into evidence at the Confirmation Hearing.

in detailed discussions regarding terms for the potential transaction. *Finance Committee Minutes dated February 10, 2023*, DX-049; *Board Minutes dated February 25, 2023*, DX-055)

4.  On February 28, 2023, after extensive discussions and negotiations, Invitae entered into the March Exchange. *See Scott Decl.* at ¶ 41. Through the March Exchange, Invitae exchanged $305.7 million of 2024 Unsecured Notes for $275.3 million of 4.5% Series A Convertible Senior Secured Notes due March 2028 and 14.2 million shares of common stock, and issued and sold to the participating 2024 Unsecured Noteholders $30 million of the 4.5% Series B Convertible Senior Secured Notes due March 2028 (collectively with the Series A Notes, the "Secured 2028 Notes," held by the "Secured 2028 Noteholders"), in exchange for cash. *See Declaration of Ana Schrank in Support of First Day Motions ("Schrank First Day Decl.")* ¶ 7, ECF No. 21, DX-077.

5.  Notwithstanding Invitae's efforts to restructure its balance sheet, manage its liabilities, and purse a level of profitability, the Company continued to face financial headwinds. *Schrank First Day Decl.* at ¶ 8. On September 1, 2023, Invitae retained Moelis & Company ("Moelis") to assist with certain investment banking services in connection with any potential financing and restructuring. *Id*. On September 22, 2023, Invitae retained Kirkland & Ellis LLP ("K&E") as restructuring counsel to assist further with these restructuring efforts. *Id*. at ¶ 71. On September 26, 2023, Invitae expanded the scope of services of another one of its outside advisors, FTI Consulting, Inc. ("FTI") to develop long-range financial projections and related scenario analyses. *Id*. FTI also supported operational decision-making, due diligence for a sales process, and contingency planning for a possible restructuring and other various strategic alternatives. *Id*.

6. On September 23, 2023, the Board established a special committee, charged with the responsibility to explore restructuring options ("Special Committee"). *Schrank First Day Decl*. at ¶ 8, n.2.  Upon its appointment, the Special Committee immediately began evaluating potential restructuring alternatives. *Id*. at ¶ 8. On October 23, 2023, the Company executed an agreement with Jill Frizzley, an experienced board member with experience in restructuring and the healthcare industry, to serve as an independent advisor. *Declaration of Jill Frizzley* ("*Frizzley Decl*.") ¶ 7, ECF No. 735. Thereafter, on December 7, 2023, Ms. Frizzley was appointed to the Board as an independent director and made a member of the Special Committee. *Id*. at ¶ 9.

7. Ms. Frizzley testified that she is the President of Wildrose Partners, LLC, where she has worked since 2019. Ms. Frizzley provides independent director, fiduciary, governance, restructuring, and other corporate consulting services. Ms. Frizzley also provides specialized counsel to executives and boards of directors on fiduciary duties, corporate and board governance, and turnaround management planning. *Frizzley Decl*. at ¶ 4.

8. The record reflects that Ms. Frizzley has over two decades of expertise focusing on corporate governance, corporate restructurings, bankruptcies, mergers and acquisitions, and bank finance. She has served as an independent director on more than 60 boards of companies of various industries from cryptocurrency to aerospace, fintech, and fitness. She has served previously on independent and special committees in connection with (a) sale and recapitalization processes, (b) bankruptcy and restructuring investigations, (c) chapter 11 filings, and (d) other corporate restructuring efforts. As an independent director, Ms. Frizzley has been involved with and/or directed approximately 15 investigations in connection with a chapter 11 or potential chapter 11 filings. *Frizzley Decl*. at ¶¶ 5, 6.

9.  As noted, Ms. Frizzley was engaged first by Invitae on as an independent advisor. Prior to this engagement, she had no relationship with Invitae or with the Debtors' largest secured creditor (Deerfield). At the time of the engagement, she understood that she would be conducting an independent investigation into potential estate claims and causes of action. Subsequently, on October 18, 2023, the Special Committee authorized the commencement of such an investigation. *Frizzley Decl.* at ¶ 8.

10. Upon becoming an advisor to Invitae, Ms. Frizzley directed and oversaw an independent investigation into possible claims and causes of action that may be held by the Debtors. No other Board member or member of the Special Committee was involved in the investigation. The investigation focused on reviewing the factual and legal bases for potential claims arising from certain transactions within a two-year lookback period. In particular, she investigated: (1) the March Exchange involving, among other things, the exchange of certain unsecured notes due in 2024 for the Secured 2028 Notes; (2) the August 2023 exchange transaction involving the exchange of unsecured notes due in 2024 for Invitae equity and additional secured notes due in 2028; (3) certain acquisitions and divestitures, and (4) a related party transaction involving Invitae's investment in Genomic Life. The potential claims that she investigated relative to such transactions included breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent transfer, and breach of fiduciary duty. *Frizzley Decl.* at ¶ 11.

11. When Ms. Frizzley began the investigation, she directed K&E to obtain company books and records so that she could determine the scope of the investigation and analyze the transactions that would be the subject of any investigation. K&E collected copies of Invitae's public filings, board materials, and emails from relevant custodians and spent

hundreds of hours reviewing these documents and conducting targeted email searches. Throughout the course of the investigation, K&E would provide Frizzley with updates and analysis on its review of the record and summaries of key documents. *Frizzley Decl.* at ¶ 12.

12.  In addition to a review of the record, Ms. Frizzley also directed K&E to conduct interviews of relevant witnesses, which included Invitae's CEO, Ken Knight, and Invitae's primary financial advisor, J. Wood, with respect to the March Exchange. In total, K&E expended approximately 600-700 hours on the investigation, and the investigation remained open until the Invitae's entry into the Transaction Support Agreement (the "TSA") on February 13, 2024. *Frizzley Decl.* at ¶¶ 13-15.

13. The Board's decision ultimately to pursue the TSA and commence the chapter 11 cases was the culmination of months of strategic review, including regular meetings of the Special Committee, the Board, management, and professional advisors. During this time, the Board and Invitae's retained advisors were focused on pursuing a reorganization of the company and were exploring all options to facilitate a reorganization. When it became clear that the Invitae's existing lenders would not support a reorganization, and that a sale of the company was deemed the most value-maximizing path forward, the Board shifted its direction to pursue a sale process intended to maximize the recovery for all stakeholders. *Frizzley Decl.* at ¶ 17.

14. As a result of extensive negotiations, Deerfield agreed to a potential chapter 11 plan classification scheme and allocation of proceeds under the TSA which would provide for (i) Deerfield's subordination to the payment of the administrative costs of the chapter 11 cases and priority tax claims (estimated at the time to be $64.8 million) and wind-down

costs (estimated at the time to be $13-15 million); and (ii) its uncapped subordination providing for full payment to all general unsecured creditors at all Debtors other than Invitae Corporation and to a Convenience Class of all general unsecured creditors at Invitae Corporation holding a claim (or elect to reduce their claim) in an amount less than $250,000 (collectively projected at the time to be $17.2 million in payouts). *Declaration of Andrew Swift* ("*Swift Decl.")* ¶ 14, ECF No. 841, DX-148.

15. As a result of these commitments by Deerfield, the overwhelming majority of general unsecured creditors, including many trade vendors and other operational claimants are expected to receive payment in full. Subsequently, the Debtors filed the Second Amended Plan, which eliminated any favorable treatment among non-Convenience Class general unsecured creditors. The Debtors negotiated with Deerfield to ensure this change was made without sacrificing any of the initially projected $17.2 million in value provided by Deerfield on a senior basis to unsecured creditors in the initial plan. Specifically, the Second Amended Plan instead featured a "GUC Distribution Reserve" (estimated at the time to be no less than $6.8 million), which would provide a minimum, senior recovery to all Holders of non-Convenience Class General Unsecured Claims. *Swift Decl.* at ¶ 14.

16. Deerfield's ability to credit bid, negotiated as part of the TSA, also facilitated the recovery of approximately $60 million in additional value reflected in the increased sales price of the assets sold to Labcorp. *Swift Decl.* at ¶ 15. At the outset of the auction, the Debtors only had one qualified bid for $180 million from Labcorp. Deerfield submitted an initial topping credit bid that caused Labcorp to ultimately increase its bid to $239 million, increasing the final headline sale price by $59 million. *Frizzley Decl.* at ¶ 19. This Court finds, based on unrebutted testimony by Ms. Frizzley and Mr. Swift, that the Debtors' decision, not to

pursue litigation against Deerfield—which would have precluded such a credit bid—resulted directly in this higher bid and enhanced recovery for all stakeholders.

17. In addition, without the TSA, this Court finds that the Debtors likely would have been unable to fund the cases through the consensual use of cash collateral. *See, e.g. Swift Decl.* at ¶ 21; *Scott Decl.* at ¶ 45; *Frizzley Decl.* at ¶ 19. Absent the use of cash collateral, the Debtors would have needed to either (i) seek expensive DIP financing and a likely priming fight or (ii) engage in a costly, contested cash collateral hearing. These significant costs would have had a detrimental impact on all creditors. *Swift Decl.* at ¶ 21. In general, the Court finds that the commitments obtained through negotiations with Deerfield far exceed the speculative recovery sought by the Committee through pursuit of the costly litigation. *Id.*; *see also Frizzley Decl.* at ¶¶ 19, 21.

18. With respect to the anticipated costs to the bankruptcy estate in pursuing the potential claims, the record does not support a finding that any recovery might justify such additional costs and delays. Indeed, quite the opposite. Allowing the Committee's litigation to proceed would have precluded the substantial benefits the Debtors secured through their confirmed Plan and required an enormous outlay of funds to prosecute complex, potentially multi-year litigation. The Committee has not demonstrated that funding of this litigation could be achieved on a contingency or alternatively financed basis. The Committee's sole witness on this subject—Mr. Dunn—admitted on cross-examination that he could not identify a single law firm which has committed to undertaking the litigation on a contingency basis, including the Committee's own law firm. *See Tr. of July 9, 2024, Hrg., Cross-Examination of Mr. Dunn* 12:5 – 15:8, ECF No. 785. The Court has also factored into its analysis that any potential additional individual creditor recovery would be

minimal, given the significant dollar amount of outstanding claims that would share in such recovery.

This Court's denial of derivative standing is an exercise of its equitable powers. *See Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (granting or denying "derivative standing . . . is a straightforward application of bankruptcy courts' equitable powers."). The parties before the Court agree with respect to the applicable standard to be employed by the Court in ruling on the propriety of granting derivative standing. Derivative standing is appropriate "only when a movant has established that there is a colorable claim which exists, and that the debtor has unjustifiably refused to bring such claim." *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985).

In determining whether a debtor's refusal is unjustified, "[t]he court should weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 516 (Bankr. S.D.N.Y.). The cost-benefit analysis required under the test for derivative standing should include an assessment of the probability of success, the amount of potential recovery, and the costs of litigation. *In re STN Enters.*, 779 F.2d at 905; *In re Diocese of Camden, New Jersey*, 2022 WL 884242 at *5 (Bankr. D.N.J. Mar. 24, 2022). The party seeking derivative standing bears the burden to produce evidence to "assure [the Court] that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at *4.

In this Court's bench ruling at the conclusion of the July 12, 2025, hearing, the Court focused on the second prong of the test, to wit, whether the Debtors unjustifiably elected not to pursue the potential causes of action identified by the Committee, in favor of the robustly negotiated Transaction Support Agreement with Deerfield. This Court has undertaken a detailed "cost-benefit" analysis resting significantly on the previously referenced unrebutted and credible testimony, in evaluating justifiable refusal. The bottom-line inquiry is whether pursuing the proposed claims is likely to benefit the estate, and in doing so, this Court has considered a variety of factors such as the probability of success, anticipated financial recovery for creditors, as well as the anticipated costs, risks and delays to the administration of the bankruptcy estate. In this regard, most dispositive for this Court's analysis is the unrebutted testimony of Ms. Frizzley and Mr. Scott— together with supporting evidence—documenting the extensive investigation and review of the potential claims and various restructuring options, undertaken by the independent director, professionals, and the Board's appointed committees.

Pointing out the many hurdles to overcome in pursuing such potential claims[2], this Court denied the relief requested in the Standing Motion, ruling that the Debtors were justified in pursuing the many benefits offered through the negotiated TSA, as opposed to the costs, risks and delays attendant to prosecuting the speculative causes of action. To be clear, this Court concluded that in light of the Committee's failure to meet its burden with respect to the "justifiability" prong,

---

[2] These included, inter alia: the availability of safe-harbor defenses under Section 546(e); the availability of exculpation and indemnification rights; the factual dispute related to Invitae's solvency; risks of jettisoning a confirmable plan supported by significant stakeholders; risks and costs associated with litigation; the arms'-length nature of the pre-petition negotiations; the use of special advisors to assist and advise the Board and the Company's directors and officers in the exercise of their business judgment, including law firms Pillsbury Winthrop, Latham & Watkins, and Kirkland & Ellis, and financial advisors FTI Consulting, Compensia, J. Wood, and Perella; the use of Special Committees to advise the Board, including the use of Pricing, Compensation, and Finance Committees; the use of a disinterested director; the high threshold for overcoming director and officer business judgment decisions; the lack of any asserted breach in the underlying financial instruments; and Deerfield's noninsider status. *See Tr. of July 12, 2024 Hrg.* 6:2 – 7:20, ECF No. 793; *id.* at 8:5–16.

there was no need to address whether the proposed claims are even colorable--apart from the noted

possible defenses and litigation hurdles considered under the Court's "cost-benefit" analysis. The

Court's conclusion remains unchanged.

### B.  Confirmation Hearing – Debtors' Releases

At issue before the Court is whether the Releases contained in Article VIII of the Plan

("Debtor Releases") represent a sound exercise of the Debtors' business judgment, were negotiated

in good faith and at arm's length, and are in the best interest of the Debtors and their estates. In

ruling on this issue, this Court considers five factors, known as the *Master Mortgage* factors. *In re*

*710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014)

(citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)). The

analysis includes an inquiry into whether there is: (1) identity of interest between the debtor and

non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the

plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and

(5) payment of all or substantially all of the claims of the creditors and interest holders. *See id.*

These five factors are "neither exclusive nor conjunctive requirements," but rather guide the court

in determining the fairness of the Releases. *In re 710 Long Ridge*, 2014 WL 886433 at *14. It has

been further noted that these factors are mere "helpful guideposts," and "are not controlling." *In*

*re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del. 2018) (affirming Bankruptcy

Court's denial of standing where *Master Mortgage* guideposts were satisfied, even though "all of

the guidepost [did not] need[] to be satisfied").

This Court adopts and incorporates herein the above supplemental findings of fact, as well as

the findings of fact set forth in paragraph 45 of the Court's *Findings of Fact, Conclusions of Law,*

*and Order Confirming the Third Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated August 2, 2024 (ECF No. 913), and supplements such findings as follows:

1. An identity of interest exists between the Debtors and the parties to be released, namely the Debtors' directors and officers and the Holders of 2028 Senior Secured Notes. These stakeholders engage as critical participants in the Plan process, share a common goal with the Debtors in seeing the Plan succeed and would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan (or to participate in the Plan's ultimate implementation) without the Debtor Releases. Moreover, with respect to certain of the releases—e.g., those releasing the Debtors' current r directors and officers—there is a clear identity of interest supporting the releases because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Wind-Down Debtors and/or the Plan Administrator.

2. Holders of the 2028 Senior Secured Notes and Deerfield also were integral parties to the TSA, supported the Plan, and supported the Sale Transaction embodied in the Plan. *See Declaration of Andrew Spirito* ("*Spirito Decl.*"), ECF No. 839, DX-147. The Debtor Releases provide finality to those parties, critical to effectuating the Sale Transaction and to the wind down efforts of the Debtors, underpins the settlement and compromise of issues achieved by the Plan, maximizes value for creditors, and permits the estates to consummate the Plan. *See, e.g. Frizzley Decl.* at ¶¶ 20-21; *Swift Decl.* at ¶ 17. As a result, the Court finds that the inclusion of the Debtor Releases inures to the benefit of all the Debtors' released stakeholders, and that the Debtors, together with its directors, officers and released stakeholders plainly share an identity of interests.

3.  Likewise, the significant contributions by Debtors' directors and officers are also evident.

It is well-settled that the efforts of a debtor's management constitute a substantial

contribution. *See, e.g., In re Zenith Elecs. Corp.,* 241 B.R. 92, 111 (Bankr. D. Del. 1999)

(finding non-debtor parties had substantially contributed where (a) officers and directors

designed and implemented the operational restructuring and negotiated the financial

restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In*

*re Hercules Offshore, Inc.*, 565 B.R. 732, 758-60 (Bankr. D. Del. 2016) (holding that a

release of the debtors' officers, directors, and professionals was appropriate where the

record reflected an "intensive and thoughtful effort by management and the [s]pecial

[c]ommittee," with the advice and assistance of its hired professionals, "to respond to the

market challenges" and who "chose the option that they believed would conserve the value

of the [e]states and maximize recovery for all stakeholders, including equity holders."). In

these cases, and in addition to their day-to-day roles, the Debtors' directors and officers,

and their professionals, spent many hours preparing the Company for (and guiding the

Company through) its bankruptcy filing. *See Declaration of Ana Schrank in Support of*

*Confirmation* ("*Schrank Conf. Decl*."), ECF No. 838, DX-146. Such efforts included

assisting in the preparation of bankruptcy schedules, negotiating with stakeholders,

overseeing a communications strategy, and meeting with customers to assuage their

concerns about the bankruptcy filing, the company's financial condition, and prospects. *Id*.

at ¶ 7. Among other things, management and its retained professionals were integral in

helping to develop cash collateral budget and other cash flow forecasts; likewise,

management also engaged in prepetition negotiations with lenders, assisted in negotiations

relating to the consensual use of cash collateral, attended meetings on first day preparations

and reviewed first day pleadings, reviewed and resolved various post-petition claims, reviewed and approved statements of financial activities, schedules of assets and liabilities, and monthly operating reports, prepared for and participated in the initial Debtor interview and the section 341(a) meeting of creditors, and oversaw compliance with the U.S. Trustee's cash management requirements. *Id.*

4. Additionally, the Court finds that the Debtors' directors and officers, together with the retained professionals, played a crucial role in the sale process as well; this included overseeing due diligence, meeting with potential purchasers, preparing for, assisting with, and attending the auction, and assisting on the integration of the Company's business with Labcorp. *Schrank Conf. Decl.* at ¶ 8. Among other things, management attended regular diligence calls and other related meetings with our advisors and potential purchasers and responded to extensive diligence requests from potential purchasers to ensure that the sale process would result in the highest and best price for the Company. *Id.* In sum, the record reflects that senior management undertook tasks relating to the Company's restructuring and sale which went well beyond ordinary, "day-to-day" responsibilities, such as negotiating with trade vendors and others, and preparing for a reduction in force. *See id.* at ¶¶ 6 – 11.

5. The aforementioned findings regarding the substantial contribution by current management and retained professionals do not extend to former directors, officers, employees and professionals, who were not associated with or retained by the Debtors at the time of the bankruptcy filing. Such individuals are to be carved out of the definition of "released parties" under the Plan.

6.   The Court further finds that the Debtor Releases were important inducements in negotiations with the Required Holders. Without the Debtor Releases, it is highly unlikely that the Required Holders would have permitted the Debtors' use of the Cash Collateral, which granted them access to approximately $142 million of liquidity to fund the Debtors' operations during the chapter 11 cases. In sum, the Debtor Releases facilitated the Debtors' restructuring. *See, e.g. Frizzley Decl*. ¶¶ 16 – 21.; *Tr. of Conf. Hrg on July 22, 2024 – Cross Examination of Ana Schrank* 11:1 – 11:8, ECF No. 877 (discussing non-monetary consideration in exchange for releases); *id. – Cross Examination of Andrew Spirito* 57:7- 14 (same); *id. – Direct Examination of Andrew Swift* at 86:22 – 87:5 (same); *id. – Cross Examination of Andrew Swift* at 93:23 – 94:5 (discussing releases as component of the TSA).

7.    More specifically, the Debtor Releases are critical to the success of the Debtors' Plan. Absent the Debtor Releases, it is highly unlikely Deerfield would have agreed to support the Plan, and highly unlikely that the TSA, the Asset Purchase Agreement, or the Plan would exist at all. As described above, the Debtors' directors and officers contributed substantial value to these chapter 11 cases and did so with the understanding that they would receive releases from the Debtors. *See, e.g. id.*; *Swift Decl*. at ¶ 17.

8.   As evidenced by the Voting Report, the Debtors' stakeholders supported the Plan. Notably, the only Voting Class accepted the Plan. *See Ex. A of Declaration of James Lee with Respect to the Tabulation of Votes* ("*Voting Report*"), ECF No. 837, DX-125.

9.   The Plan provides for meaningful recoveries for creditors, including 100 percent recoveries for over 90 percent of the Debtors' creditors. As demonstrated by the Liquidation Analysis, the ranges of recoveries for those Holders of unsecured Claims and Interests are higher

under the Plan than they would have been in a chapter 7 liquidation scenario. *See Spirito Decl*. at ¶¶ 19 – 23. The Plan maximizes value and provides meaningful recoveries for all stakeholders under the circumstances. *See id*. at ¶¶ 31 – 36. The Court defers to the business judgment exercised by Debtors' management, upon consultation with the independent director and the Debtors' professionals, that the significant benefits the Debtors received in exchange for the Debtor Releases, including full payment of the claims of over 90 percent of the Debtor's creditors, justifies the inclusion of such releases under the Plan. The Court finds the Debtor Releases under the Plan to be fair, reasonable, supported by the requisite number of creditors, and in the best interests of the Debtors' estates.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: July 7, 2025