NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>INVITAE CORPORATION, *et al.*,<br><br>Debtors. | Bankruptcy Action No. 24-11362 (MBK) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>Appellant,<br><br>v.<br><br>INVITAE CORPORATION, DEERFIELD PARTNERS, L.P., U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, and UNITED STATES TRUSTEE,<br><br>Appellees. | Civil Action No. 24-8550 (RK)<br>(CONSOLIDATED)<br><br>**OPINION**<br>**FILED UNDER TEMPORARY SEAL** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon Appellant Official Committee of Unsecured Creditors' ("Appellant" or the "Committee") appeal from (1) the United States Bankruptcy Court for the District of New Jersey's ("Bankruptcy Court") "Order Denying the Official Committee of Unsecured Creditors' Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on behalf of the Debtors' Estates, and (II) Exclusive Settlement Authority" (Bankr. ECF No. 914, "Standing Order")[1]; and (2) the

---

[1] References to "ECF No. __" refer to documents filed in this present appeal. References to "Bankr. ECF No. __" refer to documents filed in the Bankruptcy Court proceeding, *In re Invitae Corp.*, No. 24-11362 (Bankr. D.N.J.).

Bankruptcy Court's "Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Invitae Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code" (Bankr. ECF No. 913, "Confirmation Order"). (ECF No. 1; ECF No. 11, "Comm. Br.") Briefs in opposition were filed by Appellees Invitae Corp. ("Invitae" or the "Company" or the "Debtor") (ECF No. 44, "Invitae Opp."), Deerfield Partners, L.P. ("Deerfield") (ECF No. 48, "Deerfield Opp."), and U.S. Bank Trust Company, National Association, as Trustee and Collateral Agent ("U.S. Bank") (ECF No. 46, "U.S. Bank Opp.") (collectively "Appellees"). The Committee replied. (ECF No. 60, "Comm. Rep.") Pursuant to this Court's limited remand, the Bankruptcy Court issued a Supplemental Opinion relating to the Standing Order and Confirmation Order (Bankr. ECF No. 1202, "Supp. Op."), and thereafter the Committee filed supplemental briefing (ECF No. 77, "Comm. Supp. Br.").[2] The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Bankruptcy Procedure 8019. For the reasons set forth below, the Standing Order is **AFFIRMED**, and the Confirmation Order is **AFFIRMED**.

## I.   BACKGROUND

This appeal concerns two interrelated decisions issued by the Bankruptcy Court in July 2024. In the first, the Honorable Michael B. Kaplan, U.S.B.J. denied a request by the Committee to bring a derivative action against creditors and other entities for a series of purportedly fraudulent prepetition transactions. (*See* Standing Order.) In the second, the Bankruptcy Court confirmed the final Bankruptcy Plan, which contained release provisions shielding a number of individuals and entities from liability in future actions brought by the Debtor—including the very individuals and

---

[2] The Appellees stood on their prior submissions. (*See* ECF No. 75.)

entities that would have been the subject of the Committee's derivative lawsuit had it been authorized to litigate. (*See* Confirmation Order.)

As it relates to both issues, the Bankruptcy Court ruled against the Committee, who appealed on August 19, 2024. (ECF No. 1.) As provided previously herein, months of briefing followed (ECF Nos. 11, 44, 46, 48, 60). On June 25, 2025, this Court remanded the matter to the Bankruptcy Court for the limited purpose of supplementing its prior findings of fact and conclusions of law. (ECF No. 69, the "Remand Opinion".) On July 7, 2025, the Bankruptcy Court issued a twenty-paged "Supplemental Findings of Fact and Analysis Pursuant to Order of Remand." (*See* Supp. Op.) The Committee then filed a supplemental brief (ECF No. 76), and Appellees all stood on their prior submissions (ECF No. 75). The Court now addresses the Committee's appeal, informed by a complete record and a thorough explication by the Bankruptcy Court.

At this point, the factual and procedural backgrounds of this matter are well known to the parties, and thus the Court only reiterates and supplements its prior factual and procedural recitation—taken from a record spanning more than 10,000 pages—to provide additional necessary context.

### A.    FACTUAL BACKGROUND

#### 1.    Invitae's Financial Difficulties

Invitae is a medical genetics company that was founded in 2010 to "deliver[] genetic testing services, digital health solutions, and health data services." (AD0764, AD0771 ¶¶ 2, 18.)[3] After

---

[3] The record designated by Appellant is accessible at ECF Nos. 12-1 through 12-13. The record designated by Invitae is accessible at ECF Nos. 44-1 through 44-4. This Opinion cites to exhibits using pages in the record, not ECF numbers. Citations to documents filed by Appellant start with the prefix "A" and citations to documents filed by Invitae start with the prefix "AD," consistent with how the parties paginated the exhibits themselves.

years of growth, the Company made thirteen acquisitions between 2019 and 2021. (AD0787 ¶ 56.) To fund these acquisitions, Invitae entered into three primary transactions, raising a total of $1.635 billion. *First*, in 2019, Invitae issued $350 million of convertible unsecured notes—predominantly to Appellee Deerfield—set to come due on September 1, 2024 (the "2024 Unsecured Notes"). *Second*, in 2020, Invitae obtained a $135 million term loan, set to come due on June 1, 2024. *Third*, in April 2021, certain lenders purchased $1.15 billion in unsecured notes, set to come due on April 1, 2028 (the "2028 Unsecured Notes"), which were held by a wide variety of creditors. (*See* AD1330 ¶ 14; AD1332 ¶ 18; AD1376–AD1377; AD1472; AD1717.)

In 2022, facing financial and liquidity issues compounded by significant debt maturation looming on the horizon, Invitae began considering plans and proposals to address the upcoming debt maturities and other cashflow concerns. In Spring 2022, to address the Company's "potential liquidity strain," Invitae retained independent consultants J. Wood Capital and Perella Weinberg Partners to advise on potential restructuring prospects with creditors. (*See* Invitae Opp. at 6 (citing AD1332 ¶ 18).) Invitae also reviewed "no less than five proposals" and engaged in discussions with some of the holders of the 2028 Unsecured Notes. (*See* Deerfield Opp. at 6 (citing A3964–A4003).) Nothing proved successful. (*Id.*)

As 2022 turned to 2023, Invitae remained focused on "addressing the 2024 debt maturity overhang," *i.e.*, figuring out how to manage the $350 million of unsecured notes that were about to mature. (Invitae Opp. at 7.) As part of this process, Invitae's leadership, plus advisors from J. Wood, met and considered proposals with various unsecured noteholders. By February 2023, two proposals remained on the table for consideration: the first proposal would exchange *2028 Unsecured Notes* for "a mix of senior secured debt and preferred equity." (AD1341 ¶ 39.) The

second proposal—submitted by Deerfield—involved an exchange of *2024* Unsecured Notes for secured debt. (*See* AD0631.)

At a Board meeting on February 25, 2023, J. Wood advised the Board to accept the Deerfield proposal because it addressed the more pressing concern of the 2024 Unsecured Notes, rather than the less-urgent 2028 Unsecured Notes. J. Wood explained that there were "various risks" with the 2028 proposal, and "substantially greater benefit of extending the term of the 2024 [Unsecured] Notes (given their relative immediacy)." (AD0675.)

### 2.    The March Exchange

On February 26, 2023, Invitae's Board unanimously authorized an exchange of the 2024 Unsecured Notes that would come to be known as the "March Exchange."[4] (AD2171–AD2183.) The March Exchange consisted of two parts: (1) Invitae exchanged $305.7 million in 2024 Unsecured Notes for $275.3 million in Series A 2028 Secured Notes, plus more than 14 million shares of common stock; and (2) Invitae issued $30 million in Series B 2028 Secured Notes (together with the Series A 2028 Secured Notes, the "2028 Secured Notes") for cash. (A9471.) To be clear, this meant that Invitae was released of its obligation to pay back $305.7 million in 2024 Unsecured Notes that were coming due, and was now instead on the hook for approximately that same amount in *Secured* Notes that would come due in 2028. Although the new 2028 Secured Notes had a longer runway to pay back, they were also more valuable and would take priority in any future bankruptcy payout—if there were to be one.

The parties' disagreement over the motivation behind and impact of the March Exchange is central to the present appeal. According to the Committee, the transaction unfairly advantaged

---

[4] Appellant refers to this same transaction in its briefs as the "Uptier Transaction." (*See, e.g.*, Comm. Br. at 5.)

Deerfield, who was able to exchange all of its unsecured debt for secured debt to the detriment of Invitae, who allegedly gave away more than it received. (*See* Comm. Br. at 5–6.) According to Appellees, on the other hand, the March Exchange was reasonable and necessary because, based on guidance from an array of qualified third-party expert advisors, it "address[ed] the Company's most pressing problem"—the looming and fast-approaching 2024 maturities—and was designed to attempt to steady the proverbial ship and to provide some needed, immediate financial stability. (*See, e.g.*, Deerfield Opp. at 7–9; Invitae Opp. at 10–11.) At the time, Ken Knight, President and CEO of Invitae, explained in a press release, "[w]e have added $30 million in cash to our balance sheet and successfully refinanced the vast majority of our short-term obligations through 2028. With this demonstrated commitment from long-term financial investors, Invitae can focus on its goal of achieving positive cash flow and deliver on its mission . . ." (AD0396.)

### 3.    The August Exchange

Following the March Exchange, Invitae's financial situation did not sufficiently improve. In August 2023, Invitae and Deerfield entered into another "privately negotiated exchange agreement" (A4291) to "further deleverage the Company" (Deerfield Opp. at 10). This time, Deerfield exchanged approximately $17.2 million in 2024 Unsecured Notes for $100,000 in 2028 Secured Notes plus more than 15.8 million shares of the Company's common stock. (A4291.) No other parties were involved in this "August Exchange."

### 4.    Pre-Bankruptcy Measures

Regrettably, Invitae's financial picture continue to slide as the Company barreled toward restructuring and third-party sale. This prompted the Company to consider additional financing or restructuring. Toward this end, the Company retained Moelis & Company, Kirkland & Ellis, and FTI Consulting, Inc. to provide counsel and advice in various financial, legal, and accounting

capacities. (*See* AD0792 ¶ 71.) Invitae's Board also established a Special Committee to "evaluate strategic alternatives." (AD0766–AD0767 ¶ 8 & n.2.) The Company appointed Jill Frizzley, "a disinterested director with restructuring expertise" to the Board of Directors and to the Special Committee. (*Id.* ¶ 8.) In January 2024, the Company made retention payments to key executives to ensure they remained with Invitae through a sale and restructuring process. (AD1347 ¶ 48.)

## B. BANKRUPTCY PROCEEDINGS

On February 13, 2024, Invitae filed a voluntary petition for Chapter 11 bankruptcy. (*See* Bankr. ECF No. 1.) On March 1, 2024, the United States Trustee appointed the Official Committee of Unsecured Creditors pursuant to Section 1102 of the United States Bankruptcy Code. (Bankr. ECF No. 131); *see* 11 U.S.C. § 1102(a)(1) ("[A]s soon as practicable . . . the United States trustee shall appoint a committee of creditors holding unsecured claims[.]"). Invitae filed its proposed Chapter 11 plan on May 9, 2024. (*See* Bankr. ECF No. 471; A0600–A0653.)

### 1. The Transaction Support Agreement

On the same day Invitae filed for bankruptcy, it entered into a Transaction Support Agreement ("TSA") with Deerfield wherein Deerfield agreed to subordinate its secured claims to a group of small, unsecured claims in Invitae's bankruptcy. (*See* A4360.) The TSA, *inter alia*, set forth that holders of unsecured claims "in the amount less than $250,000" and unsecured claims involving Invitae's subsidiaries would be paid first in full and in cash; then holders of 2028 Secured Note claims would be paid their *pro rata* share of the distributable value of the Debtor; and finally, holders of the 2028 Unsecured Notes would receive whatever was left. (*See* A4359–A4360.) In other words, those with 2028 Secured Note claims, like Deerfield, who would typically be paid out before any unsecured creditor, would lose their preferred spot to those with small claims (known as the "Convenience Class Creditors") and to those who were unsecured creditors of

Invitae's subsidiaries (known as the "Subsidiary Unsecured Creditors"). (*Id.*) Still, creditors with

unsecured claims that fell outside the claims of the Convenience Class Creditors and Subsidiary

Unsecured Creditors would receive only what was left over after the creditors with priority were

paid out.

As part of the TSA, Deerfield also negotiated the ability to "credit bid" in an auction for

Invitae's assets. (*See* Supp. Op. at 11; *see also* AD1189 ¶ 15.) When the auction began, Invitae

received only one qualified bid for $180 million from Labcorp. (*Id.*) However, Deerfield placed a

bid higher than Labcorp's, who subsequently increased its own bid to $239 million. (*Id.*) Deerfield

effectively facilitated an additional recovery of $59 million for the bankruptcy estate as Labcorp

was selected and closed the deal. (*Id.*)

2.    The Standing Motion

On May 21, 2024, the Committee filed a motion for derivative standing (the "Standing

Motion") to commence a lawsuit aimed at unwinding the March and August Exchanges.[5] (Bankr.

ECF Nos. 526, 792; A0857–A0931, "Standing Mot.") A 72-paged, 272-paragraphed, fourteen-

count proposed Adversary Complaint (the "Proposed Complaint") was appended to the Motion.

(Bankr. ECF No. 792-1; A0933–A1009, "Proposed Compl.") Through the Standing Motion, the

Committee sought to "bring[] a series of estate claims and causes of action . . . to remedy conduct

by which the Company's officers and directors gave one group of unsecured creditors all of the

equity value of the Company's assets and attempted to leave more than $1 billion of similarly

situated unsecured creditors with nothing." (Proposed Compl. ¶ 1.) According to the Committee,

Invitae's Board knew that the March Exchange would not solve the Company's financial

---

[5] As explained further in Section III.B.1 *infra*, bankruptcy courts may confer derivative standing "upon
creditors' committees to bring actions to recover property for the benefit of the estate." *In re Centaur, LLC*,
No. 10-10799, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citing *Cybergenics Corp. v.
Chinery*, 330 F.3d 548 (3d Cir. 2003)).

problems, explaining that "if the Company needed another 10,000 feet of runway to lift the Invitae

jet off the ground, it spent all of its unencumbered value and assets to build 100 feet and a crash

pad." (*Id.* ¶ 7.)

The Proposed Complaint sought to bring causes of action on behalf of the Debtor's estate

against, *inter alia*: Deerfield; U.S. Bank (solely in its capacity as Trustee and Collateral Agent);

eight former members of the Board of Directors who approved either the March or August

Exchange, or both; four corporate Officers who had authorization to negotiate the March or August

Exchanges; five current Officers at the time of the drafting of the Proposed Complaint; and 100

unnamed John Doe defendants. (*Id.* ¶¶ 13–36.)

The Committee asserted fourteen causes of action, including constructive and actual

fraudulent conveyance as to the March and August Exchanges and certain bonus payments paid

out to executives while Invitae was on the brink of bankruptcy, as well as breach of fiduciary duty

against Invitae's directors and officers and more. (*Id.* ¶¶ 168–272.)[6] The Proposed Complaint

sought relief in the form of, *inter alia*, avoidance (*i.e.*, undoing) of the March Exchange and August

---

[6] The complete list of claims is: (1) Avoidance and Recovery of the March Exchange as a Constructive
Fraudulent Conveyance (against U.S. Bank, Deerfield, and John Does); (2) Avoidance and Recovery of the
March Exchange as an Actual Fraudulent Conveyance (against U.S. Bank, Deerfield, and John Does);
(3) Avoidance and Recovery of the August Exchange as a Constructive Transaction (against Deerfield);
(4) Avoidance and Recovery of Constructive Fraudulent Conveyance in Relation to Guarantees and Liens
of the Debtor Subsidiaries (against U.S. Bank); (5) Breach of Fiduciary Duty (against Directors and
Officers); (6) Aiding and Abetting Breach of Fiduciary Duty (against Deerfield); (7) Avoidance and
Recovery of Unperfected Security Interest in Unencumbered Accounts (against U.S. Bank); (8) Avoidance
and Recovery of Unperfected Security Interest in the Unencumbered Commercial Tort Claims and Proceeds
Thereof (against U.S. Bank); (9) Declaratory Judgment Regarding the Unencumbered Accounts and
Unencumbered Commercial Tort Claims (against U.S. Bank); (10) Avoidance and Recovery of Preferential
Transfers of Bonus Payments (against eight individual Defendants); (11) Avoidance and Recovery of
Constructive Fraudulent Conveyance of Bonus Payments (against eight individual Defendants);
(12) Disallowance of Claims (against Deerfield, U.S. Bank, eight individual Defendants, and John Does);
(13) Declaratory Judgment Regarding Right to Setoff (against Deerfield, Directors, and Officers); and
(14) Avoidance and Recovery of Constructive Fraudulent Conveyance of Consent Fees (against Deerfield).
(Proposed Compl. ¶¶ 168–272.)

Exchange; disgorgement of compensation; avoidance of all bonus payments and consent fees; and damages, including costs and interest. (*Id.* at 71–72.)

3.    The Standing Order and Supplemental Opinion

Prompted by the filing of the Standing Motion and Proposed Complaint on May 21, 2024, the parties exchanged voluminous briefing. (Bankr. ECF Nos. 713, 720, 728, 752.) On July 9, 2024, Judge Kaplan held a six-hour hearing on the Standing Motion where he took testimony from four witnesses, as well as closing arguments from counsel. (*See* Bankr. ECF No. 785.) On July 12, 2024, Judge Kaplan issued a preliminary bench ruling denying the Standing Motion. (Bankr. ECF No. 793; A7972–A8019, "Standing Hearing," at 8:20–9:1; *see also* Supp. Op. at 3.)

Judge Kaplan noted that a bankruptcy court can only grant derivative standing "when a movant has established that there is a colorable claim which exists *and* that the debtor has unjustifiably refused to bring such claim." (Standing Hearing at 5:10–12 (emphasis added).) "The bottom line inquiry," Judge Kaplan explained, "is whether asserting such claims is likely to benefit the estate." (*Id.* at 5:13–14.) Judge Kaplan listed a variety of factors that a bankruptcy court "can and should take into account" when examining a debtor's decision to pursue litigation, including "the probability of success, anticipated financial recovery for creditors, and the cost and the risks and the delays to the administration of the bankruptcy estate." (*Id.* at 5:14–19.) This is a cost-benefit analysis "employed to determine whether the debtors' decisions or actions are justifiable." (*Id.* at 5:22–23.)

Judge Kaplan explained that in undertaking the cost-benefit analysis, he took into account "a variety of significant issues and hurdles" related to the litigation, each of which "would need to be addressed as part of the litigation in order to be successful going forward." (*Id.* at 6:12–13; 8:15–16.) The hurdles were:

1. "The potential availability of safe-harbor defenses under 546(e)";

2. "The potential availability of exculpation and indemnification rights under both Delaware law and the corporate charter and other corporate governance documents";

3. "The significant factual dispute as to whether the debtor was insolvent at the time of the relevant transactions as opposed to a hindsight analysis or consideration of subsequent events";

4. "Meaningful factual disputes as to the equivalency of the value received by the debtor from the transactions in question";

5. "The potential risks and costs to the estate in jettisoning a confirmable plan supported by significant stakeholders and potentially resulting in significant delays and distributions";

6. "The potential risks and administrative costs and delays associated with pursuing substantive litigation";

7. "The substantial size of the unsecured creditor body, taking into account the significant investment by Deerfield as well [as] relative to any possible recovery";

8. "The arm's-length nature of the negotiations pre-petition with multiple parties going back to the Spring of '22";

9. "The use of professional advisors, Special Committees, and independent directors in assisting and advising the board in the exercise as well as the [Directors & Officers] in their collective exercise of their business judgment";

10. "A high threshold for overcoming [Director & Officer] business judgment decisions";

11. "The lack of any asserted breach in the underlying financial instruments and documentation"; and

12. "In general, Deerfield's lack of control over the debtor corporation or its status—lack of status as an insider."

(*Id.* at 6:15–7:20; 8:6–8:11.)

The Bankruptcy Court found that "the Committee ha[d] failed to establish the unjustifiability of the debtors' chosen path not to bring suit." (*Id.* at 8:20–22.) On July 22, 2024, the parties participated in an all-day plan confirmation hearing before Judge Kaplan where he heard further testimony from five witnesses and officially closed the record as to the Standing Motion. (*See* Bankr. ECF No. 877; A8432–A8632.) The next day, on July 23, Judge Kaplan

finalized his ruling, explaining that none of the previous day's testimony or arguments had caused him to deviate from his preliminary ruling. (A8416 at 3:9–15.) This final ruling was further confirmed in a written order denying the Standing Motion "for the reasons stated in the Court's bench decision read into the record on July 12, 2024, and as supplemented by the Court's bench decision read into the record on July 23, 2024." (A8934.) The Bankruptcy Court reserved its right to supplement its bench decisions with a written opinion. (*Id.*)

On remand, Judge Kaplan issued the above-referenced supplemental written opinion. (*See generally* Supp. Op.) In the opinion, the Bankruptcy Court reiterated the factual and procedural history of the case, focusing in particular on the retention of outside expert consultants who provided neutral, objective advice in coordination with Invitae executives and committees prior to the decision to enter into the March Exchange with Deerfield. (*See id.* at 5–6, 9–10.) The Bankruptcy Court also detailed the comprehensive independent internal investigation that led to the decision not to pursue any debtor claims. (*See id.*)

In determining whether the Debtor was justified in choosing not to commence the legal actions as sought by the Committee, Judge Kaplan credited the testimony of Randy Scott, co-founder and Chairperson of Invitae, who described the Company's thoughtful consideration of potential transactions throughout the early months of 2023. (*Id.* at 6–7, 14.) The Bankruptcy Court noted that, when charting a course to manage debt and ultimately enter into the March Exchange, Invitae relied on J. Wood Capital, Perella Weinberg Partners, Goldman Sachs, an internal pricing committee, a finance committee, and a variety of both internal and external governance processes. (*Id.* at 5–7.)

Consistent with, but expounding upon his prior oral findings, Judge Kaplan emphasized the value of Jill Frizzley, the independent director with "over two decades of expertise focusing

on corporate governance, corporate restructurings, bankruptcies, mergers and acquisitions, and bank finance." (*Id.* at 8.) Ms. Frizzley, who "had no relationship with Invitae or with the Debtors' largest secured creditor (Deerfield)," (*id.* at 9), "directed and oversaw an investigation into possible claims and causes of action" that the debtors might have been able to bring. (*Id.*) Her thorough investigation, completed in conjunction with Invitae's counsel, the highly regarded law firm of Kirkland & Ellis, involved a review of company books and records, including board materials and emails from relevant custodians, as well as interviews of relevant witnesses such as CEO Ken Knight. (*Id.* at 9–10.) The Bankruptcy Court observed that, all told, legal counsel expended approximately 600–700 hours on the investigation. (*Id.* at 10.)

As will be set forth in greater detail hereinafter, Judge Kaplan concluded, consistent with his prior *ore tenus* decision, that Invitae was "justified in pursuing the many benefits offered through the negotiated TSA, as opposed to the costs, risks and delays attendant to prosecuting the speculative causes of action." (*Id.* at 14.) To support this conclusion, Judge Kaplan explained in writing:

> The bottom line-inquiry is whether pursuing the proposed claims is likely to benefit the estate, and in doing so, this Court has considered a variety of factors such as the probability of success, anticipated financial recovery for creditors, as well as the anticipated costs, risks and delays to the administration of the bankruptcy estate. In this regard, most dispositive for this Court's analysis is the unrebutted testimony of Ms. Frizzley and Mr. Scott—together with supporting evidence—documenting the extensive investigation and review of the potential claims and various restructuring options, undertaken by the independent director, professionals, and the Board's appointed committees.

(*Id.* at 14.)

### 4.    The Confirmation Order

The Bankruptcy Court entered an order confirming the Bankruptcy Plan on August 2, 2024. (*See* Confirmation Order; A8870–A8929, "Bankr. Plan".) Central to the second aspect of the instant appeal is Article VIII of the Plan, "Settlement, Release, Injunction, and Related

Provisions," which provided "complete settlement, compromise, and release" of certain claims in consideration for the distributions and other benefits provided by the Plan. (*See* Bankr. Plan at 42–46.) Section C of Article VIII, "Releases by the Debtors," specifically states that "each Released Party is deemed . . . released and discharged by the Debtors . . . in each case on behalf of themselves . . . and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively . . . from any and all Claims and Causes of Action . . . ." (*Id.* at 43.) The parties released pursuant to this section include, *inter alia*, each Debtor, Deerfield, U.S. Bank, and the current and former directors, managers, and officers of each of the above (together, the "Released Parties"). (*See id.* at 2 ¶ 18; 5 ¶ 53; 11 ¶¶ 135–36.)

In its Supplemental Opinion, the Bankruptcy Court made a series of factual findings and held that these Released Parties "engage[d] as critical participants in the Plan process, share[d] a common goal with the Debtors in seeing the Plan succeed, and would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan (or to participate in the Plan's ultimate implementation) without the Debtor Releases." (Supp. Op. at 16.) In so holding, the Bankruptcy Court found, in particular, that both Deerfield and the Debtors' directors and officers made substantial contributions facilitating the bankruptcy process, especially since Deerfield had helped develop the TSA and increased the price of the sale with Labcorp, and the directors and officers "spent many hours preparing the Company for (and guiding the Company through) its bankruptcy filing." (*Id.* at 17.) Ultimately, the Bankruptcy Plan— including the Debtor Releases—was confirmed notwithstanding the Committee's objection. (*See id.* at 4.)

The Bankruptcy Plan went into effect on August 7, 2024. (*See* Bankr. ECF No. 927.) On August 19, 2024, the Committee appealed.[7] (ECF No. 1.)

## II.  **LEGAL STANDARD**

A district court has appellate jurisdiction over the final judgments, orders, and decrees of a bankruptcy court. 28 U.S.C. § 158(a)(1). A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *See In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995) (quoting former Fed. R. Bankr. P. 8013); *see also In re Great Atl. & Pac. Tea Co., Inc.*, No. 14-4170, 2015 WL 6395967, at *2 n.1 (S.D.N.Y. Oct. 21, 2015) (explaining that although Fed. R. Bankr. P. 8013 was removed in the new Federal Rules of Bankruptcy Procedure, "logic still compels the same conclusion with respect to the appellate powers of the District Court"). The standard of review for bankruptcy court decisions "is determined by the nature of the issues presented on appeal." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 157 (D.N.J. 2005). A bankruptcy court's factual findings are reviewed for clear error. *In re Smith*, 102 F.4th 643, 657 (3d Cir. 2024). Legal conclusions, in contrast, are subject to plenary review. *See In re Gilbert*, 120 F.4th 114, 121 (3d Cir. 2024), *as amended* Nov. 1, 2024 ("We review without deference the Bankruptcy Court's legal analysis.").

Issues within the Bankruptcy Court's equitable discretion are reviewed for abuse of discretion. *In re Hechinger Inv. Co. of Del., Inc.*, No. 99-2261, 2001 WL 34368282, at *6 (D.N.J. Mar. 21, 2001) (citing *In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996)). The decision to deny derivative standing is within the Bankruptcy Court's equitable powers. *See Cybergenics Corp.*,

---

[7] Initially, the two issues on appeal were noticed under different docket numbers: the Committee appealed the Bankruptcy Court's Confirmation Order in Case No. 24-8550 and appealed the Bankruptcy Court's Standing Order in Case No. 24-8555. (*See* ECF No. 3.) The two appeals were consolidated on October 1, 2024. (ECF No. 7.)

330 F.3d at 568. Accordingly, courts apply an abuse of discretion standard to decisions denying derivative standing. *See, e.g., In re Prosser*, 469 B.R. 228, 231 (D.V.I. 2012); *In re Racing Servs., Inc.*, 540 F.3d 892, 901 (8th Cir. 2008) ("[T]he bankruptcy court's decision whether to grant a creditor derivative standing will be reviewed for an abuse of discretion"); *In re Adelphia Commc'ns. Corp.*, 371 B.R. 660, 665 (S.D.N.Y. 2007) ("Because the ability to confer derivative standing upon committees is a straightforward application of bankruptcy courts' equitable powers, the decision to confer standing is reviewed for an abuse of discretion." (cleaned up)).[8]

"This [abuse of discretion] standard is 'at root a deferential standard of review,' and the district court 'should not disturb an exercise of discretion unless there is a definite and firm conviction that the [bankruptcy] court . . . committed clear error of judgment in the conclusion it reached upon weighing the relevant factors.'" *In re Hudson's Coffee, Inc.*, No. 08-5133, 2009 WL 1795833, at *2 (D.N.J June 22, 2009) (quoting *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006)). As such, a bankruptcy court "abuses its discretion only if no reasonable person could take the view it adopted." *In re Cortuk*, No. 22-1690, 2022 WL 17361623, at *1 (D.N.J. Dec. 1, 2022) (quotation omitted) (cleaned up).

---

[8] The Committee contends that a bankruptcy court's determination of colorability in the derivative standing context must be reviewed *de novo* because "the colorability analysis, like a motion to dismiss, involves only legal questions." (Comm. Rep. at 11.) Here, the Bankruptcy Court did not undertake a colorability evaluation, and, as discussed *infra*, did not need to. No additional discussion is warranted.

## III.  DISCUSSION

On appeal, the Committee challenges the Bankruptcy Court's Standing Order and Confirmation Order.[9]

### A. STANDING ORDER

The Committee first appeals the Standing Order. Specifically, Appellant contests the Bankruptcy Court's overall analysis of its Standing Motion as insufficient and asserts that some of the "hurdles" that the Bankruptcy Court relied on in its decision would not have negatively affected the putative litigation. (*See generally* Comm. Br. at 13–25; *see also* Comm. Supp. Br. at 1.)

### 1.  Derivative Standing

Generally, the trustee of the debtor has a fiduciary duty to "maximize the value of the bankruptcy estate," which potentially includes bringing avoidance actions against third parties under certain circumstances. *See Cybergenics Corp.*, 330 F.3d at 573. By the terms of the Bankruptcy Code itself, this duty—and by extension, the ability to bring an avoidance action on behalf of the debtor—does not extend to other creditors. *See id.*; *see also In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 423 (2d Cir. 2008) ("The Bankruptcy Code does not expressly authorize committees or individual creditors—in contrast to trustees and debtors-in-possession—to sue on behalf of an estate."). But "[t]his situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor—really, the debtor's management—bears a fiduciary duty to avoid fraudulent transfers that it itself made." *Cybergenics Corp.*, 330 F.3d at 573. Indeed, "[d]ebtors sometimes lack the inclination, or the means, to bring

---

[9] In its June 26, 2025 opinion, the Court rejected the Appellees' argument and ruled that the subject appeal is not equitably moot. (*See* Remand Opinion at 12.)

actions that should be prosecuted." *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005.)

This is where derivative standing comes in, providing a "critical safeguard against lax pursuit of avoidance actions." *Cybergenics*, 330 F.3d at 573. As a result, "bankruptcy courts can confer derivative standing upon creditors' committees to bring actions to recover property for the benefit of the estate." *Centaur, LLC*, 2010 WL 4624910, at *4 (citing *Cybergenics*, 330 F.3d at 548). However, the decision to grant derivative standing is "uncommon" and "'the exception rather than the rule.'" *In re DeCurtis Holdings, LLC*, No. 23-10548, 2023 WL 5274925, at *4 & n.43 (Bankr. D. Del. Aug. 14, 2023) (quoting *In re Merritt*, 711 F. App'x 83, 86 (3d Cir. 2017) and citing *In re Airocare, Inc.*, No. 10-14519, 2011 WL 2133526, at *1 (Bankr. E.D. Va. May 24, 2011) ("The Bankruptcy Code does not expressly permit such parties to initiate adversary proceedings. Derivative standing is thus an implicit exception to the 'general rule' whereby the Bankruptcy Code assigns to the trustee or debtor-in-possession 'the privilege of prosecuting' various actions on behalf of the estate." (cleaned up))). The party seeking derivative standing bears the burden of proof. *In re Diocese of Camden, N.J.*, No. 20-21257, 2022 WL 884242, at *4 (Bankr. D.N.J. Mar. 24, 2022); *In re MRPC Christiana, LLC*, No. 18-26567, 2019 WL 6652237, at *10 (Bankr. D.N.J. Dec. 5, 2019) ("It is the creditor's burden in the first instance to demonstrate it satisfies the[] prerequisites for derivative standing.").

In determining whether to grant a creditor committee derivative standing, courts have employed various formulations[10] of the test articulated in *In re STN Enterprises*: *first*, whether the

---

[10] *See, e.g., Diocese of Camden, N.J.*, 2022 WL 884242, at *4 (stating that courts "generally consider four elements: (1) a demand has been made upon the statutorily authorized party to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate, if successful, exists based on a cost-benefit analysis performed by the court; and (4) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case" (citations omitted)); *DeCurtis Holdings LLC*, 2023

committee has "present[ed] a colorable claim or claims for relief that on appropriate proof would

support a recovery," and *second*, whether the debtor "unjustifiably failed to bring suit." 779 F.2d

901, 905 (2d Cir. 1985).[11] The second element is a cost-benefit analysis and requires the court to

"assure itself that there is a sufficient likelihood of success to justify the anticipated delay and

expense to the bankruptcy estate that the initiation and continuation of litigation will likely

produce." *Id.* at 906; *see also Diocese of Camden, N.J.*, 2022 WL 884242, at *9 ("It is appropriate

to perform a cost-benefit analysis."). Indeed,

> even if the proposed actions represent colorable and beneficial claims against the
> [estate], the [d]ebtor might well be justified in declining to bring them if a claim
> was colorable but seemed unlikely to result in a favorable resolution. Likewise, the
> [d]ebtor might be justified in declining to bring a claim that was likely to achieve a
> favorable resolution but not one favorable enough to justify the time and expense
> of litigation and a concomitant delay in plan confirmation.

*In re Roman Catholic Diocese of Harrisburg*, 640 B.R. 59, 85 (Bankr. M.D. Pa. 2022). The cost-

benefit analysis is meant to guard against allowing standing "without any assurance that doing so

would likely lead to a net recovery for the estate." *Diocese of Camden, N.J.*, 2022 WL 884242, at

*9.

Under *STN*, a court's cost-benefit inquiry (*i.e.*, the second element of the derivative

standing test) involves a determination of the following factors: (1) "whether the action [asserting

such claim(s)] is likely to benefit the reorganization estate"; (2) "the probabilities of legal success

---

WL 5274925, at *4 (requiring a party to demonstrate that: "(a) the debtor in possession has unjustifiably
refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the
debtor in possession; (b) the moving party has alleged a colorable claim or cause of action; and (c) the
moving party has received leave to sue from the bankruptcy court"); *Centaur, LLC*, 2010 WL 4624910, at
*4 (listing the three elements as "(1) a colorable claim; (2) that the trustee unjustifiably refused to pursue
the claim, and (3) permission of the bankruptcy court to initiate the action" (citing *Yes! Ent. Corp.*, 316
B.R. at 145)).

[11] The parties agree that the *STN* test is the appropriate one to apply here. (*See* Comm. Br. at 14–15; Invitae
Opp. at 27; Deerfield Opp. at 25.) This test has been applied by the Bankruptcy Court before. *See, e.g., In
re One2One Commc'ns, LLC*, No 12-27311, 2014 WL 3882467, at *3 (Bankr. D.N.J. Aug. 7, 2014).

in the event the action is pursued"; (3) "financial recovery in event of success"; (4) "whether appointment of a trustee or another party to bring the action would be preferable;" and (5) "the cost to the estate in proceeding with the action and the terms relative to any attorneys' fees." *In re G-I Holdings, Inc.*, No. 04-3423, 2006 WL 1751793, at *11 (D.N.J. June 21, 2006) (citing *STN*, 779 F.2d at 905–06). These factors are "by no means exhaustive." *One2One Commc'ns, LLC*, 2014 WL 3882467, at *3 (quoting *Racing Servs.*, 540 F.3d at 901).

2.     The Bankruptcy Court Properly Conducted a Cost-Benefit Analysis

All parties to this appeal spill considerable ink on the underlying merits of the Committee's Standing Motion, rehashing legal arguments related to colorability, various safe harbors, hotly-contested factual discrepancies, and a variety of other issues. Here, the Court's role is to determine whether the Bankruptcy Court abused its discretion when, after undertaking a cost-benefit analysis and weighing a wide variety of factors set forth in both its oral and written opinions, it determined the Committee "failed to establish the unjustifiability of the debtors' chosen path." (*See* Standing Hearing at 8:20–22; *see also* Supp. Op. at 14 (denying derivative standing "in light of the Committee's failure to meet its burden with respect to the 'justifiability' prong").)

Taking into account both his oral findings on the record and his Supplemental Opinion, it is clear that Judge Kaplan assessed and analyzed the costs and benefits of litigation thoroughly and sufficiently. A bankruptcy court is not required to conduct a "mini-trial," but must nonetheless "examine, on affidavit and other submission, by evidentiary hearing or otherwise" whether the action is likely to benefit the estate. *See STN*, 779 F.2d at 905. Here, Judge Kaplan reviewed the voluminous briefing, including affidavits and extensive exhibits, and also presided over a days-long evidentiary hearing, where he took testimony from seven witnesses, considered approximately 300 exhibits, and heard arguments from both parties. (*See* A7634–A7848; A8435–

A8632; *see also* Supp. Op. at 3–4.) Thereafter, Judge Kaplan issued a 20-paged Supplemental Opinion that set forth in further detail the factual basis for his decision, including extensive citation to the evidentiary record and witness testimony, as well as findings of witness credibility. (*See* Supp. Op.)

Notably, the Bankruptcy Court did not make any explicit findings as to colorability; but in this posture, it did not have to. The *STN* test, indeed, all of the derivative standing tests, require that the movant prove all elements—colorability *and* unjustifiability—to authorize derivative standing. *See, e.g.*, *Diocese of Camden, N.J.*, 2022 WL 884242, at *4. As the Bankruptcy Court made clear in its Supplemental Opinion, "the [Bankruptcy] Court focused on the *second* prong of the test, to wit, whether the Debtors unjustifiably elected not to pursue the potential causes of action identified by the Committee, in favor of the robustly negotiated Transaction Support Agreement with Deerfield." (Supp. Op. at 14 (emphasis added).) Indeed, in conducting its extensive cost-benefit analysis, the Bankruptcy Court determined that "there was no need to address whether the proposed claims are even colorable—apart from the noted possible defenses and litigation hurdles considered under the Court's 'cost-benefit' analysis." (Supp. Op. at 15.)

Courts, when faced with similar multi-pronged legal tests, routinely proceed directly to address a dispositive prong which necessarily ends the inquiry—even if it is not the first prong of the test. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 670 (1984) (setting forth the two-pronged test for ineffective assistance of counsel and advising that "[a] court need not first determine [the first element] before examining [the second element] . . . If it is easier to dispose of an ineffectiveness claim on the ground of [the second element], that course should be followed"); *Marten v. Goodwin*, 499 F.3d 290, 397 (3d Cir. 2007) (applying the *Calder* effects test and explaining that "[o]nly if the [third] element of the effects test is met need we consider the other

two elements"); *Nemours Found. v. Manganaro Corp.*, 878 F.2d 98, 100 (3d Cir. 1989) (applying the collateral order doctrine test and stating "[w]e need not discuss the first and third prerequisites for the collateral order doctrine because we conclude that the second requirement . . . is not met in this case").

Assuming *arguendo* that the Committee's claims were colorable, the Committee must also prove the unjustifiability prong. *See Diocese of Camden, N.J.*, 2022 WL 884242, at *9 ("The Committee has not shown that Debtor's refusal to bring the claim is unjustified. A debtor's refusal to bring a claim is unjustifiable when the committee asserts a colorable claim *and* demonstrates such claim is likely to benefit the estate." (emphasis added)). Therefore, notwithstanding whatever a hypothetical exhaustive analysis of colorability may have yielded, Judge Kaplan's conclusion would have been the same in the end: denial of the Standing Motion on the grounds that the Committee failed its burden to demonstrate that their proposed claims would provide a benefit to the estate that outweighed the costs.

As to the *STN* factors themselves, bankruptcy courts in this Circuit routinely conduct cost-benefit analyses in the derivative standing context without making explicit findings as to the *STN* factors, let alone considering each *ad seriatim*. *See, e.g.*, *In re Pack Liquidating, LLC*, 658 B.R. 305, 336 (Bankr. D. Del. 2024) (granting derivative standing based solely on the minimal litigation cost); *In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. 651, 658 (Bankr. W.D. Pa. 2025) (citing *STN* but not discussing any of the specific factors). Nonetheless, Judge Kaplan's oral analysis and supplemental written findings are consistent with and incorporate *de facto STN*'s factors. (Supp. Op. at 13 (citing *STN*).)

As to the first factor, "whether the action is likely to benefit the reorganization estate," *see G-I Holdings, Inc.*, 2006 WL 1751793, at *11, the Bankruptcy Court identified that the Bankruptcy

22

Plan had already been supported by a number of significant stakeholders, and that to engage in litigation at this point would result in significant delays. (Standing Hearing at 6:24–7:2.) Indeed, the Bankruptcy Court concluded that "the Committee's litigation to proceed would have *precluded the substantial benefits* the Debtors secured through their confirmed Plan and [would have] required an enormous outlay of funds to prosecute complex, potentially multi-year litigation." (Supp. Op. at 12 (emphasis added).) In support of his conclusion, Judge Kaplan summarized and credited the testimony of Andrew Swift, Managing Director of Moelis and Co., who has more than twelve years of experience in investment banking, including leading complex bankruptcy and reorganization teams. (AD1183 ¶ 2.) Citing Mr. Swift, Judge Kaplan explained that Deerfield's ability to credit bid (as negotiated in the TSA) facilitated the recovery of approximately $60 million in additional value to the estate. (Supp. Op. at 11.) Clearly, foregoing this opportunity by pursuing claims against Deerfield, particularly in light of potential significant costs and delays, would be detrimental, not beneficial, to the estate.

As to the second factor, the "probabilities of legal success in the event the action is pursued," *see G-I Holdings, Inc.*, 2006 WL 1751793, at *11, the Bankruptcy Court referenced the Proposed Complaint's many potential legal hurdles including: (1) the availability of safe harbor defenses, such as that under 11 U.S.C. § 546(e); (2) the availability of exculpation and indemnification rights; (3) the "high threshold for overcoming D&O business judgment decisions;" and (4) the "lack of any asserted breach in the underlying financial instruments and documentation." (*See* Standing Hearing at 6:15–19, 8:6–9.)

To be clear, Judge Kaplan did not render a definitive legal opinion on the underlying merits of any of these hurdles. Rather, he correctly acknowledged that determining the applicability of any one of these potentially-viable hurdles to litigation would be costly, fact-intensive, and

prolonged. *See, e.g., In re Mallinckrodt PLC*, No. 20-12522, 2024 WL 206682, at *14 (Bankr. D. Del. Jan. 18, 2024) ("Generally, determinations under Section 546(e) require fact-intensive determinations that are not appropriate for resolution at the motion to dismiss stage."). Moreover, this safe harbor provision is a highly litigated, unsettled area of law. In fact, the precise contours of the safe harbor are still being debated in courts across the country. *See, e.g.*, Oscar Garza, Douglas Levin & Matthew Bouslog, *The Current State of Play: The Bankruptcy Code "Safe Habor" After* Merit Management, 30 Norton J. Bankr. L. & Prac. 212, 216 (2021) (reviewing recent caselaw and concluding that the interpretation of terms in the § 546(e) context like "financial institution" and "financial participant" "remain unsettled").If applicable, as determined through a likely drawn-out legal slog, the Section 546(e) safe harbor might blunt the success of the Committee's contemplated constructive fraudulent transfer claims. *See, e.g., Merrit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 371, 379 (2018); *In re National Forge Co.*, 344 B.R. 340, 369 (W.D. Pa. 2006).

As another example, even the Committee itself appears to recognize that the potential availability of exculpation rights under Invitae's Certificate of Incorporation (*see* AD0759, art. VIII § A), might be an obstacle to *some* of the Committee's proposed claims against Invitae's directors, as not *all* of the proposed claims would be affected. (*See* Comm. Br. at 18–19 (noting, *inter alia*, the exculpation provision "applies to *directors*, not officers" and "applies to *monetary remedies*") (emphasis added).) Indeed, the Committee's seeming acknowledgment proves Judge Kaplan's point: the exculpation of Invitae's directors in certain instances would be a barrier to the Committee's swift and complete recovery.

In addition to accounting for these various legal hurdles to the litigation, the Bankruptcy Court cited the "unrebutted" testimony of the highly-experienced, credentialed independent

director, Ms. Frizzley, who exhaustively investigated (1) the March Exchange, (2) the August Exchange, (3) "certain acquisitions and divestitures," and (4) a "related party transaction." (Supp. Op. at 9.) The Bankruptcy Court explicitly credited Ms. Frizzley's testimony, finding her to be "highly credible, persuasive, and comprehensive," based on her two decades of experience providing "independent director, fiduciary, governance, restructuring and other corporate consulting services . . . to executives and boards of directors on fiduciary duties, corporate and board governance, and turnaround management planning." (*Id.* at 5, 8.) Ms. Frizzley's expertise stemmed from her service on "more than 60 boards of companies of various industries" and her deep involvement with "approximately 15 investigations in connection with [] chapter 11 or potential chapter 11 filings." (*Id.* at 8.) Ms. Frizzley's credibility was further bolstered by her independence, as she had no prior relationship with either Invitae or Deerfield. (*Id.* at 9.)

The Bankruptcy Court made much not only of Ms. Frizzley's extensive experience and qualifications, but also her fulsome investigation into the potential claims the Committee ultimately sought to pursue, including breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent transfer, and breach of fiduciary duty. (*Id.*) The Bankruptcy Court detailed Ms. Frizzley's investigation: first, she directed Kirkland & Ellis to "obtain company books and records," including public filings, board materials, and relevant emails, so she could determine the scope of the investigation and analyze the subject transactions. (*Id.*) Next, she directed Kirkland & Ellis to conduct interviews of witnesses, including Invitae's CEO Ken Knight and Invitae's primary financial advisor, J. Wood. (*Id.* at 10.) In turn, Kirkland & Ellis spent approximately 600 to 700 hours across four months investigating the potential claims. (*Id.* at 9–10.)

Following Ms. Frizzley's independent investigation and subsequent presentation of her findings to the Board (*see* A716), the Debtor decided not to pursue any claims, and instead entered

into the TSA. (*Supp. Op.* at 10.) As Judge Kaplan aptly summarized, "[t]he Board's decision ultimately to pursue the TSA and commence the chapter 11 cases was the culmination of months of strategic review, including regular meetings of the Special Committee, the Board, management and professional advisors." (*Id.*) Given the "possible defenses and litigation hurdles" outlined above (*see also id.* at 14), and the Board's execution of the TSA following Ms. Frizzley's investigation, Judge Kaplan did not abuse his discretion by discounting the probability of success of the proposed claims relative to the "costs, risks, and delays attendant to prosecuting the speculative causes of action." (*Id.* at 14.)

Turning to the third *STN* factor, "financial recovery in the event of success," *see G-I Holdings, Inc.*, 2006 WL 1751793, at *11, Judge Kaplan found that, based on the "highly credible, persuasive[,] comprehensive" and "detailed" testimony of both Ms. Frizzley and Mr. Swift, "the commitments obtained through negotiations with Deerfield far exceed the speculative recovery sought by the Committee through pursuit of the costly litigation." (*Supp. Op.* at 12.) Here, Judge Kaplan appropriately exercised his discretion by engaging in a balancing of the facts, determining that even if the Debtor estate *could* recover from a derivative action (which certainly was not guaranteed), the expense of the litigation itself would undoubtedly be high. (*Id.*) Further, any potential recovery would have paled in comparison to the value gained through the sale to Labcorp, which Deerfield facilitated via the credit bid agreement. (*Id.*)

Relating to the fifth[12] *STN* factor, the potential cost to the estate, *see G-I Holdings, Inc.*, 2006 WL 1751793, at *11, the Bankruptcy Court considered the possibility of a protracted, expensive, uncertain litigation relative to the definitive and immediate option of a confirmed

---

[12] Judge Kaplan did not consider the fourth *STN* factor, and he did not need to. *See, e.g., In re Pack Liquidating, LLC*, 658 B.R. at 336 (granting derivative standing based solely on the minimal litigation cost).

Bankruptcy Plan pursuant to the TSA. (Supp. Op. at 12.) Relying on the testimony of David Dunn, a financial advisor to the Committee who had significant experience in serving as a fiduciary for entities created through chapter 11 liquidation plans and working with highly respected law firms to oversee fiduciary litigation (*see* A7561 at ¶¶ 4–5), the Bankruptcy Court held that the Committee had "not demonstrated that funding of [the] litigation could be achieved on a contingency or alternatively financed basis." (Supp. Op. at 12.)[13] Indeed, Judge Kaplan specifically noted that the litigation would require "an enormous outlay of funds," and the Committee had not met its burden to show otherwise. (*Id.*)

What's more, Judge Kaplan highlighted a variety of "meaningful factual disputes" that would inevitably have led to costly, extensive discovery by all parties, including the likely retention of expert witnesses on each side. For example, factual disputes as to whether Invitae was insolvent and/or exchanged equivalent value in the March Exchange strike at the very core of the Committee's constructive fraudulent transfer claims. (*See* Standing Hearing at 6:19–24); *Miller v. Mott*, No. 23-50004, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023) (noting that with respect to constructive fraudulent transfer claims, "[w]hether a debtor was insolvent at a point in time is highly fact-specific and should be based on . . . appraisals or expert testimony." (internal quotation marked omitted)); *In re Charys Holding Co., Inc.*, 443 B.R. 628, 638 (Bankr. D. Del. 2010) (noting that with respect to constructive fraudulent transfer claims, "reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process."). Here, the Bankruptcy Court accounted for an obvious fact: unraveling the complex

---

[13] The Committee's contention that it believed it might be able to secure contingency funding (*see* Comm. Supp. Br. at 1–2; *see also* A7629–A7630) misses the point; they did not meet their burden to prove that contingency funding had actually been secured. *See Pack Liquidating, LLC*, 658 B.R. at 336.

issues of insolvency and equivalency would have taken time and money that the Debtor could not afford.

At bottom, Judge Kaplan found—and no party disputes—that the litigation would result in significant delays, include high administrative costs, and require the Debtor estate to expend "considerable resources." (Standing Hearing at 6:24–7:6; Supp. Op. at 12–13.) This is exactly what Judge Kaplan was required to consider. *See G-I Holdings, Inc.*, 2006 WL 1751793, at *11 (requiring a court to consider "the cost to the estate in proceeding with the action and the terms relative to any attorneys' fees" (citing *STN*, 779 F.2d at 905–06)).

In sum, the Court will not disturb the Bankruptcy Court's thorough and well-reasoned analysis. The Court is mindful of the fact that the decision to grant derivative standing is "the exception to the rule," reserved only for the "uncommon" instances where a moving party satisfies its burden by proving that its proposed claims are colorable *and* that the debtor unjustifiably refused to bring the suit itself. *See In re DeCurtis Holdings, LLC*, 2023 WL 5274925, at *4 & n.43; *In re Diocese of Camden, N.J.*, 2022 WL 884242, at *4. Given the deferential standard of review and the Committee's high burden to show its entitlement to an exceptional "privilege of prosecution" *see In re Airocare, Inc.*, 2011 WL 2133526, at *1, the Court finds that Judge Kaplan did not abuse his discretion in denying the Committee's request for derivative standing. The Bankruptcy Court's Standing Order is **AFFIRMED**.

### B.    CONFIRMATION ORDER

The second aspect of the Committee's appeal is of the Bankruptcy Court's confirmation of the Bankruptcy Plan, and specifically its confirmation with regard to releases set forth in Article VIII, Section C of the Plan (the "Debtor Releases"). (*See* Bankr. Plan at 43–44.) The two appeals are interrelated: were the Court to reverse the Bankruptcy Court's Standing Order (and thereby

grant the Committee derivative standing), the Committee would *still* be precluded from pursuing
its proposed claims *unless* the Court *also* reversed the Bankruptcy Court's Confirmation Order
(which protects those the Committee seeks to derivatively sue). Here, having already affirmed the
Standing Order, it appears that the Court's decision on the Confirmation Order provides little to
no value to the Committee (i.e., effectively moot). Reversing the Confirmation Order would not
change the fact that the Committee is precluded from initiating any litigation, because it lacks the
derivative standing to do so. Notwithstanding, the Court considers the Bankruptcy Court's
Confirmation Order and its rationale for confirming the Bankruptcy Plan with the Debtor Releases
therein.

The Bankruptcy Plan releases any claims by the Debtor against a series of Released Parties,
including, *inter alia*, Deerfield, U.S. Bank, each party's (including Invitae's) current and former
directors, managers, officers, employees, attorneys, accountants, consultants, and other "Related
Parties." (*See* A8885–A8886.) These Released Parties overlap with the putative defendants that
the Committee seeks to sue through a derivative suit, which the Bankruptcy Court refused to
authorize, as affirmed by this Court in this Opinion.

The Bankruptcy Code permits a bankruptcy plan to provide for "the settlement or
adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C.
§ 1123(b)(3)(A); *see also In re Exide Holdings, Inc.*, No. 20-11157, 2021 WL 3145612, at *13 (D.
Del. July 26, 2021) (affirming the availability of Section 1123(b)(3)(A) releases in Chapter 11
liquidations). But this permission is not limitless. When confirming a plan with such a settlement
or compromise, "the court has the duty 'to determine that a proposed compromise forming part of
a reorganization plan is fair and equitable.'" *In re Coram Healthcare Corp.*, 315 B.R. 321, 334
(Bankr. D. Del. 2004) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry,*

*Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Where, as here, releases are granted to non-debtor

third parties, "additional factors are often relevant to determine the fairness of the compromise."

*Id.* (citing *In re Cont'l Airlines*, 203 F.3d 203, 212–14 (3d Cir. 2000)). Courts in this Circuit

consider the five factors applied in *In re Zenith Electrics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del.

1999):

> (1) an identity of interest between the debtor and non-debtor such that a suit against
>     the non-debtor will deplete the estate's resources;
> (2) a substantial contribution to the plan by the non-debtor;
> (3) the necessity of the release to the reorganization;
> (4) the overwhelming acceptance of the plan and release by creditors and interest
>     holders; and
> (5) the payment of all or substantially all of the creditors and interest holders under
>     the plan.

*In re One2One Commc'ns, LLC*, No. 13-1675, 2016 WL 3398580, at *6 (D.N.J. June 14, 2016)

(citing *Zenith*, 241 B.R. at 110 and *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937

(Bankr. W.D. Mo. 1994)).[14] "These factors are neither exclusive nor conjunctive requirements, but

simply provide guidance in the [c]ourt's determination of fairness." *In re Washington Mutual, Inc.*,

442 B.R. 314, 346 (Bankr. D. Del. 2011).[15] "Two elements are almost universally determinative":

*first*, that the "success of the debtors' reorganization bears a relationship to the release of the non-

consensual parties," and *second*, that the releasees "have provided a critical financial contribution

to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release

of liability." *See In re 710 Long Ridge Road Operating Co., II, LLC*, No. 13-13653, 2014 WL

886433, at *14 (Bankr. D.N.J. Mar. 5, 2014).

---

[14] The Court refers to these factors as the "*Master Mortgage*" factors, consistent with the parties' briefing.
*See Master Mortgage Inv. Fund, Inc.*, 168 B.R. at 937.

[15] All parties to this appeal agree that the *Master Mortgage* factors are applicable to the Debtor Releases at
issue. (*See* Comm. Br. at 26; Invitae Opp. at 48; Deerfield Opp. at 52; Comm. Rep. at 24.)

Indeed, the Bankruptcy Court in its Supplemental Opinion made factual findings as to the contributions made by Deerfield and the Debtors' directors, officers, and retained professionals in exchange for the Debtor Releases. (*See* Supp. Op. at 16–19.)[16] Judge Kaplan concluded that the Released Parties were stakeholders who "engage[d] as critical participants in the Plan process, share a common goal with the Debtors in seeing the Plan succeed and would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan . . . without the Debtor Releases." (*Id.* at 16.)

In his Supplemental Opinion, Judge Kaplan explicitly analyzed the facts through the lens of the *Master Mortgage* factors, concluding that the Debtor Releases were appropriate as to Deerfield and the "current management and retained professionals." (*Id.* at 18.) Integral to Judge Kaplan's decision was the "unrebutted and credible" testimony of Ms. Frizzley, Mr. Scott, Mr. Swift, and Ana Schrank, the CFO of Invitae, who holds an MBA and spent more than 25 years working in finance. (*Id.* at 5; *see also* AD1161 ¶ 2.) The Bankruptcy Court found each witness to be "highly credible, persuasive and comprehensive in their testimony and detailed explanations as to the underlying exercise of business judgment by Debtors' management and their professionals in . . . opting to grant the Debtor Releases of claims against certain members of management and stakeholders." (*Id.*)

Notably, in its Supplemental Opinion the Bankruptcy Court "carved out" *former* directors, officers, employees and professionals from the definition of "Released Party" in the Bankruptcy Plan, finding that those parties—"who were not associated with or retained by the Debtors at the time of the bankruptcy filing"—did not make a substantial contribution to the Debtor estate, and

---

[16] Although there are a variety of Released Parties named in the Confirmation Order, the Bankruptcy Court made findings primarily as to the "Debtors' directors and officers and the Holders of the 2028 Senior Secured Notes." (Supp. Op. at 16.) The Court's analysis, therefore, applies to these parties.

therefore were not entitled to release. (*Id.*) Accordingly, the Court now reviews the Debtor Releases as to Deerfield and the *current* "management and retained professionals."

        1.      Deerfield

Applying the *Master Mortgage* factors, and relying on the testimony of Ms. Frizzley, Mr. Swift, and Andrew Spirito, Managing Director of FTI Consulting, the Bankruptcy Court found that holders of the 2028 Secured Notes, which included Deerfield, shared an identity of interest with the Debtors because they were "integral parties to the TSA, supported the Plan, and supported the Sale Transaction embodied in the Plan." (*Id.* at 16.) As Judge Kaplan explained: "The Debtor Releases provide finality to those parties, critical to effectuating the Sale Transaction and to the wind down efforts of the Debtors, underpin[ning] the settlement and compromise of issues achieved by the Plan, maximiz[ing] value for creditors, and permit[ting] the estates to consummate the Plan." (*Id.*) The evidentiary record—to which the Bankruptcy Court cites extensively—reflects Deerfield's indispensable involvement in bringing the bankruptcy to fruition through the TSA. Indeed, as a party to the TSA, Deerfield helped set the terms of the Bankruptcy Plan, (*see id.* (citing AD1189)), which also evidences a substantial contribution to the Bankruptcy Plan. *See One2One Commc'ns, LLC*, 2016 WL 3398580, at *8.

Although Deerfield did not provide a direct cash injection into the Debtor estate during the bankruptcy proceedings, it contributed to the financial viability of the estate and, by extension, allowed for a more robust payout to the Debtor's claimants. The case of *In re rue21, Inc.*, is instructive here. 575 B.R. 314 (Bankr. W.D. Pa. 2017). In that case, the bankruptcy court found that a released party provided valuable benefit to the debtor's estate by agreeing "not to sell or transfer any interest in the [d]ebtors' stock" and accordingly "forego[ing] the benefit of claiming a worthless stock deduction on account of its equity." *In re rue21, Inc.*, 575 B.R. at 326–327.

According to the bankruptcy court, the released party had not provided a financial injection to the bankruptcy estate, but, by not selling its own interest, had "preserv[ed] approximately $80 million of net operating losses [] for the [d]ebtors' use in future years." *Id.*

Here, Deerfield submitted a bid in the sale of the Company leading up to the liquidation, which raised the sale price significantly, and by extension, allowed more claims to be paid out to creditors in the bankruptcy proceeding. (*See* Supp. Op. at 11 ("Deerfield's ability to credit bit, negotiated as part of the TSA, also facilitated the recovery of approximately $60 million in additional value reflected in the increased sale price of the assets sold to Labcorp.") (crediting the testimony of Mr. Swift); *see also* AD1189 ¶ 15 ("At the outset of the auction, the Debtors only had one qualified bid for $180 million from Labcorp. Deerfield submitted an initial topping credit bid that caused Labcorp to ultimately increase its bid to $239 million, increasing the final headline sale price by $59 million.").) Further, Deerfield and the other 2028 Secured Note creditors also agreed to subordinate their claims to the Convenience Class Creditors and Subsidiary Unsecured Creditors —accounting for 94% of total unsecured creditors—which allowed those creditors to recover in full. (*See* AD1190 ¶ 19; AD1198 ¶ 18; *see also* Supp. Op. at 10–11.)

Additionally, the written declaration of Ms. Frizzley—whose testimony the Bankruptcy Court heavily credited (*see* Supp. Op. at 5)—establishes that Deerfield provided a "substantial benefit" during the TSA process by agreeing to allow the use of its cash collateral to fund the chapter 11 cases. (*See* AD1198 ¶ 19; *see also* Supp. Op. at 19.) As Judge Kaplan explained, "the Debtor Releases facilitated the Debtors' restructuring," because without the Releases "it is highly unlikely" the Debtors would have been permitted to use the cash collateral. (Supp. Op. at 19 (relying on testimonies of Ms. Frizzley, Ms. Schrank, Mr. Spirito, and Mr. Swift).) Indeed, this ultimately provided the Debtors "access to approximately $142 million of liquidity to fund the

Debtors' operations during the chapter 11 cases." (*Id.*) As contemplated by *In re rue21*, Deerfield's multiple contributions provided significant, valuable benefits to the Debtors' Estate, even if not in the form of direct injections of cash into the estate. *See also 710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433, at \*14–16 (holding debtor releases appropriate when the released party bears a relationship to the "success" of the reorganization and that the released party provided a "critical financial contribution").

As Judge Kaplan determined, "[a]bsent the Debtor Releases it is highly unlikely Deerfield would have agreed to support the Plan, and highly unlikely that the TSA, the Asset Purchase Agreement, or the Plan would exist at all." (*Id.*) This countenanced highly in favor of confirming the Debtor Releases as to Deerfield, especially since the *Master Mortgage* factors are "guideposts" which need not all be satisfied. *See In re Millenium Lab Holdings, II, LLC*, 591 B.R. 559, 584 (D. Del. 2018) (explaining that the *Master Mortgage* factors are "not considered requirements" (quoting *710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433, at \*14)); *In re Alecto Healthcare Servs., LLC*, No. 23-10787, 2024 WL 1208355, at \*11–12 (Bankr. D. Del. Mar. 20, 2024) (finding that the factors weigh in favor of releases "on balance," despite finding that only two of the five factors weigh in favor), *aff'd* 2025 WL 961482 (D. Del. Mar. 31, 2025). Indeed, Judge Kaplan "properly canvassed the issues and, in its analysis and thorough ruling, considered the factors set forth in [*Master Mortgage*]." *In re Alecto Healthcare Servs., LLC*, 2025 WL 961482, at \*16.

2.    Directors and Officers

The Bankruptcy Court's confirmation of the Debtor Releases as to the current directors and officers fares similarly. In its Supplemental Opinion, the Bankruptcy Court found that "significant contributions by Debtors' directors and officers" warranted their inclusion as Released Parties,

because they were integral to both the bankruptcy and Labcorp sale processes. (*See* Supp. Op. at 17–18.)

As to the first *Master Mortgage* factor, the Bankruptcy Court found an identity of interest between the directors and officers and the Debtor because the Debtor would "assume certain indemnification obligations under the Plan." (Supp. Op. at 16.) In other words, were the directors and officers to be subjected to litigation, it would be the Debtor—not the individuals—who likely would be legally responsible to pay any monetary damages.

As to the second factor, the Bankruptcy Court found that the directors and officers "engaged in prepetition negotiations with lenders, assisted in negotiations relating to the consensual use of cash collateral, attended meetings on first day preparations and reviewed first day pleadings, reviewed and resolved various post-petition claims," and more. (*See* Supp. Op. at 17–18.) With regards to the sale to Labcorp, the Bankruptcy Court noted that the retained professionals "played a crucial role in the sale process as well; this included overseeing due diligence, meeting with potential purchasers, preparing for, assisting with, and attending the auction, and assisting on the integration of the Company's business with Labcorp." (*Id.* at 18.) Judge Kaplan concluded that "it is well settled" under the law that these efforts "constitute a substantial contribution" to the Debtor estate. (*Id.* at 17 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 111).)

The Committee challenges Judge Kaplan's conclusion, arguing, *first*, that Judge Kaplan misstated the law,[17] and *second*, that that "the directors and officers made *zero* contributions to the

---

[17] The Committee cites to some non-binding caselaw in support of its position. *See, e.g.*, *710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433, at *18 ("[I]t is well settled that an employee or corporate director is not entitled to claim that he has 'contributed' to a reorganization by merely performing his duties."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606–07 (Bankr. D. Del. 2001) ("[T]he officers, directors, and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").

Estates outside of post-petition work that they had already been compensated for." (Comm. Br. at 29 (emphasis added); *see also* Comm. Supp. Br. at 2.) Without question, Judge Kaplan correctly noted the many benefits that the directors and officers provided to the Debtor both pre- and post-petition, whether or not they technically constituted "critical financial contribution[s] to the debtor's plan." *See 710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433, at *14. Regardless, this *Master Mortgage* factor, like all the factors, is not dispositive—and the many other factors weigh in favor of granting the Debtor Releases.

Indeed, the remaining *Master Mortgage* factors weigh in favor of approval. As to the third *Master Mortgage* factor, and as explained above, Judge Kaplan concluded that "the Debtor Releases are critical to the success of the Debtors' Plan." (Supp. Op. at 19.) As to the fourth *Master Mortgage* factor, the "overwhelming acceptance of the plan and release by creditors and interest holders," *In re One2One Commc'ns, LLC*, 2016 WL 3398580, at *6, Judge Kaplan correctly noted that "the only Voting Class accepted the Plan." (Supp. Op. at 19; *see* A8273 (indicating that Class 3, the 2028 Secured Noteholders, were the only class entitled to vote); A8220 (indicating 96.39% of the value of voting Class 3 claims accepted the Plan).) Finally, as to the fifth *Master Mortgage* factor, "the payment of all or substantially all of the creditors and interest holders under the plan," the Bankruptcy Court noted that the Plan provided for "meaningful recoveries for creditors, including 100 percent recoveries for over 90 percent of the Debtors' creditors." (Supp. Op. at 19.) Indeed, although the creditors represented by the Committee did not ultimately recover under the Plan, many unsecured creditors did, including the Convenience and Subsidiary Class Creditors, and those recoveries were "higher under the Plan than they would have been in a chapter 7 liquidation scenario." (*Id.* at 19–20 (crediting testimony of Mr. Spirito).)

As Judge Kaplan summarized in his Supplemental Opinion:

> [t]he Plan maximizes value and provides meaningful recoveries for all stakeholders under the circumstances. The Court defers to the business judgement exercised by Debtors' management, upon consultation with the independent director and the Debtors' professionals, that the significant benefits the Debtors received in exchange for the Debtor Releases, including full payment of the claims of over 90 percent of the Debtor's creditors, justifies the inclusion of such releases under the Plan."

(*Id.* at 20.) This Court is mindful of the role of the *Master Mortgage* factors as mere "guideposts," and, under any standard of review,[18] concludes that the Bankruptcy Court did not err in weighing the factors and finding the Debtor Releases to be "fair and equitable." *See In re Coram Healthcare Corp.*, 315 B.R. at 334.

Accordingly, the Confirmation Order is **AFFIRMED.**

---

[18] "In reviewing the bankruptcy court's decision . . . the district court[] applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992) (quotation omitted).

## CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the Bankruptcy Court's decision to deny

the Standing Motion and **AFFIRMS** the Bankruptcy Court's decision to confirm the Debtor

Releases. An appropriate Order accompanies this Opinion.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated:</u> August 11, 2025